**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03183

REFUGIO RAMIREZ OVANDO, CAROLINE DIAS GONCALVES, J.S.T., and G.R.R., and all those similarly situated,

        Plaintiffs,

    v.

KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and ROBERT GUADIAN, in his official capacity as Director of the Denver Field Office of the U.S. Immigration and Customs Enforcement,

        Defendants.

---

**CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

1.    Militarized Immigration and Customs Enforcement (ICE) agents – often with masks, body armor, and long guns – are showing up in neighborhoods across Colorado and indiscriminately stopping and arresting people with brown skin in their mission to meet the Administration's ramped-up enforcement demands. They are going door-to-door, sweeping apartment parking lots, and confronting residents and neighbors walking near their homes or jobs. They are pulling over workers and college students going about their daily lives. ICE agents are then arresting Latine people without warrants, without probable cause, and without assessing legal status and flight risk as required by law.

2.    But immigration enforcement agents do not have unfettered authority to make warrantless arrests. Section 8 U.S.C. § 1357(a)(2) requires that an agent have probable cause to believe that the person being arrested is (1) in the United States in

violation of immigration laws and (2) likely to escape before a warrant can be obtained. This means an arresting immigration officer must make two probable cause determinations pre-arrest; otherwise, the arrest is unlawful.

3.    ICE agents are ignoring the law's clear requirement to assess flight risk before making a warrantless arrest. Instead, they are scrambling to fill arbitrary quotas set by the Administration, causing chaos and terror in neighborhoods throughout Colorado. This lawsuit seeks to enjoin Defendants' ongoing pattern and practice of flouting federal law in connection with their mass immigration arrests in Colorado.

4.    Following President Trump's second inauguration in January 2025, the Administration set out to increase immigration enforcement, even if doing so required "push[ing] the envelope" of its authority.[1]

5.    The impact of that directive is being felt across the country and our state.

6.    Federal data suggest that by early March 2025, immigration enforcement officers made nearly 23,000 arrests nationwide.[2] By the summer, that number rose to approximately 60,000.[3]

---

[1] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

[2] Albert Sun, et al., What the Data Shows About Trump's Immigration Enforcement So Far, The New York Times (Mar. 4, 2025), https://perma.cc/5SCU-P38Z.

[3] TRAC Immigration, https://perma.cc/X97P-7UMV.

7.      In Colorado alone, ICE arrested almost 2,000 people in the first half of the year.[4]

8.      In late May, the White House and the Department of Homeland Security (DHS) recast their goals as a quota: immigration enforcement agents must make 3,000 immigration-related arrests per day or face "consequences for not hitting arrest targets."[5]

9.       To reach that number, top White House aide Stephen Miller directed immigration enforcement agents to change their approach to arrests in the field. These agents, according to the White House, should no longer conduct targeted and investigation-based operations. Instead, they should "just go out there and arrest" in public spaces.[6]

10.     The Administration also encouraged immigration agents to "turn the creative knob up to 11" when it comes to enforcement, including through arrests collateral to anyone actually identified in a warrant.[7]

---

[4] Alayna Alvarez, et al., ICE Arrests of Noncriminals Spike in Colorado Under Trump, Axios (July 18, 2025), https://perma.cc/4X3N-J42B; Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have a criminal history, The Colorado Sun (July 18, 2025) https://perma.cc/Z2Z7-423D.

[5] David J. Bier, 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions, Cato Institute (June 20, 2025), https://perma.cc/SP8K-J8CR; Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RU-BJNX.

[6] Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RU-BJNX.

[7] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

11.    Agents effect these collateral arrests without the probable cause determinations that federal law requires.

12.    In the weeks following the White House's 3,000-arrests-per-day directive, daily arrests of noncitizens in Colorado increased by 300% compared to the prior year.[8]

13.    And there is no sign the Administration is slowing down. The Administration now has tens of billions of newly appropriated dollars for expanded immigration detention facilities, including tripling detention capacity in Colorado, that will provide additional incentive for Defendants to expand their illegal arrest scheme.[9]

14.    Our state's 169,000 undocumented immigrants, and hundreds of thousands more Latine Coloradans, now live in fear and at daily risk because of federal immigration agents' indiscriminate practices. ICE's arrest scheme is tearing families apart and terrorizing communities.

---

[8] Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have criminal history, The Colorado Sun (July 18, 2025), https://perma.cc/AA5D-UMUM; Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS; Ted Hassan, ICE's tactics draw criticism as it triples daily arrest target, Reuters (June 10, 2025), https://perma.cc/2TLV-DMV2.

[9] Russell Contreras, et al., ICE operations in Colorado raise legal questions, AXIOS Denver (July 7, 2025), https://perma.cc/P9WH-BJY9 (noting immigration officers' "footprint in Colorado could soon grow"); see also Dan Boyce, Two Colorado facilities eyed as possible ICE detention centers, Colorado Public Radio (June 27, 2025), https://perma.cc/94DK-LS3M; see also S. Wilson, Three new ICE detention centers reportedly planned in Colorado, Colorado Newsline (Aug. 15, 2025), https://perma.cc/6U75-TFHJ; Seth Klamann, ICE plans to open as many as three new detention centers in rural Colorado, report says, The Denver Post (Aug. 15, 2025), https://perma.cc/84WP-KMTH.

15.     The individual Plaintiffs' experiences are representative. ICE agents arrested each of them without a warrant and without any evaluation that they were likely to flee before a warrant could be obtained. If they had, they would have learned that each individual has lived in their respective communities for years, has deep family or community ties, has a long history of local employment or schooling, and presents no likelihood of escape, let alone probable cause. Plaintiffs and their families were devastated by the unlawful captures and now live every day in a heightened state of fear of again being separated.

16.     Plaintiffs respectfully ask this Court to enjoin these unlawful and harmful practices in Colorado on a class-wide basis.

## JURISDICTION AND VENUE

17.     Jurisdiction is proper and relief is available under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. §1651 (All Writs Act), and 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act).

18.     Defendants are not immune. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1298 (10th Cir. 2009); *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199, 216 (2007).

19.     Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

20.    **Plaintiff Refugio Ramirez Ovando** is a 43-year-old father who has lived in Colorado for 20 years with his wife and four U.S.-citizen children. His children attend school in the community and his family attends church together every Sunday. He is a long-tenured employee who works as a finisher in construction. On May 19, 2025, Mr. Ramirez was pulled over near his home as he was driving to work. The agents did not tell him why they had pulled him over. Instead, they arrested him without a warrant after making no inquiry into his ties to the community or otherwise evaluating his flight risk. An ICE agent later admitted that they had been looking for someone else and that Mr. Ramirez was arrested by mistake. Mr. Ramirez was detained in ICE's Denver Contract Detention Facility in Aurora, Colorado (Aurora Detention Facility) for over three months before finally securing relief in his immigration case, receiving his lawful permanent residency, and being released to return home.

21.    **Plaintiff Caroline Dias Goncalves** is a 19-year-old University of Utah college student and Dreamer who has lived in the United States since she was brought to this country at age seven. On June 5, 2025, Ms. Dias was driving along the highway from Utah to Colorado to visit a friend. Near the town of Fruita, Colorado, a Mesa County Sheriff's Office deputy pulled her over and claimed that she had been following a semitrailer truck too closely. The deputy released her with a warning, but secretly (and illegally) alerted ICE agents of Ms. Dias' whereabouts through a Signal message. ICE agents then stopped her a few miles down the highway and arrested her without a warrant

and without evaluating her flight risk. ICE agents took Ms. Dias to the Aurora Detention Facility, where she was detained for 15 days.

22.     **Plaintiff J.S.T.**[10] is a 36-year-old man and asylum seeker who has lived in Colorado for 15 years—all his adult life. For almost a decade, J.S.T. has worked for the same employer, his local restaurant and community grocery store. On February 5, 2025, federal immigration and law enforcement agents raided Whispering Pines Apartments, where J.S.T. lived, along with other locations in Aurora and the Denver metro area. ICE agents stopped J.S.T. as he was leaving the apartment parking lot to drive to his job. ICE agents arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained. ICE transported J.S.T. to the Aurora Detention Facility, where he languished for four weeks.

23.     **Plaintiff G.R.R.** is a 32-year-old father and business owner who has lived in the United States for 11 years. G.R.R. lives in Colorado Springs and works in construction. On April 27, 2025, hundreds of federal agents and immigration officers raided a nightclub in Colorado Springs where G.R.R. was waiting as a designated driver for a friend. During the raid, immigration officers arrested G.R.R. without a warrant and without evaluating his likelihood of escape before a warrant could be obtained. Officers took him to the Aurora Detention Facility, where he suffered for over six weeks.

24.     **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security, which oversees the component agencies responsible for enforcing U.S.

---

[10]  Plaintiffs J.S.T. and G.R.R seek to proceed under pseudonyms and are contemporaneously filing a motion to request that relief.

immigration law, including ICE and Customs and Border Protection. Plaintiffs sue Defendant Noem in her official capacity for declaratory and injunctive relief only.

25.    **Defendant Todd M. Lyons** is the Acting Director of ICE, an agency of the United States within DHS. Among other things, ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. Plaintiffs sue Defendant Lyons in his official capacity for declaratory and injunctive relief only.

26.    **Defendant Robert Guadian** is the Director of ICE's Denver Field Office. Plaintiffs sue Defendant Guadian in his official capacity for declaratory and injunctive relief only.

## FACTUAL ALLEGATIONS

### A.    ICE Relies on Illegal Warrantless Arrests to Meet Administration Demand

27.    Across the state, whether during individual stops or larger-scale raids of places where predominantly Latine people live, work, and socialize, ICE has stopped and arrested people without a warrant and without probable cause to believe the individuals were in the United States in violation of the law and posed a flight risk.

28.    For example, during raids of multiple apartment complexes in the Aurora and Denver metro area in early 2025, heavily armed ICE agents knocked on every door, asking tenants to provide identification and questioning tenants about their immigration status without presenting a warrant or explaining why they were there.[11]

---

[11] Janet Oravetz, et al., ICE Raids Target at least 7 Locations in Denver, Aurora, Thornton, 9 News (Feb. 5, 2025), https://perma.cc/M2GG-AVL5; Kevin Beaty, et al., ICE and Federal Agents Raid Multiple Metro Denver Apartments Early Wednesday, Denverite (Feb. 5, 2025), https://perma.cc/L9T7-ZY4K/; Sam Tabachnik, ICE Raids Hit Buildings in

29.    Tenants felt fear and terror when faced by yelling agents with guns in hand.

30.    ICE agents made several warrantless arrests of people they encountered while going door-to-door.

31.    On February 5, 2025 alone, ICE agents conducted raids in at least seven apartment complexes and communities across Denver, Aurora, and Thornton.[12]

32.    On April 27, 2025, federal immigration enforcement officers flooded a nightclub in Colorado Springs with tear gas to funnel patrons out and stop as many people as they could.[13] Without performing any flight risk analysis, these officers made warrantless arrests and filled buses with people to send to the Aurora Detention Facility.

33.    As recently as late September 2025, ICE has been active in Colorado's Front Range, mountain towns and the Western Slope, making warrantless arrests.[14]

---

Aurora and Denver; Feds Say they Targeted Tren de Aragua Gang, The Denver Post (Feb. 5, 2025), https://perma.cc/PP7W-D5TS; Allison Sherry, et al., As ICE Expands its Colorado Efforts, Many Without Criminal Records Are Caught in a Wide Net, CPR (Apr. 7, 2025), https://perma.cc/M2GT-RNBJ (describing ICE practice of arresting "people who were in the wrong place at the wrong time when ICE agents descended on an area to make targeted arrests of accused or convicted criminals also in the country without authorization"); Kevin Beaty, What we saw from inside ICE's raid at Aurora's Edge apartments, Denverite (Feb. 6, 2025), https://perma.cc/E663-K7VS; Jeffrey Cook, With ICE Agents going door-to-door in Colorado, residents are on edge: Reporter's notebook, ABC News (Feb. 7, 2025), https://perma.cc/R76C-KJDH.

[12] Janet Oravetz, et al., ICE Raids Target at least 7 Locations in Denver, Aurora, Thornton, 9 News (Feb. 5, 2025), https://perma.cc/M2GG-AVL5.

[13] Joe Hernandez, The DEA says 114 immigrants in the U.S. illegally were arrested at a Colorado nightclub, NPR News (Apr. 27, 2025), https://perma.cc/UR9V-HNUU.

[14] Ryan Fish, ICE activity reported in Colorado mountain towns, sparking community concerns, ABC News (Sept. 25, 2025),https://perma.cc/F2D8-NDHC.

34.     This increase in enforcement activity in Colorado shows no signs of stopping; instead, ICE's collateral arrests and enforcement activity in the Denver metro area outpace activity around the country.[15] Communities across the state brace for the presence of federal agents and for tactics that violate the law.

### i.     Stop and Arrest of Refugio Ramirez Ovando

35.     Plaintiff Refugio Ramirez Ovando is a 43-year-old father of four U.S.-citizen children. He has lived in Colorado for the past twenty years, currently near Grand Junction. He has worked in the construction concrete industry as a finisher and is one of the longest-tenured employees (over 18 years) at his company.

36.     Mr. Ramirez's children are all enrolled in school, and his oldest daughter is in her senior year of the prestigious International Baccalaureate program at her high school. She plans to attend college after graduation.

37.     Mr. Ramirez is an active member of his church and attends most Sundays with his family.

38.     At around 6:10 a.m. on May 19, 2025, Mr. Ramirez left his home to go to work.

39.     When Mr. Ramirez got into his car, he saw two unmarked vehicles driving on his street; both had emergency lights inside them like the kind used by law enforcement.

---

[15] Kevin Beaty, Immigration arrests have quintupled in Denver under Trump, Denverite (Aug. 20, 2025), https://perma.cc/28RQ-2XVU.

40.     One of the vehicles, a black SUV, began following him as he left his neighborhood.

41.     The second vehicle, a gray car, followed behind the black SUV.

42.     Once Mr. Ramirez left his neighborhood and reached a stoplight, the black SUV turned on its emergency lights and signaled to Mr. Ramirez to pull over.

43.     Mr. Ramirez quickly complied. Both the black SUV and the gray car parked behind him.

44.     A man wearing a vest marked "POLICE" got out of the black SUV and walked around to the driver's side of Mr. Ramirez's car.

45.     The man also had a badge marked "ICE" clipped to his pants and was visibly armed with a handgun.

46.     A man from the gray car approached the passenger's side of Mr. Ramirez's car. This agent was also dressed in civilian clothes under a tactical vest that said "POLICE" and was visibly armed.

47.     The agent from the black SUV, speaking Spanish, ordered Mr. Ramirez to turn off his car, place the keys on the dashboard, and roll down his window. He ordered Mr. Ramirez to provide identification.

48.     Mr. Ramirez handed him his valid Colorado driver's license, which showed his address in the neighborhood close by.

49.     The agent nevertheless asked Mr. Ramirez for his consular ID and passport. Mr. Ramirez replied that he did not need a consular ID because he had a driver's license and that his daughter could bring his passport. The agent said that was not necessary.

50.     The agent took Mr. Ramirez's license back to the black SUV, while the other agent continued to stand at the passenger side of Mr. Ramirez's car without speaking.

51.     The first agent came back and gave Mr. Ramirez's license to him. He asked where Mr. Ramirez was from, whether he had permission to be in the United States, and whether he had any papers to show his legal status.

52.     Mr. Ramirez stayed quiet but asked the agent if he was under arrest or free to leave. The agent continued to ask the same questions and Mr. Ramirez again remained quiet, except to ask if he was under arrest. The agent then responded, "Okay, well now you are [under arrest]." The Spanish-speaking agent opened Mr. Ramirez's driver's side car door and ordered him to get out.

53.     The agents did not have a warrant for Mr. Ramirez's arrest.

54.     The agents did not ask Mr. Ramirez any questions about his potential flight risk, including his ties to the community, how long he had lived in the United States, his employment, his family, or whether he had any criminal history.

55.     The Spanish-speaking agent handcuffed Mr. Ramirez and directed him to get into the back of the black SUV. The agent began to drive and did not tell Mr. Ramirez where they were going. While in the car, the agent asked if anyone else was at Mr. Ramirez's home. Mr. Ramirez explained that his wife and U.S.-citizen children were home.

56.     Mr. Ramirez was processed at a DHS Office in Grand Junction. While there, he was asked about where he was born and how long he had been in the United States.

He answered and explained that the very day he was arrested was his 20th anniversary of his arrival in the United States.

57.    Mr. Ramirez overheard the Spanish-speaking agent on the phone talking and laughing about the coincidence that they had arrested Mr. Ramirez on the 20th anniversary of his arrival to the United States. Mr. Ramirez felt humiliated.

58.    During the processing, one of the agents told Mr. Ramirez that he had not been the person they were originally looking for, but they arrested him anyway.

59.    At around 6:00 or 7:00 p.m., ICE agents transferred Mr. Ramirez to the Aurora Detention facility. Mr. Ramirez was detained from May 19, 2025, until August 26, 2025.

60.    During that time, some of the guards blocked detainees' phone calls, even with attorneys – and some days, Mr. Ramirez was not permitted to make calls at all.

61.    The air conditioning was often broken, and it became unbearably hot in the cells.

62.    When elected officials came to visit the facility, the facility would be cleaned and staged for those visits to make it look better than it was in reality. Mr. Ramirez experienced significant anxiety, feeling frustrated and helpless.

63.    During Mr. Ramirez's detention, his family suffered. Mr. Ramirez had been the primary earner for his family. His wife, who had stayed home to care for their children, began selling food to pay the bills. The family had to rely on the kindness of their community to provide food and donations for legal expenses. They sold a truck and borrowed money, incurring roughly $20,000 in loans and debts. Mr. Ramirez's oldest

daughter's mental health declined. She was diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, an Exfoliation Disorder, and Post Traumatic Stress Disorder during his detention. Mr. Ramirez's sons also began showing symptoms of anxiety and depression, and all of his children began attending therapy.

### ii.    Stop and Arrest of Caroline Dias Goncalves

64.    Plaintiff Caroline Dias Goncalves is a University of Utah college student who has lived in the United States since she was seven years old. She attends college on a merit scholarship.[16]

65.    On the afternoon of June 5, 2025, Ms. Dias was driving on the highway from Utah to Colorado to visit a friend and was pulled over by a Mesa County Sherriff's Office deputy. That deputy, Alexander Zwinck, stopped her in Fruita, Colorado, claiming that she followed a semitrailer truck too closely.[17]

66.    Upon Officer Zwinck's request, Ms. Dias gave him her driver's license and other necessary paperwork. Strangely, he then asked Ms. Dias to leave her own car and accompany him to his patrol car. She complied.[18]

67.    Officer Zwinck continued to interrogate Ms. Dias while she sat in the passenger seat of his patrol car. He asked her multiple questions about her road trip,

---

[16] Courtney Tanner, University of Utah student is being held at Colorado immigration detention center, The Salt Lake City Tribune (June 12, 2025), https://perma.cc/SXC6-MQN8.

[17] Courtney Tanner, University of Utah student is being held at Colorado immigration detention center, The Salt Lake City Tribune (June 12, 2025), https://perma.cc/SXC6-MQN8.

[18] McKenzie Diaz, From a road trip to ICE detention, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

including whether she had "fun plans for the weekend" and if her friend was expecting her.[19] He also asked Ms. Dias personal questions, including whether she was a college student and what she was studying. Ms. Dias shared she was studying nursing and applying for nursing school next spring. Officer Zwinck praised her plans, noting the difficulty of her career choice.

68.    At one point during the interrogation in Officer Zwinck's patrol car, he asked Ms. Dias, "Where are you from?" suggesting that she had "a bit of an accent" (she does not believe she does). Ms. Dias told Officer Zwinck, "I'm from Utah." After Officer Zwinck pressed if she was born and raised in Utah, Ms. Dias responded that she was born in Brazil and moved to Utah with her parents as a child. *Id.*

69.    Officer Zwinck assured Ms. Dias. that "everything came back good" and said he would let her go with a "warning." Officer Zwink informed her, "You're good to go, you have safe travels, OK." *Id.*

70.    Officer Zwinck then used Signal messaging to alert ICE agents about Ms. Dias' whereabouts.

71.    ICE agents stopped Ms. Dias a few miles down the highway near Grand Junction, Colorado.

72.    The agents did not wear uniforms, badges, name tags, or tactical vests.

73.    They did not show Ms. Dias any identification or provide their names.

---

[19]  Mesa County Sheriff's Office, Body Cam Footage, YouTube (June 5, 2025), https://www.youtube.com/watch?v=2IyuTMNug6E.

74.      They did not ask Ms. Dias any questions about flight risk including how long she had been in the United States, her ties to the community, if she had a fixed address, her educational history, employment, or whether she had any criminal history.

75.      ICE agents arrested her, saying she had violated U.S. immigration laws and "We're going to take you."[20]

76.      They handcuffed Ms. Dias and placed her in the passenger seat of their truck. Ms. Dias told the agents that she had her driver's license and Social Security card. They responded that she could have a Social Security card but still be "illegal" in the United States.

77.      The agents drove her to the DHS Office in Grand Junction and processed her, taking her fingerprints and asking her to sign paperwork.

78.      While she was sitting in a cell, an ICE agent told her he could not release her—even though he preferred to arrest "criminals" and she had "never caused any trouble."

79.      He explained "under this president and under this presidency, we have to arrest anyone who is not a citizen."

80.      The agents transported Ms. Dias "to a warehouse, chained her feet, and then transferred her" to the Aurora detention facility.[21]

81.      ICE imprisoned Ms. Dias at the detention facility for 15 days.

---

[20] McKenzie Diaz, From a road trip to ICE detention: Caroline Dias Goncalves story, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

[21] McKenzie Diaz, From a road trip to ICE detention: Caroline Dias Goncalves story, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

82.     She felt "scared, alone, and heartbroken."[22] In a statement following her release from the unlawful detention, she shared: "The past 15 days have been the hardest of my life."[23] She had been "placed in a system that treated [her] like [she] didn't matter." *Id.* While detained, she was "given soggy, wet food" and forced to keep "confusing schedules." *Id.* She felt like her life had been "ripped away."[24] She and other detainees were often forced to choose between going outside for recreation or eating breakfast; if they chose to go outside, food would not be saved for them. Ms. Dias met another 19-year-old woman who had been transferred to the same dormitory after receiving a death threat while in detention. This left an impression on Ms. Dias as it was so frightening.

83.     During Ms. Dias' detention, her family suffered too. A relative commented, "We can't do anything," and "We're scared. We're not in jail with her but we feel like it."[25] Ms. Dias' parents and siblings have started therapy to process their ongoing trauma related to her detention and have problems sleeping.

84.     Even after her release, Ms. Dias' detention continues to have a profound impact on her life. ICE did not give her driver's license back to her, so she must rely on friends, family, and her lawyer for transportation to appointments, school, and work.

---

[22] Nicole Acevedo, Dreamer who spent 15 days in ICE detention says she was 'scared and felt alone', NBC News (June 24, 2025), https://perma.cc/Y6QF-79FU.

[23] Statement from Caroline Dias Goncalves, TheDream.US (June 23, 2025), https://perma.cc/V659-2NE7.

[24] McKenzie Diaz, From a road trip to ICE detention, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

[25] Courtney Tanner, University of Utah student is being held at Colorado immigration detention center, The Salt Lake Tribune (June 12, 2025), https://perma.cc/SXC6-MQN8.

Ms. Dias held two jobs before she was detained and was fired from one job after her release. She had to move in with her parents because she could no longer afford rent in Salt Lake City, where she attends school. She lives an hour away from school now, which makes attending school difficult. As a result, she has moved to taking part-time classes online, which is delaying her progress in completing her degree.

85.     Ms. Dias is required to wear an ankle monitor and attend check-ins with an ICE contractor every four weeks. She has to coordinate rides to attend check-ins, which is burdensome and stressful.

86.     Ms. Dias is fearful and anxious that any issue with her ankle monitor or small mistake could result in being detained again. She struggles with insomnia and plans to start therapy.

### iii.    Stop and Arrest of J.S.T.

87.     Plaintiff J.S.T. is a 36-year-old man who has lived in Colorado for nearly all his adult life. J.S.T. has lived at Whispering Pines Apartments in Aurora for the last seven years. J.S.T. is dedicated to his family, church, and community.

88.     J.S.T. has worked at his local restaurant and grocery store for nearly a decade. His colleagues describe him as "a responsible and hardworking individual who maintains harmonious and respectful relationships with both coworkers and customers."

89.     J.S.T. is committed to improving his community and participates in various neighborhood projects and volunteer efforts. For over ten years, he has been part of a Catholic religious study group that meets monthly for Bible study. He volunteers with this

group in the larger community, working to provide free food and clothing donations to neighbors in need.

90.     Around 6:00 a.m. on February 5, 2025, J.S.T. left his apartment and, as was his routine, got into his car to drive to work.

91.     That morning, federal immigration officials and law enforcement agents in tactical gear and armored vehicles swarmed the Whispering Pines apartment complex.

92.     White vans blocked the exits to the complex's parking lot.

93.     Agents were conducting an enhanced immigration enforcement operation to meet the Administration's ramped-up arrest quotas.

94.     Whispering Pines was one of many apartment complexes immigration agents raided in the Denver metro area that day.

95.     An ICE officer stopped J.S.T. while he was in his vehicle and asked for identification. J.S.T. provided his Colorado driver's license.

96.     The officer asked J.S.T. whether he had "problems with immigration or past criminal violations." J.S.T. replied "no."

97.     The officer took J.S.T.'s driver's license to a white unmarked van and never returned it to J.S.T.

98.     The officer ordered J.S.T. to step out of his car. J.S.T. complied. Immediately after that, a second immigration officer ordered him to turn around and put his hands on the car. That officer searched J.S.T. and took his car keys, billfold wallet, and telephone, none of which he returned.

99.    The first officer, who had taken J.S.T.'s driver's license, returned a few minutes later and informed J.S.T. that he "would have to go with them."

100.    The officer zip-tied J.S.T.'s hands.

101.    The officer did not have a warrant for J.S.T.'s arrest.

102.    The officer did not ask J.S.T. any questions about his ties to the community, family, church, job at the grocery store, residence at Whispering Pines, or anything else regarding flight risk.

103.    J.S.T. asked if he could call his family. The officer refused his request and placed J.S.T., hands still bound, in a van in the parking lot.

104.    During this time, ICE officers were going door-to-door in the Whispering Pines apartment complex and knocking on the doors of many apartments.[26]

105.    ICE officers then began questioning people inside.

106.    At least eight other people from the Whispering Pines apartment complex were detained that day.

107.    The immigration officers transferred J.S.T. to a smaller vehicle for transportation, and two ICE agents took him to the ICE field office in Centennial. J.S.T. was processed at the Centennial ICE office: agents took his fingerprints and biographical information and asked him questions about his prior contacts with border patrol.

---

[26] Kevin Beaty, What we saw from inside ICE's raid at Aurora's Edge apartments, Denverite (Feb. 6, 2025), https://perma.cc/E663-K7VS (stating immigration agents "seemed to knock on every door they could find" in other Aurora-area apartment buildings targeted the same day as Whispering pines); Jeffrey Cook, With ICE Agents going door-to-door in Colorado, residents are on edge: Reporter's notebook, ABC News (Feb. 7, 2025), https://perma.cc/R76C-KJDH.

108.   ICE agents still did not ask J.S.T. about his community ties, his family, or his employment.

109.   Once J.S.T. was processed, an ICE officer chained his hands and feet together and put him on a bus for transport to the Aurora Detention Facility. While in detention, J.S.T. spoke to other people who had been detained from his apartment complex. His neighbors shared that ICE did not have arrests warrants for them, nor did his neighbors have criminal records.

110.   ICE imprisoned J.S.T. at the Aurora Detention Facility for over a month. During that time, J.S.T. was given minimal food and milk that was often spoiled. Sleeping "felt impossible" because the lights were always on, and guards were constantly pointing flashlights in J.S.T.'s face. The beds were made of metal and hard to sleep on.

111.   J.S.T. was only given two uniforms to wear, which were often dirty because they were washed only once per week.

112.   Eventually, J.S.T. was released on bond. But he has suffered and continues to suffer significant harm. J.S.T. lost his apartment and many of his belongings because he could not pay rent while he was in detention.

113.   J.S.T., his family, and his community live in constant fear due to these events. Because of the temporary living situation after losing his apartment, he cannot spend as much time taking care of his niece. J.S.T.'s niece, who has been bonded to J.S.T. her entire life, fears separation from J.S.T.

### iv.    Stop and Arrest of G.R.R.

114.    Plaintiff G.R.R. is a 32-year-old father and business owner who has lived in the United States for more than a decade. G.R.R. currently resides in Colorado Springs. He shares an apartment with his 9-year-old son ("M.R."), ex-wife and co-parent ("A.R."), both of whom are U.S. citizens.

115.    For the ten years he has lived in the United States, he has worked in construction, doing drywall, tile, flooring, and kitchen work. He now owns his own business doing the same. G.R.R. takes pride in his work and reputation.

116.    G.R.R. attends church most Sundays, and his church community is close-knit. He received many letters from his church community while he was unlawfully detained. G.R.R. cares for the well-being and safety of his friends and family.

117.    One day, G.R.R. agreed to be his friend's designated driver. In the early morning hours of April 27, 2025, G.R.R. pulled up to a nightclub in Colorado Springs to pick up his friend, so that his friend would not have to drive home after drinking. When G.R.R. arrived, his friend wasn't answering the phone, so G.R.R. went inside to look for him.

118.    Moments later, the nightclub was flooded with tear gas.

119.    Federal agents had locked the side doors from the outside of the nightclub to funnel all patrons out through the front.

120.    When G.R.R. went out the front doors, he saw law enforcement officers with bulletproof vests, helmets, and uniforms.

121.    More than 300 law enforcement officers from ICE and other agencies were on the scene and arrested more than 100 people.

122.    The armed officers were yelling and pointing assault weapons at patrons streaming out of the club trying to avoid the tear gas.

123.    G.R.R. was terrified. He had no idea what was going on. The raid was loud. There were drones in the sky. G.R.R. sought safety from the officers pointing guns by hiding under a car in the parking lot where he stayed for ten to fifteen minutes. An officer in tactical gear and pointing a long gun ordered G.R.R. to get out from under the car. G.R.R. complied.

124.    As G.R.R. stood up, the officer shoved him to the ground. When G.R.R. fell, he sliced his hand open on the ground and was in pain. The officer zip-tied G.R.R.'s injured and uninjured hands together anyway and patted him down.

125.    The officer did not ask G.R.R. any questions. He simply reached into G.R.R.'s pockets and removed his wallet and phone.

126.    The officer rifled through G.R.R.'s wallet and found a Colorado driver's permit, Colorado state identification, and a Mexican consular card. The officer kept G.R.R.'s wallet and phone. He threw them in a large bag along with belongings confiscated from others.

127.    Later, another officer took G.R.R. to an on-site EMT to look at his hand. The EMT counseled that G.R.R. "probably needed stitches." The officer disregarded the EMT's advice. Instead, he instructed the EMT to "put a Band-Aid on it." Once the EMT

bandaged G.R.R.'s injury, the officer shackled G.R.R.'s feet, handcuffed his wrists, and connected them to a chain on his waist. These restraints were painful.

128.   Up to this point, no one asked G.R.R. about his ties to the community, employment, living circumstances in Colorado Springs, or anything else to assess whether he posed a flight risk.

129.   Hours later, around 6:00 a.m., the officer took G.R.R. to a large bus bound for ICE's Aurora Detention Facility. The bus was mostly full of nightclub goers, and everyone on it was a Spanish speaker.

130.   ICE officers initially placed G.R.R. and all his bus-mates in a single holding cell.

131.   Approximately sixty individuals were in the cell with him, all from the Colorado Springs raid.

132.   When ICE interviewed G.R.R. at the Aurora Detention Facility, officers asked his name, how he came to the United States, and where he was from. They did not ask about why he was at the nightclub or any questions about guns or drugs.

133.   ICE held G.R.R. at the Aurora Detention Facility for 50 days.

134.   The conditions in the Detention Facility were terrible.

135.   The beds were so hard that they hurt his back, and it took two days to see a doctor after G.R.R. complained about his back pain.

136.   G.R.R. also caught a severe cold because of the low temperatures, as did others.

137.    G.R.R. had to use the bathroom and showers together with the other detainees. The entire situation was "extremely degrading and scary."

138.    No one ever returned G.R.R.'s government-issued identifications.

139.    The ordeal has been extremely hard on his ex-wife A.R. and his son. His son M.R. has acted out behaviorally at school, and fears separation from G.R.R., refusing to leave G.R.R.'s side.

140.    G.R.R.'s detention has also caused harm to A.R. and A.R.'s mother because G.R.R. could not earn income during his detention. G.R.R.'s family depends on his income for their costs of living.

141.    G.R.R. was (and is) terrified about what will happen to him, his son, and his family. He has constant fear of re-arrest by ICE. Members of G.R.R.'s Bible study group are also afraid to congregate in each other's homes and have reduced the frequency of their meetings.

v.    **Additional Declarants**[27]

142.    In addition to the individual Plaintiffs, many others in Colorado have suffered from ICE's same unlawful warrantless arrest practice over the course of the year.

a.    On the morning of February 5, 2025, J.P.P. was in his Aurora apartment with his wife and stepdaughters, aged 12 and 16. They heard a commotion in the hallways, followed by one loud bang and three loud explosions. After the explosions, several ICE officers raided the apartment, pointing long guns, and yelling in English. ICE

---

[27] The numerous declarations of plaintiffs and other witnesses are attached to the Motion for Preliminary Injunction and are incorporated herein by reference.

arrested J.P.P. without probable cause that he was a flight risk, traumatizing J.P.P. and his family. At the time of his arrest, J.P.P. had a pending asylum application, had attended all his immigration court proceedings, and had recently provided all of his biometric data to ICE at a check-in appointment. J.P.P. describes the ICE raid and grenade bombs being thrown into his apartment as one of the most horrifying things he had ever experienced, and this included being tortured by police officers in Venezuela.

b.        On March 28, 2025, O.M.R. was arrested by ICE without any warrant and with no determination of likelihood of flight. O.M.R. was simply a passenger in a vehicle that was pulled over by ICE. At the time ICE arrested him, O.M.R. had an Application for Temporary Protected Status pending with the U.S. Citizenship and Immigration Services. O.M.R. has been detained at the Denver Contract Detention Center in Aurora, Colorado, since his warrantless arrest on March 28, 2025. Since his detention, O.M.R.'s partner and children have faced eviction, and O.M.R. suffers from skyrocketing anxiety and a painful physical condition that is exacerbated by living at the Detention Center.

c.        J.C.C. is a 53-year-old man who has lived in the United States since 1996. He has four U.S.-citizen children and owns his own concrete and landscaping business. On the morning of July 18, 2025, J.C.C. went to the Home Depot near South Parker, Colorado, where he bought supplies and was driving to his job. Two immigration officers pulled him over and demanded legal documentation. Without asking any questions regarding flight risk or any warrant, one of the officers arrested J.C.C., who has been in the Aurora Detention Center ever since. He and his family have experienced

immense stress and trauma and have been forced to use up nearly all of their financial savings.

d.      Eida Altman is the founder and Executive Director of Denver Metro Tenants' Union ("DMTU"). She describes the chaotic aftermath of ICE's February 5, 2025 raid at Cedar Run apartment complex in Aurora, Colorado, where more than two dozen people were arrested without warrants and with no flight risk determinations. In the months that followed the Cedar Run raid, ICE agents have returned to those apartments and others with a substantial Latine population where DMTU works, terrifying the community and disrupting basic life functions.

e.      Arturo Vazquez is an immigration attorney practicing in Denver, Colorado. During the past few months, he has consulted with at least 15 people who have been stopped, arrested, and then detained by ICE agents without a warrant in Aurora. These warrantless arrests follow a similar pattern: ICE agents in unmarked vehicles pull over Latine person and obtain a suspect's driver's license. The driver's license was obtained pursuant to the Colorado Road and Community Safety Act, SB13-251, which allows people who cannot provide proof of lawful presence in the United States to obtain a particular type of driver's license. Once the ICE agent sees the SB251 license, which contains markings denoting it as such, the ICE agent orders all occupants out of the car and arrests them, telling them that they are being detained for being in the country without authorization. The ICE agents do not have warrants for these arrests, and do not ask any questions that would establish any of them were flight risks.

f.      Mary Jo Highland and Daniel Herrera are also local immigration attorneys who practice in Denver, Colorado. During the past two months, Ms. Highland has consulted with at least five people who were pulled over by ICE agents in unmarked cars then arrested by ICE without a warrant and without any inquiry or determination of flight risk in Dillon, Silverthorne, and Fort Collins. Mr. Herrera has consulted with at least seven people who were arrested under similar circumstances without a warrant or any assessment of flight risk in Aurora, Dillon, and Silverthorne.

g.      Claire Noone is an immigration attorney practicing in Glenwood Springs, Colorado. During the past few months, she has spoken with approximately 15 people who have been stopped, arrested, and then detained by ICE in the Roaring Fork Valley—all without a warrant or any determination of flight risk. During some of the arrests, people were told "a warrant exists" but agents refused to produce it. Immigration agents engage in regular coordinated surges in activity, spending about a week conducting enforcement in the Roaring Fork Valley before returning about two months later.

h.      Shaleen Morales is a senior staff attorney with the Rocky Mountain Immigrant Advocacy Network (RMIAN), a nonprofit legal services provider that represents detained noncitizens before the Aurora Immigration Court in Colorado. She describes numerous people locked up in the Aurora Detention Facility. For these people, ICE's pattern and practice has been the same: stop and arrest without a warrant or probable cause that the person is in the country illegally or poses a flight risk. A few examples of unlawful stops and warrantless arrests are as follows:

i.    ICE arrested Individual A.A. at his workplace in Aurora. Officers arrived without a warrant to arrest another individual. In searching for that individual, ICE also collaterally arrested A.A. when he left the workplace. He was not shown a warrant for his arrest and officers did not ask him for information related to flight risk or community ties. Since his arrest this summer, he is still detained.

ii.    Individual E.E. was working at a restaurant in Evergreen, Colorado, when confronted by ICE. When he responded to questions regarding his immigration status, ICE arrested E.E. without a warrant and without any discussion concerning flight risk or connections to the community. E.E. was detained this summer and is still litigating his removal case in front of the Immigration Court.

iii.    Individual F.F. was arriving to work in Denver, Colorado, when a law enforcement officer, who he thought was the local police, stopped him. ICE asked for F.F.'s driver's license and asked for his "papers." When F.F. confirmed he did not have lawful status, the ICE officer arrested him and two others in the vehicle. F.F. was not asked questions concerning flight risk or connections to community. F.F. is still detained and litigating his immigration case.

**B.    ICE's Policy and Practice of Effecting Warrantless Arrests Without Making Individualized Determinations of Legal Status and Flight Risk Violates Federal Law and ICE's Own Policies**

143.    In the Immigration and Nationality Act ("INA"), Congress placed restrictions on the ability of immigration agents to conduct warrantless arrests. Section 287(a)(2) of the INA, codified as 8 U.S.C. § 1357(a)(2), imposes two conditions that must be met before an agent makes a warrantless arrest: the agent must have "reason to believe" both that (1) the individual "is in the United States in violation of any [immigration] law or

regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *Id*.[28]

144.    Immigration officers have long understood that they do not have unfettered authority to make warrantless arrests in the interior of the United States. The requirement to determine legal status and flight risk before arresting an individual without a warrant predates the original 1952 INA and was enacted to constrain warrantless arrests after immigration officers in the 1940s were regularly effecting arrests without warrants in excess of their statutory authority.

145.    "Reason to believe," as used in the statute, equates to the constitutional requirement of probable cause, which requires an individualized inquiry particular to the person at issue.

146.    ICE agents may not make categorical assumptions about likelihood of escape based on a person's apparent race and assumed immigration status. If probable cause to believe somebody did not have lawful presence in the country were sufficient, there would be no reason to separately require probable cause that the individual also posed a flight risk. Instead, § 1357 requires agents to make an individualized determination of both status *and* flight risk before they can lawfully conduct a warrantless arrest.

---

[28] Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. *See* 8 C.F.R. § 287.8(c)(2)(ii). The federal regulations further require immigration officers to identify themselves and state the reason for the arrest. *Id.* (c)(2)(iii).

147.    In other words, ICE does not have authority to arrest Coloradans without a warrant unless they have probable cause to believe that the person is in this country in violation of immigration law *and* is a flight risk.

148.    ICE previously understood this and said as much in its own policies, even though they have been ignoring the requirements on a widespread basis since at least January 2025.

149.    In 2022, DHS adopted explicit requirements for agents in the field when they conduct any warrantless arrest under 8 U.S.C. § 1357(a)(2).

150.    In 2022, as part of a lawsuit settlement that applied to the Chicago ICE office area of responsibility, DHS issued a "Broadcast Statement of Policy" outlining requirements for evaluation and documentation of flight risk that constitute "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." *Castañon Nava v. DHS*, No. 1:18-cv-03757, Dkt. 15-1 (Broadcast Statement of Policy), at ¶ 27.[29]

151.    Under this "Broadcast Statement of Policy," immigration officers were required to consider the totality of the circumstances in evaluating an individual's "likelihood of escape," including an individual's community ties (such as their family, home, or employment) and an individual's prior attempts to escape or evade immigration authorities. *Id.* at ¶ 1.

---

[29] https://perma.cc/J8HP-VGL2.

152.    The policy further required that immigration officers who have made a warrantless arrest document the facts and circumstances surrounding the warrantless arrest "as soon as practicable." *Id.* at 2.

153.    The documentation was required to include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.*

154.    In May 2025, DHS and ICE claimed that the settlement had expired and then immediately rescinded the Broadcast Statement of Policy and encouraged its agents to engage in warrantless arrests.[30]

155.    And even before DHS rescinded its guidance, ICE was violating the requirements of § 1357(a)(2) and facing motions to enforce in the *Castañon-Nava* case. That Court recently found that, under the current Administration, ICE committed repeated, material violations of the settlement by engaging in warrantless arrests in violation of the requirements of § 1357(a)(2).  The Court extended the settlement agreement to February 2, 2026, and ordered ICE to reissue the Broadcast Statement of Policy to all ICE officers.[31]

**C.    ICE Will Continue Its Unlawful Practices Without Court Intervention**

156.    Despite federal law, ICE agents have continued to conduct illegal arrests in Colorado—including during broad immigration sweeps, individual stops, and collateral

---

[30] Marisa Kabas, The Handbasket, ICE agents get green light to make unjustified warrantless arrests (June 12, 2025), https://perma.cc/E794-KCHH.

[31] *Castañon Nava v. DHS*, No. 1:18-cv-03757, Memorandum Opinion and Order, Dkt. 214 (N.D. Ill., Oct. 7, 2025), Ex. O to Motion for Preliminary Injunction.

detentions—and are hailing the success of their escalated enforcement operations.[32] ICE's unlawful tactics will not stop absent court intervention.

157.    Tom Homan, a former ICE director who now serves as President Trump's "Border Czar," has repeatedly confirmed the Administration's intent to rely on indiscriminate warrantless arrests throughout the United States, including in jurisdictions like Colorado that they label as a "sanctuary" states.

158.    Mr. Homan has "said [] from Day 1," that arresting any person in the U. S. without lawful presence is "not off the table" because the Administration and DHS are "opening th[e] aperture [of immigration enforcement policy] up."[33]

159.    Mr. Homan has publicly stated that DHS has a new "mandate" to make collateral arrests to increase their arrest numbers.[34] He explained that "unlike the last administration," President Trump's DHS is not "going to tell ICE officers not to arrest an illegal alien" if that noncitizen is found with others targeted by the agency.[35]

---

[32] X, ICE Denver (@ERODenver) Feb. 5, 2025 9:40 AM, https://perma.cc/9UXU-7W7J (describing "very real public safety threat" solved by raid).

[33] Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, The New York Times (June 13, 2025), https://perma.cc/E3RE-RK7S.

[34] Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, The New York Times (June 13, 2025), https://perma.cc/E3RE-RK7S.

[35] Adam Shaw, Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats', Fox News (Jan. 21, 2025), https://perma.cc/VW65-PPZ9.

160.    For this reason, Mr. Homan asserts that under President Trump's watch, Americans are "going to see a higher number of collateral arrests" in so-called sanctuary jurisdictions (like Colorado).[36]

161.    Mr. Homan has stated that sanctuary jurisdictions should expect to see "[m]ore agents in the neighborhood[.]" *Id.*

162.    The head of ICE, Defendant Todd Lyons, agreed publicly that non-criminals in the United States will be taken into custody collaterally during arrest operations.[37]

163.    And when ICE swept through Denver and Aurora with an army of federal agents, the agency's local leadership echoed Mr. Homan and Lyon's positions.[38]

164.    While in Colorado on the morning of multiple apartment raids, then-ICE Acting Director Caleb Vitello confirmed in a video shared by ICE's Denver Field Office ICE and others "have to come to the communities" in "sanctuary" jurisdictions, like the Denver metro area. *Id.*

165.    Director Vitello reaffirmed that these ICE enforcement operations are "just going to continue . . ." *Id.*

---

[36] The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry (CNN broadcast Jan. 27, 2025), https://perma.cc/4KDM-64SC.

[37] Camilo Montoya-Galvez, ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers, CBS News (July 21, 2025), https://perma.cc/RT3S-CJP4.

[38] X, ICE Denver (@ERODenver), Feb 5, 2025 9:40AM, https://perma.cc/9UXU-7W7J.

166.    Colorado's communities now know ICE's tactics all too well and live in constant fear as a result. ICE's arrests across the state have seen a nearly "300% increase from the same period in 2024."[39]

167.    There is no sign ICE will slow down. To the contrary, immigration officers' "footprint in Colorado could soon grow."[40] President Trump's budget in the "One Big Beautiful Bill," signed into law in July 2025, designated $170 billion to immigration enforcement, including more than $45 billion for additional ICE detention space.

168.    In Colorado, private prison operators are proposing to convert two dormant correctional facilities into ICE detention facilities.[41]

169.    ICE officials told Colorado's Congressional delegation that the agency plans to reopen the shuttered Hudson Correctional Facility as an immigration detention center, which could add space for 1,250 people.[42]

170.    ICE recently expanded the existing Aurora Detention Facility's capacity to over 1,530 people.

---

[39] Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS.

[40] Russell Contreras, et al., ICE operations in Colorado raise legal questions, AXIOS Denver (July 7, 2025), https://perma.cc/P9WH-BJY9.

[41] Dan Boyce, Two Colorado facilities eyed as possible ICE detention centers, Colorado Public Radio (June 27, 2025), https://perma.cc/94DK-LS3M.

[42] Stephen Swofford, Trump administration plan to reopen Colorado prison north of Denver for ICE detainees, Denver Gazette (Aug. 13, 2025) https://perma.cc/2WPZ-JKLU; Seth Klamann, ICE tells Colorado lawmakers it plans to open new detention facility near metro Denver, The Denver Post (Aug. 12, 2025), https://perma.cc/C48R-ADK9.

171.    ICE is also hiring new recruits for increases in enforcement operations. President Trump's budget allocated $8 billion to ICE to hire 10,000 new officers through 2029.[43] ICE is offering bonuses of up to $50,000 for retired agents to return to work.[44]



[45]

ICE has targeted its recruiting efforts through television ads on Denver television stations, seeking to lure local law enforcement officers frustrated with so-called "sanctuary" jurisdictions' alleged orders to "stand down" to work for ICE with promises of large bonuses and student loan forgiveness.[46]

---

[43] Fed Agent, DHS Readies for Funding Surge After "Big Beautiful Bill" Passage, (July 10, 2025), https://perma.cc/ALT6-AKYR.

[44] Michelle Sandiford, ICE offers up to $50,000 signing bonus for retired employees to return to the job, Federal News Network (July 21, 2025), https://perma.cc/RA6T-38Q8.

[45] LinkedIn, U.S. Immigration and Customs Enforcement, https://perma.cc/E86X-9CJ7.

[46] Anna Alejo, ICE recruitment ad made to lure Denver police officers faces pushback from police and city leaders, CBS News (Sept. 26, 2025), https://perma.cc/DAY8-6Q3A.

172.   ICE has continued its raids throughout Colorado, broadening its reach across the state and into mountain towns.[47]

173.   Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R.'s experiences are not unique. They reflect an unlawful practice that immigration officers rely on in their enforcement operations across the country and throughout Colorado: make warrantless arrests without the requisite probable cause determinations regarding legal status and flight risk.

174.   For each Plaintiff, immigration agents never assessed anyone's flight risk, nor did they obtain a warrant before making an arrest.

175.   These agents instead indiscriminately arrested people, including people with pending immigration applications, no criminal history, established residences in the community, steady employment, family in the United States, and other community ties contradicting any purported flight risk. And agents targeted high-density locations like apartment complexes and nightclubs where many Latine people lived or gathered but conducted no individualized analysis about their status or likelihood of escape.

176.   Absent judicial intervention, Defendants will continue their unlawful practices in Colorado, and Plaintiffs and members of the class are likely to suffer repeat unlawful arrests.

---

[47] Ryan Fish, ICE activity reported in Colorado mountain towns, sparking community concerns, ABC News (Sept. 25, 2025), https://perma.cc/F2D8-NDHC.

### D.    ICE's Illegal Practices Have Terrorized the Community and Sowed Distrust in Police

177.    Because of ICE's policy and practice of conducting unlawful warrantless arrests, Plaintiffs and community members are terrified to leave their homes, afraid that going out in public could result in another ICE encounter.

178.    Plaintiff G.R.R. feels nervous leaving his home and fears going to public places. He is afraid of law enforcement officers. Similarly, Plaintiff J.S.T. is afraid of going out in public. Ms. Dias also feels anxious when leaving home. Community members O.M.R. and J.P.P. experienced severe anxiety after their encounters with and warrantless arrests by ICE.

179.    Plaintiffs and community members also experienced physical injuries, pain, and hunger due to ICE's unlawful arrests and the ensuing events. G.R.R.'s hand was cut on the ground when an immigration agent violently pushed him to the ground while arresting him. G.R.R. and Ms. Dias suffered the pain of tight shackles on their wrists and ankles. All Plaintiffs received only poor-quality, sometimes spoiled food in inadequate portions while detained. Community member O.M.R. experienced pain from the sleeping conditions in the Aurora Detention Center, which J.P.P. described as "unbearable." All Plaintiffs, and all those similarly situated, experienced emotional and dignitary harms because ICE targeted them for enforcement and arrest in violation of federal law.

180.    Because ICE made these arrests without a warrant, Plaintiffs and community members live with the fear that they could be arrested and detained again at any time regardless of whether they are a flight risk. Each of the Plaintiffs lives, works, travels, and socializes in communities where ICE agents have been active, and where

ICE has made repeat visits and unlawful warrantless arrests. ICE is making warrantless arrests in the Front Range, the I-70 mountain corridor, and the Western Slope of people based only on the type of their driver's license without proper statutory inquiry. Given the Administration's stated objectives, and their systematic violation of § 1357(a)(2), the Plaintiffs and class members face high risk of additional unlawful arrests.

181.    ICE's actions have also stoked intense anxiety and fear of future harm among Plaintiffs, community members, and their families.

182.    Community members with young children are terrified of being swept up in a raid and separated from their children. Plaintiff G.R.R.'s young son is acting out at school, and G.R.R. constantly worries about being separated from his American-born son. J.S.T.'s young niece, a U.S. citizen, fears being separated from her beloved uncle, who has helped raise her.

183.    And Plaintiffs fear financial and economic repercussions from ICE's actions. While detained, Plaintiffs were unable to work. J.S.T. lost his home; Mr. Ramirez and G.R.R. were unable to provide financially for their children and families. Ms. Dias lost one of her jobs and was forced to move back home – she has had to reduce her courseload at college due to financial strain, transportation difficulties, and ongoing stress and trauma.

184.    Elected leaders in Colorado, both Democrats and Republicans, have sounded the alarm about the widespread harmful effects of immigration enforcement by ICE and other federal agency immigration practices.

185.    Community leaders in Colorado are also raising concerns about ICE's tactics. "'The impact has been profound on families. The community has been put into a really precarious position,' said [Raquel] Lane-Arellano, from the Colorado Immigrant Rights Coalition."[48] Residents in mountain towns in Colorado have high rates of suicide and substance abuse disorders, partially due to fluctuations in income, which can cause stress for the local workforce. Latine communities in these towns, who make up a large portion of the population, are particularly vulnerable. Yirka Díaz Platt, a bilingual social worker who resides in Silverthorne, Colorado, said "a pervasive fear of deportation has caused many Latino workers and residents to retreat into the shadows. People are cancelling in-person meetings and avoid applying for government services that require submitting personal data, according to local health workers and advocates."[49]

186.    ICE's unlawful arrests have sent shockwaves of terror across the state of Colorado, including in mountain towns, which traditionally have many migrant workers. Voces Unidas de las Montañas, a nonprofit focused on advocacy and policy on behalf of immigrants, stated they have received over 100 phone calls or messages via their social media platforms or to their direct hotline from people who are on heightened alert because

---

[48] Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS.

[49] Natalie Skowlund, Deportation fears add to mental health problems confronting Colorado resort town workers, Colorado Newsline (Apr. 6, 2025), https://perma.cc/BFY3-L7PW.

of their concern over increased immigration presence within Colorado.[50] "They're questioning whether they themselves are in danger and whether their kids should be going to school or what action they should be taking. Those are the conversations we're having or we were having that week at an unprecedented level," stated the CEO and President of Voces Unidas de las Montañas, Alex Sanchez. *Id.* Across the country including Colorado, immigrants are afraid and retreating into the shadows.[51]

## CLASS ACTION ALLEGATIONS

187.    Individual Plaintiffs seek to represent a class of individuals who have been or will be subjected to the unlawful practices this lawsuit challenges: arrests regardless of probable cause of flight risk.

188.    Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R. seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

> All persons since January 20, 2025, who have been arrested or will be arrested in this District by ICE without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

189.    The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is sufficiently numerous as to make joinder impracticable. In the first six months of this year, ICE data shows that its agents arrested almost 2,000

---

[50] Spencer Wilson, Fear grips Colorado mountain towns amid rumors of increased patrols by Immigration and Customs Enforcement, CBS News (June 5, 2025), https://perma.cc/84JZ-UG4T.

[51] Catherine E. Scholchet, et al., 'It's like one day everyone left': How immigration crackdowns are reshaping America, CNN (Aug. 26, 2025), https://perma.cc/LP5F-HYKR.

people in Colorado.[52] At large-scale raids alone, upwards of 150 people have been swept up—most pursuant to collateral, warrantless arrests. ICE has publicly stated that it intends to continue making warrantless arrests regardless of an individual's circumstances.

190.    The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because all members of the class are subject to ICE's policies and practices regarding warrantless arrests, as well as the absence of policies relating to how an agent should make a probable cause determination of unlawful status and flight risk. There are questions of law and fact common to the class, including:

  a.    Whether ICE has a policy, pattern, or practice of conducting warrantless arrests without proper probable cause including whether an individual is likely to escape before a warrant can be obtained for the arrest;

  b.    Whether ICE's policy, pattern, or practice of conducting warrantless arrests without proper probable cause including whether that individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

191.    The proposed class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Individual Plaintiffs' legal claims are typical to all members of the proposed class. Individual Plaintiffs have no interests separate from those of the class

---

[52] Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have a criminal history, The Colorado Sun (July 18, 2025) (citing Deportation Data Project's compilation of ICE data on immigration arrests in Colorado) https://perma.cc/Z2Z7-423D.

they seek to represent and seek no relief other than the relief sought on behalf of the class. Defendants have acted and intend to act in a manner adverse to the rights of the members of the class, making final injunctive and declaratory relief appropriate regarding the class as a whole.

192.   The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the class.

193.   Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise and resources to adequately prosecute this case on behalf of Plaintiffs and the proposed class. Plaintiffs' counsel will fairly and adequately represent the interests of the class.

194.   Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole. The relief requested – constraining Defendants' practice of effecting warrantless arrests without making the probable cause determinations required by law – will provide relief to the class as a whole.

195.   Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R. and the class have been directly injured by Defendants' statutory and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

196.   In *United Farm Workers v. Noem*, the Eastern District of California issued its April 29, 2025 Order Granting Plaintiffs' Motion for Provisional Class Certification and

Granting Plaintiffs' Motion for a Preliminary Injunction which issued a similar injunction for the class proposed in this case.  785 F.Supp.3d 672, 742-3 (E.D. Cal. 2025).  The Court noted that the government "shows a pattern and practice of warrantless arrests without [immigration] agents performing individualized flight risk assessments to have probable cause for the arrest as required." *Id.* at 735.

**FIRST CLAIM FOR RELIEF**
Violation of 8 U.S.C. § 1357(a)(2) and 5 U.S.C. §§ 704, 706(2)(C):

197.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth here.

198.   Defendants arrested Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R. without warrants. Before each arrest, Defendants failed to make the required individualized findings including flight risk.

199.   Defendants made these arrests without a warrant and without "reason to believe" that Plaintiffs were "in the U.S. in violation of immigration laws" and "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 U.S.C. § 1357(a)(2). These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latine descent live, work, drive, and gather.

200.   Defendants do not have a policy or practice that adequately ensures compliance with the statutory limits of ICE's warrantless arrest authority. While Defendants did previously and nominally have guidance on how to make an individualized determination of both unlawful immigration status and likelihood of escape before a warrant can be obtained, including through their now-rescinded Broadcast Statement of

Policy, Defendants now not only permit, but encourage their agents to make warrantless arrests carte blanche in violation of law.

201.    Based on ICE's public statements that it will continue making "unintended arrests" in jurisdictions like Colorado, along with statements from "Border Czar" Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants will continue to arrest individuals without regard to whether there is reason to believe both that the individuals are in the country illegally and are likely to escape before an arrest warrant can be obtained, in violation of 8 U.S.C. § 1357(a)(2).

202.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination and flight risk analysis is "final agency action" that is ultra vires and "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(C).

203.    Individual Plaintiffs and Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

**SECOND CLAIM FOR RELIEF**
Violation of 8 C.F.R. § 287.8(c)(2)(ii) and 5 U.S.C. §§ 704, 706(2)(C):

204.    Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth here.

205.    Defendants arrested Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R., without warrants. Before each arrest, Defendants failed to make the required individualized findings including flight risk.

206.   Defendants made these arrests without a warrant and without "reason to believe" that Plaintiffs were "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 C.F.R. § 287.8(c)(2)(ii). These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latine descent live, work, drive, and gather.

207.   Defendants do not have a policy or practice for ensuring compliance with the statutory limits of ICE's warrantless arrest authority and do not provide any meaningful guidance to ICE personnel on how to make an individualized determination of both immigration status or likelihood of escape before a warrant can be obtained. Defendants permit their agents to make warrantless arrests carte blanche in violation of law.

208.   Based on ICE's public statements that it will continue making "unintended arrests" in jurisdictions like Colorado, along with statements from "Border Czar" Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, Defendants will continue to arrest individuals without regard to whether there is a reason to believe both that the individuals are in the country unlawfully and likely to escape before an arrest warrant can be obtained, in violation of 8 C.F.R. § 287.8(c)(2)(ii).

209.   Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination and flight risk analysis is "final agency action" that is ultra vires and "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(C).

210.   Individual Plaintiffs and Class Members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and

declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1. Assume jurisdiction over this matter;

2. Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

3. Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

4. Declare under 28 U.S.C. § 2201(a) that Defendants' actions violate the rights of Plaintiffs and the Class under 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and 5 U.S.C. § 706(2)(C);

5. Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

6. Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

7. Order any and all such other relief as the Court deems just, equitable, and proper.

DATED: October 9, 2025

*/s/ Kenzo Kawanabe*
Kenzo Kawanabe, Bar No. 28697
Sean Grimsley, Bar No. 36422
Bianca Miyata, Bar No. 42012
Olson Grimsley Kawanabe Hinchcliff &
Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151
kkawanabe@olsongrimsley.com
sgrimsley@olsongrimsley.com
bmiyata@olsongrimsley.com


Timothy R. Macdonald, Bar No. 29180
Annie Kurtz, Bar No. 51525
Emma McLean Riggs, Bar No. 51370
Sara Neel, Bar No. 36904
Scott Medlock, Bar No. 57210
American Civil Liberties Union of
Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (303) 777-5482
tmacdonald@aclu-co.org
akurtz@aclu-co.org
emcleanriggs@aclu-co.org
sneel@aclu-co.org
smedlock@aclu-co.org

Hans Meyer, Bar No. 37812
Meyer Law Office
1547 Gaylord Street
Denver, CO 80206
Telephone: (303) 831-0817
hans@themeyerlawoffice.com

*Attorneys for Plaintiffs*