**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03183

REFUGIO RAMIREZ OVANDO, CAROLINE DIAS GONCALVES, J.S.T., and G.R.R., and all those similarly situated,

        Plaintiffs,

   v.

KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and ROBERT GUADIAN, in his official capacity as Director of the Denver Field Office of the U.S. Immigration and Customs Enforcement,

        Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. FACTUAL BACKGROUND ................................................................................. 4

    A.    ICE's Immigration Sweeps Are Unlawful....................................................... 4

    B.    Without Court Intervention, ICE Will Continue Effecting Unlawful Arrests to Meet the Administration's Arbitrary Enforcement Targets ....... 13

III. LEGAL STANDARD ........................................................................................... 18

IV. ARGUMENT ....................................................................................................... 18

    A.    Plaintiffs Are Likely to Succeed on the Merits ........................................... 18

        i.    ICE's Practice of Making Warrantless Arrests Without the Necessary Probable Cause Violates Federal Law ........................ 19

            a.    The INA Requires Agents to Make Two Individualized Probable Cause Determinations Before Effecting Warrantless Arrests .......................................................... 20

            b.    ICE Has a Pattern and Practice of Making Warrantless Arrests Without an Individualized Determination that a Person Presents a Flight Risk ......... 23

    B.    Plaintiffs and Class Members Will Suffer Irreparable Harm from Continued Unlawful Warrantless Arrests ................................................. 26

    C.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an Injunction is in the Public Interest ............................................................ 30

V.  SECURITY ......................................................................................................... 33

VI. CONCLUSION.................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**

*Arevalo v. Trump*,
785 F.Supp.3d 644 (C.D. Cal. 2025).............................................................. 34

*Barker v. Wingo*,
407 U.S. 514 (1972) ..................................................................................... 26

*Bravo v. City of Santa Maria*,
665 F.3d 1076 (9th Cir. 2011) ...................................................................... 21

*Case v. Hatch*,
No. 08-CV-00542 MV/WDS, 2011 WL 13285731 (D. N.M. May 2, 2011)................. 26

*Colorado Wild Inc. v. U.S. Forest Service*,
523 F.Supp.2d 1213 (D. Colo. 2007) ............................................................ 34

*Continental Oil Co. v. Frontier Refining Co.*,
338 F.2d 780 (10th Cir. 1964) ...................................................................... 33

*Creedle v. Miami-Dade Cnty*,
349 F.Supp.3d 1276 (S.D. Fla. 2018) ........................................................... 25

*D.B.U. v. Trump*,
781 F.Supp.3d 1158 (D. Colo. 2025)....................................................... 30, 34

*Denver Bible Church v. Azar*,
494 F.Supp.3d 816 (D. Colo. 2020) .............................................................. 30

*Denver Homeless Out Loud v. Denver, Colo.*,
32 F.4th 1259 (10th Cir. 2022) ..................................................................... 30

*DTC Energy Group, Inc. v. Hirschfeld*,
912 F.3d 1263 (10th Cir. 2018) .................................................................... 18

*E. Bay Sanctuary Covenant v. Trump*,
932 F.3d 742 (9th Cir. 2018) ........................................................................ 25

*Heideman v. S. Salt Lake City, Utah*,
348 F.3d 1182 (10th Cir. 2003)..................................................................... 27

*Hernandez v. Sessions*,
872 F.3d 976 (9th Cir. 2017) ........................................................................ 30

*League of Wilderness Defs. v. Connaughton*,
752 F.3d 755 (9th Cir. 2014) ................................................................... 32, 33

*Loper Bright Ent. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................... 25

*M.G. through Garcia v. Armijo*,
117 F.4th 1230 (10th Cir. 2024) ................................................................... 18

*Marshall v. Columbia Lea Reg'l Hosp.*,
  345 F.3d 1157 (10th Cir. 2003) ................................................................. 21

*Moreno v. Napolitano*,
  213 F. Supp. 3d 999 (N.D. Ill. 2016) ........................................................ 25

*Mountain High Knitting, Inc. v. Reno*,
  51 F.3d 216 (9th Cir. 1995) ...................................................................... 20

*Nken v. Holder*,
  556 U.S. 418 (2009) .......................................................................... 18, 30

*Perez v. ZL Restaurant Corp.*,
  81 F.Supp.3d 1062 (D. N.M. 2014) ........................................................... 31

*Ramirez v. U.S. Immigr. & Customs Enf't*,
  568 F.Supp.3d 10 (D. D.C. 2021) ....................................................... 20, 31

*Roa-Rodriquez v. United States*,
  410 F.2d 1206 (10th Cir. 1969) .......................................................... 19, 21

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) ................................................................... 33

*Rodriguez Vazquez v. Bostock*,
  779 F.Supp.3d 1239 (W.D. Wash. 2025) .................................................. 26

*Roy v. Cnty. of Los Angeles*,
  No. 12-09012, 2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ........................ 25

*S.E.C v. Curshen*,
  372 Fed. Appx. 872 (10th Cir. 2010) ........................................................ 20

*S.E.C. v. Reven Holdings, Inc.*,
  No. 1:22-cv-03181, 2024 WL 1675677 (D. Colo. Mar. 29, 2024) .............. 31

*United Farm Workers v. Noem*,
  785 F.Supp.3d 672 (E.D. Cal. 2025) ...................................... 2, 20, 30, 33

*United States v. Cantu*,
  519 F.2d 494 (7th Cir. 1975) .................................................................... 20

*United States v. Khan*,
  324 F.Supp.2d 1177 (D. Colo. 2004) ....................................................... 21

*United States v. Puebla-Zamora*,
  996 F.3d 535 (8th Cir. 2021) .................................................................... 20

*United States v. Quintana*,
  623 F.3d 1237 (8th Cir. 2010) .................................................................. 20

*United States v. Valenzuela*,
  365 F.3d 892 (10th Cir. 2004) .................................................................. 21

*United States v. Vazquez-Pulido*,
   155 F.3d 1213 (10th Cir. 1998) ................................................................. 21

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ................................................................... 31

*Wages & White Lion, Inv., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) .................................................................... 33

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ................................................................... 29

*Westover v. Reno*,
   202 F.3d 475 (1st Cir. 2000) ..................................................................... 20

*Ybarra v. Illinois*,
   444 U.S. 85 (1979) ..................................................................................... 21

**Statutes**

8 C.F.R. § 287.8 ........................................................................................ 1, 34

8 U.S.C. § 1357 ....................................................................................... passim

C.R.S. § 24-74-103 ......................................................................................... 7

**Other Authorities**

H.R. Rep. 82-1365 (1952) ............................................................................ 21

*Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, Interim Dec. 4125 (BIA 2025).............. 27

This case challenges U.S. Immigration and Customs Enforcement's (ICE) unlawful practice of making warrantless arrests of Latine people *en masse*, without the probable cause determinations required by federal law.[1] The Immigration and Nationality Act (INA) prohibits federal agents from arresting people without a warrant absent probable cause to believe both that (1) the person being arrested is in the country illegally *and* (2) the person constitutes a flight risk. 8 U.S.C. § 1357(a)(2).[2] ICE is not complying with the law. This Motion[3] seeks Court intervention requiring that ICE do so.

Plaintiffs Refugio Ramirez Ovando, Caroline Dias Goncalves, J.S.T., and G.R.R. move this Court to provisionally certify a class and issue a class wide preliminary injunction to ensure that, when ICE operates in this District, it complies with its legal duties. Such an injunction will not disturb ICE's lawful operations and will prevent ICE from terrorizing communities by violating the restrictions Congress placed on their power in 8 U.S.C. § 1357(a)(2).

## I.    INTRODUCTION

In late May 2025, the White House and the Department of Homeland Security (DHS) imposed a quota of 3,000 immigration-related arrests per day—with

---

[1] **Certification Pursuant to D.C.Colo.LCivR. 7.1:** Plaintiffs' counsel conferred with Defendants about the relief requested herein by contacting Peter McNeilly and Kevin Traskos of the U.S. Attorneys' Office in the District of Colorado before filing this Motion. As of the filing of this Motion, Defendants did not take a position on the relief requested.

[2] References to 8 U.S.C. § 1357(a)(2) include related regulations including, but not limited to, 8 C.F.R. § 287.8(c)(2)(ii).

[3] Concurrent with this Motion, Plaintiffs are filing their Motion to Exceed Page Limits.

"consequences for not hitting arrest targets."[4] To meet that goal, the Administration has encouraged agents to make warrantless arrests of anyone they encounter and suspect of being in the country unlawfully.[5] But Congress has always limited immigration enforcement agents' authority to make warrantless arrests. For nearly 80 years, federal statute has required that an agent conducting a warrantless arrest must have probable cause to believe that the person being arrested is both (1) in the United States in violation of immigration law, and (2) likely to escape before a warrant can be obtained. [6] 8 U.S.C. § 1357(a)(2). Absent probable cause on both, the arrest is unlawful.

Contrary to the law, Defendants are targeting communities based on assumptions about their demographics, and detaining people on the spot even though they are not named in immigration arrest warrants and pose no risk of flight. Coloradans fear—and are at risk of—being immediately taken into immigration custody based on nothing more than the color of their skin, their accent, or where they live and work. ICE's warrantless arrest practice in Colorado is part of its nationwide mission to drive up enforcement numbers. At least one other federal court has enjoined the agency from pursuing that end by violating federal statute. *See* Order, *United Farm Workers v. Noem*, 785 F.Supp.3d

---

[4] Ex. A, Wright Decl., Ex. 1, David J. Bier, 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions, Cato Institute (June 20, 2025), https://perma.cc/SP8K-J8CR; Ex. A, Wright Decl., Ex. 2, Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/K6VR-X523.

[5] *See* Part II(B), *infra*.

[6] Congress adopted the § 1357(a)(2) language in 1946. An Act to Amend the Law Relating to the Authority of Certain Employees of the Immigration and Naturalization Service to Make Arrests Without Warrant in Certain Cases and to Search Vehicles within Certain Areas, H.R. 386, 79th Cong., 2d Sess., Pub. L. 79-613, 60 Stat. 865 (Aug. 7, 1946).

672, 742-3 (E.D. Cal. 2025). Despite this, Defendants have doubled down, replicating the same lawlessness in immigration operations across the country, including in interior portions of the United States like Colorado.

Plaintiffs are Latine individuals caught in Defendants' warrantless arrest dragnet. ICE arrested them without any assessment—let alone probable cause—that they posed a risk of fleeing before a warrant could be obtained. Had agents made any investigation into Plaintiffs' risk of flight before detaining them, those agents would have learned of each person's strong ties to the communities of family, friends, colleagues, and neighbors that were left shattered when ICE took Plaintiffs into custody. Plaintiffs and putative class members also face a material risk of re-arrest without ICE following the statutory requirements. Because ICE's illegal arrests are ongoing and because the practice puts Plaintiffs and putative class members at risk of arrest or re-arrest in violation of federal law, they face irreparable harm absent Court intervention.

Accordingly, to prevent further deprivation of class members' rights, Plaintiffs seek a preliminary injunction prohibiting Defendants from conducting warrantless arrests without probable cause both that a person is in the country unlawfully *and* that the person is a flight risk. Issuing such an order is well within the Court's remedial power, is necessary to provide Plaintiffs and the proposed class with complete relief, and is no broader than necessary to compel Defendants' compliance with federal law.

## II.    FACTUAL BACKGROUND

### A.    ICE's Immigration Sweeps Are Unlawful

Throughout 2025, ICE agents have swept through Colorado—from its Front Range cities to its mountain towns to the Western Slope. As the Complaint details, ICE targets areas with high Latine populations, often showing up with guns, body armor, and masks[7] to terrorize and arrest community members, arresting them without the required probable cause determinations of flight risk, all in violation of federal law.

This is not happenstance. The Administration has imposed informal quotas on ICE, requiring agents to make 3,000 immigration-related arrests per day or face "consequences for not hitting arrest targets."[8] ICE has decided to hit those numbers the easy way: without warrants. Faced with the quotas, agents do not want to do § 1357(a)(2)'s legally required legwork. It is simply more expedient to ignore the statute and hope that vulnerable people, most without counsel, will not have the means, resources, or courage to hold officials to account for acting outside their authority.

In the first week of February 2025 alone, ICE hit neighborhoods in more than five U.S. cities, including Denver. ICE touted its actions as a "series of enhanced immigration

---

[7] Ex. A, Wright Decl. Ex. 3, Janet Oravetz, et al., ICE raids target at least 7 locations in Denver, Aurora, Thornton, 9 News (Feb. 5, 2025), https://perma.cc/M2GG-AVL5; Ex. A, Wright Decl. Ex. 4, Sam Tabachnik, et al. ICE raids hit apartment buildings in Aurora and Denver, The Denver Post (Feb. 5, 2025), https://perma.cc/A3XH-5N3V; Ex. A, Wright Decl. Ex. 5, Chase Woodruff, ICE agents conduct operations in multiple Denver, Aurora locations, Colorado Newsline (Feb. 5, 2025), https://perma.cc/EW3C-KHJT.

[8] Ex. A, Wright Decl. Ex. 2.

operations."[9] Federal data show that by early March, federal agents had made nearly 23,000 arrests nationwide.[10] By the end of April, that number ballooned to over 66,000.[11] In the first six months of 2025, ICE data shows that its agents arrested almost 2,000 people in Colorado.[12] And while ICE has refused to disclose the exact number of Coloradans swept up in its stepped-up enforcement operations,[13] public estimates are that hundreds of people have been arrested in large-scale raids alone.[14] Many of these were "collateral" arrests of people who happened to be present during ICE raids, without any determination that the people detained were a flight risk.[15]

---

[9] Ex. A, Wright Decl. Ex. 6, U.S. Immigration and Customs Enforcement, Press Release, ICE operations between Feb. 1 and Feb. 6 (Feb. 10, 2025), https://perma.cc/54YY-SPWQ.

[10] Ex. A, Wright Decl. Ex. 7, Albert Sun, et al., What the Data Shows About Trump's Immigration Enforcement So Far, The New York Times (Mar. 4, 2025), https://perma.cc/5SCU-P38Z.

[11] Ex. A, Wright Decl. Ex. 8, U.S. Immigration and Customs Enforcement, Press Release, 100 days of record-breaking immigration enforcement in the US interior (Apr. 29, 2025), https://perma.cc/AQG6-WMEJ.

[12] Ex. A, Wright Decl. Ex. 9, Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have a criminal history, The Colorado Sun (July 18, 2025) (citing Deportation Data Project's compilation of ICE data on immigration arrests in Colorado), https://perma.cc/Z2Z7-423D.

[13] Ex. A, Wright Decl. Ex. 10, Megan Ulu-Lani Boyanton, How President Trump's shifting deportation push has played out in Colorado, The Denver Post (June 19, 2025), https://perma.cc/FZN9-LT33.

[14] Ex. A, Wright Decl. Ex. 10; Ex. A, Wright Decl. Ex. 11, Max Levy, 18 of the 104 detained in Colorado Springs nightclub raid already had deportation orders, ICE says, The Denver Post (May 9, 2025), https://perma.cc/2DAW-9D29.

[15] Ex. A, Wright Decl. Ex. 12, Camilo Montoya-Galvez, ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers, CBS News (July 21, 2025), https://perma.cc/2F9F-PYZJ.

In the attached declarations, Plaintiffs and other declarants document ICE's unlawful actions. Each of ICE's arrests were performed without any attempt to ascertain the requisite probable cause that the person was likely to escape before a warrant could be obtained.

Refugio Ramirez Ovando lives near Grand Junction, Colorado, with his wife and four children. Ramirez Decl., attached as Ex. B, at ¶ 2. He works in the concrete industry where he has been employed for 19 years. *Id.* at ¶ 3. Early on May 19, 2025, ICE pulled over Mr. Ramirez, as he drove to work, without any reasonable suspicion of wrongdoing. *Id.* at ¶¶ 6, 9. Without asking him any questions inquiring into his risk of flight, ICE arrested him without a warrant. *Id.* at ¶¶ 17-18. Indeed, Mr. Ramirez was arrested near the home he owns – where he lives with his wife and four U.S.-citizen children. *Id.* at ¶¶ 2, 9. Had ICE agents inquired, they would have seen that Mr. Ramirez presented no flight risk whatsoever and has long and deep ties in the community. *Id.* at ¶¶ 2-7. Mr. Ramirez spent over three months in detention before he won relief in his immigration case and became a lawful permanent resident. *Id.* at ¶¶ 27, 33.

Plaintiff Caroline Dias Goncalves is a 20-year-old college student who has lived in the United States since she was brought to the country at age seven. Dias Decl., attached as Ex. C, at ¶ 1. She and her family have had an asylum application pending with the government for several years. *Id.* at ¶ 3. On June 5, 2025, Ms. Dias was driving from Utah to Colorado to visit a friend. *Id.* at ¶ 4. Near Fruita, Colorado, a Mesa County Sheriff's Office deputy pulled her over for allegedly following a semitrailer too closely. *Id.*

The deputy let her go, but secretly (and illegally[16]) alerted ICE agents to Ms. Dias' whereabouts through a Signal message. *Id*. at ¶¶ 10, 17. ICE agents then stopped her about ten minutes later. *Id*. at ¶¶ 11, 12. They arrested Ms. Dias without a warrant and without probable cause to believe she was a flight risk. *Id*. at ¶ 17. After processing, she was taken to the Aurora Detention Facility, where she remained in custody for a terrifying 15 days. *Id.* at ¶¶ 20, 25, 27, 30.

Plaintiff J.S.T. is a 36-year-old man who has lived in Colorado for 15 years – nearly all his adult life. J.S.T. Decl., attached as Ex. D, ¶ 1. For almost a decade, J.S.T. has worked for the same employer, a local restaurant and grocery store. *Id.* at ¶ 3. On February 5, 2025, federal immigration agents raided Whispering Pines Apartments, where J.S.T. lives. *Id.* at ¶¶ 8-10, 16. ICE agents arrested J.S.T. without a warrant and without probable cause to believe he was a flight risk *Id.* at ¶¶ 11-14. After transporting him to the Aurora Detention Facility, he was imprisoned for nearly a month. *Id.* at ¶ 21.

Plaintiff G.R.R. is a 32-year-old business owner who has lived in the United States for a decade. G.R.R. Decl., attached as Ex. E, ¶ 1. He is the father of a U.S.-citizen child. *Id.* at ¶ 2. G.R.R. lives in Colorado Springs and works in construction. *Id.* at ¶¶ 1, 4. On or about April 27, 2025, hundreds of federal agents, including from ICE, raided a nightclub in Colorado Springs where G.R.R. had gone to pick up a friend as his designated driver. *Id.* at ¶¶ 8, 10-11. ICE arrested G.R.R. without a warrant and without probable cause to

---

[16] *See* C.R.S. § 24-74-103; Ex. A, Wright Decl. Ex. 13, Shelly Bradbury, Colorado sheriff's deputy who alerted ICE to Utah student violated state law, AG says, The Denver Post (July 22, 2025), https://perma.cc/6NVF-245V.

believe he was in the country unlawfully and a flight risk. *Id.* at ¶¶ 20-21, 25, 28. ICE transported him to the Aurora Detention Facility, where he was held for over six weeks. *Id.* at ¶¶ 24, 29.

Numerous other Declarants describe the same illegal pattern and practice by ICE. J.C.C. is a 53-year-old man who has lived in the United States since 1996. J.C.C. Decl., attached as Ex. F, ¶ 1. He has four U.S.-citizen children and owns his own concrete and landscaping business. *Id.* at ¶¶ 2-3. On July 18, 2025, J.C.C. went to the Home Depot near South Parker, Colorado, to buy supplies as he drove to his job. *Id.* at ¶¶ 5-6. Two immigration officers pulled him over and demanded legal documentation. *Id.* at ¶¶ 7-11. Without a warrant or asking any questions regarding flight risk, they arrested J.C.C. on the spot. He has been imprisoned ever since. *Id.* at ¶¶ 12, 16, 19. He and his family have experienced immense stress and trauma and, without their primary breadwinner, have been forced to drain nearly all their savings. *Id.* at ¶¶ 17, 21.

Similarly, J.P.P. was in his Aurora apartment with his wife and stepdaughters, aged 12 and 16. Jordan Decl., attached as Ex. G, ¶ 8. Even though J.P.P. and his family had pending asylum claims and had recently provided all their biometric data to ICE during an check-in appointment, several ICE officers smashed in the door to his apartment, threw flash bang grenades inside, and entered pointing long guns while yelling in English. *Id.* at ¶¶ 9-11. ICE arrested J.P.P. without a warrant or probable cause that he was a flight risk, traumatizing J.P.P. and his family. *Id.* at ¶¶ 12- 15.

In yet another example, ICE agents pulled over a vehicle in Aurora in which O.M.R. happened to be riding as a passenger. ICE was seeking the driver of the vehicle but

decided to effect the collateral arrest of O.M.R. without any warrant or inquiry into his risk of flight. *Id.* at ¶¶ 3-5. Had ICE agents made any effort to assess whether O.M.R. was likely to flee, as required by law, the available evidence would have demonstrated he posed no such risk.  O.M.R. lived with his partner and her children. *Id.* at ¶ 2. O.M.R. had an Application for Temporary Protected Status pending with the U.S. Citizenship and Immigration Services.  *Id.* at ¶ 7. He had not missed any court dates. *Id.* at ¶ 7. Willfully failing to discern these facts, ICE arrested O.M.R. on the spot. *Id.* at ¶¶ 3, 6. O.M.R. has been detained ever since. *Id.* During his detention, O.M.R.'s partner and children have faced eviction, and O.M.R. suffers from skyrocketing anxiety and a painful physical condition that is not being meaningfully treated as the Aurora Detention Center provides notoriously poor medical care.[17] *Id.*

Local immigration attorneys have similarly represented and consulted with many immigrants whom ICE has arrested without warrants or the required probable cause determinations. Arturo Vazquez is an immigration attorney practicing in Denver, Colorado. Vazquez Declaration, attached as Ex. H, at ¶¶ 1-3. During the past few months, he has consulted with at least 15 people who have been stopped, arrested, and then detained by ICE agents without a warrant in Aurora. *Id.* at ¶ 4. These warrantless arrests follow a similar pattern: ICE agents in unmarked vehicles pull over a Latine person and obtain a suspect's driver's license. *Id.* at ¶¶ 5-13. Some of these driver's licenses are obtained

---

[17] *See, e.g.*, Ex. A, Wright Decl. Ex. 14, Am. Civ. Liberties Union of Colo., Cashing in on Cruelty, Stories of Death, Abuse, and Neglect at the GEO Immigration Facility in Aurora (Sept. 17, 2019), https://perma.cc/TK54-CLBN.

pursuant to the Colorado Road and Community Safety Act, SB13-251, which allows people who cannot provide proof of lawful presence in the United States to obtain a particular type of driver's license. *Id.* at ¶ 6. Once the ICE agent sees a SB251 license, which contains markings denoting it as such, the ICE agent orders all occupants out of the car and arrests them, telling them that they are being detained for being in the country without authorization. *Id.* at ¶ 7. The ICE agents do not have warrants for these arrests, and do not ask any questions that would shed light on whether the people arrested are flight risks. *Id.* at ¶ 9.

Mary Jo Highland and Daniel Herrera are also local immigration attorneys, who practice in Denver, Colorado. Highland Decl., attached as Ex. I, at ¶¶ 1-2; Herrera Decl., attached as Ex. J, at ¶¶ 1-2. During the past two months, Ms. Highland has consulted with at least five people who were pulled over by ICE agents in unmarked cars then arrested by ICE without a warrant and without any inquiry or determination of flight risk in Dillon, Silverthorne, and Fort Collins. Ex. I, Highland Decl., ¶¶ 4-5, 8. Mr. Herrera has consulted with at least seven people who were arrested under similar circumstances without a warrant or any assessment of flight risk in Aurora, Dillon, and Silverthorne. Ex. J, Herrera Decl. ¶¶ 4-5, 8.

Claire Noone is an immigration attorney practicing in Glenwood Springs, Colorado. Noone Decl., attached as Ex. K, at ¶ 1. During the past few months, she has spoken with approximately 15 people who have been stopped, arrested, and then detained by ICE without a warrant or any determination of flight risk in the Roaring Fork Valley. Ex. K, Noone Decl., ¶¶ 4, 7. During some of the arrests, people were told "a warrant exists" but

agents refused to produce it.  Ex. K, Noone Decl., ¶¶ 4, 8. Immigration agents engage in regular coordinated surges in activity—spending about a week conducting enforcement in the Roaring Fork Valley before returning about two months later. Ex. K, Noone Decl., ¶ 5.

Non-profit service providers across Colorado have experienced the disruption of ICE's warrantless arrests. For example, Eida Altman is the founder and Executive Director of Denver Metro Tenants' Union (DMTU). She experienced the chaotic aftermath of ICE's raid at Cedar Run Apartments in Aurora, Colorado, where more than two dozen people were arrested without warrants and no flight risk determinations. Altman Decl., attached as Ex. L, at ¶ 11. In the months that followed the Cedar Run raid, ICE agents have returned to those apartments and others with a substantial Latine population, terrifying the community and disrupting basic life functions.

Attorneys with the Rocky Mountain Immigrant Advocacy Network (RMIAN), a nonprofit legal service provider that represents detained noncitizens before the Aurora Immigration Court in Colorado, have spoken with many people in Colorado who experienced the same: they were arrested without a warrant, and without any flight risk analysis. Morales Decl., attached as Ex. M. A few examples are as follows:

    a. ICE arrested AA at his workplace in Aurora, Colorado. Officers arrived without a warrant to arrest another individual. While searching for that person, ICE arrested AA when he left the workplace. He was not shown a warrant for his arrest and officers did not ask him for information related to flight risk or his community ties. Since his arrest this summer, he is still detained. Morales Decl. ¶ 5.a.

    b. Individual EE was working at a restaurant in Evergreen, Colorado, when confronted by ICE. When he responded to questions regarding his

immigration status, ICE arrested Individual EE without a warrant and without any discussion concerning flight risk. EE was detained this summer and is litigating his removal case. *Id.* at ¶ 5.e.

    c.  Individual FF was arriving to work in Denver, Colorado, when a law enforcement entity, who FF thought was the local police, stopped him. ICE asked for FF's driver's license and "papers." When FF confirmed he did not have lawful status, the ICE officer arrested him and two others in the vehicle. ICE did not ask FF questions concerning flight risk or connections to community. FF is still detained and litigating his case. *Id.* at ¶ 5.f.

Plaintiffs' and Declarants' experiences demonstrate a pattern and practice of ICE officers in Colorado ignoring statutory requirements in favor of arresting as many Latine people as possible. ICE regularly makes warrantless arrests without the necessary probable cause determinations that the arrestee is both in the country unlawfully and poses a flight risk. Had ICE agents done any investigation into the community ties of any of the individuals described above, they would have learned that each has lived in their respective communities for years, is strongly tied to local family members and neighbors, has a long history of local employment or schooling, and poses no likelihood of trying to flee.

These unlawful warrantless arrests have significant consequences. Plaintiffs and class members have predictably experienced lengthy incarcerations, physical injuries, and/or pain. For example, immigration officers injured G.R.R.'s hand when violently pushing him to the ground. Ex. E, G.R.R. Decl., ¶ 14. Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R. suffered severe economic harms as a result of their warrantless arrests and subsequent detention. Mr. Ramirez and his wife incurred significant debt; Ms. Dias lost a job and had to move in with her parents and reduce her courseload at college; J.S.T. lost

his apartment; and G.R.R. could not work or take care of his young U.S.-citizen son. Ex. B, Ramirez Decl. ¶ 35; Ex. C, Dias Decl. ¶ 35-36; Ex. D, J.S.T. Decl. ¶ 25; Ex. E, G.R.R. Decl. ¶¶ 31-32. Because no warrant was obtained, Plaintiffs had no time to make any arrangements to get their affairs in order – or to retain counsel in their immigration matters. More broadly, knowing that ICE officers are willing—even eager—to make on-the-spot arrests of anyone they encounter even where not permitted by federal law, Plaintiffs and community members experience intense anxiety and fear causing many Latin[e] workers and residents to "slip[] into the shadows."[18]

### B.    Without Court Intervention, ICE Will Continue Effecting Unlawful Arrests to Meet the Administration's Arbitrary Enforcement Targets

ICE agents in Colorado and across the country have hailed the escalation of the agency's arrest tactics as "an overwhelming success."[19] Tom Homan, who serves as President Trump's "Border Czar," has repeatedly confirmed the Administration's intent to rely on broad and indiscriminate warrantless arrests, including collateral arrests of bystanders, especially in so-called "sanctuary jurisdictions," as they label Colorado.[20] Mr. Homan told CNN that under President Trump, such jurisdictions are "going to see a

---

[18] Ex. A, Wright Decl. Ex. 15, Natalie Skowlund, Deportation fears add to mental health problems confronting Colorado resort town workers, Colorado Newsline (Apr. 8, 2025), https://perma.cc/BFY3-L7PW; Ex. A, Wright Decl. Ex. 16, Catherine E. Scholchet, et al., 'It's like one day everyone left': How immigration crackdowns are reshaping America, CNN (Aug. 26, 2025), https://perma.cc/LP5F-HYKR.

[19] Ex. A, Wright Decl. Ex. 17, Steve Eder, et al., 'La Migra!' A Glimpse of Trump's Promised Deportation Storm, The New York Times (Jan. 17, 2025), https://perma.cc/AR97-ETMY.

[20] Ex. A, Wright Decl. Ex. 18, Allison Sherry, Colorado, Denver named again as 'sanctuary' spots for unauthorized new arrivals, fight continues in court, Colorado Public Radio (Aug. 5, 2025), https://perma.cc/ULQ6-FFT7.

higher number of collateral arrests"[21] and should expect to see "[m]ore agents in the neighborhood[.]"[22] CNN asked Mr. Homan to confirm that by "collateral arrests," he meant arrests of individuals without criminal records who agents had not planned to encounter. He did: "Yes, if they're in the country illegally, they're going to get arrested too."[23] Mr. Homan warned: "unlike the last administration, we're not going to tell ICE officers not to arrest an illegal alien. So if they find, others will be arrested."[24] The ICE agents who arrested Plaintiffs and the others described in the Declarations followed this directive, and one agent even told Ms. Dias that "under this president, and this presidency, we have to arrest anyone who is not a citizen." Ex. C, Dias Decl. ¶ 21.  But these directions flatly violate federal law.

Notwithstanding section 1357(a)(2), the current head of ICE, Defendant Lyons, has articulated the same position. According to Mr. Lyons, ICE has "to go out into the community and make those arrests, and that's where you are seeing [that] increase" in so-called "collateral" arrests.[25] It is therefore no surprise that when ICE swept through the Denver metro area with an army of federal agents, ICE echoed Mr. Homan's warnings.

---

[21] Ex. A, Wright Decl. Ex. 19, The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry (CNN broadcast Jan. 27, 2025), https://perma.cc/4KDM-64SC.

[22] Ex. A, Wright Decl. Ex. 19.

[23] Ex. A, Wright Decl. Ex. 19.

[24] Ex. A, Wright Decl. Ex. 20, Adam Shaw, Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats', Fox News (Jan. 21, 2025), https://perma.cc/3Q5X-8WMV.

[25] Ex. A, Wright Decl. Ex. 12.

ICE's Denver office posted photos of raids around Denver, claiming they were taking action against "communities with sanctuary policies."[26]



In that same post, ICE Denver shared a video of then-ICE Acting Director Caleb Vitello confirming that these ICE enforcement operations are "just going to continue."[28]

Colorado's communities have witnessed these tactics in spades. Public reporting indicates that ICE arrests in Colorado have shown "a nearly 300% increase from the same period in 2024."[29] In the weeks following the new quota directive, daily arrests in Colorado surged by more than 30%.[30] These figures are likely to keep escalating. In its most recent

---

[26] Ex. A, Wright Decl. Ex. 21., X, ICE Denver (@ERODenver) Feb. 5, 2025 9:40AM, https://perma.cc/9UXU-7W7J.

[27] The photos are from a variety of articles. Ex. A, Wright Decl. Exs. 3, 4 & 5.

[28] Ex. A, Wright Decl. Ex. 21.

[29] Ex. A, Wright Decl. Ex. 22, Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS.

[30] Ex. A, Wright Decl. Ex. 22.

appropriation, Congress gave the Administration $170 billion for immigration enforcement, including more than $45 billion for additional ICE detention space. In Colorado, private prison operators are eyeing converting two mothballed prisons to ICE detention facilities.[31] And ICE is on a hiring spree. Congress granted President Trump $8 billion for ICE to hire 10,000 new officers through 2029.[32] ICE is offering bonuses of up to $50,000 for retired agents to return to work.[33] ICE is intensifying its efforts to increase its strength and numbers particularly in what it calls "sanctuary" jurisdictions like Colorado: ICE has targeted its recruiting efforts through television ads in Denver, seeking to poach local law enforcement officers with promises of bonuses and student loan forgiveness.[34] ICE's presence is statewide – in addition to raids in metropolitan areas, as recently as

---

[31] Ex. A, Wright Decl. Ex. 23, Russell Contreras, et al., ICE operations in Colorado raise legal questions, AXIOS Denver (July 7, 2025), https://perma.cc/P9WH-BJY9 (noting immigration officers' "footprint in Colorado could soon grow"); *see also* Ex. A, Wright Decl. Ex. 24, Dan Boyce, Two Colorado facilities eyed as possible ICE detention centers, Colorado Public Radio (June 27, 2025), https://perma.cc/94DK-LS3M; Ex. A, Wright Decl. Ex. 25, Sara Wilson, Three new ICE detention centers reportedly planned in Colorado, Colorado Newsline (Aug. 15, 2025),https://perma.cc/RJ2P-8EFJ; Ex. A, Wright Decl. Ex. 26, Seth Klamann, ICE plans to open as many as three new detention centers in rural Colorado, report says, The Denver Post (Aug. 15, 2025), https://perma.cc/84WP-KMTH.

[32] Ex. A, Wright Decl. Ex. 27, Fed Agent, DHS Readies for Funding Surge After "Big Beautiful Bill" Passage, (July 10, 2025), https://perma.cc/ALT6-AKYR.

[33] Ex. A, Wright Decl. Ex. 28, Michelle Sandiford, ICE offers up to $50,000 signing bonus for retired employees to return to the job, Federal News Network (July 21, 2025), https://perma.cc/RA6T-38Q8.

[34] Ex. A, Wright Decl. Ex. 29, Anna Alejo, ICE recruitment ad made to lure Denver police officers faces pushback from police and city leaders, CBS News (Sept. 26, 2025), https://perma.cc/DAY8-6Q3A.

late September 2025, ICE activity has been reported in towns far from the metro area, such as Frisco, Steamboat Springs, and Alamosa.[35]



[36]

Mr. Ramirez's, Ms. Dias's, J.S.T.'s, and G.R.R.'s experiences are not unique. They are the product of Defendants' deliberate scheme to dramatically increase arrest statistics by encouraging warrantless arrests outside the bounds sanctioned by Congress. And as the agency ramps up its rhetoric, its enforcement targets, and its resources, communities across Colorado are bracing themselves in fear of facing the same unlawful treatment.

---

[35] Ex. A, Wright Decl. Ex. 30, Ryan Fish, ICE activity reported in Colorado mountain towns, sparking community concerns, ABC News (Sept. 25, 2025), https://perma.cc/F2D8-NDHC; Ex. A, Wright Decl. Ex. 31, Taylor Dolven, "There's a baby!" ICE agents stop Alamosa family at gunpoint, smash car window, The Colorado Sun (Oct. 1, 2025), https://perma.cc/K878-XZQY.

[36] Ex. A, Wright Decl. Ex. 32, LinkedIn, U.S. Immigration and Customs Enforcement, https://perma.cc/E86X-9CJ7.

### III.   LEGAL STANDARD

A party seeking a preliminary injunction must establish: (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in their favor," and (4) "an injunction is in the public interest." *M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1238 (10th Cir. 2024) (internal citation omitted). The second factor of irreparable harm is the "most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal citation omitted). And the third and fourth factors "merge" where (as here) the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

### IV.   ARGUMENT

This Court should enter a preliminary injunction to stop ICE's unlawful, ongoing practice of effecting warrantless arrests without the required individualized determinations of flight risk. As shown below, Plaintiffs and the class are likely to succeed on the merits and will suffer irreparable harm without immediate relief. Such injunctive relief is in the public interest, and the equities tip in plaintiffs' and class members' favor. Immigration agents cannot be allowed to terrorize people in Colorado in violation of the law.

#### A.   Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs assert causes of action against Defendants for violating 8 U.S.C. § 1357(a)(2), which bars ICE agents from making warrantless arrests *unless* they have "reason to believe" that (a) the person being arrested "is in the United States in violation of any [immigration] law or regulation" *and* (b) the person "is likely to escape before a

warrant can be obtained." In Colorado, ICE agents have a custom, policy, and practice of disregarding these legal constraints. ICE is arresting people not named in any immigration warrant without conducting any evaluation of the risk that they would flee before a warrant, if justified, could be obtained. These repeated and flagrant statutory violations have caused the Plaintiffs, their families, and communities across Colorado profound harm. Injunctive relief is warranted to stop this federal abuse of power and prevent the further irreparable harm it will otherwise inflict.

### i. ICE's Practice of Making Warrantless Arrests Without the Necessary Probable Cause Violates Federal Law

Congress granted immigration agents only limited authority to conduct warrantless arrests under 8 U.S.C. § 1357(a)(2). The statute does not authorize indiscriminate round-ups. Instead, immigration agents can conduct a warrantless arrest *only if* they have "reason to believe" that a noncitizen is unlawfully in the country *and* the noncitizen is "likely to escape before a warrant can be obtained." *Id*. "Reason to believe," as used in the statute, has been interpreted as the constitutional requirement of probable cause. *Roa-Rodriquez v. United States*, 410 F.2d 1206, 1208-09 (10th Cir. 1969). Federal law has consistently and expressly limited immigration enforcement agents' authority to conduct warrantless arrests in this way for nearly 80 years. *Supra* at n.6. While the INA's requirements of probable cause echo those imposed by the Fourth Amendment of the Constitution, they have an independent statutory basis and impose the additional obligation to evaluate flight risk. Said differently, the government must conduct the probable cause determinations mandated by the INA in addition to complying with any Constitutional guardrails limiting its power to implement a warrantless arrest.

As with constitutional violations, widespread refusal to follow statutory requirements warrants injunctive relief. *See, e.g.*, *S.E.C v. Curshen,* 372 Fed. Appx. 872, 883 (10th Cir. 2010) (unpublished); *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F.Supp.3d 10, 35 (D. D.C. 2021) (issuing classwide injunction for ICE's widespread failure to comply with statutory obligation); *United Farm Workers*, 785 F.Supp.3d at 742-3.

### a. The INA Requires Agents to Make Two Individualized Probable Cause Determinations Before Effecting Warrantless Arrests

Congress has constrained federal immigration agents' authority to effect warrantless arrests by requiring that they satisfy both of two pre-arrest probable cause standards: first, that the person is unlawfully present in the United States; *and* second, that the person is likely to flee before a warrant can be obtained. The requirement that immigration agents establish probable cause of flight risk before conducting a warrantless arrest "is always seriously applied." *United States v. Cantu*, 519 F.2d 494, 496–97 (7th Cir. 1975); *see also Mountain High Knitting, Inc. v. Reno*, 51 F.3d 216, 218 (9th Cir. 1995) (holding § 1357(a)(2) requires particularized finding of likelihood of escape); *Westover v. Reno*, 202 F.3d 475, 479–80 (1st Cir. 2000) (holding immigration agent was in "direct violation" of § 1357(a)(2) where no evidence existed that noncitizen was likely to escape). Section 1357(a)(2)'s requirement that immigration agents have probable cause a noncitizen is not legally present must also be supported by specific facts beyond the reasonable suspicion that might suffice for noncustodial questioning about one's immigration status. *See e.g. United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021); *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010).

For both inquiries, a "mere suspicion" does not establish probable cause. *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal citation omitted); *Roa-Rodriquez*, 410 F.2d at 1209. Rather, an officer must rely on facts "particularized with respect to that person." *Ybarra v. Ilinois*., 444 U.S. 85, 91 (1979). For example, this Court has held that immigration agents violated the statute by failing to engage in a particularized analysis of specific flight-risk facts such as employment, paying rent, owning a vehicle, living with roommates or family, and lack of any history of legal trouble. *United States v. Khan*, 324 F.Supp.2d 1177, 1187 (D. Colo. 2004).

Mere association with others suspected of certain activities or proximity to a place of other illegal activity is not, without more, sufficient. *United States v. Vazquez-Pulido*, 155 F.3d 1213, 1216 (10th Cir. 1998). Categorical assumptions based on a person's demographic characteristics or the conclusion that a person fits a certain "profile" are insufficient. *See e.g. Bravo v. City of Santa Maria*, 665 F.3d 1076, 1085 (9th Cir. 2011) (assumptions based on family member's gang membership insufficient to establish probable cause). And the Constitution precludes selective enforcement of the law based on race or ethnicity. *See, e.g., Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1166-67 (10th Cir. 2003).

The requirement of individualized suspicion regarding *both* legal status and flight risk to justify a warrantless arrest predates the 1952 INA. These long-standing statutory mandates reflect Congress's "carefully considered distinction between powers which may be exercised without warrant and such where a warrant [would] be required." H.R. Rep. 82-1365 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1653, 1710.

More recently, in 2022, as part of a legal settlement, DHS issued a "2of Policy" outlining requirements for evaluation and documentation of flight risk based on "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." *See* Ex. N, Braun Decl. Attachment 26 (Broadcast Statement of Policy), *Castañon Nava v. DHS*, No. 1:18-cv-03757, Dkt. 15-2, at ¶ 27. The policy—i.e., the agency's own interpretation of § 1357(a)(2)'s requirements—instructed immigration officers to consider the totality of the circumstances in evaluating an individual's "likelihood of escape," including an individual's community ties (such as their family, home, or employment) and an individual's prior escapes or evasions of immigration authorities. *See* Ex. N, Braun Decl., at 1. The policy further required that immigration officers who made a warrantless arrest document the facts and circumstances surrounding the warrantless arrest "as soon as practicable." *Id*. at 2. The documentation had to include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id*. While DHS and ICE's obligations under the law have not changed, when the settlement terminated in May 2025, ICE immediately rescinded its guidance and encouraged its agents to engage in warrantless arrests.[37] And even before the settlement expired, ICE was violating the requirements of section 1357(a)(2) and facing motions to enforce in the *Castañon-Nava* case. That Court recently found that, under the current Administration, ICE engaged in warrantless arrests in the Northern District of Illinois in violation of the

---

[37] Ex. A, Wright Decl. Ex. 33, Marisa Kabas, The Handbasket, ICE agents get green light to make unjustified warrantless arrests (June 12, 2025), https://perma.cc/E794-KCHH.

settlement and the requirements of section 1357(a)(2). The Court extended the settlement agreement to February 2, 2026, and ordered ICE to reissue the Broadcast Statement of Policy to all ICE officers nationwide.[38]

> **b.**    **ICE Has a Pattern and Practice of Making Warrantless Arrests Without an Individualized Determination that a Person Presents a Flight Risk**

As the declarations show, ICE's arrests of the Plaintiffs and putative class members have been the product of ICE's highly coordinated practice to arrest as many noncitizens as possible, regardless of any individual, specific, articulable bases for doing so without a warrant. ICE made no individualized assessment of flight risk when conducting these warrantless arrests, thus violating federal statute, guidance from this Court and others, and ICE's own interpretation of statute and regulations.

Before arresting Plaintiffs Mr. Ramirez, Ms. Dias, G.R.R., and J.S.T., as well as others described in the declarations, ICE agents did nothing to ascertain whether they posed a flight risk. ICE did not inquire about or take any other steps to determine tenure in the United States, family connections, housing arrangements, employment or education, or ties to the community. If they had, they would have learned that all these people built their lives in the United States. Mr. Ramirez, Ms. Dias, J.R.R., J.S.T., and J.C.C. have all lived in the United States for at least a decade. Ex. B, Ramirez Decl. ¶ 1; Ex. C, Dias Decl. 1; Ex. E, G.R.R. Decl. ¶ 1; Ex. D, J.S.T. Decl. ¶ 1; Ex. F, J.C.C. Decl. ¶ 1. Mr. Ramirez, G.R.R., J.C.C., and J.P.P. have raised children, many of whom are U.S.

---

[38] Ex. O, Memorandum Opinion and Order, *Castañon Nava v. DHS*, No. 1:18-cv-03757, Memorandum Opinion and Order, Dkt. 214.

citizens, in Colorado for many years. Ex. B, Ramirez Decl. ¶ 2; Ex. E, G.R.R. Decl. ¶¶ 2-3; Ex. F, J.C.C. Decl. ¶ 2; Ex. G, Jordan Decl. ¶ 8. J.S.T. helps financially support and raise two U.S.-citizen nieces. Ex. D, J.S.T. Decl. ¶ 6. Mr. Ramirez, J.C.C., and J.S.T. are long-tenured employees who have worked for their employers or run their own business for roughly a decade or more. Ex. B, Ramirez Decl. ¶ 3; Ex. F, J.C.C. Decl. ¶ 3; Ex. D, J.S.T. Decl. ¶ 3. Ms. Dias attends college on a merit scholarship and supported herself by working two jobs at the time of her arrest. Ex. C, Dias Decl. ¶¶ 1, 35. Mr. Ramirez and J.S.T. have strong ties to their church communities, where they regularly worship. Ex. B, Ramirez Decl. ¶ 5; Ex. D, J.S.T. Decl. ¶¶ 4-5.

ICE agents also did not investigate Ms. Dias' ongoing asylum application to assess any flight risk. Ms. Dias and her family filed and have been pursuing her asylum application. Ex. C, Dias Decl. ¶ 3. Had agents investigated and considered these facts, they would have understood that Ms. Dias did not present any flight risk; indeed, Ms. Dias and her family are required to provide the government their locations as part of their applications.

ICE arrested other declarants without a warrant despite obvious evidence demonstrating they did not pose any flight risk. For example, Mr. Ramirez and J.P.P. were arrested close to or even inside their homes. Ex. B, Ramirez Decl. ¶¶ 9, 17; Ex. G, Jordan Decl. ¶¶ 8, 15. Complying with federal law took a back seat to ICE's directive that "under this president … [they] have to arrest anyone who is not a citizen." Ex. C, Dias Decl. at ¶ 21.

ICE's pattern and practice of disregarding applicable probable cause requirements violates 8 U.S.C. § 1357(a)(2). Federal agencies "may not rewrite clear statutory terms to suit [their] own sense of how the statute should operate." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018) (quoting *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014)); *see also Loper Bright Ent. v. Raimondo,* 603 U.S. 369, 412-13 (2024) (courts need not defer to agency interpretation of the law). Courts have uniformly applied this maxim to invalidate agency practices that disregard § 1357(a)(2)'s flight risk provision. Where, as here, an immigration agency "make[s] no determination whatsoever that the subject of [an arrest] is likely to escape … before a warrant can be obtained, … [the agency] goes beyond its statutory authority to make warrantless arrests." *Moreno v. Napolitano*, 213 F. Supp. 3d 999, 1008-09 (N.D. Ill. 2016) (granting summary judgment on plaintiffs' claim that ICE policy of issuing detainers without regard to flight risk violated § 1357(a)(2)).[39] DHS's own prior guidance interpreting § 1357(a)(2) in its Broadcast Statement of Policy confirms this. *See supra at* 22-23.

Defendants' actions demonstrate that, absent intervention from this Court, ICE will continue ignoring 8 U.S.C. § 1357(a)(2)'s mandates. As then-acting ICE Director Vitello said in Colorado, these ICE enforcement operations are "just going to continue."[40] *See, supra* at 15. And he was right. As recently as a few weeks ago, ICE engaged in

---

[39] *See also Roy v. Cnty. of Los Angeles*, No. 12-09012, 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018) (same); *Creedle v. Miami-Dade Cnty*, 349 F.Supp.3d 1276, 1295 (S.D. Fla. 2018) (plaintiff stated plausible claim under APA that ICE failed to comply with § 1357(a)(2)).

[40] Ex. A, Wright Decl. Ex. 21.

immigration arrests in Colorado's mountain towns, detaining people by professing to enforce traffic laws, or lying in wait at government offices for people who lack legal immigration status.[41] The Administration's demands to maximize immigration arrests remain in place, and DHS is looking to convert at least two empty Colorado prisons into more immigration detention facilities.[42] ICE's unlawful practices will continue absent Court intervention.

### B.    Plaintiffs and Class Members Will Suffer Irreparable Harm from Continued Unlawful Warrantless Arrests

ICE's illegal policies and practices are causing and will continue to cause irreparable harm to Plaintiffs and the putative class. Courts have long recognized that detention following arrest like that experienced by Plaintiffs in the Aurora Detention Center is, in itself, a profound harm. "The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness." *Barker v. Wingo*, 407 U.S. 514, 532 (1972). "It is hard to adequately state the significance of the potential injury" to a person who is illegally incarcerated, as one cannot "be given back" any day "he has spent in prison." *Case v. Hatch*, No. 08-CV-00542 MV/WDS, 2011 WL 13285731, *5 (D. N.M. May 2, 2011). Detention causes "potentially irreparable harm every day [one] remains in custody." *Rodriguez Vazquez v. Bostock*,

---

[41] Ex. A, Wright Decl. Ex. 34, Voces Unidas de las Montañas, ICE detains longtime Colorado father after fake traffic stop (Aug. 28, 2025), https://perma.cc/YA29-YDLC; Ex. A, Wright Decl. Ex. 35, Taylor Dolvan, What happens when ICE takes away a Colorado family? A teammate disappears. A colleague misses work. Neighbors are gone (Sept. 5, 2025), https://perma.cc/UF5Q-MTHZ.

[42] Ex. A, Wright Decl. Ex. 23, (noting immigration officers' "footprint in Colorado could soon grow"); Ex. A, Wright Decl. Exs. 24, 25 & 26.

779 F.Supp.3d 1239, 1262 (W.D. Wash. 2025) (internal citation omitted). This injury is "certain, great, actual, and not theoretical." *See Heideman v. S. Salt Lake City, Utah*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citations omitted).

Recent changes that the Administration is seeking to make to the availability of bond for immigrants in detention amplify this harm. As of September 5, 2025, overturning 50 plus years of practice and precedent (even though the law has not changed), the government has now taken the position that immigration courts cannot grant bond to detainees who entered the United States without inspection, no matter how long ago that entry occurred. *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 226-29, Interim Dec. 4125 (BIA 2025). Thus, detained immigrants' only potential recourse would be to pursue lengthy and complex federal *habeas corpus* proceedings or simply sit in ICE detention for however long their immigration case takes. This also means loss of employment, draining of financial resources, deteriorating mental health, denial of medical care, and estrangement from family.

Plaintiffs' experiences confirm these significant ongoing harms. That ICE arrested Plaintiffs on the spot without first obtaining a warrant deprived each Plaintiff of any opportunity to get their affairs in order or seek counsel. Ms. Dias' family was distraught when their daughter disappeared on her road trip. Ex. C, Dias Decl. ¶ 22. G.R.R., who made a short trip to pick up a friend from a nightclub, never came home to his nine-year-old son. Ex. E, G.R.R. Decl. ¶¶ 3, 8-9, 30-31. J.S.T. lost his apartment, relegated to depending on his family and living in temporary lodging since his release from detention.

Ex. D, J.S.T. Decl. ¶ 25. Ms. Dias never received her driver's license back, making it difficult for her to go to work or attend school. Ex. C, Dias Decl. ¶ 34.

Plaintiffs and putative class members are understandably scared to leave their homes, go to work, accompany or send their children to school, go to the doctor, and run even basic errands. For instance, Ms. Dias feels fear and anxiety when she leaves home and is terrified at the thought of being arrested again. Ex. C, Dias Decl. ¶¶ 33, 37, 39. Plaintiffs and other putative class members describe avoiding public places for fear of being stopped and arrested. *See, e.g.,* Ex. C, Dias Decl. ¶ 37, 39; Ex. E, G.R.R. Decl. ¶ 37. The indiscriminate nature of ICE's unlawful arrest practices means that even a person with a pending immigration application still risks being arrested and detained with no notice to their children or family.

Plaintiffs and putative class members' fears are justified. They continue to live, work, and go about their daily business in communities and locations targeted by ICE. ICE has returned to housing communities where it conducted raids earlier this year. Ex. L, Altman Decl. ¶ 15. Tenants in those communities are lying low, often avoiding seeking any critical improvements or repairs to their homes, out of fear that this could draw further attention to their presence. *Id.* ¶¶ 15-17. ICE continues to stop and detain community members in similar locations in Aurora, Dillon, Silverthorne, Roaring Fork, and Fort Collins, pulling over people in unmarked cars or declining to provide officer identification. Ex. H, Vazquez Decl. ¶¶ 4-5; Ex. I, Highland Decl. ¶¶ 4-5; Ex. J, Herrera Decl. ¶¶ 4-5; Ex. K, Noone Decl. ¶¶ 4, 6. After requesting identification and, in some instances, seeing a SB251 license (which identifies the driver as a person who has not provided proof of

lawful presence in the United States), ICE arrests the vehicle occupants without warrants or making any investigation or determination of their flight risk. Ex. H, Vazquez Decl. ¶¶ 6-8; Ex. I, Highland Decl. ¶¶ 6-8; Ex. J, Herrera Decl. ¶¶ 6-8; Ex. K, Noone Decl. ¶ 7.

The members of the putative class with young U.S.-citizen children are terrified of being swept up by ICE and separated from their families. G.R.R. spent nearly seven weeks at a detention center, devastated that he was separated from his nine-year-old son. Ex. E, G.R.R. Decl. ¶¶ 29-31. G.R.R.'s son now fears leaving his G.R.R.'s side because he believes he can protect G.R.R. from being arrested and detained again. *Id.* ¶ 31. G.R.R.'s son has started acting out at school. *Id.* G.R.R.'s fear is shared by many of the putative class members with school-age children. Mr. Ramirez's daughter was diagnosed with depression, anxiety, and PTSD while he was detained, and all four of his children began attending therapy due to the stress, depression, anxiety, and separation anxiety caused by his detention. Ex. B, Ramirez Decl. ¶¶ 36-37.[43] *See, e.g.*, *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (identifying "separated families" as irreparable harm). The fear and harms extend to Plaintiffs' and putative class members' families and children who are less likely to seek and obtain services such as public education and medical assistance. For example, Summit County School District recorded

---

[43] Ex. A, Wright Decl. Ex. 36, Spencer Wilson, Fear grips Colorado Mountain towns amid rumors of increased patrols by Immigration and Customs Enforcement, CBS Colorado (June 5, 2025), https://perma.cc/84JZ-UG4T (quoting the CEO of Voces Unidas de las Montañas, a non-profit serving immigrant communities: noncitizens are calling their hotline to "question[]" whether "their kids should be going to school" in the current environment).

an average drop of almost 30% of students attending schools across the district after fears of ICE raids in the community.[44]

Courts regularly hold such injuries constitute irreparable harm for purposes of preliminary relief. *See United Farm Workers*, 785 F.Supp.3d at 741-4 (enjoining DHS and citing immigration agents' statements that they will return to conduct similar operations to arrest immigrants); *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (highlighting the "irreparable harms imposed on anyone subject to immigration detention"); *D.B.U. v. Trump*, 781 F.Supp.3d 1158, 1174-5 (D. Colo. 2025) (granting preliminary injunction and finding irreparable harm of risk for immigration removal).

### C.    The Balance of Hardships Weighs Heavily in Plaintiffs' Favor, and an Injunction is in the Public Interest

The balance of equities and the public interest factors "merge" where the government is opposing injunctive relief. *Denver Homeless Out Loud v. Denver, Colo.*, 32 F.4th 1259, 1278 (10th Cir. 2022) (quoting *Nken*, 556 U.S. at 435). As a result, courts must balance the harm to plaintiffs of not granting the injunction against the harm to the government if the injunction is granted. *Denver Bible Church v. Azar*, 494 F.Supp.3d 816, 843 (D. Colo. 2020) (citing *Fsish v. Kobach*, 840 F.3d 710, 755-56 (10th Cir. 2016)).   The government's violation of federal law is not in the public's interest, especially when there

---

[44] Ex. A, Wright Decl. Ex. 37, Spencer Wilson, Some students in Colorado's high country say a climate of fear is impacting their education, CBS Colorado (Sept. 17, 2025), https://perma.cc/GA6L-URSE; *see also* Ex. A, Wright Decl. Ex. 38, Yesenia Robles, Aurora teachers provide a glimpse into their classrooms on the day of immigration raids, Chalkbeat Colorado (Feb. 10, 2025), https://perma.cc/4K8V-4RXB (noting the Aurora school district had attendance of 89.44% prior to the raids, and when rumors circulated raids would begin, attendance dropped to 79%).

are no adequate remedies available. *See Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013). The harm to Plaintiffs, putative class members, and Colorado communities in this case is great. The harm to ICE, on the other hand, is non-existent: Plaintiffs ask only that ICE stop violating its existing statutory obligations.

Plaintiffs' proposed injunctive relief targets ICE's unlawful warrantless arrest practices. Plaintiffs ask this Court to provisionally certify the class and order ICE to take the steps necessary to comply with section 1357(a)(2)'s requirements. To that end, Plaintiffs request a classwide injunction (i) prohibiting ICE from effecting warrantless arrests without having probable cause both that the individual is in the country illegally and that the person is likely to escape before a warrant can be obtained; and (ii) provide Plaintiffs and the Court adequate documentation to substantiate that ICE is complying with the statute on an ongoing basis given the widespread and persistent violations across this District to date.

Such injunctive relief is standard in cases of widespread statutory violations. *See, e.g.*, *Ramirez*, 568 F.Supp.3d at 35 (issuing classwide permanent injunction for ICE's widespread failure to comply with statutory obligation); *S.E.C. v. Reven Holdings, Inc.*, No. 1:22-cv-03181, 2024 WL 1675677 at *13-14 (D. Colo. Mar. 29, 2024) (enjoining violations of federal securities laws); *Perez v. ZL Restaurant Corp.*, 81 F.Supp.3d 1062, 1074 (D. N.M. 2014) (consistent Fair Labor Standards Act violations warranted injunction).

A preliminary injunction is in the public interest. Absent an injunction, Colorado's communities, businesses, schools, and local law enforcement efforts will suffer severe

harm. *See League of Wilderness Defs. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014) (noting that when assessing the public interest, courts "primarily address[] impact on nonparties") (internal citation omitted). Communities in Colorado fear ICE's unlawful warrantless arrest tactics. "[L]ocal health workers and advocates" explain that individuals in immigrant communities are "avoid[ing] applying for government services that require submitting personal data," because they fear being rounded up as a result.[45] And U.S.-citizen children of Plaintiffs and putative class members live in constant fear of being separated from parents and caregivers, foregoing school and healthcare to avoid ICE. Ex. E, G.R.R. Decl. ¶ 31; Ex. B, Ramirez Decl. ¶¶ 36-37.

ICE's policies and practices also erode trust in local law enforcement. Immigrant communities and mixed-status families are discouraged from calling law enforcement out of fear that they or their loved ones will be arrested and deported.[46] As former Border Patrol Commissioner Chris Magnus recognized, "[t]hese roundups create widespread distrust of law enforcement and discourage many community members from reporting crimes as victims or witnesses." *See* Ex. N, Braun Decl. at ¶ 21.

---

[45] Ex. A, Wright Decl. Ex. 15.

[46] Ex. A, Wright Decl. Ex. 39, Ryan Fish, Colorado law enforcement concerned immigrants' fear will mean fewer reported crimes, Denver 7 ABC (Feb. 19, 2025), https://perma.cc/JYX8-Z9KX; Ex. A, Wright Decl. Ex. 40, Nik Theodore, Insecure Communities: Latino Perceptions of Police Involvement in Immigrant Enforcement, University of Illinois at Chicago (May 2013), https://perma.cc/54C6-N52F (study reporting that 45% of Latine individuals, and 67% of those without status, stated that they are less likely to voluntarily offer information about crimes or to report a crime because they are afraid the police will ask them or people they know about their immigration status).

Unlike Plaintiffs, Defendants will suffer no material harm, let alone any threat of permanent harm, should this Court grant Plaintiffs' requested relief. *See League of Wilderness Defs.,* 752 F.3d at 761 (concluding the balance of harms tips towards plaintiffs "because the harms they face are permanent" whereas the opposing intervenor faced only temporary delay). A prohibition against violating the law does not harm the government. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Wages & White Lion, Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("There is generally no public interest in … unlawful agency action") (internal citation omitted). *See also United Farm Workers*, 785 F.Supp.3d at 742 (explaining "the government will not be harmed by being enjoined from engaging in practices . . . which fail to comply with decisional and statutory responsibilities"). Plaintiffs' requested relief does not prevent ICE or any immigration agent from enforcing federal immigration laws to the fullest extent *allowed by law*. The balance of hardships and public interest weigh heavily in favor of Plaintiffs' requested relief.

## V.    SECURITY

No bond is necessary in this case. District courts may dispense with bonds where an injunction poses no realistic harm to the defendants. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964). As discussed, ICE cannot possibly incur harm from complying with Plaintiffs' proposed preliminary relief here because that relief directs those agents to stop violating existing law. *See United Farm Workers,* 785

F.Supp.3d at 742 (rejecting bond because relief "directs compliance with … statutory obligations").

District courts are also empowered to dispense with the bond requirement where it "'would effectively deny access to judicial review.'" *Colorado Wild Inc. v. U.S. Forest Service*, 523 F.Supp.2d 1213, 1230-31 (D. Colo. 2007) (internal citation omitted). Courts therefore "routinely impose either no bond or a minimal bond" in cases "involving public interests." *Arevalo v. Trump*, 785 F.Supp.3d 644, 668 (C.D. Cal. 2025) (internal citation omitted) (imposing bond of $1). This Court should decline to impose a bond or at most impose a nominal bond. *D.B.U.*, 781 F.Supp.3d at 1175 (declining to order bond).

## VI. CONCLUSION

This Court should grant Plaintiffs' motion, provisionally certify the class, and issue the requested classwide preliminary injunction enjoining further violations of Plaintiffs' and the Warrantless Arrest Class's rights in this District under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) pending further proceedings.

DATED: October 9, 2025

/s/ Kenzo Kawanabe
Kenzo Kawanabe, Bar No. 28697
Sean Grimsley, Bar No. 36422
Bianca Miyata, Bar No. 42012
Olson Grimsley Kawanabe Hinchcliff &
Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151
kkawanabe@olsongrimsley.com
sgrimsley@olsongrimsley.com
bmiyata@olsongrimsley.com

Timothy R. Macdonald, Bar No. 29180
Annie Kurtz, Bar No. 51525
Emma McLean Riggs, Bar No. 51370
Sara Neel, Bar No. 36904
Scott Medlock, Bar No. 57210
American Civil Liberties Union of
Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (303) 777-5482
tmacdonald@aclu-co.org
akurtz@aclu-co.org
emcleanriggs@aclu-co.org
sneel@aclu-co.org
smedlock@aclu-co.org

Hans Meyer, Bar No. 37812
Meyer Law Office
1547 Gaylord Street
Denver, CO 80206
Telephone: (303) 831-0817
hans@themeyerlawoffice.com

*Attorneys for Plaintiffs*