# EXHIBIT :

## **DECLARATION OF J.C.C.**

Pursuant to 28 U.S.C. § 1746, I, J.C.C., declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a 53-year-old man from a small town, Rancho Parral de las Huertas, in Zacatecas, Mexico. I came to the United States with my wife in 1996. We came to build a better life for our family, create a stable home, and provide opportunities for ourselves and our future children. I have lived in the United States continuously since that time.

2. My wife and I have four U.S. citizen children, ages 28, 27, 20, and 7. Our youngest son, who is seven years old, is especially close to me and relies on my guidance and support in his daily life. The entire family has been deeply affected by my detention.

3. I am self-employed and run my own concrete and landscaping business. I complete all jobs myself and take great pride in the work I do. I started my business in 2011 after years of working for others, and it has provided a good and steady income, allowing me to fully support my family. For larger jobs, I hire additional help from friends or family.

4. I own a home in the United States, which I purchased in 1999 through a mortgage. I have paid a substantial portion of it off and continue to make payments. My family and I have built our life here, and I am dedicated to supporting them and maintaining our home and business.

5. On the morning of July 18, 2025, I had been hired for a job off of South Parker. As usual, I got up early and went straight to the job site to start my day. After arriving, I realized that I was missing some parts I needed to complete the work. Since the Home Depot on Main and Parker is close by, I decided to drive there quickly to buy the parts and then return to continue with the job.

6. That morning felt like any other workday. I was focused on my responsibilities and making sure my crew and I could finish the job properly. I drove to Home Depot, purchased the parts I needed, and then got back into my truck to head back to the job site.

7. As I was driving, I noticed an unmarked car behind me flashing its headlights. At first, I thought it was just an impatient driver trying to pass, so I tried to move to the side. The driver behind me motioned with his hand for me to keep driving. At the first traffic light, I made a right turn. At that point, I realized something was very wrong: the same car stayed behind me, and another unmarked car suddenly pulled in front of me, blocking me in completely. I stopped immediately and pulled over to the side of the road.

8. Two men got out—one from the car behind me and one from the car in front. They approached my truck quickly. The man at my driver-side window wore civilian clothes and a tactical vest that had no markings identifying him as ICE or police. The other man, on the passenger side, was also in civilian clothes with a vest.

9. The man at my window signaled with his hand for me to roll down the window. I did as he asked. He told me to turn off my truck and place my keys on top of the vehicle. He began speaking to me in Spanish, but I responded in English. He then asked me directly: "Do you know why I stopped you?" I said, "No." He opened my car door and told me to step out of the truck. I complied.

10. He walked me to the back of my truck and pointed to my license plate. He said a plastic bag was partially covering part of the plate. Then he said, "We are immigration." He gestured toward his belt, but I did not see a badge, uniform, or anything else that clearly identified him as ICE or any other law enforcement agent.

11. He asked if I had any documentation to prove that I had legal status. I told him I did not have it with me at the moment. He shouted, "Do you have legal documentation, yes or no?" I told him I wanted to speak with an attorney. He asked me if I had a driver's license, I told him I did, he then requested to see it. I then showed him my driver's license. He looked at it and said it was not valid federally.

12. Without further explanation, he placed me under arrest. He handcuffed my wrists, shackled my legs, and secured a restraint around my waist all with chains. The second man simply watched. He did not return my driver's license.

13. I asked if he could contact my son to come pick up my truck because it's my work truck with a lot of tools in the back, and he said that he could do that. He let me call my son with my phone; I was later notified while at the DHS office that my son was able to pick up my truck. On the way, the officer made some casual conversation, saying he had "got another guy like me" before, talking about a guy who can also speak a little bit of English. They asked me personal questions about when I came to the United States, if I had ever been reported before, whether I had children, and if I was married. I answered their questions.

14. After the arrest, I was taken to the Department of Homeland Security office in Centennial. There, I was placed in a holding cell with other people. I waited with my cellmates until my name was called for processing.

15. I was called out of the holding cell to meet with an officer who handled my paperwork. This officer introduced himself as Officer Ramirez. He explained very little about the documents I was signing. He told me the papers I was signing were not like deportation documents, though I did not fully understand everything at the time. After processing with Officer Ramirez, I was returned to the holding cell with other detainees. I was then put on

a bus with the other detainees to transport us to the Aurora Detention Center. This occurred around 6:00 p.m. I was never told where I would be taken but I already knew where the detention center was and what happens when you get detained.

16. Since my arrest more than four months ago, I have remained in detention, and the consequences for my family and me have been profound. I am the primary breadwinner for my family, and my absence and lack of income has caused severe financial hardship. My family has been forced to use up nearly all of our savings just to cover basic expenses, and while they have not yet had to sell any belongings, the situation is very tight. My wife now works full time, but maintaining the household on her own has been overwhelming. My eldest child has stepped in to try to help, but they have their own life and can only do so much. On top of these expenses, they have had to pay for attorneys to assist with my case, which has only added to the financial strain.

17. My youngest child—who is especially close to me—has been deeply affected by my detention. They already have an Individualized Education Program (IEP) at school and receive extra support because of ADHD and an adjustment disorder. My daily presence and involvement have always been important for helping them stay on track. Since my detention, they have struggled even more emotionally and psychologically, and I am very concerned that my continued absence will only worsen their condition. My entire family has experienced immense stress and trauma as a result of this detention.

18. My family and I experienced a brief moment of hope when I had a bond hearing on August 14, at which the immigration judge granted me a $10,000 bond. We were elated, believing I would soon be released. However, we later learned that DHS had filed a stay to appeal the bond, extending my time in detention and compounding the hardship for my family and

me. I continue to be detained, fighting my case, which has been emotionally exhausting and profoundly unfair.

19. At no point was I ever shown a warrant for my arrest or told there was any warrant. The officers never explained why they had the legal authority to stop me. They did not identify themselves clearly or explain their agencies. I only learned from my attorneys after I was arrested and detained that the officers were from ICE and the DEA. I believe this arrest was racially motivated, as I was singled out solely because of my ethnicity and perceived immigration status.

20. Before detaining me, the officers did not ask any questions to assess my flight risk. They did not inquire about my long-standing ties to the community, my steady employment, my family ties, the fact that I have lived in the United States for decades, or anything else before deciding to arrest me.

21. This experience has caused significant emotional and financial hardship for me and my family and has left me with a profound sense of injustice, knowing that my arrest and continued detention were entirely unnecessary and unlawful.

22. This declaration was read back to me in Spanish, a language in which I am fluent.

I, J.C.C., swear under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and recollection.

/s/     JCC

J.C.C.

Executed on this 26 day of September 2025