# EXHIBIT 7

## ELIZABETH JORDAN ATTORNEY AFFIRMATION:
## ATTORNEY OF RECORD FOR O.M.R. and J.P.P.

I, Elizabeth Jordan, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct to the best of my knowledge and belief:

1. I am an immigration attorney and assistant professor at the University of Denver Sturm College of Law, where I direct the immigration clinic. Under my supervision, law students serve as student attorneys for noncitizens detained at the Aurora Detention Center and appearing at the Aurora Immigration Court. I represented O.M.R., one subject of this Declaration, in his bond proceedings. I also represented J.P.P. in his immigration proceedings, also a subject of this Declaration. I make this statement in my individual capacity and not on behalf of the University of Denver.

*O.M.R.*

2. Prior to his detention, O.M.R. was living in Aurora with his partner and her children. O.M.R. was authorized to work in the United States under the immigration laws. Other than an arrest for trespass in Texas when he crossed the border, O.M.R. had no criminal record. He also had no missed court appearance.

3. O.M.R. was arrested by ICE in Aurora on March 28, 2025 without any warrant and with no determination of his likelihood of flight.

4. The I-213 Record of Deportable noncitizen that ICE filed in immigration court for O.M.R. indicated that O.M.R. had been a collateral arrest during a traffic stop. ICE reported in the I-213 that it was conducting surveillance of another individual who got in the driver side of a vehicle. ICE reported that another individual, later identified as O.M.R., got in the passenger side of the vehicle. ICE officers followed the vehicle and then performed a traffic stop. There is no indication ICE had gathered any information about O.M.R. prior to the traffic stop.

5. According to the narrative in the I-213, after pulling the vehicle over, ICE obtained identification for both the target who was driving and O.M.R. The ICE officer instructed the target to exit the vehicle and arrested him. While O.M.R. remained in the vehicle, an ICE officer conducted a "field interview." After the "field interview," the ICE officer instructed O.M.R. to exit the vehicle and arrested him. The ICE officer did not ask O.M.R. any questions to determine his likelihood of flight and there is no discussion of O.M.R.'s likelihood of flight in the narrative in the I-213.

6. There was no warrant of arrest filed in immigration court. No warrant of arrest is mentioned in the I-213 document. On information and belief, ICE did not prepare one prior to arresting O.M.R.

7. At the time of his arrest by ICE, O.M.R. had an Application for Temporary Protected Status pending with the U.S. Citizenship and Immigration Services. O.M.R. has been

detained at the Denver Contract Detention Center in Aurora, Colorado since his warrantless arrest on March 28, 2025. Since his detention, O.M.R.'s partner and children have faced eviction. O.M.R. suffers from a painful physical condition that is exacerbated by the hard bed in the detention center, disrupting his sleep. Being detained has also caused O.M.R. to express hopelessness and experience skyrocketing anxiety.

*J.P.P.*

8. I also represented J.P.P., who was apprehended in a violent raid by ICE at his home at the Cedar Run Apartments on February 5, 2025. His wife and his step-daughters, aged 12 and 16, were also present.

9. Early on the morning of Feb. 5, J.P.P. and his wife received a phone call from a friend informing them that immigration agents were gathering outside of their apartment complex. J.P.P. opened the curtain to their balcony and saw immigration agents in the parking lot with large weapons and what looked like tanks. Shortly thereafter, J.P.P. heard a commotion in the hallways outside of their apartment and saw through the peephole in his front doorr uniformed men with long guns yelling at the occupants of the apartment across the hall, whose door the officers had broken. J.P.P. and his family decided to hide under the bed that the teenage girls shared.

10. Suddenly, they heard one loud bang followed by three loud explosions. No one had knocked on their door, announced themselves, or provided a warrant. J.P.P. thought that the officers had exploded a bomb in their apartment.

11. J.P.P.'s stepdaughters started screaming. J.P.P. feared that he would be shot. After the explosion, several uniformed ICE agents ran into the apartment, pointing the long guns at J.P.P. and his family and yelling in English. J.P.P.'s wife tried to explain that there were children in the apartment.

12. J.P.P., his wife, and his older stepdaughter were handcuffed with metal handcuffs behind their back. A male agent patted the 16-year-old daughter down.

13. An ICE agent who spoke Spanish began to question J.P.P. and the family while they were still in handcuffs. The agent did not know J.P.P.'s name, but asked him for his name and birthdate. After checking his name and birthdate, and that of his wife, the ICE agent told them that they were "clean."

14. J.P.P.'s wife had previously applied for asylum for the family and they had just recently, on December 9, 2024, had an appointment with U.S. Customs and Immigration Service in Aurora, where they submitted their fingerprints and biometric data. J.P.P. also had recently attended his hearing at Immigration Court in Denver on December 12, 2024. At that hearing, the immigration judge informed him that the government had not opened an immigration case against him.

15. Even though J.P.P. had recently given his biometric data to the government and attended his recent immigration court proceeding, and the ICE agent told him that he was "clean," J.P.P. was taken into ICE custody on February 5, 2024, at the end of his interview. On information and belief, ICE did not have a warrant for his arrest and did not ask him any questions to determine whether he was a flight risk.

16. When I met J.P.P., he was deeply traumatized. He described the ICE raid and grenade bombs being thrown into his apartment as one of the most horrifying things he had ever experienced, and this included being tortured by police officers in Venezuela. A mental health professional I retained for his immigration case diagnosed him with severe anxiety and PTSD related to the traumatic circumstances of his arrest. His family is also traumatized.

17. After his arrest by ICE, J.P.P. was taken to the Denver Contract Detention Facility in Aurora, Colorado. J.P.P. described the conditions at the detention center as unbearable.

I, Elizabeth Jordan, swear under penalty of perjury that the forgoing declaration is true and correct to the best of my knowledge and recollection.

_____
Elizabeth Jordan, Esq.
Executed this 30th day of September, 2025