# EXHIBIT 8

## <u>DECLARATION OF G.R.R.</u>

Pursuant to 28 U.S.C. § 1746, I, G.R.R., declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a 32-year-old man born in Mexico. I came to the U.S. with a visa and have lived continuously in Colorado Springs, Colorado, for the last 10 years.

2. I have a 9-year-old son, M.R., who is a United States citizen and was born in Colorado in 2016. My ex-wife and co-parent is A.R. She is a citizen of the United States. I have known A.R. since we were children, and we were friends for years before we became romantically involved. We remain good friends, are amicable co-parents, and are talking of marriage again. We realized these few years while separated that we truly love each other and that we want to spend our lives together. I am using my family's initials so that they are not harassed by people because I am bringing this case.

3. I live with my son and his mother.

4. I have been continuously employed in Colorado for the 10 years I have lived here, doing drywall, tile, flooring, and kitchen work. I now own my own business. One of my frequent co-workers on projects, whom I have known for 8 years, wrote to the immigration court to express that I am a hard-working person and good member of society. I take pride in my good work and good reputation.

5. A.R. and I have worked hard to establish stability for our son. He has attended the same elementary school in Colorado Springs since kindergarten and is very supported by the teachers and community there.

6. I attend church every Sunday. My church community is very close-knit, and they wrote letters to me while I was detained in the GEO facility.

7. I have no affiliation with any gang, including Tren de Aragua.

8. On April 27, 2025, I agreed to pick up a friend from a nightclub in Colorado Springs, as his designated driver, so that he would not drive home after drinking. It was very late at night when I went to get him, approximately 3:00 or 3:30 a.m.

9. When I got to the club, my friend was not answering his phone, so I went inside the club to try to find him.

10. About five minutes after I entered the club, while I was looking for my friend, everything became very chaotic. Windows were broken from the outside and tear gas was thrown inside the club. People started panicking and trying to leave the club, but some doors were locked from the outside. I did not know what was happening and was very afraid.

11. When I managed to get out of the club, I saw law enforcement officers with bulletproof vests, helmets, and various uniforms pointing assault weapons at the people trying to escape the tear gas.

12. I crawled under a car in the parking lot because I had no idea what was going on and I was so scared, especially because the officers were pointing assault weapons. I remained under the car for ten or fifteen minutes.

13. A masked officer in tactical gear ordered me to get out from under the car, and I complied. I did not try to run or leave. The officer had tactical gear on and a large gun that looked like an assault rifle.

14. This same masked officer pushed me forcibly down to the ground after I got out from under the car and the same masked officer then put zip ties on my wrists, behind my back. As a result of being thrown to the ground, my hand was cut, and it was very painful. The zip ties were also very tight and hurt my wrists.

15. While I was zip tied, another officer patted me down over my clothing.

16. The officer reached into my pockets during the pat down and took my wallet and my phone. He did not ask for my consent before doing so.

17. My wallet is a billfold, with one plastic window where someone can see a card and several card slots, where the cards are not visible. The card in the window was my Colorado driving permit. My Colorado state identification and Mexican consular card were inside the card slots and not visible.

18. The officer went through my wallet and pulled out all my cards without my consent, including my Colorado identification and Mexican consular card. The officers kept my wallet, my phone and my identifications. He put them in a bag. To this day, I have not received these cards back.

19. The officer patted me down again and then marched me to some EMTs and firefighters. The firefighters looked at my hand. The EMT said that I probably needed stitches. The officer told the EMT to put a Band-Aid on it instead.

20. After the EMT looked at my hand, officers put metal shackles on my feet, with a chain between them. The foot cuffs were too tight, and they hurt me. They also put a chain on my waist and handcuffs on my wrists and then attached my wrist shackles to my waist chain, so that I could not lift my arms.

21. Nobody asked me any questions about my ties to the community, my employment, how long I had lived in Colorado Springs, or anything else.

22. I was taken to a line that led up to a bus, with other people in similar shackles. I think I got on the bus around 6 a.m.

23. The bus was mostly full. There were no white people on the bus. Everyone on the bus spoke Spanish.

24. The bus took us directly to the Aurora immigration detention facility in Aurora, Colorado. I think I was in the first group of people to be sent there from those that were detained at the club.

25. Nobody asked me any questions until I arrived at the Aurora detention facility. Nobody used my name until I was asked for it at the Aurora detention facility.

26. When we got to the Aurora detention facility, they put all of us from the bus in a large cell, all together. I think there were about sixty people in that cell. Officers took us into smaller rooms one-by-one to question us.

27. Later, 5 or 6 people arrived who had been detained in the nightclub raid and said they had been taken to another location before coming to the detention center. They joined us in the same cell.

28. When I was questioned, they asked me my name and other questions like how I came to the country and where I was from. They did not ask me any questions about the nightclub, guns, drugs, or Tren de Aragua.

29. I spent 50 days at the Aurora detention facility, and I suffered every day. I could not see my son, which made me terribly sad. The conditions at the detention facility were also terrible. The beds were so hard and stiff that my back started to hurt. I asked to see a doctor, and it took two days to see one. The doctor could not help. I also got quite sick while in detention, as did many other people that were in the same pod with me. The food was awful, and all of us in one pod had to use the bathroom and shower together. It was extremely degrading and scary. I was always so worried about what would happen to me, my son, and my family.

30. Because I was taken directly to the detention center, I was not able to inform my family until later. If I had more time before the arrest, I would have been able to earn more money, spend more time with my family, and get my affairs in order including possibly hiring an immigration attorney.

31. While I was detained, my son also really suffered. M.R. had problems in school which he had never had before, both acting out and being very withdrawn in class. Although his teacher tried to support him, M.R. struggled the whole time I was detained. My son does not want to leave my side because he thinks that he can protect me from being arrested and detained again.

32. I have provided substantial support to A.R., as the mother of my son, for a long period of time, and not having my income was a burden for her and the rest of my family.

33. Eventually, the immigration judge granted me bond on June 13, 2025, so that I could be released from the Aurora detention facility. I paid the bond and was released on June 16, 2025. But ICE put additional restrictions on my liberty. I had to check in with them once already, and I have another check-in in December 2025. ICE also makes me wear an ankle monitor. I remain in a lot of fear of being re-detained because of the ankle monitor and check-ins. The ankle monitor also bothers me when I'm doing my work including being in the way when I am working.

34. My experience in the raid, the warrantless arrest, and my detention has completely changed my life. I want to make sure this does not happen to me again or to anyone else. My family has been really affected too. They live in fear that they may lose me again. Today, I have much more fear of officers including those wearing masks.

35. I plan to fight my deportation case to the fullest. I am going to apply for cancellation of removal due to my long residence in the United States and the suffering my son will experience if I am deported.

36. In addition, A.R. and I plan on getting married again because we realize that after being apart for a time, we are simply better off together. Our son needs us, and we love each other. We want to show that love again through marriage. When I do get remarried, I will be eligible to apply for my green card through that relationship. Thus, I have multiple pathways under immigration law to get my green card.

37. I fear ICE all the time and, as a result, I avoid public places and stay at home. My friends within the community also live in fear and avoid public places they used to go and instead stay at home.

38. I want to be a named plaintiff in this case. I understand that if the Court grants the motion for class certification, I would represent a large number of people who have been arrested by ICE without a warrant, and who were detained without ICE making any attempt to determine if they were a flight risk. This is exactly what happened to me and many other people I was with during the raid.

39. I understand that this class action is only seeking declaratory relief, and not money damages. I understand that I would not receive any money for participating in this case, but that my lawyers might receive attorneys' fees from the defendants if they win.

40. I understand that, as a class representative, I represent the interests of all class members in this lawsuit and that it is my responsibility to represent the interests of the class as a whole and not just my own personal interests. I am committed to being an adequate class representative because I understand how important these issues are not just for me, but for many other people who ICE is arresting without warrants in Colorado.

41. I am not aware of any reason I could not be an adequate class representative. I am not aware of any conflict of interest between myself and other people like me who were (or will be) arrested by ICE without a warrant.

42. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action, or the case is over.

43. I understand and accept that any resolution of the lawsuit, such as by settlement or dismissal, is subject to the Court's approval and must be in the interests of the class as a whole.

44. I understand that, by agreeing to become a class representative, I have a duty to take steps to help move the case forward, which I will do with my attorneys. I know that I must attend court if necessary; provide information to my attorneys that they feel is necessary for the case; give them documents I have if it is required; testify at a deposition, hearing, or trial if necessary; and provide my attorneys with my contact information and current whereabouts because it may be necessary for them to contact me on short notice.

45. I understand that I am volunteering to represent many other people who ICE arrested who have similar claims. I believe it is important that people in my situation not be detained after arrest without a warrant and without any analysis of whether they are a flight risk. I will work hard to make sure the class's interests are fairly and adequately protected. I will devote all the time and effort necessary to this lawsuit to help the class members, in addition to myself.

46. This declaration was read back to me in Spanish, a language in which I am fluent.

I, G.R.R., swear under penalty of perjury that the forgoing declaration is true and correct to the best of my knowledge and recollection.

/s/    GRR
_____

G.R.R.
Executed this 29th day of August, 2025