# EXHIBIT 9

# DECLARATION OF CAROLINE DIAS GONCALVES

Pursuant to 28 U.S.C. § 1746, I, Caroline Dias Goncalves, declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a 20-year-old woman, and I was born in Brazil. I came to the United States in September 2012 when I was seven years old. I live with my family in Saratoga Springs, Utah. I am a student at the University of Utah on a merit scholarship, and I am majoring in nursing.

2. Before the events described below, I had never been arrested. I have no criminal convictions or charges.

3. My family filed an asylum application for me that is currently pending before the United States Citizenship and Immigration Services (USCIS). While this asylum application is pending, I have also been granted employment authorization, which allows me to work lawfully in the United States.

4. On June 5, 2025, at approximately 1:40 p.m., I was driving along the highway from Utah to Colorado to visit a friend. When I was near Fruita, Colorado, I was pulled over by a Mesa County sheriff's deputy. He said that I had been driving too closely behind the semitrailer truck in front of me.

5. The deputy was stopped at an intersection when I first noticed him. After I drove by, he pulled out and followed me for several minutes before he turned on his lights and pulled me over.

6. I pulled over right away. The officer came to my car and asked if the car belonged to me and if I had the paperwork for it. I handed him my license. He asked where I was going and how much further I had to drive. He went back to his car and ran my license. This process took several minutes.

1

7. The officer then came back and asked if I had any other insurance cards and how long I had owned my car. He said the piece of paper I provided was for my temporary registration and was expired. He asked if I had any paperwork for my current tag. Then, the officer told me to get out of my car and go sit in his patrol car.

8. The officer continued to ask me questions while I sat in the passenger seat of his patrol car. He asked me a number of questions about my road trip, including whether I had "fun plans for the weekend" and if my friend was expecting me.

9. At one point during the questioning in the patrol car, the deputy asked me "Where are you from?" He said that I have "got a bit of an accent," although I don't believe that I do. I told the officer that I was from Utah. After the officer pressed me further as to if I was born and raised in Utah, I responded that I was born in Brazil and moved to Utah with my parents as a child.

10. The officer then assured me that "everything came back good" and said he would let me go. He said, "You're good to go, you have safe travels, OK." The interaction was recorded on his body camera footage. My friend, who I had been speaking with on the phone when I was pulled over, stayed on the phone during the interaction as well.

11. I continued driving. About 10 minutes later, I was pulled over again by a black unmarked pickup truck that had flashing police lights that were turned on.

12. Two men were inside the truck. Neither of them wore uniforms. They had no visible badges, no name tags, and no tactical vests. They never showed me identification and never gave me their names.

13. One of them came to my window while the other walked around my car. The man at my window told me, "Can you get out of the car, ma'am?" I got out, and he told me that I was under arrest for violating the immigration laws of the United States.

2

14. This same man brought me over to the side of the road near a railing. There, they put handcuffs on me. The handcuffs hurt my wrists. They asked if I wanted to take anything from my car. I told them that I needed to grab my bags. One of the men grabbed my bags, wallet, and purse and placed those in the truck.

15. They put me in the passenger seat of their truck. One of the men sat in the back seat while the other man drove. They did not speak much to me. The only thing they said to me was related to my Social Security card. I told him that I had documents, including my driver's license and Social Security card. He responded, "You can have a Social Security card and still be illegal in the U.S." The rest of the time, they talked quietly to each other.

16. The drive lasted about 10 minutes. I noticed they were not wearing body cameras. During the ride, one of them said that they were just going to "check if everything was okay" and would "bring me back if everything checked out."

17. At the time, I did not know why I had been stopped again so soon after being pulled over by the sheriff. Later, I learned that the sheriff had illegally tipped off ICE in violation of Colorado law, which explained why these men had targeted me. The officers did not show me an arrest warrant or tell me they had an arrest warrant for me. They did not ask me any questions about my length of time in the country, ties to the community, if I had a fixed address, educational history, employment, lack of criminal history, how long I had lived in the United States, or anything else before they arrested me.

18. After the men in the black truck handcuffed me and drove me away, they took me to an office building. I remember reading "Department of Homeland Security" on the building when we arrived. Later, I learned it was the Department of Homeland Security office in Grand Junction, Colorado.

19. When I first got there, officers removed all my jewelry and my shoelaces. They placed me in a holding cell. I could overhear officers talking among themselves about a "task force" and how they were planning to "catch people the next day." I was in that office for a long time. It felt like several hours, and I was there until they transferred me to detention in Aurora, Colorado.

20. During the time I was there in the Grand Junction office, agents processed me. They fingerprinted me and made me sign several papers. One of the first things an officer said to me really confused me. While I was sitting in the cell, he opened the door and said, "Remember when I told you I would take you back to your car? Well, let me know when you want me to take you back." I was surprised because I was already in handcuffs and being held in their custody.

21. Shortly after, another officer took a phone call. When he came back, he told me, "I can't let you go after we put handcuffs on you." He kept apologizing and said that he did not want to bring me in. He told me that he preferred to arrest "criminals" and that "you and your mom have never caused any trouble." But then he explained that "under this president and under this presidency, we have to arrest anyone who is not a citizen."

22. The officers tried to act like they were being kind to me. They gave me a jacket because I was cold and allowed me to make phone calls. I was able to call my mom and dad. I told them I had been arrested by ICE and that I was being taken to the immigration detention center in Aurora, Colorado. Both of my parents were crying and screaming on the phone. After a couple of minutes, the officers cut me off and made me hang up the phone.

23. While I was signing papers, one officer told me that the papers provided notice for a court date. He said that if I signed, it would help me get out on bond faster so I could talk to a judge. He

4

presented himself as a "nice guy" and told me it was better for me to sign right then. I remember signing a couple of documents, but he reassured me that I was not signing my "deportation ticket."

24. Of the different officers I saw there, most were wearing guns, but they were still dressed in regular clothing, not uniforms. Two men were especially involved: one was doing the processing, and the other was sitting at the computer. I spent most of the time in the cell and did not have long interactions with them.

25. Around midnight or 1:00 a.m., officers transferred me from the Homeland Security office in Grand Junction to the immigration detention center in Aurora, Colorado. I was placed on an ICE bus with two women in uniform. I sat in the front row. My hands were not chained, but my legs were shackled together.

26. After being transported on the ICE bus for hours, I arrived at the Aurora immigration detention center in the early morning. Once we arrived, the officers removed the chains from my feet and brought me inside. They placed me in a small cubicle where I sat for a couple of hours. Eventually, officers had me sit in a chair and went through the intake process. They collected all my personal belongings, placed them in a box, and then gave me two sets of clothing: shirts, pants, socks, underwear, and shoes. They instructed me to change into this detention center uniform. They also took my picture and issued me a photo identification card that I was required to carry while inside. After this process, I went back to wait until they were ready to move me. Eventually, they assigned me to a dormitory.

27. I was placed in the South Side Nancy dormitory. I was so exhausted from being awake all night and from the stress of the arrest and transport that, on the first day, I slept all day and did not eat breakfast. I was in the detention facility for approximately 15 days. I felt scared, alone, and

heartbroken. While detained I was given soggy, wet food and forced to keep confusing schedules. I felt like my life had been ripped away.

28. On some days, we were forced to make choices between things that should not have conflicted. For example, one morning, we were told we had to choose between going outside for recreation or eating breakfast. We were not allowed to do both. The officers said they would not save food if we went outside, and that if we did not eat immediately, we would not be fed. I chose to go outside, but one of the officers who was sympathetic convinced others to save food for us. I heard her complaining about how the morning GEO workers were "lazy."

29. While I was detained, I met another young woman who was nineteen years old, the same age as me. She had received a threatening letter saying that someone was going to kill her, and she was transferred into my dormitory for safety reasons. Meeting her left an impression on me, as she was so close to my age and facing terrifying circumstances.

30. I remained in the Aurora GEO facility for more than two weeks. My time there was stressful, exhausting, and emotionally draining. The constant counts (where guards would stop everything to "count" the detainees interrupting our activities), lack of control, and uncertainty about what would happen to me made it extremely difficult.

31. At the bond hearing, the judge asked me questions, such as whether I had a sponsor if I were released. I explained that I did have a sponsor and that I had friends and family in the community who could support me. My lawyer also stated that I was not a flight risk because I had strong ties with the community. After the hearing, the judge set my bond at $2,000.

32. My parents and sponsor paid the bond. It took about two to three days to process my release through the detention system.

33. When I was released, the officers returned my belongings. An ICE officer came to speak with me and gave me paperwork to sign, explaining that I would be placed in the ankle monitor program. They told me that if I did anything wrong, I would be returned to detention.

34. Since my release from detention, life has been extremely difficult and stressful. I have been trying to start therapy. Things have also been challenging because the officers did not return my driver's license to me, and I do not know if or when I will get it back. Not having my license makes transportation difficult, and I have to rely on friends, family, or my lawyer to get to appointments, school, and work. Every trip requires careful planning, and constant dependence on others has been frustrating and stressful.

35. The detention and arrest have had a significant impact on my work and financial stability. Before my detention, I was working two jobs. I missed work while I was detained, and one of my employers fired me shortly after my release. I was forced to move back in with my parents because I could no longer afford rent. Before detention, I had been living in an apartment with roommates in Salt Lake City near the University of Utah and had plans to move into a new place in Salt Lake City before school started in the fall. Because of the detention, I lost the opportunity to secure another apartment and now live an hour away from Salt Lake City. This has made commuting to school and work even harder.

36. My education has also been affected. I am currently taking classes part-time online because I cannot manage a full-time in-person schedule due to the stress that I continue to experience and my living and transportation situation since detention. This is a significant change from my previous school routine, and it has delayed my progress in completing my degree.

37. I continue to wear an ankle monitor. Since leaving detention, ICE has been difficult to contact, and the check-ins are stressful and disruptive. I am required to check in every four weeks with

7

a company that works for ICE, rather than directly with ICE itself. Each check-in requires a 20 to 30-minute drive, and I must coordinate rides to attend. The process is stressful and creates constant anxiety because I fear that any small mistake could result in my being detained again.

38. The psychological impact of detention on my family has also been severe. My parents and siblings have begun therapy because of how shaken and traumatized they are. We all have problems sleeping and feel ongoing stress about mine and my family's safety and future.

39. I live with a constant fear that this could happen again. The entire experience has made me feel unsafe and uncertain about my place in the United States. I also believe that my arrest and detention were unfair and motivated by discrimination. ICE had no valid reason to arrest or detain me. I feel that it is wrong that police cooperated with ICE in this way when Colorado law prohibits them from doing this. Police should protect the community and ensure safety, not assist in targeting people for their immigration status.

40. The entire experience has disrupted my independence, education, work, and daily life. My family and I continue to deal with the trauma, fear, and stress caused by my detention, the ankle monitor, and the ongoing monitoring requirements.

41. I want to be a named plaintiff in this case. I understand that if the Court grants the motion for class certification, I will represent many other people who have been arrested by ICE without a warrant and who were detained without ICE making any effort to see if they were a flight risk.

42. I understand that this class action is only asking for declaratory relief and not money damages. I understand that I would not receive any money for participating in this case, but that my lawyers may receive attorneys' fees from the defendants if the case is successful.

43. I understand that, as a class representative, I must represent the interests of all class members in this lawsuit and not just my own personal interests. I am committed to being a class representative because I know how important these issues are, not just for me, but for many others who ICE is arresting without warrants in Colorado.

44. I am not aware of any reason I could not serve as a fair and adequate class representative. I am not aware of any conflict of interest between myself and other people who have been, or may be, arrested by ICE without a warrant.

45. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action or the case is finished. I understand and accept that any resolution of the lawsuit—whether by settlement or dismissal—must be approved by the Court and must serve the best interests of the class as a whole.

46. I understand that, by agreeing to become a class representative, I have a duty to help move the case forward. I will do so by working with my attorneys. I understand that I may need to attend court, provide information or documents to my attorneys, testify at a deposition, hearing, or trial if necessary, and stay in contact with my attorneys so they can reach me quickly if needed.

47. I understand that I am volunteering to represent many other people who ICE has arrested under the same circumstances. I believe it is important that people like me not be detained after arrest without a warrant and without any consideration of whether they are a flight risk. I will work hard to make sure the class's interests are fairly and adequately protected.

I, Caroline Dias Goncalves, swear under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and recollection.

/s/ Caroline Dias Goncalves

Caroline Dias Goncalves

Executed on this 29th day of September 2025

10