# EXHIBIT :

## DECLARATION OF REFUGIO RAMIREZ OVANDO

Pursuant to 28 U.S.C. § 1746, I, Refugio Ramirez Ovando, declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1. I am a 43-year-old man, born in Aguascalientes, Mexico. I have resided continuously in Colorado for the past 20 years.

2. I am the proud father of four (4) United States citizen children, currently ages 18, 15, 13, and 8. I share parenting responsibilities with my wife, G.M., and we live together as a family near Grand Junction, Colorado.

3. For the past 19 years, I have worked in the construction concrete industry. I am one of the longest-tenured employees at my company, where I work as a finisher. I take great pride in my reputation as a dependable worker, provider, and father.

4. All of my children are enrolled in school. My oldest son has an Individualized Education Plan (IEP) for math. My oldest daughter began high school on an IEP but through dedication and hard work, she joined the International Baccalaureate program in her sophomore year. She is now entering her senior year and has plans to attend college.

5. I am an active member of my church, which I attend every Sunday with my family. My church community is close-knit and a source of spiritual and moral support.

6. On the morning of May 19, 2025, I left my home around 6:10 a.m. to head to work. This day is unforgettable for me because it was both my father's birthday and the 20th anniversary of the day I came to the United States.

7. As I got into my car to warm it up, I noticed two unmarked vehicles driving on my street. They were not marked as "police" or "ICE" vehicles, but I could see emergency lights in them like the kind used by law enforcement but not overhead, on the inside of the vehicles.

1

At the time, I did not think much of it as I had no reason to believe they were there for me because, for the last 20 years, I have never committed a crime or had any other issues.

8. As I began driving, I saw that the two unmarked cars were now positioned at different ends of the street at my trailer home community. The neighborhood I live in is mostly Hispanic. One of the vehicles, a black SUV, let me pass in front of it as I was about to exit my neighborhood and then began following behind me with a grey car following closely behind it as well.

9. Once I was out of my neighborhood and had reached a stoplight near my trailer home community, the black SUV turned on its emergency lights signaling me to pull over. I immediately pulled over at the street corner. The black SUV parked right behind me. The gray car parked right behind the black SUV. The SUV and gray car were the same two cars I had seen earlier in my neighborhood.

10. A man exited the black SUV and approached my car on the driver's side. He was wearing a vest that said "POLICE." He had a badge clipped to his pants, and I was able to see that he was an ICE agent because his badge was marked as ICE. He was wearing civilian clothes under a tactical vest and was visibly armed with a handgun on his belt. He looked Hispanic and spoke to me in Spanish.

11. At the same time, another agent approached my passenger's side. This second man had come from the gray car. He was white, dressed in civilian clothes, but also wore a tactical vest that said "POLICE" and was visibly armed. He did not speak to me at all and just stood there silently, watching me.

12. As I saw the Hispanic agent approaching my driver's side, I partly rolled my window down. The man did not tell me why he was stopping me. Speaking in Spanish, he ordered me to

2

turn off my car, then ordered me to place the keys on the dashboard, and finally, ordered me to roll the window down all the way. I complied.

13. The agent then ordered me to provide identification. I gave him my valid Colorado driver's license which showed my address in the neighborhood, which he did not return to me. He then asked if I had a consular ID. I told him I did not need one because I had a driver's license. He then asked for my passport, and I told him I did not have it with me but that my daughter could bring it. The agent responded that it would not be necessary. The entire conversation took place in Spanish.

14. After that, he took my driver's license back with him to the black SUV, while the other man—the English-speaking agent—remained standing by my passenger's side without speaking. After a couple of minutes, the Spanish-speaking agent returned to the driver's side window. He handed my driver's license back to me, and I put it away in my wallet.

15. The Spanish-speaking agent then began to question me about my immigration status. He asked me where I was from, whether I had permission to be in the United States, and if I had any papers to show my legal status. The questions were direct and repeated, clearly focused only on my immigration status. I chose not to answer these questions. I remember feeling very nervous because the agent kept pressing, but I stayed quiet.

16. I repeatedly asked the agent: "Am I under arrest?" At first, he told me no. I then asked, "Can I leave?" He told me no. I asked the same questions again, and as I continued to not respond to his questions and repeatedly ask if I was under arrest, the agent said, "Okay, well now you are [under arrest]."

17. The Spanish-speaking agent then opened my car door, which automatically unlocks when the vehicle is in park, and ordered me to get out. I complied. Once I got out, he asked if I

3

had any weapons or anything that could harm him. I replied that I did not. He frisked me and then placed me in handcuffs.

18. Neither agent told me they had an arrest warrant for me or showed me an arrest warrant. They did not ask me any questions about my ties to the community, how long I had lived in the country, my employment, how long I had lived in my home, my lack of any problems or criminal history, my family including my U.S. citizen children, or anything else before he arrested me. They never told me why they stopped me or why he was arresting me.

19. After placing me in handcuffs, the Spanish-speaking agent directed me into the back of the black SUV. At this point, the English-speaking agent said that he would move my car because it was pulled over but not in a good spot for traffic. The English-speaking agent took my keys, got into my car, and drove it to a different location. Later, during my detention, I found out that my car had been recovered and picked up by a family member. After the English-speaking agent returned, the Spanish-speaking agent moved to the driver's seat of the black SUV and began to drive. I was not told where I would be going, but everyone in my community knows where the ICE detention center is, so I knew I would be taken there.

20. While I was in the back of the black SUV on the way to the Department of Homeland Security office, the Spanish-speaking agent began asking me more questions. He asked if anyone else was at home. I told him that my wife and children were there. The agent responded that he did not want to go after anyone else. I explained that there was no reason for him to because my children are U.S. citizens. He still never asked me about my ties to the community, my employment, how long I had lived in my home, or anything else like that.

4

21. The Spanish-speaking agent also asked me if I was afraid to return to Mexico. I told him yes, that I was afraid of the poverty in my country. After that, I chose to remain silent for the rest of the ride. I did not answer any more questions until I arrived at the Department of Homeland Security Office.

22. When we arrived at the Department of Homeland Security Office, the same Spanish-speaking agent stayed with me throughout the process while other agents were present around us. This Spanish-speaking agent asked me where I was born, how long I had been in the United States, and other similar questions about my background, family, and immigration history. I answered these questions as part of the processing. The agent also asked if I wanted to speak to the Mexican Consulate, but I refused and said I wanted to speak to my family instead. I was allowed to make quick phone calls to my wife and my employer, but the calls were cut short. I was not asked questions about my ties to the community, work history, or other factors.

23. During the processing, one of the agents told me that I was not the person they were originally looking for. He said they would show me a photo of the individual they were after, but they never showed me any photo.

24. While I was being processed, I overheard the Spanish-speaking agent who arrested me speaking on the phone with another ICE agent. The call was on speaker, and both the Spanish-speaking agent and the other agent, who spoke in English, were laughing and talking about the coincidence that I first entered the United States on May 19, 2005, and they arrested me on May 19, 2025. I found this humiliating and cruel.

25. I confronted the Spanish-speaking agent about his behavior, asking what was so funny and whether he understood that I knew some English. I told him I understood what he was

5

saying. After many years of living in the United States, I understand and speak in English at a basic level. At that point, the Spanish-speaking agent suddenly changed his tone with me and began acting differently. He asked me if I believed in God. I told him that I did, and he proceeded to talk to me about God. I stayed silent, but inside I felt belittled and angry. It felt awful to hear him speak about God while at the same time making me suffer and treating me without dignity or respect.

26. Despite telling me I was not the person they had been searching for, the agents kept me at the ICE office from about 6:30 a.m. until 6:00 or 7:00 p.m. that night. Then they transferred me to the Aurora ICE detention facility.

27. I remained detained in that facility from May 19, 2025, until August 26, 2025—almost 100 days. During my time in detention, I felt the weight of how unfair the situation was. I was not the person ICE was looking for, yet I was the one who was arrested and locked up. I have no idea why they arrested me, but they told me that they were after someone else and assumed incorrectly that I was the person they were looking for. I also believe their actions were discriminatory because I am Hispanic and they saw me in that neighborhood and arrested me even after they realized I wasn't the man they were after.

28. Being detained meant I was separated from my family and forced to live in harsh conditions even though I had done nothing wrong. Every day inside felt like punishment for something I did not do, and I suffered the stress, fear, and uncertainty of not knowing when or if I would be released.

29. Inside detention, I encountered a wide range of people—men who had been there for months, and others who had already been there for years waiting for their cases to move forward. Many officers were abusive or indifferent. Some guards went out of their way to

6

block our phone calls, even with our attorneys. Many days we were not allowed to make legal calls at all. I tried to document my grievances, but nobody wanted to help because everyone feared retaliation if they spoke out. The facility was often unbearably hot during the summer months. We were often told the air conditioning was not working. At times, the heat was so bad that I would cut up a shirt, soak it with water, and use it to try to cool down. A few guards would take pity on us and open our cell doors so that we could breathe, but this was rare.

30. The conditions were miserable. Elected officials occasionally came to tour the facility, but when they visited, the place was cleaned and staged to make it look presentable. I was not allowed to speak with them, and the reality of daily life inside—the heat, the blocked calls, the fear—was hidden.

31. I started working inside detention just to distract myself. The pay was one dollar per day, and we had to apply for shifts. The work helped me get through the days, but it was demeaning to know how little our labor was valued. Despite the awful circumstances, one good thing came out of my time there: I learned how to read in Spanish. Another detainee, a fellow inmate, taught me.

32. I hired a lawyer to help me get out on bond. However, even though the Immigration Judge recognized I had strong ties to the community, no criminal history, and a decent immigration case, she said that she did not have the ability to grant my release on bond. This devastated me and my family.

33. Because of that, I had to wait months until the immigration judge finally granted me relief in my immigration case, and ordered my removal cancelled, which means that I now have my lawful permanent residency.

34. My detention devastated my wife and children. My wife hadn't worked outside the home before since the birth of my youngest child, who was born premature. My wife had to stop working to dedicate herself to his care. I was the primary earner for our family until I was detained. My wife had to suddenly figure out how to support our family without me. She sold food, like gorditas and menudo, both at my son's sports games and from our home, to earn money to pay the bills. My oldest daughter was also looking for a job she could have during her senior year of high school to help support the family but was not able to obtain employment because she was still too young.

35. We received help from our community, who brought food and helped collect donations for an attorney. However, all of our savings were quickly spent on legal fees and basic survival expenses. We had to sell our truck and borrow money from friends and family to cover additional costs, leaving us with approximately $20,000 in loans and other debts. The financial strain was overwhelming, and every resource we had was exhausted. My wife lost weight during this time from stress and worry, and she was forced to take on responsibilities that she had never had to manage alone before.

36. I believe my eldest daughter was the family member most affected by my detention. She has always dreamed of becoming an immigration attorney. In 2022, she began experiencing symptoms of depression and anxiety. While these conditions were before my detention, my absence caused her mental health to get much worse. During my detention, she was evaluated and found to have Major Depressive Disorder (MDD), Generalized Anxiety Disorder (GAD), an Exfoliation Disorder, and Post Traumatic Stress Disorder (PTSD). I have always been her biggest support, and being away from her made it extremely difficult for her to cope and her mental health was severely impacted.

37. During the summer of 2025, all of my children began attending therapy due to the stress caused by my arrest and detention. My oldest son started showing initial symptoms of anxiety and depression, and my youngest son developed indications of separation anxiety and depression. These challenges affected my children's emotional well-being and made daily life much harder for my wife and family.

38. My detention also caused me significant anxiety. I tried my best to stay strong and hold myself together for the sake of my family, but I often felt frustrated and helpless.

39. I believe that my arrest was unjust and unlawful. ICE agents admitted that I was not the person they were looking for, yet they still chose to arrest me. I believe this happened because of racial profiling. Had I not been Hispanic, I believe they would have released me as soon as they realized I was not the person they were targeting.

40. The agents never showed me a warrant, never read me my rights, and never respected the protections guaranteed by our laws or the Constitution. I have never been arrested let alone convicted of any crime whatsoever. For the last 20 years I have worked hard, raised my family, paid taxes, purchased a home, and contributed to my community. I ask that ICE agents be required to follow the law and treat people with dignity.

41. I want to be a named plaintiff in this case. I understand that if the Court grants the motion for class certification, I would represent many other people who have been arrested by ICE without a warrant and who were detained without ICE making any effort to see if they were a flight risk.

42. I understand that this class action is only asking for declaratory relief and not money damages. I understand that I would not receive any money for participating in this case,

9

but that my lawyers may receive attorneys' fees from the defendants if the case is successful.

43. I understand that, as a class representative, I must represent the interests of all class members in this lawsuit and not just my own personal interests. I am committed to being a class representative because I know how important these issues are, not just for me, but for many others who ICE is arresting without warrants in Colorado.

44. I am not aware of any reason I could not serve as a fair and adequate class representative. I am not aware of any conflict of interest between myself and other people who have been, or may be, arrested by ICE without a warrant.

45. I understand that my duty to be a class representative continues until the Court decides this case is no longer a class action or the case is finished. I understand and accept that any resolution of the lawsuit—whether by settlement or dismissal—must be approved by the Court and must serve the best interests of the class as a whole.

46. I understand that, by agreeing to become a class representative, I have a duty to help move the case forward. I will do so by working with my attorneys. I understand that I may need to attend court, provide information or documents to my attorneys, testify at a deposition, hearing, or trial if necessary, and stay in contact with my attorneys so they can reach me quickly if needed.

47. I understand that I am volunteering to represent many other people who ICE has arrested under the same circumstances. I believe it is important that people like me not be detained after arrest without a warrant and without any consideration of whether they are a flight risk. I will work hard to make sure the class's interests are fairly and adequately protected.

48. This declaration was read back to me in Spanish, a language in which I am fluent.

I, Refugio Ramirez Ovando, swear under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and recollection.

/s/ Refugio Ramirez Ovando

Refugio Ramirez Ovando

Executed on this 29th day of September 2025

11