# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-03183-RBJ

REFUGIO RAMIREZ OVANDO,
CAROLINE DIAS GONCALVES,
J.S.T., and
G.R.R.,

       Plaintiffs,

v.

KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security,
TODD LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and
ROBERT GUADIAN, in his official capacity as Director of the Denver Field Office of U.S. Immigration and Customs Enforcement,

       Defendants.

---

# RESPONSE TO PLAINTIFFS' MOTION
# FOR A PRELIMINARY INJUNCTION

---

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 4

BACKGROUND ........................................................................................................... 6

I.    The Complaint ................................................................................................. 6

II.   The Motion for Preliminary Injunction ..................................................... 7

III.  ICE arrests in Colorado ............................................................................... 9

   A.   Congress has authorized immigration officers to enforce immigration law and detain aliens who are in the United States unlawfully. .............................................. 9

   B.   ICE has provided training and issued directives requiring officers to comply with § 1357(a)(2). ........................................................................................................... 9

   C.   Denver ERO officers conduct arrests with warrants but face obstacles because individuals routinely try to avoid detection. ............................................................ 11

   D.   ERO officers making warrantless arrests evaluate the risk of flight. ............... 12

IV.   The four Plaintiffs' past arrests and current status............................................... 14

LEGAL STANDARD .................................................................................................. 16

ARGUMENT ............................................................................................................... 17

I.    Plaintiffs are not likely to succeed on the merits. ................................................. 17

   A.   Plaintiffs have not made a clear showing of standing to seek prospective relief. ..................................................................................................... 17

   B.   Plaintiffs cannot proceed under the APA because they have not shown that the purported "policy, pattern, and/or practice of making warrantless arrests" in Colorado is final agency action. ............................................................................. 25

   C.   Plaintiffs' APA claims also fail because Plaintiffs have not shown ICE has a pattern and practice of making warrantless arrests in Colorado without regard to the risk of flight. ........................................................................................................ 30

   D.   Plaintiffs have not shown an injunction is warranted. ...................................... 34

II.   Plaintiffs have not shown they will suffer irreparable harm if the relief they seek is not granted. ............................................................................................................. 37

III.  Plaintiffs have not strongly shown that the public interest and balance of the equities support granting relief....................................................................... 38

CONCLUSION ............................................................................................................ 38

## INTRODUCTION

The four Plaintiffs seek a sweeping preliminary injunction that would require the Court to monitor all warrantless arrests in Colorado by U.S. Immigration and Customs Enforcement (ICE) officers. Plaintiffs base this request on their two claims, both brought under the Administrative Procedure Act (APA). Their APA claims assert that ICE officers in Colorado have a policy, pattern or practice of not complying with statutory and regulatory provisions that, in relevant part, require immigration officers making warrantless arrests to "have reason to believe that the alien . . . is likely to escape before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(2). Plaintiffs fail to meet their heavy burden to obtain the preliminary relief they seek, for several reasons.

**No standing.** First, the four Plaintiffs have not shown standing. They seek prospective relief based on the alleged policy, pattern or practice. To obtain such relief, they must show a real or immediate threat of experiencing an unlawful warrantless arrest. Each Plaintiff points to a past warrantless arrest that they claim violated § 1357(a)(2). But under long-settled legal standards, that fact (even if true, which Defendants contest) is not enough for Plaintiffs to meet their burden to show that they each now personally face a likelihood of an unlawful warrantless arrest where the arresting officer would violate § 1357(a)(2). And numerous other facts show the unlikelihood of such an arrest for any Plaintiff.

**No final agency action.** Second, Plaintiffs' APA claims suffer from a fatal flaw: they do not challenge a final agency action. Their twin APA claims rest on the premise that ICE has a "policy, pattern, and/or practice of making warrantless arrests" in

violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii), and that such a policy, pattern, and/or practice amounts to a "final agency action" that is in violation of law under the APA. ECF No. 1 ¶¶ 202, 209. They do not, however, challenge ICE's actual directives to ICE officers about warrantless arrests, which require *compliance* with 8 U.S.C. § 1357(a)(2) and 8 C.F.R. 287.8(c)(2)(ii). They instead argue, based on examples of allegedly unlawful arrests, that ICE has a "pattern and practice" of violating those provisions. But even if such an agency practice existed, the APA does not permit such a challenge to proceed because it is not a challenge to a discrete "final" agency action.

**No § 1357(a)(2) violation.** Third, Plaintiffs have not shown the merits of their claim—that ICE officers, acting in accordance with a pattern or practice, will arrest them without warrants and without "reason to believe" they are present in the country unlawfully and likely to escape before a warrant can be obtained. To prevail at this stage, Plaintiffs must show a continuing violation of § 1357(a)(2) that *will* injure *them*. But they have not shown that ICE in fact has a policy or practice of ignoring this requirement; indeed, ICE-wide directives require ICE officers to comply with § 1357(a)(2), not disregard it. Also, Plaintiffs have not even shown that ICE officers violated that provision during Plaintiffs' *past* arrests.

**No authority to issue universal injunction.** Fourth, Plaintiffs' request for an order governing ICE's conduct in Colorado as to nonparties is a request for a universal injunction. This Court lacks equity jurisdiction to grant such an injunction. Any grant of relief would need to be narrowly tailored to Plaintiffs.

**No showing that irreparable harm is likely, nor that the equities favor them.**

Fifth, Plaintiffs have not met their burdens to show that absent a preliminary injunction, irreparable harm is likely—that is, without such an order, they will be arrested in violation of § 1357(a)(2)—nor that the equities of the sweeping, preliminary injunction they seek favor them.

For all these reasons, the Court should deny Plaintiffs' motion.

## BACKGROUND

### I.    The Complaint

Plaintiffs' Complaint challenges arrest practices by ICE officers in Colorado without a warrant. They allege that Colorado has "169,000 undocumented immigrants," and that in Colorado in the first half of 2025, ICE arrested almost 2,000 people. ECF No. 1 ¶¶ 7, 14. They claim that some of those arrests were warrantless and that ICE officers are—at least sometimes—making warrantless arrests without reason to believe the arrestee is a flight risk. *Id.* ¶¶ 3–7. They allege that they themselves were arrested by ICE officers "without any evaluation of whether they were likely to flee before a warrant could be obtained." *Id.* ¶ 15. And they allege that "ICE agents" have a "pattern and practice" of unlawful warrantless arrests, which they "seek to enjoin." *Id.* ¶ 3.

To challenge that alleged pattern and practice, Plaintiffs assert two claims for relief, both based on the APA. Claim One asserts an APA claim based on agency action in violation of 8 U.S.C. § 1357(a)(2), *id.* ¶¶ 197–203; Claim Two is identical except that it is based on 8 C.F.R. § 287.8(c)(2)(ii), *id.* ¶¶ 204–10. Each APA claim asserts that Defendants have a "policy, pattern, and/or practice of making warrantless arrests" in

6

violation of law, and each asserts that this policy, pattern or practice amounts to "final agency action" under 5 U.S.C. § 704. *See id*. ¶ 202 (First Claim, asserting that Defendants have a "policy, pattern, and/or practice of making warrantless arrests" in violation of 8 U.S.C. § 1357(a)(2) that is "final agency action" under 5 U.S.C. § 704); *id.* ¶ 209 (Second Claim, alleging that Defendants have a "policy, pattern, and/or practice of making warrantless arrests" in violation of 8 C.F.R. 287.8(c)(2)(ii) that is "final agency action" under 5 U.S.C. § 704)). They pray for various relief, including a preliminary injunction "enjoining further violations of . . . 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii)." *Id.* at 47.

## II.    The Motion for Preliminary Injunction

In their Motion for Preliminary Injunction (Motion), Plaintiffs seek an order that enables them (through their counsel) to monitor and assume control over certain ICE operations in Colorado relating to arrests, training, and reporting. *See* ECF No. 13 at 1 (moving for "a class wide preliminary injunction to ensure that, when ICE operates in this District, it complies with its legal duties"); ECF No. 13-1 (proposing an injunction dictating actions to be taken by ICE during and after all arrests, mandating training for all ICE officers, mandating reporting about such arrests, and more).[1]

In support of this relief, Plaintiffs argue that they have a likelihood of success on their APA claims. Specifically, they argue that ICE has a "pattern and practice" of

---

[1] Plaintiffs also filed a motion for class certification on October 9, 2025, ECF No. 14, but at a status conference on October 15, the Court directed that Defendants need not respond to that motion.

making warrantless arrests without an individualized determination of whether the person presents a flight risk. ECF No. 13 at 23–26. (They do not argue that ICE has an actual *policy* requiring such conduct.) In support, the four Plaintiffs provide declarations about their own arrests and experiences. Otherwise, they rely almost entirely on hearsay (declarations from attorneys and others about what others told them) and news articles that frequently do not stand for the cited proposition or are biased and incomplete.[2]

As to irreparable harm, Plaintiffs describe their concerns (and the concerns of nonparties) about immigration enforcement in Colorado and related arrests in general. *See id.* at 26–30. On the balance of harms and the public interest, Plaintiffs similarly point to concerns that relate generally to the effects of immigration enforcement and of arrests by ICE officers in general.

---

[2] For example, on page 5 of the Motion, Plaintiffs' claim that "[m]any" aliens were warrantlessly arrested at "large-scale raids" in Colorado without an assessment of flight risk, and cite a CBS News article for support. ECF No. 13 at 5 & n.15. But the cited article does not describe any law enforcement operations in Colorado. *See* ECF No. 13-2 at 68–70 (article). Likewise, on page 22, Plaintiffs cite an article from a publication called "The Handbasket" for the proposition that in June 2025, "ICE immediately rescinded its [prior] guidance and encouraged its agents to engage in warrantless arrests." ECF No. 13 at 22 & n.37. But the actual June 2025 communication from ICE leadership states that ICE officers "must consider the totality of the circumstances" in assessing the risk of escape, and listing several non-exhaustive factors that may be relevant to the determination. *See* Ex. A, Declaration of G. Davies, ¶ 14, Att. 2.

### III.    ICE arrests in Colorado

##### A.    Congress has authorized immigration officers to enforce immigration law and detain aliens who are in the United States unlawfully.

Congress has "charged" the Secretary of Homeland Security with the "administration and enforcement" of the Immigration and Nationality Act (INA). 8 U.S.C. § 1103(a); *see also* Ex. A, Declaration of G. Davies, ¶ 3. In that Act, Congress has provided for, and in some circumstances required, the detention of certain aliens. *See, e.g.,* 8 U.S.C. §§ 1225(b), 1226(a), 1226(c), 1231(a). Congress has authorized immigration officials to interrogate individuals and to conduct arrests with or without a warrant. *See id.* §§ 1357(a)(1) (permitting immigration officers to "interrogate any . . . person believed to be an alien as to his right to be or remain in the United States"); 1226(a) (providing for arrest and detention with an administrative warrant); 1357(a)(2) (permitting arrests without a warrant in certain circumstances).

In Colorado, the enforcement of federal immigration laws, including the apprehension of individuals who are not legally in the United States, is generally conducted by the Enforcement and Removal Operations division of ICE's Denver's Field Office ("Denver ERO"). Ex. A ¶¶ 4–6. Denver ERO officers also occasionally participate in joint enforcement actions with other federal law enforcement agencies. *Id.* ¶ 9.

##### B.    ICE has provided training and issued directives requiring officers to comply with § 1357(a)(2).

Twice per year, Denver ERO officers receive immigration enforcement training on, among other things, warrantless arrests and the requirements of 8 U.S.C. § 1357(a). *Id.* ¶ 14. As to § 1357(a)(2), ICE officers are trained that to make a warrantless arrest,

the officer must have reason to believe both that the individual is an alien illegally in the United States and that the individual is likely to escape before an arrest warrant can be obtained. *Id.* ¶ 14. When making these determinations, officers are trained to consider the totality of the circumstances. *Id.* Under this approach, there is no exhaustive list of factors that should be considered in determining whether an individual is likely to escape before a warrant can be obtained, but examples of some relevant factors include: the individual's true identity and residence, whether the individual answers the officer's questions and provides truthful information when asked, whether the individual provides inconsistent or incredible responses when asked, prior escapes or evasions of immigration authorities, whether the individual has successfully evaded detection for an extended period of time, attempted flight from an officer, lack of ties to the community, or any other specific circumstances, in an officer's specialized training and experience, that justify a reason to believe that the subject is likely to escape. *Id.*

In the past few years, Denver ERO officers have also received repeated directives consistently instructing that they may only conduct warrantless arrests if there is reason to believe that the alien to be arrested is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained. *Id.* ¶¶ 15–16. First, on May 27, 2022, an ICE Broadcast Statement of Policy announcing this requirement was sent from ICE's Principal Legal Advisor to all ICE officers. *Id.* Next, on June 11, 2025, this Statement of Policy was rescinded by the Principal Legal Officer via a broadcast to all ICE employees. *Id.* ¶ 16. But the June 11 broadcast reiterated that ICE officers could only "conduct warrantless arrests if there is

reason to believe that the alien to be arrested is present in the United States in violation of any U.S. immigration law and is likely to escape before a warrant can be obtained." *Id.* Most recently, on October 22, 2025, the Principal Legal Officer issued another Broadcast Statement of Policy, which again outlined mandatory obligations to comply with § 1357(a)(2), including the obligation to determine whether there is reason to believe that there is a likelihood of escape before performing a warrantless arrest. *Id.*

### C. Denver ERO officers conduct arrests with warrants but face obstacles because individuals routinely try to avoid detection.

Although some warrantless arrests occur, Denver ERO officers typically conduct targeted operations to arrest aliens pursuant to warrants. *Id.* ¶ 6. These operations primarily focus on aliens with final removal orders or serious criminal history. *Id.* Once officers know the probable whereabouts of the target based on their investigation, they will seek an arrest warrant. *Id.* Arrest warrants can be issued and signed only by certain supervisory officials. *See* 8 C.F.R. § 287.5(e)(2).[3]

Even after Denver ERO officers have located an alien at an address and obtained a warrant to arrest that alien, their targets often engage in conduct that makes it difficult to apprehend them. *Id.* ¶ 7. An immigration arrest warrant does not empower officers to enter a residence without consent, and oftentimes individuals will not answer the door when officers knock. *Id.* If officers knock on a door, this may inform the target that they are being targeted by ICE, and, as a result, the alien will become more difficult

---

[3] A sample arrest warrant is found here: https://www.ice.gov/sites/default/files/documents/Document/2017/I-200_SAMPLE.PDF.

to apprehend. *Id.* Knocking on doors with an administrative warrant is thus very rarely a viable way to execute arrests. *Id.* Instead of knocking, officers may surveil the target until he is in a public area before executing an arrest, but this approach requires multiple officers to stake out a residence for many hours, and even this approach often is unsuccessful. *Id.*

> **D.    ERO officers making warrantless arrests evaluate the risk of flight.**

During their operations, Denver ERO officers may encounter individuals who are not the target but who they may decide to question to determine if they are illegally in the country. *Id.* ¶ 10. For example, these individuals may be suspected to be the target, or may appear to be associated with the target in some way. *Id.* These individuals are generally referred to by ICE officers as "collaterals" to distinguish them from the target. *Id.*

In accordance with their training, ICE officers are expected to evaluate, through a consensual encounter, whether there is reason to believe that the person may be in the United States unlawfully, as well as whether the person poses a flight risk. *Id.*[4] Officers may ask identification and citizenship questions and may run field background checks based on information provided to them, including biometric information in some instances. *Id.* ¶¶ 8, 10.

---

[4] When a Denver ERO officer encounters such an individual, there may or may not be an outstanding arrest warrant for that individual. To get a warrant at that moment, the officer would need to obtain the warrant from an authorized supervisory official, who may not be available. Further, an arrest warrant generally is issued along with or after the issuance of another document, a notice to appear. *See* 8 C.F.R. § 236.1(b)(1).

In assessing flight risk, officers also may take into account that individuals illegally in the United States who seek to avoid later detection may provide false information, or no information at all. *Id.* ¶ 10. And they may take into account their experience that individuals who are not legally in the United States often do not report to ICE, even if directed or required to do so. *Id.* As noted above, individuals subject to a warrant very frequently seek to avoid detention. *Id.* At the scene, officers may issue an individual a Form G-56, which obligates the individual to report to ICE offices.[5] But individuals served with a Form G-56 frequently do not report. *Id.* ¶¶ 12–13. In addition, aliens who remain in the United States for 30 days or longer now generally must register and (if over 18 years of age) carry proof of registration. 8 U.S.C. §§ 1302(a), 1304(e).

Ultimately, if the information known to the officers, based on their training and experience, provides reason to believe that the individual is violating immigration laws and poses a risk of escape, an officer may arrest that individual without a warrant. Ex. A ¶ 10. Nevertheless, ICE officers do not make a warrantless arrest every time there is reason to believe an individual is not lawfully in the United States. Several factors may lead the officer to determine that there is no reason to believe such an individual is likely to escape. *Id.* ¶ 12. For example, an officer may find no flight risk if the individual is already actively appearing at immigration proceedings, has participated in immigration

---

[5] A sample can be found at https://www.ice.gov/doclib/detention/checkin/G_56.pdf.

proceedings and, as a result, has an ankle monitor, or presents with certain medical or health issues, such as late-term pregnancy, among other reasons. *Id.*

## IV.    The four Plaintiffs' past arrests and current status

As described below, before each of the four Plaintiffs' arrests, officers gathered information indicating that the individual was not lawfully in the United States, and were also presented with other facts that provided some reason to believe that the individual would be likely to leave before a warrant could be obtained.

In addition, specific facts about each Plaintiff undermine any assumption that they will face an unlawful *warrantless* arrest in Colorado in the future. After their arrests, a warrant was issued for each Plaintiff. In addition, Plaintiffs G.R.R. and J.S.T. and Ms. Dias are subject to ankle monitoring following their arrests. *See* ECF No. 13-4 ¶ 33, ECF No. 13-5 ¶ 22, ECF No. 13-6 ¶ 33; Ex. A ¶¶ 19–21. Plaintiff Dias does not live in Colorado and asserts that she does not presently have a driver's license. ECF No. 13-4 ¶¶ 1, 34. And Mr. Ramirez states that since his arrest, he has become a lawful permanent resident. *See* ECF No. 13-3 ¶ 33.

**Refugio Ramirez Ovando.**  Mr. Ramirez was pulled over by ICE officers who believed that he was a target with a final order of removal. Ex. A ¶ 18 & Att. 4; ECF No. 13-3 ¶ 23. He admitted to being from Mexico and illegally in the United States. Ex. A ¶ 18. He provided the officers with his Colorado driver's license. ECF No. 13-3 ¶ 13. The officers asked if he had a consular ID, but he responded that he "did not need one because [he] had a driver's license." *Id.* When asked for his passport, Mr. Ramirez said that he did not have it with him, but that his daughter could bring it. *Id.*

Mr. Ramirez then stopped responding to the officers' questions. *Id.* ¶ 15. He also began to ask if he could leave. *Id.* ¶ 16. Soon thereafter, he was arrested. *Id.* Once taken into custody, he was issued a Notice to Appear and an arrest warrant. Ex. A ¶ 18.

**Caroline Dias Goncalves.**  Ms. Dias does not reside in this District. *See* ECF No. 13-4 ¶ 1. While visiting Colorado from Utah, where she lives, she was pulled over by a Mesa County sheriff's deputy on the interstate. *Id.* ¶¶ 1, 4. She told him that she was born in Brazil and moved to Utah as a child. *Id.* ¶ 9. The deputy conducted an electronic check for any criminal history and was informed that Ms. Dias was a visa overstay and removable based on an immigration violation. Ex. A ¶ 19 & Att. 5. The deputy released Ms. Dias and contacted immigration officers, giving them the make and model of her vehicle and her direction of travel. ECF No. 13-4 ¶ 9. Two immigration officers then pulled her over, identified her, and arrested her. *Id.*; Ex. A ¶ 19 & Att. 5. Once taken into custody, she was issued a Notice to Appear and an arrest warrant. *Id.*

**J.S.T.**  Plaintiff J.S.T. was approached by immigration officers while in his car in the parking lot of an apartment complex on a morning when several law enforcement agencies were conducting operations related to Tren de Aragua. ECF No. 13-5 ¶¶ 8, 11; Ex. A. ¶ 20 & Att. 6. An officer asked him if he "had problems with immigration or past criminal violations, and [J.S.T.] said 'no.'" *Id.* ¶ 11. The officer used J.S.T.'s driver's license to check government records, and, contrary to what J.S.T. told the officer, the databases indicated that J.S.T. did, in fact, have a history of immigration issues—specifically, attempts to cross the border without inspection. Ex. A ¶ 20 & Att. 6. When officers asked J.S.T. about his status in the United States, he told them that he did not

have any documents on him that would allow him to be in the United States legally. *Id.* He was taken into custody and issued a Notice to Appear and an arrest warrant. *Id.*

**G.R.R.**  Plaintiff G.R.R. was arrested during a multi-agency operation at an illegal nightclub in Colorado Springs concerning Tren de Aragua. Ex. A ¶ 21 & Att. 7; *see also* ECF No. 13-6 ¶¶ 8–14. During the operation, G.R.R. fled the club and hid from authorities under a car in the parking lot. *See* ECF No. 13-6 ¶¶ 10–12. An officer eventually found G.R.R. and ordered him to come out. *See id.* ¶ 13. The officer patted G.R.R. down and found his wallet, which contained his Colorado state identification and his Mexican consular ID card. *Id.* ¶¶ 15–17. Officers questioned G.R.R. about his name and status in the United States. Ex. A ¶ 21 & Att. 7. He told them his name and that he did not have any documents on him that would allow him to be in the United States. *Id.* Thereafter, G.R.R. was arrested. *Id.* He was taken into custody and issued a Notice to Appear and an arrest warrant. *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019). A court may enter a preliminary injunction only if the moving party proves "(1) that she's substantially likely to succeed on the merits, (2) that she'll suffer irreparable injury if the court denies the injunction, (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Id.* at 797 (quotations omitted).

In all cases, the movant's right to a preliminary injunction must be "clear and unequivocal." *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018) (quotation marks omitted). Moreover, a preliminary injunction is disfavored when "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Fort Collins*, 916 F.3d at 797. "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" and must make a "strong showing" that those factors weigh in its favor. *Id.* (quoting *Fish v. Kobach*, 840 F.3d 710, 724 (10th Cir. 2016)). Here, Plaintiffs face this heavier burden because they seek a disfavored injunction: they seek to mandate that ICE adopt a new warrantless arrest policy, and that relief is all they could obtain at trial (if not more).

## ARGUMENT

### I.      Plaintiffs are not likely to succeed on the merits.

Plaintiffs have not met their heavy burden to make a strong showing that they are substantially likely to succeed on their APA claims.

### A.      Plaintiffs have not made a clear showing of standing to seek prospective relief.

Plaintiffs seek prospective relief in the form of a court order enjoining ICE's enforcement of an alleged District-wide practice of warrantless arrests without a flight risk assessment. ECF No. 13 at 34. "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To establish Article III standing based on a concern about a potential future injury, "a plaintiff must demonstrate (i) that she . . . likely will suffer an injury in

fact, (ii) that the injury likely . . . will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA* v. *Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "At the preliminary injunction stage . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation omitted). Plaintiffs fail to show clearly that they have standing for the specific injunctive relief they seek.[6]

### 1. Plaintiffs have not shown they face a certainly impending injury from any policy, pattern or practice of unlawful arrests.

Plaintiffs contend that they are entitled to prospective injunctive relief because they have experienced past harms through the enforcement of ICE's alleged warrantless arrest policy and they fear future enforcement of that policy. *See* ECF No. 13 at 32–35. Even if that ICE policy existed (it does not), past enforcement of that policy and Plaintiffs' subjective fears of its future enforcement are insufficient to demonstrate Article III standing for the relief they seek.

To establish Article III standing for prospective relief, the plaintiff must show a "future harm" that is "certainly impending." *Clapper*, 568 U.S. at 416. The mere *threat* or *fear* of future enforcement will not suffice; indeed, "allegations of *possible* future injury

---

[6] Plaintiffs do not seek damages based on their interactions with ICE officers. *See* 28 U.S.C. § 1346(b)(1) (waiving sovereign immunity for claims for damages based on torts by federal employees); *id.* § 2680(h) (clarifying that this waiver extends to claims of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" by law enforcement officers). Nor do they seek to challenge their allegedly unlawful arrests as they relate to immigration proceedings. *See Aguayo v. Garland*, 78 F.4th 1210, 1217 (10th Cir. 2023) (assuming that an alien arrested in violation of § 1357(a)(2) can seek, as a remedy, termination of removal proceedings).

are not sufficient." *Clapper*, 568 U.S. at 409 (citations omitted). Even the "realistic threat" of injury is not enough. *Summers v. Earth Island Inst.*, 555 U.S. 488, 499–500 (2009) (cleaned up). What is required is a showing of a "concrete, particularized, and *actual or imminent*" harm. *Murthy*, 603 U.S. at 57 (emphasis added).

The Supreme Court has explained that various types of evidence are insufficient to show a certainly impending injury. Those principles doom Plaintiffs' showing here.

***Past injury.*** It has long been the law that the mere fact of a past injury is not enough to show that future harm is likely. "[P]ast wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. *Id.* at 97. The Court held that, while the plaintiff could pursue a retrospective damages claim, he lacked standing to seek prospective relief because he had not shown that "he was likely to suffer *future* injury from the use of . . . chokeholds by police officers." *Id.* at 105 (emphasis added). Because the plaintiff had shown no "immediate threat" that he would again be "choke[d] . . . without any provocation or resistance on his part," he "failed to demonstrate a case or controversy . . . that would justify the equitable relief sought." *Id.*

Here, like the plaintiff in *Lyons,* Plaintiffs offer no basis to believe that it is *likely* that ICE will subject *them* to unlawful warrantless arrests in the *imminent* future. Rather, the record shows the contrary. First, Plaintiffs' own allegations show how unlikely it is that they would face another ICE arrest. They allege that the number of undocumented aliens in Colorado (169,000) is over *eighty times* ICE's *total* arrests in Colorado during

the first half of 2025 (2,000)—and Plaintiffs allege only a far smaller number of warrantless arrests that, in their view, violated § 1357(a)(2). *See* ECF No. 13 at 10.

Second, none of the Plaintiffs have offered any reason to show why they would likely be stopped, let alone arrested, again in this District. None have shown that *they* were originally the target of a past ICE enforcement action. *See* ECF No. 13-3 ¶ 23; ECF No. 13-4 ¶ 4; ECF No. 13-5 ¶ 16; ECF No. 13-6 ¶¶ 8–13. Nor have they identified a single instance either before or after their arrests in which they were stopped, let alone arrested, by ICE. *See generally* ECF Nos. 13-3, 13-4, 13-5, 13-6; *see also Lyons*, 461 U.S. at 105 (observing that the plaintiff made "no allegation of further unfortunate encounters" since the alleged encounter).

Third, Plaintiffs are not likely be subject to an unlawful *warrantless* arrest in the future. ICE now has arrest warrants for Plaintiffs. *See* Ex. A ¶¶ 12, 17–20. Any future arrest of Plaintiffs would therefore be based on an arrest warrant, not warrantless.

Fourth, other specific personal circumstances about Plaintiffs make it even less likely they will face warrantless arrest without assessment of flight risk in this District. Plaintiff Dias does not reside in Colorado, making her unlikely to be subject to any alleged ICE policy in Colorado. *See* ECF No. 13-4 ¶ 1. Plaintiff Ramirez states that he became a lawful permanent resident, which would allow him to show his lawful status and avoid arrest under § 1357(a)(2). *See* ECF No. 13-3 ¶ 33. And Plaintiffs G.R.R., J.S.T., and Ms. Dias acknowledge that they are subject to ankle monitoring following their arrests, and individuals with ankle monitoring are unlikely to be flight risks. *See* ECF No. 13-4 ¶ 37, ECF No. 13-5 ¶ 22, ECF No. 13-6 ¶ 33.

*Alleged unlawful enforcement policy.* The mere fact that allegedly unlawful government enforcement has been authorized does not satisfy the "certainly impending" requirement. In *Clapper*, the plaintiffs claimed that the government's allegedly-unlawful surveillance activities injured them by interfering with their foreign contacts. 568 U.S. at 412. But the Court concluded that their concerns about enforcement were insufficient, as their speculation of harm relied on a legal provision that "*authorizes*—but does not *mandate* or *direct*—the surveillance that respondents fear." *Id*. Similarly, in *Lyons*, the Court concluded that, even assuming that the defendant police department *did* have a practice of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force," the plaintiff had still failed to show a "real and immediate" injury. 461 U.S. at 105. In other words, showing that the police department was generally likely to continue to employ chokeholds was not enough unless the plaintiff *himself* would *likely* be subject to that chokehold again.

Here, Plaintiffs claim there is an alleged policy of unlawful law enforcement, but as in *Lyons*, even if such a policy existed, it is insufficient to show standing. Moreover, Plaintiffs' showing of a purported unlawful enforcement policy is far weaker than the one the Court considered in *Lyons*. Here, ICE directives expressly prohibit the precise conduct that Plaintiffs allege: warrantless arrests under § 1357(a)(2) without prior consideration of flight risk. Plaintiffs assert that ICE has a pattern and practice of acting otherwise, but that evidence consists of their individual arrest experiences, pseudonymous third-party anecdotes, and third-party statements by immigration attorneys. *See* ECF No. 1 ¶¶ 27–142. At most, that evidence describes varying,

unconnected encounters, not an official, routinely applied, District-wide warrantless arrest pattern and practice. Plaintiffs thus have not even shown an unlawful law enforcement policy—let alone that they face a "real and immediate" threat of being harmed by it. *Lyons*, 461 U.S. at 102.

***Concerns about potential enforcement.*** The "certainly impending" standard also cannot be satisfied by evidence that a threat of potential enforcement has caused concerns. A "chill" based on "apprehensiveness" that the government may in the future act wrongfully "in some way that would cause direct harm" to the plaintiff is not enough to show a "threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). In *Laird*, the plaintiffs challenged, on First Amendment grounds, Army surveillance of civilian political activity, arguing that the existence of the Army's practice created an "impermissible chilling effect." *Id*. at 3. The Court rejected that "chilling effect" as a sufficient injury to establish standing, explaining that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Id*. at 13–14. Similarly, in *Lyons*, the Court rejected the argument that "the plaintiff's subjective apprehensions" of future enforcement could satisfy Article III standing; instead, it was "the *reality* of the threat of repeated injury" that was "relevant to the standing inquiry." 461 U.S. at 107 n.8. In short, the "fear" of future enforcement "is insufficient to create standing." *Clapper*, 568 U.S. at 417.

As in *Lyons*, Plaintiffs claim they suffer injury based on their own subjective apprehensions of future immigration enforcement. But "subjective apprehensions" of future enforcement do not show standing. *Lyons,* 461 U.S. at 107 n.8.

*Noem v. Perdomo*. Finally, the Supreme Court's recent order in *Noem v. Perdomo* further supports the conclusion that Plaintiffs lack standing here. In *Perdomo*, the plaintiffs alleged that federal immigration agents engaged in a pattern of detentive stops without reasonable suspicion of an immigration violation, and the Supreme Court stayed a district court's injunction based on those allegations pending appeal. *Noem v. Perdomo*, No. 25A169, 2025 WL 2585637 (Sept. 8, 2025). Although the Court did not elaborate on why it viewed the federal government as likely to succeed on the merits, Justice Kavanaugh explained in a concurrence that under the "Court's decision in [*Lyons*], plaintiffs likely lack[ed] Article III standing to seek a broad injunction restricting immigration officers from making . . . investigative stops." *Id.* at *2 (Kavanaugh, J., concurring). Justice Kavanaugh explained that in his view, the plaintiffs did not have "standing to obtain future injunctive relief . . . merely because [they] experienced past harm and fear its recurrence," and otherwise had "no good basis to believe that law enforcement will unlawfully stop *them* in the future . . . and certainly no good basis for believing that any stop . . . is imminent." *Id.* (emphasis in original).

Such "interim orders" from the Supreme Court "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). And this is a like case. The Supreme Court's ruling in *Perdomo* thus supports concluding that Plaintiffs lack Article III standing to seek prospective injunctive relief because they have not shown that they will likely be imminently arrested without a warrant and with no reason to believe they pose a flight risk.

2.    **Plaintiffs do not have standing to challenge the application of ICE's alleged policy to others.**

Plaintiffs also lack standing to challenge ICE's purported warrantless arrest policy as it may apply to others because individuals do not have standing to challenge immigration arrest practices as they relate to others.

In *United States v. Texas*, 599 U.S. 670 (2023), certain states claimed that the federal government's immigration arrest policies violated certain statutes and sought "to order the Executive Branch to alter its arrest policy." *Id*. at 674. The Court held that the states lacked standing to bring such claims because it had "long held 'that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution.'" *Id*. (quoting *Linda R.S. v. Richard D*., 410 U.S. 614, 619 (1973)). For this reason, even if the states *were* correct that the federal government's immigration arrest policies violated the immigration statute, they lacked standing to bring claims challenging federal immigration arrest policies. *Id*. (taking "no position on whether the Executive Branch here is complying with its legal obligations under" the relevant statutes). After all, a cognizable injury requires more than "an asserted right to have the Government act in accordance with law." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (quotation omitted).

The Court's decision in *Texas* supports the conclusion that Plaintiffs here lack standing. It confirms that Plaintiffs lack standing to challenge arrest policies affecting others. Thus, as in *Texas*, Plaintiffs lack standing to challenge the Executive Branch's arrest policy other than as applied to themselves.

**B.      Plaintiffs cannot proceed under the APA because they have not shown that the purported "policy, pattern, and/or practice of making warrantless arrests" in Colorado is final agency action.**

Plaintiffs bring this case under the APA, asserting that ICE has adopted a policy (or pattern and practice) of unlawful warrantless arrests, and that this amounts to a final agency action subject to challenge under the APA. But Plaintiffs fail to show that there is a final agency action to challenge here.

In general, judicial review under the APA "is available only for 'final agency action.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (quoting 5 U.S.C. § 704).[7] The APA defines "agency action" as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent[,] or denial thereof, or failure to act." 5 U.S.C. § 551(13). In limiting APA review to "final" agency action, Congress restricted "pervasive oversight by federal courts over the manner . . . of agency compliance with . . . congressional directives," which would "inject[] the judge into day-to-day agency management." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 67 (2004).

The Supreme Court has articulated "two conditions that generally must be satisfied for agency action to be 'final' under the APA." *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). "First, the action must mark the consummation of the agency's decisionmaking

---

[7] The APA also permits review of actions "made reviewable by [another] statute," 5 U.S.C. § 704, but no other statute makes the purported warrantless arrest practice reviewable here.

process—it must not be of a merely tentative or interlocutory nature." *Id.* (quoting *Bennett*, 520 U.S. at 177). "[S]econd, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* (quoting *Bennett*, 520 U.S. at 177–78). The APA thus permits courts to consider only those claims that challenge discrete, "identifiable" final actions with "concrete effects." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990).[8]

Plaintiffs are not challenging an action that meets *either* condition.

### 1. Plaintiffs have not challenged a final action that is the consummation of an agency decisionmaking process.

An agency's final policy decision that binds its employees may reflect a discrete, consummated decision-making process and meet the first condition for final agency action. For example, in *Biden v. Texas*, 597 U.S. 785 (2022), the Supreme Court held that two ICE memoranda terminating a policy (the Migrant Protection Protocols) that returned certain aliens to Mexico met the first condition for final agency action, because the memoranda marked the consummation of the agency's decisionmaking process and "bound DHS staff" to not follow the Protocols. *Id*. at 808.

---

[8] Congress did not impose a "final agency action" limitation on review of actions by state actors in 42 U.S.C. § 1983, but instead granted a right to judicial review of actions by such actors "under color of . . . custom, or usage." Accordingly, judicial decisions under § 1983 reviewing *state* law enforcement patterns and practices are inapplicable in determining what federal agency actions can be challenged under the APA. Similarly inapposite are decisions where courts have addressed their authority to address *constitutional* violations, because Plaintiffs do not assert a constitutional violation here. *Cf. Maehr v. U.S. Dep't of State*, 5 F.4th 1100, 1106 (10th Cir. 2021) (discussing the jurisdiction of courts to grant injunctions to protect *constitutional* rights).

In contrast, an agency practice is not enough, without more, to meet this condition. Thus, in *Lujan*, the Court explained that the mere fact that an agency has taken multiple similar actions does not suffice to show that a *different*, discrete final agency action exists knitting them all together. There, the plaintiffs characterized various individual decisions about public land management as a "land withdrawal review program," and sought review under the APA. 497 U.S. at 877–78. The Supreme Court held that the agency decisions could not be combined in this way and considered a single, final "agency action" under the APA. *Id.* at 890; *see also id.* at 891 (APA does not allow plaintiffs to amalgamate actions into a purported overarching policy and then "seek wholesale improvement of th[e] program by court decree").

Therefore, applying *Lujan*, courts reject APA claims (like the ones in this case) where the plaintiff (1) identifies several discrete, allegedly unlawful acts; (2) claims that a common pattern, policy, or practice underlies all the acts; and (3) attempts to challenge the purported pattern, policy, or practice. *See, e.g.*, *Nat. Treas. Employees Union v. Vought*, 149 F.4th 762, 783–84 (D.C. Cir. 2025) (multiple actions that changed an agency's operations characterized as overarching decision to shut down the agency); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, No. 2:21-CV-1685-JCC-DWC, 2022 WL 18674583, at *2–3 (W.D. Wash. Dec. 6, 2022) (hundreds of permits issued for shellfish aquaculture operations characterized as policy); *Bark v. United States Forest Serv.*, 37 F.Supp.3d 41, 50 (D.D.C. 2014) (claimed policy based on five instances of agency permitting concessioners to improperly charge use fees).

Plaintiffs' APA claims here are like the claims in these cases: they assert that ICE's conduct in various different arrests shows an agency pattern and practice of not complying with § 1357(a)(2), which they seek to challenge under the APA. As in the cases set forth above, under *Lujan*, this means that they have not challenged an agency action that reflects the consummation of an agency decisionmaking process, such as a written policy that binds employees.[9]

Plaintiffs also have not shown that ICE is "applying some particular measure across the board" in all encounters that result in warrantless arrests. *Lujan*, 497 U.S. at 890 n.2 (conceding that such a measure may be susceptible to APA review). ICE agents in Colorado do not arrest every alien encountered who they have reason to believe is in the country unlawfully. Ex. A ¶¶ 12–13. And even if Plaintiffs had shown an across-the-board practice, that still would not be sufficient in this case, as they have not shown that such an across-the-board practice is the result of some other "specific order or regulation" that is "final." *Lujan*, 497 U.S. at 890 n.2.

In short, the first condition for final agency action is not met because Plaintiffs have not shown that the purported wrongful pattern and practice is the result of a concrete, identifiable, consummated decision-making process.

---

[9] Indeed, ICE *has* issued directives to its officers directing them to comply with § 1357(a)(2), but Plaintiffs do not challenge those policies. *Cf. Vought*, 149 F.4th at 787 ("Cases involving final agency action not committed to writing are few and far between.").

**2.    Plaintiffs have also not shown that the alleged general pattern and practice *itself* has direct legal consequences for them.**

Plaintiffs also have not met the second condition for final agency action: that the challenged action *itself* determined "rights or obligations" or is a source "from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (quotations omitted). For agency action to be "final," the "legal consequences" of the challenged action must be "direct and appreciable." *Hawkes*, 578 U.S. at 597. An internal directive can meet this test if it "b[inds] [agency] staff" to act a certain way that affects third parties. *Biden*, 597 U.S. at 808–09 (memo that "forb[ade]" agency employees from "continu[ing] a program" determined rights and obligations of program's beneficiaries); *cf. Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004) (Roberts, J.) (no final agency action where agency letter did not "[c]ompel[] [any] one to do anything").

But here, Plaintiffs do not challenge the actual directives ICE has issued that direct ICE officers to *comply* with § 1357(a)(2) when making warrantless arrests. Rather, they point to an alleged pattern and practice of violating that provision. But they have not shown that ICE has made a decision that will assuredly affect them if ICE encounters them. They have not shown, for example, that ICE has required that all warrantless arrests in Colorado be made without assessing the statutory factors. Such assertions would be untrue. Ex. A ¶¶ 14–16. Nor are ICE agents in Colorado trained to simply ignore the chance of escape when deciding whether to make a warrantless arrest. *Id.*

This case is thus far different from *Moreno v. Napolitano*, 213 F. Supp. 3d 999 (N.D. Ill. 2016), which Plaintiffs cite. In that case, the government admitted that it had a

detainer *policy* under which, whenever it issued a detainer, "ICE agents d[id] not make any determination at all" about whether the subject of the detainer was likely to escape before issuing detainers to state facilities. *Id.* at 1006 (emphasis omitted). Unlike in *Moreno*, here there is no policy that predetermines the outcome before the encounter happens—*i.e.*, that *mandates* an unlawful arrest. For that matter, there is no such practice, either: ICE agents do not arrest every alien they encounter whom they have reason to believe is in the country unlawfully.[10] Ex. A ¶¶ 12–13. The purported "policy, pattern, and/or practice of warrantless arrests" thus does not meet the second condition for final agency action.

In sum, neither condition for final agency action is met. Plaintiffs' APA claims challenging the purported "pattern, practice, and/or policy" thus are unlikely to succeed.

### C. Plaintiffs' APA claims also fail because Plaintiffs have not shown ICE has a pattern and practice of making warrantless arrests in Colorado without regard to the risk of flight.

Even if Plaintiffs had identified a final agency action, their APA claims still fail because they have not shown ICE has a practice of making warrantless arrests in Colorado without regard to the risk of flight, or that such a practice was applied to them.

**What § 1357(a)(2) requires.** Plaintiffs' argument begins by overstating what § 1357(a)(2) requires. Under § 1357(a)(2), immigration officials "have power without

---

[10] The Court cannot infer the existence of an ICE policy from the statement a single ICE agent allegedly made to Plaintiff Dias after her arrest. Indeed, that alleged statement—that ICE policy is to arrest all aliens—is clearly *not* ICE policy, as numerous aliens (tourists, workers, students, lawful permanent residents, diplomats, etc.) are authorized to be in the country, and there is no evidence that ICE is seeking to arrest all of them.

warrant . . . to arrest any alien in the United States, if [they have] reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest." *Id.*

In the Tenth Circuit, it is unclear whether "reason to believe" means probable cause or requires something less than probable cause.[11] In any case, even probable cause "doesn't require proof that something is more likely true than false." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (Gorsuch, J.). It requires only a 'fair probability,' a standard understood to mean something more than a 'bare suspicion' but less than a preponderance of the evidence at hand." *Id.* (citing *United States v. Ludwig*, 641 F.3d 1243, 1252 & n.5 (10th Cir. 2011)).

Determining whether there was a reason to believe an alien was likely to escape before a warrant can be obtained is a nuanced inquiry because law enforcement interactions occur in many contexts. The reasonable-suspicion inquiry "turn[s] on the totality of the particular circumstances." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 n.10 (1975). Courts consider the circumstances "through the lens of a reasonable

---

[11] Plaintiffs rely on out-of-circuit authority and *Roa-Rodriquez v. United States*, 410 F.2d 1206 (10th Cir. 1969), to argue that "reason to believe" means probable cause. ECF No. 13 at 19. But, in that case, the Tenth Circuit ruled that an arrest violated § 1357(a)(2) where the evidence showed that the alien was *lawfully present*; in reaching that conclusion, the court did not clearly hold that § 1357(a)(2) requires probable cause that escape will occur. *See Roa-Rodriquez*, 410 F.2d at 1209. More recently, when the Tenth Circuit addressed in another context the meaning of a "reason to believe," it explained that this standard "require[s] something less than probable cause." *United States v. Denson*, 775 F.3d 1214, 1216-17 (10th Cir. 2014) (Gorsuch, J.) (explaining that the Tenth Circuit deviates from others on that phrase's meaning).

law enforcement officer" and defer to the officer's judgments. *United States v. Lopez-Martinez*, 25 F.3d 1481, 1484 (10th Cir. 1994).

Numerous contextual factors may signal that escape is likely before a warrant can be obtained. These include "[w]hen an alien's removability 'is clear and undisputed,'" *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (quoting *Contreras v. United States*, 672 F.2d 307, 309 (2d Cir. 1982)), when the alien admitted that he "had been picked up before," *Aguirre v. INS*, 553 F.2d 501, 502 (5th Cir. 1977) (quotations omitted), or appeared "extremely nervous" and seemed to be "looking for an opportunity to run," *United States v. Meza-Campos*, 500 F.2d 33, 34 (9th Cir. 1974), or admitted that he had previously been removed, *United States v. Puebla-Zamora*, 996 F.3d 535, 538 (8th Cir. 2021), or attempted to evade custody, *Contreras*, 672 F.2d at 309, or was "stopped in a vehicle," *United States v. Murillo-Gonzalez*, 524 F.Supp.3d 1139, 1151 (D.N.M. 2021), *aff'd*, No. 22-2123, 2024 WL 3812480 (10th Cir. Aug. 14, 2024).

Finally, neither 8 U.S.C. § 1357(a)(2) nor 8 C.F.R. § 287.8(c)(2)(ii) imposes any affirmative obligation on officers to make the assessment of the risk of flight in any particular manner. Given that an alien is free to leave at any point during a consensual encounter, officers must make these assessments quickly and based on limited information. *Murillo-Gonzalez*, 524 F. Supp. 3d at 1151 (deferring "to the officer's on-the-scene judgments" and upholding an arrest under § 1357(a)(2)). "Because of the difficulty of making an on-the-spot determination as to the likelihood of escape without any opportunity to verify information provided or to conduct a full-scale interview, an

[immigration] officer's determination will not be upset if there is any reasonable basis for it." *Contreras*, 672 F.2d at 308 (cleaned up).

**Plaintiffs' arrests do not show that immigration officers have a practice of ignoring the risk of flight[12] before making warrantless arrests.**  Plaintiffs claim that the circumstances of their arrests show that ICE officers have a practice of ignoring the risk of flight. But their evidence fails to make this showing. Their own versions of events point to different factors that, given the totality of the circumstances, provide reason to believe that there was risk of flight.

*Refugio Ramirez Ovando*:  Mr. Ramirez's I-213 indicates that he admitted that he was here illegally. He admits that he was "very nervous" and, initially, only partly rolled down his window. He was also driving a car. Finally, after initially cooperating with officers and answering their questions, he stopped.

*Caroline Dias Goncalvez*:  Immigration officers determined before stopping her vehicle that it was clear Ms. Dias had overstayed her visa. They encountered her driving a car on the highway in a state where she did not reside.

*J.S.T.*:  J.S.T. had attempted to mislead the officers. He told officers that he did not have a history of immigration problems. But officers identified him in records showing that he was illegally present and had previous interactions with immigration authorities when trying to enter the country from Mexico without authorization.

---

[12] Plaintiffs do not dispute that the arresting immigration officials had reason to believe that each Plaintiff was in violation of immigration laws. None claimed to have legal status during their arrests.

*G.R.R.*:  When confronted by officers, he was unable to provide any documentation or information to the officers to suggest he had a legal status. And during the enforcement action, he attempted to hide from the officers.

**D.    Plaintiffs have not shown an injunction is warranted.**

Plaintiffs are not entitled to an injunction either individually or District-wide.

**1.    Plaintiffs have not shown an injunction is warranted as to them.**

"The purpose of an injunction is to prevent future violations" and, therefore, requires the movant to establish a "cognizable danger of recurrent violation" and not just "the mere possibility" of future harm. *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953). To obtain injunctive relief, Plaintiffs thus must show a current violation of law. *See Farmer v. Brennan*, 511 U.S. 825, 846 & n.9 (1994) (explaining that "eligibility for an injunction" requires a showing, at the time the injunction is sought, that the violation is continuing and will continue "into the future"). "Where a plaintiff seeks an injunction, his susceptibility to *continuing* injury is of particular importance." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011).

Plaintiffs have not shown they are suffering a continuing injury. Most recently, ICE issued a directive on October 22, 2025, to all ICE officers that specifically prohibited the conduct—warrantless arrests without flight risk assessment—that Plaintiffs allege has occurred. Ex. A ¶ 16 & Att. 3. Plaintiffs have not established that any other policy is in effect or any other practice is being or will be implemented. *See supra*, Sections I.A.1, I.C. They have also provided no evidence that, in the months since their initial arrests, they personally have suffered a continuing injury—that they faced additional stops or

arrests by ICE. *See supra*, Section I.A.1. Indeed, as described above, Plaintiffs' personal circumstances demonstrate that they are *unlikely* to face any warrantless arrest without a flight risk assessment in this District. Having failed to demonstrate any ongoing violation of law, Plaintiffs are not entitled an injunction.[13]

### 2.    Plaintiffs have not shown a District-wide injunction is needed.

Plaintiffs' request for District-wide relief also contravenes the Supreme Court's recent decision in *Trump* v. *CASA, Inc.*, 606 U.S. 831 (2025). In *CASA*, the Supreme Court rejected a universal injunction that directed the federal government how to act not only with respect to the plaintiffs but also as to nonparties. *See id.* at 841. It explained such an injunction exceeds the statutory grant of jurisdiction to federal courts over suits. *See id.* at 841–42. Rather, at most, a court granting equitable relief "may administer complete relief *between the parties*." *Id.* at 851 (citation omitted). Even then, the injunction must fit the plaintiff's injury, as "[c]omplete relief is not a guarantee—it is the maximum a court can provide." *Id.* at 854.

---

[13] Plaintiffs' requested injunction would also impermissibly impose a categorical rule on ICE in evaluating the risk of flight. Because the reasonable-suspicion inquiry "turn[s] on the totality of the particular circumstances," *Brignoni-Ponce*, 422 U.S. at 885 n.10, reasonable suspicion cannot be reduced to per se rules that treat certain factors as categorically insufficient. Supreme Court precedent thus forbids injunctions that impose per se restrictions in this context. *See e.g.*, *United States v. Arvizu*, 534 U.S. 266, 272–74 (2002); *United States v. Sokolow*, 490 U.S. 1, 8 (1989). But Plaintiffs' requested injunction contravenes this principle. It seeks to categorically bar ICE officers from forming reasonable suspicion for a warrantless arrest based on certain facts: namely, unlawful presence in the United States. *See* ECF No. 13-1 at 2. That is the exact kind of categorical rule prohibited by the Supreme Court, and it cannot be included in injunctive relief here.

The District-wide injunction Plaintiffs seek would violate those limits. Under *CASA*, any injunctive relief may apply *only* to Plaintiffs. They, though, seek a preliminary injunction beyond themselves, seeking to enjoin ICE "from effecting warrantless arrests in this District" unless certain conditions are satisfied. ECF No. 13-1 at 1.

Entry of that injunction would generate all the problems with universal injunctions identified in *CASA*. By covering millions of nonparties, it would broadly "halt[] the enforcement of federal policy" across the entire state of Colorado. *CASA*, 606 U.S. at 856. It would create a "fast and furious process of rushed, high-stakes, [and] low-information decisionmaking." *Id.* at 855–56 (alteration in original) (citation and quotation marks omitted). And it would invite micromanagement of Executive Branch policy and enforcement decisions and would cause an improper transfer of core executive functions to the Judiciary. If a handful of plaintiffs challenging law-enforcement practices could obtain district-wide relief, federal courts would once again "exercise general oversight of the Executive Branch" in a manner that *CASA* deemed to "exceed [courts'] power." *Id.* at 861. The District-wide relief Plaintiffs seek is thus impermissible.[14]

---

[14] A party-specific injunction is likely administrable here. *See*, *e.g.*, *Kentucky* v. *Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("Because an injunction limited to the parties can adequately protect the plaintiffs' interests while the case is pending disposition on the merits, the district court abused its discretion in extending the preliminary injunction's protection to non-party contractors . . . ."); *Philadelphia Yearly Meeting of Religious Soc'y of Friends v. U.S. Dep't of Homeland Security*, 767 F. Supp. 3d 293, 336 (D. Md. 2025) ("Plaintiffs have provided no basis to conclude that they could not provide to DHS, for purposes of enforcement of the injunction, a list of the locations of their places of worship and of other sites at which they may hold their worship services.").

**II.    Plaintiffs have not shown they will suffer irreparable harm if the relief they seek is not granted.**

"A plaintiff seeking a preliminary injunction must establish that . . .  [it] is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A mere "possibility of irreparable harm" is insufficient. *Id.* at 22; *see also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (preliminary injunction protects against "irreparable injury that will surely result without [its] issuance"). "That harm must be both certain and great, not merely serious or substantial. And a speculative or theoretical injury will not suffice." *Colorado v. U.S. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (cleaned up). The harm also must have an "irreparable effect in the sense of making it difficult or impossible [for the plaintiff] to resume their activities or restore the status quo ante in the event they prevail." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Under these standards, Plaintiffs have not shown that they will suffer irreparable harm if the Court does not grant the preliminary relief they seek. They contend that they face possible future arrest without the ability "to get their affairs in order" and while in "public places." ECF No. 13 at 27–29. But the relief Plaintiffs seek—enjoining warrantless arrests without a flight risk assessment—would not prevent those harms because federal law allows for their potential detention and arrests with a warrant. *See* 8 U.S.C. §§ 1226, 1231. And Plaintiffs cannot demonstrate that they will be irreparably harmed absent a preliminary injunction in light of ICE's October 2025 Statement of Policy already requiring ICE officers to comply with § 1357(a)(2). Plaintiffs' argument that they will face future harm (in the form of unlawful warrantless arrest) from

immigration enforcement unless ICE operates under a court-ordered preliminary injunction is thus too speculative to show irreparable harm. Accordingly, Plaintiffs cannot establish a continued and future irreparable injury absent an injunction.

**III.    Plaintiffs have not strongly shown that the public interest and balance of the equities support granting relief.**

The final two preliminary injunction factors, the public interest and the balance of the equities, "merge" when the Executive Branch is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs have not shown that these factors strongly weigh in their favor. While Plaintiffs have identified their concerns, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted). Here, the public interest in enforcing the immigration laws is "substantial[]." *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-57 (1976). An alien's unlawful presence in the United States is a continuing violation of the law and the government has a legitimate and significant interest in ensuring that immigration laws are enforced. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1047 (1984). Courts may not "blithe[ly]" dismiss that public interest in immigration enforcement. *Nken*, 556 U.S. at 436. The order Plaintiffs seek, though, would do just that and interfere with the federal government's significant immigration enforcement function. The public interest is, therefore, served by allowing ICE to continue to conduct its operations without preliminary intervention by the Court.

**CONCLUSION**

For all the reasons discussed above, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: October 27, 2025

PETER MCNEILLY
United States Attorney

*s/ Brad Leneis*
Brad Leneis
Logan Brown
Nick Deuschle
Assistant United States Attorneys
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0411
brad.leneis2@usdoj.gov
logan.brown@usdoj.gov
nick.deuschle@usdoj.gov

Attorneys for Defendants

## CERTIFICATE OF SERVICE

I certify that on October 27, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will cause notice to be delivered electronically to all counsel of record.

*s/ Brad Leneis*
Brad Leneis
Assistant U.S. Attorney