IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge R. Brooke Jackson

Civil Action No. 1:25-cv-03183-RBJ

REFUGIO RAMIREZ OVANDO,
CAROLINE DIAS GONCALVES,
J.S.T, and
G.R.R.,

      Plaintiffs,

v.

KRISTI NOEM,
TODD LYONS,
ROBERT G. HAGAN[1]
in their official capacities,

      Respondents.

---

# ORDER

---

## I.   <u>Introduction</u>

Immigration officials are entrusted with enforcing the immigration laws and are authorized to pursue an aggressive deportation agenda. They may arrest and initiate removal proceedings against individuals they believe are present without

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Robert G. Hagan has automatically been substituted as a party in his official capacity as Director of the Denver Field Office, U.S. Immigration and Customs Enforcement.

1

lawful status. But in carrying out these responsibilities, they must follow the law. This case arises out of U.S. Immigration and Customs Enforcement's ("ICE") alleged practice in Colorado of arresting individuals suspected of being unlawfully present without a warrant and without making the individualized flight-risk determination required by 18 USC § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

Plaintiffs are four individuals who were subjected to this unlawful practice. Although they lacked legal status, each had deep and longstanding ties to their communities—including parents, spouses, children, stable employment histories, and active participation in their local churches. No reasonable officer could have reasonably concluded that these plaintiffs were likely to flee before a warrant could be obtained. Yet ICE nonetheless arrested each one immediately and detained them for significant periods, causing severe hardship and loss. Plaintiffs seek to represent a class of similarly situated individuals who are not targets of ICE's removal operations but have been arrested without a warrant or remain at risk of warrantless arrest in violation of the statute's individualized-flight-risk-assessment requirement.

Before the Court are plaintiffs' motions for a preliminary injunction and provisional class certification (ECF Nos. 13 and 14), and defendants' motion to restrict electronic access to the case file (ECF No. 46).[2] For the reasons stated herein,

---

[2] For clarity, record citations in this Opinion appear inside the text, i.e. (Pl. Ex. 1); in some cases, for readability, short-form citations are used in the main text with full citations provided in footnotes.

plaintiffs' motion for provisional class certification is GRANTED to the extent that this Court will provisionally certify a class under the definition provided in Part V of this Opinion; plaintiffs' motion for a preliminary injunction is GRANTED in part and DENIED in part, as described in Part V; and defendants' motion to restrict electronic access is GRANTED in part and DENIED in part, without prejudice to renew, as described in Part V.

## II.    Background

### A.    ICE's Warrantless Arrest Power

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and its "power to determine immigration policy is well settled."[3] *Arizona v. United States*, 567 U.S. 387, 394 (2012). To that end, Congress has passed comprehensive legislation regulating the apprehension, arrest, detention, and removal of persons unlawfully present in the United States; and the Executive branch, through its agencies, including the Department of Homeland Security (DHS), and its subcomponent, ICE, is tasked with carrying out the legislature's design. *See id.* at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so"); 8 U.S.C.

---

[3] Throughout this opinion, the term "alien" is used where it appears in a statute, regulation, judicial opinion, or ICE internal document. Otherwise, unless a more specific term is necessary, this opinion interchangeably refers to individuals or persons "without lawful status," "unlawfully present," or "undocumented persons," or some similar expression, when discussing people in the United States in violation of the immigration laws.

§ 1103(a) (charging DHS "with the enforcement of … laws relating to the immigration and naturalization of aliens").

Under the framework established by Congress, removal proceedings typically begin when a suspected removable person is served with a charging document known as a "Notice to Appear" ("NTA"). *See* 8 U.S.C. § 1229(a). At the time an NTA is issued, or anytime thereafter until the conclusion of removal proceedings, immigration officers may issue a "Warrant of Arrest," known as Form I-200, and under this authority, "arrest[ ] and take[ ] into custody" the subject of the proceedings. *See* 8 C.F.R. §§ 236.1, 1236.1. Thus, ICE officers possess extremely broad authority to arrest persons suspected of violating the immigration laws upon the issuance of an NTA *and* a valid arrest warrant.

However, where "no federal warrant has been issued," Congress has granted immigration officers "more limited authority" to make arrests. *Arizona*, 567 U.S. at 408. This authority is governed by 8 U.S.C. § 1357(a)(2), and its corresponding regulation, 8 C.F.R. § 287.8(c)(2)(ii), which permit arrest only where the officer "has reason to believe" that the individual "is in the United States in violation of [the immigration laws]" and "is likely to escape before a warrant can be obtained for his arrest[.]" § 1357(a)(2); § 287.8(c)(2)(ii). This two-pronged requirement precedes the 1952 passage of the INA and has never been amended. *See* Act of Aug. 7, 1946, ch. 768, 60 stat. 865 (adopting the language of § 1357(a)(2) in a predecessor statute).

4

The "reason to believe" language in § 1357(a)(2) is the equivalent of the constitutional requirement of probable cause. *See, e.g.*, *Roa-Rodriguez v. United States*, 410 F.2d 1206, 1209 (10th Cir. 1969) (adopting the "probable cause" standard in finding that a warrantless arrest violated § 1357(a)(2)); *Morales v. Chadbourne*, 793 F.3d 208, 216 (1st Cir. 2015) (collecting cases interpreting "reason to believe" in § 1357(a)(2) as the equivalent of probable cause).[4]

This statutory requirement, that an immigration officer must have probable cause of flight risk, "is not mere verbiage." *United States v. Pacheco-Alvarez*, 227 F.Supp.3d 863, 889 (S.D. Ohio 2016) (citing *Arizona*, 567 U.S. 387); *see also United States v. Cantu*, 519 F.2d 494, 496-97 (7th Cir. 1975) (explaining that the likelihood of escape limitation is "always seriously applied"). Before effecting a warrantless arrest, ICE officers must make a "particularized inquiry" that the subject is likely to abscond. *Moreno v. Napolitano*, 213 F.Supp.3d 999, 1007-08 (N.D. Ill. 2016); *see also United States v. Kahn*, 324 F.Supp.2d 1177, 1186-87 (D. Colo. 2004) (considering defendant's traditional flight risk factors, including ties to the community, in finding that his warrantless arrest violated § 1357(a)(2)); *Pacheco-*

---

[4] Defendants' suggestion in their response brief that the probable cause standard applies only to the first prong of § 1357(a)(2), that is, the officer's reason to believe that the subject is unlawfully present in the United States, and not the second, flight-risk prong, rests on an unreasonable reading of *Roa-Rodriguez*, 410 F.2d at 1208-09, is otherwise unsupported, and is rejected (ECF No. 34 at 31 n. 11).

*Alvarez*, 227 F.Supp.3d at 889-90 (same); *United States v. Bautista-Ramos*, No. 18-cr-4066-LTS, 2018 WL 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (same).

## B.   The Castañon-Nava Litigation and ICE's Broadcast Statements of Policy

In May 2018, ICE conducted "large-scale immigration sweeps" in Chicago, Illinois. *See Nava v. DHS*, 435 F.Supp.3d 880, 885 (N.D. Ill. 2020). By ICE's own account, 106 of the 156 arrests made during this operation, known as "Operation Keep Safe," were "at-large collateral arrests," meaning people who were not ICE targets and for whom ICE lacked a warrant. *Id.*

Five of these individuals, all of whom had lived in Chicago for between 4 and 30 years, filed a putative class action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 101-913, alleging that ICE violated § 1357(a)(2) by arresting them "without…individualized determination[s]" of flight risk, and that their arrests reflected ICE's "widespread policy and practice of violating the INA in this manner." *Nava*, 435 F.Supp.3d at 885-86.

After the district court denied defendants' motion to dismiss, the parties settled. *See Castañon Nava v. DHS*, No. 18-cv-3757, 2025 WL 2842146, at *1 (N.D. Ill. Oct. 7, 2025). Under the terms of the settlement, ICE issued a nationwide "Broadcast Statement of Policy" ("Broadcast I"), setting out "how ICE officers are to conduct warrantless arrests in a manner consistent with 8 U.S.C. § 1357(a)(2)."

*Id.* at *4, *22.  In other words, ICE has articulated what the law requires of its officers and established protocols to ensure compliance.

Specifically, Broadcast I provided, in relevant part, that: (1) to make a warrantless arrest, an ICE officer is required "to have probable cause that an individual is in the United States in violation of U.S. immigration laws *and* probable cause that the individual is likely to escape before a warrant can be obtained for the arrest" (emphasis in original); (2) when determining "likelihood of escape," an officer "must consider" the totality of the circumstances known to them before the arrest; (3) relevant factors include whether the officer can "determine the individual's identity, knowledge of that individual's prior escapes or evasions of immigration authorities, attempted flight from an ICE Officer, ties to the community (such as a family, home, or employment) or lack thereof, or other specific circumstances" weighing in favor or against flight risk; and (4) "mere presence within the United States in violation of U.S. immigration law" is not, on its own, evidence of flight risk (Def. Ex. E, Broadcast Statement of Policy, Final Draft, Nov. 23, 2021).

Importantly, Broadcast I also dictated that, "as soon as practicable," ICE officers are required to "document the facts and circumstances" of a warrantless arrest in the narrative section of the subject's Form I-213, including, the subject's "ties to the community, if known at the time of arrest, including family, home, or

7

employment," and "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained" (*id.*).[5] Additionally, ICE officers were instructed that information "learned post-arrest relevant to custody determination should be documented separately from the information relevant to likelihood of escape known at the time of the warrantless arrest" (*id.*).

Earlier this year, plaintiffs' counsel for the *Nava* settlement brought a motion to enforce the agreement, alleging that during largescale immigration operations at the beginning of the second Trump Administration, ICE committed "repeated, material violations" of the agreement by warrantlessly arresting 26 class members without possessing probable cause of flight risk.  *Castañon Nava*, 2025 WL 2842146, at *6.  On June 11, 2025, while the motion was pending, Charles Wall, ICE's Principal Legal Advisor ("PLA"), sent out another nationwide "Broadcast" policy statement ("Broadcast II").  *Id.* at *22.  This statement declared that the *Nava* had expired, and that ICE was no longer bound by it.  Accordingly, it purported to rescind Broadcast I (*see* Def. Ex. F, "Termination of Castañon-Nava Settlement Agreement," Jun. 11, 2025).

---

[5] Form I-213, entitled "Record of Deportable/Inadmissible Alien" is an "official record prepared by immigration officials when initially processing a person suspected of being in the United States without legal permission."  *Castañon Nava*, 2025 WL 2842146, at *4 n. 4 (cleaned up) (citing *Punin v. Garland*, 108 F.4th 114, 119 (2d Cir. 2024)).

Broadcast II reiterated that, to make a warrantless arrest under § 1357(a)(2), ICE officers must have "probable cause" of flight risk under the "totality of the circumstances."  It included the same list of "relevant" factors, but it also made a number of significant amendments to Broadcast I (*id.*).  Gone was the unequivocal language that unlawful presence, by itself, is *insufficient* to justify warrantless arrest, replaced by a softer statement that, "[n]otably, courts have found that an alien's mere presence in violation of U.S. immigration law may not serve as a basis for a warrantless arrest" (*id.*).  It dispensed with the documentation requirements from Broadcast I (*id.*).  Instead, it merely "encouraged" ICE officers and agents "to document in Form I-213 the basis for determining that an alien was likely to escape before a warrant could be obtained" without elaboration (*id.*).

After plaintiffs filed notice of numerous additional alleged violations during more largescale enforcement operations in late September, the district court found that ICE had, in fact, warrantlessly arrested 22 class members without probable cause of flight risk.  *Castañon Nava*, 2025 WL 2842146, at *21.  Furthermore, finding that Mr. Wall's "agency-wide directive" purporting to unilaterally terminate the settlement and rescind Broadcast I violated the agreement, the court extended the duration of the settlement by six months.  *Id.* at *23.

Accordingly, "[p]ursuant to the order of the district court," on October 22, 2025, ICE sent a third nationwide "Broadcast" policy statement ("Broadcast III"),

9

repeating, word-for-word, the legal standards and documentation protocols for warrantless arrests in Broadcast I, and informing its officers that they remained in effect until the expiration of the settlement on February 2, 2026 (Def. Ex. G, "Effective Immediately: *Castañon-Nava* Broadcast Statement of Policy," Oct. 22, 2025).

## C. **Procedural History and the Parties' Positions**

In the instant matter, plaintiffs filed their initial "Class Complaint for Declaratory and Injunctive Relief," "Motion for Preliminary Injunction," and "Motion for Class Certification" on October 9, 2025 (ECF Nos. 1, 13, and 14). They contend that, in Colorado, "ICE agents are ignoring the law's clear requirement to assess flight risk before making a warrantless arrest," and they seek to "enjoin Defendants' ongoing pattern and practice of flouting federal law in connection with their mass immigration arrests" (ECF No. 1 at ¶3). They state two causes of action under the APA, asking this Court to "hold unlawful and set aside" this alleged pattern and practice as "final agency action" that is ultra vires and "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii) (*see id.* at ¶¶202, 209). 5 U.S.C. §§ 704, 706(2)(C). Plaintiffs also seek to represent a class under Federal Rule of Civil Procedure 23(b) consisting of:

> All persons since January 20, 2025, who have been arrested or will be arrested in this District by ICE without a warrant and without a pre-arrest, individualized

assessment of probable cause that the person poses a flight risk (ECF No. 1 at ¶188; ECF No. 14 at 2).

In their proposed preliminary-injunction order, plaintiffs request that the Court: (1) enjoin immigration officers from effecting warrantless arrests in this District absent probable cause of both unlawful presence and risk of flight; (2) require that any officer making a warrantless arrest comply with the standards set out for individualized flight-risk determinations in Broadcasts I and III; (3) require officers to document in the arrestee's I-213 the facts and circumstances supporting the arrest, consistent with those Broadcasts; (4) order defendants to provide plaintiffs' counsel with documentation of warrantless arrests in the District every 60 days, and to produce records of specific arrests within seven days upon request; (5) ensure that all officers authorized to execute immigration arrests in this District are trained on these requirements; and (6) provide ongoing documentation of that training until its completion (ECF No. 13-1).[6]

On October 27, 2025, defendants filed their response brief, arguing that: (1) plaintiffs lack standing; (2) the complaint fails to state a claim under the APA; (3) plaintiffs fail to show that their warrantless arrests violated § 1357(a)(2), let alone

---

[6] Plaintiffs also request, in their motion for a preliminary injunction, that the Court appoint the named plaintiffs as Class Representatives, appoint plaintiffs' counsel as Class Counsel, and provisionally certify the class, and separately, not require plaintiffs to post a bond (ECF No. 13-1).

that ICE has a pattern or practice of disregarding the statute; (4) the Court lacks authority to issue a "universal" injunction extending beyond the named plaintiffs; and (5) the plaintiffs have not demonstrated a likelihood of irreparable harm or that the equities favor granting a preliminary injunction (ECF No. 34). Plaintiffs replied on October 29, 2025 (ECF No. 40).

On October 30 and 31, 2025, this Court held a hearing on plaintiffs' motions (ECF No. 43 and 45). The facts below are drawn from the testimony and exhibits admitted at the hearing.[7]

## III.   <u>Findings of Fact</u>

### A. <u>The Warrantless Arrests of the Named Plaintiffs</u>

1. *Refugio Ramirez Ovando*

Mr. Ramirez Ovando has lived near Grand Junction, Colorado for more than 20 years (ECF No. 47, H. 10/30/25, at 50). He and his wife have four U.S.-citizen children, ages 8 to 18, whom they raise together (*id.* at 51-52). They attend church every Sunday (*id.* at 53). Mr. Ramirez Ovando has worked for the same construction company for 19 years and has no criminal history (*id.* at 52, 68-69).

---

[7] Some of the exhibits the Court considered were declarations sworn under the penalty of perjury from non-testifying witnesses and media reports. By and large, defendants objected to the former but not the latter. It is well-established that, at the preliminary injunction stage, courts may consider evidence that may not otherwise be admissible at trial under the Federal Rules of Evidence, including evidence containing hearsay. *See, e.g.*, *DigitalGlobe, Inc. v. Paladino*, 269 F.Supp.3d 1112, 1119 (D. Colo. 2017) (citing *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003)). "The fact that evidence might be excludable goes to the weight of that evidence, not necessarily its admissibility." *Id.*

On the morning of May 19, 2025, while driving to work, he was stopped by two armed plainclothes ICE officers (*id.* at 53-55). He later learned that they had stopped him by mistake—the officers believed he was someone else (*id.* at 66-67). He provided his SB-251 Colorado driver's license when asked for identification (*id.* at 56).[8] When asked for another form of ID, he offered to have his daughter bring his passport from home (*id.*).

The officer then asked Mr. Ramirez Ovando whether he had any "papers" or permission to be in the country (*id.* at 58). When Mr. Ramirez Ovando repeatedly requested to know if he was under arrest or free to leave, the officer took him into custody (*id.* at 58-59). Only after he was taken into custody—both on the way to and at the ICE field office—did officers ask questions related to his family, community ties, and other flight risk factors (*id.* at 60-62).

His I-213 corroborates his account (*see* Def. Ex. A, I-213 for Mr. Ramirez Ovando). The "Encounter" section contains no information indicating that ICE made any individualized flight-risk determination before arresting him (*id.*). A later section notes that he lives with his wife and four-U.S. born children, a factor that ICE's assistant director for the Denver field office testified would cut *against* flight

---

[8] An SB-251 license is an identification issued by the state of Colorado to individuals who are not citizens of the United States or lawful permanent residents (ECF No. 47 at 207-08). It is easily distinguished from a standard Colorado license because it contains a black horizontal stripe on the top, includes the inscription, "not valid for federal purposes," and lacks a star in the top right-hand corner denoting a "REAL ID" (*id.* at 185-86, 207-08).

risk, but this information was collected only during processing (ECF No. 48, H. 10/31/25, at 354).

Mr. Ramirez Ovando was in detention for nearly 100 days before an immigration judge granted him lawful permanent resident status and he was released (ECF No. 47 at 64, 66). He testified to atrocious conditions inside the facility, including extreme temperature fluctuations, inappropriate sleeping conditions, and inadequate medical care (*id.* at 63-65). His arrest and detention also caused significant financial hardship for his family and severely impacted his children's mental health, all of whom started attending therapy (*id.* at 67-68).

### 2. *Caroline Dias Goncalves*

Ms. Dias Goncalves is a 20-year-old scholarship student at the University of Utah and also works as a restaurant hostess (*id.* at 28-30). She has lived in Utah with her family, active members of the Church of Jesus Christ of Latter-day Saints, since she was seven years old (*id.* at 28-29, 45). At the time of her arrest, she had a pending asylum application with United States Customs and Immigration Services (USCIS) and valid work authorization (*id.* at 30, 127).

On June 5, 2025, while driving alone on highway I-70 in western Colorado to visit a friend, she was stopped for an alleged traffic infraction by a sheriff's deputy, who checked her ID, issued a warning, and then contacted Homeland Security Investigations (HSI), a division of ICE (*id.* at 31-33). Minutes later, armed

plainclothes HSI agents pulled her over (*id.* at 33-34). They immediately told her that she was "under arrest for violating the immigration law," handcuffed her, and transported her to the DHS field office in Grand Junction (*id.* at 34-35).[9]

Her I-213 fully corroborates her account (Def. Ex. B, I-213 for Ms. Dias Goncalves). The "Encounter" section is entirely bereft of any information regarding her community ties or flight risk (*id.*). A later section notes her pending asylum application and work authorization, but the agents appear not to have known, or at least not considered, this information during the arrest decision (*id.*).

Ms. Dias Goncalves was detained for 15 days before she was released on bond, an ankle monitor, and check-ins with a case officer in Utah (ECF No. 47 at 37, 40-41). Her detention caused her to lose one job, move back in with her parents nearly an hour from campus, drop all but one of her courses, and begin therapy for her stress and anxiety (*id.* at 41-43).

   3.  *J.S.T.*

J.S.T. is a 36-year-old man who has lived in the United States for over 15 years, and at the same Aurora, Colorado apartment for the last seven (*id.* at 80; Pl. Ex. 4, J.S.T. Aff., at ¶ 1). He has worked for a small family-owned grocery store for nine years (ECF No. 47 at 82). He has two brothers and a sister-in-law nearby and

---

[9] There, Ms. Dias Goncalves was told by an unknown ICE officer that "under this president and under this presidency, [we're] arresting anyone that is not a U.S. citizen" (ECF No. 47 at 36).

is extremely close with two of his teenage nieces, whom he helped raise from when they were toddlers (*id.* at 81-82). J.S.T. has no criminal record and is active in his church, participating in weekly prayer group and volunteer activities (*id.* at 82-83, 88; Pl. Ex. 4 at ¶¶4-5).

On February 5, 2025, as J.S.T. was leaving for work, an armed ICE officer in a military-green uniform stopped him as part of a large-scale immigration enforcement operation at his apartment complex (ECF No. 47 at 84-86). J.S.T. provided his SB-251 license (*id.* at 85). Another officer asked him whether he had any prior legal problems, including with immigration (*see id.* at 86; Pl. Ex. 4 at ¶11). Although he had been voluntarily returned to Mexico at the border in 2006, he said "no" (ECF No. 47 at 80-81, 86). He was immediately taken into custody (*id.* at 87).

His I-213 substantially mirrors the others (Def. Ex. C, I-213 for J.S.T.). The "Encounter" section contains no information related to his perceived flight risk. Rather, the narrative suggests that once he admitted that he lacked lawful status, his warrantless arrest was a *fait accompli* (*see id.*) ("An administrative warrant was unable to be obtained at the time of arrest, so Officers conducted a warrantless arrest"). Although a later section references J.S.T.'s voluntary return, it is unclear when ICE learned this information, and viewing the document in totality, it appears to have played no role in the arrest decision (*id.*).

16

J.S.T. spent nearly a month in detention (ECF No. 47 at 92). He was later released on bond, an ankle monitor, and regular ICE check-ins (*id.* at 92-93). As a result of his arrest and detention, he lost his apartment and possessions and had to move into a small room in a relative's mobile home (*id.* at 94-95). His relationship with his nieces has suffered, as he no longer has the ability to host them (*id.* at 95-96). He also suffers from anxiety and fears going out in public (*id.* at 96).

4. *G.R.R.*

G.R.R. is a 32-year-old man who has lived continuously in Colorado Springs for 10 years (*id.* at 173). He owns a remodeling business and lives with his fiancé and their 10-year-old son, both U.S. citizens (*id.* at 173; Pl. Ex. 3, G.R.R. Aff., at ¶¶2-3). He is active in a close-knit church community (ECF No. 47 at 173-74).

On April 27, 2025, G.R.R. went to pick up a friend who had been drinking at a nightclub (*id.* at 174). Within minutes, he heard loud booms and breaking glass, and the club began to fill with smoke from tear gas (*id.* at 175-76). Believing the club was under attack, he ran outside along with others to find "a lot of police officers with long guns pointing them at people" and shouting (*id.* at 176). Unbeknownst to him, ICE and other federal law enforcement agencies were conducting a joint task-force operation at the club (ECF No. 48 at 281-82). Amid the chaos, he hid underneath a car (ECF No. 47 at 176). An officer approached G.R.R., shoved him to the ground, badly cutting his hand, and removed his wallet (*id.* at 176-78). Upon

17

discovering his SB-251 license and Mexican consular ID, ICE officers immediately zip-tied his hands, placed him on a bus with roughly 60 others, and transported him to detention with no further inquiry (*id.* at 178-79).

His I-213 follows the same pattern (Def. Ex. D, I-213 for G.R.R.).  The scant information in the "Encounter" section tends to show that as soon as ICE determined he did not have lawful status, he was arrested as a matter of course.  A later section notes that G.R.R. has a prior misdemeanor assault conviction that was dismissed upon successful completion of a two-year suspended sentence, but there is no indication that ICE knew this information at the time or relied upon it in deciding to arrest him.

G.R.R. was detained for nearly two months before being released on bond, an ankle monitor, and regular ICE check-ins (ECF No. 47 at 183-84).  His son began struggling in school during the detention and now refuses to leave his father's side for fear that he will be taken again (*id.* at 184; Pl. Ex. 3 at ¶31).  G.R.R. likewise fears being rearrested and avoids going out in public (ECF No. 47 at 184; Pl. Ex. 3 at ¶37).

B. **Additional Evidence of Warrantless Arrests without Individualized Flight Risk Assessments**

The Court received additional evidence tending to show that ICE has a practice of conducting warrantless arrests in Colorado without considering flight risk on an individual basis.

First, the Court considers relevant numerous public statements by senior immigration officials, nationally and locally, declaring in unequivocal and unqualified terms that ICE *will* arrest anybody it encounters who is unlawfully present. For example, ICE's acting director, Todd Lyons, has stated that, while the agency prioritizes the "worst of the worst," "non-criminals living in the U.S. without authorization will also be taken into custody during arrest operations" (Pl. Ex. 35).[10] Tom Homan, former ICE deputy director and "Border Czar," echoed this, stating that if ICE officers encounter people in the country illegally while pursuing their targets, "they're going to get arrested too" (Pl. Ex. 42).[11] Robert Guadian, Denver's former ICE field office director, similarly confirmed in a local news interview that

---

[10] Pl. Ex. 35, Camilo Montoya-Galvez, "ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers," CBS News (Jul. 20, 2025).

[11] Pl. Ex. 42, The Source with Kaitlin Collins, "Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Efforts: 'There's No Safe Haven'; Trump Calls DeepSeek A.I. 'Positive Development' But Also A 'Wake-Up Call For U.S. Tech Industry,'" (originally aired Jan. 27, 2025), *available at* https://transcripts.cnn.com.

"if we encounter someone who is illegally present during the course of our operations, we're going to take those people into custody" (Pl. Ex. 80).[12] These statements and others sing with one voice and do not bespeak of a commitment to scrupulously comply with § 1357(a)(2)'s requirement that warrantless arrests be based on individualized flight-risk determinations supported by probable cause.

These statements are of a piece with the Trump Administration's publicly confirmed minimum daily quota of 3,000 immigration arrests (*see, e.g.*, Pl. Ex. 116),[13] and the command from White House deputy chief of staff, Stephen Miller, to "just go out there and arrest illegal aliens," whoever and wherever they are (Pl. Ex. 25).[14] Meeting or coming anywhere close to this quota necessarily requires the arrest of substantial numbers of undocumented immigrants without pending criminal charges or records, in other words, non-targets (*see id.*). Unsurprisingly, ICE's own statistics confirm that this category of individuals accounts for, by far, the largest percentage increase in immigration arrests nationally and in Colorado this year (*see,*

---

[12] Pl. Ex. 80, Denver 7 ABC, "Denver7 Investigates: Embedding with ICE during a 'high-stakes' operation," (originally aired Jul. 29, 2025), *available at* https://www.denver7.com/news/investigations/denver7-investigates-embedding-with-ice-during-a-high-stakes-operation.

[13] Pl. Ex. 116, The Sean Hannity Show, "Stephen Miller reveals Trump admin's 'daily goal' for illegal migrant arrests." Fox News (originally aired May 29, 2025), *available at*: https://www.youtube.com/watch?v=MJNXsOqFSZs.

[14] Pl Ex. 25, Elizabeth Findell, et al., "The White House Marching Orders That Sparked the L.A. Migrant Crackdown," The Wall Street Journal (Jun. 9, 2025).

*e.g.*, Pl. Exs. 24, 30, 32, 45, 64).[15]  Although there will be exceptions, members of this group are far less likely to present a risk of flight where the relevant factors are seriously applied.

The Court also takes note of ICE's predominant enforcement strategies in Colorado, including vehicle stops of the kind that led to the arrests of Mr. Ramirez Ovando and Ms. Dias Goncalves, and the large-scale, militarized raids of apartment buildings and other locations known to host large Latino populations, such as those that swept up J.S.T. and G.R.R (*see, e.g.*, Pl. Exs. 26, 34, 57).[16]  These enforcement methods, especially the latter, are guaranteed to bring many nontargets without lawful status—who nonetheless have strong ties to the community and are not flight risks—face-to-face with ICE.  Beyond anecdotal evidence, the manner of these raids, and the volume of resulting arrests, strongly support the conclusion that ICE is not

---

[15] Pl. Ex. 24, David J. Bier, "65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions," CATO Institute (Jun. 20, 2025); Pl. Ex. 30, Albert Sun & Allison McCann, "What the Data Shows About Trump's Immigration Enforcement So Far," The New York Times (Mar. 4, 2025);  Pl. Ex. 32, Sandra Fish, et al., "Most people arrested by ICE in Colorado and Wyoming this year did not have criminal history," The Colorado Sun (Jul. 21, 2025); Pl. Ex. 45, Seth Klamann, "Immigration arrests in Colorado have surged under the Trump administration. Now we know how much." The Denver Post (Jul. 9, 2025); Pl. Ex. 64, "Detention FY 2025 YTD," U.S. Immigration and Customs Enforcement, *available at* https://www.ice.gov/detain/detention-management.

[16] Pl. Ex. 26, Janet Oravetz, et al., "ICE raids target at least 7 locations in Denver, Aurora, Thornton, Denver 9 News (Feb. 5, 2020); Pl. Ex. 34, Max Levy, "18 of 104 detained in Colorado Springs nightclub raid already had deportation orders, ICE says," The Denver Post (May 9, 2025); Pl. Ex. 57, "ICE detains longtime Colorado father after fake traffic stop," Voces Unidas (Aug. 28, 2025).

conducting individualized flight risk assessments before executing warrantless arrests.

To be sure, ICE could choose to arrest every undocumented person it encounters even where there is no probable cause of flight risk to authorize a warrantless arrest. It could do this by obtaining an administrative warrant after the initial encounter and then finding and arresting them. But again, the record does not suggest that this is what's happening.

In addition to the named plaintiffs, the Court received evidence, albeit through some hearsay, about the arrests of four other individuals, as well as the experience of a local immigration attorney, illustrating a consistent pattern of warrantless arrests under similar circumstances:

1. *J.C.C.*

J.C.C has lived in the United States for nearly 25 years, lives with his wife and their four U.S.-citizen children, owns a home, and operates a concrete and landscaping business (Pl. Ex. 5, J.C.C. Aff., at ¶¶1-4).

On July 18, 2025, he was stopped by ICE while driving to a job site and arrested without a warrant (*id.* at ¶¶5-12). Plainclothes officers demanded his identification, asked about his legal status, and arrested him without inquiring into his community ties (*id.* at ¶¶9-12). Although he was later granted bond, ICE is

appealing that decision, and he remains detained, causing significant financial and emotional hardship for him and his family (*id.* at ¶¶16-18).

### 2. *O.M.R.*

O.M.R. was arrested during a traffic stop, while getting a ride to his job at the University of Colorado medical complex from a friend who was the target of an enforcement operation (ECF No. 48 at 230-31; Def. Ex. L, I-213 for O.M.R.). At the time, O.M.R. had a pending Temporary Protected Status application and valid work authorization (ECF No. 48 at 230; Def. Ex. L.). He had previously been issued an NTA by Border Patrol and released on recognizance (ECF No. 48 at 247-48). There is no indication that he violated the terms of his release, failed to appear for proceedings, or had been ordered removed.

### 3. *J.P.P.*

J.P.P. was arrested during the same February 5, 2025, sweep of Denver-area apartment complexes that resulted in J.S.T.'s arrest (*see id.* at 234-35; Pl. Ex. 4 at ¶¶4-20). The veracity of their accounts is generally supported by the wide reporting on the conduct of these operations (*see, e.g.*, Pl. Exs. 26-28).[17]

---

[17] Pl. Ex. 26, *supra*, fn. 15; Pl. Ex. 27, Sam Tabachnik, et al., "ICE raids hit apartment buildings in Aurora and Denver; feds say they targeted Tren de Aragua gang," The Denver Post (Feb. 5, 2025); Pl Ex. 28, Chase Woodruff, "ICE agents conduct operations in multiple Denver, Aurora locations," Colorado Newsline (Feb. 5, 2025).

He observed heavily armed federal officers moving through his complex and shouting (ECF No. 48 at 235). J.P.P., his wife, and their two daughters (ages 12 and 16) hid under the bed (*id.* at 236). After ICE and other officers burst into the apartment, deploying flash bang grenades to gain entry, J.P.P. went out and tried to speak with them (*id.* at 236-37). After providing his name and date of birth, he was taken into custody without inquiry (*id.* at 237-38). At the time, he had a pending asylum application and had checked in with USCIS three months prior (*id.* at 241). There is no indication that J.P.P. was a target of the raid or was otherwise wanted by or even known to ICE (*id.* at 238).

### 4. *F.J. and his children*

F.J., his wife, and their two children (ages 12 and 15) are asylum seekers living in Durango, Colorado (*id.* at 378-79). On October 27, 2025, as F.J. was driving the children to school, they were stopped by ICE, apparently by mistake, and arrested without warrants (*id.* at 380-81). ICE did not inquire about F.J.'s residence, employment, or other community ties until after his arrest (*id.* at 381-82). Like J.P.P. and J.S.T., local reporting corroborates the basic circumstances of F.J.'s stop and arrest, as well as his family's status as asylum seekers with no criminal records or prior problems with immigration (*see id.* at 379-80; Pl. Exs. 132 and 134).[18]

---

[18] Pl. Ex. 132, Katie Langford & Seth Klamann, "ICE arrest of father, two children in Durango spark local protests," The Denver Post (Oct. 28, 2025); Pl. Ex. 134, Olivia Prentzel, "Hundreds

5. *Testimony of attorney Arturo Vazquez*

Finally, Mr. Vazquez is an immigration attorney with approximately 10 years of experience, who specializes in representing individuals in removal proceedings on the "detained docket" at the Aurora detention center (ECF No. 47 at 192-93).

Mr. Vasquez testified that until this year, virtually all his clients were arrested by ICE pursuant to an administrative warrant and had some type of criminal conviction (*id.* at 194-95). However, between June and the end of October, he has consulted with between 15 and 20 individuals who were arrested by ICE during traffic stops following the same "general pattern" (*id.* at 195-99, 199). He testified that, in each instance, plainclothes officers in unmarked cars stopped the car and demanded to see the occupants' licenses or other ID (*id.* at 199). If the driver or passenger provided a SB-251 license, the officers would arrest them, temporarily hold them while they continued to make more arrests, and then transport them to the detention center (*id.* at 195-96, 199-201). According to Mr. Vasquez, none of these individuals were provided a warrant, had any criminal history or prior removal order, and they were not asked any questions pertaining to their community ties (*id.* at 201-202, 204-06, 210-11).

---

protest outside ICE building in Durango after 2 children, father detained, The Colorado Sun (Oct. 28, 2025).

Collectively, the record supports the conclusion that ICE is routinely conducting warrantless arrests in Colorado without making the statutorily required individualized assessment of flight risk.

## IV.   Discussion

### A. Jurisdiction

Article III establishes that federal courts can only hear cases and controversies. U.S. Const. art. III, § 2, cl. 1. Standing is a jurisdictional requirement. To have standing, plaintiffs must show that (1) they suffered an injury in fact; (2) the injury is fairly traceable to the challenged conduct, in other words, causation; and (3) redressability. *See Spokeo Inc. v. Robins,* 578 U.S. 330, 338 (2016).

The injury-in-fact requirement demands that the injury or threat of injury be "concrete and particularized and actual or imminent," *id.*, as opposed to "conjectural" or "hypothetical." *O'Shea v. Littleton,* 414 U.S. 488, 495-96 (1974); *see also Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) ("allegations of possible future injury are not sufficient.") (citations omitted). Furthermore, plaintiffs must show that they have "sustained or [are] immediately in danger of sustaining some direct injury as the result of the challenged official conduct." *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-102 (1983). If a plaintiff alleges a future harm, that harm must be "certainly impending." *Clapper,* 568 U.S. at 416. The fact that plaintiffs were injured in the past is not enough, by itself, to satisfy standing. *See*

26

*O'Shea,* 414 U.S. at 495-96 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief… if unaccompanied by any continuing present adverse effects."). But courts can consider past wrongs as "evidence bearing on whether there is a real and immediate threat of repeated injury." *Lyons*, 461 U.S. at 102.

Here, plaintiffs Dias Goncalves, J.S.T., and G.R.R. can establish standing because the injuries they suffered from the illegal arrest and detention are ongoing.[19] Plaintiffs' arrests and detention were, and *remain*, warrantless. Defendants argue that plaintiffs have not alleged an injury that confers standing because, while the initial detention was accomplished without a warrant, their continued detention was later supported by I-200 warrants ICE issued for all the plaintiffs in the field office during processing (*see* ECF No. 34 at 20; Def. Exs. A-D). Defendants claim those after-the-fact warrants legitimized plaintiffs' arrests, ending any period of illegal detention. But issuing *post hoc* warrants once plaintiffs had already been unlawfully arrested does nothing to cure the initial statutory violation. Under the defendants'

---

[19] Plaintiff Ramirez Ovando cannot establish standing. When the complaint was filed, he had already obtained legal permanent residency (*see* ECF No. 47 at 51, 66). Although he has not received physical documentation of his changed status, ICE has access to this update, and it is unlikely that he will be subject to the same injury because he is no longer unlawfully present in the United States (*see id.* at 66; ECF No. 48 at 278-80). Also, there is little concern that he will be rearrested without either a probable cause determination or arrest warrant because ICE agents can and do conduct identity checks for collaterals (*see* ECF No. 48 at 283-84). Mr. Ramirez Ovando is also not subject to the same monitoring protocols as the other three plaintiffs. He does not wear an ankle monitor, and he is not required to report to an immigration officer. His harm is exclusively backward looking, and thus, he lacks standing to seek the relief in this lawsuit.

reasoning, ICE could simply stop any suspected undocumented person, conduct a warrantless arrest with no probable cause of flight risk, and *then* bring the arrest within the color of law by issuing a warrant at the field office. This view effectively vitiates § 1357(a)(2)'s two-pronged probable cause requirement, which is aimed precisely at preventing such unrestrained immigration enforcement actions.

To give Congress's words meaning and force, the Court rejects these *post hoc* warrants as a vehicle for depriving plaintiffs of standing. Rather, the Court finds that the *post hoc* warrants had no legal effect. Plaintiffs' warrantless arrests have not been "fixed." The *Nava* court has twice rejected the notion that an I-200 warrant issued either *after* or *concurrent* with an arrest made without an assessment of individual flight risk transforms an unlawful warrantless arrest into a lawful, warranted one. *See Nava*, 435 F.Supp.3d at 888, 904 (denying defendants' motion to dismiss where ICE "executed arrest warrants for the Individual Plaintiffs after they took them into custody"); *Castañon Nava*, 2025 WL 2842146, at *12-17 (concluding, after thorough analysis, that I-200 warrants issued to collaterals in the field during their arrests were "invalid," and treating these arrests as warrantless). This Court reaches the same conclusion.

This case is not *Lyons*. 461 U.S. 95. In *Lyons*, the Supreme Court held that the plaintiff's past harm and fear of being placed in an illegal chokehold by the police again was insufficient to confer standing for prospective, injunctive relief, absent a

showing of a "real and immediate threat of repeated injury." *Id.* at 102, 102-13. Here, by contrast, plaintiffs' injuries are not past—they are present. This case is instead akin to *County of Riverside v. McGlaughlin*, 500 U.S. 44 (1991), where a group of felony arrestees who were held in jail without a judicial determination of probable cause for a constitutionally unreasonable period of time were permitted to sue for injunctive relief on behalf of a class of similarly situated individuals, including future detainees. *Id.* at 44, 49-52. There, the Supreme Court found that, at the time of the complaint, plaintiffs "were suffering a direct and current injury as a result" of their unlawful detention, fairly traceable to the actions of defendants, and redressable by the court. *Id.* at 51.

Even though plaintiffs Dias Goncalves, J.S.T., and G.R.R. are no longer detained, they are still "suffering [ ] direct and current" injuries as a result of their unlawful arrests and detention, *i.e.*, bond, ankle monitors, and adherence to strict reporting requirements, all on the pain of being returned to immigration jail at ICE's election. *Id.* Their liberty interests are still impacted due to the initial warrantless arrest. Unlike in *Riverside*, where some of the class representatives eventually received probable cause determinations or were released after the filing of the complaint, obviating their constitutional injury, the invalid administrative warrants issued after-the-fact by ICE in no way affect the status or position of the plaintiffs

here.[20]  *Id.*  They do not blunt or nullify plaintiffs' ongoing injuries stemming from their arrests in violation of § 1357(a)(2).

Plaintiffs request that this Court issue an injunction to hold ICE to the law and their own procedures: either issue an I-200 warrant before effecting an arrest or follow the flight risk inquiry of § 1357(a)(2)'s second prong.  This remedy would directly redress the harm plaintiffs have suffered.  Because plaintiffs' injuries from the warrantless arrest are ongoing, they must be returned to their original pre-detention position: to wit, no ankle monitors, or reporting requirements, or other release conditions, and their bonds refunded.  If ICE chooses to pursue these plaintiffs again, this time in compliance with the law, they must obtain a valid administrative or judicial warrant before arrest.[21]  Furthermore, absent a material change in circumstances, ICE may not detain plaintiffs for any period of time or impose conditions that are any more onerous than the present conditions.

---

[20] The Supreme Court found that there was still standing under the well-established principle that "the termination of a class representative's claim does not moot the claims of the unnamed members of the class."  *Id.* at 51 (internal citation omitted).

[21] As discussed in Section IV.C.2.a., *infra*, the Court finds that these three individuals did not pose a "substantial probability" of flight at the time of their arrests, and nothing in the intervening period has altered that conclusion.  Thus, absent a material change of circumstances, ICE may not rearrest these plaintiffs without a warrant under § 1357(a)(2).

**B. <u>Plaintiff's Motion for Class Certification</u>**

Plaintiffs seek provisional class certification for purposes of issuing preliminary relief. Plaintiffs' proposed class, under Fed. R. Civ. P. 23(b)(2), consists of:

> All persons since January 20, 2025, who have been arrested, or will be arrested in this District by ICE without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk (ECF No. 1, at ¶188; ECF No. 14 at 2).

In order to certify a class, the party seeking the provisional certification bears the burden of showing that the threshold requirements of Rule 23(a) have been met. *Rex v. Owens,* 585 F.2d 432, 435 (10th Cir. 1978). These threshold requirements are numerosity, commonality, typicality, and adequacy of representation, and they "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *General Telephone Co. v. EEOC,* 446 U.S. 318, 330 (1980). Plaintiffs have satisfied all four requirements within Rule 23(a). The Court addresses each requirement in turn:

### 1. *Numerosity*

Numerosity requires that "the class is so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a). To satisfy numerosity, the delineation between class members and non-class members must be identifiable. Plaintiffs must show "some evidence of established, ascertainable numbers constituting the class in order

to satisfy even the most liberal interpretation of the numerosity requirement." *Rex,* 585 F.2d at 436.  The Tenth Circuit considers "ascertainability" as a sub-requirement of numerosity.  *Id.*  It has not explicitly adopted specific standards for ascertainability.  "District courts [may] consider [out-of-circuit standards] as part of their discretion to grant or deny class certification." *Evans v. Brigham Young Univ.,* No. 22-4050, 2023 WL 3262012, at *8 (10th Cir. 2023) (unpublished).

The Third and Seventh Circuits provide helpful multi-factor tests.  Under the Third Circuit's two-element test, the class must be objectively defined and there must be "a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." *Hayes v. Wal-Mart Stores, Inc.,* 725 F.3d 349, 353 (3rd Cir. 2013) (citations omitted).  The Seventh Circuit similarly requires that a plaintiff show ascertainability by "defining classes clearly and with objective criteria." *Mullins v. Direct Digit., LLC,* 795 F.3d 654, 672 (7th Cir. 2015).

Plaintiffs' proposed class satisfies the numerosity requirement because it captures an ascertainable, defined class based on objective criteria, with the number of class members being so numerous that joinder becomes impracticable.  There are approximately 169,000 persons without lawful status in Colorado, some of whom have already been arrested without a warrant or probable cause determination, and others who are likely to be arrested under similar circumstances based on ICE's

continued practice of disregarding the § 1357(a)(2) inquiry (ECF No. 1 at ¶¶7, 14). This number has not been contested by defendants. The proposed class defines a subset of the 169,000 undocumented persons, namely, those persons in Colorado without lawful status who are arrested by ICE without the prior issuance of a valid arrest warrant or a finding of probable cause that they are likely to escape if not arrested without a warrant. Thus, this proposed class is numerous and identifiable.

### 2. *Commonality and Typicality*

The inquiries made into commonality and typicality "tend to merge." *General Tel. Co. v. Falcon,* 457 US. 147, 157 (1982). Commonality requires the class to share common questions of law or fact. Fed. R. Civ. P. 23(a)(2). The class representatives must "demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Typicality demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The class members "must depend upon a common contention," and that common contention "must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350.

Plaintiffs satisfy the commonality and typicality requirements. All class members, by virtue of being in Colorado without lawful status, are subject to ICE's

continued illegal practices. The harm suffered by the named plaintiffs has been shared by all class members who have similarly been arrested without a valid warrant or a particularized finding of probable cause that they are likely to escape. Once this order is issued the Court would not expect others to be similarly arrested without a valid warrant or a particularized finding of probable cause that they are likely to escape; but if such arrests are made notwithstanding this order, those individuals would likewise share the harm suffered by the plaintiffs.

### 3. *Adequacy of Representation*

Rule 23(a) demands that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on the behalf of the class?" *Rutter v. Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1188 (10th Cir. 2002) (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

Plaintiffs adequately represent the class because they share a strong interest in ensuring ICE's compliance with the law. Plaintiffs are part of a larger community of undocumented persons living in Colorado or temporarily in the state. The willingness of these three people to publicly hold themselves out as representative of this community, despite the risk of further exposure and potential targeting,

indicates that they are willing to prosecute the case vigorously on behalf of the class. In addition, nothing in the record indicates that plaintiffs or their counsel have any conflicts of interest with other class members. Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation and have the requisite level of experience and resources to adequately prosecute this case on plaintiffs' behalf (ECF No. 1 at ¶193).

### 4. *Rule 23(b) Certification*

Once a proposed class satisfies the prerequisites of Rule 23(a), the court must then determine whether the class is maintainable under the two requirements within Rule 23(b). *Amchem Prods. v. Windsor,* 521 U.S. 591, 614 (1997). Plaintiffs seek to certify the class under 23(b)(2) which provides that a class action is appropriate if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2). "Put differently, Rule 23(b)(2) demands a certain cohesiveness among class members with respect to their injuries, the absence of which can preclude certification." *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008).

Plaintiffs seek an injunction and declaratory relief from ICE's practice of arresting so-called "collaterals" without a warrant or probable cause determination. Those practices are generally applicable to the class as a whole, namely,

undocumented Coloradans that are not ICE targets (ECF No. 1 at ¶199). Plaintiffs have adequately shown that ICE has engaged in a practice of disregarding the probable cause determination required under § 1357(a)(2) when conducting warrantless arrests (*see infra* Section IV.C.2). Plaintiffs were not ICE targets. They were not the "worst of the worst." But when encountered, often by happenstance, they were flagged as persons unlawfully present, minimally questioned (if at all), and arrested (ECF No. 1 at ¶¶55, 75, 100, 124). Their I-213 forms are devoid of evidence that the officer had the requisite probable cause to arrest them without a warrant (*see infra* Section IV.C.2). Despite its own proclaimed policies (Def. Ex. E-G), ICE continues to engage to this day in the practice of arresting collaterals without inquiring into their flight risk or documenting any plausible reason to support their warrantless detention (*see, e.g.,* Pl. Exs. 132, 134).[22] Therefore, there is sufficient cohesiveness among class members under Rule 23(b)(2).

The Court finds that the requirements for provisional certification of the class proposed by the plaintiffs have been satisfied.

### C. Plaintiff's Motion for a Preliminary Injunction

#### 1. Standard of Review

A preliminary injunction is "an extraordinary remedy never awarded as of right." *DTC Energy Group, Inc. v. Hirschfeld*, 912 F.3d 1263, 1269 (10th Cir. 2018)

---

[22] Pl. Ex. 132, *supra*, fn. 18; Pl. Ex. 134, *supra*, fn. 18.

(internal citations omitted).  However, a preliminary injunction is necessary where "the right to relief is clear and unequivocal" and "monetary or other traditional legal remedies are inadequate" to protect the positions of the parties "before a trial on the merits can be held."  *Id.*  (internal citations and alterations omitted).

"The party seeking a preliminary injunction must prove four factors: (1) the party is likely to succeed on the merits; (2) the party will likely suffer irreparable injury without the injunction; (3) the balance of equities favors the injunction, meaning the moving party's threatened injury without the injunction outweighs the nonmoving party's injury with the injunction; and (4) the injunction does not harm the public interest."  *Nat'l Assn. of Industrial Bankers v. Weiser*, ___ F.4th ___, 2025 WL 3140623, at *6 (10th Cir. Nov. 10, 2025).  Where "the government opposes the preliminary injunction, the last two factors merge, such that any harm to the public interest affects the balance of the equities."  *Id.* (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

As a preliminary matter, defendants contend that, in this case, plaintiffs bear an "even heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors" because they seek a "disfavored injunction," one that would mandate ICE to adopt a new warrantless arrest policy and grant them all the relief they could obtain at trial (ECF No. 34 at 17) (citing *McDonnell v. City & Cnty. of Denver*, 878 F.3d 1247, 1257 (10th Cir. 2018)).

The Court rejects this view. Plaintiffs primarily ask that defendants be "enjoined from future violations of established … statutory rights," a "classic form of prohibitory injunction." *United Farm Workers v. Noem*, 785 F.Supp.3d 672, 732 (E.D. Ca. 2025) (concluding, in a similar context, that plaintiffs' request for an injunction directing DHS to comply with § 1357(a)(2) and § 287.8(c)(2)(ii) was "prohibitory" rather than "mandatory"); *see also* 42 Am. Jur. 2d *Injunctions* § 5 (2017) ("An injunction is considered prohibitory when the thing complained of results from present and continuing affirmative acts and the injunction merely orders the defendant to refrain from doing those acts"). The remainder of the plaintiffs' requested relief is simply designed to ensure compliance with that prohibition.

Furthermore, defendants' argument that plaintiffs "seek to mandate that ICE adopt a new warrantless arrest policy" is at odds with their position that, under Broadcast III, this policy *is already in place*, obviating the need for any injunction (*compare* ECF No. 34 at 17 *with* ECF No. 26 at 3) (arguing that a "preliminary injunction hearing may not be necessary" as the "prospective relief requested by [p]laintiffs … is largely coextensive with DHS' Statement of Policy issued on October 22, 2025").

Therefore, plaintiffs bear the ordinary (though still significant) burden for obtaining a preliminary injunction. The Court now considers each factor in turn.

2. **Success on the Merits**

a. **Plaintiffs have shown that their warrantless arrests likely violated § 1357(a)(2) and § 287.8(c)(2)(ii).**

Initially, the Court finds that each of the named plaintiffs have sufficiently shown that they were arrested without probable cause that they were "likely to escape before a warrant" could be obtained. § 1357(a)(2); § 287.8(c)(2)(ii).

"Probable cause depends upon all of the facts and circumstances known to the arresting officer … at the time of the arrest," *Gibson v. Brown*, No. 16-cv-2239-MSK-STV, 2020 WL 1815911, at *4 (D. Colo. Apr. 9, 2020), and is assessed from the "standpoint of an objectively reasonable officer." *Luethje v. Kyle*, 131 F.4th 1179, 1193 (10th Cir. 2025). Probable cause requires a "substantial probability" based on facts related to the individual. *Storey v. Taylor,* 696 F.3d 987, 992 (10th Cir. 2012). "Mere suspicion" is not enough. *U.S. v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004) (internal citation omitted).

The Court's conclusion is reinforced by the nearly identical manner in which the plaintiffs' arrests unfolded. In each instance, the immigration officers took plaintiffs into custody upon confirming their identities and their lack of lawful status. The officers asked no questions—until after their arrests—bearing on flight risk, including about plaintiffs' families, employment, or other community ties. *See, e.g.,* *Kahn*, 324 F. Supp. at 1187 (finding a warrantless arrest unlawful under § 1357(a)(2)

39

where immigration agents failed to consider such factors); *UFW*, 785 F.Supp.3d at 684-92, 735 (describing arrests conducted without any inquiry into flight risk and concluding such arrests violated the statute). While neither § 1357(a)(2) nor § 287.8(c)(2)(ii) mandates any particular inquiry before a warrantless arrest, and community ties are just one relevant factor, the total absence of questions on these topics strongly indicates that the officers did not seek what they did not wish to find.

Also, in each case, the Court is unable to discern from the plaintiffs' I-213 forms any evidence that the arresting officers developed probable cause of flight risk prior to their arrests (*see* Def. Exs. A-D). Under defendants' own Broadcast statements, officers must document the "specific, particularized facts" relied upon to determine that the subject was a flight risk (*see* Def. Exs. E, G; *see also* ECF No. 47 at 120-22; ECF. No. 48 at 303-05); however, none of the officers did that here. This omission does not, standing alone, show that the plaintiffs' arrests violated the statutory requirement. But when considered alongside plaintiffs' uncontroverted testimony regarding their encounters, it weighs heavily in favor of that conclusion.

Defendants argue, in essence, that ICE did not need to ask plaintiffs questions about their community ties because, for each of them, there were independent grounds demonstrating flight risk. Defendants are wrong. No objectively reasonable officer could have found that these plaintiffs posed a "substantial

probability" of flight risk based on the limited information they possessed at the time of the arrest.  *Storey*, 696 F.3d at 992.  The Court considers each of them in turn:

   *i.  Mr. Ramirez Ovando*

Defendants contend there was probable cause to arrest Mr. Ramirez Ovando because: (1) he was stopped in a car; (2) he described himself as "very nervous" in his affidavit; and (3) "after initially cooperating," he stopped answering the officer's questions about his immigration status (ECF No. 34 at 33; *see also* ECF No. 48 at 412-13).

Under the totality of the circumstances, none of these facts, alone or in combination, support a finding of flight risk.  First, according to the I-213, he candidly admitted he was unlawfully present (*see* Def. Ex. A).  Thus, when the officer continued to question him about his status, it was reasonable for him to ask whether he was under arrest or free to leave.  He was neither evasive nor dishonest, factors which ICE may consider for flight risk (*see* ECF No. 48 at 285-87).  *See, e.g.*, *Castañon Nava*, 2025 WL 2842126, at *17 (collecting cases).  Second, there is no evidence that the officer *perceived* Mr. Ramirez Ovando as "nervous."  Third, the fact that Mr. Ramirez Ovando was stopped in a car minutes away from his home adds nothing to the calculus.  *Cf. United States v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (finding flight risk where a noncitizen was stopped while speeding in a car belonging to someone else in a distant state and provided false information

41

to the arresting officer).  Furthermore, the officers *knew* Mr. Ramirez Ovando was near his home because they had observed him leaving *and* he offered to call his daughter to bring his passport to the scene (ECF No. 47 at 53-54, 56).[23]

    *ii.*    *Ms. Dias Goncalves*

Defendants justify this plaintiff's warrantless arrest solely on the basis that, as a Utah resident, she was driving a car on a Colorado highway (ECF No. 47 at 45-46; ECF No. 48 at 199).

This argument fails for two reasons.  First, Mr. Guadian testified that ICE in Colorado routinely communicates and coordinates with their counterparts in Utah (ECF No. 47 at 135-36).  He agreed that ICE can and does share information so that officers in one state can effectuate an arrest in the other, undercutting any argument that Ms. Dias Goncalves had to be taken into custody upon contact with HSI (*id.*).  Second, as discussed above, *Quintana*, where the Eighth Circuit upheld a warrantless arrest for an unlawfully present person driving cross-country, presented additional aggravating circumstances absent here.  623 F.3d at 1241.  Probable cause for flight

---

[23] At the close of hearing, defendants also argued that Mr. Ramirez Ovando was dishonest because he did not explicitly state that he had a foreign passport (ECF No. 48 at 412).  This argument is meritless.  The record shows that the officer only asked Mr. Ramirez Ovando whether he had another form of identification, including a Mexican consular ID (ECF No. 47 at 56).  In this context, where the officer affirmatively asked about a foreign identification, there is no legitimate argument that Mr. Ramirez Ovando was being anything less than forthright.

risk is not established anytime a person without status is stopped on the interstate.[24] *Cf. Cantu*, 519 F.3d at 495, 497 (finding probable cause of flight risk where officers received and verified a tip concerning driver for a human trafficking operation spanning Mexico and Illinois). Such a hard-and-fast rule is antithetical to probable cause's "flexible, common sense standard." *United States v. Biglow*, 562 F.3d 1272, 1282 (10th Cir. 2009).

Here, officers knew that Ms. Dias Goncalves, a 20-year-old visa overstay with no criminal history, had already cooperated with and provided her information to the deputy sheriff. Furthermore, she was not avoiding the immigration authorities; she had applied for asylum and recently obtained work authorization through USCIS. Under these circumstances, the mere fact that she was driving a car in a neighboring state was insufficient to conclude that she posed a flight risk.

    *iii.*    *G.R.R.*

The only fact that defendants argue supplied probable cause for G.R.R. is that he hid under a car after law enforcement emptied the nightclub with flash bang grenades and teargas (*see* ECF No. 34 at 34).

---

[24] Defendants also rely on a single district court case upholding an arrest under § 1357(a)(2) where the subject was apprehended during a traffic stop, *United States v. Murillo-Gonzalez*, 524 F.Supp.3d 1139, 1151 (D.N.M. 2021), *aff'd* No. 22-2123, 2024 WL 3812480 (10th Cir. Aug. 14, 2024) (*see* ECF No. 34 at 32). However, that case provides minimal analysis and merely cites to *Quintana*. 524 F.Supp.3d at 1151. Moreover, in affirming the judgment on appeal, the 10th Circuit did not reach the question of the warrantless arrest.

Although "attempted flight" from an ICE officer may, in some circumstances, provide probable cause of flight risk (*see* Def. Exs. E-G), those circumstances are not present here. *See, cf.*, *Contreras v. U.S.*, 672 F.2d 307, 309 (2d Cir. 1982). In light of the overwhelming force used to clear the club, and the chaotic and terrifying scene that confronted G.R.R. once outside, no reasonable officer would interpret taking cover under a car as evidence of an intent to flee rather than an effort to secure his physical safety. Nor does his presence at the club bear on flight risk. *See Ybarra v. Illinois*, 444 U.S. 84, 91 (1979) ("mere propinquity to others suspected of criminal activity does not, without more, give rise to probable cause").[25]

    *iv.*    *J.S.T.*

For J.S.T.—and J.S.T. alone—defendants have identified a facially plausible theory of probable cause, specifically, that he told the officer that he had no prior issues or contact with immigration despite having been voluntarily removed to Mexico at the border approximately twenty years earlier (*see* ECF No. 34 at 33). Notwithstanding J.S.T.'s testimony that he did not understand being turned away at a port of entry as a "problem," a reasonable officer, had they known about his attempted entry, might have concluded that he was being deliberately evasive (ECF

---

[25] Defendants do not argue that G.R.R.'s vacated conviction for misdemeanor assault was evidence of flight risk. Nor could they under these circumstances. Not only was there no evidence that the ICE officers who arrested him knew this information beforehand, but even if they had, the fact that he had complied with the court process and successfully completed a form of probation over a two-year period in satisfaction of his suspended sentence would not demonstrate flight risk.

No. 47 at 101-02).  *See cf.*, *Castañon Nava*, 2025 WL 2842146, at *9; *Pacheco-Alvarez*, 227 F.Supp.3d at 890; *Bautista-Ramos*, 2018 WL 5726236, at *7.

The trouble for defendants is that there is absolutely no evidence that the arresting officer actually knew of J.S.T.'s previous encounter with Border Patrol or considered it in any way when assessing flight risk.  Although ICE officers in the field can access information concerning a subject's immigration history, the Court declines to speculate that they did so here (ECF No. 48 at 283-84).  As discussed in Section III. A. 3, *supra*, the content and structure of J.S.T.'s I-213 strongly suggests that this information was obtained after the decision to arrest was made.  Considering the totality of the circumstances, the Court finds that there was no probable cause for J.S.T.'s warrantless arrest.

At bottom, defendants' arguments for each of the named plaintiffs are *post hoc* rationalizations and guesswork.  Plaintiffs have met their burden to show that ICE arrested them without a warrant and without probable cause of flight risk based on an individualized assessment.  Defendants have failed to rebut that showing with any specific evidence to the contrary.

> **b.  Plaintiffs have shown that defendants likely have a pattern or practice of ignoring the individualized flight risk determinations mandated by § 1357(a)(2) and § 287.8(c)(2)(ii).**

Furthermore, plaintiffs have successfully shown that their cases are not isolated incidents, but part of a larger policy, pattern, or practice by ICE in this state.

On this question, *UFW* is instructive.  785 F.Supp.3d at 716-25.  In that case, the court considered whether plaintiffs demonstrated that Customs and Border Patrol (CBP) had a policy, pattern, and/or practice of warrantlessly arresting suspected noncitizens in California's Central Valley "without the required individualized flight risk analysis," mirroring the issue before this Court.  *Id.* at 723.  The *UFW* court was presented with "evidence regarding 11 arrests," specifically, affidavits from three named plaintiffs, affidavits from four putative class members, and an affidavit from a labor organizer who provided information told to her by four anonymized individuals.  *Id.* at 724-725.  The court concluded that this "significant anecdotal evidence" was sufficient to establish a pattern or practice claim, and that plaintiffs were likely to succeed on the merits.[26]  *Id.* at 724, 735.

The quantum and quality of pattern or practice evidence in this case is similar to that in *UFW*.  This Court considered the testimony (and supporting documents) of the four named plaintiffs, the hearsay accounts of four putative class members (J.P.P., J.C.C., O.M.R., and F.J.), and evidence from a veteran immigration attorney regarding 15 to 20 similar warrantless arrests seemingly made without any individualized assessment of flight risk.  As in *UFW*, the Court rejects the contention

---

[26] Other courts have found that even less is required to make a successful pattern or practice claim for violation of § 1357(a)(2).  In the original *Nava* decision, the court found that the allegations of just five warrantlessly arrested individuals were enough to defeat a motion to dismiss.  435 F.Supp.3d at 900-02.

that individual differences between the plaintiffs or their arrests—such as a vehicle stop or a largescale raid—defeats this pattern or practice claim. *See id.* at 725 (finding that because plaintiffs alleged that CPB failed to perform probable cause determinations "*at all*" … "[d]efendants' assertions regarding the differences in circumstances … are unavailing") (emphasis in original)).

In concluding that there likely exists a policy, pattern, and/or practice of disregarding flight risk, this Court, as in *UFW*, "harmoniz[es]" the plaintiffs' "undisputed" anecdotal experience with the many media statements from top immigration officials, the nature of ICE's ongoing enforcement operations, and the agency's own statistics regarding the criminal histories of those it has arrested. *Id.* at 716; *see also Nava*, 435 F.Supp.3d at 901-02 (same); *Castañon Nava*, 2025 WL 2842146, at *13 (same). The Court also believes that Broadcast II, sent by ICE's top legal counsel and purporting to rescind the warrantless arrest policy outlined in Broadcast I, is substantial evidence of a *different* policy. Indeed, consistent with Broadcast II, ICE informed the *Castañon Nava* court that its agents had immediately ceased complying with the probable cause documentation requirement in the settlement agreement. 2025 WL 2842146, at *22.

Finally, the Court's conclusion is bolstered by the hearing testimony of Greg Davies, third in command at ICE's Denver field office (*see* ECF No. 48 at 270). Although Mr. Davies testified that he was trained on § 1357(a)(2) and was charged

with ensuring compliance from subordinate officers (*id.* at 272-76, 297-98), he could not seemingly recall the correct standard, stating, at one point, that he believed a warrantless arrest was authorized if "there's a possibility of that person possibly escaping" (*id.* at 273). His testimony does not imbue the Court with great confidence that ICE rigorously applies the individualized-flight-risk-assessment requirement and instead supports plaintiffs' contention that ICE has a pattern or practice of failing to make such determinations.

### c.  Plaintiffs have shown that defendants' policy, pattern, and/or practice likely violates the APA.

In order to state a claim under the APA, plaintiffs must show that defendants' alleged unlawful policy, pattern, and/or practice constitutes "final agency action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 (1990). A "final" action has two components: (1) it "must mark the consummation of the agency's decision making process," and (2) "must be one…from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). *See also Lujan*, 497 U.S. at 890 (dismissing APA claim against federal Bureau of Land Management (BLM) because it did not target an "identifiable" final action with "concrete effects").

Contrary to defendants' arguments, plaintiffs have satisfied the requirements for stating a judicially reviewable claim under § 706(2)(C) of the APA (*see* ECF No. 34 at 25-30). Under this provision, affected parties may challenge agency actions that exceed "statutory jurisdiction, authority, or limitations, or [are] short of statutory

right." §706(2)(c); *see also* § 704.   Courts have consistently held that an agency policy of effecting warrantless immigration arrests under § 1357(a)(2) without regard for individualized flight risk does precisely that.   *See, e.g.*, *Moreno*, 213 F.Supp.3d at 1008-09 (N.D. Ill. 2016); *Roy v. Cnty. of Los Angeles*, Case No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *21 (C.D. Cal. Feb. 7, 2018); *Creedle v. Miami-Dade Cnty.*, 349 F.Supp.3d 1276, 1295 (S.D. Fla. 2018).

Defendants' attempts to distinguish *Moreno* are unavailing (*see* ECF No. 34 at 29-30).   In that case, the court enjoined ICE's policy of categorically issuing detainers to local jails to prevent the release of suspected removable individuals, finding that it violated the flight risk provision of § 1357(a)(2).   213 F.Supp.3d at 1008-09.   Plaintiffs allege that ICE has done something similar here; specifically, it has authorized and implemented a policy, pattern, and/or practice of wholly disregarding individualized flight risk when effecting warrantless arrests under § 1357(a)(2).   Assuming there is sufficient evidence of this policy, and as discussed, there is, defendants offer no principled reason why the policy in *Moreno* is subject to judicial review, but the one at issue in this case, is not.

Additionally, the *Nava* court squarely took up the question of whether the policy alleged here constitutes "final agency action" under the APA.   435 F.Supp.3d at 900-04.   In that case, the government argued, in its motion to dismiss, that plaintiffs were "asking the court to extrapolate a few individual specific allegations

49

into a generalized conclusion" that ICE had implemented an unlawful policy of violating § 1357(a)(2) in conducting warrantless arrests. *Id.* at 901. Noting that the finality requirement must be approached "flexibly and pragmatically," the court rejected this argument, finding that the allegations permitted "an inference that this policy exists—at least in the context of large-scale enforcement actions in the Chicago area" beginning around May 2018. *Id.* at 901-02. The court found that plaintiffs adequately pleaded that ICE "consummated its decision-making process" by making arrests in violation of the statute pursuant to agency policy. *Id.* at 903.

Likewise, in the instant matter, plaintiffs have identified an identical policy, pattern, or practice of ICE's failing to conduct individualized flight risk assessments during immigration enforcement operations throughout the state of Colorado starting with the beginning of the second Trump administration on January 20, 2025. The fact that this is not committed to writing is not dispositive. *See, e.g.*, *R.I.L.-R v. Johnson*, 80 F.Supp.3d 164, 184 (D. D.C. 2015) ("both law and logic dictate that an unwritten agency policy is reviewable … a contrary rule would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing"); *Aracely, R. v. Nielsen*, 319 F.Supp.3d 110, 138 (D.D.C. 2018) (internal citations omitted). Additionally, while it is true "that generalized complaints about agency behavior" do not give rise to a claim under the APA, *see Bark v. United States Forest Service*, 37 F.Supp.3d 41, 51 (D.D.C. 2014) (internal citations omitted), to

state a claim, plaintiffs do not need to show that ICE detains each and every person without lawful status that it encounters in the field.  *See, e.g.*, *R.I.L.-R*, 80 F.Supp.3d at 173-76 (reviewing the use of general immigration deterrence as a factor in custody determinations for arriving asylum seekers even though not every affected person was detained).

Furthermore, the policy, pattern, or practice plaintiffs challenge is sufficiently "discrete."  *Cf. Lujan*, 497 U.S. at 891 (finding that plaintiffs failed to state a claim under the APA where it challenged a suite of actions or inactions in BLM's "land withdrawal review program"); *NTEU v. Vought*, 149 F.4th 762, 784 (D.C. Cir. 2025) (rejecting APA challenge to amalgamated agency conduct and decisions as constituting a single policy to shut down the Consumer Financial Protection Bureau). An injunction requiring ICE officers in Colorado to perform individualized flight risk assessments before conducting warrantless arrests—which is already the law— and to document the facts and findings from such assessments in an I-213, a policy ICE subscribed to as recently as last year, would not inject "the judge into day-to-day agency management," nor task the Court with making wholesale programmatic improvements to ICE's enforcement operations.  *NTEU*, 149 F.4th at 785.

Finally, the policy, pattern, or practice at issue has sufficiently "direct and appreciable legal consequences" for the putative class members subject to it, satisfying the second condition of "final agency action."  *U.S. Army Corps of*

*Engineers v. Hawkes Co., Inc.*, 578 U.S. 590, 598 (2016) (internal citations omitted). Through § 1357(a)(2), Congress has said that noncitizens, even where there is no doubt that they are unlawfully present, may not be subject to arrest and detention without a warrant unless there is "reason to believe" that they will flee before one can be obtained. *Id.* Adopting a policy contrary to that statute—even where such policy is not memorialized and does not result in universal detention—affects the legal rights of the very people that statutory provision is designed to protect (and those of the immigration officers charged with enforcing it). *Cf. Independent Equipment Dealers Ass'n v. E.P.A.*, 372 F.3d 420, 427 (D.C. Cir. 2004) (finding that EPA advice letter had no "concrete impact" on plaintiffs, and thus, could not sustain an APA claim).

For the stated reasons, plaintiffs have shown that: (1) their warrantless arrests likely violated § 1357(a)(2) and § 287.8(c)(2)(ii); (2) defendants likely have a policy, pattern, and/or practice of violating these sections by effecting warrantless arrests without individualized probable cause of flight risk; and (3) their claims are likely reviewable under the APA. Therefore, they are likely to prevail on the merits, and the first preliminary injunction factor weighs in their favor.

### 3. **Likelihood of Irreprable Harm**

"The second factor of irreparable harm is the most important prerequisite for the issuance of a preliminary injunction." *DTC Energy Group, Inc.*, 912 F.3d at 1270

(10th Cir. 2018).   Irreparable harm "must be both certain and great, not merely serious or substantial."  *State of Colorado v. U.S. E.P.A.*, 989 F.3d 874, 884 (10th Cir. 2021) (cleaned up).  If subjected to this harm, it will be "difficult or impossible" for the plaintiff "to resume their activities or restore the status quo *ex ante* in the event they prevail."  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).  Once again, plaintiffs have met their burden.

The experiences of the named plaintiffs confirm that the harms wrought by defendants' unlawful conduct are both "certain and great."  *Colorado*, 989 F.3d at 884.  Although none of them presented a flight risk by any reasonable measure, they were each arrested and detained without warning, ultimately spending between approximately two weeks and three months in custody.  On its own, this constitutes great harm.  *See, e.g.*, No. 25-CV-2720-RMR, *Mendoza Guttierez v. Baltasar*, 2025 WL 2962908, at *9 (D. Colo. Oct. 10, 2025) (noting that "ICE detention is more akin to incarceration than civil confinement") (internal citations omitted); *Pinchi v. Noem*, 792 F.Supp.3d 1025, 1037 (N.D. Cal. 2025) (recognizing the "irreparable harms imposed on anyone subject to immigration detention, including subpar medical and psychiatric care in ICE detention facilities, the economic burdens imposed on detainees and their families as a result of detention, and the collateral harms to children of detainees whose parents are detained") (internal citations omitted).

But even after they were released, the harms stemming from their warrantless arrests have reverberated.  Mr. Ramirez Ovando's family had to sell his truck and take out $20,000 in debt (*see* Pl. Ex. 1, Ramirez Ovando Aff., at ¶35).  Ms. Dias Goncalves lost her apartment, forcing her to move back in with her parents far away from her school (ECF No. 47 at 42).  J.S.T. also lost his apartment, lives in small room in a family member's mobile home, and his relationship with his nieces has suffered as a result (*id.* 94-95).  Three of them have ankle monitors and reporting requirements.  All the plaintiffs fear rearrest, and they and their families are suffering from emotional distress.  Their injuries are real, and they are irreparable in the sense it is "difficult or impossible" for them "to resume their activities or restore the status quo ex ante."  *Heideman*, 348 F.3d at 1189 (10th Cir. 2003).

These and similar harms will certainly befall other members of the putative class without the requested injunction.  To be sure, neither the named plaintiffs nor the putative class members have a categorical right to be free from contact with ICE, removal proceedings, or even immigration detention and other forms of monitoring.  They are, after all, in the country without lawful status and thus are properly subject to apprehension, arrest, detention, and removal according to Congress' design.  However, the specific harms that attend warrantless arrest without probable cause of flight are not inevitable.  They are the direct result of defendants' ongoing violation of the law.  As Mr. Guadian testified:

> There's different ways to get people into removal proceedings, right? Not everyone goes to a detention center for removal proceedings. You can be placed in removal proceedings and await those proceedings from home (ECF No. 47 at 147) (cleaned up).

If instead of being arrested immediately by ICE, plaintiffs were allowed to go home until summoned into immigration court or arrested on an administrative warrant, they would have had the opportunity to speak to their families, pay their rent, put their items in storage, and try to obtain representation by an immigration lawyer (*see id.* at 37, 94, 183-84). The deprivation of these opportunities is real, irreparable harm that will befall putative class members if an injunction is not ordered. Moreover, requiring ICE to release Ms. Dias Goncalves, J.S.T., and G.R.R. from their current restrictions, and obtain a proper warrant, will at least abate their ongoing harms from their unlawful arrests.

Finally, the Court rejects defendants' argument that plaintiffs cannot show a likelihood of irreparable harm in light of Broadcast III, which was issued a week before the hearing, and "already require[es] ICE officers to comply with § 1357(a)(2)" (ECF No. 34 at 37). This argument dovetails with the mootness doctrine, which imposes a "heavy burden" on the government "of persuading the court that the challenged conduct cannot be reasonably be expected to start up again." *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000). *See id.* ("Voluntary cessation of challenged conduct moots a case … only if it is *absolutely*

clear that the allegedly wrongful behavior could not reasonably be expected to recur") (emphasis in the original).  Defendants have not carried that burden.

The court in *UFW* considered and rejected a similar argument.  There, defendants claimed the case was mooted by a recently-issued "Muster" statement of policy, which articulated the standards for "reasonable suspicion, flight risk assessments, and documenting facts and circumstances on warrantless arrests," arguing that "there is now no reasonable expectation that the alleged wrong will be repeated."  785 F.Supp.3d at 730, 737.  The court concluded that the policy statement was entitled to little weight because: (1) it was "neither broad in scope nor unequivocal in tone"; (2) it was issued just one business day before the defendants were required to respond to the request for a preliminary injunction; (3) defendants could withdraw or revise the Muster statement at any time; and (4) defendants did not "repudiate the alleged wrongful allegations."  *Id.* at 739.

As in *UFW*, the circumstances in the instant matter do not warrant any confidence that ICE intends to change its practices after the most recent policy statement email.  Broadcast III is hardly "unequivocal in tone," as it explicitly states that its issuance was directed by a court (after finding that the agency flagrantly violated and attempted to unilaterally terminate its settlement agreement prohibiting the very same conduct, no less).  It sets an expiration date of February 5, 2026. Defendants, as in *UFW*, have not repudiated any of their prior actions and maintain

that they have not violated the law. Most importantly, plaintiffs presented evidence that even after Broadcast III was issued, ICE has continued to conduct warrantless arrests in Colorado without assessing flight risk, specifically in the case of F.J. and his two children in Durango. History and the public statements of top DHS and ICE officials reflect that, in the field, these broadcast statements are honored in the breach.

ICE has almost doubled its headcount in Colorado this year alone, is actively recruiting and hiring many more officers, and plans to open three additional detention centers in Colorado, nearly tripling its current capacity (*see* ECF No. 47 at 164-70; *see also, e.g.*, Pl. Exs. 48, 51, 52).[27] On this record, plaintiffs have shown that, without the requested injunction, there is likely to be a substantial *increase* in the number of warrantless arrests made without probable cause of flight risk.

For these reasons, the Court finds that the second preliminary injunction factor, irreparable harm, favors plaintiffs notwithstanding the most recent ICE policy statement.

---

[27] Pl. Ex. 48, Sara Wilson, "Three new ICE detention centers reportedly planned for Colorado," Colorado Newsline (Aug. 15, 2025); Pl. Ex. 51, Michelle Sandiford, "ICE offers up to $50,000 signing bonus for retired employees to return to the job," Federal News Network (Jul. 21, 2025); Pl. Ex. 52, Anna Alejo & Austen Erblat, "ICE recruitment ad made to lure Denver police officers faces pushback from police and city leaders," CBS Colorado (Sept. 26, 2025).

### 4. **The Balance of the Equities**

Lastly, the Court must consider whether "[plaintiffs'] threatened injury without the injunction outweighs [d]efendants' injury with the injunction," as well as the harm, if any, to the public interest. *Nat'l Ass'n of Industrial Bankers*, 2025 WL 3140623, at \*23.

As should be clear by now, the harms to the plaintiffs, including putative class members, without an injunction, are substantial. At the same time, the government and the public have a strong interest in enforcing the immigration law. *See Noem v. Vasquez Perdomo*, ----S.Ct.----, 2025 WL 2585637 (Sept. 8, 2025) (Mem.) (Kavanaugh, J., concurring); *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-57 (1976). "The Judiciary does not set immigration policy or decide enforcement priorities," and nothing in this Opinion should be construed to say otherwise. *Perdomo*, 2025 WL 2585367, at \*5. However, the relief ordered by this Court does not enjoin the government "from effectuating statutes enacted by representatives of its people." *Id.* at \*3. Rather, it compels the opposite. Neither the government nor the public can claim any legitimate interest in the systematic violation of § 1357(a)(2)'s prohibition against warrantless arrests except upon individualized probable cause of flight risk, and that is all this Court enjoins. *See, e.g.*, *Fish v. Kobach*, 840 F.3d 710, 756 (10th Cir. 2016) (the public interest is served by carrying out Congress' legislative design); *Andujo-Andujo v. Longshore*, 14-cv-01532-REB,

58

2014 WL 2781163, at * 6 (D. Colo. Jun. 19, 2024) (ICE's compliance with the law is in the public interest).  Thus, the balance of the equities weighs in favor of the plaintiffs.

As plaintiffs have carried their burden, the Court will issue a preliminary injunction to the extent described in the following section.

## V.   <u>Remedy</u>

The Court grants the following remedies.

### A. <u>Plaintiffs' Motion for Class Certification (ECF No. 14)</u>

Plaintiffs have met their burden to show by a preponderance of the evidence that the putative class ("Warrantless Arrest Class"), satisfies the requirements of Rule 23(a) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

Accordingly, for the purposes of entering a preliminary injunction in this case, the Court provisionally certifies the Warrantless Arrest Class, defined as:

> All persons since January 20, 2025, who have been arrested or will be arrested in this District by immigration officers without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

Ms. Dias Goncalves, J.S.T., and G.R.R. are appointed as Class Representatives.  Counsel for plaintiffs are appointed as Class Counsel.

**B. <u>Plaintiffs' Motion for a Preliminary Injunction (ECF No. 13)</u>**

"It is a well-settled principle that an injunction must be narrowly tailored to remedy the harm shown." *Davoll v. Webb*, 955 F. Supp. 110, 113 (D. Colo. 1997) (citing *Citizen Band Potawatomi Indian Tribe of Okla. v. Oklahoma Tax Comm'n*, 969 F.2d 943, 948 (10th Cir. 1992)).

Mindful of this principle, the Court grants the motion for a preliminary injunction only to the extent necessary to: (1) restore plaintiffs Dias Goncalves, J.S.T., and G.R.R. to the position they would have occupied but for ICE's unlawful conduct; (2) enjoin further violations of the individualized-assessment-of-flight-risk requirement enshrined in § 1357(a)(2) and § 287.8(c)(2)(ii); and (3) ensure compliance with this Order, as set forth in detail below.[28]

*First*, defendants shall refund the costs incurred by Ms. Dias Goncalves, J.S.T., and G.R.R. to obtain and post their bonds and shall remove their ankle monitors and terminate their reporting requirements and other conditions of release. Ms. Dias Goncalves, J.S.T., and G.R.R. shall not be rearrested except upon a properly obtained administrative or judicial warrant. If they are rearrested, absent a material change in circumstances, they shall not be subjected to any period of

---

[28] The standards for determining probable cause of flight risk for a warrantless arrest and documentation in a Form I-213 are substantially the same as those ICE has previously set out for itself in Broadcasts I and III (*see* Def. Exs. E and G) and are described in Part II.B of this Opinion, *supra*.

detention nor any additional or more onerous release conditions than they are presently subject to.

*Second*, defendants shall not effect warrantless arrests in this District unless, pre-arrest, the arresting officer has probable cause to believe that the individual is in the United States in violation of United States immigration laws and probable cause that the person being arrested is likely to escape before a warrant can be obtained, as required by 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(2).

In considering the likelihood of a person's escape before a warrant can be obtained for their arrest, an immigration officer must consider the totality of the circumstances known to the officer before making the arrest. These include circumstances the officer discovers between stopping a person and arresting them without a warrant. Factors relevant to the determination should include the following: the officer's ability to determine the person's identity; attempted flight from the officer; knowledge of the person's prior escapes or evasions of immigration authorities or, on the other hand, prior court attendance or other compliance with authorities; ties to the community (including family circumstances, residence, or employment); and other specific circumstances that weigh in favor of or against a reasonable belief that the person is likely to abscond. The particular circumstances before an officer are not to be viewed singly; they must be considered as a whole.

Mere presence within the United States in violation of United States immigration law is not, by itself, sufficient to conclude that a person is likely to escape before a warrant for arrest can be obtained.

*Third*, as soon as practicable after a warrantless arrest, the arresting officer shall document in writing the facts and circumstances surrounding that arrest in the narrative section of the detainee's Form I-213.

This documentation must include: (a) that the person was arrested without a warrant, (b) the location of the arrest and whether this location was a place of business, residence, vehicle, or public area, (c) whether the person is an employee of the business, if arrested at a place of business, or whether the person is a resident of the residence, if arrested at a residential location, (d) the person's ties to the community, if known at the time of the arrest, including family, home, or employment, (e) the specific, articulable facts supporting the conclusion that the person was present in violation of United States immigration law, (f) the specific, particularized facts supporting the conclusion that the person was likely to escape before a warrant could be obtained, and, (g) a statement describing how, at the time of the arrest, the officer identified themselves as an immigration officer who is authorized to execute an arrest and informed the person of the arrest and the reason for the arrest.

Information learned post-arrest relevant to a custody determination should be documented separately from the information relevant to the likelihood of escape known at the time of the warrantless arrest.

*Fourth*, in a manner, method, and at regular intervals to be agreed upon by the parties, or if no such agreement is possible, in a manner, method, and at regular intervals designated by this Court in a future Order, defendants shall provide to plaintiffs' counsel, and if necessary, this Court, a subset of randomly selected Form I-213s for warrantless arrests conducted by immigration officers in this District. Additionally, defendants shall, upon request, provide to plaintiffs' counsel the Form I-213 for a specific individual warrantless arrest no later than ten (10) days after the arrest.

The relief sought by plaintiffs in their proposed order (ECF No. 13-1) regarding training requirements and proof of compliance for the same (items five and six) is denied. Plaintiffs have not made a showing, at least at this point, that this relief is necessary to remedy the established harm. However, should compliance with the Order prove elusive, plaintiffs may renew this request.

Plaintiffs will not be required to post a bond. *See Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964) (holding that the district court has "wide discretion in the matter of requiring security" for preliminary relief, and where there is no "likelihood of harm" to the adverse party, "no bond is

necessary"). There is no likelihood that ICE will be harmed by an injunction that "directs compliance with … [its] statutory obligations," and thus, bond would serve no purpose here. *UFW*, 785 F.Supp.3d at 742 (declining to impose a bond); *see also Arevalo v. Trump*, 785 F.Supp.3d 644, 668 (C.D. Cal. 2025) (noting that "courts routinely impose either no bond or a minimal bond in cases involving public interests") (internal citation omitted).

## C. <u>Defendants' Partially Unopposed Motion to Restrict Remote Electronic Access (ECF No. 46)</u>

Finally, defendants' motion to restrict remote electronic access to the case file under Fed. R. Civ. P. 5.2(c) is granted in part and denied in part (ECF No. 46).

"Lawsuits are public events," and this is a matter of significant public import. *Luo v. Wang*, 71 F.4th 1289, 1296 (10th Cir. 2023) (internal citation omitted). "Accordingly, even if this case is one relating to immigration detention such that access is limited by default under Rule 5.2(c), the Court finds it appropriate for this case to be made … remotely accessible to class members and the public" with more limited restrictions. *Sorto-Vasquez Kidd v. Noem*, 2:20-cv-03512-ODW (JPRx), 2025 WL 1715514, at *1 (C.D. Cal. May 7, 2025).

On the consent of the parties, the Court will enter a protective order under Fed. R. Civ. P. 5.2(e)(2) restricting public access to the declaration of Mr. Davies (ECF No. 35), submitted by defendants in their response to plaintiffs' motion for a preliminary injunction (*see* ECF No. 46 at 1-2). The Court will entertain a further

protective order under Rule 5.2(e), to be discussed and agreed upon by the parties, to the extent necessary to protect additional private, personal information that appears in the electronic case file, keeping in mind that the business of the Court is done in the public eye absent good cause for restricted access.

## VI.   <u>Order</u>

1. Plaintiffs' Motion for Class Certification (ECF No. 14) is GRANTED, as set forth in the Remedy section above.

2. Plaintiffs' Motion for a Preliminary Injunction (ECF No. 13) is GRANTED in part and DENIED in part, as set forth in the Remedy section above.

3. Defendant's Partially Unopposed Motion to Restrict Remote Electronic Access (ECF No. 46) is GRANTED in part and DENIED in part, as set forth in the Remedy section above.

4. Plaintiffs are awarded their reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, in an amount to be agreed upon by the parties or else determined by the Court.

5. The parties shall meet and confer in order to agree upon a schedule for the case.

SO ORDERED this 25th day of November, 2025.

By the Court:

_____

R. Brooke Jackson
Senior United States District Judge