**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-03183-RBJ

REFUGIO RAMIREZ OVANDO, CAROLINE DIAS GONCALVES, J.S.T., and G.R.R., and all those similarly situated, and the EAST COLFAX COMMUNITY COLLECTIVE,

      Plaintiffs,

    v.

KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security, TODD M. LYONS, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement, and ROBERT HAGAN, in his official capacity as Director of the Denver Field Office of the U.S. Immigration and Customs Enforcement,

      Defendants.

---

**FIRST AMENDED CLASS COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

1.     Militarized Immigration and Customs Enforcement (ICE) agents – often with masks, body armor, and long guns – are showing up in neighborhoods across Colorado and indiscriminately stopping and arresting people with brown skin and others they profile as noncitizens in their mission to meet the Administration's ramped-up enforcement demands. They are targeting people perceived to lack immigration status by going door-to-door, sweeping apartment parking lots, and confronting residents and neighbors walking near their homes or jobs. They are pulling over workers and college students going about their daily lives. ICE agents are then arresting Latine people and other Coloradans without warrants, without probable cause, and without assessing legal status and flight risk as required by law, all as part of a policy authorized by the highest levels of the Administration.

2.      But immigration enforcement agents do not have unfettered authority to make warrantless arrests. Section 8 U.S.C. § 1357(a)(2) requires that an agent have probable cause to believe that the person being arrested is (1) in the United States in violation of immigration laws and (2) likely to escape before a warrant can be obtained. This means an arresting immigration officer must make two probable cause determinations pre-arrest; otherwise, the arrest is unlawful.

3.      ICE agents are ignoring the law's clear requirement to assess flight risk before making a warrantless arrest. Instead, they are scrambling to fill arbitrary quotas set by the Administration, causing chaos and terror in neighborhoods throughout Colorado. This lawsuit seeks to enjoin Defendants' ongoing pattern and practice of flouting federal law in connection with their mass immigration arrests in Colorado.

4.      Following President Trump's second inauguration in January 2025, the Administration set out to increase immigration enforcement, even if doing so required "push[ing] the envelope" of its authority.[1]

5.      The Administration quickly set an arbitrary quota for each ICE field office to arrest 75 people each day (or 1,200-1,500 nationwide) – and warned that managers would be "held accountable" for missing those quotas.[2]

6.      The impact of that directive is being felt across the country and our state.

---

[1] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

[2] Nick Miroff & Maria Sacchetti, Trump officials issue quotas to ICE offiers to ramp up arrests, Wash. Post (Jan. 26, 2025), https://perma.cc/RCN3-67UC.

7.      Federal data suggest that by early March 2025, immigration enforcement officers made nearly 23,000 arrests nationwide.[3] By the summer, that number rose to approximately 60,000.[4]

8.      In Colorado alone, ICE arrested almost 2,000 people in the first half of 2025.[5]

9.      In late May 2025, the White House and the Department of Homeland Security (DHS) recast their goals as a quota: immigration enforcement agents must make 3,000 immigration-related arrests per day or face "consequences for not hitting arrest targets."[6]

10.      To reach that number, top White House aide Stephen Miller directed immigration enforcement agents to change their approach to arrests in the field. These agents, according to the White House, should no longer conduct targeted and

---

[3] Albert Sun, et al., What the Data Shows About Trump's Immigration Enforcement So Far, The New York Times (Mar. 4, 2025), https://perma.cc/5SCU-P38Z.

[4] TRAC Immigration, https://perma.cc/X97P-7UMV.

[5] Alayna Alvarez, et al., ICE Arrests of Noncriminals Spike in Colorado Under Trump, Axios (July 18, 2025), https://perma.cc/4X3N-J42B; Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have a criminal history, The Colorado Sun (July 18, 2025) https://perma.cc/Z2Z7-423D.

[6] David J. Bier, 65 Percent of People Taken by ICE Had No Convictions, 93 Percent No Violent Convictions, Cato Institute (June 20, 2025), https://perma.cc/SP8K-J8CR; Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RU-BJNX.

investigation-based operations. Instead, they should "just go out there and arrest" in public spaces.[7]

11.    The Administration also encouraged immigration agents to "turn the creative knob up to 11" when it comes to enforcement, including through arrests collateral to anyone actually identified in a warrant.[8]

12.    Agents effect these collateral arrests without the probable cause determinations that federal law requires.

13.    In the weeks following the White House's 3,000-arrests-per-day directive, daily arrests of noncitizens in Colorado increased by 300% compared to the prior year.[9]

14.    Under the Administration's instruction to utilize indiscriminate worksite raids, roving patrols, collateral arrests, and the re-arrests of immigrants dutifully attending their court hearings and check-ins, at-large arrests in American communities increased 600% in President Trump's first nine months in office.[10]

---

[7] Elizabeth Findell, et al., The White House Marching Orders That Sparked the L.A. Migrant Crackdown, The Wall Street Journal (June 9, 2025), https://perma.cc/H9RU-BJNX.

[8] Jose Olivares, US Immigration Officers Ordered to Arrest More People Even Without Warrants, The Guardian (June 4, 2025), https://perma.cc/4SSK-EQUC.

[9] Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have criminal history, The Colorado Sun (July 18, 2025), https://perma.cc/AA5D-UMUM; Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS; Ted Hassan, ICE's tactics draw criticism as it triples daily arrest target, Reuters (June 10, 2025), https://perma.cc/2TLV-DMV2.

[10] American Immigration Councill, Immigration Detention Expansion in Trump's Second Term (Jan. 14, 2026), https://perma.cc/UW28-2RZ5.

15.     The number of arrests made by ICE agents in Colorado from January 20, 2025, to October 15, 2025, quadrupled compared with the same period the prior year.[11] That's an average of 393 arrests per month, with 548 in July alone.[12]

16.     And there is no sign the Administration is slowing down. The Administration now has tens of billions of newly appropriated dollars for expanded immigration detention facilities, including tripling detention capacity in Colorado, that will provide additional incentive for Defendants to expand their illegal arrest scheme.[13]

17.     Even following this Court's entry of a preliminary injunction on November 25, 2025—which prohibited ICE from engaging in warrantless arrests without the required flight risk analysis and required ICE to document the particularized facts giving rise to probable cause that someone is a flight risk—Defendants have persisted in their unlawful practice, flouting both federal law and the directives of this Court.

18.     Our state's 169,000 undocumented immigrants, and hundreds of thousands more Latine Coloradans, now live in fear and at daily risk because of federal immigration

---

[11] Taylor Dolven & Sanra Fish, ICE arrested more than 3,500 People in Colorado in 2025—including babies and the elderly, The Colorado Sun (Dec. 31, 2025), https://perma.cc/6X89-EZUZ.

[12] *Id.*

[13] Russell Contreras, et al., ICE operations in Colorado raise legal questions, AXIOS Denver (July 7, 2025), https://perma.cc/P9WH-BJY9 (noting immigration officers' "footprint in Colorado could soon grow"); *see also* Dan Boyce, Two Colorado facilities eyed as possible ICE detention centers, Colorado Public Radio (June 27, 2025), https://perma.cc/94DK-LS3M; *see also* S. Wilson, Three new ICE detention centers reportedly planned in Colorado, Colorado Newsline (Aug. 15, 2025), https://perma.cc/6U75-TFHJ; Seth Klamann, ICE plans to open as many as three new detention centers in rural Colorado, report says, The Denver Post (Aug. 15, 2025), https://perma.cc/84WP-KMTH.

agents' indiscriminate practices. That fear is only heightened by daily news of the violence and lawlessness attending surges of immigration agents in municipalities across the country, including the deaths of two U.S. citizens in Minneapolis,[14] the growing number of deaths in ICE detention facilities nationwide,[15] and ICE's willingness to violate court orders in cases nationwide.[16] ICE's arrest scheme is tearing families apart and terrorizing communities.

19.    The individual Plaintiffs' experiences and the experiences of the individual members of organizational plaintiff the East Colfax Community Collective ("EC3") are representative. ICE agents arrested each of them without a warrant and without any evaluation that they were likely to flee before a warrant could be obtained. If they had, they would have learned that each individual has lived in their respective communities for years, has deep family or community ties, has a long history of local employment or schooling, and presents no likelihood of escape, let alone probable cause. Plaintiffs, EC3 members, and their families were devastated by the unlawful captures and now live every day in a heightened state of fear of again being separated.

---

[14] Tim Evans & Andy Sullivan, Federal immigration agents kill another US citizen in Minneapolis, sparking protests, Reuters (Jan. 25, 2026), https://perma.cc/Q9YR-95XA.

[15] Maanvi Singh, Coral Murphy, and Charlotte Simmonds, 2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody, The Guardian (Jan. 4, 2026), https://perma.cc/X9WZ-DNWT; Michael Biesecker and Ryan Foley, Cuban immigrant in ICE custody died of homicide due to asphyxia, autopsy finds, PBS News (Jan. 22, 2026), https://perma.cc/NFJ2-6BT4.

[16] *See Juan v. Noem*, No. 26-CV-0107, 2026 WL 232015, (D. Minn. Jan. 28, 2026).

20.    Plaintiffs respectfully ask this Court to enjoin these unlawful and harmful practices in Colorado on a class-wide basis.

## JURISDICTION AND VENUE

21.    Jurisdiction is proper and relief is available under 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702 and 706 (Administrative Procedure Act), 28 U.S.C. §1651 (All Writs Act), 28 U.S.C. §§ 2201–02 (Declaratory Judgment Act), and the inherent equitable powers of this Court.

22.    Defendants are not immune. *See, e.g.*, 5 U.S.C. § 702; *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689–90 (1949); *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1298 (10th Cir. 2009); *Simmat v. U.S. Bur. of Prisons*, 413 F.3d 1225, 1233 (10th Cir. 2005), *abrogated on other grounds by Jones v. Bock*, 549 U.S. 199, 216 (2007).

23.    Venue is proper under 28 U.S.C. § 1391(e)(1) because at least one Plaintiff resides in this district and/or a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

24.    **Plaintiff Refugio Ramirez Ovando** is a 43-year-old father who has lived in Colorado for 20 years with his wife and four U.S.-citizen children. His children attend school in the community and his family attends church together every Sunday. He is a long-tenured employee who works as a finisher in construction. On May 19, 2025, Mr. Ramirez was pulled over near his home as he was driving to work. The agents did not tell him why they had pulled him over. Instead, they arrested him without a warrant after

making no inquiry into his ties to the community or otherwise evaluating his flight risk. An ICE agent later admitted that they had been looking for someone else and that Mr. Ramirez was arrested by mistake. Mr. Ramirez was detained in ICE's Denver Contract Detention Facility in Aurora, Colorado (Aurora Detention Facility) for over three months before finally securing relief in his immigration case, receiving his lawful permanent residency, and being released to return home. Because Mr. Ramirez still has not received from the federal government the documentation that would show his lawful status and relies on a so-called S.B. 251 Colorado driver's license, which ICE treats as a basis to arrest immigrants, he continues to live in fear of again being profiled and unlawfully arrested.

25.    **Plaintiff Caroline Dias Goncalves** is a 19-year-old University of Utah college student and Dreamer who has lived in the United States since she was brought to this country at age seven. On June 5, 2025, Ms. Dias was driving along the highway from Utah to Colorado to visit a friend. Near the town of Fruita, Colorado, a Mesa County Sheriff's Office deputy pulled her over and claimed that she had been following a semitrailer truck too closely. The deputy released her with a warning, but secretly (and illegally) alerted ICE agents of Ms. Dias' whereabouts through a Signal message. ICE agents then stopped her a few miles down the highway and arrested her without a warrant and without evaluating her flight risk. ICE agents took Ms. Dias to the Aurora Detention Facility, where she was detained for 15 days, before she was able to hire counsel, obtain a bond hearing before an immigration judge, and then successfully argue for and post bond. At the time this lawsuit was filed, ICE also required her to wear an ankle monitor as

a condition of her release. As of the filing of the First Amended Complaint, notwithstanding this Court's preliminary injunction ordering that Defendants refund the costs Ms. Dias incurred to obtain and post bond, Ms. Dias' obligor has not received a bond cancellation letter and she has not received a reimbursement check.

26. **Plaintiff J.S.T.**[17] is a 36-year-old man and asylum seeker who has lived in Colorado for 15 years—all his adult life. For almost a decade, J.S.T. has worked for the same employer, his local restaurant and community grocery store. On February 5, 2025, federal immigration and law enforcement agents raided Whispering Pines Apartments, where J.S.T. lived, along with other locations in Aurora and the Denver metro area. ICE agents stopped J.S.T. as he was leaving the apartment parking lot to drive to his job. ICE agents arrested him without a warrant and without evaluating his likelihood of escape before a warrant could be obtained. ICE transported J.S.T. to the Aurora Detention Facility, where he languished for four weeks before he was able to hire counsel, obtain a bond hearing before an immigration judge, and then successfully argue for and post bond. At the time this lawsuit was filed, ICE also required him to wear an ankle monitor as a condition of his release. As of the filing of the First Amended Complaint, notwithstanding this Court's preliminary injunction ordering that Defendants refund the costs J.S.T. incurred to obtain and post bond, J.S.T. has not received a reimbursement check.

27. **Plaintiff G.R.R.** is a 32-year-old father and business owner who has lived in the United States for 11 years. G.R.R. lives in Colorado Springs and works in

---

[17] Plaintiffs J.S.T. and G.R.R seek to proceed under pseudonyms and have filed a motion to request that relief.

construction. On April 27, 2025, hundreds of federal agents and immigration officers raided a nightclub in Colorado Springs where G.R.R. was waiting as a designated driver for a friend. During the raid, immigration officers arrested G.R.R. without a warrant and without evaluating his likelihood of escape before a warrant could be obtained. Officers took him to the Aurora Detention Facility, where he suffered for over six weeks until he was able to hire counsel, obtain a bond hearing before an immigration judge, and then successfully argue for and post bond. At the time this lawsuit was filed, ICE also required him to wear an ankle monitor as a condition of his release. As of the filing of the First Amended Complaint, notwithstanding this Court's preliminary injunction ordering that Defendants refund the costs G.R.R. incurred to obtain and post bond, G.R.R.'s obligor has not received a bond cancellation letter and he has not received a reimbursement check.

28.     **Plaintiff the East Colfax Community Collective ("EC3")** is a community-driven, multicultural, socio-economically diverse advocacy organization comprised of residents, local businesses and nonprofits, and allies. It is a nonprofit organization headquartered in Denver, Colorado. EC3's mission is to fight displacement and build collective power in the community to shape its own destiny. Its vision is to be a multicultural community where low and moderate-income residents and locally owned businesses can thrive. To these ends, EC3 provides direct support to residents and businesses at risk of displacement through immediate relief and resource navigation, housing defense, and legal assistance. EC3 also advocates for community-driven development to help address the Denver-Metro area's affordability crisis. The unlawful

practices challenged here have injured both EC3 and its members. They have directly interfered with EC3's ability to provide its core services by disrupting applications for assistance and having a chilling effect on organizing efforts. EC3's resources have also been diverted from its core services to mitigate the impacts of the challenged practice on its members and the community. EC3 member residents have been subjected to warrantless arrests without the probable cause required by law, continue to experience restrictions on their liberty pursuant to their unlawful arrest, and are at risk of and fear being subjected to the challenged practice in the future because they are among those the government has targeted for civil immigration arrest as they go about their daily business. Other EC3 members who have not already been swept up in ICE's unlawful warrantless practices fear that they will be next. EC3 member businesses have suffered financial losses because of widespread fear of unlawful warrantless arrests among their largely noncitizen clientele. ICE's ongoing unlawful tactics threaten these businesses' survival. EC3 brings this suit to protect its members and its mission.

29.    **Defendant Kristi Noem** is the Secretary of the Department of Homeland Security, which oversees the component agencies responsible for enforcing U.S. immigration law, including ICE and Customs and Border Protection. Plaintiffs sue Defendant Noem in her official capacity for declaratory and injunctive relief only.

30.    **Defendant Todd M. Lyons** is the Acting Director of ICE, an agency of the United States within DHS. Among other things, ICE is responsible for the stops, arrests, and custody of individuals believed to be in violation of civil immigration law. Plaintiffs sue Defendant Lyons in his official capacity for declaratory and injunctive relief only.

31.     **Defendant Robert Hagan** is the Director of ICE's Denver Field Office. Plaintiffs sue Defendant Hagan in his official capacity for declaratory and injunctive relief only.

**FACTUAL ALLEGATIONS**

**A.     ICE Relies on Illegal Warrantless Arrests to Meet Administration Demand**

32.     Defendants have a policy and practice, authorized by the highest levels of the Administration, of making mass civil immigration arrests in Colorado without a warrant and without the probable cause findings that are required by federal law.

33.     This policy and practice are in furtherance of the President's promise to carry out mass immigration arrests and deportations.

34.     Pursuant to this policy and practice, across the state, whether during individual stops or larger-scale raids of places where predominantly Latine people and others officers profile as noncitizens live, work, and socialize, ICE has stopped and arrested people without a warrant and without probable cause to believe the individuals were in the United States in violation of the law and posed a flight risk.

35.     For example, during raids of multiple apartment complexes in the Aurora and Denver metro area in early 2025, heavily armed ICE agents knocked on every door, asking tenants to provide identification and questioning tenants about their immigration status without presenting a warrant or explaining why they were there.[18]

---

[18] Janet Oravetz, et al., ICE Raids Target at least 7 Locations in Denver, Aurora, Thornton, 9 News (Feb. 5, 2025), https://perma.cc/M2GG-AVL5; Kevin Beaty, et al., ICE and Federal Agents Raid Multiple Metro Denver Apartments Early Wednesday, Denverite (Feb. 5, 2025), https://perma.cc/L9T7-ZY4K/; Sam Tabachnik, ICE Raids Hit Buildings in

36.     Tenants felt fear and terror when faced by yelling agents with guns in hand.

37.     ICE agents made several warrantless arrests of people they encountered while going door-to-door.

38.     On February 5, 2025 alone, ICE agents conducted raids in at least seven apartment complexes and communities across Denver, Aurora, and Thornton.[19]

39.     On April 27, 2025, federal immigration enforcement officers flooded a nightclub in Colorado Springs with tear gas to funnel patrons out and stop as many people as they could.[20] Without performing any flight risk analysis, these officers made warrantless arrests and filled buses with people to send to the Aurora Detention Facility.

40.     As recently as late January 2026, ICE has been active in Colorado's Front Range, mountain towns and the Western Slope, making warrantless arrests.[21] On one

---

Aurora and Denver; Feds Say they Targeted Tren de Aragua Gang, The Denver Post (Feb. 5, 2025), https://perma.cc/PP7W-D5TS; Allison Sherry, et al., As ICE Expands its Colorado Efforts, Many Without Criminal Records Are Caught in a Wide Net, CPR News (Apr. 7, 2025), https://perma.cc/M2GT-RNBJ (describing ICE practice of arresting "people who were in the wrong place at the wrong time when ICE agents descended on an area to make targeted arrests of accused or convicted criminals also in the country without authorization"); Kevin Beaty, What we saw from inside ICE's raid at Aurora's Edge apartments, Denverite (Feb. 6, 2025), https://perma.cc/E663-K7VS; Jeffrey Cook, With ICE Agents going door-to-door in Colorado, residents are on edge: Reporter's notebook, ABC News (Feb. 7, 2025), https://perma.cc/R76C-KJDH.

[19] Janet Oravetz, et al., ICE Raids Target at least 7 Locations in Denver, Aurora, Thornton, 9 News (Feb. 5, 2025), https://perma.cc/M2GG-AVL5.

[20] Joe Hernandez, The DEA says 114 immigrants in the U.S. illegally were arrested at a Colorado nightclub, NPR News (Apr. 27, 2025), https://perma.cc/UR9V-HNUU.

[21] Allison Sherry, ICE agents leave Ace of Spades 'death cards' on detained immigrants cars, CPR News (Jan. 23, 2026), https://perma.cc/JAN7-B63S (describing recent enforcement actions in Eagle County, Colorado); Ryan Fish, ICE activity reported in

day in late January 2026, ICE effected warrantless arrests of a number of people near Eagle County, many of whom were on their way to work.[22] At least two restaurants in the ski town did not open due to fear of ICE raids.

41.    This increase in enforcement activity in Colorado pursuant to a policy and practice authorized by the highest levels of the Administration shows no signs of stopping; instead, ICE's collateral arrests and enforcement activity in the Denver metro area outpace activity around the country.[23]

42.    Even following the entry of the preliminary injunction in this case, immigration officers in Colorado are not trained to comply with the proper standard for making a warrantless arrest under § 1357(a)(2). Immigration enforcement in Colorado is marked by a policy and practice of failing to make the required probable cause determinations.

43.    On January 28, 2026, Defendant Todd Lyons, in his capacity as the "Senior Official Performing the Duties of the Director" of ICE, issued a memorandum to all ICE personnel announcing that the current Administration would be applying a new interpretation of the statute's "likely to escape" requirement. The memorandum purports to relieve immigration officers in the field of the responsibility to make a flight risk

---

Colorado mountain towns, sparking community concerns, ABC News (Sept. 25, 2025),https://perma.cc/F2D8-NDHC.

[22] David O. Williams, Ripple effects of ICE enforcement in Eagle County, Vail Daily (Jan. 27, 2026), https://perma.cc/Q5DF-ECL8.

[23] Kevin Beaty, Immigration arrests have quintupled in Denver under Trump, Denverite (Aug. 20, 2025), https://perma.cc/28RQ-2XVU.

determination prior to effecting a warrantless arrest, and to authorize officers to make warrantless arrests whenever they determine "an alien is [un]likely to remain at the scene of the encounter."[24]

44.    The factors to consider in making this determination include "the subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle)." They also include whether "the officer has probable cause to arrest the subject for improper entry."

45.    The memorandum is another confirmation of ICE's policy and practice of making warrantless arrests without the probable cause required by law, and an attempt to render meaningless the "likely to escape" requirement Congress has imposed.

46.    The memorandum is a post-hoc attempt to justify ICE's continuing pattern and practice of effecting warrantless arrests without the probable cause required by federal statute.

47.    Communities across the state brace for the presence of federal agents and for tactics that violate the law.

i.    **Stop and Arrest of Refugio Ramirez Ovando**

48.    Plaintiff Refugio Ramirez Ovando is a 43-year-old father of four U.S.-citizen children. He has lived in Colorado for the past twenty years, currently near Grand Junction. He has worked in the construction concrete industry as a finisher and is one of the longest-tenured employees (over 18 years) at his company.

---

[24] *See* Hamed Aleaziz & Charlie Savage, ICE Expands Power of Agents to Arrest People Without Warrants, N.Y. Times (Jan. 30, 2026), https://perma.cc/5J82-ZYN5.

49.     Mr. Ramirez's children are all enrolled in school, and his oldest daughter is in her senior year of the prestigious International Baccalaureate program at her high school. She plans to attend college after graduation.

50.     Mr. Ramirez is an active member of his church and attends most Sundays with his family.

51.     At around 6:10 a.m. on May 19, 2025, Mr. Ramirez left his home to go to work.

52.     When Mr. Ramirez got into his car, he saw two unmarked vehicles driving on his street; both had emergency lights inside them like the kind used by law enforcement.

53.     One of the vehicles, a black SUV, began following him as he left his neighborhood.

54.     The second vehicle, a gray car, followed behind the black SUV.

55.     Once Mr. Ramirez left his neighborhood and reached a stoplight, the black SUV turned on its emergency lights and signaled to Mr. Ramirez to pull over.

56.     Mr. Ramirez quickly complied. Both the black SUV and the gray car parked behind him.

57.     A man wearing a vest marked "POLICE" got out of the black SUV and walked around to the driver's side of Mr. Ramirez's car.

58.     The man also had a badge marked "ICE" clipped to his pants and was visibly armed with a handgun.

59.     A man from the gray car approached the passenger's side of Mr. Ramirez's car. This agent was also dressed in civilian clothes under a tactical vest that said "POLICE" and was visibly armed.

60.     The agent from the black SUV, speaking Spanish, ordered Mr. Ramirez to turn off his car, place the keys on the dashboard, and roll down his window. He ordered Mr. Ramirez to provide identification.

61.     Mr. Ramirez handed him his valid Colorado driver's license, which showed his address in the neighborhood close by.

62.     Mr. Ramirez's license is an "S.B. 251" license, an identification issued by the State of Colorado that individuals can access even if they cannot prove lawful presence in the United States at the time they apply for the license. It is easily distinguished from a standard Colorado license because it contains a black horizontal stripe on the top, includes the inscription, "not valid for federal purposes," and lacks a star in the top right-hand corner denoting a "REAL ID."

63.     Having an S.B. 251 license does not necessarily mean someone lacks protected immigration status or even that they are a noncitizen.

64.     The agent nevertheless asked Mr. Ramirez for his consular ID and passport. Mr. Ramirez replied that he did not need a consular ID because he had a driver's license and that his daughter could bring his passport. The agent said that was not necessary.

65.     The agent took Mr. Ramirez's license back to the black SUV, while the other agent continued to stand at the passenger side of Mr. Ramirez's car without speaking.

66.     The first agent came back and gave Mr. Ramirez's license to him. He asked where Mr. Ramirez was from, whether he had permission to be in the United States, and whether he had any papers to show his legal status.

67.     Mr. Ramirez stayed quiet but asked the agent if he was under arrest or free to leave. The agent continued to ask the same questions and Mr. Ramirez again remained quiet, except to ask if he was under arrest. The agent then responded, "Okay, well now you are [under arrest]." The Spanish-speaking agent opened Mr. Ramirez's driver's side car door and ordered him to get out.

68.     The agents did not have a warrant for Mr. Ramirez's arrest.

69.     The agents did not ask Mr. Ramirez any questions about his potential flight risk, including his ties to the community, how long he had lived in the United States, his employment, his family, or whether he had any criminal history.

70.     The Spanish-speaking agent handcuffed Mr. Ramirez and directed him to get into the back of the black SUV. The agent began to drive and did not tell Mr. Ramirez where they were going. While in the car, the agent asked if anyone else was at Mr. Ramirez's home. Mr. Ramirez explained that his wife and U.S.-citizen children were home.

71.     Mr. Ramirez was processed at a DHS Office in Grand Junction. While there, he was asked about where he was born and how long he had been in the United States. He answered and explained that the very day he was arrested was his 20th anniversary of his arrival in the United States.

72.     Mr. Ramirez overheard the Spanish-speaking agent on the phone talking and laughing about the coincidence that they had arrested Mr. Ramirez on the 20th anniversary of his arrival to the United States. Mr. Ramirez felt humiliated.

73.     During the processing, one of the agents told Mr. Ramirez that he had not been the person they were originally looking for, but they arrested him anyway.

74.     At around 6:00 or 7:00 p.m., ICE agents transferred Mr. Ramirez to the Aurora Detention facility. Mr. Ramirez was detained from May 19, 2025, until August 26, 2025.

75.     During that time, some of the guards blocked detainees' phone calls, even with attorneys – and some days, Mr. Ramirez was not permitted to make calls at all.

76.     The air conditioning was often broken, and it became unbearably hot in the cells.

77.     When elected officials came to visit the facility, the facility would be cleaned and staged for those visits to make it look better than it was in reality. Mr. Ramirez experienced significant anxiety, feeling frustrated and helpless.

78.     During Mr. Ramirez's detention, his family suffered. Mr. Ramirez had been the primary earner for his family. His wife, who had stayed home to care for their children, began selling food to pay the bills. The family had to rely on the kindness of their community to provide food and donations for legal expenses. They sold a truck and borrowed money, incurring roughly $20,000 in loans and debts. Mr. Ramirez's oldest daughter's mental health declined. She was diagnosed with Major Depressive Disorder, Generalized Anxiety Disorder, an Exfoliation Disorder, and Post Traumatic Stress

Disorder during his detention. Mr. Ramirez's sons also began showing symptoms of anxiety and depression, and all of his children began attending therapy.

79.     Mr. Ramirez is now a lawful permanent resident. But he has not received the documentation from the government that would prove his lawful status (a "green card"). He doesn't even have a timeline for when he will receive it. He continues to rely on the same S.B. 251 ID he had when ICE arrested him in May.

80.     And to fulfill the Administration's agenda, ICE agents have unlawfully arrested, without warrant and without the necessary probable cause determinations, even U.S. citizens and people with protected status whom agents profile as immigrants.

81.     Indeed, Defendant Noem has confirmed that in the United States, people will be expected to provide documentation to prove their citizenship if they are encountered by immigration agents in the field, saying, "If we are on a target, there may be individuals surrounding that criminal that we may be asking who they are and why they're there and having them validate their identity."[25]

82.     Legal permanent residents and even citizens profiled and stopped by ICE who are not carrying their papers are at substantial risk of unlawful warrantless immigration arrest. For example, ICE agents arrested José Escobar Molina—a plaintiff in another challenge to ICE's unlawful warrantless arrest practice—even though he had Temporary Protected Status and told officers he "had papers." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2025 WL 3465518, at *4 (D. D.C. Dec. 2,

---

[25] Peter Aitken & Dan Gooding, Kristi Noem Says People Should Be Prepared to Prove US Citizenship, Newsweek (Jan. 15, 2026), https://perma.cc/8JKG-A4DX.

2025); *see also, e.g.*, *Vasquez Perdomo v. Noem*, 790 F. Supp. 3d 850, 869 (C.D. Cal. 2025) (describing warrantless immigration arrest of dual citizen of the U.S. and Mexico when he didn't have his passport on him during carwash raid); Jack Brook, *A U.S. citizen says ICE forced open the door to his Minnesota home and removed him in his underwear after a warrantless search*, PBS News (Jan. 20, 2026), https://perma.cc/YL48-EZB8 (describing warrantless immigration arrest of U.S. citizen following armed ICE agents' warrantless forced entry into his home; after dismissing his daughter's efforts to show his ID, ICE agents handcuffed him in front of his grandson and forced him outside in subfreezing temperatures in nothing but sandals, underwear, and a blanket around his shoulders); Jaime Adame, *Cottage Grove Woman tells of Being Detained by ICE Despite Lawful Status*, Lookout, Eugene-Springfield (Nov. 7, 2025), https://perma.cc/C5LF-YDDL (describing warrantless immigration arrest of woman who had received her green card in 2017); Douglas Saunders Sr., *OC Attorney Says She Was Detained in ICE Raid at Santa Ana Park*, Daily Journal (June 19, 2025), https://perma.cc/C5LF-YDDL (describing U.S. citizen and attorney arrested by ICE during immigration raid); Dani Anguiano, *U.S. Citizen Arrested During ICE Raid in What Family Describes as Kidnapping*, The Guardian (June 26, 2025), https://perma.cc/YB5X-US22 (describing warrantless arrest of Latina U.S. citizen being dropped off at work during ICE raid).

83.     Indeed, during the recent surge of ICE agents in Minneapolis, the city even added a page on its website dedicated to "ICE arrests of U.S. Citizens," as a hub of information and resources for impacted city residents. ICE Arrests of U.S. Citizens, Minneapolis (last visited Jan. 31, 2026), https://perma.cc/5P2V-MWZB. In a Facebook

post announcing the new page, the City of Minneapolis wrote: "Recent reports of ICE activity include detaining or arresting U.S. Citizens. If this happens to you or someone you know, learn about your rights, how to report what happened, and where to get help," https://perma.cc/HHT5-Y6WU.

84.    The Defendants consider these illegal, warrantless arrests of lawful residents and even U.S. citizens a feature, not a bug, of the Administration's discriminatory mass arrest campaign.

85.    Especially because he still has not received his green card, Mr. Ramirez reasonably fears that if he encounters ICE again, he will be rearrested on the spot even though he poses no flight risk whatsoever. Because of this fear, Mr. Ramirez is distressed by and deterred from everyday activities, like simply driving his car – the quotidian conduct that resulted in his original arrest. But he cannot entirely abstain from such activities or avoid repeating the innocent conduct that led to his first unlawful arrest.

**ii.    Stop and Arrest of Caroline Dias Goncalves**

86.    Plaintiff Caroline Dias Goncalves is a University of Utah college student who has lived in the United States since she was seven years old. She attends college on a merit scholarship.[26]

87.    On the afternoon of June 5, 2025, Ms. Dias was driving on the highway from Utah to Colorado to visit a friend and was pulled over by a Mesa County Sherriff's Office

---

[26] Courtney Tanner, University of Utah student is being held at Colorado immigration detention center, The Salt Lake City Tribune (June 12, 2025), https://perma.cc/SXC6-MQN8.

deputy. That deputy, Alexander Zwinck, stopped her in Fruita, Colorado, claiming that she followed a semitrailer truck too closely.[27]

88.     Upon Officer Zwinck's request, Ms. Dias gave him her driver's license and other necessary paperwork. Strangely, he then asked Ms. Dias to leave her own car and accompany him to his patrol car. She complied.[28]

89.     Officer Zwinck continued to interrogate Ms. Dias while she sat in the passenger seat of his patrol car. He asked her multiple questions about her road trip, including whether she had "fun plans for the weekend" and if her friend was expecting her.[29] He also asked Ms. Dias personal questions, including whether she was a college student and what she was studying. Ms. Dias shared she was studying nursing and applying for nursing school next spring. Officer Zwinck praised her plans, noting the difficulty of her career choice.

90.     At one point during the interrogation in Officer Zwinck's patrol car, he asked Ms. Dias, "Where are you from?" suggesting that she had "a bit of an accent" (she does not believe she does). Ms. Dias told Officer Zwinck, "I'm from Utah." After Officer Zwinck pressed if she was born and raised in Utah, Ms. Dias responded that she was born in Brazil and moved to Utah with her parents as a child. *Id.*

---

[27] *Id.*

[28] McKenzie Diaz, From a road trip to ICE detention, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

[29] Mesa County Sheriff's Office, Body Cam Footage, YouTube (June 5, 2025), https://www.youtube.com/watch?v=2IyuTMNug6E.

91.      Officer Zwinck assured Ms. Dias that "everything came back good" and said he would let her go with a "warning." Officer Zwink informed her, "You're good to go, you have safe travels, OK." *Id.*

92.      Officer Zwinck then used Signal messaging to alert ICE agents about Ms. Dias' whereabouts.

93.      ICE agents stopped Ms. Dias a few miles down the highway near Grand Junction, Colorado.

94.      The agents did not wear uniforms, badges, name tags, or tactical vests.

95.      They did not show Ms. Dias any identification or provide their names.

96.      They did not ask Ms. Dias any questions about flight risk including how long she had been in the United States, her ties to the community, if she had a fixed address, her educational history, employment, or whether she had any criminal history.

97.      ICE agents arrested her, saying she had violated U.S. immigration laws and "We're going to take you."[30]

98.      They handcuffed Ms. Dias and placed her in the passenger seat of their truck. Ms. Dias told the agents that she had her driver's license and Social Security card. They responded that she could have a Social Security card but still be "illegal" in the United States.

99.      The agents drove her to the DHS Office in Grand Junction and processed her, taking her fingerprints and asking her to sign paperwork.

---

[30] McKenzie Diaz, From a road trip to ICE detention: Caroline Dias Goncalves story, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

100.    While she was sitting in a cell, an ICE agent told her he could not release her—even though he preferred to arrest "criminals" and she had "never caused any trouble."

101.    He explained "under this president and under this presidency, we have to arrest anyone who is not a citizen."

102.    The agents transported Ms. Dias "to a warehouse, chained her feet, and then transferred her" to the Aurora detention facility.[31]

103.    ICE imprisoned Ms. Dias at the detention facility for 15 days.

104.    She felt "scared, alone, and heartbroken."[32] In a statement following her release from the unlawful detention, she shared: "The past 15 days have been the hardest of my life."[33] She had been "placed in a system that treated [her] like [she] didn't matter." *Id.* While detained, she was "given soggy, wet food" and forced to keep "confusing schedules." *Id.* She felt like her life had been "ripped away."[34] She and other detainees were often forced to choose between going outside for recreation or eating breakfast; if they chose to go outside, food would not be saved for them. Ms. Dias met another 19-

---

[31] McKenzie Diaz, From a road trip to ICE detention: Caroline Dias Goncalves story, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

[32] Nicole Acevedo, Dreamer who spent 15 days in ICE detention says she was 'scared and felt alone', NBC News (June 24, 2025), https://perma.cc/Y6QF-79FU.

[33] Statement from Caroline Dias Goncalves, TheDream.US (June 23, 2025), https://perma.cc/V659-2NE7.

[34] McKenzie Diaz, From a road trip to ICE detention, ABC4 News (June 25, 2025), https://perma.cc/SZR6-GPJ9.

year-old woman who had been transferred to the same dormitory after receiving a death threat while in detention. This left an impression on Ms. Dias as it was so frightening.

105.   During Ms. Dias' detention, her family suffered too. A relative commented, "We can't do anything," and "We're scared. We're not in jail with her but we feel like it." [35] Ms. Dias' parents and siblings have started therapy to process their ongoing trauma related to her detention and have problems sleeping.

106.   Even after her release, Ms. Dias' detention continues to have a profound impact on her life. ICE did not give her driver's license back to her, so she must rely on friends, family, and her lawyer for transportation to appointments, school, and work. Ms. Dias held two jobs before she was detained and was fired from one job after her release. She had to move in with her parents because she could no longer afford rent in Salt Lake City, where she attends school. She lives an hour away from school now, which makes attending school difficult. As a result, she has moved to taking part-time classes online, which is delaying her progress in completing her degree.

107.   Prior to this Court's preliminary injunction, including at the time the original complaint was filed, Ms. Dias was required to wear an ankle monitor and attend check-ins with an ICE contractor every four weeks. She had to coordinate rides to attend check-ins, which was burdensome and stressful.

108.   Prior to this Court's preliminary injunction, including at the time the original complaint was filed, Ms. Dias was reasonably fearful and anxious that any issue with her

---

[35] Courtney Tanner, *University of Utah student is being held at Colorado immigration detention center*, The Salt Lake Tribune (June 12, 2025), https://perma.cc/SXC6-MQN8.

ankle monitor or small mistake could result in being detained again. ICE agents have unlawfully arrested without a warrant even those the agency already subjects to ankle monitoring such that they pose no risk of flight. For example, a plaintiff in another challenge to ICE's unlawful warrantless arrest practice was handcuffed in a vehicle stop without being asked for his name or ID and "[e]ven after [he] showed the officers his ankle monitor and explained that he was already subject to immigration monitoring." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2025 WL 3465518, at *5 (D. D.C. Dec. 2, 2025). He was given the ankle monitor after having been subjected to *another* unlawful warrantless arrest in a Home Depot parking lot just months earlier. *Id.*

109.    Ms. Dias still lives with a constant fear that she might encounter ICE again and be arrested on the spot despite posing no risk of flight as she goes about her daily business. That fear has caused her to alter her routines and everyday conduct. She is more hesitant to travel or engage in social activities. She tries to more rigidly set her schedule ahead of time and minimize doing anything unplanned. Ms. Dias is even scared to go to work or carry out mundane tasks like running errands, though she has no choice but to continue doing these things as a matter of daily living. She struggles with insomnia and plans to start therapy.

110.    As of the filing of the First Amended Complaint, notwithstanding this Court's November 25, 2025 Order that Defendants refund Ms. Dias the costs she incurred in obtaining and posting bond, Ms. Dias still has not received that reimbursement.

### iii.   Stop and Arrest of J.S.T.

111.   Plaintiff J.S.T. is a 36-year-old man who has lived in Colorado for nearly all his adult life. J.S.T. has lived at Whispering Pines Apartments in Aurora for the last seven years. J.S.T. is dedicated to his family, church, and community.

112.   J.S.T. has worked at his local restaurant and grocery store for nearly a decade. His colleagues describe him as "a responsible and hardworking individual who maintains harmonious and respectful relationships with both coworkers and customers."

113.   J.S.T. is committed to improving his community and participates in various neighborhood projects and volunteer efforts. For over ten years, he has been part of a Catholic religious study group that meets monthly for Bible study. He volunteers with this group in the larger community, working to provide free food and clothing donations to neighbors in need.

114.   Around 6:00 a.m. on February 5, 2025, J.S.T. left his apartment and, as was his routine, got into his car to drive to work.

115.   That morning, federal immigration officials and law enforcement agents in tactical gear and armored vehicles swarmed the Whispering Pines apartment complex.

116.   White vans blocked the exits to the complex's parking lot.

117.   Agents were conducting an enhanced immigration enforcement operation to meet the Administration's ramped-up arrest quotas.

118.   Whispering Pines was one of many apartment complexes immigration agents raided in the Denver metro area that day.

119.    An ICE officer stopped J.S.T. while he was in his vehicle and asked for identification. J.S.T. provided his Colorado driver's license. J.S.T.'s license is an S.B. 251 license.

120.    The officer asked J.S.T. whether he had "problems with immigration or past criminal violations." J.S.T. replied "no."

121.    The officer took J.S.T.'s driver's license to a white unmarked van and never returned it to J.S.T.

122.    The officer ordered J.S.T. to step out of his car. J.S.T. complied. Immediately after that, a second immigration officer ordered him to turn around and put his hands on the car. That officer searched J.S.T. and took his car keys, billfold wallet, and telephone, none of which he returned.

123.    The first officer, who had taken J.S.T.'s driver's license, returned a few minutes later and informed J.S.T. that he "would have to go with them."

124.    The officer zip-tied J.S.T.'s hands.

125.    The officer did not have a warrant for J.S.T.'s arrest.

126.    The officer did not ask J.S.T. any questions about his ties to the community, family, church, job at the grocery store, residence at Whispering Pines, or anything else regarding flight risk.

127.    J.S.T. asked if he could call his family. The officer refused his request and placed J.S.T., hands still bound, in a van in the parking lot.

128. During this time, ICE officers were going door-to-door in the Whispering Pines apartment complex and knocking on the doors of many apartments.[36]

129. ICE officers then began questioning people inside.

130. At least eight other people from the Whispering Pines apartment complex were detained that day.

131. The immigration officers transferred J.S.T. to a smaller vehicle for transportation, and two ICE agents took him to the ICE field office in Centennial. J.S.T. was processed at the Centennial ICE office: agents took his fingerprints and biographical information and asked him questions about his prior contacts with border patrol.

132. ICE agents still did not ask J.S.T. about his community ties, his family, or his employment.

133. Once J.S.T. was processed, an ICE officer chained his hands and feet together and put him on a bus for transport to the Aurora Detention Facility. While in detention, J.S.T. spoke to other people who had been detained from his apartment complex. His neighbors shared that ICE did not have arrests warrants for them, nor did his neighbors have criminal records.

134. ICE imprisoned J.S.T. at the Aurora Detention Facility for over a month. During that time, J.S.T. was given minimal food and milk that was often spoiled. Sleeping

---

[36] Kevin Beaty, What we saw from inside ICE's raid at Aurora's Edge apartments, Denverite (Feb. 6, 2025), https://perma.cc/E663-K7VS (stating immigration agents "seemed to knock on every door they could find" in other Aurora-area apartment buildings targeted the same day as Whispering pines); Jeffrey Cook, With ICE Agents going door-to-door in Colorado, residents are on edge: Reporter's notebook, ABC News (Feb. 7, 2025), https://perma.cc/R76C-KJDH.

"felt impossible" because the lights were always on, and guards were constantly pointing flashlights in J.S.T.'s face. The beds were made of metal and hard to sleep on.

135.    J.S.T. was only given two uniforms to wear, which were often dirty because they were washed only once per week.

136.    Eventually, J.S.T. was released on bond. But he has suffered and continues to suffer significant harm. J.S.T. lost his apartment and many of his belongings because he could not pay rent while he was in detention.

137.    J.S.T., his family, and his community live in constant fear due to these events. Because of the temporary living situation after losing his apartment, he cannot spend as much time taking care of his niece. J.S.T.'s niece, who has been bonded to J.S.T. her entire life, fears separation from J.S.T.

138.    After his release from custody, J.S.T. now lives in fear of re-arrest. He is afraid to leave his residence for any reason, though he still continues to work for the same employer in Aurora. At the time this lawsuit was filed, he was even afraid to attend his immigration check-in appointments, as ICE has been arresting compliant noncitizens at these appointments.

139.    As of the filing of the First Amended Complaint, notwithstanding this Court's November 25, 2025 Order that Defendants refund J.S.T. the costs he incurred in obtaining and posting bond, J.S.T. still has not received that reimbursement.

### iv.    Stop and Arrest of G.R.R.

140.    Plaintiff G.R.R. is a 32-year-old father and business owner who has lived in the United States for more than a decade. G.R.R. currently resides in Colorado Springs.

He shares an apartment with his 9-year-old son ("M.R."), and ex-wife and co-parent ("A.R."), both of whom are U.S. citizens.

141.    For the ten years he has lived in the United States, he has worked in construction, doing drywall, tile, flooring, and kitchen work. He now owns his own business doing the same. G.R.R. takes pride in his work and reputation.

142.    G.R.R. attends church most Sundays, and his church community is close-knit. He received many letters from his church community while he was unlawfully detained. G.R.R. cares for the well-being and safety of his friends and family.

143.    One day, G.R.R. agreed to be his friend's designated driver. In the early morning hours of April 27, 2025, G.R.R. pulled up to a nightclub in Colorado Springs to pick up his friend, so that his friend would not have to drive home after drinking. When G.R.R. arrived, his friend wasn't answering the phone, so G.R.R. went inside to look for him.

144.    Moments later, the nightclub was flooded with tear gas.

145.    Federal agents had locked the side doors from the outside of the nightclub to funnel all patrons out through the front.

146.    When G.R.R. went out the front doors, he saw law enforcement officers with bulletproof vests, helmets, and uniforms.

147.    More than 300 law enforcement officers from ICE and other agencies were on the scene and arrested more than 100 people.

148.    The armed officers were yelling and pointing assault weapons at patrons streaming out of the club trying to avoid the tear gas.

149.    G.R.R. was terrified. He had no idea what was going on. The raid was loud. There were drones in the sky. G.R.R. sought safety from the officers pointing guns by hiding under a car in the parking lot where he stayed for ten to fifteen minutes. An officer in tactical gear and pointing a long gun ordered G.R.R. to get out from under the car. G.R.R. complied.

150.    As G.R.R. stood up, the officer shoved him to the ground. When G.R.R. fell, he sliced his hand open on the ground and was in pain. The officer zip-tied G.R.R.'s injured and uninjured hands together anyway and patted him down.

151.    The officer did not ask G.R.R. any questions. He simply reached into G.R.R.'s pockets and removed his wallet and phone.

152.    The officer rifled through G.R.R.'s wallet and found a Colorado driver's permit, Colorado state identification, and a Mexican consular card. The officer kept G.R.R.'s wallet and phone. He threw them in a large bag along with belongings confiscated from others.

153.    Later, another officer took G.R.R. to an on-site EMT to look at his hand. The EMT counseled that G.R.R. "probably needed stitches." The officer disregarded the EMT's advice. Instead, he instructed the EMT to "put a Band-Aid on it." Once the EMT bandaged G.R.R.'s injury, the officer shackled G.R.R.'s feet, handcuffed his wrists, and connected them to a chain on his waist. These restraints were painful.

154.    Up to this point, no one asked G.R.R. about his ties to the community, employment, living circumstances in Colorado Springs, or anything else to assess whether he posed a flight risk.

155.    Hours later, around 6:00 a.m., the officer took G.R.R. to a large bus bound for ICE's Aurora Detention Facility. The bus was mostly full of nightclub goers, and everyone on it was a Spanish speaker.

156.    ICE officers initially placed G.R.R. and all his bus-mates in a single holding cell.

157.    Approximately sixty individuals were in the cell with him, all from the Colorado Springs raid.

158.    When ICE interviewed G.R.R. at the Aurora Detention Facility, officers asked his name, how he came to the United States, and where he was from. They did not ask about why he was at the nightclub or any questions about guns or drugs.

159.    ICE held G.R.R. at the Aurora Detention Facility for 50 days.

160.    The conditions in the Detention Facility were terrible.

161.    The beds were so hard that they hurt his back, and it took two days to see a doctor after G.R.R. complained about his back pain.

162.    G.R.R. also caught a severe cold because of the low temperatures, as did others.

163.    G.R.R. had to use the bathroom and showers together with the other detainees. The entire situation was "extremely degrading and scary."

164.    No one ever returned G.R.R.'s government-issued identifications.

165.    G.R.R. needed to get new identification in order to drive. His current license is an S.B. 251 license.

166.    The ordeal has been extremely hard on his ex-wife A.R., and his son. His son, M.R., has acted out behaviorally at school, and fears separation from G.R.R., refusing to leave G.R.R.'s side.

167.    G.R.R.'s detention has also caused harm to A.R. and A.R.'s mother because G.R.R. could not earn income during his detention. G.R.R.'s family depends on his income for their costs of living.

168.    G.R.R. was (and is) terrified about what will happen to him, his son, and his family. He has constant fear of re-arrest by ICE. At the time this lawsuit was filed, he was afraid he might be arrested at a check-in appointment, as ICE's policy and practice includes arresting people who are complying with immigration law by attending these appointments. Members of G.R.R.'s Bible study group are also afraid to congregate in each other's homes and have reduced the frequency of their meetings.

169.    As of the filing of the First Amended Complaint, notwithstanding this Court's November 25, 2025 Order that Defendants refund G.R.R. the costs he incurred in obtaining and posting bond, G.R.R. still has not received that reimbursement.

### v.    Harm to EC3 and its members.

170.    Defendants' policy and practice of warrantless arrests without the probable cause required by law has caused significant injury to EC3 and to its resident and business members.

171.    Defendants' unlawful warrantless arrests have directly interfered with EC3's core services.

172.    EC3 provides direct support to residents and businesses at risk of displacement through immediate relief and resource navigation, housing defense, and legal assistance.

173.    EC3 supports residents through identifying the barriers to their ability to secure stable housing and locating community resources and programs to overcome those barriers. Since 2021, EC3 has successfully stopped more than 630 evictions and connected households with more than $4.7 million in financial assistance to secure their housing.

174.    A central piece of EC3's direct housing support is helping neighbors file applications for rent and mortgage assistance. ICE's challenged practice has directly interfered with this service provision.

175.    Several times in the last 6-8 months, EC3 was working with households to secure emergency financial assistance when ICE arrested the family's primary breadwinner, including with no warrant.  When ICE takes a person so relied upon by their family, it directly threatens the application for assistance, because the financer loses assurance that the family will be able to maintain their housing stability once they receive short-term aid. EC3 has been unable to move forward with several applications because of ICE's unlawful detentions, which harms both EC3 and its members.

176.    Moreover, the most common financial aid programs that EC3 utilizes require significant and specific documentation. Under normal circumstances, EC3 staff must spend several hours with families walking through the kind of paperwork required to complete applications for assistance. Collecting that documentation is far more difficult

when the primary breadwinner is detained. Getting access to that person's online accounts, for example, to provide evidence of their pay stubs, can be impossible. Sometimes the aid programs require physical signatures on documents, which can prevent families from securing the aid they need, particularly on the timeline they need it to secure housing or to avoid eviction. And the programs almost always require documentation from everyone named on the lease, so even if a family could somehow show the requisite financial stability without the detained breadwinner's income, they would not be able to move forward without that documentation.

177.    ICE's warrantless arrests are particularly and uniquely disruptive to this work, because they occur without warning and thus without an opportunity for EC3 to help prepare a household by doing things such as securing passwords, getting signatures, and other steps necessary to secure financial support.

178.    Finally, the sheer trauma of having a family member arrested, detained, and possibly deported also directly interferes with EC3's ability to help households navigate the process of securing aid. On several occasions, EC3 has been working on housing-related applications with families who suddenly needed to shift their focus to crisis management when ICE took a loved one, and they needed to track the person down, try to figure out how to communicate with them, and connect with legal representation. Helping families with that kind of compounding emergency at the very least slows down EC3's housing support work dramatically, if it doesn't disrupt it entirely. Again, warrantless arrests are particularly disruptive to this process as they do not allow for advance planning.

179.    EC3 also works to organize tenants to help improve their housing conditions and to assert and protect their rights. The unlawful warrantless arrests have created an enormous obstacle to this core EC3 program.

180.    Typically, when EC3 learns of an ongoing issue in the community, its organizers support tenants by going door-to-door in the relevant apartment complex to hear directly from families about what they are experiencing. Then the organizers typically invite tenants to a meeting where neighbors can meet each other and discuss their shared issues. EC3 provides support at these meetings by providing training on attendees' rights as tenants and on their landlords' responsibilities. Often the result of this organizing is some kind of collective action demanding that the negative conditions be remedied—for example, a group letter sent to the landlord.

181.    Tenants already have a lot of hesitancy in getting involved in this kind of organizing. But the widespread community fear resulting from ICE's unlawful warrantless arrests—including raids on apartment complexes in the region—has further chilled participation, particularly among the immigrant communities that EC3 serves. Trying to overcome that fear has demanded far more of EC3 staff time, labor, and capacity compared to what organizing used to require. For example, staff has had to become sufficiently trained in immigrants' rights in order to deliver know-your-rights presentations on that topic as a basic part of helping people feel comfortable speaking out, even about issues seemingly unrelated to immigration (like housing conditions). In addition, EC3 has had to rely on staff and additional volunteers to escort members between their homes and meetings because there is so much fear that ICE might show up and start arresting and

detaining people without any notice—even people who have been rooted in the community for years.

182.    Paralyzing community fear has prevented EC3 from organizing at least two apartment complexes since the new Administration initiated its mass warrantless arrest campaign. The tenants in one of these buildings had been productively organizing around housing conditions with EC3 since spring of 2024. The organization began a renewed campaign there in the summer of 2025 to address issues that were continuing to occur. EC3 had been actively organizing the building when ICE arrested one of its residents in the building parking lot. The person arrested was the husband of one of the most active tenants. When that happened, that tenant leader essentially dropped out of organizing efforts, because she had to tend to the emergency of her husband's detention. Meanwhile, other tenants became extremely fearful and stopped showing up at group meetings. To accommodate that fear, EC3 organizers started doing more meetings with individuals, in person or on zoom, rather than live team meetings, which was far less efficient and effective. Still, ultimately, too many tenants believed that the property manager had invited ICE to the property and that they would be at risk if they continued to speak up about their rights.

183.    Such community fear prevented EC3 from organizing a second building as planned in Spring of 2025 notwithstanding atrocious housing conditions—like bedbug infestations, crime (including a stabbing), lack of heat, and plumbing issues—and even though many of the residents were families with small children who were suffering. A prerequisite for EC3 to organize a building with such conditions is the tenants' willingness

to engage with the local health department. The health department can be let into a unit either with the permission of the landlord or the tenant; as a third party, EC3 can't advocate without the tenant's willing participation. But the tenants were so afraid of retaliation that they chose living in those conditions rather than expose themselves to greater risk of being caught up in ICE's unlawful arrest and deportation machine.

184.    Because of widespread fear from ICE raids and collateral arrests among its membership and the broader local community it serves, EC3 has also had to devote far more resources, and rely on additional volunteers, to make people feel comfortable attending its meetings, which are core to its mission.

185.    In addition to its monthly membership meetings, EC3 hosts, for example, a monthly Renter's Legal Clinic that is the only renter's legal clinic along the East Colfax Corridor, and one of the few regularly scheduled clinics in both Aurora and Denver. The clinic aims to support residents every month by providing pro bono consultations with housing attorneys, to train residents on the latest tenant rights and protections, and to provide an opportunity for residents to apply for rental assistance and report concerns about their living conditions or landlords. The clinic also includes access to EC3's free food pantry, which provides more than 10,000 pounds of food each month to families in need. In addition to these regular offerings, EC3 also hosts meetings and events responsive to community need, like immigration Know Your Rights trainings and family preparedness workshops, where people of any immigration status can learn how to plan for the emergency circumstance of a loved one or community member being suddenly taken by ICE.

186.    EC3 has taken the steps within its control to try to help people feel safe attending these events. For example, the organization has changed the way it handles childcare during meetings. Because the area in EC3's building where childcare is provided and where meetings happen are far apart, EC3 has had to rely on volunteers to escort people's young children between the two parts of the building—that's how terrified people are. The organization has also invested in security upgrades to its building, like a new security camera, to make people feel more secure. EC3 has also been more circumspect in publicizing meetings on social media, relying much more on one-on-one communications with members, which creates far greater demands on staff time. Still, this additional outpouring of resources has not been enough to mitigate persistent community fear.

187.    In addition to directly interfering with EC3 programs like direct housing support and tenant organizing, ICE's unlawful activity in Colorado has also diverted EC3 resources to mitigating the impacts of those arrests on the community, straining its capacity to deliver the services that are core to its mission. Staff has spent enormous time supporting family members in the aftermath of raids—for example, just tracking down the status and location of loved ones who have been arrested and detained, trying to connect them with legal assistance, helping families secure food when their primary breadwinners are taken from them.

188.    The challenged practice has also injured EC3 members, who as a result of Defendants' unlawful scheme have experienced trauma, fear, and the feeling of being deprived of the basic dignity of participating in public life in Colorado.

189.    EC3's resident members include people of all immigration statuses, including noncitizens. A huge portion are Spanish speakers, many live in neighborhoods with large immigrant populations, and many work as day laborers and in the construction and hospitality industries, which have been particularly targeted by ICE. Much of EC3's membership are among the group of people the government has targeted for civil immigration arrests.

190.    Many resident members of EC3 have either already been subjected to Defendants' unlawful warrantless arrests, continue to suffer current injuries resulting from their arrests, and reasonably fear being subjected to the challenged practice in the future, or otherwise are at substantial risk of being unlawfully arrested without this Court's intervention.

191.    For example, on February 5, 2025, federal immigration and law enforcement agents raided the Cedar Run and Whispering Pines apartment complexes, where many EC3 members reside. ICE agents arrested several EC3 members without a warrant and without the probable cause required by law.

192.    For example, one member of EC3, Member A, was leaving his apartment at Cedar Run to check on a job application when ICE agents in the hallway of his building arrested him without a warrant and without probable cause that he was a flight risk.

193.    Member A is a Mauritanian asylum seeker who had a positive credible fear interview at the border. He has dark skin, and his primary language is Pulaar. He speaks the little English he does know with an obvious accent.

194.    Member A has authorization to work lawfully in the United States. In early February of 2025, he was actively applying for jobs. On the morning of February 5, 2025, he decided to go in person to check on one of his pending applications to try and demonstrate his interest in the position.

195.    That morning, Member A was dressed in a traditional Mauritanian long robe.

196.    When he opened his door, armed ICE agents, clad in tactical gear, were in the hallway outside his apartment. Some officers were stationed at the hallway exit to his right, while others to his left were in the middle of arresting someone who lived down the hall. Member A heard the arrestee, whose hands had been zip-tied, calling desperately for someone inside the man's apartment to get his passport. The officers who had detained his neighbor called Member A over to them. Although he saw no clear identification on the officers, he did as they said. He felt no need to worry because he knew he had not done anything wrong. He had never even gotten a traffic ticket.

197.    One agent positioned himself to Member A's side, and another behind him. The officer to his side searched Member A's pockets while Member A calmly stood with his arms at his sides. He thought they might be checking to make sure he did not have any weapons on his person, but that is not what they were doing. Instead, they were searching his pockets for his identification. The only items in his pockets were his apartment key, social security card, bank card, work authorization, and Colorado ID, which is an S.B. 251 ID.

198.    At some point, the officers who had been down the hallway came over, such that Member A was surrounded by about seven agents. From the time two officers

enclosed Member A between them and one reached into his pockets, Member A did not feel free to leave, nor would any reasonable person.

199.    The officers did not have any basis to suspect that Member A was in the United States in violation of the immigration laws. Instead, they profiled him based on his appearance.

200.    One officer got on the phone and, after hanging up, asked Member A whether he had a scheduled Master Calendar hearing. Member A answered that he did, and it was scheduled for January of 2026. Without asking Member A any other questions, the ICE officers zip-tied his wrists together. Not one of the officers said anything about why they were arresting Member A. They just asked him if he was ready to follow them—to which Member A responded that he was not ready, but that if they were saying he had to go, then he had no choice. They placed him on a large bus, where about ten other people were sitting in restraints. He recognized some of the people on the bus, including other members of EC3.

201.    The officers did not have a warrant for Member A's arrest and performed no flight risk analysis before arresting him.

202.    In fact, Member A's answer to the single question ICE officers asked him prior to arrest—that he had an upcoming hearing and knew when it was scheduled—only demonstrated that he was cognizant of and complying with the legal process in his immigration case.

203.    Because they did not ask Member A any other questions, they did not learn that he was a resident of the Cedar Run Apartments, where they encountered him. They

did not learn that he lived there with his brothers and his brother's wife. They did not learn that he had lived in the same neighborhood of Denver with family members for more than 14 months. They did not learn that he and his family lived in that neighborhood among a close-knit community of people who had fled violence in Mauritania. They did not learn about his regular attendance for prayer at a local mosque. Nor did they learn that Member A was actively involved with EC3, where he devotes his time to improving housing conditions for low-income tenants in the region.

204.   Had the ICE officers done the required probable cause analyses, there would have been no basis to conclude Member A was likely to escape before a warrant could be obtained.

205.   Though he is and was deeply embedded in his community and posed no risk of flight, officers took Member A into custody without a warrant.

206.   When he was placed on the bus, Member A asked if he could call his family. He was told he could not. The bus transported Member A and the others ICE had detained to an ICE field office for processing. At the office, Member A again asked if he could call his family and was again told he could not.

207.   He was then transferred to the Aurora Detention Facility. Prior to the transfer, ICE officers placed Member A in handcuffs that they secured to a metal chain around his waist. They shackled his feet. He did not arrive at the facility until very late that night, and it was not until the next day that he was able to finally call his family and tell them what had happened to him. They had been terrified when he disappeared and were deeply concerned about what would happen to him next.

208.   Member A remained imprisoned at the Aurora Detention Facility for about two months.

209.   Member A spent most of the month of Ramadan in detention. For Member A, Ramadan is a holy month of fasting and communal prayer. Observing Ramadan was exceedingly difficult at the facility, because Member A had little to no control over when he could sleep. This made his time in detention especially physically and spiritually challenging. But the hardest part of being in detention was thinking about the impact of his detention on his family. Their visits helped him keep up his morale.

210.   With the help of his community, Member A was able to hire an attorney to represent him in bond proceedings, and an immigration judge ordered his release on bond. The immigration judge ordered a bond in the amount of $5,000. With the help of EC3, Member A's family was able to find a local organization to pay the bond.

211.   Though he was freed from detention and remains out of custody for now, Member A continues to suffer direct and current injuries, including ongoing deprivations of liberty, that are part of and caused by his unlawful arrest.

212.   When he was first released, Member A had to wear an ankle monitor. After about a week, ICE removed it and instead required Member A to submit photos of himself to the agency weekly through an application on his phone. Member A has to wait for a notification on his phone—which usually comes in the morning, though not at a fixed time—and then promptly follow up with the required picture. If he sends the picture too early, it does not validate; if he responds late, he risks penalization. This is extremely burdensome, because Member A works the overnight shift at his job. He gets home

around 5 a.m. and, because he has no option to submit early, must put off sleep until he gets the notification and can submit the required photograph.

213.   In addition to the weekly pictures, Member A must report biweekly to in-person check-ins with ICE on Thursday mornings. To ensure that he never misses an appointment and to try and get just a little rest beforehand, Member A takes only partial shifts on Wednesday night, even though it is difficult to sacrifice those missed earnings. On top of these office visits, the agency sends representatives once a month for home visits to his apartment. On these days, he is given an arrival window of sometime between 8 a.m. and 4 p.m., and thus cannot leave home in the interim. When these home visits follow an overnight shift, Member A is prevented from sleeping at all.

214.   For Member A, the ongoing combination of the photo procedure, office visits, and home visits are the most painful part of having been arrested. Because of these restrictions, he is still living under a form of detention.

215.   Member A still does not understand why he was arrested in the first place, and he is very afraid the same thing will happen again. He has altered his routines to try and reduce that risk, including by limiting the time he is not either at home or at work.

216.   But Member A cannot avoid leaving his apartment, which was all that exposed him to ICE's unlawful conduct in the first instance. He needs to leave home to go to work and help support his family. Nor can he change that he has dark skin, that English is not his primary language, or that he speaks with an accent. He still relies on an S.B. 251 ID, which ICE officers in Colorado have relied on to make unlawful warrantless arrests. He still lives in a building and a neighborhood full of immigrants, and he works in

a warehouse—just the kinds of communities and spaces ICE continues to target for its campaign of warrantless arrests.

217.    Member A is at substantial risk of again being subjected to an unlawful warrantless immigration arrest.

218.    Another member of EC3, Member B, was also arrested by ICE without a warrant and without probable cause that he posed any risk of flight during the raid on Cedar Run, where he lived.

219.    Member B is also a Mauritanian asylum seeker. He has dark skin, and his primary language is Pulaar. He speaks the little English he does know with an obvious accent.

220.    Member B was in his car on the morning of February 5, 2025, leaving the apartment complex to pick up coworkers who had worked the overnight shift. For Member B, this was routine; his coworkers frequently relied on him for rides to and from work.

221.    Two ICE agents approached Member B's car in the parking lot, so he stopped. At the time, Member B didn't feel worried or afraid about speaking with the officers. He had not done anything wrong or that might cause him to be in trouble with law enforcement, and he had a pending application for asylum.

222.    When Member B rolled down his window, the officers asked to see his identification. Member B showed them his driver's license, which is an S.B. 251 license. After seeing the license, one officer got on his phone and called someone. Once the officer hung up, and without asking Member B any other questions, the agents ordered Member B to exit his car, zip-tied his hands behind his back, and arrested him.

223.    The officers did not have a warrant for Member B's arrest and performed no flight risk analysis before arresting him.

224.    Because they did not ask, they did not learn that Member B lived at Cedar Run, or that he had lived there for nearly two years. They did not learn that he lived there with his sister's five-year-old son, or that he was the only breadwinner for their family. They did not learn that he had authorization to work lawfully in the United States or that he'd been at the same job for almost a year. They did not learn that he was on his way to pick up his coworkers. They did not learn that Member B was part of a close-knit community of individuals and families who, like him, had sought refuge in Denver from violence in Mauritania. They did not learn that Member B had a pending application for asylum. And they did not learn about his active involvement with EC3.

225.    Had the ICE officers done the required probable cause analyses, there would have been no basis to conclude Member B was likely to escape before a warrant could be obtained.

226.    Though he is and was deeply embedded in his community and posed no risk of flight, officers took Member B into custody without a warrant.

227.    When Member B realized he was being sent to detention, he was terrified. He did not think things like this happened in this country. He began to worry that he must have done something wrong. But he hadn't.

228.    Member B was placed on a large bus in the apartment complex parking lot, where he waited as ICE rounded up others to take into custody. After being moved to an ICE field office to be interviewed, he was transferred to the Aurora Detention Facility.

While he was being transported to the detention center, his wrists were in handcuffs and tied to a chain around his waist, and his feet were in metal shackles. Member B was arrested early in the morning on February 5th; it was around 1 a.m. the following day when he was finally processed into the detention center and able to move his arms and legs free of restraints.

229.    Member B remained imprisoned at the Aurora Detention Facility for about two months.

230.    With help from his community, Member B was able to hire a lawyer to represent him in bond proceedings. An immigration judge ordered that he should be released on bond in the amount of $5,000, which Member B was only able to pay through the additional fundraising efforts of his friends and family.

231.    While he was detained, his family could not pay the rent. They asked the landlord for more time, avoiding eviction by racking up late fees. When Member B was later released, he needed to get a second job to help pay off the rent his family owed.

232.    Though he was freed from detention and remains out of custody for now, Member B continues to suffer direct and current injuries, including ongoing deprivations of liberty, that are part of and caused by his unlawful arrest. When he was first released, Member B was required to wear an ankle monitor. Recently, ICE replaced the ankle monitor with a GPS-enabled smartwatch that allows the agency to track him at all times. Member B is also required to take a picture of himself every morning and submit it to ICE, in addition to reporting to an ICE office in person on a monthly basis.

233.    Member B lives with fear of being unlawfully re-arrested by ICE. That fear and stress have made it hard to eat, causing him to lose weight. He had quit smoking before he was detained; now, he has started again. His anxiety has also caused him to alter his routines. He used to spend time with friends on a weekly basis, but now he is scared about leaving his home unnecessarily for fear of another encounter with ICE.

234.    But Member B cannot avoid leaving his apartment or driving his car—the precise ordinary, innocent conduct that exposed him to ICE's unlawful conduct in the first instance. Nor can he alter the characteristics that made him a target, like having dark skin and speaking with an accent. Member B needs to drive to get to work, and he still relies on the S.B. 251 ID that prompted ICE officers to arrest him the first time. Member B continues to live and spend his time in and around immigrant communities, where ICE has sought to ramp up its mass arrests.

235.    Member B is at substantial risk of again being subjected to an unlawful warrantless immigration arrest.

236.    Another member of EC3, Member C, was also arrested by ICE without a warrant and without probable cause that he posed any risk of flight during the raid on Cedar Run, where he lived.

237.    Member C is a Senegalese asylum seeker. He has dark skin, and his primary language is Pulaar. He also speaks conversational French. He speaks the English he does know with an accent.

238.    Member C lived at Cedar Run with his four roommates, who are all part of his close-knit community of Pulaar-speaking Africans.

239.    On the early morning of February 5, 2025, Member C was getting ready for his first day at his new job. Member C heard a knock on his apartment door and opened it. Four armed officers were standing outside, in masks and tactical vests. The officers, in English, said, "give me your documents." Member C and his four roommates gave the officers their work authorization cards and other immigration documents. At the time, Member C did not feel afraid of speaking with officers, as he had no criminal record, had not done anything that might cause him to be in trouble with law enforcement, had his work authorization, and had a pending application for asylum.

240.    The officers looked at the documents, gave a "thumbs-up" gesture, and gave the documents back. One of the officers stuck a piece of green tape on Member C's door.

241.    It appeared to Member C as if the officers were knocking on every door, and marking the doors to apartments where occupants had answered with green tape and doors to apartments where occupants did not answer with red tape.

242.    Member C left his apartment and got in his car, intending to start his job as planned. Even though he could see many officers and government vehicles, he thought he would have no problem because he had not done anything wrong and the officers at his door had already seen his paperwork.

243.    As Member C was driving slowly toward the parking lot's main exit, an officer wearing tactical gear and a gun gestured at him to stop and roll down his window. Member C stopped and rolled down his window.

244.    The officer, who spoke fluent French, asked for his documents.

245.    Member C gave her his work authorization, his Notice to Appear for his next court date in his asylum case, and his driver's license, which is an S.B. 251 license.

246.    The officer typed Member C's alien identification number into her phone. After looking at her phone for a moment, the officer told Member C, "You have crossed the Mexican border, and we are told to arrest all people who have crossed through the Mexican border." She ordered him to get out of his car.

247.    Member C got out of his car. The officer asked Member C if he had anything that could hurt them, and Member C responded that he did not. He surrendered his bracelet, watch, headphones, and keys. Without asking any other questions, the officer zip-tied Member C's hands behind his back and arrested him.

248.    Because she did not ask, the officer did not learn that Member C lived at Cedar Run. She did not learn that he had lived at the same apartment for about 9 months. She did not learn that Member C was going to his first day at a new job, or about his deep ties to Denver's Pulaar-speaking African community. She did not learn that he attended his local mosque for Friday prayers without fail, frequently assisting religious leaders with setting up for and cleaning up after prayer. And she did not learn about his active involvement with EC3.

249.    Again, because she did not ask, the arresting officer did not know that Member C had never missed a court date in his asylum case. In fact, just before moving to Denver, Member C had travelled across the country, from a midwestern state to the East Coast, solely to appear in-person at a master calendar hearing scheduled there.

250.    Had the arresting officer done the required probable cause analysis, there would have been no basis to conclude Member C was likely to escape before a warrant could be obtained.

251.    Though he is and was deeply embedded in his community and posed no risk of flight, officers took Member C into custody without a warrant.

252.    When Member C realized he was being sent to detention, he was terrified and confused. He had not done anything wrong, so he could not understand why he had been arrested. Predominantly, he was terrified that he would be returned to Senegal, where he knew he would be killed in retaliation for his past political activity.

253.    Member C was placed on a large bus in the apartment complex parking lot, where he waited as ICE rounded up others to take into custody. He was moved to an ICE field office to be interviewed. An English-speaking officer conducted that interview using Google Translate. Afterwards, Member C was transferred to the Aurora Detention Facility. On the way there, his wrists were in handcuffs and tied to a chain around his waist, and his feet were in metal shackles.

254.    Member C was able to raise $1,500 in small contributions from his community, enough to pay an attorney to represent him at his bond hearing in the spring. The immigration court denied bond. The attorney he hired agreed to represent him pro bono in his asylum matter.

255.    Member C sought asylum because of his political and ethnic persecution in Senegal. Member C was granted asylum on November 17, 2025. The government has

appealed the immigration judge's order and decided to keep Member C imprisoned at the Aurora Detention Center pending a decision on the appeal.

256.    As of this filing, Member C remains imprisoned by ICE, a full year after ICE unlawfully arrested him and almost three months since he was granted asylum.

257.    Member C continues to suffer in detention because of his unlawful arrest. The deprivation of liberty itself weighs on him, and the poor conditions impact his health and mental state. Member C finds it very difficult to sleep, because he is assigned a narrow and hard bunk bed, in a cell where the lights are never switched off. Detention staff frequently shout at and speak abusively to the detainees, including Member C, and he feels dehumanized and afraid.

258.    Member C's most acute suffering in detention is caused by the fact that he cannot financially support or communicate with his family. Before he was detained, he supported his wife and his children. Now he cannot, and they are dependent on the goodwill of other family members. When free, he spoke to his wife and children every day. In detention, he sometimes goes months between speaking with them, due to the difficulties of communicating from inside the detention center. His youngest child is just over two years old. Member C has been in detention and unable to sustain contact with her for nearly half her life.

259.    Member D is a Mauritanian asylum seeker and active EC3 member who fears he will be arrested by ICE without a warrant. Member D has dark skin, frequently wears traditional African dress, and speaks primarily Pulaar. His English is heavily accented. Member D spends his life in and amongst migrant communities: in his

apartment building, where he lives with four other African immigrants and is surrounded by neighbors who are immigrants from different parts of the world; at his job serving refugees at a local nonprofit; in his prolific volunteer work with economic justice and African leadership organizations; and in his participation in EC3's food distribution program. Through his many connections to the African community in Denver, Member D has become aware of a substantial increase in ICE arrests, and warrantless arrests in particular, in the Denver Metro Area in the last year.

260.    Member D knows of multiple people who were detained without warrants in the early February 2025 raids of apartment complexes. These were people who had no criminal records and active asylum cases; people who were doing everything the government asked them to do. Some of those people have since been released, traumatized and displaced, and some have since been deported. He knows more than ten people who have been detained, without warrants or changed circumstances, at their scheduled check-ins with ICE. Member D knows that wherever he goes, he risks becoming the next person to be detained, even though he has no criminal record, a pending asylum case, and has complied with all check-in requirements, because he has seen such detentions happen repeatedly in his close-knit African community.

261.    Member D has had much experience with living in fear; he left his country after being persecuted for his advocacy on behalf of enslaved people, advocacy he began after escaping slavery himself. Now, he chooses to risk his own safety by continuing to leave his home to volunteer. However, whenever he does, he is anxious and remains extremely vigilant for immigration enforcement activity. When he drives, he is constantly

afraid that he will be stopped and forced to present his S.B. 251 license. He knows that, as a dark-skinned African man who does not speak fluent English, if he were to encounter ICE, he would be at risk of unlawful arrest. Even if Member D were to stop his perfectly legal and altruistic volunteer activity because of his fear, he would still live in an immigrant community and need to leave his apartment to work. He cannot avoid these activities. Without this Court's intervention, Member D, an immigrant, and a person who lives and works in the immigrant communities most impacted by ICE's mass arrest campaign, is at substantial risk of being unlawfully arrested.

262.    Member E is a Latina member of EC3, asylum seeker, and single mother of a nine-year-old daughter, who lives every day in fear that she will be arrested by ICE without warning. Member E has dark skin, her primary language is Spanish, and she speaks English with a discernible accent. She lives in a community in Denver with a high population of immigrants from different parts of the world. She also works at a nonprofit that helps immigrants, refugees, and non-native English speakers with adult education and other services to help them become self-sufficient in the community. Through her network of family and friends and through her job, Member E has become aware of a substantial increase in ICE warrantless arrests in the region since January of 2025. Many of those arrested had jobs, families, and were active in the community when they were suddenly taken. Member E lived in Aurora in early 2025 when ICE raided multiple apartment complexes. She became so fearful that she did not leave home for an entire week. Her daughter did not go to school, she did not go out to buy food, she wasn't sleeping; she spent every moment feeling like she was waiting to be arrested by ICE.

263.    For Member E, that pervasive and justified anxiety continues to this day. As late as mid-January 2026, fear among the local population caused her bosses at work to instruct everyone to keep classroom doors closed to protect the vulnerable people utilizing the organization's services. Recently, several of Member E's friends were arrested at a gas station while they were filling up their tank with gas. Two trucks blocked the friends' car in; agents asked for ID, and when the two showed the officers their S.B. 251 licenses, they were arrested. ICE agents did not have warrants for the two people they stopped at the time of their arrest. Neither had any criminal history or other trouble with the law, and both had pending applications for asylum. They both had jobs and families here. The arrests make Member E terrified of what would happen to her daughter if she were suddenly taken away. She lives her life in a state of fear and does what she can to minimize risk to her family. She doesn't go out to do fun things and tries to limit how much she is out of the house. Over the summer, she tried to take her daughter to the park sometimes, but now she is too scared. There is so much fear in the community that even her nine-year-old daughter and friends live every day in a state of hypervigilance.

264.    But Member E and her daughter cannot avoid the everyday activities Member E knows have exposed others in her community to ICE's unlawful tactics; they both need to leave home to go to work and school. Because they are among those ICE has targeted for its mass arrest campaign, Member E and her daughter, like so many of EC3's membership, are at substantial risk of being swept up in ICE's unlawful arrest practice without this Court's intervention.

265.    EC3 member small businesses have also suffered financially as a result of ICE's unlawful warrantless arrests. EC3's member businesses include grocery stores, liquor stores, convenience stores, restaurants, dealerships, and others that have high numbers of immigrant clientele. Many are struggling or even shutting down in the face of widespread community fear of ICE's unlawful warrantless arrests.

266.    For example, one EC3 small business member is a restaurant on East Colfax whose clientele is almost entirely Spanish-speaking noncitizens. Around April of 2025, the business experienced a significant decrease in sales, with a significant decrease in clients served per week. Many of the restaurant's clients are regulars. But following the immigration raids this past spring, those clients have felt scared leaving their homes to eat. The restaurant, which had increased profits every year over the last several years, is now down significantly in revenue compared to the previous year, and has had to cut expenses drastically—eliminating subscriptions, reducing inventory, and letting people go—and still take out loans just to stay afloat. The loss of business is a direct result of community fear following raids in the area and amidst reports of collateral arrests even of people who have no criminal history and with deep community ties, when they are simply going about their daily lives. ICE's unlawful practice has created such fear that the restaurant is struggling to keep its doors open. The owner fears that if ICE continues these kinds of tactics, the restaurant, which has been a staple of the community for years, will not survive.

vi.    **Additional Declarants**[37]

267.    In addition to Plaintiffs and members of EC3, many others in Colorado have suffered from ICE's same unlawful warrantless arrest practice over the course of the year.

a.    On the morning of February 5, 2025, J.P.P. was in his Aurora apartment with his wife and stepdaughters, aged 12 and 16. They heard a commotion in the hallways, followed by one loud bang and three loud explosions. After the explosions, several ICE officers raided the apartment, pointing long guns, and yelling in English. ICE arrested J.P.P. without probable cause that he was a flight risk, traumatizing J.P.P. and his family. At the time of his arrest, J.P.P. had a pending asylum application, had attended all his immigration court proceedings, and had recently provided all of his biometric data to ICE at a check-in appointment. J.P.P. describes the ICE raid and grenade bombs being thrown into his apartment as one of the most horrifying things he had ever experienced, and this included being tortured by police officers in Venezuela.

b.    On March 28, 2025, O.M.R. was arrested by ICE without any warrant and with no determination of likelihood of flight. O.M.R. was simply a passenger in a vehicle that was pulled over by ICE. At the time ICE arrested him, O.M.R. had an Application for Temporary Protected Status pending with the U.S. Citizenship and Immigration Services. O.M.R. has been detained at the Denver Contract Detention Center in Aurora, Colorado, since his warrantless arrest on March 28, 2025. Since his detention, O.M.R.'s partner and children have faced eviction, and O.M.R. suffers from skyrocketing

---

[37] The numerous declarations of plaintiffs and other witnesses are attached to the Motion for Preliminary Injunction and are incorporated herein by reference.

anxiety and a painful physical condition that is exacerbated by living at the Detention Center.

c.      J.C.C. is a 53-year-old man who has lived in the United States since 1996. He has four U.S.-citizen children and owns his own concrete and landscaping business. On the morning of July 18, 2025, J.C.C. went to the Home Depot near South Parker, Colorado, where he bought supplies and was driving to his job. Two immigration officers pulled him over and demanded legal documentation. Without asking any questions regarding flight risk or any warrant, one of the officers arrested J.C.C., who has been in the Aurora Detention Center ever since. He and his family have experienced immense stress and trauma and have been forced to use up nearly all of their financial savings.

d.      Eida Altman is the founder and Executive Director of Denver Metro Tenants' Union ("DMTU"). She describes the chaotic aftermath of ICE's February 5, 2025 raid at Cedar Run apartment complex in Aurora, Colorado, where more than two dozen people were arrested without warrants and with no flight risk determinations. In the months that followed the Cedar Run raid, ICE agents have returned to those apartments and others with a substantial Latine population where DMTU works, terrifying the community and disrupting basic life functions.

e.      Arturo Vazquez is an immigration attorney practicing in Denver, Colorado. During the past few months, he has consulted with at least 15 people who have been stopped, arrested, and then detained by ICE agents without a warrant in Aurora. These warrantless arrests follow a similar pattern: ICE agents in unmarked

vehicles pull over a Latine person and obtain a suspect's driver's license. The driver's license was obtained pursuant to the Colorado Road and Community Safety Act, SB13-251, which allows people who cannot provide proof of lawful presence in the United States to obtain a particular type of driver's license. Once the ICE agent sees the SB251 license, which contains markings denoting it as such, the ICE agent orders all occupants out of the car and arrests them, telling them that they are being detained for being in the country without authorization. The ICE agents do not have warrants for these arrests, and do not ask any questions that would establish any of them were flight risks.

   f. Mary Jo Highland and Daniel Herrera are also local immigration attorneys who practice in Denver, Colorado. During the past two months, Ms. Highland has consulted with at least five people who were pulled over by ICE agents in unmarked cars then arrested by ICE without a warrant and without any inquiry or determination of flight risk in Dillon, Silverthorne, and Fort Collins. Mr. Herrera has consulted with at least seven people who were arrested under similar circumstances without a warrant or any assessment of flight risk in Aurora, Dillon, and Silverthorne.

   g. Claire Noone is an immigration attorney practicing in Glenwood Springs, Colorado. During the past few months, she has spoken with approximately 15 people who have been stopped, arrested, and then detained by ICE in the Roaring Fork Valley—all without a warrant or any determination of flight risk. During some of the arrests, people were told "a warrant exists" but agents refused to produce it. Immigration agents engage in regular coordinated surges in activity, spending about a

week conducting enforcement in the Roaring Fork Valley before returning about two months later.

h.      Shaleen Morales is a senior staff attorney with the Rocky Mountain Immigrant Advocacy Network (RMIAN), a nonprofit legal services provider that represents detained noncitizens before the Aurora Immigration Court in Colorado. She describes numerous people locked up in the Aurora Detention Facility. For these people, ICE's pattern and practice has been the same: stop and arrest without a warrant or probable cause that the person is in the country illegally or poses a flight risk. A few examples of unlawful stops and warrantless arrests are as follows:

i.      ICE arrested Individual A.A. at his workplace in Aurora. Officers arrived without a warrant to arrest another individual. In searching for that individual, ICE also collaterally arrested A.A. when he left the workplace. He was not shown a warrant for his arrest and officers did not ask him for information related to flight risk or community ties. Since his arrest this summer, he is still detained.

ii.      Individual E.E. was working at a restaurant in Evergreen, Colorado, when confronted by ICE. When he responded to questions regarding his immigration status, ICE arrested E.E. without a warrant and without any discussion concerning flight risk or connections to the community. E.E. was detained this summer and is still litigating his removal case in front of the Immigration Court.

iii.      Individual F.F. was arriving to work in Denver, Colorado, when a law enforcement officer, who he thought was the local police, stopped him. ICE asked for F.F.'s driver's license and asked for his "papers." When F.F. confirmed he did not have lawful status, the ICE officer arrested him and two others in the vehicle. F.F. was not asked questions concerning flight risk or connections to community. F.F. is still detained and litigating his immigration case.

**vii.   ICE Continues to Effect Unlawful Warrantless Arrests in Colorado.**

268.   Since this lawsuit was filed, and even following the entry of this Court's preliminary injunction, ICE agents in Colorado have continued to effect unlawful warrantless immigration arrests based on the same policy, pattern, and practice as Defendants had prior to the filing of the lawsuit.

269.   In one common practice, ICE agents are arresting without warrant Coloradans who demonstrate they are not a flight risk by showing up to their scheduled immigration check-ins.

270.   For example, J.M.G. is a 22-year-old asylum seeker who lived in Denver with his mother and 12-year-old sister until ICE agents arrested him at a scheduled ICE check-in. J.M.G. and his family fled Panama after his father was persecuted and killed. They came to this country to find safety and opportunity and came to Denver because they have a U.S. citizen cousin here. They had been living in Denver for about two and a half years, during which time J.M.G. secured lawful work authorization, a lawful Colorado driver's license, and paid his taxes. He had no criminal history; not even a traffic ticket. He got a job at a local sushi restaurant to help his mother pay the rent. He enjoyed playing soccer. He is a gentle and immensely caring young man.

271.   J.M.G. was in ICE's alternatives-to-detention program. Initially, he had to take pictures of himself on an application on his phone to submit to ICE. On a few occasions, he sent his picture late, because he worked the night shift, arrived home at around 3 a.m., and struggled to stay awake for the notification that would prompt him to submit the required photograph. ICE moved him onto an ankle monitor instead and

required him to report to an ICE office for check-ins once a week. He never missed an appointment. At his last appointment, in late 2025, the front-desk directed him to a room he had never been in before, where handcuffs were hanging on the walls and ICE agents were waiting for him. He was terrified. The agents told him he was being arrested. He asked why they would arrest him if he was doing everything right. The ICE agents did not ask him a single question about his living situation, his job, his involvement in his community, or anything else. They removed his ankle monitor and handcuffed him, with his hands tied to a metal chain around his waist. They transferred him to an ICE field office, where he was able to call his mom. She was so scared that she could barely speak; she stuttered through their conversation. When J.M.G. saw an immigration judge, he was told he could be sent to Ecuador, Honduras, or Uganda unless he accepted voluntary departure back to his home country, Panama. J.M.G. was scared; he didn't know anyone in those places and had never been to any of them. So he agreed, under duress, to accept a voluntary departure to Panama. At the time of this filing, J.M.G. is still in custody at the Aurora Detention Center, waiting for ICE to remove him to the country he fled in fear for his life. His family lives in fear every day and will need to relocate to afford to live here without him.

272.    ICE agents did not have a warrant for J.M.G. at the time of his arrest, and he posed no risk of flight. His arrest was unlawful, and his detention and deportation are a tragic loss for the Denver community.

273.    Even after this Court's preliminary injunction order, ICE is also continuing to engage in unlawful warrantless arrests of people they profile as noncitizens in purported

traffic stops. In violation of this Court's order, ICE is effecting these warrantless arrests upon sight of a Colorado S.B. 251 license, without asking any questions about the individual's ties to the community or other factors relevant to their risk of flight.

274.   ICE arrested R.J.R.P., an asylum seeker from Venezuela, early in the morning on Christmas Eve of 2025, when he was driving to his job at a nonprofit that supports individuals with intellectual and developmental disabilities. It was a short drive; R.J.R.P. lived about a five-minute drive from his job. He had stopped at a red light and, when it turned green, saw sirens start to flash on a car that had pulled up behind him. R.J.R.P. was confused by why the police would be stopping him; he had not run the red light and had no criminal history in either the United States or in Venezuela and had never gotten so much as a traffic ticket. Because he had heard about others stopped by ICE in purported traffic stops, he suspected the car behind him might be immigration enforcement, too. R.J.R.P. immediately pulled to the side of the road and turned on his hazards. As the vehicle with sirens pulled up behind him, another drove past R.J.R.P.'s car to park in front of him. As all of this happened, R.J.R.P. felt like he was in a nightmare; he had never before gotten in any trouble with law enforcement, and it didn't seem real.

275.   An officer approached R.J.R.P.'s window. He had a small gun holstered at his side and was wearing black clothes and a khaki tactical vest that said "police." The officer asked to see R.J.R.P.'s identification. R.J.R.P. gave the officer his license, which is a Colorado S.B. 251 license. Upon seeing R.J.R.P.'s license, the officer immediately ordered him out of the car, ordered him to turn around, and placed him under arrest. The officer did not ask R.J.R.P. any questions before handcuffing him.

276.    When R.J.R.P. told the officers his handcuffs were too tight, the officers replaced them, this time cuffing his wrists in front of his body, tied to a metal chain around his waist, and shackled his feet. They took him to an ICE field office for processing. While he was there, one of the officers started making fun of him and told him he should deport himself and that he should never have come to this country. It was difficult to hear those words, because R.J.R.P. had fled Venezuela to find safety and had applied for political asylum in the United States.

277.    When ICE officers arrested R.J.R.P., they were looking for someone else. That person happened to live at the same address as R.J.R.P., but the house he lived in is a boarding house with rooms rented individually.

278.    ICE arrested R.J.R.P. without a warrant and even though he posed no risk of flight. The officers noted that he had two addresses associated with him that he had not reported to the agency, but they did not ask a single question about that before taking him into custody. Nor did they ask any questions to evaluate whether the totality of circumstances suggested he was likely to escape before a warrant could be obtained for his arrest. Had they asked, they would have learned that R.J.R.P. posed no risk of flight. He lived and worked within 5 minutes of where he was arrested. He had worked the same job for about a year, serving vulnerable members of his community. He lived near his sister and her young daughter.

279.    R.J.R.P. is a beloved member of his family and his community. His co-worker saw ICE agents arrest him, and by the time his bosses arrived to try to do something to help, he had already been taken. R.J.R.P. has spent his whole life trying to

do the right thing, and never expected to end up in a place like the Aurora Detention Facility. He remains imprisoned there, where he prays every day to have the strength and patience to overcome the trauma he continues to experience.

280.   There are many other examples of ICE continuing to violate this Court's order and the law.  On December 6, 2025, ICE stopped a car with three men in it who were on their way to work at local restaurants. An unmarked car flashed red and blue lights, and the driver, asylum-seeker A.G.R., pulled into the parking lot of a nearby strip mall. Unmarked officers approached both front doors and indicated for A.G.R. and his friend Y.V.N., also an asylum seeker, to roll down their windows. A.G.R. and Y.V.N. are both monolingual Spanish speakers. Their friend was sitting in the back seat. Both men rolled down their windows. An officer who only appeared to know a few words of Spanish said "identification," to A.G.R. A.G.R. gave him his driver's license, which is a Colorado S.B. 251 license. The officer then asked "resident or citizen?" A.G.R. said no and handed the officer his work authorization.

281.   At the same time, the officer on Y.V.N.'s side, who appeared to speak fluent Spanish, said "Do you have documents showing you are allowed to be here?" Y.V.N. gave the officer his work permit and his friend's work permit. The officer took the documents and said, "turn off your phones." He took the papers around the car and showed them to the English-speaking officer. Then both officers came back to the doors of the car, yelling for the men to "open the doors." Officers did not ask any questions of the three men before handcuffing them and placing them in their unmarked cars.

282.    Officers drove the three men around the strip mall, to the back alley. A worker at the strip mall came out and asked what they were doing. The officers told the worker to go back inside, and the worker did. Only then did the officers remove vests labelled "ICE" and badges from the passenger seat of one of their cars and put them on. Y.V.N. asked the Spanish-speaking officer why they had been arrested, and the officer responded that it was because officers had run the car's plate through their system and "[A.G.R.] is illegal."  As the officer drove them to the Centennial Office, he took his hand off the wheel and took a picture of each of the two shackled men in the back of the car.

283.    ICE did not have a warrant for any of the three men. A.G.R. and Y.V.N. continue to suffer in detention. Their friend has already been deported.

284.    A.G.R., who fled Nicaragua because he protested the regime currently in power, had lived in his apartment for about a year. He always worked, to economically support his severely disabled child, who he was forced to leave behind in Nicaragua. A.G.R. was serving a probation sentence on a nonviolent misdemeanor when he was detained; he was fully in compliance with probation, attending all his required check-ins. In detention, he is receiving inadequate medical treatment for H.I.V., and reports repeated flashbacks to the arrest. Y.V.N. was also serving a sentence on a nonviolent misdemeanor when he was detained, and also fully in compliance with probation. He had worked at a local restaurant for about a year. He, too, is a political dissident, from Colombia, and was in asylum proceedings when he was detained. Y.V.N. was paying an immigration lawyer in installments. After he was detained, the lawyer told him they could not continue representation unless he was released on bond. Bond was denied and, without counsel,

Y.V.N. has since been ordered deported to Ecuador or Honduras. He knows nobody in either country, and is terrified either will send him back to Colombia, where he will be killed.

285.    In late December, ICE stopped a car with three men in it who were on their way to a job fixing gravesites at a cemetery in Bennett. When making the drive, the three men typically stopped at a local McDonalds for food. The morning before their contact with ICE, a woman at the McDonalds approached them and asked them questions about where they were going. The next morning, they returned to the McDonalds, and the same woman was there. The woman pulled out her phone while watching them. They left the McDonalds, and a few minutes later, they were pulled over by an unmarked vehicle flashing its sirens. ICE agents approached them, armed and wearing tactical vests. One agent asked to see identification for the driver, which was an S.B. 251 license. Upon seeing the license, did not ask any further questions and instead ordered the driver out and immediately arrested him. Then, without asking the other two passengers any other questions related to immigration status or assessing any of the men's risk of flight, the officers demanded identification from the passengers, ordered them out of the car one by one, and immediately arrested and handcuffed them. After the arrest, one of the agents told them they had been seen at the McDonalds, but said nothing else about why they were arrested. The men were transferred to the Denver Field Office for processing.

286.    None of the men had any criminal history. At the time of the arrest, the driver had lived in Colorado for twenty-five years and had worked for the same landscaping company for eighteen years. He had been attending the same local church for five years.

However, the agents did not care to learn any of that. One of the two passengers had lived in Aurora for twenty-five years at the time of the arrest. He has two daughters who are U.S. Citizens, one of whom lives at home and relies on him financially while she attends college. He and the driver remain imprisoned at the Aurora Detention Facility, removed from their communities of more than two decades. The other passenger has already been deported.

287.    When they made these three arrests, the ICE agents had been in the area looking for someone else entirely. The agents stopped the car because one of the officers saw three Latino men speaking Spanish get into it. ICE did not have a warrant for any of the three men at the time of their arrest and made no effort to determine if the men were a flight risk.

288.    In raids near Vail on January 21, 2026, ICE agents stopped and arrested several people without warrants and without conducting the flight risk assessment required by statute (and this Court's order). For example, E.Y.G.M. and C.L.P. are brothers, and they both reside in an apartment complex near Vail. On January 21, 2026, E.Y.G.M. was driving himself, C.L.P. and their cousin to work. E.Y.G.M. has lived in the U.S. for over six years, maintains stable employment and housing in the Vail area, and has no criminal history. C.L.P. has lived in the U.S. for nearly three years, has stable employment and housing in the Vail area, and also has no criminal history, including traffic infractions. ICE agents were parked in the apartment complex's parking lot, and several unmarked cars began following E.Y.G.M. and his brother as they drove out of the lot. The ICE agents pulled them over, using the unmarked cars to block them in from the front and

behind. The ICE agents exited their cars, wearing plainclothes but armed and with tactical vests that said "POLICE." The ICE agents did not ask any questions – they just pulled open the door of E.Y.G.M.'s car and pulled the three men out to arrest them. The ICE agents immediately arrested and handcuffed the three men without asking them any questions at all, much less any questions that would establish a flight risk. ICE did not have a warrant for any of the three men at the time of their arrest.

289.    The people that ICE profiles for immigration enforcement in Colorado continue to face substantial risk of unlawful warrantless immigration arrest as documented by the many people that Defendants have continued to arrest without warrants and without the required flight risk analysis, and without specifying the articulable facts supporting probable cause of flight risk that this Court's preliminary injunction order required.

**B.    ICE's Policy and Practice of Effecting Warrantless Arrests Without Making Individualized Determinations of Legal Status and Flight Risk Violates Federal Law and ICE's Own Policies**

290.    In the Immigration and Nationality Act ("INA"), Congress placed restrictions on the ability of immigration agents to conduct warrantless arrests. Section 287(a)(2) of the INA, codified as 8 U.S.C. § 1357(a)(2), imposes two conditions that must be met before an agent makes a warrantless arrest: the agent must have "reason to believe" both that (1) the individual "is in the United States in violation of any [immigration] law or

regulation," and (2) the individual "is likely to escape before a warrant can be obtained for his arrest." *Id.*[38]

291.    Immigration officers have long understood that they do not have unfettered authority to make warrantless arrests in the interior of the United States. The requirement to determine legal status and flight risk before arresting an individual without a warrant predates the original 1952 INA and was enacted to constrain warrantless arrests after immigration officers in the 1940s were regularly effecting arrests without warrants in excess of their statutory authority.

292.    "Reason to believe," as used in the statute, equates to the constitutional requirement of probable cause, which requires an individualized inquiry particular to the person at issue.

293.    ICE agents may not make categorical assumptions about likelihood of escape based on a person's apparent race and assumed immigration status. If probable cause to believe somebody did not have lawful presence in the country were sufficient, there would be no reason to separately require probable cause that the individual also posed a flight risk. Instead, § 1357 requires agents to make an individualized determination of both status *and* flight risk before they can lawfully conduct a warrantless arrest.

---

[38] Federal regulations track the prohibition on conducting a warrantless immigration arrest without establishing likelihood of escape. *See* 8 C.F.R. § 287.8(c)(2)(ii). The federal regulations further require immigration officers to identify themselves and state the reason for the arrest. *Id.* (c)(2)(iii).

294.    In other words, ICE does not have authority to arrest Coloradans without a warrant unless they have probable cause to believe that the person is in this country in violation of immigration law *and* is a flight risk.

295.    ICE previously understood this and said as much in its own policies, even though they have been ignoring the requirements on a widespread basis since at least January 2025.

296.    In 2022, DHS adopted explicit requirements for agents in the field when they conduct any warrantless arrest under 8 U.S.C. § 1357(a)(2).

297.    In 2022, as part of a lawsuit settlement that applied to the Chicago ICE office area of responsibility, DHS issued a "Broadcast Statement of Policy" outlining requirements for evaluation and documentation of flight risk that constitute "the underlying laws and policies applicable to all arrests effected under 8 U.S.C. § 1357(a)(2)." *Castañon Nava v. DHS*, No. 1:18-cv-03757, Dkt. 15-1 (Broadcast Statement of Policy), at ¶ 27.[39]

298.    Under this "Broadcast Statement of Policy," immigration officers were required to consider the totality of the circumstances in evaluating an individual's "likelihood of escape," including an individual's community ties (such as their family, home, or employment) and an individual's prior attempts to escape or evade immigration authorities. *Id.* at ¶ 1.

---

[39] https://perma.cc/J8HP-VGL2.

299.    The policy further required that immigration officers who have made a warrantless arrest document the facts and circumstances surrounding the warrantless arrest "as soon as practicable." *Id.* at 2.

300.    The documentation was required to include, among other things, "the specific, particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained." *Id.*

301.    In May 2025, DHS and ICE claimed that the settlement had expired and then immediately rescinded the Broadcast Statement of Policy and encouraged its agents to engage in warrantless arrests.[40]

302.    And even before DHS rescinded its guidance, ICE was violating the requirements of § 1357(a)(2) and facing motions to enforce in the *Castañon-Nava* case. That Court recently found that, under the current Administration, ICE committed repeated, material violations of the settlement by engaging in warrantless arrests in violation of the requirements of § 1357(a)(2).  The Court extended the settlement agreement to February 2, 2026, and ordered ICE to reissue the Broadcast Statement of Policy to all ICE officers.[41]

### C.    ICE Will Continue Its Unlawful Practices Without Court Intervention

303.    Despite federal law, ICE agents have continued to conduct illegal arrests in Colorado—including during broad immigration sweeps, individual stops, and collateral

---

[40] Marisa Kabas,  ICE agents get green light to make unjustified warrantless arrests, The Handbasket (June 12, 2025), https://perma.cc/E794-KCHH.

[41] *Castañon Nava v. DHS*, No. 1:18-cv-03757, Memorandum Opinion and Order, Dkt. 214 (N.D. Ill., Oct. 7, 2025), Ex. O to Motion for Preliminary Injunction.

detentions—and are hailing the success of their escalated enforcement operations.[42] ICE's unlawful tactics will not stop absent court intervention.

304.    Tom Homan, a former ICE director who now serves as President Trump's "Border Czar," has repeatedly confirmed the Administration's intent to rely on indiscriminate warrantless arrests throughout the United States, including in jurisdictions like Colorado that they label as "sanctuary" states.

305.    Mr. Homan has "said [] from Day 1," that arresting any person in the U.S. without lawful presence is "not off the table" because the Administration and DHS are "opening th[e] aperture [of immigration enforcement policy] up."[43]

306.    Mr. Homan has publicly stated that DHS has a new "mandate" to make collateral arrests to increase their arrest numbers.[44] He explained that "unlike the last administration," President Trump's DHS is not "going to tell ICE officers not to arrest an illegal alien" if that noncitizen is found with others targeted by the agency.[45]

---

[42] X, ICE Denver (@ERODenver) Feb. 5, 2025 9:40 AM, https://perma.cc/9UXU-7W7J (describing "very real public safety threat" solved by raid).

[43] Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, The New York Times (June 13, 2025), https://perma.cc/E3RE-RK7S.

[44] Hamed Aleaziz, Under Pressure From the White House, ICE Seeks New Ways to Ramp Up Arrests, The New York Times (June 13, 2025), https://perma.cc/E3RE-RK7S.

[45] Adam Shaw, Trump border czar Tom Homan reveals ICE teams are already arresting 'public safety threats', Fox News (Jan. 21, 2025), https://perma.cc/VW65-PPZ9.

307.   Mr. Homan later said that if ICE encounters noncitizens without criminal records while looking for "criminals," "they're [being arrested] too."[46] At the time Mr. Homan made this statement, approximately half of the arrests ICE had made to-date were people with no criminal record. *Id.*

308.   For this reason, Mr. Homan asserts that under President Trump's watch, Americans are "going to see a higher number of collateral arrests" in so-called sanctuary jurisdictions (like Colorado).[47]

309.   Mr. Homan has stated that sanctuary jurisdictions should expect to see "[m]ore agents in the neighborhood[.]" *Id.* And according to Homan, "If ICE is there... and other aliens are there, we're going to arrest them."[48]

310.   The head of ICE, Defendant Todd Lyons, agreed publicly that non-criminals in the United States will be taken into custody collaterally during arrest operations.[49] He declared that if ICE agents encounter "anyone who is here illegally, irrespective of whether

---

[46] Gabe Gutierrez & Nicole Acevedo, ICE makes close to 1,200 arrests in one day, NBC News (Jan. 27, 2025), https://perma.cc/9EJ8-CU3N.

[47] The Source with Kaitlan Collins: Trump DOJ Fires Officials Who Prosecuted Him; Homan on Mass Deportation Effort: "There's No Safe Haven"; Trump Calls DeepSeek A.I. "Positive Development" But Also a "Wake-Up Call" For U.S. Tech Industry (CNN broadcast Jan. 27, 2025), https://perma.cc/4KDM-64SC.

[48] Ted Hesson, Trump's ICE arrests non-criminals despite crime-focused message (June 13, 2025), https://perma.cc/8JV2-F6NT.

[49] Camilo Montoya-Galvez, ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers, CBS News (July 21, 2025), https://perma.cc/RT3S-CJP4.

or not they have a criminal record, that person will be taken into custody" as a collateral arrest.[50]

311.    And when ICE swept through Denver and Aurora with an army of federal agents, the agency's local leadership echoed Mr. Homan and Lyon's positions.[51]

312.    While in Colorado on the morning of multiple apartment raids, then-ICE Acting Director Caleb Vitello confirmed in a video shared by ICE's Denver Field Office ICE and others "have to come to the communities" in "sanctuary" jurisdictions, like the Denver metro area. *Id.*

313.    Director Vitello reaffirmed that these ICE enforcement operations are "just going to continue . . ." *Id.*

314.    Even after federal courts, including this Court, entered preliminary injunctions to stop ICE's warrantless arrests, the official Department of Homeland Security account on X (formerly Twitter) posted that ICE officers make arrests based on "reasonable suspicion," not the required probable cause standard.[52]

---

[50] Transcript: Acting ICE director Todd Lyons on "Face the Nation with Margaret Brennan," CBS News (July 20, 2025), https://perma.cc/VA6H-APB8; Camilo Montoya-Galvez, ICE head says agents will arrest anyone found in the U.S. illegally, crack down on employers of unauthorized workers, CBS News (July 21, 2025), https://perma.cc/RT3S-CJP4.

[51] X, ICE Denver (@ERODenver), Feb 5, 2025 9:40AM, https://perma.cc/9UXU-7W7J.

[52] X, Homeland Security (@DHSgov), Jan. 16, 2026 (post deleted; screenshot on file).

315.    Colorado's communities now know ICE's tactics all too well and live in constant fear as a result. ICE's arrests across the state have seen a nearly "300% increase from the same period in 2024."[53]

316.    There is no sign ICE will slow down. To the contrary, immigration officers' "footprint in Colorado could soon grow."[54] President Trump's budget in the "One Big Beautiful Bill," signed into law in July 2025, designated $170 billion to immigration enforcement, including more than $45 billion for additional ICE detention space.

317.    In Colorado, private prison operators are proposing to convert two dormant correctional facilities into ICE detention facilities.[55]

318.    ICE officials told Colorado's Congressional delegation that the agency plans to reopen the shuttered Hudson Correctional Facility as an immigration detention center, which could add space for 1,250 people.[56]

319.    ICE recently expanded the existing Aurora Detention Facility's capacity to over 1,530 people.

---

[53] Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS.

[54] Russell Contreras, et al., ICE operations in Colorado raise legal questions, AXIOS Denver (July 7, 2025), https://perma.cc/P9WH-BJY9.

[55] Dan Boyce, Two Colorado facilities eyed as possible ICE detention centers, Colorado Public Radio, KRCC (June 27, 2025), https://perma.cc/94DK-LS3M.

[56] Stephen Swofford, Trump administration plan to reopen Colorado prison north of Denver for ICE detainees, The Denver Gazette (Aug. 13, 2025) https://perma.cc/2WPZ-JKLU; Seth Klamann, ICE tells Colorado lawmakers it plans to open new detention facility near metro Denver, The Denver Post (Aug. 12, 2025), https://perma.cc/C48R-ADK9.

320.    ICE is also hiring new recruits for increases in enforcement operations. President Trump's budget allocated $8 billion to ICE to hire 10,000 new officers through 2029.[57] ICE is offering bonuses of up to $50,000 for retired agents to return to work.[58]



[59]

ICE has targeted its recruiting efforts through television ads on Denver television stations, seeking to lure local law enforcement officers frustrated with so-called "sanctuary" jurisdictions' alleged orders to "stand down" to work for ICE with promises of large bonuses and student loan forgiveness.[60]

---

[57] Fed Agent, DHS Readies for Funding Surge After "Big Beautiful Bill" Passage, (July 10, 2025), https://perma.cc/ALT6-AKYR.

[58] Michelle Sandiford, ICE offers up to $50,000 signing bonus for retired employees to return to the job, Federal News Network (July 21, 2025), https://perma.cc/RA6T-38Q8.

[59] LinkedIn, U.S. Immigration and Customs Enforcement, https://perma.cc/E86X-9CJ7.

[60] Anna Alejo, ICE recruitment ad made to lure Denver police officers faces pushback from police and city leaders, CBS News (Sept. 26, 2025), https://perma.cc/DAY8-6Q3A.

321.    ICE has continued its raids throughout Colorado, broadening its reach across the state and into mountain towns.[61]

322.    Mr. Ramirez, Ms. Dias, J.S.T., G.R.R., and the EC3 members' experiences are not unique. They reflect an unlawful practice that immigration officers rely on in their enforcement operations across the country and throughout Colorado: make warrantless arrests without the requisite probable cause determinations regarding legal status and flight risk.

323.    For each Plaintiff and the EC3 members, immigration agents never assessed anyone's flight risk, nor did they obtain a warrant before making an arrest.

324.    These agents instead indiscriminately arrested people, including people with pending immigration applications, no criminal history, established residences in the community, steady employment, family in the United States, and other community ties contradicting any purported flight risk. And agents targeted high-density locations like apartment complexes and nightclubs where many Latine people and others ICE profiled as noncitizens lived or gathered but conducted no individualized analysis about their status or likelihood of escape.

325.    Absent judicial intervention, Defendants will continue their unlawful practices in Colorado, and Plaintiffs and members of the class are likely to suffer repeat unlawful arrests.

---

[61] Ryan Fish, ICE activity reported in Colorado mountain towns, sparking community concerns, ABC News (Sept. 25, 2025), https://perma.cc/F2D8-NDHC.

**D.    ICE Has Continued Its Unlawful Practices in Defiance of Federal Law and this Court's Preliminary Injunction**

326.    Defendants' conduct since entry of the November 25, 2025, preliminary injunction only underscores the grave need for the oversight and accountability this lawsuit seeks.

327.    In addition to enjoining further violations of the individualized-assessment-of-flight-risk requirements enshrined in 8 U.S.C. § 1357 and 8 U.S.C. § 287.8(C)(2)(ii), the preliminary injunction required that "as soon as practicable after a warrantless arrest, the arresting officer shall document in writing the facts and circumstances surrounding that arrest in the narrative section of the detainee's Form I-213," ECF No. 49 at 62. The documentation requirements in the order are substantially the same as those in ICE's prior Broadcast Statements of Policy, the existence of which Defendants argued obviated the need for injunctive relief in this case.

328.    Yet not only have Defendants in Colorado continued to carry out the agency's policy and practice of making warrantless arrests without the probable cause required by law; they have also flouted the documentation requirements in this Court's order and belied Defendants' representations that such process is or was the agency's norm.

329.    In the period from November 25, 2025 – December 31, 2025, alone, Defendants' counsel identified at least fifty-eight I-213s that they represent "do not contain facts indicating a warrant may have been issued."

330.     By agreement of the parties, Defendants' counsel produced a random third of such I-213s where ICE had made an arrest without a warrant to Plaintiffs' counsel, documenting twenty arrests.

331.     <u>Not a single I-213</u> complied with the requirements of this Court's preliminary injunction.

332.     In at least 90% of the I-213s that Defendants claim reflect warrantless arrests that they have provided to Plaintiffs pursuant to this Court's order, the ICE agents did not document conducting any flight risk analysis whatsoever before arresting the individual named in the I-213. And none of the I-213s come close to compliance with this Court's clear directives about what information must be documented in the I-213.

333.     The vast majority demonstrated ICE agents' continuing policy and practice of disregarding and violating 8 U.S.C. § 1357(a)(2). The circumstances surrounding the arrests documented in these I-213s mirror the experience of additional class members around the state who have been subjected to unlawful warrantless arrests since entry of the preliminary injunction. Class members are being arrested during purported traffic stops, simply walking in neighborhoods or near workplaces where Coloradans ICE profiles as noncitizens live and make their living, and even while reporting to scheduled check-ins with ICE. The people swept up in these warrantless arrests include community members with no criminal records whatsoever; they include asylum seekers; they include parents and families' primary breadwinners.

334.     Notwithstanding this Court's order, Defendants have persisted in pursuing the Administration's unlawful warrantless arrest policy and practice in order to follow the

President's directive to "do all in their power to achieve the very important goal of delivering the single largest Mass Deportation Program in History."[62]

**E.    ICE's Illegal Practices Have Terrorized the Community and Sowed Distrust in Police**

335.    Because of ICE's policy and practice of conducting unlawful warrantless arrests, Plaintiffs, EC3 resident members, and community members are terrified to leave their homes, afraid that going out in public could result in another ICE encounter.

336.    Plaintiff G.R.R. feels nervous leaving his home and fears going to public places. He is afraid of law enforcement officers. Similarly, Plaintiff J.S.T. is afraid of going out in public. Ms. Dias also feels anxious when leaving home. Community members O.M.R. and J.P.P. experienced severe anxiety after their encounters with and warrantless arrests by ICE. EC3 members like Members A and B have altered their routines to limit the risk of a repeat of what happened to them in February 2025, while other EC3 members, like Members D and E, have done the same to try and avoid being subjected to ICE's unlawful practice in the future.

337.    Despite their fear, the individual Plaintiffs and resident members of EC3 cannot entirely avoid the everyday conduct that led to their original arrests, like leaving their apartment building or driving to work.

338.    Plaintiffs, EC3 members, and community members also experienced physical injuries, pain, and hunger due to ICE's unlawful arrests and the ensuing events. G.R.R.'s hand was cut on the ground when an immigration agent violently pushed him to

---

[62] Donald J. Trump (@realDonaldTrump), Truth Social (June 15, 2025), https://perma.cc/K2TD-TQPD.

the ground while arresting him. G.R.R. and Ms. Dias suffered the pain of tight shackles on their wrists and ankles. All Plaintiffs received only poor-quality, sometimes spoiled food in inadequate portions while detained. Community member O.M.R. experienced pain from the sleeping conditions in the Aurora Detention Center, which J.P.P. described as "unbearable." All Plaintiffs, and all those similarly situated, experienced emotional and dignitary harms because ICE targeted them for enforcement and arrest in violation of federal law.

339.    Because ICE made these arrests without a warrant, Plaintiffs, EC3 members, and community members live with the fear that they could be arrested and detained again at any time regardless of whether they are a flight risk. Each of the Plaintiffs and EC3 members lives, works, travels, and socializes in communities where ICE agents have been active, and where ICE has made repeat visits and unlawful warrantless arrests. ICE is making warrantless arrests of people in the Front Range, the I-70 mountain corridor, and the Western Slope based only on the type of their driver's license and without proper statutory inquiry. Given the Administration's stated objectives and its authorization of immigration officers' systematic violation of § 1357(a)(2), the Plaintiffs, EC3 members, and other class members face high risk of additional unlawful arrests.

340.    ICE's actions have also stoked intense anxiety and fear of future harm among Plaintiffs, EC3 membership, community members, and their families.

341.    Community members with young children are terrified of being swept up in a raid and separated from their children. Plaintiff G.R.R.'s young son is acting out at

school, and G.R.R. constantly worries about being separated from his American-born son. J.S.T.'s young niece, a U.S. citizen, fears being separated from her beloved uncle, who has helped raise her.

342.    And Plaintiffs and EC3 members fear financial and economic repercussions from ICE's actions. While detained, Plaintiffs were unable to work. J.S.T. lost his home; Mr. Ramirez and G.R.R. were unable to provide financially for their children and families. Ms. Dias lost one of her jobs and was forced to move back home – she has had to reduce her courseload at college due to financial strain, transportation difficulties, and ongoing stress and trauma. Member B's family could not pay the rent while he was in detention, and he had to get a second job once he was released to make up for missed payments and pay late fees to avoid their eviction. And EC3 small member businesses that have struggled since ICE implemented its unlawful policy in the region reasonably fear that persistent mass arrests will cause further financial losses and even threaten their ability to keep the doors open.

343.    Elected leaders in Colorado, both Democrats and Republicans, have sounded the alarm about the widespread harmful effects of immigration enforcement by ICE and other federal agency immigration practices.

344.    Community leaders in Colorado are also raising concerns about ICE's tactics. "'The impact has been profound on families. The community has been put into a really precarious position,' said [Raquel] Lane-Arellano, from the Colorado Immigrant

Rights Coalition."[63] Residents in mountain towns in Colorado have high rates of suicide and substance abuse disorders, partially due to fluctuations in income, which can cause stress for the local workforce. Latine communities in these towns, who make up a large portion of the population, are particularly vulnerable. Yirka Díaz Platt, a bilingual social worker who resides in Silverthorne, Colorado, said "a pervasive fear of deportation has caused many Latino workers and residents to retreat into the shadows. People are cancelling in-person meetings and avoid applying for government services that require submitting personal data, according to local health workers and advocates."[64]

345.    ICE's unlawful arrests have sent shockwaves of terror across the state of Colorado, including in mountain towns, which traditionally have many migrant workers. Voces Unidas de las Montañas, a nonprofit focused on advocacy and policy on behalf of immigrants, stated they have received over 100 phone calls or messages via their social media platforms or to their direct hotline from people who are on heightened alert because of their concern over increased immigration presence within Colorado.[65] "They're questioning whether they themselves are in danger and whether their kids should be going to school or what action they should be taking. Those are the conversations we're

---

[63] Seth Klamann, Immigration arrests in Colorado have surged under the Trump administration. Now we know how much, The Denver Post (July 9, 2025), https://perma.cc/7BCV-GCRS.

[64] Natalie Skowlund, Deportation fears add to mental health problems confronting Colorado resort town workers, Colorado Newsline (Apr. 6, 2025), https://perma.cc/BFY3-L7PW.

[65] Spencer Wilson, Fear grips Colorado mountain towns amid rumors of increased patrols by Immigration and Customs Enforcement, CBS News (June 5, 2025), https://perma.cc/84JZ-UG4T.

having or we were having that week at an unprecedented level," stated the CEO and President of Voces Unidas de las Montañas, Alex Sanchez. *Id.*

346.    In late January 2026, following a wave of warrantless ICE arrests during purported traffic stops in Colorado's mountain towns, ICE agents left ace of spades cards behind in the vehicles of the people they detained. These cards, historically known as "death cards," have been used by white supremacist groups as racist symbols and threats of physical harm.[66]

347.    Across the country including Colorado, immigrants are afraid and retreating into the shadows.[67]

## CLASS ACTION ALLEGATIONS

348.    Individual Plaintiffs seek to represent a class of individuals who have been or will be subjected to the unlawful practices this lawsuit challenges: arrests regardless of probable cause of flight risk.

349.    Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R. seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

> All persons since January 20, 2025, who have been arrested or will be arrested in this District by ICE without a warrant and without a pre-arrest, individualized assessment of probable cause that the person poses a flight risk.

---

[66] Jennifer Brown, Racist ace of spades cards left behind following ICE arrests in Eagle County, Colorado nonprofit says, The Colorado Sun (Jan. 23, 2026), https://perma.cc/3E3H-9453.

[67] Catherine E. Scholchet, et al., 'It's like one day everyone left': How immigration crackdowns are reshaping America, CNN (Aug. 26, 2025), https://perma.cc/LP5F-HYKR.

350.   The proposed class satisfies the requirements of Federal Rule of Civil Procedure 23(a)(1) because it is sufficiently numerous as to make joinder impracticable. In the first six months of this year, ICE data shows that its agents arrested almost 2,000 people in Colorado.[68] At large-scale raids alone, upwards of 150 people have been swept up—most pursuant to collateral, warrantless arrests. ICE has publicly stated that it intends to continue making warrantless arrests regardless of an individual's circumstances. And as a result of this Court's preliminary injunction ordering Defendants to produce a random sampling of I-213s documenting warrantless arrests to Plaintiffs' counsel, Plaintiffs have learned of a significant number of class members subjected to unlawful warrantless arrests in the period from November 25, 2025, to December 31, 2025.

351.   The proposed class meets the commonality requirements of Federal Rule of Civil Procedure 23(a)(2) because all members of the class are subject to ICE's policies and practices regarding warrantless arrests, as well as the absence of policies relating to how an agent should make a probable cause determination of unlawful status and flight risk. There are questions of law and fact common to the class, including:

  a. Whether ICE has a policy, pattern, or practice of conducting warrantless arrests without proper probable cause including whether an individual is likely to escape before a warrant can be obtained for the arrest;

---

[68] Sandra Fish, et al., Most people arrested by ICE in Colorado and Wyoming this year did not have a criminal history, The Colorado Sun (July 18, 2025), https://perma.cc/Z2Z7-423D (citing Deportation Data Project's compilation of ICE data on immigration arrests in Colorado).

> b.    Whether ICE's policy, pattern, or practice of conducting warrantless arrests without proper probable cause including whether that individual is likely to escape before a warrant can be obtained for the arrest violates 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

352.    The proposed class meets the typicality requirement of Federal Rule of Civil Procedure 23(a)(3). Individual Plaintiffs' legal claims are typical to all members of the proposed class. Individual Plaintiffs have no interests separate from those of the class they seek to represent and seek no relief other than the relief sought on behalf of the class. Defendants have acted and intend to act in a manner adverse to the rights of the members of the class, making final injunctive and declaratory relief appropriate regarding the class as a whole.

353.    The proposed class meets the adequacy requirements of Federal Rule of Civil Procedure 23(a)(4). Each putative class representative has committed to fairly and adequately representing the interests of the class.

354.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation. Plaintiffs' counsel have the requisite level of expertise and resources to adequately prosecute this case on behalf of Plaintiffs and the proposed class. Plaintiffs' counsel will fairly and adequately represent the interests of the class.

355.    Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole. The relief requested – constraining Defendants' practice of effecting

warrantless arrests without making the probable cause determinations required by law – will provide relief to the class as a whole.

356.   Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R., Plaintiff EC3, its members, and the class have been directly injured by Defendants' statutory and regulatory violations and are at risk of future harm from continuation of their acts and omissions in failing to adhere to their obligations under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii).

357.   In *United Farm Workers v. Noem*, the Eastern District of California issued its April 29, 2025 Order Granting Plaintiffs' Motion for Provisional Class Certification and Granting Plaintiffs' Motion for a Preliminary Injunction which issued a similar injunction for the class proposed in this case.  785 F.Supp.3d 672, 742-3 (E.D. Cal. 2025).  The Court noted that the government "shows a pattern and practice of warrantless arrests without [immigration] agents performing individualized flight risk assessments to have probable cause for the arrest as required." *Id.* at 735.

358.   The U.S. District Court for the District of Columbia similarly issued a preliminary injunction "against defendants' unlawful policy and practice of making warrantless civil immigration arrests without probable cause that the individual is likely to escape before a warrant can be obtained." *Escobar Molina v. U.S. Dep't of Homeland Sec.*, --- F. Supp. 3d ----, 2025 WL 3465518, at *36 (D.D.C. Dec. 2, 2025) and provisionally certified a regional class of those who have been or will be subjected to such a warrantless arrest in the District.

359.   Since the Court entered its preliminary injunction in this case, Defendants have continued to engage in their policy and practice of unlawful warrantless arrests throughout Colorado in violation of both federal law and this Court's order.

360.   On January 28, 2026, the Chief Judge of United States District Court for the District of Minnesota issued an Order identifying 96 court orders that ICE has violated in 74 cases since January 1, 2026. *Juan T.R. v. Noem*, No. 26-CV-0107, 2026 WL 232015 at *1 (D. Minn. Jan. 28, 2026). The court observed that "ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence." The court cautioned that the long list of violations, which "almost certainly substantially understated" the "extent of ICE's noncompliance," "should give pause to anyone—no matter his or her political beliefs—who cares about the rule of law." *Id.*

361.   Permanent class-wide injunctive relief is necessary to protect Coloradans from Defendants' disregard for the limits of their authority.

### FIRST CLAIM FOR RELIEF
Violation of 8 U.S.C. § 1357(a)(2) and 5 U.S.C. §§ 704, 706:

1.   Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth here.

2.   Defendants arrested Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R., and members of Plaintiff EC3 without warrants. Before each arrest, Defendants failed to make the required individualized findings including flight risk.

3.   Defendants made these arrests without a warrant and without "reason to believe" that Plaintiffs were "in the U.S. in violation of immigration laws" and "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 U.S.C.

§ 1357(a)(2). These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latine descent and others they profile as noncitizens live, work, drive, and gather.

4.      Defendants do not have a policy or practice that adequately ensures compliance with the statutory limits of ICE's warrantless arrest authority. On the contrary, per the Administration's public statements, including Acting ICE Director Todd Lyons' January 28, 2026 Memorandum, Defendants now not only permit, but encourage their agents to make warrantless arrests in violation of law.

5.      Based on ICE's public statements that it will continue making "unintended arrests" in jurisdictions like Colorado, along with statements from "Border Czar" Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, DHS's continued affirmations that the agency arrests based on reasonable suspicion and not the probable cause required by law, and the ongoing and widespread evidence of continuing violations of this Court's preliminary injunction, Defendants will continue to arrest individuals without regard to whether there is reason to believe both that the individuals are in the country illegally and are likely to escape before an arrest warrant can be obtained, in violation of 8 U.S.C. § 1357(a)(2).

6.      Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination and flight risk analysis is "final agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations" under 8 U.S.C. § 1357(a)(2). 5 U.S.C. §§ 704, 706(2)(A), (C).

7.      Defendants' policy, pattern, and/or practice of making warrantless arrest without the required individualized status determination and flight risk analysis is ultra vires. It is an exercise of power they do not possess. Defendants' powers are limited by statute, and their challenged practice goes beyond those limitations.

8.      This Court has inherent equitably authority to enjoin violations of federal law by federal officers.

9.      Individual Plaintiffs, Plaintiff EC3, and Class members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

**SECOND CLAIM FOR RELIEF**

Violation of 8 C.F.R. § 287.8(c)(2)(ii), 5 U.S.C. §§ 704, 706, and the *Accardi* doctrine:

10.     Plaintiffs repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth here.

11.     Defendants arrested Plaintiffs Mr. Ramirez, Ms. Dias, J.S.T., and G.R.R., and members of EC3 without warrants. Before each arrest, Defendants failed to make the required individualized findings including flight risk.

12.     Defendants made these arrests without a warrant and without "reason to believe" that Plaintiffs were "likely to escape before a warrant can be obtained for [their] arrest" in violation of 8 C.F.R. § 287.8(c)(2)(ii). These arrests were part of Defendants' policy, pattern, and/or practice of using warrantless arrests during sweeps of areas where people of Latine descent and others that they profile as noncitizens live, work, drive, and gather.

13.    Defendants do not have a policy or practice for ensuring compliance with the statutory limits of ICE's warrantless arrest authority. On the contrary, per the Administration's public statements, including Acting ICE Director Todd Lyons' January 28, 2026 Memorandum, Defendants permit their agents to make warrantless arrests in violation of law.

14.    Based on ICE's public statements that it will continue making "unintended arrests" in jurisdictions like Colorado, along with statements from "Border Czar" Tom Homan making clear that mass warrantless arrest operations are consistent with agency-wide policy, DHS's continued affirmations that the agency arrests based on reasonable suspicion and not the probable cause required by law, and the ongoing and widespread evidence of continuing violations of this Court's preliminary injunction, Defendants will continue to arrest individuals without regard to whether there is a reason to believe both that the individuals are in the country unlawfully and likely to escape before an arrest warrant can be obtained, in violation of 8 C.F.R. § 287.8(c)(2)(ii).

15.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the required individualized status determination and flight risk analysis is "final agency action" that is "arbitrary, capricious, . . . or otherwise not in accordance with law," and "in excess of statutory jurisdiction, authority, or limitations" under 8 C.F.R. § 287.8(c)(2)(ii). 5 U.S.C. §§ 704, 706(2)(A), (C).

16.    Defendants' policy, pattern, and/or practice of making warrantless arrests without the probable cause required by law violates the elementary principle of

administrative law that agencies are required to follow their own regulations. *States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

17.    Defendants' policy, pattern, and/or practice of making warrantless arrest without the required individualized status determination and flight risk analysis is ultra vires. It is an exercise of power they do not possess. Defendants' powers are limited by statute, and their challenged practice goes beyond those limitations.

18.    This Court has inherent equitably authority to enjoin violations of federal law by federal officers.

19.    Individual Plaintiffs, Plaintiff EC3, and Class Members have no plain, adequate, or complete remedy at law to address the wrongs described herein. The injunctive and declaratory relief sought by Plaintiffs is necessary to prevent continued and future irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(2);

3.    Appoint the undersigned counsel as class counsel pursuant to Federal Rule of Civil Procedure 23(g);

4.    Declare under 28 U.S.C. § 2201(a) that Defendants' actions violate the rights of Plaintiffs and the Class under 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 287.8(c)(2)(ii), and 5 U.S.C. § 706;

5.   Issue a preliminary and permanent injunction enjoining further violations of Plaintiffs' and the Class's rights under 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(ii);

6.   Vacate and set aside Defendants' policy and practice of making warrantless immigration arrests without an individualized determination of *both* removability and flight risk, in violation of 8 U.S.C. § 1357(a)(2) and 8 C.F.R. § 287.8(c)(2)(i), (ii);

7.   Order Defendants, their subordinates, agents, employees, and all others acting in concert with them to expunge all records collected and maintained about Plaintiffs and class members from their unlawful arrests, including any derivative information;

8.   Award reasonable attorneys' fees, costs, and other disbursements permitted under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable statute; and

9.   Order any and all such other relief as the Court deems just, equitable, and proper.

DATED: February 3, 2026

*/s/ Timothy R. Macdonald*
Timothy R. Macdonald, Bar No. 29180
Annie Kurtz, Bar No. 51525
Emma McLean Riggs, Bar No. 51370
Sara Neel, Bar No. 36904
Scott Medlock, Bar No. 57210
American Civil Liberties Union of Colorado
303 E. 17th Avenue, Suite 350
Denver, CO 80203
Telephone: (303) 777-5482
tmacdonald@aclu-co.org
akurtz@aclu-co.org
emcleanriggs@aclu-co.org
sneel@aclu-co.org
smedlock@aclu-co.org

Kenzo Kawanabe, Bar No. 28697
Sean Grimsley, Bar No. 36422
Bianca Miyata, Bar No. 42012
Olson Grimsley Kawanabe Hinchcliff & Murray LLC
700 17th Street, Suite 1600
Denver, CO 80202
Telephone: (303) 535-9151
kkawanabe@olsongrimsley.com
sgrimsley@olsongrimsley.com
bmiyata@olsongrimsley.com

Hans Meyer, Bar No. 37812
Meyer Law Office
1547 Gaylord Street
Denver, CO 80206
Telephone: (303) 831-0817
hans@themeyerlawoffice.com

*Attorneys for Plaintiffs*