# Exhibit I

**Declaration of Keegan Hayes**

1. I am a private investigator in Colorado. I own the investigation firm Uncover Private Investigations, which I founded in September 2020.

2. I have worked as a private investigator for over five years.

3. My firm provides investigation services for criminal defense and civil cases. We conduct financial and missing person investigations, as well as offer various kinds of background checks, surveillance cases, corporate investigations, and threat intelligence.

4. I am certified with the Colorado Office of the Alternate Defense Counsel ("OADC") as a criminal investigator. OADC assigns participating private criminal defense lawyers to cases where the Colorado Office of the State Public Defender has a conflict of interest. Those criminal defense lawyers receive investigation services from firms like mine. I have also attended continuing education courses regarding immigration law as part of my training to be a criminal defense investigator.

5. I have previously been a member of the Professional Private Investigators Association of Colorado, a non-profit organization that provides training and continuing education to investigators, and have attended their trainings.

6. I am currently volunteering as an investigator for the American Civil Liberties Union of Colorado ("ACLU of CO").

7. Attorneys for the ACLU of CO asked me to interview various people who were presently detained at the GEO Group private prison facility in Aurora, Colorado ("GEO facility") that provides detention services to Immigration and Customs Enforcement ("ICE").

8. I found each of the below-identified individuals who I interviewed to be credible.

9. Unless otherwise noted, as of the date this declaration was executed, none of the individuals below are still imprisoned at the GEO facility. I searched the ICE detainee locator ("ICE locator," https://locator.ice.gov/odls/) for each of these people, and the locator found no result. Based on my training, experience, and what I learned from these individuals about their immigration cases, this leads me to conclude that they have likely been deported or taken a voluntary

1

EXHIBIT

P248

P248.001

departure in the time since I interviewed them and they are no longer in the United States.

10. For each of the below interviews, I utilized a Spanish language interpreter. It was my impression that the interpreter faithfully translated what participants said, paused for appropriate clarification, and did not inject their own commentary or color.

## C.E.P.C.

11. I interviewed C.E.P.C at the GEO facility on February 17, 2026. I spoke to him for approximately two-and-a-quarter hours.

12. C.E.P.C. is 30 years old and was born in Venezuela. Before he was arrested by ICE in January of 2026, he had been living in the United States since the Fall of 2022. Shortly after he entered the country, he was detained by Border Patrol. He was released from custody and given "check in" appointments with immigration authorities. After being released from custody, he initiated an asylum application and was issued a work authorization permit to allow him to legally work in the United States. C.E.P.C. is afraid that if he returns to Venezuela, he will be persecuted or tortured.

13. C.E.P.C. has no criminal history in either the United States or Venezuela.

14. At the time ICE agents arrested him, C.E.P.C. was engaged to be married to a United States citizen. C.E.P.C. lived with his fiancée at a house in Colorado.

15. At the time C.E.P.C. was stopped and arrested by ICE agents, he was working as a Lyft driver. He had legal authorization to work in the United States.

16. In addition to driving for Lyft, C.E.P.C. also worked as a delivery driver for Amazon.

17. At approximately 8 am on January 7, 2026, C.E.P.C. picked up a Lyft customer in Aurora and began driving her to her destination. He suddenly saw an unmarked car activate its lights and sirens behind him. C.E.P.C pulled over as soon as it was safe to do so.

2

P248.002

18. ICE agents came to C.E.P.C.'s window. C.E.P.C. rolled down the window, and an ICE agent demanded his identification. C.E.P.C. provided his Colorado driver's license and his Social Security card.

19. The ICE agents told C.E.P.C. that he was "illegal," and ordered him to give them his car keys and exit the vehicle, and that if he didn't C.E.P.C. would "see what happens next." C.E.P.C. gave them his keys and stepped out of the vehicle. The ICE agents immediately handcuffed him.

20. C.E.P.C. did not believe the ICE agents knew who he was, because they did not address him by name.

21. Before arresting him, the ICE agents did not ask C.E.P.C. any questions about his immigration status, ties to the community, employment history, family circumstances, or any other questions related to whether he was a flight risk or would fail to attend immigration proceedings. They did not ask him for anything but his ID.

22. The ICE agents told C.E.P.C.'s passenger to get another ride.

23. The ICE agents took C.E.P.C. to a truck where they confiscated his belongings, including his phone and wallet. The truck drove C.E.P.C. to the ICE field office in Centennial, Colorado, where he was processed. The ICE agents left C.E.P.C.'s car on the side of the road.

24. After several hours at the Centennial office, C.E.P.C. was handcuffed and shackled and driven to the GEO facility.

25. The conditions of confinement C.E.P.C experienced in the GEO facility were very poor. The food was not good quality, he was unable to sleep due to noise and light, and people detained with him had become sick.

26. On or about January 27, 2026, C.E.P.C., through counsel, requested release from detention on bond. It was C.E.P.C.'s understanding that the immigration judge denied him bond due to his manner of entry into the United States.

27. C.E.P.C. was worried about being in detention in these conditions for an indefinite amount of time. While Mr. P.C. generally considers himself "a fighter,"

3

P248.003

his treatment in detention made him just want to "give up" and go back to Venezuela.

28. Based on my interview with C.E.P.C., I believe that he is no longer findable in the ICE locator because he chose not to fight his immigration case from detention and has been removed from the United States.

**F.L.Z.**

29. I interviewed F.L.Z. at the GEO facility on February 17, 2026. I spoke to her for approximately one-and-a-half hours.

30. F.L.Z. is 38 years old and was born in Guatemala. F.L.Z. entered the United States in December 2021. Border Patrol briefly detained her, but she was released from custody on or about December 23, 2021. When Border Patrol arrested her, she expressed a credible fear of persecution if she was forced to return to Guatemala.

31. Upon her release from detention in December 2021, immigration officials instructed F.L.Z. to attend an appointment in Denver on or about January 21, 2022. She attended that appointment and provided the authorities her address and other contact information.

32. During this time, F.L.Z. paid an immigration lawyer approximately $13,000 to file an asylum application for her, and to seek a work authorization for her. Some time later, she contacted another lawyer and learned that the original lawyer had not filed the asylum application or sought a work authorization for her.

33. F.L.Z. received a letter in the mail stating she had an appointment at the ICE office in Centennial, Colorado scheduled for Sunday, January 18, 2026.

34. F.L.Z. went to the ICE office, even though a lawyer told her it was unusual for the office to be open on a Sunday. The original lawyer did not accompany her to this appointment.

35. When F.L.Z. arrived at the ICE office, the office was open despite it being a Sunday. ICE employees put F.L.Z. into a room and told her she was being detained and that she was not free to leave. The ICE employees told F.L.Z. that she would be detained for only two weeks, and that "it would be better" for her case "if she worked on the case from inside" the GEO facility.

4

P248.004

36. ICE employees then took F.L.Z. to the GEO facility in shackles.

37. Before the ICE employees arrested F.L.Z., the ICE employees did not ask her any questions about her ties to the community, employment history, family circumstances, or any other questions related to whether she may was a flight risk or would fail to attend immigration proceedings. They did not ask her any questions about her life.

38. F.L.Z. has no criminal history either in the United States or Guatemala.

39. Before ICE arrested and detained her in January of 2026, F.L.Z. had steady housing – she was living with her boyfriend in the basement of a house in Colorado.

40. During her imprisonment at the GEO facility, F.L.Z. felt sick and experienced pain on her right side and in her foot but received no medical attention. The GEO facility was cold, and the food was terrible. F.L.Z. also had difficulty sleeping because the lights were left on at night in her cellblock.

41. F.L.Z. signed a voluntary departure agreement on or about February 14, 2026, to be deported so that she could be released from the conditions at the GEO facility.

42. Based on my interview with F.L.Z., I believe she is no longer findable in the ICE locator because she chose not to fight her immigration case from detention and has been removed from the United States.

**C.L.P.**

43. I interviewed C.L.P. at the GEO facility on Sunday, February 28, 2026. I spoke to him for almost two hours.

44. C.L.P. was born in Honduras. He entered the United States in approximately April 2023 with his brother and shortly thereafter, the men moved to Colorado. Prior to the events described below, neither of them had ever had any contact with any United States immigration authorities.

45. C.L.P. had stable housing at the time ICE arrested him in January of 2026. He lived at an apartment complex near Vail, Colorado with his brother, E.G.M., and cousin, F.H.M.

P248.005

46. C.L.P. had steady employment, working as a housekeeper and in construction.

47. C.L.P. told me he has no criminal history either in the United States or Honduras.

48. On January 21, 2026, between 7:30 am and 7:45 am, ICE arrested C.L.P. as he was driving to work with E.G.M. and F.H.M. C.L.P. was in the front passenger seat, E.G.M. was driving, and F.H.M. was sitting in the back.

49. The vehicle C.L.P. was riding in was driving between Vail and Eagle-Vail. An unmarked vehicle came up very close behind them – close enough that C.L.P. was concerned they were about to be rear-ended. E.G.M. pulled over to allow this aggressive driver to pass them, but the vehicle remained behind them after they pulled over.

50. After E.G.M. pulled over, C.L.P. noticed there was also a second unmarked vehicle behind them that also pulled over and stopped behind the first unmarked vehicle.

51. C.L.P. saw two men exit the first vehicle, and one man approached each side of the vehicle he was riding in. C.L.P. also saw two more men exit the second vehicle but they remained behind the stopped vehicles. At this time, C.L.P. thought the men might be local police.

52. E.G.M. rolled down his window. The unidentified man on that side of the car asked for E.G.M.'s identification, which E.G.M. handed to the man. C.L.P. believes that E.G.M. had a Colorado SB-251 driver's license with the black bar indicating it is "Not valid for federal identification, voting, or federal public benefits."

53. E.G.M. handed the man his driver's license, but then the men on both sides of the car opened the vehicle's doors. The man on the driver's side reached in and pulled the keys out of the ignition and put the keys on top of the vehicle. The men then grabbed C.L.P. and E.G.M.'s arms, pulled them out of the car, and immediately handcuffed them behind their backs. The men then similarly pulled F.H.M. out of the back seat and handcuffed him as well. The men had not asked C.L.P. or F.H.M. any questions at this time – not even what their names were or if they had identification.

54. At no time after the unmarked vehicles forced the car to stop did C.L.P. believe he was free to leave.

6

P248.006

55. C.L.P. and E.G.M. both asked why they were being arrested, but the men did not respond to them. The unidentified men did not ask them any questions during the arrest and did not say anything at all to C.L.P. or F.H.M.

56. It was only after the unidentified men put the handcuffs on C.L.P. that they even asked for his identification. C.L.P. told the unidentified men that he had his wallet in his pants pocket, which contained his Honduran identification card.

57. The unidentified men then placed C.L.P. and F.H.M. in one of the unmarked vehicles, and E.G.M. in the other unmarked vehicle. The men drove them to a nearby apartment complex that was under construction where there were four other unmarked vehicles.

58. Once they reached the under-construction apartment complex, C.L.P., E.G.M., and F.H.M. were taken out of the unmarked vehicles and placed in shackles and chains, and their handcuffs were moved to the front of their bodies. The unidentified men then placed them back in the vehicles.

59. The unidentified men never told C.L.P. the reason he was being arrested, nor did the unidentified men show him (or his family members in the vehicle) any warrant.

60. Before arresting them, the ICE agents did not ask any of the three men any questions about their immigration status, ties to the community, employment history, family circumstances, or any other questions related to whether they were a flight risk or would fail to attend immigration proceedings. Other than asking to see identification of the driver (E.G.M.), they had not asked the men any questions at all.

61. C.L.P. was eventually taken to the GEO facility. While in the GEO facility, he lost weight due to the very poor-quality food. C.L.P. intends to request voluntary deportation, due both to the poor conditions at the GEO facility and because he needs to continue earning money to help his sick father.

62. At the time I signed this declaration, C.L.P. was still imprisoned at the GEO facility. Given his expressed desire to seek a voluntary departure, however, I believe he is likely to be gone from the United States soon based on my training and experience.

7

P248.007

63. C.L.P. did not wish to speak to any lawyers.

64. I also searched for E.G.M. and F.H.M. in the ICE locator. At the time I performed these searches, they could not be found in the locator. Based on my training and experience, it is my belief that neither man is still in the United States.

I declare under penalty of perjury under the law of the United States and 28 U.S.C. § 1746 that the foregoing is true and correct.

Keegan Hayes

Date: 3/3/26

8

P248.008