IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-3183-RBJ

REFUGIO RAMIREZ OVANDO, et al,

Plaintiffs,

vs.

KRISTI NOEM, et al,

Defendants.

---

REPORTER'S TRANSCRIPT
Motions Hearing, Vol. 1

---

Proceedings before the HONORABLE R. BROOKE JACKSON, Judge, United States District Court for the District of Colorado, commencing on the 10th day of March, 2026, in Courtroom C204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:
TIMOTHY R. MACDONALD, EMMA K. MCLEAN-RIGGS, ANNA I. KURTZ, and SCOTT C. MEDLOCK, ACLU of Colorado, 303 East 17th Avenue, Suite 350, Denver, CO 80203
AND
HANS C. MEYER, The Meyer Law Office PC, PO Box 40394, 1547 North Gaylord Street, Denver, CO 80204

For the Defendants:
BRAD E. LENEIS, NICHOLAS A. DEUSCHLE, and LOGAN P. BROWN, U.S. Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202

Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358

Proceedings reported by mechanical stenography; transcription produced via computer.

# I N D E X

Opening Statement By Ms. Kurtz . . . . . . . . . . . . . . . .6

Opening Statement By Mr. Leneis . . . . . . . . . . . . . . . 11

PLAINTIFFS' WITNESSES PAGE

JB
Direct Examination By Mr. Macdonald . . . . . . . . . 15
Cross Examination By Mr. Brown . . . . . . . . . . . .107
Redirect Examination By Mr. Macdonald . . . . . . . .108

JL
Direct Examination By Mr. Meyer . . . . . . . . . . .109

DEONICIO CASTILLO
Direct Examination By Mr. Meyer . . . . . . . . . . .155
Cross Examination By Mr. Deuschle . . . . . . . . . .165

AL
Direct Examination By Mr. Macdonald . . . . . . . . .167

GREGORY DAVIES
Direct Examination By Mr. Macdonald . . . . . . . . .184

PLAINTIFFS' EXHIBITS:

| | Identified | Received |
|---|---|---|
| 200 | 194 | 194 |
| 201 | 144 | 144 |
| 202 | 181 | 181 |
| 204 | 85 | 86 |
| 205 | 242 | 242 |
| 207 | 64 | 65 |
| 208 | 82 | 82 |
| 218 | 231 | 231 |
| 224 | 224 | 224 |
| 225 | 226 | 226 |
| 226 | 226 | 226 |
| 229 | 226 | |
| 237 | 96 | 96 |
| 242 | 209 | 210 |
| 258 | 40 | 40 |
| 292 | 200 | 201 |

Reporter's Certificate . . . . . . . . . . . . . . . . . . .246

P R O C E E D I N G S

(Proceedings commenced at 9:04 a.m.)

THE COURT: 25-cv-3183, Refugio Ramirez Ovando et al. versus Kristi Noem. We're going to have to change that, I guess.

MR. LENEIS: Sometime soon, Your Honor.

THE COURT: Maybe it will be Mr. Leneis. Who knows.

MR. LENEIS: I hope not, Your Honor.

THE COURT: We're set this morning on the plaintiffs' motion to enforce preliminary injunction. I will take your appearances first, even though of course I know you. For the plaintiffs?

MR. MACDONALD: Good morning, Your Honor. Tim Macdonald on behalf of the plaintiffs. With me at counsel table is Anna Kurtz, Scott Medlock, Emma McLean-Riggs, and Hans Meyer.

THE COURT: Good morning, everybody.

MR. LENEIS: Good morning, Your Honor. Good to see you. Brad Leneis, Logan Brown, Nick Deuschle for the defendants.

THE COURT: Thank you. So, I've read your motion and response. I don't really need opening statements. If you feel the need to make one, I suggest you make it as brief as possible so that we can get right into the evidence. Plaintiff, you may proceed.

MR. MACDONALD: Thank you, Your Honor. As a

preliminary matter, defendants had filed a motion for officers to testify under pseudonym. We had filed an opposition to that just maybe 45 minutes after Your Honor had issued a ruling on Sunday morning. And understanding you were busy this weekend, for which we all apologize, as were we, Your Honor, would Your Honor entertain argument, understanding you granted the motion thinking that we did not oppose it? We obviously do oppose that motion. Would you entertain --

THE COURT: I'm familiar with it, Mr. Macdonald. Do you have any tissues over there? Thank you. Have a seat, Mr. Macdonald.

MR. MACDONALD: Thank you, Your Honor.

THE COURT: So, the confusion was on my part. I was looking at the file on Sunday getting ready for flying from Arizona to Denver on early Monday morning for this hearing. And there were two motions, and I thought that there wasn't any conferral. It turns out that there was a conferral on this particular motion, and the defendant properly noted the plaintiffs' opposition. I somehow missed that.

In any event, now that I have been totally educated, the motion is granted, and the plaintiffs' opposition is overruled. The reason is this: These days in our country, and in this case, even, people get very angry and act out of character. For good and sufficient reason, the plaintiffs, several of them, have requested and been granted the right to

participate with pseudonyms, or initials.

The defendants' concern is that these ICE agents in some parts of our society are quite unpopular, and as a result, could face recriminations. I think that's right. The Court itself has had some blowback, let's say, from this case. I was informed by the United States Marshals some time ago that someone in Florida had posted not only my picture, but my home address, had indicated that this was a Court that loves illegal immigrants, and invited illegal immigrants to go to my home and find a place to live. Between the lines, I suppose, it might have invited people who didn't like my ruling to do the same.

I can't shield myself from that. Many of my colleagues around the country have had threats and so forth in the climate that we're in, but I don't want to foist that on anyone. So, even though I am in a position of believing very strongly that these are public matters and public proceedings and that we do our business in public, when it comes to the safety of people who appear in the court, I'm going to do what I can to protect them, whether they're ICE agents or plaintiffs or lawyers or anyone else. So, that is the reason for my ruling. Let's proceed.

MR. MACDONALD: Thank you, Your Honor. We will begin with maybe a five-minute opening statement.

THE COURT: Okay.

MR. MACDONALD: Thank you.

MS. KURTZ: Good morning, Your Honor.

THE COURT: Good morning.

MS. KURTZ: Anna Kurtz for the plaintiffs. You issued an injunction in this case at the end of November based on evidence that defendants were making warrantless immigration arrests without the probable cause required by federal law. The injunction ordered defendants to stop that practice. And to help ensure that outcome, your order also imposed accountability and transparency measures for warrantless arrests in the district. Moving forward, it required officers to document certain information in the I-213s, the arrest reports, and it required defendants to produce a subset of those reports to the plaintiffs.

We're here today because plaintiffs have received about a third of the reports for warrantless arrests from the date of the PI to the end of January, and what those documents show is virtually uniform noncompliance with your order. These documents are attached to our motion, and also in Plaintiffs' Exhibits 202, 204, 207, and 208, separated by the date that we received them. We were also supposed to receive arrest reports for February today, Your Honor, but defendants have informed us that because of the hearing today, that will be delayed.

But reading the warrantless arrest reports that defendants have produced, it is as if this Court's order never happened. By and large, the reports do not include any mention

of flight risk, let alone the specific articulable facts supporting the conclusion that the person was likely to escape before a warrant could be obtained. Instead, in narrative after narrative, a person is leaving home, maybe going to work, maybe even reporting to an ICE check-in because they were trying to actively comply with the rules, when they are encountered by an ICE officer, asked at most about their identity and their status, and immediately arrested. The arrest reports look just like the ones that led this Court to issue the PI in the first place.

And defendants don't even argue otherwise. Instead, they argue the Court shouldn't grant the relief that we request, that it's not warranted. Why? Defendants say we haven't shown a policy or practice for widespread willful violations of your order. We will see what the evidence shows about that, but either way, that is not our burden. It's a strawman that the defendants attack because we have shown what we need to, which is noncompliance in spades.

Defendants also say the Court can trust that they are going to do better going forward. They also said last October that they were already complying with what the PI would require, such that there was no need for the Court's injunction to begin. And what defendants say now does not provide confidence that compliance will improve without additional relief.

First, defendants have haven't offered a single piece

of evidence that would allow the Court to see for itself what their training or other efforts at compliance have been. Second, they rely on a statement from Gregory Davies that intake officers received training to achieve better compliance with the PI on February 13th. The fact that that training came on February 13th, more than two months after the injunction was issued, is significant. Your Honor, that is the day after this Court ruled, over defendants' vigorous objection, that we would have a status conference to discuss their noncompliance. In other words, the effort came only with the impending prospect of accountability to this Court.

Third, even the content of that training as described by Davies is troubling. It suggests that intake officers received instruction to encourage arresting officers to change their I-213s after the fact where the reports don't comply with the PI. And all of this just confirms that this Court's oversight is a necessary motivator, and that more transparency is needed to ensure meaningful compliance with the law.

And that is the basis for all of the relief plaintiffs request today. That's why we need to see the training, the evidence of training, and to see more documentation of these arrests. It was the same reason for accountability measures that were in the preliminary injunction. And indeed, the only reason we have the evidence that we've been able to show Your Honor of noncompliance is because of this Court's order that

they produce those forms in the first place.

Defendants suggest the documents that they've provided us aren't a fair sample of their warrantless arrests, so their compliance can't be judged based on those. But those are what they have provided, and if anything, it's just an argument that the relief we requested, which is to see all of the I-213s for warrantless arrests like the plaintiffs in *Nava* and *Escobar Molina* and *UFW*, that that relief is warranted.

Defendants say they've been working diligently to achieve compliance. They should show us the training, show us the evidence of that, also the same as in *Nava* and *UFW*.

On the issue of field warrants, Your Honor, defendants say those arrests are beyond the scope of this case because they're getting warrants before putting anyone under arrest, but as Your Honor will hear, the stories of people subjected to those arrests show the opposite.

All plaintiffs asked for is additional documentation of those arrests like what the Court ordered in *Nava* to better understand whether this practice is just an end run around the statute and the Court's order. All of the relief we've requested is important to effectuate the PI, to understand why defendants have not complied with Your Honor's order, and to try to achieve compliance going forward.

Finally, defendants say additional relief is premature, that they need more time, but each of the 213s in front of the

Court is not just an abstract example of noncompliance. Each one represents a real person who was suddenly and unlawfully taken from their community. And you won't hear from any of them today, Your Honor, because for the most part, because of defendants' unlawful practices, they are already gone. We won't be able to hear and we won't be able to tell you their stories.

So, the additional relief plaintiffs ask for can't wait. It can't wait because with every violation we risk losing the only firsthand accounts that we have of what's actually happening that doesn't come from defendants themselves. And it can't wait because every violation causes profound harm to human beings that can't be undone.

THE COURT: So, just a minute, please. The relief that you're asking for is the list of 12 items at pages seven and eight of your motion. Yes?

MS. KURTZ: Yes, Your Honor.

THE COURT: Well, the two things that strike me as potentially important that aren't in the list and that you haven't addressed are, number one, this redefinition of what "likely to escape" means, and two, what to do about this field arrest issue that you're raising. So, as we go forward today, I will be interested to hear what you have to say about those two points. It seems to me that those are as important as the document issues. Thank you for your opening.

MS. KURTZ: Thank you, Your Honor.

THE COURT: Mr. Leneis?

MR. LENEIS: Your Honor, what the plaintiffs say is that there's a continuing pattern and practice of unlawful warrantless arrests. Those are the first words in their motion, so that's what you should focus on as you listen to the evidence today. Is the agency in effect encouraging officers to make unlawful warrantless arrests? The evidence you hear today is not going to support that claim. The facts don't fit that story, numbers don't fit, and the agency's actions don't fit.

On the numbers, the bulk of the evidence is from the first two weeks after the PI went into place, and the record here is only about two months long. You will hear that there may have been warrants for many of those arrests, and others where the fact of the warrant wasn't documented in the 213. The PI doesn't require that documentation for arrests with warrants, and that's something that the agency is working on.

Many of the other arrests you're going to hear about involve one unit, not all of the officers in the whole state. So, all in all, the numbers don't show an agency-wide pattern and practice of warrantless arrests.

Plaintiffs say that the relief they're asking for can't wait, but we didn't hear anything from the plaintiffs in January after we turned over the first set of 213 requests. We didn't get a request from them to confer about what was going on. And the -- like I said, the bulk of the evidence is from that

initial period.

The agency's actions also don't fit the claim that there's a continuing pattern and practice of unlawful warrantless arrests. You will hear that the agency wants its officers to get warrants for arrests. They get them in advance. They get them in the field. Getting warrants is not a way to evade the PI. The agency also started working right away to implement the really new part of the PI, which is the production requirement. And it's been complying with that requirement, although it does need a little more time this month due to this hearing.

And you're going to hear about what the agency is doing now to improve documentation, to improve feedback to officers, and we think that those steps that the agency is taking are going to make it so that it's easier to evaluate what's happening on the basis of the PI that already exists. The bottom line is that these are not the actions of an agency that's continuing a pattern and practice of unlawful warrantless arrests across the state.

So, you should look at the whole picture in terms of the numbers and the actions. You're not going to see a recalcitrant agency. You're going to see one that's working to comply with the Court's order. That means that at the end of the day, the Court is not going to have cause to order new dramatic burdensome relief that would modify the PI to greatly

expand it and add an enormous administrative burden to the agency.

In terms of the relief that the plaintiffs are asking for, they certainly want more than all of the I-213s for warrantless arrests. What they want includes attorney-client privileged materials about communications between agency lawyers and the agency personnel, and they're also asking for a direct intervention into law enforcement matters.

The plaintiffs said that the reason that they are asking for immediate relief is because of the consequences of what they deem is unlawful warrantless arrests. And I don't want to short change the importance of complying with the preliminary injunction, because that is the agency's goal, but their position is that these people were not likely to escape before a warrant could be obtained, and that means that they could have been arrested without difficulty pursuant to a warrant sometime after the initial account. So, to the extent that what they're talking about are the consequences of arrest in general, the Court should just keep in mind what the statute permits the agency to do.

One last point about the evidence in the hearing, we think that the ordinary rules of evidence apply. Federal Rule of Evidence 1101(b) states that the rules apply in civil cases and proceedings, and there's no recognized exception for evidentiary hearings like this one as there is for preliminary

injunctions. Thank you.

THE COURT: Thank you.

MR. MACDONALD: Your Honor, before we call our first witness, we would like to invoke the rule of exclusion. I don't know -- because I've never seen any of these people, I don't know what they look like, but we'd like to invoke the rule.

THE COURT: Well, you're entitled to a sequestration order, which simply means that if somebody is expected to be a witness, the witnesses should remain outside the courtroom until they are called. Once they are called to testify, they may stay after that. If you're not going to be a witness, you're welcome here.

MR. MACDONALD: And, Your Honor, after someone's testified, they may not communicate with people who are still on the witness list; is that right?

THE COURT: Yes. And of course lawyers can't brief them on what's happened, too. They're supposed to be unknowing about what has already happened until they testify.

MR. MACDONALD: Great. Thank you, Your Honor. Your Honor, plaintiff calls Agent JB to the stand. And I cannot get him, because I don't know what he looks like.

THE COURT: Come on up here, sir. Now, sir, are you an ICE agent?

THE WITNESS: Yes, sir.

THE COURT: We're allowing you to just use your

initials.

THE WITNESS: Okay.

THE COURT: Sir, would you raise your hand.

(The Witness is Sworn)

THE COURT: Have a seat right behind you, sir.

MR. MACDONALD: May I proceed, Your Honor?

THE COURT: Yes.

**DIRECT EXAMINATION**

BY MR. MACDONALD

Q Good morning. Could you state your initials for the record, please.

A JB.

Q Shall I call you Mr. JB, or what would you prefer?

A It's whatever. JB is fine.

Q All right, JB. My name is Tim Macdonald. I represent the plaintiffs in this case. It's nice to meet you. Could you please tell the Court what your job is.

A I'm a deportation officer assigned to the Denver field office.

Q And you work for ICE?

A Yes, sir.

Q When did you become a deportation officer -- I'm going to call you Mr. JB, just because I'm used to that, if that's all right?

A Yes, sir. I became a deportation officer -- I was hired on

in August of 2020.

Q So, you've been a deportation officer now a little more than five years?

A Yes, sir.

Q Who is your supervisor?

A Right now it's --

MR. BROWN: Your Honor, can we -- for supervisors, can we also do initials, based on the previous order?

THE COURT: Is this somebody whose name hasn't already come into the case?

MR. BROWN: I am not sure of what the answer is going to be, but given that other officers are appearing just with their initials pursuant to the Court's order, I think his supervisor should also receive initials.

THE COURT: I don't know. There have been several supervisors, and their names are even on the caption of the case, and they've testified in the case. Why don't you ask him who the supervisor is so you will know who it is, and then -- just walk up there and ask him.

MR. BROWN: Your Honor, his supervisor is lower level than others who have appeared, and his supervisor does make arrests just like other officers. And so we would ask that the supervisor only be identified as -- the supervisor has not previously appeared in this case, not in the caption, not elsewhere, so we would request that the supervisor only be named

by initials, please.

MR. MACDONALD: One of the problems, Your Honor, is I won't then be able to tie him to any of the documents we have. If I only have the supervisor's initials, I then am unable to follow up and ask relevant questions about what that person's authority is.

THE COURT: I agree. Objection overruled.

THE WITNESS: My supervisor right now is Rhiannon Garcia, who is an SDDO, supervisor detention deportation officer.

Q. (By Mr. Macdonald) I apologize. I missed the name.

A Rhiannon Garcia.

Q Rhiannon Garcia. I apologize. Is that a man or woman?

A It's a female.

Q And Ms. Garcia is a -- what you described as an SDDO, a supervisory detention and deportation officer?

A Yes, sir.

Q Have you held any other positions with ICE, or only a deportation officer?

A That is my only position I've held.

Q Have you always been based out of the Denver field office?

A That is my primary office, but I have gone on detail other places.

Q Where have you gone on detail, Mr. JB?

A I've been down to the border, to El Paso. I've also been

to Harlingen, Portland, and Minneapolis.
Q So, you've been down to the border. When was that?
A That was under President Biden, and that was 2021, I believe.
Q To make it easier, how about in the last, call it two years, have you been on any assignments outside the Denver field office?
A Yes, sir.
Q Where?
A Portland and Minneapolis.
Q When did you go to Portland?
A That was October. October of last year.
Q October of 2025?
A Yes, sir.
Q When did you go to Minneapolis?
A I've went there twice for one week at a time each time. I would have to look through my records to give you --
Q Approximately when?
A I believe December and January.
Q So, just two months agoish?
A Ish. Yes, sir.
Q And you went for one week at a time in Minneapolis?
A About ten days each time.
Q And in Portland, were you involved in a lawsuit that stemmed from a warrantless arrest in Oregon?

A I'm currently -- there is a lawsuit, but it wasn't -- it's in regards to other topics.
Q It did not involve a warrantless arrest?
A It involved a number of things, sir.
Q Did the case in Oregon that you were involved with involve a warrantless arrest?
A That was one of the aspects. Yes, sir.
Q And did you testify in that case?
A I did.
Q In federal court?
A Yes, sir.
Q Using the initials JB?
A Yes, sir.
Q Did you go through ICE academy training down in Georgia?
A Yes, sir.
Q When was that?
A So, I left October 24th, 2020, and then I graduated around March of 2021. That was during COVID.
Q And were you actually down in Georgia for that period?
A At Glencoe. Yes, sir. The entire time.
Q So, your training lasted from October 24th, 2020, through March of 2021?
A Yes, sir.
Q Did your training include both book, sort of lectures, and practical simulated exercise?

A It was a number of both lectures, practical exercises, vehicles, and other training that we have to do. Live fire shooting and Spanish as well.
Q Do you speak Spanish?
A Not fluently.
Q When you're -- if you have -- if you're engaged with someone out in the field who speaks Spanish, is a monolingual Spanish speaker, do you get a translator?
A If I -- if they're not -- if -- if they're not understanding the questions I'm asking them, I will have to get a interpreter via like a telephone.
Q How many supervisors are in the Denver field office as what you've referred to as SDDOs?
A I don't know the exact number. No, sir.
Q Approximately, sir?
A I don't know.
Q Approximately how many deportation officers are in the Denver field office?
A That's a really hard question to answer, too, because the Denver field office also is comprised of like Wyoming and stuff like that.
Q I'm sorry?
A So, like in the actual office itself, I'm not quite sure. We just hired a bunch of new -- new employees as well, so I don't know the number, sir.

Q When did you just get -- when did you just hire a bunch of new deportation officers?
A I would say like the beginning of this year.
Q January of 2026?
A Roughly.
Q Okay. Do you know how many new people you've started to see around the office?
A I don't know, sir.
Q All right. You don't know the total size of the people the office has in the Denver field office?
A No, sir.
Q Are you authorized as a deportation officer to issue I-200 warrants?
A Depends.
Q I'm sorry. I didn't understand that answer.
A It depends, sir.
Q Explain what that depends on.
A If you're acting that day in the capacity of the supervisor, because there's no supervisor available, you're an acting SDDO, and you are authorized to issue I-200s.
Q And explain to the Court what an I-200 is, please.
A It's the warrant. It's an administrative arrest warrant for someone who is undocumented, or not in the country legally.
Q And those I-200 warrants, they're not sworn under oath, are they?

A No.

Q And you said that if you're designated as an acting SDDO, supervisory detention deportation officer that day, you can issue an I-200 warrant?

A Yes.

Q Okay. How are you designated as an acting supervisor or acting SDDO on a day-to-day basis?

A It's primarily based on seniority, or it's appointed by the supervisor that's absent that day. Or you could be in the -- you could be appointed by -- let's say like your supervisor is out for 120 days on a detail, then they're going to appoint usually the most senior deportation officer as the acting SDDO for that unit.

Q Okay. Let me see if I can break that down. So, sometimes it's done on a daily basis. So, you come in on a day and someone will tell you today, Mr. JB, you're an acting supervisor, an acting SDDO?

A Yes. Or like if the SDDO is sick that day, then it's delegated to whoever is the senior officer of the day.

Q So, there's just one designated per day in that circumstance you've just described?

A For that unit?

Q Yes.

A Yes.

Q All right. And describe for us what a unit is.

A A unit, it's comprised of deportation officers, and every unit has its specialty. As like if you're over -- if you're assigned over at the detention center, then you're the detained unit. If you are fugitive operations, then you're assigned under -- right now we have two SDDOs in that unit that oversee people that have final orders of deportation, usually.

Q Who is your -- what is your unit?

A Currently?

Q Yes.

A The FCC. The field command center right now.

Q Field command center, the FCC?

A Yes, sir.

Q And does that change on a daily or weekly basis what unit you're assigned to?

A No.

Q And does each unit have only one SDDO?

A No.

Q Typically?

A Like over at detained they have multiple SDDOs. Fugitive operations will have multiple. It depends on how many DOs you have or deportation officers you have in that unit. So, if you have ten DOs, then you usually will have two SDDOs.

Q How about units that are going out in the field arresting people, engaging in operations? What is the typical size of that unit?

A There's not a typical size, sir.
Q Are they bigger or smaller than ten DOs?
A There's not a typical size, sir.
Q Could be anything from two people to twenty people?
A ICE's policy is you -- when you make an arrest, it's a two-person arrest.
Q I'm trying to get at the units, sort of understanding that structure.
A That's going to be above my pay grade, sir.
Q So, with respect to the acting SDDO, how many times have you been designated an acting SDDO?
A Multiple times.
Q How many?
A I don't have that exact number.
Q More than five?
A Yes.
Q More than ten?
A Yes.
Q More than 20?
A I don't -- I don't have the exact number, because even -- whenever I was assigned to the criminal alien program, I would have to be acting at that time, too, because a supervisor was out sick.
Q When you're designated an acting SDDO, do you get that in written form?

A Sometimes, or it will be verbal.
Q It could sometimes just be verbal?
A Mm-hmm.
Q So, a supervisor could say Mr. JB, you're acting today, go out in the field?
A They won't say go out in the field. They -- for instance, like let's say, like, your supervisor calls in sick, and usually the assistant field office director will come down, and you're going to be acting for today.
Q The assistant field office director, that's Mr. Davies?
A Yes. That's one of the AFODs. We have multiple AFODs, but --
Q How many AFODs, or assistant field office directors do you have?
A I don't have the exact number, because we're still appointing others at this time.
Q How about the ones that you've interacted with?
A I have an AFOD that's in charge of operations, which is Greg -- which is Davies. Yes, sir.
Q Okay. So, is Mr. Davies the AFOD that you interact with the most?
A I wouldn't say the most, but he oversees operations.
Q How many other AFODs do you interact with, Mr. JB?
A There's another AFOD that I see if I'm at the -- if I'm at the office.

Q Who is that?
A It's Nichole Black.
Q You're familiar with the regulations that specify what type of officers can issue I-200 warrants?
A Like the policy?
Q Yeah.
A Yeah. Yes, sir.
Q Okay. And are you familiar with the regulations, which -- I believe they're in 8 CFR 287.5 that specifies which type of officers can issue I-200 arrest warrants?
A I can't recite it at this time, but what is the question exactly?
Q Are you familiar with that regulation, sir?
A Yes. I'm familiar.
Q Okay. And is acting SDDO one of the people listed in the regulation as someone who can issue arrest warrants?
A An SDDO can. And so if you're acting, then you are appointed as an SDDO for that day.
Q Just for the day?
A Well, for the time that you've been appointed for.
Q Okay. Could be just for the day?
A Could be just for the day.
Q Could be just in a conversation that someone told you you're acting, and in that circumstance, your view is that satisfies the regulation, and you can issue an arrest warrant

for someone out in the field?

MR. BROWN: Objection, Your Honor. This calls for a legal conclusion.

THE COURT: I don't think so. Overruled.

THE WITNESS: So, my understanding is if you're an acting SDDO, and it requires an SDDO signature, then you are qualified to make that decision.

Q. (By Mr. Macdonald) Okay. And that's true even if there's no paperwork or even an email designating you as an acting SDDO for the day?

A If you are appointed as an acting SDDO, which is a lawful order that you will be the acting for the day, then yes. You do have the authority.

Q Okay. And that authorization can just come in a conversation?

A Yes.

Q Okay. We're going to talk about some I-213s for warrantless arrests that have happened in Colorado the last several months. Before we do that, please explain to the Court what an I-213 is.

A It is the -- basically the what and where, why, of the arrest. The what happened in the arrest. It goes over the encounter. It goes over the immigration history, their criminal history, and just different stuff that we put in there that we think is pertinent to that arrest.

Q Referred to often as an arrest report or an arrest record; right?
A Yes, sir.
Q I-213s are not sworn under oath; is that true?
A That is correct.
Q But you're trained to make I-213s as accurate and complete as you can; is that fair?
A Yeah.
Q They taught you that at the academy?
A Mm-hmm. Yes.
Q And it's important that I-213s are accurate, because they're used by the government, among other things, in immigration proceedings against people that you arrest; true?
A They should be accurate if the arresting officer wrote the 213. Sometimes the arresting officer did not write the 213, and that's been an issue before.
Q Why would the arresting officer not write the I-213, or at least not the narrative section of the I-213 that specifies how the arrest happened?
A During some of the operations we've had in different states, it was either delegated to sometimes a processing team, or you just did the encounter part, and they would do the rest of the 213. It just depends. Or your supervisor that was appointed would do the narrative. Because your job was to get back out in the field and do investigations and start doing

apprehensions or whatever was -- needs to be done for the day, sir.

Q Okay. So, sometimes the arresting officer needs to get back out in the field and do more arrests, and so the supervisor or someone else back in the field office fills out the I-213?

A Sometimes.

Q Okay. And that's what happened in Portland, at least to some extent; isn't that right?

A That is correct.

Q And some of those I-213s were inaccurate, weren't they, the ones that were completed after the arrests in Portland?

A I don't know about -- about everyone's 213s, but sometimes it did happen.

Q Okay. You were working as a deportation officer in 2022 when the Department of Homeland Security issued something called the broadcast statement of policy relating to warrantless arrests. Do you recall that?

A No.

Q All right. Are you familiar with litigation in Illinois referred to as the *Castañon-Nava* case?

A I've seen emails about the *Nava* case, but I didn't read over them, because you're talking about 2022, sir?

Q I am talking about 2022.

A I was assigned to the detained unit, and so I didn't have the opportunity to go out into the field to make warrantless

arrests at that time.
Q So, whatever emails came in in 2022 relating to the *Nava* broadcast statement of policy could have come to you, but you wouldn't have read them?
A I would have received them. But we also get Fourth Amendment training that would cover warrantless arrests twice a year.
Q Did you ever get training on the requirements from the broadcast statement of policy from the *Nava* case?
A We've gotten training on warrantless arrests. I'm not quite sure if it was solely based on the *Nava*, but usually it's a -- when we do get our Fourth Amendment training, is -- it's -- it's an over -- basically all the cases that are current, we get training on. So, it's not just one case that we're going to basically get training on.
Q Okay. But you've heard of the *Nava* case. That's --
A I have.
Q Okay. How long were you assigned to the detained unit?
A I was in there for roughly two years.
Q When to when?
A Once I graduated the academy, I went straight to the detained unit. So, from 2021 to roughly 2023.
Q When in 2023, sir?
A I don't -- I can't recall at this time.
Q Okay. So, you started -- you finished your training in

March 2021, went into the detained unit, and about two years, you were working in the detained unit?
A Yes, sir.
Q So, that means you were working at the GEO facility out in Aurora?
A Yes, sir.
Q When did you first start making arrests out in the field?
A When you say the field, like what do you mean by the field?
Q Not -- the first time you started making arrests. How about we just start there.
A Oh, that was whenever I was in the criminal apprehension program, or criminal alien program, which is CAP. So, yeah.
Q Do you know approximately when that was, sir?
A No, I don't. Sometime in 2023.
Q And were you -- did you have specific training about your authority to make warrantless arrests once you started making those out in the field?
A I've always had Fourth Amendment training and warrantless arrest training, even when I was in the detained unit.
Q Okay. And you understand there's statutory authority separate and apart from the Fourth Amendment that authorizes ICE to engage in warrantless arrests when they have two -- when they can satisfy two prongs: probable cause that a person is in the country in violation of the laws, and probable cause that a person is likely to escape before a warrant can be obtained?

You're familiar with that standard?
A I am familiar with the warrants, yes.
Q Okay. And you're familiar with those two requirements?
A I'm familiar -- at that time, or the requirements now as well? Because things have changed.
Q Tell me how things have changed.
A Well, since the -- since this case now we have to document different things in the 213, and we have to take other things into consideration during the warrantless arrest.
Q Okay. And is it your testimony that before this Court's order, you didn't have to do those things?
A To do which things?
Q What you just described. Document things in an I-213?
A It was not documented before, but we would still have to ask certain questions.
Q And when you say it was not documented before, what was not documented before this Court's order in the I-213s, sir?
A Like, I wouldn't write like a -- like -- like connections to the community and stuff like that. But I would still ask questions like how many kids do you have, where do you live, stuff like that. Because I would always try to -- the likelihood of us finding them again or the likelihood of escape.
Q All right. I just want to make sure I understand this. Are you saying before this Court's order, you wouldn't document community ties in the I-213s?

A I would not.
Q Why not?
A Because once we did our field interview and we took them back to the office, or over to the GEO facility for processing, those questions would be asked, and that would be -- if there was something of concern, like, if they're like the only parent with children, they could only take care of it, then we would have to make the decision whether we're going to release them on -- or possibly release, or we would have to talk to another supervisor to see what they wanted to do.
Q Before this Court's order of November 25th, 2025, would you document in the I-213 that the person was arrested without a warrant? Did you feel that was something you needed to do?
A Once I was advised that we had to document, then yes. It was documented.
Q All right. Make sure I understand your answer. Before this Court's order, would you document in the I-213 that a person was arrested without a warrant?
A No.
Q Why not?
A Because an I-200 would always be -- well, our practice is the I-200 would always be issued for certain cases. Like if it's a reinstate, then you wouldn't issue an I-200. It would be an I-205, but there will always be a 200 issued at some point because whenever you're -- you submit the documents to the

Court, an I-200 has to be in the A file, or the Court will not accept the charging documents.

MR. MACDONALD: Let's put up Exhibit 68, please. Your Honor, this was previously admitted in the PI hearing. Your Honor, for exhibits like this that were previously admitted in the last hearing, would you like me to move to admit them again?

THE COURT: No.

MR. MACDONALD: Okay.

Q. (By Mr. Macdonald) Mr. JB, this is the broadcast statement of policy for warrantless arrests that Assistant Field Office Director Davies testified in the last proceeding was sent to all ICE employees on May 27th, 2022. So, do you have that in front of you?

A Yes, sir.

Q Okay. It specifies at the top that this broadcast states the underlying laws and policies applicable to all arrests effected under 8 USC 1357(a)(2), and then it specifies the regs. Do you see that?

A I do.

Q And this is something you would have been trained on at least before 2023 when you were out in the communities making arrests. Is that a fair statement, sir?

A Yes, sir.

Q Okay. Now, if we look at the second page, and that second full paragraph says, after having made an arrest under 8 USC

1357(a)(2), an ICE officer must document the facts and circumstances surrounding that warrantless arrest in the narrative section of the alien's I-213 as soon as practicable. Do you see where I'm reading, sir?
A Yup. Yes, sir.
Q Okay. So, this was a policy in effect when you were out in the field making arrests in 2023, 2024, 2025, before this Court's order; right?
A Yes, sir.
Q And the first thing it says that the documentation -- this documentation must include that the alien was arrested without a warrant. Do you see that?
A I do see where it says this document must include, yes.
Q Okay. And you just testified a moment ago that that was not your understanding when you were making arrests before this Court's order; right?
A What -- can you rephrase that? What do you mean?
Q A few minutes ago I asked you whether you, when you were making arrests before this Court's order, would document that the person was arrested without a warrant, and you said no. Do you recall that testimony from a few minutes ago?
A Correct.
Q So, your obligations under the policy was to document that an alien was arrested without a warrant. Why weren't you doing it?

A Because an I-200 would always be issued regardless. It would always -- it's -- well, actually, correction. If an I-200 was not issued beforehand, then in a timely manner, it would be issued. For instance, if we're out making arrest, and we get -- agitators come out or people that are trying to block us in, and an I-200 can't and obtained at the time, then we would have to detain them until we get back to the office to get an I-200 signed.
Q I'm not sure I understand that answer. The policy at the time, starting from the moment you were authorized and allowed to arrest people out in the field, was that if you arrested them without a warrant, you must document that the alien was arrested without a warrant. And explain to me why you were not doing that.
A Because it depends at the time, like when I first started off in CAP and fugitive operations, we usually always had an I-200. That's why. So, it wouldn't be documented if we made warrantless arrests. It was very rare that we made warrantless arrests during that time. That's why.
Q Did you make warrantless arrests? You can remember with specificity over 2003 [sic], 2004, 2005, that you never made warrantless arrests, Mr. JB?
A We did make warrantless arrests.
Q Okay. And did you document that the alien was arrested without a warrant?

A If I -- if I -- well, I don't know if I wrote the 213, sir. So, if someone else wrote it and they wrote it in there, then it would be documented.

(Simultaneous discussion interrupted by the court reporter.)

A I can't remember. But I can't recall if I made a warrantless arrest, if I would have annotated it in the 213.

Q Mr. JB, one of the other requirements under the *Nava* broadcast statement of policy that you received was that you must document -- and let's go down to number five. The specific particularized facts supporting the conclusion that the alien was likely to escape before a warrant could be obtained. Do you see that?

A Yes.

Q About five minutes ago, you testified that before this Court's order, you did not do that.

A If I would have made the arrest then, and I didn't document it, then I didn't document it.

Q Why did you not understand this was an obligation that you had before this Court's order?

A Because my understanding was in a timely manner, an I-200 would have to be issued if it required an I-200. Like, if it required a 205, we wouldn't write that in the 213 as well.

Q And are you saying that you would -- so, you would arrest someone. When someone was arrested without a warrant, you would arrest them without a warrant, and then you would produce an

I-200?
A It depends if they're just being detained at the time. If they're being detained at the time, and we didn't arrest them yet, then we would not issue an I-200 yet.
Q What if you brought them back to the Centennial facility and ultimately GEO? That's what you're saying is you issue an I-200 after the fact; right?
A If it's in a timely manner, then yes.
Q You would arrest them, take them to the Centennial facility, and then get an I-200; true?
A Sometimes.
Q That's also what happened in Oregon; right?
A No, sir. An I-200 was sometimes issued on scene.
Q Sometimes it was issued on scene; right?
A Yes.
Q And sometimes -- in the Portland situation, it was issued after you had taken the people back to the processing office; true?
A Now -- I think at the time, if we didn't -- during some of the book-in process, an I-200 had to be produced before we actually brought them into processing.
Q And so what you're saying is in Oregon, some of the time you issued I-200s in the field, and sometimes you issued them after processing; true?
A No. Not after processing.

Q While they were being processed?
A No. Because before you brought them to the facility, you had to have an I-200 before you brought them. So, it would either be before the encounter or while on scene.
Q Okay. While on scene, while the person is in handcuffs; right?
A Not necessarily.
Q Sometimes?
A Sometimes.
Q Right. And with respect to the person who brought the lawsuit in Oregon, did you fill out an I-200 for her while she was handcuffed at the scene?
A During that circumstance, we actually had people escape, and we had to chase after them, and the scene was chaotic at that time. And so due to limited deportation officers at the time, we handcuffed everybody because of the likelihood of escape. And they already were escaping out of my vehicle and my partner's vehicle to the point where we had to chase them down the road.
Q And the person who brought the lawsuit in Oregon was initialed MGMA. Do you remember that?
A Yes, sir.
Q MGMA didn't try to escape, did she?
A Escape is either you do it or you don't.
Q Did you believe that MGMA was trying to escape?

A I think if the opportunity presented itself, yes. Just due to the fact that other people were trying to escape, and that person was telling other people not to answer questions.
Q Let's go -- MGMA, you did prepare a field warrant while she was in handcuffs?
A We prepared -- oh. Our supervisors did the I-200s while we were on scene.
Q I want to go back to the broadcast policy. Do you recall now having looked at it receiving any training whatsoever about the requirements of the broadcast policy for warrantless arrests?
A I remember getting Fourth Amendment training and warrantless arrest training.
Q Okay. Let's look at Exhibit 258, if we can. Let's look at the second page, Mr. JB, if we could. Do you see that this at the top says warrantless arrest, and then there's a reference to the *Castañon-Nava* case? Do you see that, sir?
A Yes, sir.
Q And down at the bottom, it says, ICE academy. Do you see that?
A Yes, sir.
MR. MACDONALD: Your Honor, we would move admission of Exhibit 258.
MR. BROWN: No objection, Your Honor.
THE COURT: Admitted.

Q. (By Mr. Macdonald) On this page we're looking at right here, it says, an officer who conducts a warrantless arrest of a noncitizen must document the facts and circumstances surrounding the warrantless arrest in the narrative section of the I-213. Do you see that?

A Yes.

Q And that's consistent with what the broadcast policy that we just looked at said; right?

A Yes.

Q And so even though there was training at ICE -- at the academy, when you were out in the field you didn't realize this documentation requirement existed for warrantless arrests?

A I understand that we have to document like what happened on scene and stuff.

Q Let's look at the next page, please. This ICE training says that an I-213 must contain the following six facts for an individual flight risk analysis. Do you see that?

A Yes.

Q Okay. These six facts are similar, if not identical, to what we just saw in the *Nava* broadcast statement of policy in the prior exhibit. Do you see that?

A I see the flight risk analysis, the six statements, yes.

Q Okay. And so when you were out in the field making over the course of the at least two-year period between sometime in 2023 and this Court's order in November of 2025, did you

understand you had to document these six things in the I-213?
A I understood that I have to document what happened on scene, but at that time, I didn't -- I don't believe when I was working in CAP, I didn't make any warrantless arrests.
Q That's a different question, sir. When you were working out in the field, there were times where your unit, before this Court's order -- so, at any point before November of 2025 -- could make warrantless arrests; is that true? They could do that?
A We always have the authority to make warrantless arrests.
Q Okay. Did you understand that these were the obligations to document --
A I understand that we have obligations, but not exactly all six.
Q Okay. You didn't understand that you had an obligation to document all six of these?
A No.
Q When did you leave the CAP unit that you referenced earlier?
A I think it was January of 2024.
Q What unit did you go to in January 2024?
A The fugitive operations.
Q What was the fugitive operations unit?
A Our job is to apprehend people with final orders predominantly.

Q When you went to detain people with final orders, did you ever encounter collaterals? Do you know what that term means?
A I do, sir.
Q What does it mean?
A It just means someone other than your target.
Q Okay. From starting in January of 2024 when you were part of the fugitive operations unit, did you ever encounter collaterals in the field when you were going after a specific target?
A Yes. If we were working with like the DEA or something, yeah, during that time.
Q Did you ever arrest those collaterals when you were out in the field starting in January of '24 going forward, ever?
A I'm sure I did.
Q Okay. Those would have been warrantless arrests; right?
A Not necessarily, because our supervisor at the time would -- the common practice was to issue 200s before actually bringing them into custody.
Q And are you testifying to this Court that from starting in January of 2024 until this Court's order, you never engaged in a warrantless arrest of a collateral, sir?
A I'm saying the common practice was to obtain a 200 -- an I-200 before taking the person into custody.
Q Are you testifying that you never engaged in a warrantless arrest of someone who was deemed a collateral between

January 2024 and November 25th, 2025?
A What was the last date?
Q November 25th, 2025.
A I'm not sure if -- if I did arrest a collateral without a warrant, because the common practice was to obtain an I-200 from the supervisor.
Q You don't know one way or the other sitting here today?
A No, because that was -- the common practice was to always get a 200.
Q And when you say the common practice was to always get a 200, an I-200 arrest warrant, you mean when you saw -- you were -- saw a collateral, someone that was not a target, whose name you did not know, that you would get an I-200 in the field? That's what you're testifying?
A Yes, sir.
Q And at the time you got that I-200 in the field, would you have the person sometimes in handcuffs?
A Depends.
Q Sometimes would you have them in handcuffs?
A Yes. Depending on if they're going to escape.
Q Sir, you agree that the mere presence within the United States in violation of U.S. immigration law is not by itself sufficient to conclude that an alien is likely to escape before a warrant for arrest could be obtained? You agree with that; right?

A Say that one more time?

Q The mere presence within the country in violation of immigration law is not by itself sufficient to conclude that a person is likely to escape before a warrant can be obtained. Do you agree with that?

A I wouldn't necessarily agree with it.

Q You would not agree with that?

A No.

Q All right. Let's put Exhibit 68 back up, please. This is the *Nava* broadcast statement of policy that you received and was in effect while you were out in the field making arrests. Let's look down at the bottom line of that first page of Exhibit 68. This is the ICE policy, sir.

It says, however, mere presence -- down at the bottom, last line, Jason, on the right. However, mere presence -- and we will put up the next page, please, Jason. Can we have both of those pages together, please? Okay. So, this is the *Nava* policy in effect while you're in -- and actually, it's still in effect today.

And it says at the bottom, however, mere presence within the United States in violation of U.S. immigration law is not by itself sufficient to conclude that an alien is likely to escape before a warrant for arrest can be obtained. Do you see where I'm reading?

A Yes, sir.

Q Okay. And you disagree with that. That's what you just testified; right?

A I disagree with it. That doesn't mean I don't have to follow that policy, though.

Q Oh. Okay. So, even though you disagreed with it a moment ago, you were actually complying with this in the field?

A Yes.

Q Did you know that was the policy?

A Yes.

Q Do you recall an email and a statement from ICE's principal legal adviser, Charles Wall, that was sent out in June of 2025 declaring that the *Nava* settlement had expired? Do you remember that?

A I don't. I don't remember that.

Q All right. We're going to show it to you in a moment. You said -- I just want to get back to your -- you talked about the fugitive operations unit you started with in January of 2024. How long did you stay with them?

A Until recently. Probably until December of this past year.

Q December of 2025?

A Yes, sir.

Q Okay. And what unit are you with now?

A The FCC, the field command center.

Q Field command center. And that still keeps you out in the field; is that right?

A Negative.
Q Are you making arrests today?
A No.
Q So, have you made any arrests since December of 2025?
A January -- actually, January is the last -- last time that I made an arrest.
Q Why did you move to the field command center?
A It was up to management's decision.
Q All right. We can just quickly put up Exhibit 124, please, Jason. Thank you. This was also previously admitted, Your Honor.
So, this is a -- if you look down at the bottom, it says, to all employees. It's dated June 11th, 2025. It says, please be advised that the settlement agreement in *Nava* terminated at midnight on May 12th. Do you see where I'm reading there, Mr. JB?
A Yes, sir.
Q And if we turn to the next page, you can see that it's from Charles Wall, the principal legal adviser?
A Yes, sir. At the bottom, yes.
Q Okay. Does this help refresh your memory that you would have received an email from the principal legal adviser, Mr. Wall, telling you that the *Nava* settlement had terminated?
A I don't know if I received it.
Q Okay. Should have gone to all ICE employees?

A Should.
Q Okay. So, you should have received it?
A Yes.
Q All right. Did -- would this email have changed anything that -- about how you were doing your job at the time?
A No.
Q Do you recall getting an email from Mr. Wall on or about October 22nd, 2025, saying that the *Nava* broadcast statement of policy was reinstated?
A No.

MR. MACDONALD: Let's take a look at Exhibit 126, please. This was previously admitted, Your Honor.

THE COURT: Okay.

Q. (By Mr. Macdonald) Mr. JB, this is another email from Mr. Wall, the principal legal adviser. And just as an aside, do you know that Mr. Wall is currently also the deputy director of ICE, maybe in an acting capacity?
A I don't know his exact capacity at this time.
Q Okay. But a high up official of ICE?
A Yes.
Q So, this is an email October 22nd, 2025, saying that ICE was ordered to reissue the broadcast statement of policy. Do you see that?
A Yes.
Q All right. Did this -- do you recall seeing this now that

you've had a chance to look at it?

A No.

Q All right. And as part of this email from Mr. Wall in October 2025, he reissued to all ICE agents the broadcast statement of policy that is in Exhibit 68 that we were just talking about. Do you recall that?

A No.

Q Did this email from Mr. Wall in October 2025 change how you were doing your job in the field at all?

A If I didn't know about it, then I wouldn't have changed the way I operate out in the field.

Q Okay. Is there a reason you wouldn't have known about an email that one of the top officials at ICE sent to all employees about warrantless arrest policy?

MR. BROWN: Objection, Your Honor. This calls for speculation why he wouldn't have known something.

THE COURT: Overruled.

THE WITNESS: We get a lot of emails, and you're overwhelmed by emails. And so if it's brought up during training that, hey, this is what we're doing now, or an email comes out from one of our immediate supervisors, tells us, hey, this is how we're going to be conducting business now, like, due to like this case now, then we change the way we operate.

Q. (By Mr. Macdonald) Okay. But you don't remember any such training or instructions about the broadcast statement of policy

in *Nava* and any of these back and forth emails we've seen from Mr. Wall?
A No. Not exactly, no.
Q When you say not exactly, tell me what you mean.
A Well, I don't remember seeing the emails due to at the time of making these -- or making arrests, I thought what we were doing at the time was sufficient.
Q So, this happened in October -- late October of 2025. In early November, did you -- do you remember receiving any instructions that you should try to obtain a warrant for arrest whenever feasible before making an arrest?
A Yes.
Q Who gave you that instruction?
A Our supervisors did. And then on December 2nd, I remember seeing -- I did get an email on the criteria that they wanted to see in the 213s.
Q On December 2nd?
A That was the last email I remember.
Q Okay. Who was that email from?
A That was -- I can't recall, but I think ICE headquarters.
Q And you don't remember what human being sent that email?
A No, sir.
Q But you remember it specifically as being on December 2nd?
A December 2nd, yes.
Q Have you reviewed that email in the last week as you

prepared for your testimony?
A Yes.
Q Did that help refresh your memory in any way?
A Yes.
Q But it didn't help refresh your memory as to who sent that?
A No.
Q All right. You understand I don't have that email. Are you aware of that?
A I am not aware of that.
Q But that email told you what someone wanted and specified in I-213s?
A Yes.
Q And what was that?
A What was what?
Q What were the things that the email that I don't -- can't see --
A Sorry.
Q Excuse me, sir. What were the things in that email from December 2nd you just referenced -- what did it specify that you should put in the I-213s, sir?
A It just had certain criteria that they wanted to see. I can't recall exactly, because after I seen that, I would look back at that email whenever I wrote my 213s.
Q And are the things that were specified in that email the same as the factors that were required and we looked at in

Exhibit 68 and that we looked at in Exhibit -- which is the broadcast statement of policy, and the same things specified in the ICE training that is Exhibit 258?

A I don't know if they're exact, but similar.

Q Okay. In early November, did you receive instructions that you should try to obtain a warrant for arrest whenever feasible before making an arrest?

A Yes.

Q Who gave you those instructions?

A Our supervisors.

Q Who?

A It was -- I believe it's either going to be Kevin Cruz or Rhiannon Garcia.

Q Are those instructions in writing?

A No. No. It was verbal.

Q Was there any documentation along with that?

A From him?

Q From anyone.

A I can't recall. But I remember during our training, they were like, you should try to get a warrant every single time, or an I-200 or a 205, depending on the arrest.

Q Okay. When you say in your training, what training are you referring to?

A Well, it just depends, either formal training or informal training. Like sometimes we will be in the office, and we will

talk about different cases and, hey, for this, let's try to -- let's get an I-200 or a I-205. This is the common practice that we want to see going forward.

Q And I thought you previously testified that back when you were in the fugitive operations unit when you were first making arrests, you said that was the common practice. Didn't you say that earlier?

A Yes.

Q Okay. So, for you, nothing changed?

A Well, in what aspect? Like, for the 213, writing the 213, yes. Things changed.

Q With respect to making -- whether or not you were trying to get a warrant in the field, did anything change in the conversation that you just mentioned in early November --

A No, sir.

Q -- 2025?

A No, sir. Because we always tried to obtain an I-200 or 205.

Q I take it from your prior testimony -- I'm going to ask this question. I think you probably won't know it, but I will ask it just to be sure: Are you aware of any of the recent orders in the *Nava* case in Illinois requiring the broadcast statement of policy to be sent out yet again?

A No.

Q You're obviously aware that this Court entered the

preliminary injunction on November 25th, 2025; right?
A I don't know exactly when, but I know that there was an injunction, yes.
Q Did this Court's preliminary injunction change how you were doing your job in the field?
A Yes.
Q How?
A By the 213.
Q Could you explain more.
A Yes. I would -- the -- I think it was eight -- eight, basically criterias that they wanted to see in the 213, I would tailor it to basically what the judge wanted or wanted to see.
Q Do you understand that the judge's criteria are at least functionally the same criteria that were in the *Nava* broadcast statement of policy that had been in place?
A I didn't -- I didn't know.
Q You did not know that?
A No.
Q All right. So, you weren't doing it before, but you changed, at least that's your testimony, after the judge's order?
A Yes.
Q How did you learn about the Court's injunction?
A An email.
Q From who?

A It was the December 2nd one.
Q It's the same email we were just talking about?
A Right. And I was aware that Davies or AFOD went to court.
Q How were you aware that Mr. Davies went to court?
A I think talk around the office.
Q Did you have any training on what this Court's preliminary injunction required of you as an agent?
A No. Not formal, but the email itself gave us guidance.
Q So, no formal training. That's what you just said?
A I know that there's Fourth Amendment training, but I don't think I was -- well, I know I was out that -- during that time, so I wasn't able to take the Fourth Amendment, which covers our warrantless arrest.
Q When was the training that you were out for?
A I think that was -- I believe -- I can't recall, but I think it was December.
Q But you weren't there for it in any event, so you don't know what happened?
A No, sir.
Q Do you know if any materials were prepared at that training about the requirements of this Court's order?
A No. It's just our supervisor told us that we will try our best to get an I-200 or a 205.
Q Have you discussed the requirements of this Court's order with any of your fellow agents?

A Yes.

Q Who and what have you discussed?

MR. BROWN: Objection. Please I would like to -- excuse me. Objection. To the extent that he's going to identify any DOs in the field, I would request that he just uses their initials, please.

THE COURT: That's fine.

THE WITNESS: Thank you, sir. Yeah. In passing, during arrests in my unit, we would say, hey, like, let's start annotating it more, basically by that email. Like, I referred to that email so that we can start basically complying with the order.

Q. (By Mr. Macdonald) Have you recently gotten any additional instructions with how to comply with the Court's order?

A Other than just being verbally told by our chain of command?

Q Yeah.

A No.

Q Okay. On or about February 13th, did you receive any additional instructions from anyone about how to comply with the Court's order?

A No.

Q When you're out in the field, you often have potential targets you're looking for; is that true?

A Yes.
Q Could be individual people, or it could be a particular geographic location; right?
A I mean, we have a target that we're looking for in that location.
Q Sometimes you go to a location where you think there will be a target-rich environment; is that true?
A That is true.
Q When you get targets from your intel team, sometimes that information is not accurate; is that fair?
A That's fair.
Q For example, a person that your target team says for you to look at could turn out to be a lawful permanent resident or LPR; true?
A The target we're looking for?
Q Sometimes the target you get from an intel team, that information could be wrong. You've said that?
A Right. Yup.
Q True?
A Yes, sir.
Q And sometimes the person could turn out to be an LPR, the person you've gotten from your target team, your intel team?
A Yes. But the thing is before you make the arrest, you have to do your checks yourself, or they should be done, and you have to look at various systems. So, you can't just look at one

system and rule out that person is here illegally. But yes. Sometimes when it comes from the targeting team, yes. Sometimes it is wrong. Yes, sir.

Q Okay. And because it's wrong, I think you just testified it is, you have to do your own checks; right?

A Yes.

Q And did you typically rely on your supervisor to do those checks?

A No, sir.

Q Did you rely on your supervisor to review the databases to confirm identities in the first instance when you were in the field?

A I would -- I would find the target, and then I would show all my basically evidence that the person is here illegally, and then it's up to the supervisor whether or not they're going to review that to like say yes, they are here illegally, and then issue the I-200 or 205.

Q How about when you're making a warrantless arrest? In that set of circumstance -- and that has happened; right? You've made warrantless arrests?

A Mm-hmm.

Q Yes?

A Yes, sir.

Q And in that circumstance, you rely on your own expertise and experience; right?

A It's a combination of my expertise and a field interview that the person admitted to being here illegally that gave me the probable cause to make the warrantless arrest.

Q How often are you communicating with your supervisor when you're in the field on an operation?

A Depends. It's either after every arrest or at the end of the day. It just depends.

Q Okay. So, it could be you communicate with your supervisor at the end of the day?

A Yes, sir. It just depends if they're back at the office or they're out with us. If they're out with us, then you're communicating while you're out in the field. But if they're back in the office or if they're not that -- if they're not in that day, and you're acting, then maybe a phone call at the end of the day, or usually the AFODs and above will know about the arrests of the day.

Q Are you communicating with your supervisor by text sometimes?

A Sometimes. Or a phone call or email.

Q Could be text. Could be email?

A Yes, sir.

Q And when -- you also are communicating with the other deportation officers that are with you in the field; right?

A Yes, sir.

Q Okay. And you do that sometimes by text; true?

A Yes, sir.

Q Sometimes all the people in an operation get on a text chain, and you're texting back and forth during the operation; true?

A Yes, sir. Or majority of the time will be on the phone with a conference call.

Q But sometimes they're on a text chain?

A Sometimes.

Q Tell the Court what a scratch I-213 is, please.

A A scratch I-213 is basically all the -- it's like a field interview when you ask them questions, where are they from, their name, where they live, occupation. Basically it's the 213 just when you're talking to the person, but when you're in front of them. So, you're just writing it down rather than you basically processing them and actually typing it into the computer. It's just a blank 213 that you're filling in.

Q Is there always a warrant if there's a target?

A Can you rephrase -- like, are you saying is there always a 200?

Q Yes.

A No. Because there could be a 205. It depends on the case category. For instance, if the person is a reinstate, they shouldn't have a 200. It should be a 205, because a 200 has already been issued. Or if they have a final order of deportation, then an I-200 would have already been in the file.

So, you wouldn't reissue another 200. Even though now we do, because -- just to be really safe, but the 200 should always be in the file.

Q Okay. Make sure I understand what you're saying. You're saying now, when you go after a target who has a final order, you will reissue an I-200?

A Yes.

Q And you think that's silly?

A Yes, sir.

Q Why?

A Because an I-200 was already issued before. That's like -- that's basically you're reissuing two warrants, again, when you already have one, and an -- an immigration judge already said yes, I order you removed from the United States. And so a 205 should be the next step, not a 200. Because a 205 is what accompanying is it, which is the -- you have a -- either an SDDO or the AFOD or the immigration judge that signs the 205, which that's a part of the file.

Q Okay. It's also possible that someone's status could change after they had a final removal order; right? Someone could get a U Visa. Someone could get temporary protected status. So, that's possible, isn't it?

A Yeah. Anything is possible.

Q But now you're starting to reissue I-200s, administrative arrest warrants for people that you're going after; right?

A Reissue? Right? Is that what you said?
Q Issue another one?
A Yes.
Q When did that start?
A After the injunction.
Q So, that started after the injunction from this Court?
A My practice, yes. But I don't know about other units or other individuals. But predominantly, before we would actually try to locate someone, an I-200 would be issued.
Q When did your practice change, then?
A To reissue an I-200?
Q Yeah.
A It depends on the SDDO. If I would get an FOW, a field office worksheet, that was the classic way of doing it, which would -- you would find a target. You would type up -- we call it blue folders. And then if the -- if the supervisor wanted to see a 200 in there, you would reissue one, or you do a 205. The correct method, if they have a final order, it would be a 205.
Q And --
A Sorry. Or you get a copy of the -- of the initial 200 that was issued.
Q Okay. And for someone who didn't have a final order of removal -- okay?
A Mm-hmm. Yes.
Q A collateral in the field that you come across, you find

out their identity. You form the conclusion that they're here in violation of the laws. Is it your testimony you are now also trying to get field warrants, I-200s obtained for those people?
A If they did not have a previous I-200?
Q Correct.
A Yes.
Q Okay. And you do that sometimes after you've put them in handcuffs; true?
A Sometimes.
Q You do that sometimes when they're in your patrol car; true?
A I don't have a patrol car.
Q You have a vehicle when you're out in the field?
A I do have a government-issued ICE vehicle, yes.
Q Okay. What do you call that?
A A government vehicle.
Q Okay.
A A G-Ride.
Q Sometimes you get the I-200 in the field once you've already put the person in your government-issued vehicle; true?
A Depends, but yes.
Q Sometimes?
A Sure. Yes.
THE COURT: Just a minute, Mr. Macdonald. Kevin, do you need a break?

MR. MACDONALD: Do you want to take five minutes, Judge?

THE COURT: Well, you've got other witnesses.

MR. MACDONALD: Well, let me take a break, look at this, and see if we can move it along.

THE COURT: That's a good idea. Let's take about ten minutes.

(Recess at 10:36 a.m., until 10:55 a.m.)

MR. MACDONALD: May I proceed, Your Honor?

THE COURT: Yes.

MR. MACDONALD: Thank you. Jason, can we pull up Exhibit 207. Mr. JB, this is a package of exhibits -- package of I-213s that we received from the Government. If we could go to page 15, please.

MR. BROWN: Your Honor, I would just like to say, we have stipulated to the admissibility of the 213s attached. There's a series of exhibits like this where there is a cover email from counsel to opposing counsel -- from defendants' counsel to opposing counsel that attach I-213s, or really they're frequently in a link to 213s, but the exhibit, the 213s are attached to the exhibits. And we have stipulated to the admission of the 213s; however, for the cover emails, we would agree to their admission, but only in the sense that they are representations of counsel, and we don't think that they are substantive evidence of anything that the agency has said.

THE COURT: Okay. All right, then. 207 is admitted with that qualification.

MR. MACDONALD: And, Your Honor, just for the record, we disagree with the qualification, but they're admitted, and we will use them as we deem appropriate. The statement -- that email on the first two pages of 207 are statements. They are non-hearsay under 801(d)(2), statement of an agent within the scope of the relationship, but we will let Your Honor sort that out as needed.

THE COURT: Okay. Onward, Mr. Macdonald.

MR. MACDONALD: Okay. Thank you.

THE COURTROOM DEPUTY: Just to clarify, I do see there is redacted versions as well. Do you want these published?

MR. MACDONALD: We're not going to publish these. Thanks, Ms. Smotts. We're just going to show them on the screen for the judge and the witness, if that's all right with you, Your Honor.

THE COURT: Yeah. It's all right with me. You're talking about this 213 here that's got fingerprints on it?

MR. MACDONALD: I am, Your Honor. That's true, Your Honor. Jason, if we can, let's go back to the first page of 207.

Q. (By Mr. Macdonald) So, just to orient ourselves, Mr. JB, this is a -- the first page of 207 is an email from Assistant United States Attorney Mr. Brown. It's dated February 10th,

2026. So, a month ago exactly. And if you see in that second sentence, it says, per Judge Jackson's order and our agreement, we uploaded one-third of the I-213s for warrantless arrests in January. Do you see where I'm reading?

A Yes, sir.

Q Okay. So, these are I-213s for warrantless arrests in January of this year. Let's look at page 15.

MR. BROWN: Objection, Your Honor. Lack of foundation for that. The witness doesn't know anything beyond that. That's a representation of counsel. He's not aware of the background of that.

THE COURT: Okay. Okay. Fine.

Q. (By Mr. Macdonald) Let's go to page 15. Mr. JB, this is a -- and we're not going to use the name of this person that was arrested. I will refer to them as RCP with their initials, and this person was arrested on January 20th, 2026. Do you see that?

A Yes, sir.

Q Okay. And if we look at the next page, you're one of the arresting agents? Do you see that?

A Can you scroll down a little bit?

Q Yeah. It says arresting agents right there at the top.

A Yes, sir.

Q Okay. Do you see your name?

A Yes, sir.

Q Okay. Are any of the people on that arresting agents list SDDOs, sir?
A Yes, sir.
Q Which ones?
A The first one.
Q Okay. That's the person you referred to earlier. We said their name already. That's Ms. Garcia?
A Yes, sir.
Q Okay. So, you were involved in this arrest; right?
A It appears so.
Q Okay. If we see the record of deportable and excludable alien, that's often referred to as the narrative; true?
A Yes.
Q Okay. You're described as part of the MCAT team, the mobile criminal alien team?
A Yes, sir.
Q Okay. And you were part of that MCAT team at least as of January 20th, 2026?
A Yes, sir.
Q Okay. So, at that time, you were still making warrantless arrests in the field?
A I was making arrests in the field.
Q Okay. Some of those were warrantless?
A I can't recall all my arrests during that time. I don't want to say that I made warrantless arrests, but I made arrests

at that time. If it deemed necessary to make a warrantless arrest, then yes.

Q Sitting here today, you can't remember whether you made even a single warrantless arrest in the month of January?

A No.

Q Okay. The narrative says that you were conducting surveillance in Castle Rock; true?

A Yes, sir.

Q And that you observed two Hispanic males; right?

A Yes, sir.

Q And how did you -- first of all, do you remember if you prepared this narrative? It doesn't say; right?

A It looks like something I would have prepared.

Q Okay. You believe you prepared this; right?

A Yes.

Q And how did you identify them as Hispanic males? What features led you to conclude that they were Hispanic males?

A After the fact. Like, this is written after. So, two males came out that matched the description of my -- of the target, but two males came out. We added Hispanic after because they are Hispanic males.

Q Okay. You didn't identify them as Hispanic males at the time --

A No.

Q -- before --

A No. I would identify people as someone that resembles my target.
Q Okay. And that's what you think happened here?
A I have to -- you have to give me time to read over it.
Q Okay. Yeah. Please do.
A Okay.
(Pause in the proceedings.)
A Okay.
Q So, does this refresh your memory that in fact they didn't match the description of your target?
A Matched the description, but it was not my target.
Q Sorry. You're testifying that the two -- one or both of the individuals matched the description of your target, sir?
A Well, that's -- that's the way I would have to be, because I can't see the photo up top on the 213, and I don't have a photo of my original target at this time. So, if I -- at the time if I believed that person could be my target, and I have reasonable suspicion that that is my target, then yes. We would target that person.
Q Where in your encounter do you describe that either of the two people match the description of your target?
A I didn't, but I did run the plate of that vehicle, and that's how we found out who their -- what their identity was.
Q Okay. So, you didn't write down that one of these two people matched, at least in your view, the description of the

target. You forgot to write that down?
A It's not in there. Correct.
Q Okay. Should it have been in there?
A It could be.
Q Should it have been in there, sir?
A I mean, it just depends.
Q Sometimes you put it in there, and sometimes you just leave it out?
A Well, I don't think every 213 is perfect, sir. But this is as accurate as possible at that time.
Q Make sure I understand that. It's as accurate as possible at that time, even though you're testifying now that you left out the fact that one of the people looked like the target?
A I'm saying that I don't remember this incident exactly.
THE COURT: Who was the target?
THE WITNESS: It says right here.
MR. MACDONALD: Let's use the initials. Is it BF?
THE WITNESS: BF.
Q. (By Mr. Macdonald) The person identified as BF in this I-213?
A Yes, sir.
Q Okay. And why was it relevant -- you prepared this narrative after the arrest; right?
A Yes.
Q Okay. Did you do it in the field, or did you do it back

when you were at headquarters?
A My normal practice is to do it -- I've done it out in the field, but my normal practice is to do it back at the office.
Q Okay. And you don't remember here whether it was in the field or back at the office?
A No, sir.
Q Okay. Would it help you if you looked at the time this was prepared on the first page, the date and hour?
A No.
Q Why would that not help you?
A Because it's not like we make one arrest and we're done for the day. We have other targets that we're going to go back and try to locate and stuff like that.
Q Okay. So, you may have to wait a while before you fill out the narrative, because you're going after other targets?
A Sometimes.
Q Okay. Why was it relevant after the fact to describe them as Hispanic males?
A Because they're Hispanic males.
Q Why was it important to describe that?
A It's -- if you're going to give a description of somebody, you're going to give, you know, height, weight, what they look like.
Q Okay. The narrative, you didn't include height, weight, or what they looked like?

A Up top, it will say what height and weight they are.

Q The person that you arrested here, Mr. RCP had no prior criminal or arrest history; true?

A I don't know.

Q Let's look at page 17 of the exhibit, the next page of the I-213 at the top. Can you see criminal history?

A Yes, sir.

Q It says that RCP has no prior criminal or arrest history?

A It says that, but I don't -- this wasn't -- usually I only write down the encounter, and then the processing team will fill all that in, like gang affiliation, all that stuff.

Q Okay. And I missed the beginning.

A Oh. I said I probably did not prepare the criminal history part or gang affiliation or anything like that. That's done by the processing team. During this time, I would do the narrative part, like the encounter.

Q Okay. But in any event, you don't dispute that RCP had no criminal history?

A I don't know if he did or not, but I can tell you that he's here in the country illegally, which is a crime.

Q Just being in here, like a Visa overstay? That's a crime?

A In the INA, yes.

Q You didn't note in the encounters -- and let's go back to that. Is it your testimony that being in the country unlawfully -- well, strike that. We'll come back to that. It

also says that Mr. RCP stated he's not in or associated with any gangs; right?
A If that's what he told the processing team.
Q Okay. You didn't have any contrary information to either of these, that he had no prior criminal or arrest history, or that he's not associated with any gang?
A No.
Q All right. On the encounter, you were attempting, you say, to locate Mr. BF; right?
A Yes.
Q But that RCP got into a Honda Civic with certain plates, and you indicate that the vehicle is registered to BF, who was your target; right?
A Yes.
Q You say you followed the vehicle. You performed a stop by activating your lights; true? That's what you say?
A That's what it says in the 213, yes.
Q Okay. You go on to say that you -- officers contacted both occupants simultaneously and requested identification?
A Yes.
Q That would be a typical practice --
A Yes.
Q -- for you? You say that officers identified themselves as officers with ICE, performed a field interview. That is one of your typical practices?

A Yes.
Q You say during the interview, both admitted to being in the U.S. illegally with no documents. Do you see that?
A Yes.
Q Lots of your I-213s say that?
A A lot?
Q Yeah.
A I can't say every single one, but it's a common -- yes.
Q All right. And is your testimony that at least in lots of the field interviews that you've done, people, including here, RCP, just admitted that they were in the country without documents?
A During the investigation, yes.
Q This would have been in the field; right?
A Yes.
Q Okay. And after the interview in which you say that both individuals admitted to being in the U.S. illegally with no documents, officers ordered both out of the vehicle. Both complied with the orders, and officers informed them that they are under arrest for immigration violations; true?
A Yes.
Q Okay. And you applied handcuffs, and both were transported to the Denver field office for processing?
A Yes.
Q Okay. You didn't know the identity of RCP at the time you

made that -- that you stopped the vehicle; true?
A Yes.
Q You didn't know the identity of the other person that was pulled over and then arrested with RCP; true?
A Before; correct?
Q Okay. You didn't know who they were until they provided -- well, in fact, here, you don't even say that they provided identification, do you?
A Both handed officers the Colorado driver's license identification and Mexican identification.
Q Thank you. Thanks for that clarification. I've seen a lot of I-213s. Okay. So, they provided their identification?
A Yes, sir.
Q You don't say that they were fraudulent or with false names; right?
A Correct.
Q So, the people handed you their identifications. You say they said they were here illegally. You ordered them out of the car and placed them under arrest and took them to processing; true?
A I did -- common practice at the time was to try to get an I-200 signed.
Q Could you say that again, please?
A Yeah. Common practice after we already did the interview and everything, we determined they are here illegally, we would

try to obtain an I-200. That was the common practice.

Q Do you say anything about that alleged common practice in this I-213?

A No, sir.

Q And do you know whether you got an I-200 for RCP or the other passenger, the other collateral who was in the vehicle with him?

A Common practice is at some time an I-200 would have been issued.

Q Okay. That wasn't my question, sir.

A I'm sorry.

Q Do you know whether you got an I-200 for RCP?

A You're asking me about several arrests. I can't tell you exactly about this one.

Q Okay. Could you, from your files at ICE, have gone and checked before you came in here to testify today?

A To see if there's a 200 in there?

Q Yes.

A Yeah.

Q You didn't do that?

A No, because I didn't know about this case. This was all a surprise, all these 213s.

Q Okay. Would you normally -- if you had gotten an I-200 after you placed handcuffs on RCP, would you normally have noted that in this I-213 narrative?

A Can you repeat it one more time?
Q Yes. If you had obtained an I-200 administrative warrant in the field after this encounter began, would you normally note that in the -- in this I-213 narrative section?
A Sometimes.
Q Sometimes you do, and sometimes you don't?
A Sometimes they -- I might forget to actually put it in there.
Q You agree that both RCP and the other person in the car would be deemed collaterals, as you understand the word?
A Depends. It could be targeted. It could be -- or collaterals.
Q How were they targeted here, sir?
A No. I'm saying it just depends, but these would be collaterals.
Q That was my question.
A Yes.
Q You agree that these two people that you arrested there -- describe in this I-213 would be collateral?
A They would be collaterals of the initial target.
Q All right. But they weren't with the initial target; true?
A True.
Q All right. And when would you have been able to get an I-200 field arrest warrant in this circumstance, given the description that you provide in the I-213?

A After a field interview. I would attempt to either reach out to my supervisor, or if one of us are acting that day, we could issue an I-200.

Q You weren't acting as an SDDO this day; right?

A It says that Rhiannon Garcia was the SDDO. So, she would have issued it either on scene, or I would have had to have made a phone call.

Q You don't know whether SDDO Garcia issued an I-200 for this arrest, do you?

A I don't know, no.

Q And speaking of -- and you were not acting. That's clear; right? Acting SDDO in this incidence?

A Correct. It appears.

Q And with respect to acting -- being an acting SDDO, what specific training have you received to be an acting SDDO?

A It's not a -- it's not a training. You have to be a senior deportation officer, GS-12 or higher.

Q Okay. There's no specific training that you've received for that?

A No.

Q Okay. This I-213 doesn't say one way or another whether it's a warrantless arrest; true?

A Correct.

Q This I-213 does not contain the specific particularized facts supporting a conclusion that the person was likely to

escape before a warrant could be obtained; true?

A True, because if an I-200 was issued, you wouldn't write that in there.

Q But you don't know if one was?

A Correct.

Q You agree you did not have any particularized facts supporting a conclusion that RCP was likely to escape before a warrant could be obtained; true?

A Say that one more time?

Q You did not have any particularized facts supporting a conclusion that RCP was likely to escape before a warrant could be obtained, did you?

A That's false. Due to -- during that field interview, if they don't have a -- like for instance he's driving somebody else's car. So, for me -- or he doesn't have a stable address. So, for me to try to find him again, the likelihood of me being able to locate him again is near zero. So, a warrantless arrest would be practical in that time.

Q Okay. You said that RCP didn't have a stable address. How did you know that --

A That's not what I said.

Q Excuse me. Let me finish my question. You just testified that RCP didn't have a stable address. How do you know that, and where did you indicate that in the I-213?

A That's not what I'm saying. What I'm saying is if he

didn't -- I don't know if he did or not at that time, like, looking at this. But at the time, while I'm doing my field interview and my investigation, if he doesn't have a stable address or he doesn't have ties to the community anything -- or those criteria, then we would make a warrantless arrest. But I don't know if this was a warrantless arrest or we already had I-200s on scene due to common practice was to get a signed I-200 from an SDDO.

Q So, you didn't -- you don't know whether he had ties to the community; right?

A Looking back, you're asking me about one arrest, like, after several.

Q Okay. I just want to make sure I get an answer to my question. I know the judge is going to get frustrated with me the longer we go. Do you know --

THE COURT: Is going to get?

MR. MACDONALD: Fair point, Your Honor. I probably started that way.

Q. (By Mr. Macdonald) Do you know whether RCP had ties to the community?

A Right now?

Q Yes.

A I don't know right now.

Q Did you know at the time?

A If -- because I would have asked the question, yes. I

would have known at the time.
Q You just wouldn't have written it down?
A No.
Q Okay. You didn't -- did you know whether he had a stable address?
A I would have asked him at the time.
Q You just forgot to write that down too?
A Well, I wouldn't have written it down if we would have had an I-200.
Q Which you don't know whether you did or not?
A Exactly.
Q Let's take a quick look at the first page of that I-213 again. Up at the top, it has the address. Do you see that --
A Yes, sir.
Q -- for RCP?
A Yes, sir.
Q That would have come from his driver's license; right?
A Depends.
Q Maybe?
A Possibly. It depends on the processing -- the processing team actually inputs all this into the computer, and then it spits it out onto the 213. So, whatever address the individual gave to the processing team, it would be put up there, or it could be on his driver's license.
Q Okay. And if we look at the date and hour over on the

right-hand side, it says 1/20/2026 at 1340. Does that mean this was filled out back at the headquarters at 1:40 p.m.?
A Yes.
Q Okay. Are you aware that RCP submitted a declaration in this case? Were you aware of that?
A No.
Q For the Court's benefit, it's Exhibit 250. And are you aware that he testified -- declared that this arrest happened at about 7:00 a.m.?
A That's possible.
Q Okay. You wouldn't dispute that?
A No.
MR. MACDONALD: All right. Let's take a quick look at Exhibit 208, please. Move admission of Exhibit 208, Your Honor.
MR. BROWN: Same objection as before with regard to the cover emails, but otherwise it's fine.
THE COURT: Okay. It's admitted.
Q. (By Mr. Macdonald) Let's turn to page five of the exhibit, please. So, and actually -- so, this is another arrest. It's dated the same, January 20th. It's for someone with the initials MACV. You see the address is actually the same address in Castle Rock that we just looked at for RCP, but I will -- let's look at the encounter here on the next page. And just to be clear, this is another one of your arrests. Do you see your name here?

A Yes.
Q Okay. And the encounter information, I will represent to you, it's identical to Exhibit 207, the encounter for RCP. You can just kind of quickly see that it's the same date. It's the same individuals conducting surveillance, referenced to BF and car. Do you see that?
A Which means they were in the vehicle together.
Q So, this is in fact the other collateral -- MACV is the other collateral who was arrested with RCP; right?
A They were arrested together, yes.
Q Okay. And this is your encounter; right?
A Yes.
Q Okay. And this one actually says the following encounter and arrest narrative was authored and provided by Deportation -- sorry -- DO JB. I caught myself. Sorry, Your Honor. Right?
A It does say that, yes.
Q The other one didn't say that. This one did, so that just confirms you are the author of the narrative. The narrative is identical for both people; true?
A Yes.
Q And this one doesn't have -- because it's identical, we don't even need to ask those questions. The same I-213, same -- or at least same narrative for that. Do you recall that the driver's license that RCP and MACV provided to you had a black banner that said not valid for federal identification purposes?

A I can't recall, but that sounds about right.
Q Okay. That's something common; right? You've seen that in a lot of folks?
A That are here illegally.
Q That are here?
A Unlawfully.
Q Say that again?
A Unlawfully.
Q Yes. So, you've seen lots of people that you stop that have a license that has a black bar that says not valid for federal identification purposes?
A Yes. A lot, but not all.
Q Say again?
A I said yes, a lot, but not all.
Q And when someone has that license, what does that tell you?
A It tells me -- it's an indicator that they don't have a Social due to the fact that they're likely here without status.
Q And the Court has heard this referred to as an SB251 license from the State statute that created the ability for people to get these licenses. Have you heard of that?
A Yes.
Q Okay. So, is it okay if I refer to these as SB251 licenses? You will know what I'm talking about?
A Yes, sir.
Q Do you understand that people with an SB251 license are not

necessarily here in the country unlawfully?
A Yes.
Q Okay. Did you fill out a scratch I-213 for either the arrest of RCP or MACV?
A I can't recall, because sometimes back at the field office, you would do a scratch 213.
Q Did you have -- so, you don't know one way or another sitting here today?
A Exactly.
Q Did you have any text or other conditions with your SDDO or any of the other DOs who were on the scene at that arrest?
A I can't recall, because if we were all there together, we would talk amongst ourselves.
Q So, you don't know one way or another?
A No.
Q Did you document anywhere facts that would lead you to conclude that either RCP or MACV was likely to escape before a warrant could be obtained?
A You're asking if we documented it?
Q Yeah. Did you document it anywhere?
A No.
MR. MACDONALD: Okay. Let's look at Exhibit 204. Move admission of Exhibit 204, Your Honor.
MR. BROWN: Same objection. Stipulation to the cover email, but otherwise --

THE COURT: Okay. 204 is admitted with that qualification.

MR. BROWN: Thank you, Your Honor.

Q. (By Mr. Macdonald) Let's look at Exhibit 15 -- I'm sorry. Page 15 of Exhibit 204. Mr. JB, this is an I-213, an arrest that happened on December 27th, 2025, two days after Christmas, of a person named R -- with the initials RHG. Do you see that?

A Yes, sir.

Q Okay. If we look at the next page, you're one of the arresting officers. Do you see that?

A Yes, sir.

Q If we look at the encounter data, down below, this was authored and provided by you; true?

A Looks like something I would write.

Q Okay. And this one actually says, the following encounter and arrest narrative was authored and provided by DO, with your name; true?

A Yes.

Q Okay. Here again, you reference that you were conducting surveillance in an attempt to locate a particular individual; true?

A Can you give me a second just to read it real quick?

Q Absolutely. Sorry about that.

(Pause in the proceedings.)

A Okay.

Q You were conducting surveillance, looking for a target; true?
A Yes.
Q You say you observed three Hispanic males speaking Spanish; true?
A That is what's written down, yes.
Q Okay. How did you know -- same discussion about Hispanic. Is this something you added later, or did you identify them as Hispanic at the time? And if so, how?
A Yes. Afterwards, yes. I would write in there, Hispanic male.
Q Okay. And you say that one of them matched the description of your target?
A That's what it says.
Q Okay. And that they got into a car that was registered to a particular person whose initials are J -- we will call them JAH for this purpose.
A Okay.
Q Leaving out a couple middle names, if we can. And you go on to say you ran some checks. Do you see that?
A Yes.
Q Do you know what checks you ran?
A I would have ran all immigration checks. There's various systems that we would have ran.
Q Okay. What type of system would lead you to conclude that

this person had no legal status, JAH?
A If he has a prior, like, either he's trying to petition for a Visa or he's been encountered by immigration before, or just there's different ways that we can find out if they're here unlawfully.
Q Sitting here today, you're not sure what you checked, but just that you did a check; is that right?
A Yes, sir.
Q Okay. And then it says you identified JAH as the driver. How did you do that?
A How did I positively ID, like, who he is?
Q Yeah.
A Through his picture.
Q He was driving a car, and you were behind him, and you were able to identify him?
A No. It says right here that there was three of them; right? I believe that I actually spotted them outside the vehicle before they got into it. And so the driver or one of the occupants who looked like my target, ran the plate that the vehicle they got into, saw the driver, and was like, that's the driver that is registered to that vehicle.
Q All right. I just apologize. I'm just trying to understand the logistics. So, you identified three people. You thought one of them was your target?
A Yes.

Q Turns out that's wrong; right? None of them were your target?

A Correct.

Q Okay. But they got into a vehicle. So, at that point, all three of them are in a car; true?

A Yes.

Q You're behind them, because you're looking at their plate; true?

A It's either, I could have got the plate from -- from the vehicle or behind the vehicle.

Q Okay. So, you think you were in front of them, turned around --

A No.

Q -- looked at their plate?

A No. Like, if we're in a parking lot, and they're parked, and I'm perpendicular to them, I could get a plate that way. Or I could do a drive-by, pass the vehicle, turn around, and then set up. It just depends.

Q You don't remember how this happened?

A No, sir.

Q Okay. But they got in a vehicle. You were running the plates. You identified who the plates belonged to. You ran a check on that person?

A Yes.

Q And then it's your testimony that you must have had a

picture of that person, and you're saying you also had a clear shot of the driver, and you could link the picture in your system with the driver?

A If I look at a picture and I see the person's face, then I can -- and it looks pretty accurate, the conclusion would be that's probably the driver.

Q Okay. While they're driving away from you?

A Yeah.

Q You then pulled the vehicle over; right?

A Yes.

Q Activated your lights? You say you attempted to speak to them in English; right?

A Yes.

Q You asked where they are from, and they all claimed to be from Mexico?

A Yes.

Q You asked if they are all in the United States illegally, and all said yes, illegal. That's what you wrote?

A Yes.

Q And at that point, you ordered them out of the vehicle and identified yourselves as ICE officers and informed them that they were under arrest for immigration violations, placed in handcuffs; right?

A Yes.

Q And transported them to the field office; right?

A Yes.
Q Okay. So, RHG, the subject of this I-213 was not driving; true?
A True.
Q You had no idea who he was when you pulled him over; true?
A I didn't -- I did know who the driver was.
Q You had no idea who RHG was when you stopped the car; true?
A I did know. I ran the plate.
Q RHG is not the person who was driving, and is not associated with the plate. Do you understand that from your own encounter here?
A Sorry. Okay. So, he's one of the other collaterals.
Q He's another collateral. You didn't know who RHJ [sic] was when you pulled him over; true?
A True.
Q And you asked two questions, according to your encounter: Where are you from, and are you in the country illegally? Those are the two questions that you wrote down that you asked them?
A Yes.
Q Okay. And then your narrative says you informed them they were under arrest. At that point, and I don't think I'm mistaken, you had not even obtained RHG's driver's license, at least according to your account; right?
A I would already -- so, you're trying to say that I did my field interview, and they already claimed to be here illegally?

Correct?

Q I'm asking what you documented in your encounter, Mr. JB.

A And I'm saying I would have done my field interview, and as soon as they would have claimed they're not from the United States and they're here illegally in the United States, I had probable cause to arrest them.

Q And so that's what you did. You arrested them?

A Yes.

Q Okay. You didn't ask them anything about their community ties; true?

A I would have asked after.

Q After you arrested them?

A As soon as I put them in handcuffs, because if you do -- if you ask more questions, the likelihood of them trying to escape, it increases.

THE COURT: Which language were you speaking with them?

THE WITNESS: If they understand some English, then English. And if Spanish, then Spanish.

THE COURT: But I asked which language did you speak with these guys?

THE WITNESS: I would have spoke Spanish.

THE COURT: Can you demonstrate how you would ask them about their residence and other things like that?

THE WITNESS: Yeah. Like, where they're actually

from?

THE COURT: Yeah.

THE WITNESS: I would ask them like de qué país eres, like what country are you from? Tiene documentos, like any papers, identification, stuff like that. It's very, very basic. And if they're not understanding that, and they're not understanding the question, then yes, I would have to call my language line to try to get the question answered, but majority of the people do understand the questions that I'm asking.

Q. (By Mr. Macdonald) And how about how would you ask them in Spanish about their community ties?

A That's a question I would have to ask later, because I would ask them, do you have any kids? Like, what do you do for work? And stuff like that.

Q Okay. You would ask them about their community ties after you arrested them?

A Sometimes.

Q Okay.

A Like, if they're compliant and they're not trying to escape or anything, then yeah. I would ask them tienes hijos, like what do you do for work, stuff like that.

Q You would ask them about their community ties, like where they went to church?

A I wouldn't ask them that.

Q All right. You didn't document any -- any of the facts

related to the risk of escape here in the I-213; right?
A No.
Q You don't indicate that -- on here that this is a warrantless arrest, do you?
A No. Because it might not have been a warrantless arrest.
Q Again, sitting here today, you have no idea whether it was a warrantless arrest or not?
A Because it could have been we got I-200s on scene.
THE COURT: You say it might not have been, and it could have been.
THE WITNESS: Yes, sir.
THE COURT: You just don't know, do you?
THE WITNESS: Not in this exact instance, because later on, I would actually start putting this was a warrantless arrest. And so to my understanding, if I didn't put it in there, then we would actually have I-200s on scene signed before actually taking them into custody.
THE COURT: Have you seen that signed I-200 for this individual?
THE WITNESS: No, sir. Due to the fact that I wasn't able to see all the 213s that were submitted to go back and have time to prep to see if we had 200s, because common practice is at some time a 200 will be signed, either on scene, back at the field office, or prior. So, there's -- we don't have an instance where a 200 is never issued.

THE COURT: So, then your testimony would be that you never have a warrantless arrest, under your definition of what that means?

THE WITNESS: Yes. At the first, it would be a warrantless arrest, and then we would obtain the 200. Just due to the circumstances of EOIR or court, you have to have an I-200 to put them into proceedings.

Q. (By Mr. Macdonald) You're getting these warrants after the fact, after the arrest, aren't you? Isn't that the truth?

A After the arrest, or during?

Q After the arrest.

A During or after.

Q Let's look at the same exhibit, 204, page 11. This is the arrest of the driver, JAH, that we were just talking about. Do you see his name at the top? Same date of action? And if you turn to the next page, we see you're listed as one of the arresting agents? Do you see that?

A Yes, sir.

Q Okay. And if we look at the encounter, it's the same encounter; right?

A Appears as if.

Q Okay. So, this is from you, same person. Don't remember whether this was a warrantless, don't remember what you asked them about their family ties or anything else; true?

A True.

Q All right. Do you remember where you heard them speak in Spanish?
A No.
Q Do you remember if you got a call from someone from a McDonald's restaurant informing you or one of your colleagues about these three individuals?
A No.
Q You don't know one way or another?
A No.

MR. MACDONALD: Let's look at Exhibit 237, please. Exhibit 237. And, Your Honor, I will use the name of this individual, because it's public in light of Your Honor's habeas petition that you granted for Mr. Deonicio Castillo Cabral, who is going to testify later today if I ever stop talking.

THE COURT: Well, I hope so. And just to that point, we only have today, and at 1 o'clock, I have a short hearing in another case. It won't take, I hope, more than 10 or 15 minutes, but it seems like you're using an awful lot of time with one witness.

MR. MACDONALD: Understood, Your Honor. Move admission of 237, please.

MR. BROWN: No objection.

THE COURT: All right. It's admitted. Onward.

THE COURTROOM DEPUTY: Mr. Macdonald, do you want this one published?

MR. MACDONALD: Let's not publish this one either. Thanks, Ms. Smotts.

Q. (By Mr. Macdonald) If we look at the fifth page in the exhibit, this is an I-213 for Mr. Castillo Cabral.

A Okay.

Q Have you reviewed it, sir?

A Yes.

Q It's an arrest you were involved in of Mr. Castillo Cabral on January 14th, 2026?

A Yes.

Q Okay. And this is one where you actually document getting a signed I-200 in the field; right?

A Well, it says officers were able to obtain a signed I-200 before the arrest. Then it says, we were also able to get a signed I-200.

Q For Mr. Castillo Cabral, down at the bottom?

A Correct.

Q Okay. And I'm going to try to move very quickly. Do you have any independent recollection today of this encounter, Mr. JB?

A No.

Q None whatsoever?

A No.

Q Okay. So, whatever it says in this encounter is at least the best recollection you would have of what happened to

Mr. Castillo Cabral?
A Yes.
Q All right. Were you an acting SDDO on this day?
A Possibly.
Q You don't know one way or another?
A Negative. Because there's no -- I can't -- can you scroll up to see where it says arresting officers? Actually, scroll down. Sorry. It will be down -- can you go to the part where it says -- yeah. Arresting officers?
Q Yeah. This one doesn't totally say arresting officers, and you don't know -- it was going to be one of my questions, but I'm trying not to wear out my --
THE COURT: I think it does say that.
Q. (By Mr. Macdonald) It says there was two of you. We know there was you, and we know there was a person with the initials JL, another DO who is identified here. The two of you?
A Yes, sir.
Q Is it possible that you were the only two there at this arrest?
A Yes, sir.
Q Okay. Sometimes that happens, there's just two of you?
A Yes, sir.
Q Here you went to a construction site?
A Yes.
Q All right. Mr. JB, in your view, is someone being stopped

in a vehicle sufficient for probable cause to satisfy the likelihood of escape prong?
A Say that one more time?
Q Is someone being stopped in a vehicle sufficient to establish in your mind probable cause to satisfy the likelihood to escape prong, the requirement for a warrantless arrest?
A I'm not understanding that question.
Q You stopped someone in a vehicle?
A Mm-hmm.
Q Do you follow that?
A Yes.
Q Let's assume you don't have an I-200, and you're making a warrantless arrest. Okay?
A Okay.
Q In your mind, based on your experience and training, is the fact that you stopped them in a vehicle sufficient to give you probable cause that the person is likely to escape before you can obtain the warrant?
A I mean, it plays a factor. Like, they could drive off, but that doesn't give me whether the likelihood of them to escape or not.
Q It doesn't do that?
A I'm just not understanding the question at all. Because we had I -- like, an I-200. So --
Q Yeah. I'm trying to move on from the I-200s. So, let's

pull the I-200 down. I'm talking about in a general situation, you have pulled people over in a vehicle, and I'm trying to understand your view of what gives you probable cause that the person is likely to escape. And I'm just trying to understand whether you believe that pulling them over in a vehicle gives you probable cause that they're likely to escape.

A No.

Q Okay. How do you factor in a person's age or health in evaluating likelihood of escape?

A Oh, well, age is very important. So is health. Like, if they're under the age of 18, we don't have the facilities to detain that person, or if they're over -- used to be a certain age that we would have to ask for supervisor approval to take them into custody. Health, if they're in really bad health, then yeah. We're not going to detain them.

Q I want to finish with just a few questions about your testimony in the Oregon case. You were sent to Oregon as part of an ICE operation in October of 2025; true?

A True.

Q You spent 30 days there; true?

A I think it was actually less than 30. Like 28, I think.

Q Twenty-eight days?

A Sure. Yes.

Q You had a target to arrest eight people a day; true?

A I don't think there was a number on it. But I think

they -- I think they did actually finally was like, hey, like, the spot that we wanted to be at was eight per team. But they -- it never came out in writing.
Q All right. If you testified that you had a target goal of eight arrests per day, would that be inaccurate?
A No. That's -- that's accurate, but it was never in writing. That's what I'm saying.
Q Okay. It wasn't in writing, but someone told you --
A Yes, sir.
Q -- target goal of eight arrests per day?
A Yes, sir.
Q Okay. And you were able to meet those expectations at least sometimes over the course of your 28 days in Oregon?
A Yes.
Q Does the target teams here in Colorado have -- does each team have a similar target goal of eight arrests per day?
A No.
Q How many?
A No. We don't have a -- we don't have a target. Like, we don't have a number.
Q If Mr. Guadian or Mr. Davies testified there was a target goal of three arrests per day, would that be inaccurate?
A I don't remember them ever saying that.
Q You recall you were involved in a warrantless arrest in Oregon on October 30 of seven people in a white van?

A I don't know how many people, but yeah.

Q A number of people in a white van?

A Yes, sir.

Q You testified about it earlier on your direct and said the people tried to escape?

A Yes.

Q Okay. One of those people filed a habeas petition, a petition in federal court?

A Yes.

Q You're aware of that? That person is MGMA. That's the caption of the case. Do you remember that?

A Yes.

Q You testified in front of United States District Judge Kasubhai of the District of Oregon. Do you remember that?

A Yes.

Q You were the person who made the decision to initiate the traffic stop; true?

A After investigation, yes.

Q One of the reasons you wanted to stop the van is because you were concerned about possible human smuggling or human trafficking. That's what you testified to; true?

A It was a possibility, yes.

Q Okay. After stopping the van, you smashed the driver side window; true?

A After repeated -- being repeatedly ordered to roll down the

window.

Q Is that your testimony?

A Yes.

Q Okay. You smashed the window?

A Yes.

Q You did that within a couple seconds of the first order to roll down the window; true?

A Yes.

Q There was video of you smashing the window that was entered into evidence in the Oregon case; true?

MR. BROWN: Objection, Your Honor. What is the probative use of this evidence in this case that impacts arrests in Colorado?

THE COURT: Are you asking me?

MR. BROWN: I'm saying there is none, and the prejudice clearly outweighs it, and there's no relevance to this case here.

THE COURT: Mr. Macdonald?

MR. MACDONALD: It goes to credibility. Just a few more questions based on what happened in that trial, Your Honor.

THE COURT: The objection is overruled.

Q. (By Mr. Macdonald) There was video of you smashing the window; true?

A There was video.

Q The federal judge found that you, quote, did not provide

any meaningfully reasonable time for the driver to comply with your commands before driving -- excuse me -- before shattering the driver side window; true?

A I don't -- I don't think he -- I don't know if he made a decision on that.

Q Okay.

A I'm not aware of that.

Q You testified in the MGMA habeas case about the vehicle owner having a rap sheet -- the vehicle owner of the white van that you pulled over, and you testified that it said Mexico on it; right? Do you remember that testimony?

A That's what was told to me over the -- how we were communicating.

Q Okay. The Court found that you, quote/unquote, destroyed the rap sheet and other documents relating to the mission that morning. Are you aware of that?

A I got rid of target -- the target packages, or I don't like to call it target packages, but the -- basically most of the, like, pictures or notes that I had due to the fact that I'm not assigned to the Portland office. So, if I would have kept it in my vehicle, it would have got confused with targeting here in Colorado. But I didn't do it intentionally due to the court case. I didn't know about the court case until after I already got rid of it.

Q The court case was filed the day after the arrest of MGMA;

is that right?

A I don't know. But I wasn't aware of that, though.

Q With respect to the testimony about human smuggling, the Court found, quote, officer testimony regarding human smuggling serves only as an inappropriate pretextual reason for developing reasonable suspicion for a stop, and that officers' concerns of human smuggling are unfounded. Are you aware of that?

A No.

Q In that case, you signed a scratch I-213, but the supervisor in that instance with the initials RF wrote the encounter for MGMA and the I-213 after getting a description of the arrest from you; is that true?

A I don't think I wrote the scratch 213.

Q Did you sign the scratch I-213?

A I don't think I did, because I was injured at that time.

Q If the -- if the opinion says that RF filled MGMA's scratch I-213, though JB's signature, not RF's is on the form, you wouldn't dispute that, would you?

A I would have to see the form, sir.

Q Are you aware that the Court found that the I-213 for MGMA, quote, does not accurately reflect what happened?

A I don't know the findings of that court case.

Q You testified in that case that you arrested the person without a warrant because you believed there was a high likelihood of escape. Do you recall that testimony?

A Yes.

Q All right. I take it, then, you don't know that the Court found that your testimony that supposed pre-arrest determination was never documented, and no other evidence indicates that the determination occurred before MGMA's arrest, and that the Court found your testimony not credible? You're not aware of that, are you?

A No.

Q All right. I take it, then, you're not aware that the federal judge concluded that you and your fellow officers were, quote, fabricating, close quote, warrants after the arrests were made? You're not aware of that?

A No.

MR. MACDONALD: No further questions, Your Honor.

THE COURT: Cross examination?

MR. BROWN: No questions, Your Honor.

THE COURT: I have a question. I think it was after a question that the Court asked, but maybe it was after follow-up questions by Mr. Macdonald. You said, according to what I recall, that there would have been an I-200, because you have to have that to get into the proceedings. What do you mean?

THE WITNESS: For instance, like if someone is going to go see the immigration judge for a notice to appear, in the packet that we have to submit to the Court, it has to have the notice to appear and an I-200. That's with the documents that

get submitted.

THE COURT: Are you saying that because of that, you always will put an I-200 in the file at some point?

THE WITNESS: If it -- if it -- if they have to go see an immigration judge, yes, sir.

THE COURT: Would you do that even if there wasn't any I-200 at the time the person was arrested?

THE WITNESS: Are you -- sir, are you saying like if we did a warrantless arrest, and then afterwards we did a 200?

THE COURT: I'm asking if you put something in the file before you go see the immigration judge, namely an I-200, even though there wasn't one in the file before.

THE WITNESS: If there wasn't one in the file, yes. There will always be one that we put in there.

THE COURT: Any follow-up questions?

MR. MACDONALD: No, Your Honor.

MR. BROWN: I have a clarification based on Your Honor's questioning.

THE COURT: That's fine.

**CROSS EXAMINATION**

BY MR. BROWN

Q Officer, you were just responding to some questions from the judge; right? Is it your view that the I-200 that gets put in the file after a warrantless arrest covers that warrantless arrest?

A No.

MR. BROWN: No further questions.

THE COURT: Okay. Mr. Macdonald, does that signal one question?

MR. MACDONALD: Well, I pulled it down because I was afraid of that, Your Honor.

**REDIRECT EXAMINATION**

BY MR. MACDONALD

Q As currently your common practice, you don't date or times -- there's no way to know when an I-200 is filled out; isn't that true?

A It will be annotated at the top right on the 200, the date.

Q But not the time?

A Not the time.

MR. MACDONALD: No further questions.

THE COURT: All right. Mr. JB, you are excused and free to go. Next witness?

MR. LENEIS: Your Honor, if I might, we're set for a one-day hearing. JB's testimony was set for 30 minutes. I think it went on almost three hours. We've had very limited time to prepare for these witnesses, so we're just hopeful that this is all going to fit in a day and not get stretched out to a whole week.

THE COURT: I've got a flight tomorrow morning at 9:30 to Phoenix, Arizona, and at this point, I'm intending to keep

that schedule.

MR. LENEIS: Very good, Your Honor. I'm glad to hear it.

THE COURT: But if necessary, I will change it.

MR. LENEIS: Glad to hear that as well.

THE COURT: But it won't make me particularly happy to have to change it.

MR. LENEIS: I'm going to stop responding.

THE COURT: All right. Next witness?

MR. MACDONALD: We call JL, Officer JL. I think it's JL.

MR. MEYER: Yes. Your Honor, it's Officer JL.

THE COURT: So, while we're waiting for Officer JL, all right. We will keep going until 12:30, and stop -- no. Forty-five minutes. We will keep going until 12:15, and then we've got the 1 o'clock short hearing, I hope, and then we will pick it up after that.

MR. MEYER: Understood, Your Honor. Did the Court want to swear in the witness?

THE COURT: Yes.

(The Witness is Sworn)

THE COURT: I didn't even see that he was there yet.

**DIRECT EXAMINATION**

BY MR. MEYER

Q Good morning. Can you hear me okay?

A Yes.
Q Officer, I'm going to refer to you by your initials based on some agreements we have in court, or I will just call you Officer if that's okay?
A That's fine, sir.
Q My name is Hans Meyer, and I represent the plaintiffs in this case.
A Okay.
Q Can you please state your name for the record. Sorry. Excuse me. Not the name. Your initials for the record, first and last.
A JL.
Q What's your rank and position?
A I'm a deportation officer.
Q How long have you been a deportation officer?
A Roughly for five years, sir.
Q More or less when did you start?
A 2020.
Q Do you remember the month?
A March.
Q And that's for ICE; right?
A Yes. Previously I was a ERA. I started as a ERA March 2020, and then I started as a DO roughly about a year after that.
Q Just so I understand, what is an ERA? Because I don't know

what that means.
A It's an enforcement removal assistant.
Q Okay. After that, in March of 2021, you became a DO?
A Correct.
Q Okay. And since March of 2021, you've been a DO?
A Correct.
Q Have you held any other positions, supervisor, acting SDDO, anything like that?
A No, sir.
Q Okay. All right. Have you always been at the Denver field office?
A No, sir.
Q Where were you before? What other places have you worked as a DO?
A I worked in Denver, and then Boston. And then I came back to Denver.
Q What timeframe were you in Boston?
A Roughly most of 2024. A little bit of 2025, and then came back to Denver.
Q Do you remember when you came back to Denver in 2025?
A The summer. Probably around June.
Q Been here since June 2025?
A Correct.
Q Okay. And just to clarify, between March 2021 and what date when you went to Boston?

A I don't -- off the top of my head, I'm not a hundred percent sure.

Q Give me a benchmark.

A I was in Boston for roughly 11 months.

Q Okay. So, if we do the math, around May of 2024 would be about right when you went to Boston?

A Roughly, yes.

Q Okay. Part of becoming an ICE agent, did you do training?

A As far as FLETC, yes.

Q Was that down in Georgia?

A Correct.

Q How many months?

A The course is roughly around five months, or --

Q Did you get Fourth Amendment training in that?

A Correct.

Q Did you get training on your statutory duties and obligations?

A Correct.

Q Training on your regulatory or your regulation duties and obligations?

A Off the top of my head, I don't recall all of the training, but we had some training, yes.

Q You've worked quite frequently with Officer B -- I'm going to use his initial -- is that correct?

A Correct, sir.

Q What's Officer B's position?
A He's a deportation officer as well.
Q Has he ever served as a supervisor deportation officer?
A I don't believe so.
Q So, in any enforcement that you've done, he's never been serving as a deport officer, always as an acting deport officer?
A That I'm not 100 percent sure on.
Q Okay. I want to talk a little bit about your training on completing incident reports and these things we call I-213s. Sound good?
A Okay.
Q I-213s are reports about arresting in the field; correct?
A It has most of that information in there, yes. But it also has other information.
Q But the 213 is made when ICE makes an arrest of someone; correct?
A Correct.
Q Now, you were trained as part of your -- would you call it basic training or officer training?
A Basic training would probably be a good term.
Q So, in those five months of basic training, you were taught how to fill out incident reports, narrative sections for things like 213s; right?
A They go over it, yes.
Q Okay. And how important that is to include the important

facts in those documents about your police work; right?
A Correct.
Q Like what you observed that would justify an investigatory detention?
A That's correct, yes.
Q Okay. What facts you would have that would articulate a basis to justify, let's say a vehicle stop?
A That would be included in there, yes.
Q Okay. Whether or not you were parked on a target that you had previously identified and had a 200 for, like a warrant already for a person that you planned to arrest? That would be in there too?
A Not necessarily. Some of them are, I guess abbreviated just to have most of the facts in there.
Q So, it wouldn't be important for you to put in that narrative report that you had a warrant already for somebody?
A If we did have a warrant for someone, it probably would be in there, but sometimes it might not be in there as well.
Q Just to clarify, if you did have a warrant for somebody, it should be in there?
A Again, I think it's case-by-case basis.
Q What were you trained to do: put important facts in or not put important facts in those reports?
A Can you -- I'm confused on what you're asking.
Q Is having a warrant for somebody's arrest an important fact

for you as a law enforcement officer? Let's say when you're going to go out and arrest that person, to justify that arrest.
A Again, I feel like it's case-by-case basis, but yes.
Q And if you made a warrantless arrest, it would be important for you to put information in that incident report that explains it's a warrantless arrest; correct?
A Yes.
Q Okay. And this is because this implicates Fourth Amendment obligations that you have; correct?
A Correct. Yes.
Q And statutory and regulatory obligations you have; correct?
A Yes.
Q Now, you agree with me that these 213s are important to have all of that critical information on because they're relied on in immigration court; correct?
A That is correct.
Q So, a justification for a detention is really important?
A Yes.
Q Sufficient information to articulate probable cause is critically important?
A I could agree with that, yes.
Q Whether or not the arrest was warrantless is critically important?
A Again, I think it's case-by-case basis, and each 213 -- sometimes all the information doesn't get put in there.

Q But you would agree with me it's critically important information for a law enforcement officer to document?
A Correct. Yes.
Q Same thing if there's a warrant?
A Yes.
Q You working -- you were working as a DO in 2022 here in Denver; right?
A Yes.
Q Okay. Do you remember receiving or getting information about something called a broadcast statement of policy in 2022 around warrantless arrests?
A I'm not sure. We probably -- might have got an email, but off the top of my head, I'm not sure.
Q You're not sure if you got it or you didn't get it?
A I'm not sure of the --
Q Okay. Can we pull up Exhibit 68. I'm showing you this broadcast statement of policy. Can you see that?
A Yes, I can.
Q That's a statement of policy that came out when you were a deportation officer in 2022. Have you seen this broadcast statement of policy?
A Yes.
Q Okay. When?
A I couldn't give you a definite date. I'm not sure.
Q Okay. All right. Did you receive it in an email in May of

2022?

A Again, I'm not entirely sure.

Q Now, I want to focus in on this broadcast statement of policy, because this talks about warrantless arrests, and that's what I want to talk to you about for the rest of today.

A Okay.

Q What are the requirements you need to have in order to be able to conduct a warrantless arrest? You don't have to look at that. You can just tell me from your training and experience. What are the requirements you need to have as a duly authorized ICE enforcement officer in order to take somebody into custody for a warrantless arrest?

A Based off of the field interview, if they don't have any documentation, we would -- based off of that, if they have -- if we have reason to believe they're going to escape before we can get a 200 signed, we can take them into custody. And then when we get into the office, we can have a supervisor sign it at that time. There's a number of other things that come into play: if they have any medical or health implications, if they are sole providers of kids, stuff like that.

Q Can we pull back up Exhibit 16, please. I want to go back to this exhibit, the broadcast statement of policy. So, you did read this. You did receive this and look through it; correct?

A At some time, yes.

Q All right. You would agree that mere presence in the

country isn't sufficient to justify that somebody presents a likelihood of escape; right?
A I could agree with that, yes.
Q Can we go to the second page, please. So, when you conduct arrests that are warrantless, under this broadcast policy, you have to identify yourself to the -- excuse me. You have to document your encounter with this person as soon as possible after the arrest; correct?
A Yes.
Q Okay. And you have to document the facts and circumstances surrounding the warrantless arrest in the narrative section of the I-213; right?
A Correct.
Q That's all the important information to justify the legality of the arrest; correct?
A Yes.
Q It's your job as an officer; right?
A Again, I think it depends on the circumstances, but yes.
Q Well, it's your job as an officer to document the circumstances around the warrantless arrest per this policy; correct? It's not me. This is the policy; right?
A Yes.
Q It's not a maybe or I don't know. It's that's the policy, and you're aware of that policy?
A Understood, yes.

Q And that includes that the arrest was made without a warrant, so you need to document that in the 213, don't you?
A Yes, sir.
Q You can refer to the broadcast policy. It also relates to whether or not another requirement for you in making a warrantless arrest is that you've got to both inquire about and document that person's ties to the community at the time of arrest; correct?
A That's also part of the field interview, sir.
Q Correct. It's part of this policy? It's what you're required to do as an officer when you do a warrantless arrest?
A According to this, yes.
Q Were you following this in 2022?
A I wasn't making arrests on the street in 2022. I was doing detention work at that time.
Q Well, let me pause there and just ask you, when did you start doing the enforcement operations?
A I couldn't give you an exact date, but November, December timeframe of 2025.
Q So, just to make sure that I'm understanding, were you doing any street level enforcement before November 2025?
A Again, I don't have an exact timeline. I have done detention work. I've done a little bit of street work. And then I've done more detention work.
Q Okay. Let's try to lock this in. You've done street

enforcement?
A Correct. Yes.
Q Before November of 2025? Correct? You just said that.
A Well, correct. Yeah.
Q Okay. All right. And then in November of 2025, now you're working strictly in street enforcement; is that correct?
A I wouldn't say strictly in street work, no.
Q But you're doing that frequently?
A Yes. That's part of the job. Correct.
Q Okay. Did you get any formal training on the statement of policy?
A Not that I recall, no.
Q Okay. So, between May of 2022 and today, you never got any training on this broadcast statement of policy?
A Again, I'm not entirely sure.
Q Well, I mean, you're a good officer; right?
A I would say so, yes.
Q So, a good officer would remember if they'd been trained on warrantless arrest procedures that are required by the agency; right?
A We have annual training, but I don't recall exactly what all it's on.
Q Okay. But my question was more specific. Between May of 2022 and today, did you ever get trained on this policy in your office?

A Again, I'm sure we did, but I don't recall.
Q You don't recall. Okay.

THE COURT: Why don't you find a convenient place to break.

MR. MEYER: Yeah. Maybe one or two more questions, and then maybe a pause.

Q. (By Mr. Meyer) Just to finish up talking about this guidance -- or this policy, excuse me. Part of when you make a warrantless arrest is you need to articulate the specific particularized facts that support your conclusion as an officer that this person is likely to escape; correct?
A I could agree with that, yes.
Q Where that is is inside the 213 narrative section; correct?
A Yes. It should, yes.
Q And this broadcast statement of policy related to a lawsuit called *Nava*; is that correct? Do you know that?
A Yes.

MR. MEYER: Maybe that would be good enough for now.

THE COURT: All right. Thank you. So, we're going to break now. I can't tell you exactly when we will start up again. I am going to hope that I can finish the other hearing by 1:15. I will try to do that. But between now and 1:15 or whenever we're finished with the other hearing, the courtroom here is going to be locked. It's a remote hearing, so you won't be able to get back in, any of you. And I think the courtroom

deputy wanted to say something about the phone line also.

THE COURTROOM DEPUTY: Yeah. Just for those listening in on the phone, the phone line will also be locked until we come back for this hearing. So, if you call in and get a message, just keep calling in after 1:15, and once we start this hearing again, you will be able to get back in.

THE COURT: All right. And maybe during the time between now and then, you can think a little more about your schedule. All right. We will see you roughly at 1:15 or so.

(Recess at 12:18 p.m., until 1:25 p.m.)

THE COURT: Go.

MR. MEYER: May I proceed, Your Honor?

THE COURT: Yes.

MR. MEYER: Thank you.

Q. (By Mr. Meyer) Officer L, can you hear me okay?

A Yes, sir.

Q One thing I forgot to mention, when you were last testifying, I asked you some questions about -- I said Officer B. Do you remember that?

A Yes.

Q Just to clarify, that would be Officer JB, for the record?

A Correct.

Q And he was the person who previously testified before you?

A Correct. Yes.

MR. MEYER: Okay. Can we pull up Exhibit 68 again,

one more time. And can we go to the third page of this exhibit. Is there another page to that exhibit? Can we pull up Exhibit 212. Actually, I need to get something, Your Honor. Can you publish 212 again real quick?

THE COURT: Is it already admitted?

MR. MEYER: Can we go back to 68? I apologize. Sorry, Your Honor. I was having a little confusion with exhibits.

THE COURT: Yeah. When you refer to these documents, it would be helpful if you would say if it's already been admitted or not, because I don't have, in front of me, at least, a list of what's been admitted and what hasn't.

MR. MEYER: Okay. And can we go to the second page. And, Your Honor, this is Exhibit 68, which I believe was previously admitted in the last hearing.

THE COURT: 68, yes.

Q. (By Mr. Meyer) Officer L, I just wanted to point your attention back to the broadcast policy in 2022, the one we were talking about before. And I want to just focus on the bottom of the page there, vehicle stops, just very quickly. And just to review this; right? ICE officers -- you would agree that ICE officers lack federal statutory authority to enforce local and state motor vehicle laws; correct?

A Correct.

Q So, you couldn't pull somebody over and stop them for some

sort of traffic infraction?

A Yes.

Q Okay. Can we go to the next page. The last page of that. And I want to just focus your attention here on the top paragraph there. As well, you would agree that ICE officers may stop a vehicle to enforce civil immigration laws only if they are aware of specific and articulable facts that warrant suspicion that that car -- that vehicle contains someone who may not be lawfully in the country?

A Correct. Yes.

Q So, you couldn't just pull over a car because you wanted to?

A Correct.

Q You need to have specific articulable facts that reasonably warrant suspicion?

A Yes.

Q Okay. Great. Thank you. We can take that down. Were you -- are you aware of what this Court ordered in this case?

A Can you elaborate on that?

Q Yeah. Are you aware that on November 25th, this Court issued an order instructing officers like you about specific things they need to do when they make warrantless arrests?

A Can you give me a little further detail on that?

Q Do you know what this Court ordered you to do on November 25th, 2025, as an ICE officer when making a warrantless

arrest?
A Can you elaborate?
Q I'm just asking if you know what this Court ordered.
A Based off your question, I'm not sure.
Q Did you get any training on this Court's order after November -- after November 25th, 2025?
A Again, I'm unsure what you're asking.
Q This Court ordered --
THE COURT: What he's asking is pretty simple, sir. Do you know what the Court ordered? Did they tell you? Did they train you? Did they teach you to do anything different because of the Court's order? That's all he's asking.
THE WITNESS: Yeah. Sir, I'm not sure what order he's talking about.
THE COURT: November 25, 2025, the injunction order.
THE WITNESS: Am I aware of it? Yes.
THE COURT: Okay. And his question is, to your understanding, what did the Court tell you ICE officers to do?
THE WITNESS: If we're -- if we're going to do warrantless arrests, we have to have reasonable articulable facts to arrest individuals without signed 200s. If that's what we're talking about?
Q. (By Mr. Meyer) That's your understanding of this Court's order on November 25th, 2025?
A As far as I know, yes.

Q Okay. And so since November 25th, 2025, you've been making arrests in the field based on that understanding about what this judge's order was; correct?
A Again, I'm kind of confused on your question.
Q Did you read the judge's order?
A Yes.
Q Okay. What does the order require you as an ICE officer to do if you're going to make a warrantless arrest? What specific things does it require?
A Specific?
(Pause in the proceedings.)
THE COURT: If you can't remember, just say, I can't remember.
THE WITNESS: I'm drawing a blank, Your Honor. I'm not sure.
THE COURT: If you don't know the answer, you can say, I don't know. If you can't remember, you can say, I don't remember.
THE WITNESS: Okay.
THE COURT: We're not trying to get you in trouble here. Just do the best you can.
THE WITNESS: I understand, sir.
Q. (By Mr. Meyer) Between November 25th of last year, 2025, and February 13th, did you receive any specific training about this Court's order, about how to do warrantless arrests?

A I believe there was a -- an email sent out. Specific training, I'm not sure, no.
Q So, it's a no?
A Yes.
Q Okay. Yes, it's a no? Sorry. You didn't receive any training on this; correct?
A I don't believe so.
Q Okay. All right. Let's go ahead and move forward. Let's talk a little bit about some of -- some arrests that happened over the last couple of months. Can we pull up, I believe it's Exhibit 207. It would be pages 15 of the exhibit. And Officer L, I want to make sure you can see this. Can you see that?
A Yes. I can see the top half.
Q Okay. Now, in addition to using your name, just using first letters in your name, we are using first letters in the names of most of the noncitizens in these documents. This is a 213; correct?
A Yes.
Q And the initials for this person are RCP; correct? First name, second, and second -- two last names?
A Yes.
Q This arrest was January 20th, 2026?
A Yup.
Q Okay. All right. Let's -- let's go down to the narrative

section real quick. Okay. Can you see under the section here -- let's highlight, this says, arresting agents. And there are one, two, three, four, five, six officers listed in this report; correct?
A I only see five, sir.
Q RG, JA, DR, JB, JL, which is you, and DL?
A I only see five, sir.
Q Okay. Well, we will move forward. Are you sure you only see five there?
A Officer JA, DR, JL, JB, and GR.
Q What about D -- DC there at the very end? Because there's JL, which is you, right before the end?
A Yes.
Q And then there's another name kind of right next to your last name. Do you see that? It starts with a D, and then the last name starts with a C right next to it, right at the far right side, arresting agents?
THE COURT: I don't see it either, so I know why --
THE WITNESS: I only see five, sir.
Q. (By Mr. Meyer) Okay. We will go with five. Now, this is a criminal -- mobile criminal alien team; correct? Let's go down to the narrative there, the record of deportable excludable alien?
A Yes.
Q Okay. So, the five of you as officers are working for the

mobile criminal alien team on this date; correct?
A Yes.
Q Let's take a pause here just to, I think help the Court understand, mobile criminal alien team, you have a target; right?
A Correct.
Q Because you've identified someone with criminal history that you've been able to do good police work on and develop an arrest warrant ahead of time; correct?
A Yes, sir.
Q Okay. So, you are targeting a person. And this guy is important enough that you got five people parked on this apartment; correct?
A Yes.
Q And this person you're looking for, I'm going to use again the letters, is somebody by the name of BF. You can see this, I think it's in the fourth line down in the left-hand side of the narrative. That's who you're looking for; right?
A Yes, sir.
Q You got a warrant for him; correct?
A I believe so.
Q Okay. That's why you've got five guys there parked outside of his apartment to apprehend him?
A Correct. Yes.
Q Okay. Now, it says that you observed two Hispanic males

later identified as -- excuse me -- as MACV and RCP get into a car; correct?

A Yes.

Q Okay. Now, when you're doing mobile criminal alien apprehension or fug. ops, you got a warrant for somebody; right? Because you're going to pick up a specified target?

A Yes. Usually it's targeted, yes.

Q Which means they'll also have an ID on them, like a photo or some sort of dossier that shows what they look like so you can apprehend them?

A Usually, yes. But sometimes it's an older picture or older photo, yes.

Q But yet you've got an ID, because obviously you've got --

A Somewhat of an idea, yes. Correct.

Q Obviously you know where this person lives. You know their name. You've contacted them in the criminal legal system; correct?

A Yes.

Q Okay. Now, as you told me before, you include all really important facts in the narrative, like legally important facts; correct?

A Correct.

Q Okay. Now, you didn't identify either RCP or MACV as matching the description of the suspect; correct? You don't have that in there; right?

A Just so there's context, I did not write this narrative.

Q Okay. But had you identified one of them as the suspect as matching that description, it would have been in there; right? Because it's a really important fact? You wouldn't leave that out?

A I guess, again, to give context, it was -- on this particular morning, it's cold. People wear hats, puffier jackets. So, we could PID somebody that would get into the vehicle that was registered to the target.

Q I understand that, but let me just kind of focus in. You didn't make a positive ID, or you didn't think either one of those gentleman matched BF, as far as it would have been in this narrative?

A Again, I didn't write the narrative.

Q You didn't find a positive match; correct?

A I did not, no.

Q Okay. There's no positive match made in here by Officer JA either, is there, from either gentleman?

A I mean, again, I can't speak for them, but based off the narrative, I don't know.

Q Let's base it off what's in the narrative. Does the narrative contain any positive ID by Officer JA for either gentleman?

THE COURT: Who is JA?

MR. MEYER: Officer JA is one of the five members of

the mobile criminal alien team who is parked outside this apartment.

THE COURT: I see it.

MR. MEYER: Waiting for the suspect that they previously knew as BF so they could come out and arrest him.

THE WITNESS: According to the verbiage in this narrative, it can be reasonable to assume that the target was getting into the vehicle.

Q. (By Mr. Meyer) Not my question. Let's try my question yes or no. The narrative doesn't say that Officer JA identifies either gentleman as the target; correct? It's right in there. You can read through the whole thing. Take your time. Let me know. While we're at it, let me know if Officer D or Officer JB -- excuse me. DR, I apologize, or Officer JB or Officer RG make any identification of either one of those men as matching the description of the target you were sitting on.

A Definitively, no. But again, in the --

Q Okay. That's all.

A -- the context of the question, it's cold outside. You're reasonably to assume somebody that is getting into a vehicle that they're registered to would be the target.

Q Well, yeah. And let's just stick to my question, and then you can answer the questions from your counsel with more detail.

A Okay.

Q There's nothing in here that says any of the five officers

identified either gentleman as matching the description of the suspect -- of the target?

A Doesn't believe so.

Q Is that a no? Nothing in there?

A I guess not. I'm still confused on your question.

Q You then follow the car; correct?

A Yes.

Q Let's go back up real quick to the first page of this I-213, and let's go up to the upper right-hand corner. You were talking about people with puffy jackets. So, this gentleman, upper right-hand corner, weight, 220 pounds. Just wanted to note that; right? Is that correct? In this 213, this guy is 220?

A That's what this says, yes.

Q Let's go back to the narrative. You then stop the vehicle with emergency lights; correct?

A Correct.

Q Okay. Because you had not identified anyone that matched the description of the target, none of the five of you, what were the specific articulable facts that warranted pulling the car over? Because you have five officers who had an ID on the target. None of those five could articulate that either one of these gentlemen fit the description. What is the specific articulable facts to justify that seizure?

A Again, I didn't write this narrative. To give context to

the 213, it states they observed -- can I read this word for word, or is that not allowed?
Q I'm okay with it if you'd like to.
A They observed two Hispanic males later identified as MAC and RCP, entered the Honda Civic, which was at the time I believe the target vehicle. So, I'm confused on what you're -- again, what your question is.
Q What would be the specific articulable facts that justify stopping a vehicle that five expertly trained ICE enforcement officers are unable to identify as being associated with the target BV -- BF?
MR. BROWN: Objection. Foundation.
THE COURT: Sustained.
Q. (By Mr. Meyer) Let's move on. So, you contact the occupants simultaneously; correct?
A Yes.
Q Okay. They hand you drivers' licenses; correct?
A Again, to give context, I was not the primary contacting officer. I was more of a blocking vehicle. So, I can only speculate on what they did.
Q Okay. They also provided Mexican identification. Is that what this report says?
A According to this, yes.
Q Apparently they were interviewed, and they admitted to being in the country without documents or status; is that

correct?

MR. BROWN: Foundation.

THE COURT: Overruled.

Q. (By Mr. Meyer) During that investigation, apparently they admitted to being in the U.S. without documents?

A Again, I didn't do the field interview on the arrest. So, according to this, that's what it says, yes.

Q And then that both were immediately placed under arrest for immigration violations; correct?

A Correct.

Q Okay. They were handcuffed?

A Yes.

Q Okay. And then obviously they were put in the back of some sort of vehicle and transported to the Denver field office?

A Correct.

Q Okay. And this I-213 contains no information about there being any I-200s for these two gentlemen?

A It doesn't look like it, no.

Q And just to be specific, to put a finer point on it, you did have an I-200 for the target, BF, but for the two guys who ended up getting arrested, there's no information in here about an I-200?

A It doesn't look like it in this, no.

Q And as you mentioned to me, as part of your training, it's very important to make sure that in police reports and

narratives, we include information for when there is a warrant to support an arrest; correct?

A Again, I think it's case-by-case basis, but yes.

Q Let's go to 208 -- Exhibit 208 as well. And, Officer L, I'm just pointing you, this is the other gentleman who was contacted. Let's go to page five, if that's okay.

THE COURT: Is 208 already admitted?

MR. MEYER: Actually, I don't believe it is.

THE COURTROOM DEPUTY: It is.

MR. MEYER: Is it? Okay.

Q. (By Mr. Meyer) This is the other gentleman who was contacted in the same arrest; correct? If you look at that name in that upper left-hand corner?

A I believe so, yes.

Q Let's look in the upper right-hand corner. So, this guy's weight is 115?

A That's what this document says, yes.

Q So, there's a 105-pound discrepancy between these two gentlemen. The last guy was 220?

A If the math adds up, yes.

Q Let's go down to the narrative section. Same narrative section here as well; correct? It's you and the other four officers; correct?

A Yes.

Q Same narrative about surveilling for a specific target, BF;

correct?
A Yes. That's what it looks like, yes.
Q Same lack of identification of this gentleman as fitting the description of BF; correct?
A I mean, again, it's -- it states officers observed males entering the vehicle of the target.
Q Yeah. My question was more specific. Same lack of identification by any of five officers that this gentleman matches the description of BF in that narrative; correct? The same narrative we just talked about?
A Again, they observed the two males enter the vehicle, so it was reasonable to assume that it was the registered owner.
Q Well, let's try my question. There's nothing in the statement by any of the five officers that indicate they made an identification that this gentleman matched the description of BF, who you were looking for with a warrant; correct?
A You could say that, yes.
Q There's no I-200 mentioned in this encounter data, is there?
A Doesn't look like it. No, sir.
Q There's no arresting officer indicated in this encounter data, is there?
A No arresting officer?
Q Yeah. There's no arresting officer named in this encounter data, is there? Like the actual officer who wrote the

narrative?
A Can you go to the next page, please?
Q Sure.
A Towards the bottom. Can you go a little further, please. Usually in the signature block is usually whoever writes the narrative.
Q Okay. Well, let's go with that. That's somebody named JL; right? Let's go back up to page two. Is JL one of the arresting officers?
A No.
Q Okay. So, the arresting officer didn't -- we don't know who the arresting officer was who made this narrative, do we?
A Again, I'm slightly confused on your question, because it states the officers that took part in the arrest.
Q Let's keep -- we will keep it simple. There's no information in here about any questions asked about family ties or community ties, are there?
A It doesn't look like it, no.
Q Okay. No information about a determination made about whether this person is likely to escape, or like written summary of the basis on which an officer would determine they're likely to escape; correct?
A I mean, based off of their field interview, I'm not sure what they asked, but based off that, I'm assuming that's what led to the arrest.

Q Yeah. Let's just try my yes or no question. There's no information in the narrative that summarizes the basis on which an officer determined the person was likely to escape? Yes or no.

A In the narrative, no.

Q Okay. Great. Now we're rolling. Let's go back to Exhibit 207 if we can. I just want to go back to this exhibit and ask the same questions. The same encounter data for RCP. Do we have 207? Page two. No. I'm sorry. Page 15. Go down to the second page of that exhibit. Just to confirm here, also it's the same narrative. No summary of community ties in this narrative, which is --

THE COURT: I can actually read.

MR. MEYER: Okay.

THE COURT: It's not in there.

MR. MEYER: Okay.

THE COURT: Beating this guy over the head isn't helping.

MR. MEYER: Well, I don't know. It was just an easy yes or no question.

THE COURT: Yes. But the answer is no, there's nothing like that in there.

MR. MEYER: Okay. Great. Let's move on.

THE COURT: And there shouldn't be, because -- well, there should be for a warrantless arrest, but there isn't. I

get that.

MR. MEYER: I appreciate that. I was just trying to get that testimony out of the witness, but the Court can read. I would love to move on if that's possible, because I know we got a lot of testimony.

THE COURT: I was hoping you would.

MR. MEYER: Yeah. Let's pull up the next exhibit. I want to talk about Exhibit 204. Actually, I apologize. It is 204, 11. And I want to talk about this stop for a little while.

THE COURT: Is this one already admitted?

MR. MEYER: This is already admitted, Your Honor.

Q. (By Mr. Meyer) This person's initials are JPAAH; right? The full five initials of this person?

A Yes.

Q Okay. Let's go to the second page. You were one of the officers involved in this apprehension; is that correct?

A Yes.

Q And this one talks about how you were with Officer JB; is that correct?

A Correct.

Q Okay. You observed three Hispanic men speaking Spanish; correct?

A According to this document, yes.

Q Okay. And in this one, one of them appeared to match the description of -- excuse me. Sorry. Of a different suspect

with the last name of -- a different target who was named OCR. This is a person you were trying to contact through the mobile criminal alien team; right?
A Yes.
Q Okay. So, this is another example of when you did have a warrant for another person, because you were looking for OCR?
A Correct.
Q And you see these three Hispanic dudes speaking Spanish?
A Again, to give context, I didn't write this narrative.
Q Okay. But you were on scene. You were involved in the apprehension?
A Again, to give context, I was -- I didn't -- I didn't see this take place. Yes. I was part of the arresting officers, but I wasn't on scene.
Q Okay. Did you have any recollection about this I-213 or about what happened here other than what's written in the narrative when you and Officer JB stopped and arrested these three gentlemen?
A I don't remember the whole interaction, no.
Q Do you have any other memory of the interaction?
A Besides what's reading on here, no.
Q So, you did have an I-200 for the person you were trying to contact; correct?
A Based off this, yes.
Q But didn't have an I-200 for these three guys who you just

saw speaking Spanish and get into a car?
A Correct.
Q Okay. All right. Then, as this says, that they were arrested and transported to the Denver field office; correct?
A Correct.
Q No information in here about an I-200 existing for their arrest?
A No.
Q Okay. Let's go as well to 204, seven. This is one of the other gentlemen who was a Hispanic guy speaking Spanish in the same contact. Let's go to the second page. This is CHG. This I believe has not been admitted into the record, if I'm not mistaken. Same exhibit. So, they're all together. This gentleman too -- let's look at the encounter data. This gentleman too was arrested, and there's no information in here about an I-200; correct?
A Doesn't look like it, no.
Q Okay. He is one of the three guys arrested without a warrant on this date?
A Yes.
Q Okay. And I know the Court can read, but there's no evaluation in here about flight risk -- excuse me -- likelihood of escape in this 213 done by the arresting officer?
A Again, to give context, I didn't write the 213. I'm assuming while they were doing their field interview, that was

established.

Q Hmm. So, you would assume that somebody did that question?

A Yes.

Q And would they be required to write that into the 213?

A Again, you should, but --

Q But you're not required to. It's not like you're required to by the judge or anything to write that into the 213?

A It's supposed to be in the 213.

Q Okay. It's supposed to be in there. Okay. Let's go to 204, page 15. This is just a third gentleman who was arrested also without a warrant. It is RHG. Same date, December 27th, 2025. Can you see that there?

A Yes.

Q Same arrest. Let's go down to the second page, and the narrative. You were also the officer involved in this one as well; correct? It's the same contact?

A Correct.

Q You were at the -- you were with MCAT. You're sitting parked on a 200 on somebody else, and this guy is one of the three Hispanic guys speaking Spanish; correct?

A According to this, yes.

Q And he is one of the other guys arrested without a warrant; correct?

MR. BROWN: Objection. Foundation, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Meyer) Do you remember whether or not you had a warrant for this person? You just told me you didn't have warrants for the other two. Did you have a warrant for this guy as a passenger in the car that you're not looking for for whom you have no I-200?

A Again, I'm assuming the field interview that was established, but based off your question, I don't know.

Q And would you have -- would there -- you know, like you said, would there be an I-200 written in here if there was a warrant for somebody's arrest?

A If it was a collateral?

Q If there was a warrant.

A It doesn't state it in this 213, no.

MR. MEYER: Okay. All right. Let's move on to a couple of others. This one I believe is a new 213. It's Exhibit 201, page 26. And, Your Honor, can I move to admit 201? I think this is the one that hasn't been admitted yet.

MR. BROWN: I think that's right. Same qualification with the other ones that attach to 213s.

THE COURT: Okay. Admitted.

Q. (By Mr. Meyer) And let's start with this person's initials. It is up in the upper left. We will just go with CCM. Sound good?

A Yes.

Q His date of arrest is two days later, actually, on

November -- or December 29, 2025; correct?
A Correct.
Q And then down on the second page on arresting agents, you are listed here as one of the arresting agents; correct?
A Yes.
Q Along with Officer JB and another officer as well; correct?
A Yes. Three officers.
Q Okay. And this is again another MCAT; right? Criminal alien team?
A Correct.
Q So, you're looking for a guy?
A Correct.
Q In fact, it's a guy whose initials are ACN; right? There in that second line?
A Yes.
Q So, you're looking for him, and you got a warrant for him; right? Because you got three guys on the criminal alien team showing up to a specific spot looking for a specific guy?
A Correct. Yes.
Q Okay. So, it looks like when you get there, and let's -- it's important to point out, let's talk about the address here. Third line, I think it's 10923 Tundra Top Drive, Parker; is that right?
A That's what it states, yes.
Q Is that a construction site?

A Off the top of my head, I'm not sure.
Q But you were involved in this contact, obviously. Your name is written in the arresting officer information?
A Correct.
Q And so there was a male standing in the middle of the road. That's what the report says; right? Do you remember that?
A That's what the report says, yes.
Q Apparently he was Hispanic; right?
A Yes.
Q Okay. And you guys got out of your vehicles, and it says you contacted him to ask about the whereabouts of your target; right?
A Correct.
Q Would you agree with me that means if three duly trained law enforcement officers are contacting a gentleman to ask about where a target might be, those officers don't think the gentleman is the target? You didn't identify him as matching the target, did you?
A Again, based off the date, December 29th, it was cold. I don't specifically remember this interaction, but whoever contacted first, I'm assuming based off their field interview, they either didn't provide identification, or they did provide identification, and then we ran our checks and detained him. But based off this --
Q So, you ran the checks and then immediately detained him;

correct?

MR. BROWN: Objection. Foundation.

MR. MEYER: Your Honor, he just testified to that.

THE COURT: Overruled.

Q. (By Mr. Meyer) So, you ran checks and then immediately detained him; correct?

A I mean, I'm assuming. Based off of this 213, that's what it --

Q That's what it looks like?

A -- looks like, yes.

Q So, you detained him and then handcuffed him; correct?

A Yes.

Q Okay. And we will just go into the body of this narrative very quickly. It's four lines from the bottom. Officers with ICE informed him he was under arrest. Can you highlight that real fast? Four lines from the bottom of that narrative section. Don't worry about it.

A I can see it, yes.

Q There we go. Now, at the time, in this body, it looks like the only I-200 you had was for ACN from the narrative section; correct?

A Yes.

Q Okay. Now, it does say after that, after he was arrested, you used Mobile Fortify; is that correct?

A Again, I don't recall this interaction. I don't know how

the process took place.
Q But there's no information in this document that indicates there was an I-200 at the time you made the arrest for this gentleman; correct? And you were there, because you were the arresting officer?
A It states that there was an order of removal from a judge.
Q Not the question. At the time you arrested him, does this narrative indicate that you had an I-200 to justify that arrest with a warrant?
A Well, during the field interview, that's not -- we're not arresting him. We're just detaining -- doing an investigative detention.
Q Right. But here you said -- here we say he was under arrest. That's pretty legally operative language, isn't it? That's Fourth Amendment arrest language.
A Well, again, to give context, I didn't write this narrative, so -- based off of this -- this is all I'm going off.
Q Okay. So, this narrative says he was under arrest first; correct?
A Based off that line, yes.
Q Let's go to -- let's go to, I believe it's Exhibit 237, if I'm not mistaken. And it would be -- I believe that's pages -- I don't have the exhibit in front of me, but I believe it's page four. I believe it has been admitted. Yes. It's this one. Let's just go -- so, this arrest was done January 14th, 2026.

A Correct.
Q Correct? Letters for the gentleman is DCC?
A Yes.
Q Let's go to the second page. Let's go to the arrested record of deportable excludable alien, and in there, you and Officer JB are again in the criminal alien team, mobile criminal alien team; correct?
A Yes.
Q Okay. So, you have a target, again, on this date, January 14th, 2026?
A Correct.
Q And that -- and interestingly enough, that address is also 10923 Tundra Top Drive; right? Same address as the one we just talked about?
A Yes. That's what it says.
Q So, you were there looking for this gentleman by the abbreviation I will use for his name of NGJ. It's on the third line there. Can you see that?
A Yes.
Q So, you have a warrant for that guy. You have a I-200 for that gentleman?
A Yes.
Q Okay. So, you're looking for him. And it looks like you contact and arrest him; is that correct?
A Yes.

Q Okay. Now, it also says that you are escorting him to his ICE vehicle -- or to your ICE vehicle, and then he starts resisting you and pushing away; correct? This would be about the middle of that paragraph.

A Yes. I see that, yes.

Q Okay. All right. And then did you -- did you write this narrative?

A I don't believe so, no.

Q Okay. Do you think JB wrote it? Because there's only two of you.

A The sign block on the bottom left-hand side should be whoever wrote the narrative. But yes. I would assume he wrote it.

Q Okay. But there's the two of you making this arrest; correct?

A Correct.

Q You weren't backup officers for this one? You were there helping make the arrest?

A Correct.

Q Okay. All right. And then this narrative says that another Hispanic male just walked straight up to you officers?

A Correct.

Q Someone you've never had contact with? Okay?

A Yes.

Q And then you asked him his name, and he answered giving you

his first name; correct?

A Yes.

Q And then you asked for ID, and he gave you a Colorado driver's license?

A Correct.

Q And that driver's license accurately identified his first and last names, DCC?

A Mm-hmm. Yes.

Q You then asked him what country he's from, and he answered Mexico?

A Correct.

Q You then only at that point identified yourself as officers with ICE, and immediately placed him under arrest for immigration violations?

A Again, to give context, I'm sure there was a field interview. It might not be articulated in this 213, but before we do any type of arrest, we do a field interview.

Q Would you have put the information in the field interview in this arrest to help establish probable cause that you could make a warrantless arrest of a person?

A Again, if I was to write the narrative, I would probably state -- put that in there, yes.

Q Okay. Was there an I-200 at the time here when you said he was under arrest for immigration violations? Does the narrative contain any information about an I-200 up to that point?

MR. BROWN: Objection. Compound, Your Honor.

THE COURT: Try it again, Mr. Meyer.

MR. MEYER: Sure.

Q. (By Mr. Meyer) Let's look at the last four lines. This report explains that this gentleman, DCC, was put under arrest for immigration violations; correct?

A Correct.

Q And that was after he answered apparently where he was from and gave you a copy of his ID; correct?

A I believe at this point he was detained.

Q And then it says you ran immigration checks after that, and they revealed no positive matches; correct?

A That's what it states, yes.

Q Okay. And then it says, but then due to his admission of being in the U.S. without permission, you then got a signed I-200; is that correct?

A According to this, yes.

Q Okay. So, that 200 was done after you had taken him into custody, after you had contacted him, after you had detained him, after you had arrested him, per what's contained in this report?

A It looks like it, yes.

MR. MEYER: Okay. May I have just a moment, Your Honor?

THE COURT: Yes.

MR. MEYER: If I may have just a moment, Your Honor? I'm just checking.

(Pause in the proceedings.)

MR. MEYER: I don't think I have any more questions.

THE COURT: Cross examination?

MR. BROWN: No, Your Honor.

THE COURT: So, I have a question, but it's really not for the witness. It's more for you lawyers. This one we've just been talking about and that was talked about this morning refers to the fact that they got an I-200 at some point. You might dispute between you at which point, but there is a reference to an I-200 warrant in this particular 213; correct?

MR. MEYER: Yes, Your Honor.

MR. BROWN: Yes, Your Honor.

THE COURT: I think the Court order was that you produce a sampling of 213s for warrantless arrests, but you produced this one. Do I conclude from that you consider this to be a warrantless arrest?

MR. MACDONALD: Your Honor, this is actually I believe the only I-213 that is in the record that we did not get from the defendants. I believe that's correct.

THE COURT: Oh. You got that somewhere else?

MR. MACDONALD: Yes, Your Honor. From the proceeding in front of Your Honor where this individual filed a habeas petition and was granted release. So, that individual is

represented by counsel and was released. That's how we have that I-213. That's the only one that's gone into evidence, Your Honor.

THE COURT: Okay. Well, the point I'm trying to make, I guess -- and that helps me. Thank you. But the point is what you were ordered to produce was 213s for warrantless arrests, and therefore, I can infer that every one you produced was a warrantless arrest, because that's what you were told to produce. Yes?

MR. BROWN: That's right, Your Honor. It's kind of a longer explanation and more complicated as to what ended up happening, and I'm happy to enlighten Your Honor.

THE COURT: You don't have to do it now. You can think about it and present it when your time comes for closing, but right now that's what my assumption is. My assumption is you produced what the Court ordered you to produce; nothing more, nothing less. All right. We're done with this witness, then; right? He may be excused and free to go. Do you have any more witnesses?

MR. MACDONALD: We do, Your Honor. We call DCC, the person that we were just discussing in that last I-213.

(The Interpreter is Sworn)

THE COURT: All right. Now you, sir.

(The Witness is Sworn)

THE COURT: All right. Thank you. Have a seat.

MR. MEYER: As well, Your Honor, just for the Court's knowledge, we can use this gentleman's full name. Obviously he's had his habeas proceedings before this Court.

THE COURT: Okay.

**DIRECT EXAMINATION**

BY MR. MEYER

Q Good afternoon.
A Good afternoon.
Q Can you hear me okay?
A Yes.
Q Can you introduce yourself with your full name to the Court.
A Deonicio Castillo.
Q And how old are you?
A I'm 53 years old.
Q I want to talk a little bit about your family and community ties. How long have you lived in the United States?
A Like 30 years.
Q Do you have any family here?
A Yes.
Q Who do you have -- who lives here with you?
A I have three children.
Q Do you need just a second, Mr. Castillo.
A Yes.

MR. MEYER: May I approach the bench, Your Honor? I

mean, not the bench. May I approach the witness?

THE COURT: Approach the witness why?

MR. MEYER: He's my witness, and I want to make sure he's okay.

THE WITNESS: It's okay. I'm okay. I have three children: Jocelyn Castillo, Giovanni Castillo, and Janet -- Jasmine Castillo.

Q. (By Mr. Meyer) And are any of them here in the courtroom with you here today?
A Yes. Two of them are here.
Q Can you point them out and maybe have them stand?
A They're back there.
Q All right. Are they all U.S. citizens?
A Yes.
Q Are you married?
A Yes.
Q How long have you been married for?
A For about 30 years.
Q Where do you live?
A Here in Denver.
Q Can you give the Court your street address?

THE COURT: Why?

MR. MEYER: I will withdraw the question. Because I'm trying to show he is not a risk of flight, and he gave that information truthfully to law enforcement agents, and he's been

there for 18 years, but I will just talk about Denver.
Q. (By Mr. Meyer) How long have you lived in your most recent address?
A I've been living there since 2008.
Q And do you own any property, land, or vehicles?
A Vehicles.
Q How many?
A Two.
Q Are they registered?
A Yes.
Q Are they insured?
A Yes.
Q Do you have a license?
A Yes.
Q Are your registration, insurance, and license the address at which you live?
A Yes.
Q What do you do for work?
A I work in construction.
Q And how long have you worked in that industry?
A For like 25 years.
Q And how long have you been in your most recent job for? Most recent employer.
A Approximately like 12 years.
Q Do you pay taxes?

A Yes.
Q How many years have you paid taxes?
A For like 25 years.
Q Have you ever been convicted of a crime?
A No.
Q Charged with a crime?
A No.
Q Arrested for a crime?
A No.
Q In immigration proceedings?
A No.
Q Previously arrested by immigration agents?
A No.
Q Okay. I want to talk about January 14th, 2026. What were you doing that day?
A I was at work.
Q And is that the -- was that at a construction site?
A Yes. It was in construction.
Q Okay. Was that an address at Tundra Top Drive in Parker, Colorado?
A Yes. It was Parker, Colorado.
Q Okay. And about how many people were at that job site?
A I think there were more than 25 people there.
Q I want to focus on your arrest by ICE this day -- that day. Excuse me. I want to start off, and I want to talk about what

was the first point of encounter you had with immigration officers? Where were you?

A I was standing next to my truck. And I had turned to the right, and I saw that the officers were walking towards me.

Q Okay. Were you like getting ready to drive your truck?

A No. I was looking for a type of tools in my truck.

Q Okay. So, you were in the middle of working?

A Yes.

Q And you said that you saw two men walking down towards you?

A Yes.

Q Before that, did you hear any screaming by some man about being arrested?

MR. DEUSCHLE: Objection. Leading, Your Honor.

THE COURT: Yes. It's a little bit leading. You can rephrase it, please.

MR. MEYER: I apologize. I will rephrase.

Q. (By Mr. Meyer) Did you hear any -- did you hear or see any commotion before these two men approached you?

A No. I didn't hear anything.

Q Did you see anything?

A No.

Q Had you -- did you see anybody get arrested by these two people before they came up to you?

A No. No. I didn't see -- no.

Q Okay. So, I just want to make sure. You're absolutely

certain you didn't see, hear -- see or hear any arrest that happened before these guys contacted you?

MR. DEUSCHLE: Asked and answered, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Meyer) How many officers approached you?

A Two.

Q Men or women?

A Men.

Q What kind of clothing were they wearing?

A I saw that they were wearing clothes like civilians.

Q In addition to the clothes, were they wearing other things on their body that would indicate that they could be law enforcement officers?

A Yes. I remember that one of them had a vest on that said Police.

Q Did they have firearms?

A Yes.

Q Both of them?

A Yes.

Q What was the very first thing that happened when they walked up to you?

A They asked me to identify myself.

Q Did they explain why they needed you to identify yourself?

A No. Just, I saw that they were police officers.

Q And so you cooperated and gave them your identification?

A Yes.
Q What identification did you give them?
A A Colorado driver's license.
Q And on that license, does it have your correct name?
A Yes.
Q Correct date of birth?
A Yes.
Q And an address you've lived at for the last 18 years?
A Yes.
Q After you handed your license to the officers, what did the officers do next?
A When I handed over the license that they asked me for, they asked me, where are you from? And I said Mexico.
Q Okay. And the license you handed them, is that a license that has a black bar on it?
A Yes.
Q Once you told them you were from Mexico, what's the very next thing that happened?
A They arrested me.
Q Okay. Immediately after that?
A Yes. Practically, yes.
Q They didn't ask you if you had any valid immigration documents?
A No.
Q When they arrested you, did they handcuff you immediately?

A Yes. They handcuffed me with my hands behind my back.
Q And these were two officers who made this arrest; correct?
A Yes.
Q Both of them armed?
A Yes.
Q Okay. Where did they take you immediately after arresting you?
A They loaded me into their truck.
Q When you got in the truck, what did you notice?
A There was someone in the truck.
Q Is that the first time you had seen that person?
A Yes. The first time I saw him.
Q Did you know that person?
A No.
Q Did you have anything to -- any reason to stand up or defend that person previously?
A No. I didn't know him.
Q At the moment they told you you were under arrest, did they ask you any questions at all about your family or your personal life?
A No.
Q Anything about how long you had lived in the country?
A No.
Q How many kids you had?
A No.

Q How long you've lived at your current address?
A No.
Q Any other information about you, whether you had ever had any convictions or problems with immigration before that?
A No.
Q And when they loaded you into the back of that car with your hands cuffed behind you, did they ask you any of those questions in the moment they put you in the back of that car?
A No. No. They didn't ask anything.
Q How long were you in GEO -- how long were you in immigration detention? Excuse me.
A Forty-eight days.
Q And that was 48 days away from your family?
A Yes.
Q How were you able to get released from custody?
A It was with a bond. It was a bond through the lawyer who did the habeas corpus.
Q And do you remember that judge's name?
A Judge Jackson.
Q Okay. When did you have your bond hearing?
A February 25th.
Q Did the immigration judge give you a bond that day?
A Yes.
Q How much was the bond he gave you?
A $2,500.

Q Did your family try to pay the bond?
A Yes.
Q Were they able to pay the bond -- when were they able to pay the bond?
A On the 27th.
Q Were you released from custody on the 27th?
A No.
Q Were you released from custody on the 28th?
A No.
Q The 1st?
A No.
Q The 2nd?
A No.
Q The 3rd?
A Yes. The 3rd.
Q So, five days after you posted bond, ICE let you out of detention?
A Yes.
Q And do you remember when the immigration judge gave you that bond, did the immigration judge say you had to do any sort of extra conditions on that bond?

MR. DEUSCHLE: Objection, Your Honor. Relevance?

THE COURT: We're kind of getting into that case now.

MR. DEUSCHLE: I think so, Your Honor.

THE COURT: Nice try, though, Mr. Meyer.

MR. MEYER: Thank you. I appreciate that. May I do one last question?

THE COURT: Let's go to the next question.

Q. (By Mr. Meyer) Today, when you were supposed to testify here, ICE made you go in to check in in Centennial, Colorado; correct?

A Yes.

MR. MEYER: I don't have any more questions.

THE COURT: Cross examination?

MR. DEUSCHLE: Very briefly.

**CROSS EXAMINATION**

BY MR. DEUSCHLE

Q Good afternoon, Mr. Castillo.

A Good afternoon.

Q I'm an attorney for the Government here. I believe you said in your testimony earlier that you lived in the United States for 30 years; is that right?

A Yes.

Q When did you enter the United States?

A I don't remember the date, but it was -- it was in '95. It was in the summer of '95.

Q In the summer of '95, you didn't enter the United States lawfully; correct?

MR. MEYER: Objection, Your Honor. This is a question designed to elicit a response that we are currently litigating

in immigration court related to alienage.

THE COURT: Normally I would agree, but isn't that part of the whole point that he's not here lawfully?

MR. MEYER: Well, I think the point was is he being arrested without a warrant.

THE COURT: Overruled.

MR. MEYER: And without a flight risk -- okay.

Q. (By Mr. Deuschle) I will repeat my question. When you entered the United States in the summer of 1995, you did not enter the United States lawfully; correct?

A Yes.

Q And you were arrested in January 2026; is that right?

A Yes. January 26th.

Q Okay. So, from the summer of 1995 to your arrest in 2006 [sic], you remained in the United States unlawfully; correct?

A What was the question?

Q Sure. From the summer of 1995 when you entered the United States unlawfully, until your arrest in January of 2026, you remained in the United States unlawfully; correct?

A Yes.

MR. DEUSCHLE: No further questions, Your Honor.

THE COURT: Redirect?

MR. MEYER: No, Your Honor.

THE COURT: All right, then. Gracias. You're excused

and free to go. Do you have another witness?

MR. MACDONALD: We do, Your Honor. We call ICE Agent AL.

(The Witness is Sworn)

THE COURT: Have a seat, please.

**DIRECT EXAMINATION**

BY MR. MACDONALD

Q Good afternoon, sir. Could you state your initials for the record.

A My initials is AL.

Q And I'm going to refer to you as Mr. AL; is that okay?

A Yes. That's okay.

Q Mr. AL, my name is Timothy Macdonald. I represent the plaintiffs in this case. What is your job, sir?

A I am a deportation officer for the Department of Homeland Security, Immigration and Customs Enforcement.

Q You work for ICE?

A Yes.

Q As a deportation officer?

A Yes.

Q How long have you been in that position?

A I'd say roughly from December of 2014.

Q December of 2014, so heading towards 11, near your 12th year as an -- in employment with ICE?

A Yes.

Q Okay. Are you a SDDO, supervisory detention and deportation officer?
A No.
Q Do you ever serve in an acting capacity as an acting SDDO?
A A couple times.
Q A couple times in 11 years?
A Yes.
Q When was the last time?
A Probably like maybe as early as four months ago.
Q How many times do you think you have served as an acting SDDO?
A Various times.
Q Various?
A Yeah. It just depends. I mean, someone calls out, you will do it for a day. It's hard to count how many times I've done it, but it's all over the place.
Q In the last year, do you think it's been more or less than five times, sir?
A I would say less.
Q Less than five?
A Yes, sir.
Q And in those less than five times in the last year where you served in an acting role, has it just been for one day, or for a longer period of time?
A From the last within six months, it's only been a couple

days.

Q When you've served in an acting role, how has that been communicated to you?

A Through text.

Q Okay. So, someone has texted you, I assume it is the -- an SDDO, supervisory officer said, Mr. AL, you're going to serve as acting today?

A Yes. It will be on a group thread.

Q It will be on the group thread?

A Mm-hmm.

Q Tell me what the group thread is, sir.

A Just the officers on duty.

Q I missed that. I apologize.

A The officers on duty.

Q Okay. So, is there a group thread of officers on duty as a, you know, sort of general matter often?

A Yes. It's our daily operation officers that are on duty or not on duty.

Q Okay.

A And information is passed on that thread or --

Q And is that group thread on a government-issued cell phone, or I'm just trying to understand how you --

A Yes.

Q -- get those. Okay. And so the deport officers who are on duty for a given day that morning would say, all right, let's

get all of us on the text chain in case we need to communicate?

MR. DEUSCHLE: Objection, Your Honor. Relevance.

THE COURT: Overruled, but let's move on quickly.

MR. MACDONALD: Sure. Thank you, Your Honor.

Q. (By Mr. Macdonald) Would you like me to repeat that question?

A Yes.

Q Okay. As a typical matter, the deportation officers for the day who are on duty would get on a text chain in the morning?

A Yes.

Q Who is your supervisor?

A KC.

Q And is that person an SDDO?

A Yes.

Q Okay. We have identified the SDDOs previously. Could you give us that person's name?

MR. DEUSCHLE: Objection, Your Honor. This individual is not just an SDDO. He's one of the witnesses that may testify today. I think given Your Honor's order --

THE COURT: Let's stay with initials, then.

MR. DEUSCHLE: Thank you.

Q. (By Mr. Macdonald) Got it. Thank you, Your Honor. Have you held other positions besides deportation officer for ICE over the last 11 years?

A No.

Q As you understand it, you've been engaging in arrests out on the streets as a deportation officer. That's part of your obligations?

A Yes.

Q At times, have you engaged in warrantless arrests?

A I mean, it happens simultaneously.

Q Tell me what you mean by it happens simultaneously.

A There's times when we were on duty, and we have a -- have our individual that we're looking for, and we come across other people that we have not identified at the time.

Q Okay. And when -- so, you're often -- would you say it's typical, you're out on a operation, you have a target? That would be typical?

A Correct.

Q Okay. And sometimes when you're out on a mission, or an operation, you have a target, you encounter other people, and you form a belief that they might be in the country in violation of the immigration laws?

A Correct.

Q And you refer to those as "collaterals"? You've heard that term?

A They are collaterals or they're associated to the target.

Q Okay. And in your time as a deportation officer, you've engaged in warrantless arrests of those people; is that true?

Collaterals or associates?
A We will come across those individuals and, yes, interview them.
Q And you have engaged in warrantless arrests of those people; is that true? Sometimes?
A I mean, we have reasonable suspicion to talk to them. When we're having a conversation with them, they -- we gather facts, and that's when we have that suspicion to further investigation on them. And then from then, that's when we determine from the facts that we've gathered that we will get a 200 for them simultaneously before arresting them.
Q So, you're saying you've never engaged in a warrantless arrest as an ICE deportation officer in your 11 years?
A I mean, can you clarify the question?
Q Do you understand that there is statutory and regulatory authority for ICE agents to engage in warrantless arrests under certain circumstances?
A I mean, since -- since this injunction, we have not.
Q I want to talk about before this injunction. Okay? Have you -- do you understand that there are circumstances in which ICE deportation officers can engage in warrantless arrests?
A Mm-hmm. So, what happens -- I guess I'm not understanding. At some point they're going to get a warrant -- a 200 issued to them.
Q I understand there's -- at some point an I-200 will be

issued. Do you have an understanding that an ICE deportation officer has certain authority to engage in warrantless arrests? Yes or no. If you don't know the answer to that, that's okay.
A Yeah. I'm not very clear what you're trying to say.
Q Are you aware of any requirements that you as a sworn law enforcement officer have to do before you engage in a warrantless arrest?
A Yes.
Q What is that?
A Find the evidence that this person is here illegally in the country.
Q Okay. And once you, in your view, if you find the evidence that someone is in the country illegally, you may arrest them?
A I will take that information to my supervisor and have them look it over to verify that this person is -- that we're able to arrest. And he will issue a 200.
Q Okay. When you say you will take it -- take the information to an officer -- to a supervisor, what -- where? If you're out in the field, how are you taking the information to a supervisor?
A I will through phone, or I will call him and let him know certain information that we have found of this individual.
Q And then what happens in that circumstances? You will inform a supervisor that you have encountered an individual. Then what happens?

A So, at that point --

Q A person for whom you do not have an I-200. You do not have a warrant at that point.

A Yes. We will let him know that he is part of our -- our scenario that he is in the -- whether -- let me refer -- let me go back. So, when we get that information of the individual from -- that we encountered that we don't know who he is, he will take that information, and he will validate it through system checks, and he will verify what he needs to do to make that decision, whether we can arrest him or not, and issue that 200.

Q And what is -- what is -- in those circumstances, what is happening with the individual where you are out on the streets?

A He is either talking to primary or secondary officers.

Q Might that person -- I apologize for interrupting. Were you finished?

A Just he's either occupied being -- talking to a secondary officer there while the other officer is exchanging the information with the supervisor.

Q Okay. Could be in handcuffs?

A No.

Q Never?

A He could be. Depending -- depending if he -- if he's a -- his demeanor. If he looks like he's going to be possibly fleeing, we will put him in cuffs.

Q And what happens if you can't get in contact with the supervisor in that moment?

A There's always someone on duty.

Q How long does it take typically in the circumstances you've just described to get an I-200?

A Doesn't take -- doesn't take long.

Q Approximately how long, sir?

A I don't have an approximate. It just depends on the situation.

Q And is the I-200 physically created at that point?

A The -- it is emailed -- electronically emailed to us.

Q Signed?

A Signed.

Q Just with an electronic signature?

A Correct.

Q And do you typically show that warrant to the person and tell them you've been arrested with a warrant?

A Typically if we have it on hand, yes. But there's been times that we haven't.

Q And in an I-213, that's a report you fill out after an arrest; right?

A A 213?

Q Yes.

A It is.

Q And you would document if someone was arrested pursuant to

a warrant; right?
A Yeah. That -- it's something that should be on the 213.
Q Because it's important to get the I-213 accurate; right? Because it's used by the Government in immigration proceedings; true?
A True.
Q You're aware that this Court entered a preliminary injunction order on November 25th, 2025?
A I was aware of it.
Q Right. What training have you received on the Court's order, if any?
A I got a email of the injunction, and then just explained what was needed.
Q When did you get an email of the injunction?
A I would say around that time.
Q So, sometime shortly after the Court's order, you think?
A Correct.
Q Who did the email come from?
A Not sure if it was from my supervisor or from our Denver email group -- group text, or group email.
Q But there was no sitdown training in which supervisors or anyone else talked to you as a deportation officer about what you needed to do to comply?
A No formal training.
Q And that single email is the only one you can remember

getting sometime shortly after the Court's order?
A Yeah. That's the only one I can remember.
Q I'd like to show -- let's put up Exhibit 207, please. We're going to talk about a few warrantless arrests that you were involved in, Mr. AL. 207 is already admitted, Your Honor. If we could go to page 12, please, Jason. And we're just going to use initials for the humans involved in this, Mr. AL. Do you see at the top, the person with the initials AMF, this is an I-213 for that individual? Do you see that?
A I do.
Q And the date of the action was an arrest of January 14th, 2026?
A I see that.
Q Okay. If we look at the -- over the right, it says by, and it has your initials, AL, in the column over on the right? And your badge number?
A I see that.
Q Okay. So, this is an I-213 that you filled out for a person that you arrested?
A I would have to go to the bottom.
Q Okay. Let's look down at the bottom. It looks like there are two different signatures. One with the initial BSA -- actually, I take it back. Both of them are by BSA, and that looks like both the signatures? And then there's an examining officer with the initials JDR. Do you see that?

A I do.
Q Do you think that one of those two people filled out the I-213?
A They complete it.
Q Okay. They complete it?
A Yes, sir.
Q You would have done -- well, actually, let's just look at the next page so that you -- so we get on the same page. The encounter data, this is the narrative of the arrest; right? That's where it belongs in an I-213?
A Yes.
Q And you see that the top right, underneath encounter data, it says, following information was provided by you?
A Yes.
Q Okay. Does that -- does that help you that you were involved in this arrest?
A Yes.
Q All right. We've seen some that have the other arresting officers on the other I-213 and the other officers involved in the arrest. I haven't been able to find a section, but down at the -- near the bottom it identifies -- right there, it does identify that you were there with four other officers -- or, excuse me -- there were four of you in total. Do you see that?
A I see that.
Q Okay. And the description of the arrest indicates that you

were doing targeted enforcement of someone with the initials MACC. Do you see that?

A I do.

Q And that's not the person that is arrested, at least -- and reflected in this I-213; right? It's a different person?

A Correct.

Q Okay. So, you were doing targeted enforcement. You pulled over a van, and there were two other individuals in the van. Do you see that -- do you see that description in the second paragraph?

A Yes.

Q And it doesn't have much description, but it says you were able to gain positive ID of the other occupants. And one of those people is AMF, and the other is with the initials AMM. So, these would be collaterals; right?

A Yes.

Q You didn't know their identity when you pulled over the van; right?

A No.

Q Okay. You did -- I apologize. Did you know their identity?

A No.

Q All right. And you say you gained positive ID of those two individuals, AMF and AMM, and the I-213 reflects that they admitted to not having status to be in the United States. Do

you see that?
A I do.
Q And then the I-213, the narrative that you filled out simply says these two people, AMF and AMM, were also taken into ICE custody to be taken in for processing at headquarters. Do you see that?
A I do.
Q Okay. So, there's no mention of getting an I-200; right?
A No.
Q So, you understand this means it was a warrantless arrest of these collaterals; right?
A Not necessarily.
Q So, you're saying maybe there was a warrant?
A There was most likely a warrant, but it's not stated in the 213.
Q When you say it's most likely a warrant, if there was a warrant, wouldn't you have put it in there as a matter of diligent police work?
A I should have.
Q Okay. And if there was a warrant before you -- if you got one after the encounter began, ICE could browse that warrant; right?
A Yes.
Q Could show it to the judge?
A We would have to get his file. It would be in there.

MR. MACDONALD: Let's take that down. Let's put up Exhibit 202, please. This has not yet been admitted, Your Honor. This is another package of I-213s. I move its admission.

MR. DEUSCHLE: Same stipulation. Same qualification, Your Honor.

THE COURT: Okay. With that understanding, it's admitted.

Q. (By Mr. Macdonald) Let's go to Exhibit 202, page 29, please. This is an encounter and arrest of a person with the initials AGR. Do you have that in front of you?
A I do.
Q Do you see that? If we turn to the next page, page 30 of the exhibit, second page. We see this one does have arresting officers, and it includes you. Do you see that?
A I do.
Q Do you see where I've circled, sir?
A Yes.
Q All right. One of those is you?
A Yes.
Q So, you were involved in this arrest; true?
A It appears my name is on there.
Q Your name is on there? Do you have any independent memory of this arrest other than what is stated in this I-213?
A I don't have recollection of it.

Q Okay. This is another arrest that doesn't say anything about ICE getting an I-200; right?
A Not that I can see.
Q Okay.
A No.
Q And like the last I-213 we saw, there's nothing in this I-213 about the person's community ties or likelihood of escape, is there?
A Not from the encounter, no.
Q And in this one, when you pulled over the vehicle, there were three occupants in there who were asked for identification. Do you see that down near the bottom of the I-213?
A I see that.
Q It says, all three occupants were asked for identification. Immigration and criminal history queries were run, and found them to be in violation of immigration laws. And the next line says, officers placed subjects under arrest, no further discussion; right?
A No further discussion.
Q All right. Sitting here today, you don't know if these -- you have no knowledge that there were I-200s that were obtained for any of these three people before their arrest, do you?
A No. Technically not.
Q And if you had them, it would -- if you had I-200s, you obtained them, it would have been important to put in the I-213.

Do you agree with that?

A Yeah.

MR. MACDONALD: No further questions, Your Honor.

THE COURT: Cross?

MR. DEUSCHLE: None, Your Honor.

THE COURT: Sir, looking at that document -- it's not there anymore. It said there were a thousand deportation officers that reported at that scene? Is that right?

THE WITNESS: Oh. No.

MR. MACDONALD: I think it might be the time, Your Honor.

THE COURT: Yes.

THE WITNESS: I was like, yeah.

THE COURT: I was going to ask.

MR. MACDONALD: That would have been a lot, Your Honor.

THE COURT: There weren't a thousand there?

THE WITNESS: No.

THE COURT: Okay. My fault. All right. You're excused, free to go.

MR. MACDONALD: We made a little more progress, Your Honor. I think we're going to call Mr. Davies.

THE COURT: Can you give me some idea of where we are with this?

MR. MACDONALD: I think Mr. Davies will be our last

witness, Your Honor.

THE COURT: How about you gentlemen? Are you going to have any witnesses?

MR. LENEIS: We've listed Mr. Davies, so -- but no one else. So, no.

THE COURT: All right. Let's take ten minutes, and see Mr. Davies.

(Recess at 3:10 p.m., until 3:19 p.m.)

THE COURT: So, during the recess, I was able to confirm that if necessary, I can change to a later flight. I don't want you to feel like you didn't have time to make your point, because I know it's important to both sides.

MR. MACDONALD: Thank you, Your Honor.

THE COURT: Okay. Next witness, please?

MR. MACDONALD: We call Mr. Greg Davies, Your Honor.

THE COURT: Good afternoon. Welcome back.

THE WITNESS: Yes, Your Honor.

(The Witness is Sworn)

THE COURT: Thank you. Go ahead.

**DIRECT EXAMINATION**

BY MR. MACDONALD

Q Good afternoon, Mr. Davies. State your name for the record, please.

A Gregory Davies.

Q Mr. Davies, my name is Tim Macdonald. I represent the

plaintiffs in this case. What's your position with ICE here in Colorado?

A The assistant field office director.

Q Okay. Same position you had when you testified back in October; right?

A Yes, sir.

Q Makes you third in command here in Colorado?

A Yes, sir.

Q Who do you report to?

A Right now I report to Acting Deputy Field Office Director Robert Coultrip.

Q What's the name again?

A Robert Coultrip.

Q Robert Coultrip? And how long have you reported to Mr. Coultrip?

A Approximately two weeks, I believe.

Q What was Mr. Coultrip previously?

A The same as me, the assistant field office director for the southern state -- southern part of the state.

Q He got promoted or something else, depending on your view?

A Yes.

Q And moved to headquarters?

A Yeah. He got a temporary promotion to the deputy position.

Q How many AFODs, assistant field office directors, are there for the Denver field office?

A I believe six.
Q But I think you described yourself as third in command last time we were here. Is that because you're based in headquarters, and the others are based elsewhere, or are all the AFODs third in command?
A Yeah. All the AFODs hold the same rank and title.
Q Got it. And currently, there's also a new acting field director; true? Is that right?
A Yeah. It's a new acting field -- yes, sir.
Q For Denver, that's George Valdez?
A That is correct.
Q So, Mr. Valdez is the top official, at least in an acting capacity, for Colorado; right?
A That is correct.
Q And that happened about a month ago?
A Yeah. Approximately.
Q Okay. He took over from Mr. Hagan; is that right?
A That is correct.
Q And Mr. Hagan was in the top position for only about four months; right?
A I believe so.
Q And Mr. Hagan took over for Mr. Guadian as the head of the field office; right?
A That's correct.
Q And Mr. Guadian was in the position for about nine months?

A Yes.

Q All right. So, who was it before Mr. Guadian?

A I believe another acting. We've had so many. I believe it might have been Acting Field Office Director Ernie Santa Cruz was there at some point.

Q Okay. In any event, we've had at least four different heads of the Denver field office since January of '25, 14 months?

A Correct.

Q Okay. Was Mr. Hagan forced out of his position by leadership in Washington?

A I'm not aware of how he was removed.

Q You've been an AFOD since 2019?

A 2019, 2020.

Q Okay. And you were previously a deportation officer?

A Correct.

Q All right. As a deportation officer, you filled out I-213s?

A Correct.

Q All right. You thought it was important then, and you think it's important now for those to be accurate and complete?

A Correct.

Q All right. As a supervisor, before you became an AFOD, you started supervising people in 2019?

A Correct.

Q And as a supervisor, you were responsible for reviewing I-213s; right?
A Yes.
Q How many supervisors in the Denver field office today?
A Not sure of the exact number. I would guestimate over 20.
Q Over 20 supervisors?
A Yes.
Q Okay. And the number of deportation officers has been growing here in Denver?
A Correct.
Q All right. Back in October, Mr. Guadian testified that they had recently hired 65 new deportation officers. At least that was as of October 30th of 2025. Does that seem right to you?
A It could be, yeah.
Q And at that time, that represented a near doubling of the Denver field office, close, from which had about 80, 85 people, and you added 65 more. Does that sound right?
A For the officer corps, yes.
Q Okay. Since October, when you and Mr. Guadian testified, how many more deportation officers have been hired? Just approximately. Not holding you to the precise numbers.
A I believe total, I believe we're between 125 and 150, to include the original 60. But it could be more than that.
Q All right. Just make sure I have the numbers right. You

think there's been like around another 60 people -- deportation officers hired since our last hearing?
A It could be. That sounds close.
Q Okay. How many different teams of ICE agents are out in the field each day somewhere in Colorado?
A I mean, it varies. Locally, we will have two or three teams out, but we have other outstations. Just depending on manpower, they could have teams out also. I do not oversee them, so I wouldn't know how many of their teams are out.
Q So, when you say locally, you mean sort of Denver metro area?
A Yes, sir.
Q Okay. And that two to three teams usually, how many people would be on those teams?
A It varies again. Total, for enforcement, we have 21 officers for our fugitive operations team. So, at any given time, a percentage of them would be out.
Q And that's where you sit on top of, the fugitive operations?
A I oversee them, yes.
Q Who else do you oversee? What other teams?
A The training unit. And I used to oversee the CAP team, which I no longer --
Q And remind us what the CAP team stands for?
A The criminal apprehension program.

Q How many other teams are there?
A I'm sorry?
Q How many other teams are there in the Denver field office?
A There's a non-detained unit, an alternatives to detention unit, a detained unit that works in Aurora.
Q Is that it?
A I believe so. There's an FCC unit that kind of shares duties with non-detained.
Q Last time the Court heard testimony that the goal of the Denver field office was that each team makes three arrests per day. Has that goal increased or stayed the same since the last hearing?
A I haven't -- there hasn't been talks of goals or quotas as of recent.
Q So, from your standpoint, nothing has changed since the prior hearing in which Mr. Guadian testified that the goal was each team made three arrests per day?
A Yeah. I haven't -- so, I haven't heard of them requesting that goal as of recent.
Q Were you aware that in other states during operations, ICE teams have targeted goals as high as eight arrests per day?
A I'm sorry. Could you repeat that?
Q Have you heard that in other states, ICE teams have target goals that are as high as eight arrests per day?
A I have not heard that.

Q Sometimes a team is just two officers, depending on what they're doing in the field?
A So, at the Denver field office, I wouldn't -- myself wouldn't constitute a team of two. It would be three or more.
Q Are there sometimes officers two at a time going out in the field -- in the streets, in the field making arrests just two people?
A Yes. Sometimes.
Q Okay. In what circumstances is that when there's -- why would that happen?
A A jail arrest. A more safer environment.
Q You understand the Court entered a preliminary injunction in this case on November 25th, 2025?
A Yes.
Q In the preliminary injunction order, it ordered you and your agents to do certain things and refrain from doing certain things; right?
A I believe so, yes.
Q Including engaging warrantless arrests without probable cause of unlawful presence and probable cause a person was likely to escape before a warrant can be obtained; is that fair?
A That the injunction included that?
Q Yeah.
A Yes.
Q Okay. The injunction also required your officers

specify -- the arresting officer specify in I-213 that an arrest was warrantless. You're aware of that?
A I am aware of that, yes.
Q And the I-213 is the arrest report used to document the encounter. You're aware that the Court's injunction included a requirement that your officers document in the I-213 the specific articulable facts that give rise -- that give probable cause the person was likely to escape. You're aware of that?
A Yes. There was items in there that they requested to have in the 213.
Q Okay. And those two prongs of unlawful presence and flight risk that the judge imposed in the preliminary injunction, those track the prior requirements from the *Nava* settlement, the broadcast policy that you talked about at the last hearing. Do you agree with that?
A Yes. That is correct.
Q Okay. So, the Court's requirements were things that your agents were already supposed to know?
A Yes. That is correct.
Q And the Court also required that the I-213s make clear what information relevant to the likelihood of escape was known before the arrest and what information was gathered after the arrest. That was part of the Court's injunction?
A Yeah. That's stated in the injunction, yes.
Q That also was part of the requirement from the broadcast

statement of policy in *Nava*; right?

A That's correct.

Q All right. And you're aware that the Court ordered that ICE provide us with random samples of I-213s for warrantless arrests in Colorado every month? That was part of the Court's requirements; right?

A I believe so, yes.

Q And the Department of Justice lawyers representing your agency agreed to give us a sample -- a random sample, which is what the Court ordered, of one-third of the I-213s from warrantless arrests each month. Were you aware of that?

MR. BROWN: Foundation.

THE COURT: Well, the question is was he aware, but it was -- yes. I will sustain the objection. You can ask it a different way.

Q. (By Mr. Macdonald) Okay. Are you aware that from the Department of Justice, we were receiving one-third of I-213s from the prior month?

A I was not aware of how many. I was -- I ensured that the Department of Justice got the 213s from us. I wasn't aware how many they were handing over.

Q And what you were trying to do, given the judge's order, is provide I-213s that were for warrantless arrests; right?

A So, I provided all 213s, not just warrantless arrests.

Q The Court's order specified what would happen for

warrantless arrests. You're aware of that?

A Yes.

MR. MACDONALD: Okay. Let's put up Exhibit 200, if we could. This has not yet been admitted, Your Honor. Your Honor, I will move admission of just the first two pages of I-200 [sic], which is the communication on the first production of the I-200s to us, and recognizing that this will draw the same objection that we've received from opposing counsel.

MR. BROWN: Yes, Your Honor. Same qualification regarding its admission.

THE COURT: Well, yes. Your qualification is that you're not witnesses in the case.

MR. BROWN: Correct. And that the information in it is representations of counsel, not the agency.

THE COURT: Counsel, who would certainly represent things correctly. Yes?

MR. BROWN: To the best of their knowledge, yes, Your Honor.

THE COURT: All right. With that discussion noted, number 200 is admitted.

Q. (By Mr. Macdonald) And if we look at the second paragraph of 200, it says, pursuant to the Court's order and our agreement, we are producing one-third of I-213s from November 25 through December 31 that correspond to arrests made where no warrant was issued pre-arrest based on a review of the I-213s.

Do you see where I'm reading there?
A Yes, I do.
Q Okay.
THE COURTROOM DEPUTY: Mr. Macdonald, did you want this one published?
MR. MACDONALD: I'm going to move off it, Ms. Smotts. We don't need to do that. Thank you. And you can take that down, Jason.
Q. (By Mr. Macdonald) Are you aware, Mr. -- I'm allowed to say your name. Sorry. I've been programmed to not say people's names. I can call you Mr. Davies; right?
A Yes.
Q Okay. Are you aware that a few days after this, the Government produced -- did a reproduction of I-213s to us, because there was some question about whether some of the I-213s in -- that were sent as a link with -- with Exhibit 200, whether there may have been warrants for those? Are you familiar with that back and forth?
A I don't believe so, no.
Q Okay. Let's put up Exhibit 202. This has been admitted, Your Honor. So, this is four days later, Mr. Davies. This is another email from Assistant United States Attorney Mr. Brown dated January 16th, 2026. And at the top, he indicates they believe they complied with the Court's order, and they've separated the I-213s into two categories. Do you see where I'm

reading?
A Yes.
Q Okay. And category one they say is I-213s that suggest that the arrest may have been made pursuant to a warrant, even though they do not explicitly mention a warrant. Do you follow that?
A Yes, I do.
Q Okay. And then category two is I-213s that do not contain facts indicating a warrant may have issued. Do you follow that?
A Yes, I do.
Q Okay. And so Exhibit 202 is the 20 I-213s that fell into category two, according to the email from counsel. And you can see that -- sorry. Can we highlight that and blow that up? So, again, category two represented to be I-213s that do not contain facts indicating a warrant may have issued. And the Government's production previously on January 12th contained 17. He was able to produce three additional randomly selected I-213s from category two today, so that makes 20 I-213s produced pursuant to the Court's order to produce I-213s for warrantless arrests. Do you follow that?
A Yes. I'm following this.
Q Okay. And let's leave that back up for just one moment, Jason. So, the review that had been done indicated there were 58 I-213s in category two, and that's for the period from when the judge entered the order, November 25th, through

December 31st. So, that's a month and five days. Do you follow that?

MR. BROWN: Foundation to the extent he's asking if that happened -- if he corrected it by saying are you following, no objection.

THE COURT: What?

MR. BROWN: The start of the question made -- raised the foundation issue. However, then he said, are you following? So, to the extent it's are you following, no objection.

THE COURT: I don't remember what the start of the question was. I would say does this say that there --

MR. MACDONALD: Sorry, Judge.

THE COURT: You moved on from your 58 now?

MR. MACDONALD: No. I'm going to ask him about the 58, Your Honor.

THE COURT: Right. It says, they found 58 to fit in category two.

MR. MACDONALD: That's right.

THE COURT: Okay.

Q. (By Mr. Macdonald) My question now is do you have any reason to dispute that there were 58 I-213s in the warrantless arrest category?

A I haven't reviewed all the 213s, so I wouldn't know.

Q You could review them. You have them; right?

A So, I have -- I handed them over. I handed over all the

213s from this timeframe. I don't have them anymore, no.
Q You have access?
A I absolutely have access to them.
Q You could ask any of the fine gentlemen sitting to my left for them; right?
A Yes.
Q Okay. And so did you review some of those?
A I've reviewed some for this -- a few for this case.
Q Okay. Just a few?
A Yes.
Q All right. So, if you looked -- you have a hard copy in front of you of Exhibit 202 that has 20 I-213s, and so that we just want you to open that up and take a look at it. So, these I-213s that were provided to us pursuant to the Court's order, are you aware that none of these I-213s say that they were warrantless arrests? None of them have that indication in the narrative?
A I haven't reviewed these. Do you want me to review these?
Q We probably don't need to waste the time for you to do that. I guess the question is are you aware of that fact whether any of those indicate that they are warrantless arrests?
A I would have to review the case.
Q Okay. And you haven't done that?
A No.
Q And you're not aware of whether any of them include the

specific articulable facts that would give rise to probable cause the person is likely to escape before a warrant could be issued? You haven't reviewed them, and you don't know that; is that fair?
A That's fair.
Q All right. And you submitted a declaration in this case, I think on Saturday night?
A I believe it was Friday night, I believe.
Q All right. It was whenever it is. March 7th, you submitted the declaration; is that right?
A I would have to look.
Q Why don't we just look at it.
A Yeah.
MR. MACDONALD: Your Honor, may I approach?
THE COURT: Thank you.
Q. (By Mr. Macdonald) So, this is the declaration that you submitted in this case on March 7th; right?
THE COURT: It says March 6th.
THE WITNESS: Yeah. I signed it on March 6th.
MR. MACDONALD: Thank you. Filed with the Court on March 7th, excuse me.
THE WITNESS: Yes. This is it, though.
MR. LENEIS: So, Your Honor, if you would like, we do have copies of the actual signed declaration. This is the one that was filed. So, it doesn't have his signature on it due to

the way that the Court's CM/ECF rules work. The actual signed declaration stays in the files, and a different -- a slightly different one is filed.

THE COURT: Is this what your second motion was on?

MR. LENEIS: This is exactly what the second motion is about, Your Honor.

THE COURT: So, which one do you want the plaintiffs to use? They're the same; right? Except for the signature?

MR. LENEIS: I believe that is the case.

MR. MACDONALD: I'm happy to use this one for now, Your Honor. I don't need the actual one that he signed.

THE COURT: Do you have any problem with his doing that?

MR. LENEIS: No.

THE COURT: All right.

Q. (By Mr. Macdonald) In paragraph 11 of Exhibit 292, your declaration, you identified four --

THE COURT: Is 292 admitted?

MR. MACDONALD: What's that?

THE COURT: Is 292 admitted?

MR. MACDONALD: It's not admitted, Your Honor. I was -- I'm happy to have it admitted. It's his declaration.

THE COURT: Any objection?

MR. BROWN: No objection.

THE COURT: It's admitted.

Q. (By Mr. Macdonald) In paragraph 11 -- let's go to page five. And you identify four specific individuals in your declaration in paragraph 11 on page five. Do you see that?
A Yes, I do.
Q And they have the initials AGR, CEPC, and FLZ; right?
A Yes. And then the fourth -- the fourth one is --
Q RJRP is the fourth?
A Correct.
Q All right. And with respect to AGR, CEPC, and FLZ, you say you have reviewed the arrest records and confirmed that an I-200 arrest warrant for each individual had been created during a previous interaction with immigration officials prior to their most recent arrest. That's what you say?
A That's correct.
Q Okay. You're not testifying that they were arrested pursuant to those warrants or that your officers knew about these warrants when they arrested them, are you?
A I'm sorry. Can you repeat that?
Q Yeah. And I will try to break it down, because it was probably an unfair compound question that your counsel could have objected to, but he was generous. So, let's start, you're not saying that your officers knew about who -- who arrested these individuals, you're not saying they knew that there was a warrant?
A So, I wasn't there, so I don't know what they knew and what

they didn't know. But during the course of the investigation, this is the information that would have come up while they were interviewing these subjects.

Q But you don't know that?

A I don't know that.

Q Okay. And you're not testifying that your agents actually arrested them pursuant to an I-200 that was created previously and was in the file; right?

A Again, I wasn't there, but this would be the warrant that they would have used if they were to take them into custody. This would have been a warrant that they could have used to take them into custody.

Q Could have used. You're not saying, because you weren't there and you haven't talked to them, that they did use it; true?

A So, I guess I don't understand that question. If they have an active warrant in the system, they would have taken them into custody with that active warrant.

Q And so similar to our -- the actual named plaintiffs in this case who were arrested without warrants, and then after the fact an I-200 was put in the file -- are you aware of that? That's a common practice even when someone is subjected to a warrantless arrest. After that fact, an I-200 is put in their file?

A Yes. That's correct.

Q Okay. And that was true for each of our named plaintiffs. Were you aware of that?
A No.
Q Ms. Dias Goncalves, Mr. Ramirez Ovando, and the others, JSG and GRR?
A No. I was not aware.
Q But you're saying someone has an I-200 in the field, and if they're encountered in the field, by definition, if they're arrested, it is pursuant to that warrant. That's your testimony?
A Yes.
Q You haven't provided those warrants to the Court or to us; true? For these four individuals?
A I have not, no.
Q Do you know if these four individuals were served with a warrant at the time they were arrested?
A I do not know.
Q And you don't know if they were actually arrested, put in handcuffs, put into a car before an officer even became aware that there was an I-200 in their file; true?
A Yeah. I do not know. I was not there.
Q And you would expect as the AFOD for Denver that your officers, including the supervisors who review the I-213s, would accurately reflect if these four people were arrested pursuant to a warrant, they would put that in the I-213. That's what you

would expect; right, sir?
A Going forward, absolutely, yes.
Q And they should have -- if it happened then, you would have expected they did it?
A So, previously, it would be different -- I mean, different -- there's different ways you could type the 213 that the supervisor would then know that you had the warrant. There's different -- if it was a targeted arrest, we would know that you had a warrant with you. If it was a jail release, we would know that you had a warrant with you. So, going forward, because of all of this, my training to the staff now has been adamantly clear if you had a warrant prior to arresting the person, it does need to be in the 213.
Q And why didn't you do that before, sir?
A Before the injunction?
Q At any point.
A Because when the supervisor's reviewing the case, there's certain words, there's certain nomenclature in the 213 that as officers with our training, we knew that subject was targeted, and there was a warrant with the file.
Q What if the person is not targeted, and they're collateral, and they're found at a construction site, for example?
A And that's a different situation altogether. That's a collateral, and that would be handled a different way. But if it was listed in the 213, the subject was targeted, then my

supervisors would know that they had a target package for that person.

Q I mean, your supervisors, I thought based on what you just testified a few minutes ago, would have been able to tell that there were warrants by running the checks in the system?

A Absolutely.

Q Okay. So, when they got an I-213, and they ran their checks, why wouldn't they have said to the arresting officer, if you arrested this person pursuant to the warrant, why isn't it in the I-213?

A Then that's -- again, that's why I've been continuingly training the staff to ensure that if it's a warranted arrest, we make sure that it's listed as a warranted arrest.

Q You -- so, you've identified these four from your review of arrest records from the I-213s that we submitted to this Court that are the ones that we were told were warrantless arrests. And you've identified four that you said a warrant existed previously; right?

A Correct.

Q And I think there are 29. Does that sound right to you, that we've received from the Government?

A Again, I do not know.

Q All right. But you could have reviewed more than these four and identified if there was ever a warrant in anyone's file; true?

A True.

THE COURT: Were these four in category one or category two?

MR. MACDONALD: All four of these were in category two, Your Honor, ones in which the representation was made these were warrantless arrests, and none of them on the face of the I-213 mention anything about a warrant, Your Honor.

Q. (By Mr. Macdonald) What is a target package, sir? You mentioned that in your last answer.

A It will involve systems checks, immigration checks, criminal history checks, fugitive operations worksheet, along with a warrant, whether it's a 200 or a 205.

Q Okay. So, that target package would have the warrant in it?

A Correct.

Q All right. And presumably, a person arrested pursuant to that warrant, they would then put that in the I-213, your arresting officers?

A Not always. Again, previously -- now, we are absolutely pushing that agenda. Previously, if it was a targeted arrest, and it was mentioned as a targeted arrest, we would not then again place subject was arrested with warrant, because we knew previously that a targeted arrest would have a warrant with them.

Q With respect to Exhibit 202 that you have had open in front

of you, other than these four individuals, you can't identify a single one of the 20 I-213s that even potentially had a warrant, can you?

A I was given other A numbers to review. I don't know if it was the ones that you're speaking of.

Q Okay. The other A numbers that you reviewed, have they come up as having warrants?

A Yes. Not all -- I don't know about all of them. I didn't review the entire list, but the ones that I reviewed I found warrants for.

Q Presumably, you would have included in your testimony here other individuals that we believe and have told the Court are warrantless arrests, if you had evidence that they were with a warrant, you would have put that in your declaration?

A I was specifically asked about these ones, so these are the ones that I put in there.

Q So, in -- on January 16th, we got the 20 I-213s that are in category two, which we understand to be warrantless. Are you aware that we received three additional I-213s on -- that we specifically requested on or about January 22nd, 2026?

A I'm not fully aware. I would have to see the 213s or the A numbers.

Q This is already admitted. Let's quickly go, and if you want to look in -- it's Exhibit 204. These are three I-213s that we specifically requested. And they are three collaterals

who were arrested in Bennett, Colorado. Have you looked at these, sir?

A I may have. I don't remember them specifically.

Q None of them say anything about flight risk, do they?

A I don't know.

Q All right. We will leave that. They say what they say. Have you looked at any of the declarations that we submitted as part of our motion to enforce that we filed last week?

A No, I have not.

Q Let's look at 207, which has already been admitted. And so the Court has seen this already, but just for your benefit, Mr. Davies, this is a February 10th, 2026, email from DOJ counsel saying that they have uploaded per agreement and per Judge Jackson's order I-213s for warrantless arrests in January. Do you see that? First page, 207?

A The date for the February 10th of 2026, I see here.

Q Correct.

A Yes. I do see that.

Q And so this is one-third of the warrantless arrests for January, and there were five of them? Were you aware of that?

A I'm seeing that here now. I wasn't aware of it before.

Q Okay. And these -- the agreement which is reflected here is that defendants would produce one-third of the I-213s for warrantless arrests, and that means there would have been 15 by this count, because we're getting one-third of them. We got

five. Do you follow that math?
A I follow that math, yes.
Q Okay. So, we saw earlier 58 for the period last five days of November and into the month of December. There were 58, according to the Department of Justice. And now there are 15, according to the Department of Justice. Significant dropoff. Do you agree with that?
A I agree with those numbers, yes.
Q Okay.
A The dropoff, I should say.
Q Understood. And your arrests with the Denver field office have not gone down; true?
A I don't know the numbers, but we -- I feel like we've averaged about the same every month, yes.
Q You would have access to those emails -- or, sorry. Those numbers; right?
A Yes.
Q And certainly, nationally, the numbers have not gone down; right?
A I'm not aware if they have or not. I haven't looked at those numbers.
MR. MACDONALD: Let's take a quick look at Exhibit 242, please. So, Your Honor, this is fiscal year '26 version of Exhibit 64 that we -- you saw and admitted in the last hearing of deportation statistics from ICE's website. We

move admission of Exhibit 242.

MR. BROWN: I don't understand, actually. Has this been previously admitted?

MR. MACDONALD: So, Exhibit 64 was fiscal year '25 version of this same spreadsheet. This is fiscal year '26 version of the same spreadsheet from ICE's website.

MR. BROWN: Your Honor, there's no foundation for this document. The prior version was admitted, but it was also admitted in the preliminary injunction hearing where rules of evidence don't apply. And here, there's no foundation at all for this exhibit.

THE COURT: The objection is overruled. It's admitted.

Q. (By Mr. Macdonald) Mr. Davies, if we look at rows 90 through 103, do you see this is a chart of ICE average daily population by arresting agency, month, and criminality, fiscal year 2026? Do you see that?

A Yes, I do.

Q And you're aware that these types of statistics are available on ICE's website; right?

A Yes.

Q And this has the data from October 2025 until February 2026?

A Yes.

Q And the spreadsheet breaks down for ICE the people that

they have arrested by convicted criminal, pending criminal charges, and other immigration violator; right?
A I'm not exactly sure if that's what this portrays. This looks like it's portraying the population in detention facilities, not arresting data.
Q So, that's absolutely right. It is the average daily population by arresting agency. So, these are people that ICE has arrested who are in detention at these -- at these times; right?
A Correct.
Q Okay. And so other immigration violator are people that have not been -- where no criminal charges have been filed at this point for any of those people. Do you understand that?
A Not -- I don't completely agree with that. They could have pending charges, I believe, and still be placed in that category.
Q Wouldn't they be placed in a pending criminal charge?
A Oh, I'm sorry. I didn't see that part. No. You're correct.
Q And I will just tell you, Mr. Guadian testified at the last hearing that other immigration violator is people where, quote, no criminal charges have been filed at this point for any of those individuals.
A That sounds correct.
Q Okay. Because there is the pending criminal charges, and

there's also convicted criminal. Those are the other two categories; right?

A Yes.

Q And if we look at October for other immigration violators, it's 18,696. Do you see that number?

A Correct.

Q That then increases each month to 21,878, 24,417, 26,506 in January, and then a slight drop in February to 25,764 people where no criminal charges have ever been filed and are in detention and were arrested by ICE. You're following along there?

A Yes.

Q So, that's a 7,000-person increase in the four months, five months from October to February, from 18,700 to 25,700; right?

A So, again, yes. That's correct. Again, this is daily population. So, some of these people could have still been in detention in November, December, and being counted, and then some people could have been removed. So, it's hard to calculate -- do you understand what I'm saying?

Q I think I understand, but let me ask the question. The population of other immigration violators is increasing by 7,000 -- at minimum, there are 7,000 new people who have never been charged with any crime who were detained by ICE between October and February. At least 7,000?

A Yes. That's correct.

Q And in fact, it's probably more, because this doesn't take into account, as you say, the people that have been removed from the country or took voluntary deport; right?
A Correct.
Q So, that's an increase of about, we will say, I did the math, it's 37.8 percent. The Judge can check that. But I want to compare it to convicted -- the people who -- convicted criminals. That's gone up from October to -- from 16,498 to 17,505. So, October it's 16,498. Do you see where I'm reading?
A Yup.
Q And in February, it's 17,005; right there?
A 17,505.
Q 17,505. Thank you. So, the folks that are in detention who have been convicted of crimes since the judge's -- around when the judge's -- we had the last proceeding and the judge entered the order has only gone up by about a thousand people; right?
A That's correct.
Q Six percent is the number that I came up with. And so ICE -- is it fair to say from this data that ICE is continuing to arrest people who -- noncriminals, people never charged with a crime at a far higher rate than people with a criminal conviction?
A Yes. That's correct.
Q All right. And I won't walk through the numbers, because

it happened at the last proceeding, fiscal year '25 showed the same trend from October 2024 through the time of the hearing. That wouldn't surprise you either; right?
A No, it wouldn't.
Q Okay. And part of the reason this data trend is happening is because ICE is arresting far more collaterals in the field than targeted arrests of people who have been convicted of crimes; true?
A Yes. We are arresting more collaterals than we have previously. That's true.
Q And that's true in Colorado as well as nationally; right?
A That's correct.
Q At the October 30 hearing, Field Office Director Guadian testified that he had not talked to the officers who were involved in the warrantless arrest of the plaintiffs, and I think at least one of them is an HSI officer, but have you talked to any of those officers, at least that are in ERO about those arrests?
A I cannot remember.
Q Mr. Guadian testified there had been no punishment, no reprimand for any of the officers at that time. Has anything -- has there been any counseling or training of the officers involved of the warrantless arrests after the judge's order?
A I do not know.
Q I'd like to talk about the Court's injunction. In your

declaration you said, I believe, that you received an email setting forth the judge's requirements from the injunction. Do you recall that?
A I'm sorry. Can you say that again?
Q Yeah. I'm shifting gears. I'm sorry. Did you receive an email after the Court entered an injunction in this case, the November 25th, '25, injunction? Did you receive an email setting forth what that injunction was?
A Yes, I did.
Q What did you do to convey the judge's requirements to the people in the Denver field office, if anything?
A So, I -- multiple things. I sent an email out to my supervisors. I had formal and informal meetings with my supervisors. I had training with officers to ensure that the message was sent out to the office.
Q What was the training that you just referred to on the requirements of the Court's order, sir?
A So, the training we did -- the formalized training we did was with the processing team, and it was exactly this, to explain what the injunction meant, how to document properly, and then it was expressed to the team that warranted arrests -- warrants should be obtained and secured for every arrest possible, to not rely on warrantless arrest, to ensure that we were getting warrants for cases when we're making arrests prior to -- prior to taking the subject into custody.

Q And you said the formal training was with the processing team. Did I hear that right?
A That is correct.
Q It was not with -- the formal training on the requirements of the judge's preliminary injunction wasn't with the deportation officers?
A They are deportation officers.
Q Are they deportation officers doing deportations out in the field?
A So, both. They're a processing team when they're processing, but they're also an enforcement team when we need them to go out and make arrests.
Q So, when you said -- I just want to understand. How many people when you gave the formal training were part of that processing team?
A I don't know the exact number.
Q Approximate?
A Fifteen.
Q Fifteen people out of --
A Approximately.
Q And I think you said you've added 120 deport officers, and there were 85 previously. So, there's 200 deport -- deportation officers, roughly, in the Denver field office?
A Denver and Wyoming.
Q Okay. And so 15 people got this training?

A Yes.
Q Okay. And were there written materials?
A For the training, there were slides.
Q What material was captured in the slides?
A It was done by our attorneys.
Q Do you know when you presented that?
A I don't know the exact date off the top of my head, but it is in my declaration.
Q Is this -- well, let's look at your declaration. I didn't see that in your declaration, but I might have missed it. Let's call up Exhibit 292, please. Let's go to page five, please. In paragraph 12 you reference something that happened on February 13th. Is this the formal training you're referring to?
A That's one of the formal trainings, yes.
Q Before you had said you did -- all right. Let's talk about that. Just a minute ago you were telling me about formal training of the processing team. So, I just want to understand, and you said -- you mentioned when that was in your declaration.
A Correct.
Q And so you've got -- and if you want to look at it, I can give you a copy of your declaration, unless you already have it. All right. You already have it. What is the date that you gave the formal training to the 15 processing team members?
A February 13th.
Q Okay. And so that's the day after the Court entered an

order that we would have a status conference to talk about our view that there was noncompliance? You're aware of that?
A No, I'm not.
Q Say that again?
A No, I'm not.
Q Okay. So, this, though -- this February 13th training is one that you said there was a -- functionally a PowerPoint deck prepared for?
A Correct.
Q Okay. Had you given any other formal written trainings prior to the February 13th meeting?
A Yes.
Q When were those?
A I've sent out emails to supervisors. I had formal meetings with supervisors. The supervisor at the fug. ops unit. I had formal trainings directly after my last testimony over this. Two separate occasions.
Q And did you have materials prepared for each of the trainings that you just described?
A I had the emails.
Q Okay. You sent out emails that included instructions, is that fair, about the Court's -- the requirement of the Court's order?
A That's correct.
Q You said you had conversations in addition?

A That's correct.

Q Did you send out any other written materials like the PowerPoint slide or some other instructions besides the emails that you described and the February 13th meeting you just discussed?

A No, I have not.

Q One of the things that your declaration says is that part of the training in paragraph 12 is that intake officers, if they determine that the arrest narrative does not comply, they're instructed to seek clarification or additional information from the arresting officer, including clarification about whether the officer had a pre-arrest warrant. And for a warrantless arrest, what specific particularized facts supported the conclusion that the individual was likely to escape before a warrant could be obtained; right?

A Correct.

Q And how will the Court or we know what was clarified if an intake officer after the fact goes back to a deportation officer to get additional facts?

A So, it was my direction to the supervisors, if you -- if they did not get the information they needed for that 213, those officers that are processing the case were not in the field, they were not there at the time of the arrest. We need to stop whatever -- whoever that officer is that's out there in the field that was there during the arrest to come back to the

office and clarify how was this -- how did this arrest happen? To ensure we were factual on the 213.

Q And so that would result in a new or a revised 213; right?

A No. They were -- they're still processing the 213 at that time.

Q So, how do they receive the narrative often, or typically?

A Typically, the encounter officers would email the encounter to the intake officers on what happened during the arrest. And my direction to the supervisors is if it's not clear enough, to ensure that officer then reports back to the office and clarifies exactly what we need to ensure that we're accurately reporting what happened during that encounter.

Q And so there would be an email that has the original reflection of what the officer said in the encounter?

A Either an email, or they will sit there, and they will write it out while they drop the person off. It all depends on who it is and --

Q Sometimes it's done in a scratch 213?

A A scratch 213, it could be.

Q Okay. And the scratch 213 is a document -- sort of physical document that they fill out sometimes in the field; right?

A I don't know if they -- I mean, they would put investigative stuff on their investigative sheet. In the previous years, we maybe used scratch 213s.

Q In your declaration, you indicate on page six that if an I-213 is determined to be deficient, the arresting officer will be counseled as necessary and will be able to amend the I-213 to address missing information. Do you see where I just read from?
A Yes.
Q What counseling have you done based on I-213s that haven't complied with the Court's order to date?
A So, at this point, we have had some officers that are no longer out on the streets making arrests. And my supervisors will -- so, it's been -- so, the processing officer is a new process that we've been doing lately. And part of the learning process is if you cannot give us the correct information after making an arrest, then you will no longer be able to use that processing team. You will come back and process the case yourself to ensure you know what information we need on that 213 going forward.
Q And so just to make sure -- thank you for that. Are there officers that have been removed from the field because they have not properly either documented or conducted warrantless arrests?
A Not solely that, but yes.
Q That has contributed to it?
A Yes.
Q The failure to document --
A Not solely, but yes.
Q Okay. And when did those -- how many people, if you

recall?
A Four.
Q When did that happen?
A I can't remember the exact time.
Q Was it in the last month?
A I believe so. A month or two.
Q Was it after February 13th?
A I don't remember.
Q You would have those records?
A I'd have to look for them. I believe I do.
Q Are you familiar with a whistleblower -- a person who has been characterized as a whistleblower named Ryan Schwank, who was an assistant chief counsel for ICE who recently testified to Congress that the legally required training program at the ICE academy is deficient, defective, and broken?
A I did hear about that.
Q And Mr. Schwank testified to Congress that ICE had cut the class -- the hours from a training program from a 584-hour training program by 240 hours. Did you also hear that?
A I don't recall exactly what he said, no.
Q But did you hear that at least the testimony was that there had been substantial cuts to the training program in -- measured in at least a couple hundred hours?
A Yeah. I don't know what he said, but I do -- I do know that there has been cuts in the training program.

Q And do you know if the cuts to the training program have been in the magnitude of several hundred hours?
A I believe so.
Q Okay. And some of the people that are showing up in Denver will have gone through this greatly reduced training program at the ICE academy; right?
A That's correct.
Q You agree that reasonable suspicion is not sufficient to make an arrest?
A That's correct.
Q Are you aware that DHS itself has put out statements saying that reasonable -- that they -- reasonable suspicion was sufficient for ICE agents to make arrests?
A I'm sorry. Can you state that one again?
Q Yeah. Are you aware that DHS has put out statements saying that reasonable suspicion was sufficient for ICE agents to make arrests?
A I don't remember. I know there was -- they were talking about reasonable suspicion. I don't remember exactly what -- probable cause is what I've always --
Q Probable cause is the standard that you talked to the judge about at the last hearing; right?
A Absolutely.
Q And that's required?
A Absolutely.

Q And if DHS is putting out tweets or making statements that reasonable suspicion is enough, that's a problem; right? From your standpoint?

A The probable cause is what I believe to be what we would need to make the arrest.

Q All right. Let's just put up Exhibit 224, please. 224 is a -- is a tweet from the official Homeland Security at DHS.gov site. Do you see that up at the top?

A I do see that.

MR. MACDONALD: Move admission of 224, Your Honor.

MR. BROWN: No objection.

THE COURT: Admitted.

Q. (By Mr. Macdonald) And if we go down to the fourth paragraph, right down here it says, law enforcement uses reasonable suspicion to make arrests as allowed under the Fourth Amendment to the U.S. Constitution. Do you see that?

A I do see that.

Q Okay. And at least your officers out in the field could be seeing tweets from the official DHS website; right? They're probably younger and savvier than I am, certainly, and maybe you too?

MR. BROWN: Compound.

THE COURT: Sustained.

MR. MACDONALD: Stipulated, Your Honor. Let me come back.

Q. (By Mr. Macdonald) Do you think, Mr. Davies, that official -- and I'm not going to waste the Court's time. We could go through a lot of DHS tweets that say the same thing and a lot of newspaper articles in which official spokespeople for DHS are saying the same thing. Do you think that DHS making official pronouncements about arrests being made on reasonable suspicion could cause confusion amongst your agents here in Colorado?

A I don't know what DHS was thinking putting out this tweet. I will tell you that my officers know that probable cause is the standard here in Denver.

MR. MACDONALD: Your Honor, for the benefit of the record, may I, without showing the witness, introduce additional tweets and statements from DHS making the same statement? Would that be useful? If it's not useful for you, I won't do it, Your Honor.

THE COURT: So, they've been wrong more than once?

MR. MACDONALD: A lot of times, Your Honor, and I think that causes and leads to the confusion that we've seen here today and elsewhere.

THE COURT: What's your position on his wanting to add some more of these tweets in?

MR. BROWN: We would need to see them, or else we object.

THE COURT: You haven't seen them?

MR. MACDONALD: They're all on our exhibit list. They've had them for days, so they have seen them, but I could identify the specific ones.

THE COURT: How many are there?

MR. MACDONALD: Exhibit 225, Exhibit 226. We can just call them up. I will do them quick, Your Honor.

THE COURT: Pardon me?

MR. MACDONALD: I can just call them up, and we will see if we draw an objection.

THE COURT: I was thinking maybe counsel could look at them now briefly, and he maybe wouldn't have an objection. It's a little hard for him to object to what the department has put out, but it's fair that he has a right to see them first.

MR. MACDONALD: Fair enough, Your Honor. We will move admission of 225 and 226.

MR. BROWN: No objection to 225 and 226, Your Honor.

THE COURT: Thank you. Admitted.

Q. (By Mr. Macdonald) Let's put up Exhibit 229, please. This is slightly different, but same principle. This is a Wall Street Journal article. And if we look on the second page, Mr. Davies, do you see a statement from Tricia McLaughlin, a spokesperson for the Department of Homeland Security? Do you see that?

A Yes. Yes, I do.

MR. MACDONALD: And there's a statement that she makes

here quoted in the Wall Street Journal. And, Your Honor, I would move Exhibit 229 into evidence.

MR. BROWN: We object to 229. It's out of court hearsay, it hasn't been authenticated, and there's no foundation.

MR. MACDONALD: Your Honor, we're not using it to offer the truth of the matter asserted. In fact, quite the contrary. Non-hearsay.

THE COURT: Well, it would probably be an admission anyway, and not hearsay. But isn't this the same lady who was quoted in response to this Court's order of saying the Court is full of beans because we don't racially profile anybody?

MR. MACDONALD: It may very well, Your Honor. I'm swimming in documents, so I don't know if this is the exact same --

THE COURT: One of my law clerks found that, and what it showed me is that she did that without even reading the order, because the order has nothing to do with racial profiling. All right. The objection is sustained. I don't find her to be a credible source about anything.

Q. (By Mr. Macdonald) In your declaration, which is Exhibit 292, if we go to page four, you say that -- the bottom of page four, paragraph 11 -- there are instances where officers may reasonably have concluded that an individual likely already had an active warrant for his or her arrest. Do you see that?

A Yes, I do.

Q Can an officer arrest someone without probable cause because they believe, reasonably or otherwise, that there was already a warrant?

A I'm sorry. Can you repeat that?

Q Yeah. I'm just trying to understand your view about if an officer -- you've identified this situation where officers may conclude, may have concluded that an individual likely had an active warrant. And so I'm trying to understand your view if that excuses the necessity of having probable cause.

A So, if my officers found the warrant in the system, there's probable cause in that system that the person is here illegally.

Q Understood. But what you're talking about here is not that they found a warrant. What you say is may reasonably have concluded that an individual likely already had an active warrant. Not that they had one. You're saying an officer believes that it's likely, not that there is one.

A I believe the instances that I'm referring to are the 213s that I reviewed for this case.

THE COURT: So, Mr. Davies, I have a question.

THE WITNESS: Yes, Your Honor.

THE COURT: You've reviewed lots and lots of 213s over the years.

THE WITNESS: Yes, Your Honor.

THE COURT: And you've reviewed some, at least, since

this Court's injunction order?

THE WITNESS: Yes, Your Honor.

THE COURT: Have you ever reviewed a 213 for a warrantless arrest that explained that they had found probable cause to believe the person was an escape risk or a flight risk and set forth the particularized facts that supported that? Have you ever seen that?

THE WITNESS: No, Your Honor.

MR. MACDONALD: Mr. Davies, I would like to look at Exhibit 218, which is a January 28, 2026, memo. Before we put it up, let me just ask you are you aware that Todd Lyons, the senior official performing the duties of the director of ICE, put out a memo on January 28 --

(The court reporter interrupted.)

MR. LENEIS: Your Honor, it was my fault again.

THE COURT: I just assumed that, Mr. Leneis.

MR. MACDONALD: I will start the question over.

Q. (By Mr. Macdonald) Are you aware that the top ICE official, Todd Lyons, had sent a memo on January 28th, 2026, addressing warrantless arrests?

A Yes, I was.

Q Okay. You received that?

A Yes, I did.

Q All right. You're looking at it right now? You've opened your binder. You've jumped the shark, and you're just looking

at it, which is fine. Are you looking at it right now?
A Yes.
Q Okay. Mr. Lyons -- and I'm going to try to move this along. One of the things he explained in this memo is that ICE had long applied the likely to escape language for prong two of the warrantless arrest that you've talked to the judge about extensively as being equivalent of flight risk. That's one of the things that Mr. Lyons talks about in the January 28, 2026, memo; true?
A That's true.
Q Okay. And you treated flight risk as being equivalent to likely to escape the entirety of your career. You've used that language; right?
A Yes.
Q And including when you testified in court in whatever day that was, October the 30th of last year?
A Correct.
Q All right. And that's how you were trained over the last 20 years, that the question was flight risk, and that was the same as likelihood of escape before a warrant could be obtained; right?
A Correct.
Q All right. Mr. Lyons in his memo says that this is an unreasoned position, and is incorrect; right?
A Yes.

Q He goes on to say that there should be -- in his view there are significant differences between likelihood of escape and flight risk. That's what he concludes?

A I'm sorry. I'm trying to find where you're at.

Q Well, I'm not actually in it, but it says what it says. If you want to go to page four -- well, I will just keep asking you questions. Have you had any training on this memo?

A No.

Q Have you seen any materials from headquarters about this memo and how it should or shouldn't change your practices?

A I believe I only received this memo.

Q Okay. Did this memo go to all of your officers?

A Yes.

Q Okay. So, all 200 people out doing things in the streets of Colorado and Wyoming?

A Whomever was employed at that time, yes.

MR. MACDONALD: Okay. Let's call up 218, given that it would be easier for the judge to see it, and the witness has already got it. So, this is the memo we're talking about. I move admission of 218, Your Honor.

MR. BROWN: No objection.

THE COURT: It's admitted.

Q. (By Mr. Macdonald) Let's go to page five, if we could. And I should have asked you this, Mr. Davies. Did you receive this at or around -- it is dated January 28th, 2026?

A I can't remember when it came into my mailbox.

Q It would have been via email?

A Yes.

Q And would it have been sort of like that broadcast policy that goes to every ICE personnel?

A That's correct.

Q Okay. So, whenever it was, it would have gone to you and all of your officers?

A That's correct.

Q All right. And most of those officers did not get your February 13th training; right? You only trained 15 people, you said?

A That's correct.

Q If we look at that first full paragraph, we can blow it up. It says, established. And Mr. Lyons in this memo is contrasting the flight risk analysis, which he says is different to the likelihood of escape analysis. And about four lines down, he says, the likelihood of escape analysis is narrowly focused on determining whether the person is likely to escape before the officer can practically obtain an administrative arrest warrant while in the field. Do you see where I've read?

A Yes.

Q That is completely different than the way you've been trained for 20 years; right?

A Correct.

Q But your --
A I guess I wouldn't say completely, but yes. It's different than the way I've been trained before.
Q But your officers received this, and this may be the way some of them are operating in the streets of Colorado; true?
A I would expect my officers to operate the way they've been trained locally.
Q You would expect them to ignore the top ICE official's instructions?
A I would hope that they would ask questions if they thought that they would do something different than what we've trained with this injunction.
Q And have you talked to any of the -- has anyone come and asked you questions about this memo?
A No.
Q Mr. Lyons' memo is trying to make the likelihood of escape prong whether the person is likely to be at the scene of an encounter after a warrant has been obtained; is that right?
A I don't know exactly what he was assuming.
Q All right. Let's look at the factors that Mr. Lyons instructs ICE -- all ICE employees to consider. That's on page three. And so on page three, if we just blow up this right here, if we could, Jason. He says, whether an alien is likely to remain at the scene of the encounter is based on the totality of the circumstances known to the immigration officer at the

time of the encounter and prior to the arrest. Possible factors include but are not limited to.

So, does this help you see that Mr. Lyons is saying the question that ICE officers should consider on the likelihood of escape prong is is this person going to be here at this location at the scene in however long it takes me to get a warrant? That's what he's suggesting; right?

A That's what it looks like he's suggesting here.

Q That's very different, in fact, than -- and conflicts with the instructions in the preliminary injunction order. Would you agree with that?

A Yes.

Q Okay. So, then the specifics that Mr. Lyons suggests, if we could drop that down, we have number two, the subject's ability and means to promptly depart the scene of the encounter, e.g. subject was encountered in a vehicle and continues to have control over the vehicle. So, that's one where he's saying functionally, if you find someone in a car, that ought to be sufficient for likelihood of escape?

A It looks like it's an example that he's putting, yes.

Q You understand if one of your officers who read this could take this to mean the head of ICE is telling me if I see someone in a car, and I pull them over, that's sufficient for likelihood of escape?

A Again, I would hope he would -- he or she would ask

questions, because this is not how they've been trained in our office.

Q The second, the subject's age and health. Do you see that? Or the third.

A The third one, yes.

Q Third one. Do you know what that means, how that would weigh in favor or against the likelihood of escape?

A No.

Q If we go to the next page, number six is whether the officer has probable cause to arrest the subject for improper entry by an alien or reentry of a removed alien in violation of statutes. Do you see that?

A Yes.

Q Okay. And that -- that would make -- collapse probable cause of unlawful presence and probable cause of likelihood of escape, wouldn't it?

A It would -- I'm sorry?

Q Well, it would mean that if you are here illegally, you've satisfied both the probable cause of unlawful presence and the probable cause of likelihood of escape; right?

A If you're looking at these criminal codes?

Q That's right.

A So, I don't -- so, we don't charge 1325 here due to the proximity to the border. 1326 we do charge here, and that person would most likely have a I-205 in their file, warrant of

deportation.

Q Understanding that you don't charge 1325, and are you saying it's never charged here in Colorado? Because I thought I had seen some.

A There might have been some as a plea deal, but we haven't charged anybody.

Q All right. And this isn't a question of whether they charge it. This is just telling an officer, if you have probable cause that someone entered unlawfully, this is a factor you should be able to take into account and make a flight risk determination. That's what Lyons' memo is saying; true?

A That's what Lyons' memo is saying, yes.

Q I'd like to put up your -- you made a declaration in this case in October; right?

A That's correct.

Q Let's put up Exhibit 212. This is your declaration from October 27th, 2025; is that right?

A Can I review it?

Q Yes. Absolutely. Do you want to look at a hard copy?

A I'm sorry. I got it in --

Q Before you look at that, can I ask you another question about the Lyons memo that we just looked at? Have you said anything to your staff, the people in the Denver field office about that Lyons memo?

A I have not, no.

Q Has the field director said anything to the staff that that Lyons memo doesn't -- to the extent you know, doesn't comply with the way we operate here in Colorado?

A I have not heard anything about the Lyons memo from him.

Q Or from anyone else in the Denver field office?

A That's correct.

Q Okay. Sorry. Let's -- do you have 212 in front of you?

A Yes.

Q It's executed on page 12, but that's page 13 of the exhibit, because there's a cover page. It's dated the 27th day of October. And you attach a handful of things to it?

A Yes. This is my declaration.

Q Okay. Let's go to page seven, if we could, of the exhibit. Paragraph 11 of your October 27th, 2025, declaration addresses the issue of what we've been calling field warrants; right? And I will just read it for the benefit of the record while you're also reading it, Mr. Davies.

It says, and this is your testimony, when a Denver ERO officer encounters a collateral whom the officer has reason to believe is an illegal alien, the officer may attempt to obtain an arrest warrant for that individual. Arrest warrants must be issued and signed by a supervisor based on probable cause that the individual is an illegal alien. The supervisor necessary to issue an arrest warrant would not necessarily be on scene or otherwise available. Regardless, obtaining an arrest warrant

would often take longer than a typical consensual encounter lasts.

That was your sworn statement back a few months ago; right?

A That's correct.

Q And so it wasn't a common practice as of the date we had this preliminary injunction hearing for your officers to get warrants in the field, because obtaining a warrant would often take longer than the typical consensual encounter lasts?

A On some cases, yes. Not all cases.

Q Often?

A Often.

Q It takes longer than the typical consensual encounter lasts? And the declaration that you submitted on March -- that you signed on March 6th says something very different, doesn't it? Let's look at Exhibit 292, page three, paragraph six. And the last four lines say, in most cases, because officers rely on supervisors to review various databases to confirm an individual's identity in the first instance and generally keep supervisors apprised of the overall situation in the field, the officers in the field are able to obtain an arrest warrant from a supervisor within five minutes of making the request. Do you follow that?

A Yes.

Q Okay. And so that's quite different than what you said a

few months ago, isn't it?
A That's correct.
Q All right. What changed?
A I wouldn't say quite different. It's slightly different, yes.
Q One says that -- one says that it often will take -- well, it says what it says. You agree that they're different. You agree that they're in some ways contradictory, don't you?
A So, I agree that some consensual encounters will last less than five minutes.
Q And you often -- and you even said often back in October?
A Yes.
Q Okay. But now, most of the time, you can do it in five minutes?
A In five minutes, yes.
Q Okay. But you agree, then, that often a consensual encounter lasts more than five minutes?
A I guess it depends on the case.
Q You testified that the practice of obtaining warrants in the field was reemphasized in November of 2025?
A I'm sorry. Say that again?
Q The practice of obtaining warrants in the field when possible was reemphasized in November of 2025?
A Yes.
Q Okay. That's what you said in this declaration that's

Exhibit 292; right?

A Yes.

Q Why did you do that?

A I feel it's better to make the arrest with the warrant versus making a warrantless arrest.

Q What happens if you have -- your agents have already arrested the person and are holding that person, and they're getting the warrant at the same time?

A So, if he's already arrested, that would have been a warrantless arrest. If they're detaining him for questioning due to whatever the situation has, then that's a -- that's a different situation.

Q So, they're encountering a person and they put handcuffs on him, for example, that's at least indicative of an arrest; right?

A Depending on the situation. If it's a volatile situation --

Q Well, what we've seen in a lot of the I-213s and what we heard from lots of your agents on the stand is they ask someone, often a collateral, whether they're here in the country illegally. They say the person says yes, illegal, and they pull them out of a car and slap cuffs on them. That's a practice you're aware of; right?

A No. I'm not aware of that practice.

Q When you reemphasized this notion of trying to get more

field warrants, how did you do that?
A Through training and conversations through our supervisors.
Q I missed the last part.
A Training and conversations with my supervisors.
Q What was the training?
A I guess the conversations with the supervisors, figuring out -- coming together on a way to expedite the process for warrants, understanding that the warrants is an important part to the arrest, versus looking for escape possibilities. And ensuring that we have the person that's in front of us in custody.
Q So, did you -- the training, was there anything written, sir?
A These were all conversations.
Q Okay. There was no email?
A There might have been emails. Like I said, I sent some emails out right after my testimony the last time to reiterate the previous case. And in those emails, I addressed pushing for getting warrants prior to making arrests.
Q Officers and agents may not detain an alien for the sole purpose of obtaining an arrest warrant; right?
A Correct.
Q And you don't know whether any of your officers are doing that out in the field, at least some of the time, do you?
A I would hope they're not.

Q You're aware that there had been a number of I-213s for people that we have requested. We've learned about them and made requests for specific I-213s, as provided in the judge's order. Are you aware that has happened?
A Like the four that I reviewed in my declaration?
Q I think those four were ones that your counsel provided to us, but are you aware -- let me just back up. Are you aware that there was a regular production of I-213s that the Government was supposed to provide to us?
A Yes.
Q The judge in his order also provided that we could make requests for specific individual I-213s. Are you aware of that?
A No.
Q Okay. I will represent to you that that has happened, that we have made such requests, and in some of the instances, we have been told that people were arrested based on warrants that were obtained after the encounter began. Are you aware of that fact?
A No.
MR. MACDONALD: Let's put up Exhibit 205. Move admission of Exhibit 205, Your Honor.
MR. BROWN: Same qualification with the other counsel emails.
THE COURT: All right. It's admitted.
Q. (By Mr. Macdonald) Look at the bottom. So, let me just

identify this for the record. It's an email from an AUSA Mr. Brown, dated January 30th, 2026. If you look down at the bottom, it says 213 requests. And it indicates that all eight individuals were arrested pursuant to a warrant. Anticipating your follow-up question, I've noted below which individuals were arrested based on warrants created before the encounter began versus those based on warrants created after the encounter began. Do you see where I'm reading?

A Yes.

Q Then there's a list of individuals here on the next page. Go to page two, specification of warrants issued before the encounter began, and warrants issued after the encounter began but before arrest. Do you see that?

A I see that, yes.

Q Okay. So, the four individuals that are identified as having a warrant issued after the encounter began but before the arrest, I won't identify their names. One of them is -- the second one is initials CLP, and I will come back to that in a moment.

THE COURT: Going to come back to it at three minutes before 5:00?

MR. MACDONALD: If I am allowed to do so, Your Honor. If I'm not allowed to do so, I will not.

THE COURT: So, you're not leaving even two minutes for cross examination?

MR. MACDONALD: Your Honor, I am trying to get the facts out that I think are necessary for Your Honor to understand the full extent of the issues that we've experienced with compliance with Your Honor's order.

THE COURT: Do you gentlemen plan to cross examine the witness?

MR. BROWN: Yes, Your Honor, but it will not be lengthy. I would imagine it is 20 minutes or under.

THE COURT: Okay. We will stop now. 9 o'clock in the morning?

MR. MACDONALD: Yes, Your Honor.

MR. LENEIS: Can we just confer for a moment, Your Honor? Because I don't know who is available or has plans. So, can we just chat for a second?

THE COURT: Yes.

MR. LENEIS: 9:00 is fine for the Government if it works for the witness.

THE COURT: How much more do you have?

MR. MACDONALD: I'm very close to the end, Your Honor. I'm hoping it's 15 minutes.

THE COURT: Do you have any other witnesses?

MR. MACDONALD: No, Your Honor.

THE COURT: You have cross examination of 20 or whatever it turns out to be?

MR. BROWN: Yes, Your Honor.

THE COURT: And do you have any other witnesses?

MR. BROWN: No, Your Honor.

THE COURT: Are you gentlemen and lady wanting to make -- ladies, I should say -- wanting to make closing arguments?

MR. MACDONALD: Totally, Your Honor, if you think it would be valuable, yes. If you think we have exhausted your patience, we're happy to not -- to dispense with closing and do it in writing or come back on something else.

THE COURT: No, no. Let's get this done. Obviously I have to change my flight schedule. I am just trying to figure out now with your help how much change I need to make. Can you pretty much assure me that you will be done before noon?

MR. MACDONALD: Yes, Your Honor.

MR. BROWN: Yes, Your Honor.

THE COURT: Have a nice evening.

(Proceedings concluded at 5:00 p.m.)

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 19th day of March, 2026.

Kevin P. Carlin, RMR, CRR
Official Court Reporter