IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-3183-RBJ

REFUGIO RAMIREZ OVANDO, et al,

Plaintiffs,

vs.

KRISTI NOEM, et al,

Defendants.

---

REPORTER'S TRANSCRIPT
Motions Hearing, Vol. 2

---

Proceedings before the HONORABLE R. BROOKE JACKSON, Judge, United States District Court for the District of Colorado, commencing on the 11th day of March, 2026, in Courtroom C204, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiffs:
TIMOTHY R. MACDONALD, EMMA K. MCLEAN-RIGGS, ANNA I. KURTZ, and SCOTT C. MEDLOCK, ACLU of Colorado, 303 East 17th Avenue, Suite 350, Denver, CO 80203

For the Defendants:
BRAD E. LENEIS, NICHOLAS A. DEUSCHLE, and LOGAN P. BROWN, U.S. Attorney's Office, 1801 California Street, Suite 1600, Denver, CO 80202

Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358

I N D E X

PLAINTIFFS' WITNESSES PAGE

GREGORY DAVIES

Direct Examination By Mr. Macdonald . . . . . . . . . .249
Cross Examination By Mr. Brown . . . . . . . . . . . . .261
Redirect Examination By Mr. Macdonald . . . . . . . . .270
Recross Examination By Mr. Brown . . . . . . . . . . . .279

PLAINTIFFS' EXHIBITS:

| | Identified | Received |
|---|---|---|
| 206 | 257 | 257 |
| 210 | 258 | 258 |
| 243 | 251 | 252 |
| 247 | 261 | |
| 248 | 254 | |
| 260 | 280 | 280 |

Closing Argument by Mr. Macdonald . . . . . . . . . . . . .281

Closing Argument by Mr. Deuschle . . . . . . . . . . . . .296

Reporter's Certificate . . . . . . . . . . . . . . . . . .312

P R O C E E D I N G S

(Proceedings commenced at 9:02 a.m.)

THE COURT: We will continue with the examination of Mr. Davies.

**DIRECT EXAMINATION**

BY MR. MACDONALD

Q Good morning, Mr. Davies.

A Good morning.

Q I think yesterday you indicated that you were able to identify by the I-213s all the people that ICE had arrested in a particular month; is that right?

A On a -- on a separate report, I can identify who we arrested, yes.

Q Okay. Describe what that report is, please.

A A daily arrest log.

Q Okay. So, there's a daily arrest log that tells you we arrested the following nine people or ten people or something like that?

A Correct.

Q Okay. And at the last hearing, I think either you or Mr. Guadian testified that you all had been averaging about nine arrests per day, at least as of that October hearing. Has that number gone up, or --

A Yes.

Q Okay. What's the number today, approximately?

A I don't --
Q Last month, excuse me. Unfair question. Not today. Over the last month?
A So, we would normally average, I believe, between 15 to 25 a day.
Q And that's over maybe since the Court entered the injunction?
A Possibly, yes.
Q And so that number has increased, fair to say, since the time period in 2025?
A I don't know if it's increased since switching back to a targeted approach. It's probably gone down, but still probably averaging between 15 to 25 a day.
Q And that's in part because you have a lot more deportation officers; right?
A Yes.
Q Okay. Are you familiar with an incident that happened up in Vail in which ICE officers left ace of spades cards in people's cars, cards that have been referred to as the death card with ICE -- the ICE Denver field office address and name and phone number in those cars that were left abandoned on the side of the road?
A So, I'm aware of one instance. It didn't have the field office address on it, though, I don't believe.
MR. MACDONALD: All right. Let's take a look at

Exhibit 243, if we could. And, Mr. Davies, this is an article from the Colorado Sun that says, racist ace of spades cards left behind following ICE arrests in Eagle County, Colorado, nonprofit says. It's dated January -- apologies, Your Honor. If I might grab my reading glasses, which I have left in my bag?

THE COURT: Are you getting a little old, Mr. Macdonald?

MR. MACDONALD: I am, Your Honor. Age is catching up with me, and probably this line of work. The combination is not healthy for the eyes, and maybe some other things.

THE COURT: Well, I can feel your pain on that issue.

Q. (By Mr. Macdonald) So, now I can see the date was January 23rd, 2026. And you see there's a picture of a -- it's the bottom of page one. If you want to look at your hard copy, which is the way this printed, there's an ace of spades card with some writing on it. And if you carry over to the second page, you can see that. And before we go any further, just do you see that's an ace of spades card that says ICE Denver field office, and then it has your -- I believe that's your headquarters address, isn't it, sir?

A That's the address to the detention facility.

Q Okay. That's the GEO detention facility?

A Yes, sir.

Q Okay. So, were you -- this card that we're looking at in Exhibit 243, were you aware that these -- these types of cards

were left in people's vehicles after arrests?
A I am aware of one instance of that happening, yes.
Q Okay. And this particular type of card with -- thanks for correcting me -- with the detention facility address, and is that the detention facility phone number on it also?
A Yes, it is.
Q Okay.

MR. MACDONALD: Your Honor, I move admission of 243.

MR. BROWN: We object, Your Honor, because 243 is not just the picture of the card. It's also an entire article full of hearsay without authentication or foundation for what's in it.

THE COURT: All right. I'm still applying the preliminary injunction rules, notwithstanding your effort to go otherwise. Your objection is overruled. It's admitted.

Q. (By Mr. Macdonald) Mr. Davies, were you one of the ICE supervisors that was notified of this ace of spades card that was left in the vehicles up in Eagle-Vail, Colorado?
A I don't know if I was notified of it. I was -- I found an article on it.
Q Is this the article you found, or did you find another one?
A I don't know if this is the exact article.
Q Okay. If we look at page one, and go down to the third full paragraph, it says, ace of spades cards, which have been used by white supremacist groups as a racist symbol and were

called death cards by some during the Vietnam War, were found in at least two vehicles after those vehicles were pulled over by ICE agents. Do you see where I'm reading there?

MR. BROWN: Objection, Your Honor. Relevance, and it's more -- there's no probative effect. The prejudice greatly outweighs any sort of probative evidence.

THE COURT: How does this relate to what we're dealing with here?

MR. MACDONALD: One of the individuals -- actually four of the individuals who were arrested with field warrants were the people that received -- were involved in this arrest, Your Honor, and there was an investigation of the cards, and I'm trying to inquire -- I would like to inquire, Your Honor, as to what sort of discipline was imposed for these actions that included people that were subjected to warrantless arrests.

THE COURT: Okay. Let's ask that question, then.

MR. BROWN: May I respond briefly? He said that there were field warrants for the arrest there. So, therefore they were not warrantless arrests, is my understanding.

THE COURT: I don't know what they were, but I've sustained your objection, and he's now going to ask the question that I wanted to know too, and that is what was done about this, if anything?

Q. (By Mr. Macdonald) Mr. Davies, what was done about this incident, if anything?

A So, as of right now, the officers involved in this incident are no longer in the field. They are in the office. And it's an ongoing investigation with our office of personnel responsibility.

Q Thank you, sir. And you understand that at least the arrests happened in -- between Vail and Eagle-Vail in Minturn, Colorado, that exit at Minturn, Colorado?

A I do know it was in that area, yes.

Q Okay. Thank you. Can we put up Exhibit 248, please. Mr. Davies, Exhibit 248 is a declaration of Keegan Hayes. I will represent to you that Mr. Hayes is an investigator working with our team who went and interviewed people at the GEO detention facility. I will just make that representation. That's what it says in Exhibit 248. Okay?

A Okay.

MR. MACDONALD: Your Honor, we attached this exhibit to our motion to enforce. It addresses, on page five, six, seven, and eight, the arrest that happened up in Eagle-Vail that we believe is a warrantless arrest, that counsel has represented was a field warrant. I would like to inquire of the witness about this, and I would like to move admission of Exhibit 248 now.

MR. BROWN: We object. This exhibit is entirely hearsay, and they have -- Mr. Hayes is on their may call list, but Mr. Davies has previously said he's never even reviewed

these. There's no foundation for him to comment on it.

THE COURT: The objection is sustained, but you can continue to inquire about the facts. It's already part of the court record anyway.

MR. MACDONALD: Yes, Your Honor. Understood.

Q. (By Mr. Macdonald) Mr. Davies, are you aware -- so, you're aware this incident happened up in Eagle-Vail; fair?

A Yes.

Q You're aware that officers -- ICE agents arrested a number of people after pulling them over in their vehicles; fair?

A Yes.

Q You're aware that at least for many of those individuals, they did not know the individual's identity when they pulled them over; fair?

A I am not aware of what happened during the arrest.

Q Okay. Have you made any inquiry about that?

A No, I have not.

Q So, you don't know that there were collaterals in those vehicles that were arrested on the side of the road in Eagle-Vail at the Minturn exit when the officers left the ace of spades cards?

A I am aware that there was a targeted enforcement action up there. And yes, collaterals were found in -- during the enforcement operation, yes.

Q Okay. And are you aware that for those collaterals that

were found during that enforcement operation, that ICE agents after detaining the humans on the side of the road, sought to obtain field warrants?

A Yes. There was a supervisor on scene.

Q Okay. And do you know that when those field warrants were issued, ICE was in fact -- had those people under mandatory detention? The people couldn't leave?

A I was not there, so I do not know what happened.

Q But you would agree with me, once ICE has pulled those folks over, they're not -- it's not a consensual encounter; is that fair?

A In the beginning, I believe it would be considered -- they're looking for a specific target. They -- my thought would be that they thought the target would have been in that car.

Q Okay. But as to the collaterals, those people are not engaged in a consensual encounter with the ICE agents; is that right?

A I believe they would be if they're questioning them about the person that they're looking for.

Q And you think that's maybe what they did? They were being questioned?

A I was not there. I cannot --

Q Let's go back -- let's put up Exhibit 205, if we could, Jason. This is already admitted, Your Honor. And this is one of the emails -- I think we finished with this yesterday,

Mr. Davies. So -- but it was a long day, and I know that was my fault, at least in part my fault. So, let's look at Exhibit -- this is -- so, Exhibit 205, first page is email from DOJ to us, January 30, 2026. And on page two of this email, it reflects four people that the Government is representing had warrants issued after the encounter began. And their initials are -- the first one is EGM. Second is CLP. Do you see where I'm reading there?

A Yes.

Q Okay. Do you know whether these are the four individuals that were arrested up in Eagle-Vail in the encounter that we were just discussing? Are you aware of that?

A I do not know.

Q But you could figure that out; right? In your files?

A Yes.

Q The I-213s would show that?

A Yes.

Q Are you aware that I don't have -- we don't have the I-213s for any of those four people?

A I'm not aware of that.

MR. MACDONALD: Okay. Let's take a look at 206, please. Your Honor, this is another one of the emails describing requests for the I-213s. I move its admission.

MR. BROWN: Same qualification as yesterday.

THE COURT: Okay. It's admitted.

Q. (By Mr. Macdonald) Mr. Davies, this is a February 12th email from government lawyers that reflects additional requests for I-213s. I'd like to direct your attention to the second bullet that indicates from the Government that there were -- a warrant issued after the encounter began for someone with the initials NGJ. Do you see where I'm reading there, sir?

A Yes, I do.

Q Okay. Do you know anything about this arrest for which we requested the I-213?

A No, I don't.

Q Okay. Are you aware that we as class counsel do not have and were not provided by the Government lawyers the I-213, a warrant, or any other information about the arrest of NGJ that was a field warrant, at least according to Exhibit 206?

A No. I'm not aware of that.

MR. MACDONALD: Let's take a look at -- let's put up Exhibit 210, please. Your Honor, move admission of Exhibit 210.

MR. BROWN: Same qualification.

THE COURT: Same answer. Admitted.

Q. (By Mr. Macdonald) Mr. Davies, this is another email from Government counsel. This one is dated March 5th, 2026. So, just six days ago. And it's responding to requests for more specific I-213s. Do you see that?

A Yes, I do.

Q All right. And I will direct your attention down to the, I

guess the fifth bullet for an individual with the initials PSS, in which the Government represents that there was a field warrant issued after the encounter began for Mr. PSS. Do you follow where I've directed you there?
A I'm sorry. Do you mean PSR?
Q I do mean PSR. Thank you. Apologies.
A Yes. I see that.
Q So, this is another -- at least the representation is this is another field warrant. Have you investigated the arrest of Mr. PSR with the A number here reflected on Exhibit 210?
A Not that I recall.
Q Are you aware that we have not -- class counsel has not received any I-213, any warrant, or the notice to appear for Mr. PSR, at least according to Exhibit 210, arrested with a field warrant?
A No. I'm not aware of that.
Q And apologies if we talked about this yesterday. You could run -- you could look in your files to see what happened to these people, whether they have warrants, and get the information about it; true?
A That's correct, yes.
Q Okay. And you can determine of all the people that have been talked about in this hearing, all the I-213s in the exhibit, you could determine whether or not they're still in GEO custody or whether they've been sent back to their country of

birth or another country. You could figure that out too?
A Yeah. Within our immigration systems, I could.
Q Say that again?
A Within our immigration systems, I can.
Q Okay. And members of the public, members of my team, the Court, could also figure out where -- whether or not any of the people we've discussed are in ICE custody by using what's called the ICE locator; is that right?
A Yeah. The ICE detainee locator.
Q Yeah. Freely available on the website for anyone?
A That's correct.
Q All right. And in order to use the ICE detainee locator, you need -- there are two ways to look folks up: a number and country of birth. That's one way?
A It's been a while since I've been on that system. I do know that -- I believe the A number is needed.
Q Okay. And when the ICE locator yields -- it can yield different results when you put in an A number and the country of birth. One of the things that the ICE locator on the website would say is zero matching records. That's one of the things it can say; is that right?
A Again, I haven't been on that system in a while. I don't know exactly what information you would get.
Q Okay. Do you know that when the ICE locator says zero matching records, that is an indication to us as members of the

public or the loved ones that the person is not in ICE detention, according to the records?

A Again, I do not know. I mean, I believe the system is -- yes, the system is there to find where the person could be. I don't know how the search happens and what information is needed to get it.

MR. MACDONALD: Let's look up -- let's put up Exhibit 247. Your Honor, this is another exhibit that was in the court file. It's attached to our motion to enforce. We would ask the Court to consider it. I don't think it's worthwhile me asking the witness any questions about it given the answers he just gave. So, I can formally move its admission, but in any event, we ask the Court to take into account in considering the issues in this case.

THE COURT: All right. I will. Objection sustained.

MR. MACDONALD: No further questions, Your Honor.

THE COURT: Cross examination?

MR. BROWN: Yes.

**CROSS EXAMINATION**

BY MR. BROWN

Q Good morning, Mr. Davies.

A Good morning.

Q AFOD Davies, I should say. I am going to try to be brief based on everything that you've already covered. I may move around a little bit. You mentioned just this morning that the

Denver ERO has switched to a targeted approach recently. Can you expand on that, please.
A So, ICE ERO has always used a targeted approach. We find leads, find targets, investigate the case, ensure the person is in fact illegal in the country and removable from the country, and then we send a team out to go and find them. With the beginning of this administration, they started pushing more towards a consensual encounter approach, which ERO Denver still maintains the targeted approach effect, but it -- it took -- it took a toll on the targeted -- the way we targeted previously. And recently, headquarters has come out and said ERO should go back to that targeted approach in full swing, and continue to know exactly who you're looking for going forward.
Q And so for targeted arrests, are warrants generated?
A Absolutely.
Q When?
A Prior to the arrest.
Q Are they generated in the field?
A No.
Q Are they generated in the office?
A Yes.
Q Before the officers go out to make the arrest?
A Yes.
Q During targeted enforcements, is there always a warrant?
A Yes.

Q Okay. Yesterday you also mentioned a few different units that Denver ERO officers might be in, and I wanted to ask a few questions about that. So, you mentioned yesterday the fugitive operations unit; is that right?
A That's correct.
Q What does the fugitive operations unit do?
A Their responsibilities is to go after fugitives, final order removable aliens, along with other aliens that could be targeted due to criminality.
Q Do they do targeted arrests?
A Absolutely.
Q Does the fugitive operations unit do collateral arrests?
A Yes, they do.
Q Okay. You also mentioned a training unit. What is the training unit?
A That's a smaller unit training the newer officers that are being hired today.
Q Do they make arrests?
A They have full authority to, but they're more focused on the training.
Q So, while -- when someone is performing the duties of a training unit officer, do they make arrests?
A No, they don't.
Q Okay. And you mentioned a criminal apprehension program?
A Yes.

Q CAP team? What is that?
A So, that team is specifically designed to make arrests at local jails, releases out of local jails.
Q So, do they -- that's -- can you describe how that happens.
A So, we have a system called the ACRIMe system. Whenever somebody is arrested locally, they are -- they're fingerprinted, and if they have any nexus to us, the hit will be sent to us. At that point, the CAP team would take that hit off of the ACRIMe system and fully investigate who was arrested, what they mean to us, why did we get it.
If they are removable, if they are illegal, a detainer I-247 would be prepared along with an I-200 or an I-205, and those would be sent to the jail, requesting for them to hold. In the state of Colorado, jails do not hold for us, but sometimes we will get notified if they're getting released. The CAP team is then responsible for going to the jail with the -- with the documents and taking that person into custody when they get released.
Q So, when the CAP team goes into the field to make an arrest, do they have a warrant?
A Yes, they do.
Q Every time?
A Every time.
Q You also mentioned a processing team; right?
A Yes.

Q What does the processing team do?
A So, again, I believe I mentioned it's a newer team that we started this past year or the previous year. That team is specifically in the processing area. When arrests come in, the arrest will get dropped off at the field office, and that processing team would then take possession of them and process them.
Q Does the processing team make arrests?
A They again have full authority to, but no.
Q You mentioned a non-detained unit. What is the non-detained unit?
A The non-detained unit is a unit that works at the field office. They're responsible for any check-ins that would happen at the field office. We have numerous people that check in for various reasons. And their job is to check them in, verify who they are, and if they are amenable to apprehension and custody, removable, they would then effectuate that.
Q So, you also mentioned an ATD unit?
A Yes.
Q Is that within the non-detained unit?
A It is. It's the alternatives to detention unit.
Q And what is that?
A So, that's the unit where if people -- not everybody needs to be in detention. They could be on an ankle bracelet. They could be on something we call a VeriWatch. They could be on

SmartLINK where you just have to check in on your phone while you're going through your immigration proceedings.
Q Okay. And so is the ATD unit in the non-detained unit?
A They work hand in hand with the non-detained unit, yes.
Q So, does the non-detained unit make arrests in the field?
A Not in the field, no.
Q Does the ATD unit make arrests in the field?
A Sometimes they do, depending on the violations that the absconder, that the ATD -- so, if somebody were to cut their GPS bracelet, then the ATD would go out and try to find them.
Q If they go out in the field to try to find them, do they have a warrant first?
A Absolutely.
Q And when the non-detained unit makes arrests in the office, do they have a warrant before making the arrest?
A Absolutely.
Q Every time?
A Every time.
Q You also mentioned an FCC unit. What is that?
A That is -- I don't know what it stands for. It changes, but it's more or less our targeting unit. It's the people that will go through the ACRIMe hits and send them to the criminal apprehension unit. They will go through the ACRIMe hits of people that have been released and we weren't able to apprehend them, and build target folders for them with the warrants, with

everything needed, and then hand them off to the fugitive operations unit.

Q So, they hand it off to the fugitive operations unit. So, they don't make the arrests?

A No, they don't.

Q So, the FCC unit does not make arrests?

A They do not make arrests.

Q And then you also mentioned a detained unit; right?

A Yes.

Q Do they make arrests?

A No. They have full authority, again, but they do not make arrests.

Q So, you talked a little bit yesterday about information in I-213 narratives. Do you remember that?

A Yes.

Q So, if an I-213 narrative mentions an arrest related to a detainer, what does that tell you about whether that arrest was pursuant to a warrant or not?

A It would tell me that it was pursuant to a warrant. If a detainer was created, a warrant was created alongside.

Q What if the narrative described an arrest that happened at a call-in?

A Yes. It would have a warrant. The subject would have been sitting in the lobby. We would have talked with the subject and then determined on whether or not we wanted to take that person

into custody.

Q And same question for any narrative that describes a targeted arrest. Can you -- does that tell you whether or not there was a warrant for that arrest?

A If it says -- if the encounter says subject -- the -- the officers were out on a targeted arrest, absolutely, there was a warrant created prior to them leaving for that enforcement action.

Q Okay. There's also been some discussion on field I-200s. So, warrants generated in the field. Do you remember that?

A Yes.

Q Can you please, like, walk me through how that happens, how officers obtain a warrant in the field.

A Most of the time there's a supervisor in the field with the team. The team, again, would be out on a targeted enforcement operation. Just an example, they're looking for a specific person. They know the person's routine. They see the person get in the car that they know that person drives. They would then pull that car over.

If there are collaterals in the car, depending on that person's -- that targeted person's criminality, then they would definitely start questioning the other occupants in the car. Once probable cause is obtained that those persons are illegal, the supervisor on scene would then fill out the arrest warrant, and then those people would be taken into custody.

Q So, the filling out of the arrest warrant is an extra step once probable cause has been determined; right?

A Yes.

Q And how is it possible to obtain a warrant in the field if the supervisor is not on scene?

A Yes. So, again, the FCC can be called at any time. Their job is also to run checks for officers that are in the field. The officers will then call the FCC with the name, the date of birth. They would look up in the systems, find out who that person is, and if there's enough probable cause to take that person into custody, they would -- they would draft the warrant there, and a supervisor would sign it at the office.

Q And so again, in that circumstance, obtaining a warrant is an extra step; right?

A Yes.

Q So, in that instance, when the remote is -- or when the warrant is digitally signed, does it have a timestamp?

A Yes, it does.

Q Notwithstanding the focus on targeted arrests, are Denver ERO officers still empowered to make warrantless arrests?

A Yes, they are.

Q If officers make a warrantless arrest and the person is brought back to the headquarters for processing, and during processing an I-200 is issued, does that warrant cover the warrantless arrest?

A It would still be considered a warrantless arrest, but that warrant is still needed for the court proceedings.

Q Is that warrant forward-looking?

A I'm sorry?

Q Is that warrant forward-looking for future possible arrests?

A Absolutely.

MR. BROWN: No further questions.

THE COURT: Redirect?

**REDIRECT EXAMINATION**

BY MR. MACDONALD

Q Mr. Davies, I think you said that there were some recent instruction from ICE headquarters that Denver ERO should go back to targeted arrests? Is that a fair characterization of what you just testified to?

A I would say it wasn't specifically Denver. It was agency-wide.

Q Okay. Who did that come from?

A I received that information from my deputy at the time. I was not in the room when the call was made.

Q Okay. It was a phone call?

A Yes.

Q And it was made to the deputy -- to your deputy, or to the person above you?

A At that point, I don't -- I can't remember if it was the

acting field office director or if she was a deputy at the time, but it was -- it was upper management that received the phone call.

Q Your upper management; right?

A Yes.

Q So, which -- which upper management received this phone call to the -- that you're referring to from ICE headquarters?

A DFOD Katie Reisner.

Q When was that?

A I don't remember the time or the day.

Q Was anything written down?

A No.

Q Was it in the last three weeks?

A I think it was earlier than that. I believe over a month, I believe.

Q But you're not sure when?

A I'm not sure when.

Q Were there any instructions given out in writing?

A No.

Q Did anyone in upper management at the Denver field office, yourself, DFOD Reisner, or the acting Denver field office director communicate those instructions to the field?

A I communicated them to my supervisors.

Q In writing?

A No.

Q Just a conversation?
A Conversation.
Q Okay. And who at ICE headquarters, if you know, gave those instructions?
A I do not know.
Q Do you know if Mr. Lyons, the head of ICE, was on that call?
A I don't know who was on the call, no.
Q Do you know if those instructions to go back to targeted -- targeted arrests came from Mr. Lyons, the head of ICE?
A I do not know if they did.
Q In that phone call or any other, did Mr. Lyons or anyone acting on his behalf retract the January 28th, 2026, memo that you and I discussed yesterday?
A I was not on the call. I do not know what was talked about.
Q I know you weren't on the call, but you got some information about it; right? You know something what was talked about?
A The target -- yes, to go back to targeted enforcement.
Q Okay. And I guess you -- you didn't hear from DFOD Reisner or anyone else that Mr. Lyons or anyone at ICE was saying ignore my January 28th, 2026, memo?
A That was never spoken about.
Q Okay. You said that the approach that had begun at the

beginning of the administration to push for arrests in consensual -- what you said was consensual encounters; right? That's what you said?

A Yes. That's the terminology they used.

Q Okay. Consensual encounters like pulling over people in a vehicle?

A They didn't come with tactics, or they didn't explain how to do it, no.

Q Okay. And I think the words you said in your testimony with Government counsel was that the approach that the administration was pushing took a toll? Was that what I heard you say?

A Maybe that wasn't the right word. It was -- it's not the way we were trained to do it. It's not the way that we have been working. So, it was a different type of approach that we were trying to pivot to. Again, the Denver field office continued its targeted actions throughout this time, but again, was not -- we didn't -- we weren't able to focus on certain targets that we would have in the past due to them wanting us to focus on other stuff.

Q Okay. But I just want to make sure I understand. You said in your testimony that it took a toll.

A Yes. I did say that. I don't know -- I don't know if that's the correct word. It did -- it didn't work as well as I think they wanted it to.

Q Okay. And the only thing that you can point to to any change that might happen was a phone call maybe sometime a month ago from headquarters from people that you can't identify?

A Yes.

Q You're, I assume, familiar with the surges of ICE agents that happened in Minneapolis; right?

A Yes.

Q Some of your agents went there, including JB, who testified here?

A Yes.

Q How many of your agents from the Denver field office went there?

MR. BROWN: Outside the scope of what I asked about, Your Honor.

THE COURT: Overruled.

THE WITNESS: I don't know the number.

Q. (By Mr. Macdonald) Approximately. More than ten?

A More than ten. More than 20.

Q Okay. There were surges in Chicago recently, too; right? A little bit before Minneapolis?

A I think before.

Q Yes. A little bit before Minneapolis?

A Yes.

Q You're familiar with that?

A Yes.

Q Did any of your agents go to Minneapolis?

A I can't remember.

Q Do you think it's likely?

A I believe maybe a couple. I believe that one was more Border Patrol. It wasn't ERO led.

Q I do remember the pictures of Mr. Bovino, so that he was -- is still Border Patrol?

A He is Border Patrol, yes.

Q There were surges in Los Angeles, surges in Washington, D.C.; right?

A Yes.

Q Okay. There could be surges here; true?

A There could be, yes.

Q And when that happens -- strike that. If that happens, I apologize. If that happens, you would not be in control of whether -- the decision as to whether other agents come here, would you? That would be a decision at ICE headquarters?

A Yes. It wouldn't be a decision for me.

Q Okay. And you couldn't stop it, as the third in command of the Denver field office, if Todd Lyons or someone else said we're going to send ICE officers from other parts of the country to Colorado? That's not within your authority to stop that; true?

MR. BROWN: Speculation. Outside the scope. Relevance.

THE COURT: Sustained.

Q. (By Mr. Macdonald) You talked about the differing units, and I think you said -- you identified some of the units can -- some of the units do conduct arrests out in the field, and some usually do not; right?

A That's correct.

Q All right. And people move between those units; right? Officers do?

A That's correct.

Q All right. I think you talked about call-in arrests in your testimony you just gave? Do you recall that?

A Call-in?

Q So, I think counsel asked you about call-ins?

A Check-ins?

Q Check-ins?

A Check-ins, yes.

Q I thought he said call-in, but undoubtedly I wrote it down wrong. But yes. Check-ins. You're familiar with check-ins; right?

A Yes.

Q Okay. And that's when ICE gives someone an instruction to come to the office and check in?

A That's correct.

Q All right. And I think you said -- and sometimes people are arrested at those check-ins; right?

A That's correct.
Q All right. And I think you testified in your -- just a moment ago that when that happens, the person, quote, would have had a warrant?
A Yes.
Q All right. But you haven't gone back in the files to check whether or not that is always the case. You just -- it's your testimony that that should be the case; right, sir?
A Absolutely.
Q Okay. But you haven't checked whether in fact it is true that they -- all the people arrested at check-ins have had a warrant issued before that arrest? You haven't checked that?
A Yeah. I haven't reviewed officers' arrests in the lobby.
Q Sometimes people are out in the field conducting surveillance; right?
A Correct.
Q And they have a target in mind, and they might even have baseball cards. You've heard of that reference?
A I have heard of that, yes.
Q And a target list? You've heard of that?
A I've heard of that, yes.
Q So, sometimes agents are in the field conducting surveillance and have a list of targets, and I just want to make sure I understand your testimony. You're not saying that they always have warrants for all those potential targets on the

target list or the baseball cards; is that true?

A If they have a target list and there's a specific target that they're looking for, they better have that warrant with them.

Q Okay. You haven't gone to check in fact whether or not when someone goes out in the field with a list of, let's say, five, six, eight names, that they always have a warrant. You haven't gone back and checked that?

A I haven't checked that.

Q Can you describe for the Court what a baseball card is.

A It's a new term they came out with for the new elite system. What we used to use, it's similar to that, was a fugitive operational worksheet. And it would just have a picture of the person we're looking for, biographical information, crimes that they've been convicted or pending. All the information that we would need from that person.

Q Let's say ICE is out conducting a targeted arrest, and they arrest a collateral, multiple collaterals, either at a construction site, for example, or in a vehicle. In that situation, you're not saying that ICE has warrants for those people; true?

A Are they not targeted individuals?

Q That's right. They're collaterals.

A Yes. They wouldn't have a warrant for them.

MR. MACDONALD: No further questions, Your Honor.

THE COURT: Recross?

MR. BROWN: Could I have one question?

**RECROSS EXAMINATION**

BY MR. BROWN

Q When you just were talking about the collateral encounter, could they get a warrant for those collaterals before the arrest but after they encounter them?

A Absolutely.

THE COURT: Reredirect? Can you resist, Mr. Macdonald?

MR. MACDONALD: I'm trying, Your Honor. No questions, Your Honor.

THE COURT: All right. Thank you, Mr. Davies. You're excused and free to leave, or welcome to stay if you want.

THE WITNESS: Thank you, Your Honor.

THE COURT: Does the defense have any witnesses?

MR. LENEIS: We do not, Your Honor.

THE COURT: Does the plaintiff have any rebuttal witnesses?

MR. MACDONALD: I don't think so, with one caveat. I'm just going to move some admission, or ask the Court to take into consideration the --

THE COURT: The Court will consider all the declarations that you have filed.

MR. MACDONALD: All right.

THE COURT: The Court has already reviewed the declarations that you have filed.

MR. MACDONALD: All right. The only other one that I would move admission, Your Honor, is Exhibit 260. That is a declaration that we obtained after we filed our motion. It is of another impacted person, and I would move its admission.

THE COURT: 260. Is there an objection to 260?

MR. LENEIS: We don't think it should be admitted, Your Honor, but you've already said you're going to consider the declarations, so we will leave it there.

THE COURT: I think that wasn't an objection. It's admitted, 260.

MR. MACDONALD: Thank you, Your Honor.

THE COURT: All right. That concludes the evidence. Now, Mr. Macdonald or Mr. Macdonald's team, do you wish to make a closing argument?

MR. MACDONALD: Yes, Your Honor. Would you like that now?

THE COURT: Go ahead. And Ms. Kurtz can come back up and sit with you if she'd like to.

MR. MACDONALD: That would be great, Your Honor.

THE COURT: Moral support, if nothing else.

MR. MACDONALD: It's usually more than that, Your Honor.

THE COURT: Oh, yes. I know.

MR. MACDONALD: I need all the help I can get.

MS. KURTZ: Thank you, Your Honor.

MR. MACDONALD: Your Honor, we asked for this hearing because it was our considered view that defendants were not complying with Your Honor's order. And I think the evidence of that after this hearing is abundantly clear.

And so if we look at the I-213s that we've -- we've submitted, we have four primary exhibits that have now been admitted into evidence. That's Exhibit 202, 204, 207, 208. Those are the I-213s that were provided to us pursuant to your Court's -- to Your Honor's order. And so you ordered them to produce I-213s for warrantless arrests so that we could evaluate the compliance. Those are the exhibits. They show the I-213s for warrantless arrests. And when read, maybe with a couple of exceptions, they show these are arrests of collaterals, people who are not a targeted arrest. They look just like the I-213s for our four named plaintiffs that you heard from in October, and the other declarants.

None of them contain the specific articulable facts of flight risk, of likelihood of escape. And I think Mr. Davies candidly answered your question yesterday about whether he's ever seen an I-213 that contains the specific articulable facts of flight risk, and he said no. So, I think the -- the evidence of their noncompliance is extensive.

And one of the things that Government counsel said

yesterday was, you know, it's not a policy and practice of continuing to violate your order. And I think that's a red herring. That's not the standard. That's not the question before the Court. We don't have to show that. We think we have shown it, but that's not the question. The question is are they complying with Your Honor's order?

THE COURT: I think the sequestration order might have been unfortunate in this hearing, because I think it would have been educational for Mr. Davies had he heard the testimony of the three DOs.

MR. MACDONALD: I agree with you, Your Honor, because I think something is getting lost in translation. And so I take Mr. Davies at his word that he had a meeting with 15 of the individuals in that office and told them to comply with your order. I take him at his word on that. But what we heard from the officers, and if we had more time, I think we could have put up officer after officer after officer that would have said the same thing as these three, that we didn't get trained. We got -- at best, we got an email.

THE COURT: There's been a lot of reference to that email. Has that ever been produced?

MR. MACDONALD: No, Your Honor. We have asked for it. We have asked for it. We have asked for the training. That was one of the first things we did a month ago when we said none of these I-213s comply. They don't say -- they don't even say

they're warrantless arrests. And now we've sort of been put in a trap of Your Honor said produce I-213s of warrantless arrests. That's the only thing you ordered them to produce to us. And then they did that, and we said, hold on a second. None of these even comply with the first part of Judge Jackson's order, that they're to say they're warrantless arrests, let alone articulate the specific articulable facts that support probable cause of likelihood of escape.

And so now I feel like, you know, Lucy and the football, where we say, you don't comply. These are warrantless arrests. That's why you're producing them. And it's like, well, maybe they have warrants.

THE COURT: I understand. I think I made that point yesterday.

MR. MACDONALD: You did. Thank you, Your Honor. So, we think it's -- one of the reasons we think that it is important -- critically important that we get the training materials such as it is, whether it's just an email, whether it's more than an email, and communications back and forth.

THE COURT: Do you know who sent this December 2nd email out?

MR. MACDONALD: No idea.

THE COURT: So, you don't know whether it was counsel, and it contained legal advice or not?

MR. MACDONALD: That is correct, Your Honor. I have

no idea.

THE COURT: And these gentlemen, you say, you've asked again and again for it. Have they indicated that they think it's privileged or not?

MR. MACDONALD: Well, so to be clear, I haven't -- until this hearing, I didn't even know there was a December 2nd email. So, I didn't ask for the December 2nd email. We asked for the training. We asked for the communications about Your Honor's order so we could understand why is there such widespread failure to comply? They did say -- in their defense, they said, well, you're asking for attorney-client communication. I'm not. I mean, Your Honor, I've been litigating for 30 years. If there's privileged material, they can redact it. Give us a privilege log. I'm not saying we get their privileged communications.

And if it's all wrapped up, maybe that's something we will have to negotiate with them, but I would assume that the instructions from AFOD Davies to his team, that's not privileged. That's, here is what you need to do in the field. Here is how you have to carry out to make sure you're complying with the law.

We have the Lyons memo. Again, I think Mr. Davies was super candid in saying that memo is inconsistent with Your Honor's order. It's inconsistent with the way in which he had been trained as a sworn officer for 20 years. But the problem

is that memo is from the chief, the head of ICE. And it went to all his members, all 200 of these new folks.

THE COURT: Well, the guys in the field don't seem to even understand it or know that it exists. That Lyons memo says flight risk or likely to escape means will they be at that exact space, or another particularly identifiable location, something like that. I don't have the exact words in my mind.

MR. MACDONALD: You're right, Your Honor. That is -- what you just described is the essence of that memo, and I agree that the officers who testified likely couldn't recount the memo. Or, I mean, it doesn't seem like they pay attention to the emails they get, but what they -- what they articulated, I think, to this Court, was that they followed the principle of it. I mean, JB testified in essence if the person is here in his view illegally, that's it.

THE COURT: Yes. I get it. I heard the testimony.

MR. MACDONALD: Okay.

THE COURT: Talk to me about field warrants and what your position is, both are you objecting to that process, and if so, do you think it's even in the case yet?

MR. MACDONALD: Yes and yes, Your Honor. We do think they're a problem, and we think they're a problem in a couple of ways. So, we know from the -- Mr. DCC who testified, our impacted person, that he was arrested pursuant to what they say is a field warrant. You heard his testimony. There's no world

in which they got a field warrant before they arrested him. You heard those facts.

THE COURT: They have their own definition of arrest.

MR. MACDONALD: That's true.

THE COURT: And who was it who said -- was it the woman whose credibility I questioned, the Supreme Court has vindicated us in this? No. The Supreme Court hasn't. But take a scenario, they do what Mr. Davies would like for them to do, and that is they encounter a collateral. They don't arrest the person. The person is free to leave, but they conduct what in other contexts might be called a *Terry* stop. And as a result, they get a field warrant, and then they arrest. I'm not saying that's what happened with the gentleman who testified or anyone else subject to a field warrant, but if those were the facts, would the plaintiffs be objecting to that?

MR. MACDONALD: So, I think the answer is it depends, Your Honor. And I think it gets -- I accept that it gets complicated. It could get complicated in certain factual scenarios. It's one of the reasons what we've asked for in terms of relief for now is the information about the field warrant arrests.

As you saw with Mr. Davies, I'm in this battle on field warrants with both hands tied behind my back, because the Government is taking the position, as you say, they may have a very different definition of arrest than what we think should be

the definition of arrest. And so they right now, because of the way the order is structured, we say -- we get lucky because someone in the community comes to us and says, I have a person that was subjected to a warrantless arrest. Here is their A number and their name.

And that doesn't -- it does happen some. That's how we've been able to make some of the specific requests that are in the record before you. But obviously, you know, we're not out canvassing. We can't go out and -- so, we get a few of those. We make a request for the I-213s, say this was a warrantless arrest. And the response we get back, if in fact they believe it was a field warrant, is you don't get it. You don't get to see any.

THE COURT: Well, the order of the Court was to produce a sampling of 213s for warrantless arrests.

MR. MACDONALD: That's right.

THE COURT: The Court's assumption and conclusion is that every one they produced was in fact a warrantless arrest. Since none of them have the particularized facts about likelihood of escape, by definition, they're not in compliance. That much I can agree with.

When we get into these field warrants, that's a whole different kind of situation. And obviously Mr. Davies, who by the way I found to be credible, Mr. Davies is a believer in warrants, including field warrants, as opposed to warrantless

arrests. And they've grappled with that in Chicago, and it's an issue here, and it's probably an issue in other places.

MR. MACDONALD: And one of the things the judge has done in Chicago, Your Honor, is order them to produce the I-213s, the actual field warrant itself, which Mr. Davies testified, the first time I heard this, has a date stamp of when it was issued. And what the judge in the *Nava* case in Chicago has ordered is you have to produce those for field warrants so that we have an opportunity to come before Your Honor or do -- to say we think this is a warrantless arrest.

THE COURT: Well, I think the judge in Chicago took that next step and said he thinks it was a warrantless arrest.

MR. MACDONALD: He did.

THE COURT: And the Seventh Circuit said, hold your horses. That expands beyond the consent decree. They didn't say they agree. They didn't say they disagree. They said that's outside the scope of what the consent decree was talking about. I think that's what happened.

MR. MACDONALD: So, what -- and I encourage -- Your Honor, we can give you the cites. I think they're in our motion. In the last two and a half weeks, the District Court in *Nava* has issued three different additional orders about noncompliance that include field warrants that don't comply. And what the Seventh Circuit said was hold your horses on ordering mass release of all the people subjected to the field

warrant arrests. So, that part is true. They did say hold your horses, but that was on his order of mass release for people who were arrested pursuant to field warrant.

So, he is -- the judge in *Nava* is absolutely continuing to order production of the field warrant I-213s and the field warrants, because on a one-off basis, they need the opportunity to say these are in fact warrantless arrests. So, we absolutely think it's in the case, Your Honor.

And I'm told ECF -- one of them is 301, and the others, please? They're in our exhibits.

THE COURT: One thing that you raised in your papers, but you didn't ask Mr. Davies about, and maybe he wouldn't know the answer, is why your original plaintiff, Ovando Ramirez, doesn't have his papers yet. Is there any update on that that you know of?

MR. MACDONALD: Mr. Meyer, who is not here, Your Honor, because he's dealing with his criminal docket this morning, would know the answer to that. I don't know the answer to that.

THE COURT: I probably should have asked Mr. Davies about that. That doesn't make sense to me. Maybe defense counsel can update us on that.

MR. MACDONALD: On the field warrants, Your Honor, it is -- and we heard from the officers this, I would say, new zeal of Mr. AL said in 11 years, I have never conducted a warrantless

arrest. I always have a warrant. That's what Mr. AL testified to. And I think both JB and JL made clear, you know, we get a warrant every time. That's what they claimed. But it's -- in many respects, it's just like the four plaintiffs who got warrants when they were already sitting at the detention office.

THE COURT: Right. I understand that. And that, the Court has determined, is a warrantless arrest. So, from the plaintiffs' point of view, what is the difference between that, namely they find the collateral, he says he's undocumented, they arrest him, they take him to headquarters, and in headquarters, they issue a warrant? That was what the four plaintiffs were talking about.

MR. MACDONALD: That's right.

THE COURT: What's the difference between that and they find the collateral, he admits that he's undocumented, they get the local supervisor or go on the phone and get the FCC to issue a quickie warrant, and then they arrest? What difference does that make to the collateral? It means that he can't go home from his place of employment and see his family and tell them what happened. He's already at the detention center. And I know that makes a difference. On the other hand, if he's not likely to escape, they can just go to his house or wherever and pick him up if they want him. In the end, what's the difference?

MR. MACDONALD: Well, so here is the difference, Your

Honor. It is Congress gave ICE limited authority to engage in warrantless arrests. You know that. You have to have both prongs in order to engage in a warrantless arrest.

THE COURT: Correct.

MR. MACDONALD: And so what the -- if they're -- if they're detaining someone in the field, making a determination that the person is here in violation of the immigration laws, and they can go get a -- they're still holding the person, so now they're exceeding the scope of that -- that detention. They've determined that they're here in their view unlawfully. They -- at that moment, they're continuing to hold the person while they get a, quote, quickie warrant, or a field warrant. That is exactly -- that will evade the limited authority that Congress gave them.

THE COURT: Well, it won't evade it. It will eviscerate it.

MR. MACDONALD: Yes. That's right. And so that's why I think --

THE COURT: But are you representing the plaintiff to vindicate the statute of Congress, or are you doing that to help your clients be in a better spot?

MR. MACDONALD: The latter, Your Honor.

THE COURT: Right. So, what is the difference, then?

MR. MACDONALD: Well, if someone knows --

THE COURT: There's a difference in that if they do it

the statutory way, if they do it the right way, it makes an extra step for the ICE agent to have to let him go and then go to his house and pick him up. And maybe as a practical matter they don't go to the house and pick him up, or maybe at least your client has a chance to sort of let his family know what's happening, and it's a little more genteel.

MR. MACDONALD: That's right.

THE COURT: And maybe that's the important difference.

MR. MACDONALD: That's exactly right, Your Honor. And that person can go home, can make immediate steps to get a, for example, some type of custody arrangement. All right? They might be a single parent. They may -- they can say, I just had my ICE encounter. Things don't look good.

I don't do family law. I know there's lots of people out in the community who have been given trainings about all the steps one could take to protect one's children, one's home, one's assets, one's debts, and all of those things someone can make arrangements for. And it's true, they may not be able to. I accept that.

THE COURT: Okay. So, we're on the same page now. At some point in some court, this court or some other court, the whole concept of field warrants is going to have to be examined by a Court and decided, is that a warrantless arrest or not? But I'm not sure that decision is on the table for me yet.

MR. MACDONALD: I agree with that.

THE COURT: Okay. You're not asking for that. What you're asking for is some evidence that tells you more about these warrantless arrests --

MR. MACDONALD: Exactly.

THE COURT: -- that have the field warrant.

MR. MACDONALD: Exactly, Your Honor.

THE COURT: They're not warrantless arrests. The field warrant arrests.

MR. MACDONALD: That is the ask. We acknowledge that we need -- I mean, we have some information. And the information we presented, Your Honor, by witnesses and through the exhibits in our view demonstrates that they are warrantless arrests. I understand that's -- that's a disputed issue with the Government. But we -- we don't have -- we don't have the information to be able to contest at least some of the things that they're saying, which is we get them quickly. It's five minutes. It's -- everything is consensual until we wet the warrant. All these things.

THE COURT: Well, ultimately, I think the way this is playing out with ICE, that is the critical issue. And that is can they do these field warrants and avoid the statute that way?

MR. MACDONALD: I think that's exactly right, Your Honor. I do think --

THE COURT: But at this point, at least the agents we heard from here and some of the documents you've submitted show

that they're making warrantless arrests without the field warrant.

MR. MACDONALD: I think that's also exactly right. It's one of the reasons why I think Your Honor's random sampling order in the -- in the November 25th order was a smart thing to do. I'm married to a mathematician. It seems to me to make perfect sense. We get a random sample. I don't need every single one of them, I thought, and then we negotiated with them over getting a third, and what they showed is what you just described.

And so that's one of the other reasons we've asked for all the I-213s for warrantless arrests, because we need that full picture. We need to know these are warrantless arrests. Obviously some are still happening. Again, I take Mr. Davies at his word that he hopes he will go back to targeted enforcement like has happened for most of the last 20 years in this country, when what -- and the data absolutely bears that out.

And in the exhibit I showed yesterday and that was showed at the last hearing, which is historically, ICE ERO, Mr. Davies and his colleagues were going after people who were convicted of crimes. That's what they were doing historically. And the numbers have flipped, and now they're not doing that. He says there was a phone call recently that hopefully will take it back the way it was.

THE COURT: Yeah. I don't really follow that. I

mean, they've been doing targeted arrests all along. That hasn't changed. I don't know if they've been arresting collaterals historically or not before the current year, but it sounded to me as if what Davies believes should be happening is what has been happening, except that the deportation officers haven't gotten the message yet. I don't see that going back to targeted arrests really changes what should have been happening all along.

MR. MACDONALD: In our view, that's right, Your Honor.

THE COURT: It doesn't mean that henceforth, you only pick up people that you target, and you don't pick up collaterals. If it meant that, maybe the plaintiff team here would be rejoicing, but I don't think that's what even the phone call meant.

MR. MACDONALD: I think that's exactly right, Your Honor. And we're certainly -- we're not hearing from ICE leadership or the top of the administration, let's slow down the effort to remove people from the country that are not here in their view legally. So, I think the ICE agents are -- at least so far have continued to engage in the same type of arrests of collaterals that Your Honor has heard the evidence of.

So, getting all the I-213s is critical in that regard as well as the field warrant information, communications that we heard that they -- when they get the quickie field warrant, Your Honor, that they are sometimes texting back and forth. So, we

can get information about the timing. That exists. We know the date, or at least Mr. Davies talked about the date stamp of that -- of the I-200s that we don't have.

We also heard from them that they're, you know, communicating -- I assume like police officers, like FBI, they have some kind of CAD report that indicates the timing for the field warrants. We think those would be important. And let me see if there's other -- a couple other things that I want to identify, Your Honor.

I think if Your Honor has no further questions, let me just check with my smarter colleague. Mr. Davies did -- he testified about the data log he receives of the arrests. So, they certainly have information in a way that would facilitate I think Your Honor and us understanding what is happening with these arrests, Your Honor, and seeing -- trying to ensure that there's compliance with Your Honor's order going forward.

Unless you have any other questions, I will stop talking.

THE COURT: No. Thank you, Mr. Macdonald.

MR. DEUSCHLE: Your Honor, I have prepared words. I can start there. If the Court has specific issues, I'm happy to start there as well. I will start with my words, then.

Your Honor, plaintiffs' motion to enforce should be denied. Their motion claims that there has been a widespread willful noncompliance with the Court's PI order. In essence,

plaintiffs have accused defendants of intentionally refusing to comply. Plaintiffs' showing yesterday and today falls far short of that. What you've heard is the defendants are making serious efforts to comply, and are correcting issues with the I-213 documentation. The Court heard what defendants have been doing to comply. You heard that immigration officers have been instructed to obtain warrants before arrests, either before an encounter or during an encounter but before arrest.

THE COURT: I've heard from three deportation officers. You sat there and listened to them.

MR. DEUSCHLE: Yes, Your Honor.

THE COURT: They didn't have a clue. They didn't know about the policy pronouncements that have been issued by ICE. They hadn't received any serious training. They didn't really have the ability to even answer Mr. Macdonald's questions. There was a stark contrast between what we were hearing or not hearing from those three guys and Davies. Don't you agree?

MR. DEUSCHLE: I partly agree, partly don't. Lawyer answer. I would say the third witness, AL, essentially said what I just said, which is he always tries to obtain a warrant, even if it's in the field, before an arrest. The other two officers, I agree, were not the best on enunciating the policy. I will point the Court to the record. Neither of those officers are currently making arrests in the field, partly for that reason.

THE COURT: Also, Davies said never, never has he seen an I-213 that was properly filled out for a warrantless arrest. It hasn't happened. How can you say there's been compliance?

MR. DEUSCHLE: Your Honor, I agree with you. The documentation of the I-213s needs correcting. I think we flagged that in our response. I think there's no disputing that. Your Honor has seen copious I-213s. It's really a documentation issue, which also led to this issue with the production of I-213s.

Just to explain that for the Court, what happens is as Mr. Davies testified, we got all the I-213s to our office. We reviewed them. Based on the face of those I-213s Your Honor has seen, they don't specify, was there a warrant or was there not a warrant? So, based on that review, we produced what we believed were warrantless arrests because they did not identify the -- whether there was a warrant.

Upon further review in preparation for this hearing, we realized there was a missing step in that process. That step is even if on the face of the I-213 it's not showing that there's a warrant, I think Mr. Davies talked about this, ICE internally understands that there was a warrant. It might say targeted arrest, or it's one of these check-ins, but it's not on the face of the warrant. So, part of our process going forward, we're not just going to review the I-213 on its face. We're going to go back to the agency and make sure that there is in fact a

warrant in place. And the --

THE COURT: That's not enough that there's a warrant in place, because we've already ruled on the situation with the first four that you can't take them into headquarters and then paper it with a warrant. One of them said we have to have a warrant there before we go before the immigration judge. That's not compliance.

MR. DEUSCHLE: No, Your Honor. And I am sorry. I misspoke. It wasn't just is there a warrant somewhere in the file. When we're doing that check, and when ICE should be noting in the I-213s moving forward, it's was there a warrant pre-arrest, and --

THE COURT: What about this guy that testified, the guy that needed the interpreter that had the two U.S. citizen daughters sitting in the back? Mr. Cabral, I think his name was. I'm not sure. What about his situation? Isn't that a perfect example of a warrantless arrest?

MR. DEUSCHLE: I'm not sure what -- I understood from his depiction of what happened, it sounds like a warrantless arrest. I don't know -- the officers weren't asked, I believe, and I think they testified they thought there was a field issue warrant, but if obviously the plain situation if somebody is encountered, they're just arrested without any sort of field issue warrants --

THE COURT: I think there couldn't have been a field

issued warrant for him, because he said as soon as he said he didn't have documents, they arrested me. Put him in handcuffs or whatever, and away he goes.

MR. DEUSCHLE: I'm not disputing if what he said is true, there are no questions, no warrant, then that was a warrantless arrest. I think we dispute his characterization of the event, but his characterization certainly depicts a warrantless arrest.

THE COURT: Well, you don't know, because you don't have a field warrant for him. I don't know how they could have gotten a field warrant for him. He certainly wasn't targeted. That's -- that's the case that we're trying to prevent here.

MR. DEUSCHLE: I agree, Your Honor.

THE COURT: And you guys should be on our team on that. There shouldn't be a team on that: the Court, the plaintiffs, or you, DOJ lawyers. We should all be in agreement that that isn't proper.

MR. DEUSCHLE: I think we are on the same team. I think a lot of this is, again, documentation. I don't think that I-213 was clear. I think it mentioned there was a field issue warrant after the fact, if I'm remembering the right I-213, but it -- I think -- I do think, again, though, we're on the same page.

We're not trying to -- I think the biggest thing, though, is the documentation there is -- if it can be clear to

us and the Court and the plaintiffs, the ones we're producing, is there a warrant? If there isn't a warrant before the arrest, was a warrant obtained in the field prior to arrest? We believe those things should be noted so that, A, we're complying with the Court's order, we're not producing false positives to the Court or to the plaintiffs.

THE COURT: No. I'm not accusing you guys of anything. On the contrary, I've -- I've been 27 years on the bench now. Fourteen on this bench. I trust and have always trusted my district attorneys and my AUSAs to be honest, to be truthful, to be interpreting their job as one of doing justice. And I've seen many examples of that over the years. And I trust you three guys in the same way.

The issue of whether the warrantless arrest -- the field warrant makes it legal is a very difficult, not yet fully decided issue. And you guys are arguing that that's proper. I don't blame you. I would if I were in your shoes. Macdonald's team says, no, that is not proper. At some point a Court, this Court or some Court has to decide that. Some higher Court probably will decide that.

What we're really focused on here is this whole practice of these guys going out there, and as soon as they come across a person that says, yeah, I'm not here legally, you're done. You're arrested. You're going in. That's what we're trying to get rid of before we next focus on this field warrant

business, I think.

MR. DEUSCHLE: I agree, Your Honor. And I think Mr. Davies' testimony should give the Court reassurance on that. He talked about the training that is given to the intake processing officers, so when an officer comes in, right, they're given the information the processing officer --

THE COURT: Well, they're not getting it. At least the three guys that were testifying here aren't getting it.

MR. DEUSCHLE: Your Honor, this process was in place after two of those officers were taken out of the field, and so they're not getting this counseling because they're not making field arrests right now. They're not doing the things that they're testifying about.

But this process is supposed to kind of on an individualized level address the documentation issues, and if they're not noting to the processing officer; right? Is there a warrant for arrest? If not, what did you ask in that field interview? You can't just say, field interview conducted. They're going to go back to those people and ask those questions.

If they didn't, the supervisors are reviewing the I-213s going forward on a weekly basis, and giving individual one-on-one counseling with those individual officers if there's a deficiency in the I-213 itself or in the underlying arrest based on their view of the I-213. So, I think that's how the

Government believes this should be addressed. If there is an issue beyond just the documentation, they're just not noting something, or there's actually something going on in the field that the supervisors need to be aware of -- Mr. Davies needs to be aware of.

Your Honor heard additional efforts to comply beyond the instruction to obtain a warrant before arrest. You heard about the email to all immigration officers in December regarding compliance with the Court's order.

THE COURT: Tell me about that email. Why haven't you produced it to Mr. Macdonald and to the Court? Do you even have it?

MR. DEUSCHLE: We do not, no, Your Honor. And I also say, it was not asked for until the plaintiffs asked for this hearing. It wasn't like there was an ongoing months-long discussion about this. So, that's part of this. But also, we don't have that email as well.

THE COURT: Well, unless it was issued by a lawyer giving legal advice, it ought to be turned over. And if you don't have it yet and they hadn't asked for it until this hearing, okay. But let's get that in their hands and our hands here.

MR. DEUSCHLE: We can certainly discuss with our clients about that.

THE COURT: Thank you.

MR. DEUSCHLE: On the I-213s, Your Honor, I do want to flag, we flagged in our response the evidence of a positive trend since the PI was issued with significantly less alleged noncompliance over time.

THE COURT: Positive trend doesn't mean that there was compliance. It means that there wasn't compliance, and now there is noncompliance fewer times than there were before. When the Court issues an order, it's to be followed, not just we will try to do a little better, and our trend will be good.

MR. DEUSCHLE: I understand, Your Honor. But I think that the -- the point I'm trying to make is ICE is making significant efforts to comply with the Court's order. The motion, again, from the plaintiffs is that there's widespread willful noncompliance. We're obviously trying to make efforts. That's all the point I'm trying to make here is the positive trend. It's not as if you're seeing month over month, week over week, the same warrantless arrests with multiple I-213s just stacking up as the months go by.

We're pointing out in -- plaintiffs' motion is that it's really declining over time. Most of their I-213s that the Court has seen are focused on the first two weeks after the Court's PI order. And then the rest are over about two months since the Court's PI order. But again, we fully acknowledge the Court's order. We're supposed to comply to it. We're really working hard to comply with that.

Given the defendants' efforts to comply, we point out plaintiffs' evidence does not show a continuing unlawful policy or widespread noncompliance. What plaintiffs have shown is extremely limited. As we said in opening, there's no evidence of noncompliance all across Colorado. Instead, the Court heard about just six encounters, seven arrests over the course of three months where it was not clear whether there was a warrant before the arrest occurred.

The evidence the Court heard was largely focused on one unit, two officers. We talked about those two officers already. They're no longer in the field making arrests at this time. The Court heard in plaintiffs' own questioning, there are no arrest quotas in Colorado. The Court heard in plaintiffs' own questioning that ICE did not change its arrest practices in Colorado with the Lyons memo.

You heard from Mr. Davies, his goal is to continue to comply with the Court's order. He hasn't issued different instructions based on the Lyons memo. In sum, the evidence you've heard does not demonstrate willful, widespread noncompliance with the Court's order. It just hasn't shown that.

Your Honor, as a last point, just to talk about the relief, some of the measures they seek, like training, aren't necessary, aren't warranted. But some of the measures are far more problematic. Some are really not designed to ensure

compliance with the Court's PI order. For example, adding additional documentation requirements, some measures would also impermissibly modify the Court's PI order. For example, the production of all I-213s for all types of arrests and the production of additional categories of documents like NTAs.

And finally, some of the relief would enmesh the Court and plaintiff's counsel with immigration enforcement. For example, the requested relief, I think it's item number two, prohibited immigration officers from doing any arrests at all without training. The Court should not impose those additional --

THE COURT: Seems like a pretty good idea to me. Why would we want these guys to go out and make arrests if they haven't been trained properly?

MR. DEUSCHLE: Your Honor, we believe they have been trained properly. And we don't think that having the plaintiffs --

THE COURT: Well, they haven't been. The three guys that testified didn't know much of anything about training or what these policies or practices were. You can take them out of the field or not take them out of the field. They were supposed to be trained. Those guys were not examples of what we hope ICE officers would know and do in the field.

MR. DEUSCHLE: I would agree they're not the shining examples of what people should do out in the field, and that's,

again, why ICE has taken them out of the field, because they weren't doing what they were supposed to be doing.

THE COURT: And that's good, but my point is whether they were in the field or not in the field, they didn't get the training. Either they didn't get training, period, or they didn't get it when they were trained.

MR. DEUSCHLE: Your Honor, I do want to point the Court, again, to that final third officer. He got the instructions that Mr. Davies has told the Court, which was --

THE COURT: There was a positive trend in the witness testimonies.

MR. DEUSCHLE: There was a positive trend in that as well. The third officer reiterated what Mr. Davies said, which is his instructions were targeted arrests, get a warrant, and then also in the field, obtain an I-200 if at all possible before you arrest someone. So, I do think that third officer was hearing the instructions and was following the instructions that Mr. Davies was passing down after the Court's PI order.

THE COURT: It's kind of like the random sampling. One-third.

MR. DEUSCHLE: Yes, Your Honor. One-third. I would say the other two-thirds, again, though, are -- it's really the one officer who is still making field arrests; right? Is saying what needs to be said, and the other two that aren't in the field, so it's really 100 percent.

THE COURT: You know, you can't generalize from those three guys one way or the other, but we've got, what? Sixty or 120 new officers that are flooding in that are making up to 25 arrests of people a day. It's an extraordinary thing that's happening in this country, and including in this state. It's an unprecedented thing. I can't just assume that all these guys are getting trained or understanding or getting it when we have yet to see even one 213 that was filled out properly for a warrantless arrest.

MR. DEUSCHLE: We're not asking the Court to assume. I think what we're asking for is to give defendants more time to correct what we really do think is mainly a documentation issue so the Court can see the I-213s.

THE COURT: Well, you're saying defendants more time, not plaintiffs more time. I think you misspoke.

MR. DEUSCHLE: I'm sorry. The defendants are asking for more time. That's really what we're asking for, I guess. I'm sorry. Your Honor, if the Court has no further questions, we would ask the Court to deny plaintiffs' motion to enforce.

THE COURT: Oh, just the one kind of rabbit trail I went down with Mr. Macdonald, what about Mr. Ovando? Why doesn't he have his stuff yet?

MR. DEUSCHLE: I don't know. I was asking my colleagues. We don't know. He might at this point. I think the last time we checked was after the PI order, but that is

something we will certainly track down. It sounds like he should. He might already. I also don't know the standard process or how long it usually takes. I would hope it would be within the same timeframe, but we will certainly check on that.

THE COURT: Okay. Thank you. Anything further, Mr. Macdonald?

MR. MACDONALD: I know you have a flight, Your Honor.

THE COURT: Pardon me?

MR. MACDONALD: I know you have a flight, so I will -- I will --

THE COURT: I have a different flight than I thought I was going to have. And I'm not even going to blame Mr. Leneis for that.

MR. MACDONALD: I will take the heat for that one, Your Honor. I think Mr. Cabral, who testified yesterday, needed the interpreter, is the sort of exact example of why we need the information on the field warrants. And so what his field -- in his I-213, that is the only one that we have from someone who was arrested pursuant to field warrant. And we didn't get it from defendants. We got it from his immigration counsel.

And what he testified is consistent with the I-213, which is his arrest was a warrantless arrest, as you indicated. He testified he told them who he was, told them he was from Mexico. They asked him if he was here with papers, and he said no. And they put him under arrest. That's consistent with what

has happened in all the I-213s that we put before Your Honor in the stories and the PI hearing. And so that's a warrantless arrest.

His I-213 says they then got a field warrant. So, exactly what we've been describing. So, that's -- that's a warrantless arrest. So, that's why we need the information on field warrants. That's why they're in this case, Your Honor. What they're doing is getting that information and then getting a field warrant, getting information that they believe that someone is in the country unlawfully, and then holding that person. That is an unlawful warrantless arrest at that time. That's why we need that.

There's a suggestion that the three officers -- you know, we had no idea who those three officers were other than that they were at least people in the I-213s who committed warrantless arrests. We obviously had five more, or three or four more people on our witness list. They could have called any officer to say, actually, I was really well trained, and here are my I-213s that comply with the Court's order. They didn't do it. And I think the reason is because the defendants are not complying with Your Honor's order.

They referenced that we couldn't ask for all the I-213s. They suggested, I think Your Honor couldn't order them to produce all the I-213s. Of course you can. Federal Rule of Civil Procedure 62 specifically says you can do that on an

injunction. We would ask that you do it so that we ensure that there's compliance in our state going forward.

Thank you, Your Honor.

THE COURT: All right. Thank you. It will stand submitted. Thank you all for your presentations. Good day.

(Proceedings concluded at 10:41 a.m.)

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 19th day of March, 2026.

Kevin P. Carlin, RMR, CRR
Official Court Reporter