IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 1:25-cv-03183-RBJ

REFUGIO RAMIREZ OVANDO,
CAROLINE DIAS GONCALVES,
J.S.T., and
G.R.R.,

       Plaintiffs,

v.

MARKWAYNE MULLIN,
TODD LYONS,
GEORGE VALDEZ,
in their official capacities,[1]

       Respondents.

## ORDER ENFORCING PRELIMINARY INJUNCTION

On November 25, 2025, the Court issued a preliminary injunction ("PI" or "PI Order") enjoining U.S. Immigration and Customs Enforcement ("ICE") from effecting warrantless arrests in the District of Colorado unless, consistent with federal law, the arresting officer makes a pre-arrest, probable-cause determination that the individual is likely to escape before a warrant can be obtained. ECF No. 49

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Markwayne Mullin and George Valdez are automatically substituted as defendants in their official capacities as the Secretary for the Department of Homeland Security and the Director of the Denver Field Office for U.S. Immigration and Customs Enforcement, respectively.

1

at 61 (PI Order).  To ensure transparency and compliance, the Court also ordered certain documentation and reporting requirements.  *Id.* at 62–63.

Before the Court now is plaintiffs' Motion to Enforce the Preliminary Injunction ("Motion to Enforce" or "Motion") and Supplement to Motion to Enforce ("Supplement").  ECF Nos. 82, 100.  Plaintiffs allege that in the months following the PI Order, defendants have demonstrated "widespread noncompliance" with both the prohibition against warrantless arrests without the mandatory flight risk analysis and the documentation requirements.  ECF No. 82 at 8.  To ensure compliance, plaintiffs seek a number of remedial measures, including requiring training for ICE officers, and imposing new documentation and reporting protocols.  Defendants contend that the evidence shows that ICE has "worked diligently to comply with the Court's preliminary injunction" while continuing to engage in its "statutorily-mandated immigration duties."  ECF No. 90 at 1.  Therefore, they argue, the "sweeping relief" requested by plaintiffs is "unwarranted and premature."  *Id.*

The matter is fully briefed.  ECF Nos. 82, 90, 100, 105.  In addition, the Court received testimony and documentary exhibits during a two-day hearing.  ECF Nos. 97, 98.  Having reviewed the submissions, the evidence, and the law, the Court finds that defendants have demonstrated material noncompliance with the PI Order and relief at this juncture is warranted and necessary.  The Motion is GRANTED in part and DENIED in part, and the Supplement is DENIED, as set forth below.

## I.     <u>Background</u>

### A. The Court's PI Order

Section 8 U.S.C. 1357(a)(2) governs warrantless immigration arrests.  This statute provides that an immigration officer may conduct a warrantless arrest only where "he has reason to believe," or probable cause, that an individual is: (i) unlawfully present in the United States and (ii) "likely to escape before a warrant can be obtained for his arrest." *Id.*  This double-pronged probable cause requirement is mirrored by the statute's implementing regulation, 8 C.F.R. § 287.8(c)(2)(i)–(ii). ICE's noncompliance with the second "flight risk" prong when conducting warrantless arrests of "collaterals"—noncitizens ICE has not targeted for arrest but encounters in the field—is at the center of this case.[2]

On October 9, 2025, four noncitizens—Refugio Ramirez Ovando, Caroline Dias Goncalves, J.S.T., and G.R.R.—filed a complaint alleging that they were unlawfully arrested as part of ICE's pattern-and-practice of making warrantless

---

[2] On January 28, 2026, ICE Director and defendant in this case, Todd Lyons, issued a memorandum ("Lyons Memo") to all ICE personnel in which he distinguished the statutory language "likely to escape" from the concept of "flight risk."  *See* Pl. Hr. Ex. 218.003.  He conceded that the agency has long understood these concepts as equivalent for the statutory probable cause analysis but contended that "[t]his unreasoned position was incorrect," and that the statute is concerned purely with whether a noncitizen is likely to move from the physical location where he is encountered before officers can obtain an administrative warrant.  *Id.*  Without addressing the ways in which the Lyons Memo conflicts with the PI Order at this juncture, *see* Part.III.C.1.b, *infra*, the Court notes that it will continue to refer to officers' obligation under § 1357(a)(2) to assess an individual's "flight risk" or "likelihood of escape" interchangeably.

immigration arrests in Colorado without conducting individualized flight-risk assessments in violation of § 1357(a)(2) and § 287.8(c)(2)(ii).  *See* ECF No. 1.  In their complaint and subsequently filed Motion for Preliminary Injunction, plaintiffs sought an injunction enjoining defendants from further violations of these provisions on behalf of a class of similarly-situated individuals.  *Id.* at 47; ECF No. 13 at 18.

At the end of October, the Court held a two-day preliminary injunction hearing.  *See* ECF Nos. 41, 43.  During that hearing, the Court heard convincing testimony from the named plaintiffs—each of whom had deep community ties— that, after encountering them in the field, ICE made no effort to assess whether they were likely to escape before arresting them without a warrant.  *See* ECF No. 48 at 28–49, 50–79, 80–102, 172–191 (PI Hr. Tr.).  Their testimony was corroborated by the narrative portions of the reports documenting their encounters and arrests (Form I-213s), which were uniformly bereft of information pertaining to their perceived flight risk or community ties.  Def. PI Hr. Exs. A, B, C, D.[3]  This pattern was mirrored by the hearsay testimonies, affidavits, and I-213s the Court received regarding 15 to 20 similar warrantless arrests in Colorado.  *See* ECF No. 48 at 192– 218, 226–257, 377–389; Pl. PI Hr. Exs. 4–5; Def. PI Hr. Ex. L.  ICE's disregard for the statutory mandate was also reflected in the numerous, consistent public

---

[3] In this Order, exhibits from the PI hearing are cited as "[Party] PI Hr. Ex," while exhibits from the hearing on the Motion to Enforce are simply cited as "[Party] Hr. Ex."

statements from national and local senior agency officials emphasizing that ICE officers are being directed to arrest everyone they encounter in the field that they believe to be unlawfully present in the United States.  *See* ECF No. 49 at 19–21.

Following the hearing, on November 25, 2025, the Court issued a written order partially granting the PI motion, finding that plaintiffs had successfully shown "defendants likely have a pattern or practice of ignoring the individualized flight risk determinations mandated by § 1357(a)(2) and § 287.8(c)(2)(ii)."  *Id.* at 45.  The Court fashioned relief narrowly-tailored to remedy this ongoing violation. Specifically, consistent with federal law, the Court ordered that "defendants shall not effect warrantless arrests in this District unless, pre-arrest, the arresting officer has probable cause to believe . . . that the person being arrested is likely to escape before a warrant can be obtained . . ."  *Id.* at 61.

The Court also articulated the standards for assessing the likelihood of escape, a determination which is based on "the totality of the circumstances" known to the ICE officer before making an arrest.  *Id.*  These factors include "the officer's ability to determine the person's identity; attempted flight from the officer; knowledge of the person's prior escapes or evasions of immigration authorities or, on the other hand, prior court attendance or other compliance with authorities; ties to the community (including family circumstances, residence, or employment); and other specific circumstances that weigh in favor of or against a reasonable belief that the

5

person is likely to abscond." *Id.* Furthermore, a noncitizen's unlawful presence in the United States is not, by itself, sufficient to conclude that he "is likely to escape before a warrant for arrest can be obtained." *Id.*

The Court did not develop these standards on its own; rather, they track ICE's own official policy statements regarding flight risk assessment. *See* Def. PI Hr. Ex. E, Broadcast Statement of Policy, Final Draft, Nov. 23, 2021 ("Broadcast I"). Just days before the PI hearing in this case, ICE resent these standards to its agents nationwide pursuant to an order from another district court. *See* Def. PI Hr. Ex. G, *Castañon-Nava* Broadcast Statement of Policy, Oct. 22, 2025 ("Broadcast III").

In addition, the Court ordered documentation and reporting measures to ensure compliance. First, with respect to documentation, the Court directed that "as soon as practicable after a warrantless arrest, the arresting officer shall document in writing the facts and circumstances surrounding that arrest in the narrative section of the detainee's Form I-213." ECF No. 49 at 62. Specifically, for a warrantless arrest, the arresting officer was required to document the following:

a. That the person was arrested without a warrant;

b. The location of the arrest and whether this location was a place of business, residence, vehicle, or public area;

c. Whether the person is an employee of the business, if arrested at a place of business, or whether the person is a resident of the residence, if arrested at a residential location;

6

    d. The person's ties to the community, if known at the time of the arrest, including family, home, or employment;

    e. The specific, articulable facts supporting the conclusion that the person was present in violation of United States immigration law;

    f. The specific, articulable facts supporting the conclusion that the person was likely to escape before a warrant could be obtained; and

    g. A statement describing how, at the time of the arrest, the officer identified themselves as an immigration officer who is authorized to execute an arrest and informed the person of the arrest and the reason for the arrest.

*Id.* Additionally, the Court indicated that "information learned post-arrest relevant to a custody determination should be documented separately from the information relevant to the likelihood of escape known at the time of the warrantless arrest." *Id.*

Once again, the Court adopted the documentation standards that ICE developed and promulgated to its own agents as part of a settlement pertaining to the same issue of warrantless arrests in the Northern District of Illinois. *See Castañon Nava v. Dept. of Homeland Sec.*, 806 F. Supp. 3d 823, 837–38 (N.D. Ill. 2025). These documentation standards were supposed to be followed by ICE agents across the country. Indeed, in the instant matter, the government argued that the reissuance of these standards obviated the need for a PI hearing or order since ICE was purportedly already committed to doing what plaintiffs wanted. *See* ECF No. 26 at 3; ECF No. 30 at 9–10, 13–15.

With respect to reporting, the Court directed defendants to produce "a subset of randomly selected Form I-213s for warrantless arrests conducted by immigration

officers in this District" to plaintiffs' counsel "in a manner, method, and at regular intervals to be agreed upon by the parties." ECF No. 49 at 63. Defendants were also ordered to provide, upon request by plaintiffs' counsel, the I-213s for specific individuals without a warrant within ten days of the arrest. *Id.*

Finally, the Court denied plaintiffs' requests to require training for all immigration officers conducting arrests in this District on their obligations under the PI, and for defendants to provide documentation confirming such training. *Id.* The Court concluded that plaintiffs had "not made a showing, at least at this point, that this relief is necessary to remedy the established harm." *Id.* However, the Court expressly left open the door to revisit these requests "should compliance with the Order prove elusive." *Id.*

**B. The Motion to Enforce**

Following the entry of the PI Order, the parties agreed that defendants would produce to plaintiffs, monthly, "a randomly selected one-third [ ] of the Form I-213s for warrantless arrests effected [in the District] in the prior month." ECF No. 82 at 2. Defendants developed a three-step collection, review, and production process. First, a senior ICE official would send all the I-213s for that month's arrests to defense counsel. ECF No. 103 at 94: 19-24 (Mot. to Enforce Hr. Tr.).[4] Second,

---

[4] The transcript for the hearing on the Motion to Enforce is found at ECF Nos. 103 and 104. For continuity, this Order cites to these proceedings using the transcript page numbers rather than the page numbers of the respective ECF documents.

defense counsel would screen the I-213s "based on whether they indicated on their face that there was a warrant for the arrest." ECF No. 90 at 7. Third, based on this screening, defense counsel would provide to plaintiffs a random one-third of the I-213s that did not indicate the existence of a warrant.

Plaintiffs filed the instant Motion on March 4, 2026. ECF No. 82. At that time, defense counsel had produced 27 "warrantless arrest" I-213s for the period between November 25, 2025 and December 31, 2025, and five for the period between January 1, 2026 and January 31, 2026. *See* Pl. Hr. Exs. 201, 207. Defense counsel also produced four additional I-213s—for J.A.A.H., R.H.G., C.H.G., and M.A.C.V.—at plaintiffs' request. *See* Pl. Hr. Exs. 204, 208. However, defense counsel declined to produce 17 specific individual I-213s requested by plaintiffs. For five of those requests, counsel asserted that they were arrested pursuant to an administrative warrant (Form I-200) issued in the field after the initial encounter but before the arrest was made, and therefore, were not subject to disclosure under the PI. *See* Pl. Hr. Exs. 205.001, 206.001, 210.001.

Based on the I-213s they received, plaintiffs claim that defendants have demonstrated uniform noncompliance with the PI. ECF No. 82 at 2. They assert that none of the I-213s conform to the documentation requirements for warrantless arrests. *Id.* at 3. They also allege that defendants continue to make warrantless immigration arrests without conducting the mandatory pre-arrest, individualized

flight-risk determination.  *Id.* at 4–6.  They ground this argument on the I-213s themselves, as well as sworn statements from some of the arrested noncitizens, the Lyon's Memo, and DHS' social media statements referencing the incorrect standard for warrantless arrests.  *See id.*; *see also* ECF Nos. 82-8, 82-9, 82-10, 82-11, 82-12.

Plaintiffs also argue that defendants are reclassifying truly warrantless arrests as arrests pursuant to field warrants, improperly exempting them from the PI Order and disclosure.  ECF No. 82 at 8–11.  Plaintiffs base this concern, in part, on the I-213 for D.C.C., which they acquired through representing him in another matter.  *Id.* at 10; *see also* ECF No. 82-14 (I-213 for D.C.C.).  They argue that the narrative portion of D.C.C.'s I-213 shows that his arrest on January 24, 2026 was completed before the issuance of a field warrant.  *Id.*

To remedy these violations and enforce compliance with the PI, plaintiffs, through their original Motion and post-hearing Supplement, submit 13 requests for relief (with two subparts).  *See* ECF No. 82 at 7–8; ECF No. 100.  These requests will be set out and discussed in full in the relief portion of this Order, *see* Part III.C, *infra*, but they may be grouped in four categories: training, reporting, documentation, and miscellaneous.

Defendants, for their part, deny that they have engaged in any "ongoing, widespread, and willful violations" of the PI, although they concede that there have been "issues" with nonconforming arrest documentation.  *See* ECF No. 90 at 6.  They

argue that relief is not warranted generally considering their diligent efforts to comply, self-initiated corrective measures, and improvement over two months, as seen by the lower number of warrantless arrests overall. *Id.* at 1–7.  They also claim that the number of warrantless arrests in the District is actually far fewer than the number of I-213s would make it appear, because many of those arrests were likely pursuant to a preexisting warrant, but were not documented as such.  Furthermore, they contend that the relief sought "would not ensure compliance with the PI, but would impermissible modify the PI, unduly burden the agency, and permit Plaintiffs to intrude into lawful immigration enforcement functions."  *Id.* at 1.

## II.    <u>**Findings of Fact**</u>

The Court has two primary forms of evidence before it: the I-213s and the testimony of four ICE officers (Deportation Officers ("DOs") J.B., J.L., A.L., and Assistant Field Office Director ("AFOD") Gregory Davies) who testified at the hearing on the Motion to Enforce.[5]  Together, this evidence paints a picture of ICE's conduct since the PI was issued.  The Court states its conclusions up front and then details the evidence that supports them.

First, ICE's efforts to train officers who conduct warrantless arrests on the contents of the PI Order have been insufficient.  The DOs have an inadequate

---

[5] The Court granted defendants' motion, ECF No. 89, to allow the three DOs to proceed pseudonymously using their initials.  ECF Nos. 93, 103: 5: 13–5: 21.

11

understanding of their obligations with respect to making lawful warrantless arrests and properly documenting them under the PI.

Second, ICE has attempted to avoid occasions where its officers make warrantless arrests by issuing I-200 administrative warrants in the field.  However, it is not clear whether these field warrants are actually being issued before the arrest, and therefore, whether these arrests are truly outside the scope of the PI.

Third, putting aside cases where ICE claims to have obtained a field warrant, officers have continued to effect warrantless arrests without making individualized, pre-arrest determinations that the noncitizen is likely to escape before a warrant can be obtained in violation of § 1357(a)(2) and the PI.

Fourth, and finally, ICE has uniformly failed to observe the documentation requirements for warrantless arrests under the PI.  At the same time, ICE has, in many cases, failed to note when an arrest was made pursuant to a warrant.  While this latter failure is not a violation of the PI, it has made it very difficult to discern the precise extent of ICE's noncompliance with respect to warrantless arrests.

## A. Training and Guidance on the PI Order

The officers testified consistently regarding the training that they received on warrantless arrests prior to and following the PI Order.

Initially, in early November, AFOD Davies had in-person and email "communications" with supervising officers about warrantless arrest practices

before the PI was issued.  ECF No. 91-1 at ¶ 5 (Davies Decl.); ECF No. 103 at 218–19.  As part of these communications, Davies, whom the Court finds credible, emphasized that whenever possible, officers should obtain a warrant before making an arrest, including by requesting a supervisor to issue a warrant for collaterals encountered in the field.  ECF No. 91-1 at ¶¶ 5–6; *see also* ECF No. 103 at 240–41.

Then, sometime after the PI was issued, an email was sent out to officers in the Denver Field Office—perhaps on December 2, 2025—setting out the PI's requirements.  *See* ECF No. 90-1 at ¶ 8; ECF No. 103 at 50, 127, 176, 215.  Nothing more definitive can be said about this email because defendants declined to produce it, and the witnesses could not recall its contents with any specificity.  The witnesses did not receive any "formal training" in connection with the email or the PI generally.  *See* ECF No. 103 at 55, 120, 176, 215–217.

In mid-February, after Davies became aware that many of the I-213s did not comply with the PI Order, he organized a formal training for the "processing team"—officers stationed at the field office who intake new arrests by typing up and completing the I-213 for the arresting officer—to ensure that arrest narratives conform with the PI's documentation requirements.  ECF No. 91-1 at ¶ 12; ECF No. 103 at 215–18.  As part of this training, the processing team was instructed that if an arrest narrative does not comply with the PI, they must contact the arresting officer to get more information or make the arresting officer return to the office to correct

13

or complete the I-213 themselves.  ECF No. 91–1 at ¶ 12; ECF No. 103 at 215, 219–20.  This training was received by approximately 15 out of 200 ICE officers that currently work in the Denver Field Office's jurisdiction.  ECF No. 103 at 216–17.

These actions—Davies' pre-PI Order communications with the supervisors, the post-Order email detailing the PI's requirements, and the February training for the processing team—are the full extent of defendants' efforts to train officers on their obligations under the PI.  This isn't a problem in itself; after all, the Court declined to mandate training in its original PI Order precisely because the injunction merely required compliance with existing statutory requirements for warrantless arrests and documentation protocols that ICE claimed to already have in place.  The problem is, as discussed below, the DOs clearly do not know or understand them.

**Officer J.B**.

Officer J.B. completed his ICE basic training in March 2021.  ECF No. 103 at 19.  Since then, he has received biannual Fourth Amendment and warrantless arrest training.  *Id.* at 30–31.  He has also received the *Castañon Nava* Broadcast Statement emails detailing the law and ICE's official policies for warrantless arrests—the same that are at issue in this case—but candidly admits that he doesn't recall receiving or having read them.  *Id.* at 29–30, 46–47, 48–50.

He also candidly admits that before the PI, he did not document any information regarding flight risk in I-213s for warrantless arrests because he

14

believed that he didn't have to. *See id.* at 32–35. He claims that after the December 2nd email, he began to "tailor" his narrative sections to reflect the requirements set out in the PI—but at least three of the I-213s show otherwise. *Id.* at 54: 10–12. Specifically, J.B. prepared the narratives for the apparently warrantless arrests of R.C.P., M.A.C.V., and R.H.G., and the I-213s do not comply with the PI in virtually any respect. *See id.* at 68, 70, 83, 85, 86; Pl. Hr. Exs. 207.016, 208.006, 204.015. They certainly bear no indication that J.B. performed a likelihood-of-escape analysis before effecting any one of these arrests. Pl. Hr. Exs. 207.016, 208.006, 204.015.

At the same time, Officer J.B. expressed his belief that he could conclude, absent individualized evidence of attempted flight, that a noncitizen was likely to escape "if the opportunity presented itself," and that, notwithstanding the law and ICE's official policy, unlawful presence in the United States is a crime and sufficient to establish flight risk.[6] *Id.* at 39: 23–40: 3; 44: 16–45: 8, 72: 17–22. While he recognized that before and after the PI, he was supposed to ask a noncitizen questions about their community ties, he did not display any awareness of whether and when those questions should be asked during the encounter to comply with the law for warrantless arrests.[7] *Id.* at 32: 4–33: 10, 92: 2–93: 24. Consistent with this

---

[6] While improper entry or illegal reentry are, under certain circumstances, criminal offenses, *see* 8 U.S.C. §§ 1325, 1326, unlawful presence itself is a civil violation—not a crime.

[7] In another federal lawsuit, a judge found that Officer J.B., while deployed as part of a surge operation in Portland, Oregon, conducted an unlawful vehicle stop without reasonable suspicion and effected a warrantless arrest without making a pre-arrest, probable-cause determination of

confusion, he appeared, at times, to endorse the troubling position that an arrest is never warrantless so long as an I-200 is issued *at some point*, even if it is back at the field office. *See* ECF No. 103 at 36: 1–8; 37: 18–22; 38: 5–8; 94: 20–95: 12.

In short, Officer J.B.'s testimony gives the Court no confidence that he understood his legal responsibilities with respect to effecting and documenting warrantless arrests before the PI Order or that he understands them now.

### Officer J.L.

Like J.B., Officer J.L. has been a DO since March 2021. *Id.* at 111. He also received the *Castañon Nava* Broadcast Statement emails but does not recall receiving any training on them. *Id.* at 116: 9–117: 2, 120: 10–121: 1.

And like J.B., with whom he often partners for enforcement operations, *see id.* at 112: 23–25, 122: 17–24, Officer J.L. could not convincingly articulate his duties for making and documenting warrantless arrests. While he generally agreed—after very long pauses—with plaintiff counsels' statements of fact about ICE's official policies, all he could independently recall about the PI was that "we have to have reasonable articulable facts to arrest individuals without signed 200s." *Id.* at 125: 19–21; *see generally* 124: 17–127: 7. When pressed on "what specific

---

flight risk. *See M-J-M-A v. Hermosillo*, ---F.Supp.3d---, 6:25-cv-02011-MTK, 2026 WL 562063, at *4–7, 19 (D. Or. Feb. 27, 2026); *see also* ECF No. 103 at 18: 24–19: 13, 101: 24–106: 13.

things" were required for warrantless arrests under the PI, he answered that he was "drawing a blank" and was "not sure." *Id.* at 126: 14–15.

J.L.'s shallow understanding of the law and policy, as reiterated by the PI, was reflected in his examination about the I-213s for several warrantless arrests that he was involved in. For three separate arrests, J.L. indicated that he assumed that he or his fellow officers had established likelihood of escape through a field interview, even though the I-213s contained no information that would warrant that conclusion. *See id.* at 138: 15–25 (M.A.C.V.), 142: 21–143: 3 (C.H.G.), and 151: 12–17 (D.C.C.). This reflexive assumption demonstrates either an insufficient understanding of the PI's requirements or the importance of faithfully complying with them, or both.

### Officer A.L.

Finally, defendants contend that even if Officers J.B. and J.L. did not demonstrate a proper understanding of their legal responsibilities under the PI, the third witness, Officer A.L. did. *See id.* at 297: 12–24. The Court disagrees.

Officer A.L. has been a DO for 12 years. *Id.* at 167: 18–25. Like J.B., Officer A.L. struggled to distinguish between a warrantless arrest and an arrest made pursuant to a field warrant, as indicated by the following exchange:

> Q: I want to talk about before this injunction. Okay? Have you – do you understand that there are circumstances in which ICE deportation officers can engage in warrantless arrests?

17

A: Mm-hmm.  So, what happens – I guess I'm not understanding.  At some point they're going to get a warrant – a 200 issued to them.

Q: I understand there's – at some point an I-200 will be issued.  Do you have an understanding that an ICE deportation officer has certain authority to engage in warrantless arrests?  Yes or no.  If you don't know the answer to that, that's okay.

A: Yeah.  I'm not very clear what you're trying to say.

Q: Are you aware of any requirements that you as a sworn law enforcement officer have to do before you engage in a warrantless arrest?

A: Yes.

Q: What is that?

A: Find the evidence that this person is here illegally in the country.

Q: Okay.  And once you, in your view, if you find the evidence that someone is in the country illegally, you may arrest them?

A: I will take that information to my supervisor and have them look it over to verify that this person is – that we're able to arrest.  And he will issue a 200.

*Id.* at 172: 19–173: 16.

It is clear from this exchange that A.L. does not believe that he makes warrantless arrests—at least since the PI.  But setting aside whether that is true, and whether the field warrants are actually issued before formal arrest, his testimony does not evince any understanding of his distinct warrantless arrest authority.

18

Whether or not he thinks he exercises that authority, as a DO making arrests in the field, he has an obligation to understand its limits under the law and the PI.

Accordingly, the Court finds, based on the testimonies of J.B., J.L., and A.L., and the I-213s, that defendants have failed to adequately train their deportation officers on the requirements of the PI.

## B. Field Warrants

As an alternative to making warrantless arrests, defendants encourage their officers to obtain field warrants for collaterals.  This practice predates the PI, but in early November, the Denver Field Office stressed that it was the preferred method for making arrests where no warrant exists at the beginning of the encounter.  *See* ECF No. 91-1 at ¶¶ 5–7; *see also* ECF No. 103 at 43: 12–44: 15, 240: 25–241: 19.

By regulation, only supervising officers and above can sign I-200 arrest warrants, although the Denver Field Office interprets this authority to extend to DOs temporarily assigned to serve as a supervisor in an acting capacity for any period of time.  *See* C.F.R. § 287.5(2); *see* ECF No. 103 at 21: 12–20, 26: 3–27: 16.  When an officer encounters a collateral in the field and determines they are unlawfully present, they will contact a supervisor or acting supervisor—who may be on scene, at the office, or elsewhere—and request a warrant.  *See* ECF No. 91-1 at ¶ 6; ECF No. 103 at 78: 1–7, 173: 12–174: 11.  If the supervisor agrees that there is probable cause of unlawful presence, they can issue the I-200 within minutes in the field.  ECF

19

No. 91-1 at ¶ 6.  If they are not on scene, they may affix an electronic signature to the warrant and send it to the arresting officer by email.  ECF No. 103 at 175: 1–15.

There are, of course, legal limits to this practice.  Most obviously, as AFOD Davies acknowledged, under the Fourth Amendment, a field warrant must *actually* precede the arrest.  *See* ECF No. 103 at 240: 9–10 (explaining, in response to a question about whether an officer may arrest and hold someone while they wait for a warrant, "if he's already arrested, that would have been a warrantless arrest"); *see generally U.S. v. Blasdel*, 153 F.4th 1069, 1075 (10th Cir. 2025) (reaffirming principle that officers may not bring an unconstitutional search or seizure within the color of law by later obtaining a warrant).  Davies previously explained that the field warrant must be obtained and issued during the course of a consensual encounter. *See* Pl. Hr. Ex. 212.007, ¶ 11.  At the Motion to Enforce hearing, he reiterated that officers "may not detain an alien for the sole purpose of obtaining an arrest warrant." *Id.* at 240: 20–22.

Without delineating the full parameters of ICE's field warrant authority, it is clear that its officers have not always abided the fundamental and undisputed rule that the I-200 must precede arrest to be considered an arrest upon a warrant.  The starkest evidence of this comes from D.C.C., a 53-year old Mexican national who was arrested by Officers J.B. and J.L. on January 14, 2026.  *See* Pl. Hr. Ex. 237.005.

D.C.C. testified at the hearing that he was looking for a tool in his truck outside of a construction site where he was working when he was approached by J.B. and J.L.  ECF No. 103 at 158: 14–159: 10.  They asked him to identify himself, and he provided his SB-251 Colorado driver's license.[8]  *Id.* at 160: 20–161: 9.  Then they asked him where he was from.  *Id.* at 161: 10–13.  After he told them he was from Mexico, they immediately arrested him, handcuffing him behind the back and placing him in their truck with another arrestee.  *Id.* at 161: 17–162: 8.

Defense counsel agreed that "if what [D.C.C.] said is true … then that was a warrantless arrest," and the Court has no trouble concluding that it was.  *Id.* at 300: 4–5.  The Court found D.C.C.—a married father of three who has lived, worked, and paid taxes in the United States for nearly 30 years with no contact with the criminal legal system—completely credible.  *Id.* at 155: 13–158: 13.  More importantly, in every important respect his account mirrors the narrative in his I-213.  *See* Pl. Hr. Ex. 237.005.  The narrative indicates, in relevant part, that upon encountering D.C.C. outside the construction site:

> Officers asked the male what his name was and he answered [D.C.C.].  Officers asked for an identification, and he produced a Colorado driver's license with the name

---

[8] As discussed in the PI Order, an SB-251 license is "an identification issued by the state of Colorado to individuals who are not citizens of the United States or lawful permanent residents," and bears certain markings distinguishing it from a standard Colorado license.  ECF No. 49 at 13, n. 8.  While defendants recognize that an SB-251 license does not automatically mean the individual is unlawfully present, through two hearings in this case, it is clear that ICE agents regularly use it in the field as a proxy justifying further investigation of immigration status if not immediate arrest.  *See, e.g.*, ECF No. 103 at 83: 21–85: 2.

21

> [D.C.C.]. Officers asked him what country he is a citizen of and he answered "Mexico." [D.C.C.] was asked if he has any immigration documents and he said "no." Officers identified themselves as Officers with ICE *and informed him that he was under arrest for immigration violations*.

*Id.* (emphasis added). The narrative indicates that after this interaction, J.B. and J.L. ran an immigration check that "revealed no positive matches," but they still obtained a signed I-200 "due to [D.C.C.'s] own admission of being in the U.S. illegally." *Id.*

This record plainly shows that D.C.C. was under arrest before J.B. and J.L. obtained a field warrant. This conclusion does not require nuanced constitutional analysis. *See, e.g.*, *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984) ("There can be no question that respondent was 'in custody' at least as of the moment he was *formally placed under arrest* and instructed to get into the police car.") (emphasis added); *Thermidor v. Miami-Dade Cnty.*, 248 F. Appx. 61, 63 (11th Cir. 2007) (unpublished) ("[A]n arrest made on the basis of an unambiguously invalid warrant is unconstitutional.") (citation omitted). Even J.L. admitted that, based on the report, the I-200 was "done after" D.C.C. had been contacted, detained, and arrested. ECF No. 103 at 152: 18–22.

Accordingly, the Court concludes that, at least on some occasions, arrests that ICE claims are made pursuant to field warrants are, in fact, warrantless.

## C. Warrantless Arrests

22

Putting aside cases where ICE claims to have obtained a field warrant, the record also reflects that officers have continued to make warrantless arrests without conducting pre-arrest, probable-cause determinations of likelihood of escape.

The strongest evidence comes from two separate car stops resulting in the arrests of five collaterals, J.P.A.A.H., C.H.G., and R.H.G. on December 27, 2025, and R.C.P. and M.A.C.V. on January 20, 2026. *See* Pl. Hr. Ex. 204.007–017, 207.015–017, 208.005–007.

In the first encounter, Officers J.B. and J.L. were searching for a target when they observed "three Hispanic male[s] speaking Spanish" get in a car and start driving. Pl. Hr. Ex. 204.008. J.B. believed one individual "matched the description" of their target. *Id.* After running the car's plates, he learned it was registered to J.P.A.A.H—who was not the target—and, following "immigration checks," concluded that J.P.A.A.H lacked lawful status. *Id.* They initiated a traffic stop.

According to the I-213s, J.B. and J.L. approached the car and "asked where they are all from and they all claimed to be from Mexico." *Id.* J.B. and J.L. then asked whether they were "in the United States illegally," and "all said, 'yes, illegal.'" *Id.* The officers then "ordered them out of the vehicle" and "informed that they were under arrest for immigration violations," and placed them in handcuffs. *Id.*

The second encounter unfolded in almost identical fashion. While searching for a target, Officers J.B. and J.L., as part of a larger team, observed "two Hispanic

23

males," M.A.C.V. and R.C.P., enter a car "known to be driven" by the target. Pl. Hr. Ex. 207.016. They pursued and pulled the car over. *Id.* Officers "contacted both occupants simultaneously and requested identifications," which they provided. *Id.* Following a "field interview" in which "both admitted to being in the U.S. illegally," the officers ordered them out of the car, "informed them that they are under arrest for immigration violations," and placed them in handcuffs. *Id.*

None of individuals arrested in these encounters were ICE targets. The I-213s do not indicate that the officers asked about community ties or made any individualized flight-risk determinations, nor do they reference any warrants being obtained after these encounters began.

At the hearing, J.L. did not deny that these were warrantless arrests. ECF No. 103 at 135: 8–23, 137: 18–20; 140: 7–144: 13. He also had no memory of asking any questions to assess flight risk, testifying instead that he "assum[ed]" it was "established" during the field interview. *Id.* at 142: 24–143:1; *see also id.* at 138: 19–25. J.B., for his part, gave conflicting and equivocal testimony. Initially, he agreed that he arrested J.P.A.A.H, C.H.G., and R.H.G. as soon as he had probable cause of unlawful presence. *Id.* at 92: 3–8. Later, he suggested that the arrests "might not have been" warrantless because "it could have been [that] we got I-200s on scene." *Id.* at 94 at 5–7. Likewise, he claimed that he may have obtained field

24

warrants for M.A.C.V. and R.C.P. because that was the "common practice" at the time, though he could not recall doing so. *Id.* at 76: 5–14; *id.* at 79: 2–5, 81: 8–11.

The Court is not persuaded. First, AFOD Davies confirmed that I-200s existed for four individuals whose I-213s did not reflect a warrant, but none of those individuals is among the five at issue here, giving rise to a negative inference. Nor did defendants refuse to produce the I-213s for M.A.C.V., C.H.G., J.P.A.A.H., and R.H.G.—as they did for five other individuals requested by plaintiffs—on the grounds that a warrant was obtained after the encounters began but before arrest.

Second, as discussed above, in D.C.C.'s case, J.B. *did* document that he obtained a field warrant. While J.B. explained that he "sometimes" forgets to include that information in the I-213, the more likely explanation is that no warrant was obtained for these arrests.[9] *Id.* at 77: 2–8. This conclusion is reinforced by the striking similarity between these encounters and those that gave rise to the original PI. Indeed, as plaintiffs argue, the I-213s for these five individuals "look just like the ones that led this Court to issue the PI in the first place." *Id.* at 253: 8–9; *see* ECF No. 49 at 12–18 (discussing the I-213s for the four original named plaintiffs).

---

[9] Even if the officers did obtain warrants after these encounters began, J.B.'s testimony makes clear that, as in D.C.C.'s case, they were issued after the individuals were already under arrest. *See* ECF No. 103 at 92: 3–15 (explaining that he put R.H.G. in handcuffs as soon as he determined that he was not lawfully present without any individualized evidence that he was likely to escape or presented a threat to officer safety).

Accordingly, the Court finds that defendants continue to make warrantless arrests without individualized probable-cause determinations for flight risk.

**D. Documentation Practices**

The PI could not have been clearer: for every warrantless arrest, the arresting officer *must* document in the I-213 that the arrest was executed without a warrant. ECF No. 49 at 62. Despite this, not one of the 36 I-213s that have been produced pursuant to the PI Order complies with this mandate. Nor do they comply with other documentation requirements; not a single narrative section records the person's community ties or "the specific, particularized facts supporting the conclusion that the person was likely to escape before a warrant could be obtained." *Id.*

Defendants do not meaningfully deny that they have failed to comply with these mandates. *See* ECF No. 90 at 6 ("As to the PI's documentation requirements, ICE has identified issues with its officers' arrest documentation and has taken steps to address those issues"); ECF No. 104 at 298: 4–5 ("The documentation of the I-213s needs correcting . . . It's really a documentation issue[.]"). AFOD Davies, who, again, the Court credits, acknowledged that he has *never* seen "a 213 for a warrantless arrest that explained that [the arresting officer] had found probable cause to believe the person was an escape risk or a flight risk and set forth the particularized facts that supported that" conclusion. ECF No. 103 at 229: 3–8.

Nevertheless, defendants argue that the problem is overstated because many of the I-213s are likely false positives: arrests where the arresting officer had a warrant although it was not documented. ECF No. 90 at 7; *see also* ECF No. 91-1 at ¶¶ 10–11. ICE officers "are expected to obtain an I-200" before contacting and arresting a target in the field, at a jail, or during a check-in at one of ICE's field offices. ECF No. 91-1 at ¶ 10; *see also* ECF No. 104 at 16: 3–17: 13, 18: 1–23, 20: 3–18. Additionally, where an officer encounters a collateral in the field who has been arrested by ICE before or has a prior removal order, there is, in many cases, an active warrant on file. *See* ECF No. 91-1 at ¶ 11; ECF No. 103 at 60: 17–25, 202: 13–203: 11. In such cases, by definition, any ensuing arrest is pursuant to a warrant.

This argument has some merit. For instance, Davies found preexisting warrants for four of the individuals that were among the "warrantless arrest" I-213s turned over by defense counsel.[10] *See* ECF No. 91-1 at ¶ 11; ECF No. 103 at 201: 2–14. Moreover, a significant number of the other I-213s contain arrest narratives that suggest the existence of a preexisting arrest warrant—for instance, the individual was the subject of a targeted arrest in the field, in a jail, or in one of ICE's offices.

---

[10] Specifically, Davies searched for and found warrants predating the arrests of A.A.G.R., R.J.R.P., F.L.Z., and C.E.P.C. *See* ECF No. 91-1 at ¶ 11; ECF No. 103 at 201: 2–14. Their I-213s can be found at Pl. Hr. Exs. 201.029–031, 202.056–058, 207.006–008, and 207.018–020, respectively. A.A.G.R. and C.E.P.C. were collaterals but had arrest warrants from previous encounters with ICE, R.J.R.P. was "part of a targeted enforcement action" in the field where a warrant had been issued five days before, and F.L.Z. was arrested with a warrant during a check-in at an ICE field office.

The problem, however, is that the I-213s lie along a spectrum.  In some, like a jail arrest, the likelihood that the officers had a warrant is near certain.  In others, as in the car stops discussed in Part II.C, above, it is clear that they did not.  In still others, it is not clear one way or another.  For example, as a factual matter, ICE does not issue an I-200 for everyone it arrests, particularly where it asserts that their detention is governed by 8 U.S.C. § 1225(b) as opposed to 8 U.S.C. § 1226(a).  *See, e.g.*, *Yanez Chavez v. Baltazar*, 1:26-cv-00556-SKC, 2026 WL 516934, at *2 (D. Colo. Feb. 25, 2026); *Rivero v. Mina*, ---F.Supp.3d---, 6:26-cv-66-RBD-NWH, 2026 WL 199319, at *2 (M.D. Fla. Jan. 26, 2026) ("The Government also argued that Gimenez Rivero is subject to mandatory detention under 8 U.S.C. § 1225, so no warrant or notice was required to detain him"); *see also* ECF No. 91-1 at ¶ 11 ("[I]f an individual was previously encountered and detained by immigration officials, they *may* have an I-200 arrest warrant in their file[.]") (emphasis added).

The Court cannot therefore conclude that prior contact with ICE guarantees that the individual was arrested pursuant to a preexisting warrant unless the I-213 says so explicitly.  Likewise, just because officers are *supposed* to obtain a warrant before arresting a noncitizen at one of the ICE offices or at BI, an agency subcontractor, does not mean that they always do so.  The bottom line is that ICE's consistent failure to distinguish in the I-213s between warrantless arrests and arrests upon a warrant confounds effective oversight.

Accordingly, ICE's failure to comply with the PI's documentation requirements for warrantless arrests is largely conceded and, in any event, established. Moreover, its corollary failure to document where an arrest *was* made on a warrant—while not itself a violation of the PI—frustrates plaintiffs' and the Court's ability to effectively monitor compliance. Defendants recognize these problems and propose to address them through new review procedures. *See* ECF No. 91-1 at ¶¶ 12–14; ECF No. 103 at 203: 18–204: 20, 205: 3–206: 24. However, these efforts do not erase the manifest noncompliance with the PI to this point.

## III. <u>Discussion</u>

### A. The Court has jurisdiction to enforce the PI

A federal district court has inherent authority to enforce its orders. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (recognizing courts' "power to impose . . . submission to their lawful mandates") (quoting *Anderson v. Dunn*, 6 Wheat. 204, 227 (1821)). That authority extends to preliminary injunctions, which courts may enforce and, if necessary, modify to achieve their intended effect. *Hutto v. Finney*, 437 U.S. 678, 690 (1978) ("Once issued, an injunction may be enforced").

Although the filing of an appeal generally "divests the district court of its control over those aspects of the case involved in the appeal," it does not prevent a district court from taking steps necessary to ensure compliance with an unstayed preliminary injunction. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56,

58 (1982).  Under Federal Rule of Civil Procedure 62(d), a court "may suspend, modify, restore, or grant an injunction" while an appeal of the underlying injunction is pending.  While the court may not "materially alter the status of the case on appeal," it may act to preserve the status quo as established by the injunction.  *U.S. v. Power Engineering Co.*, 10 F. Supp. 2d 1165, 1171 (D. Colo. 1998) (finding jurisdiction to entertain plaintiff's "motion to enforce or modify the injunction," and granting additional relief to effectuate the original injunction); *see also Lin v. Chertoff*, 07-cv-01957-LTB, 2007 WL 4459200, at *1 (D. Colo. Dec. 14, 2007) (enjoining the government from removing a noncitizen from the United States while the district court's habeas order was on appeal because removal would "significantly alter the status quo").  This authority reflects the court's continuing equitable jurisdiction and ongoing responsibility to enforce the relief it has granted.  *See Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961).

## B. Plaintiffs are entitled to relief

As discussed in Part II, above, the evidence at the hearing—especially the I-213s and the testimonies of J.B., J.L., and A.L.—demonstrate defendants' material noncompliance with the PI Order.  The Court finds that ICE officers have continued to effect warrantless arrests without making individualized probable cause determinations of the likelihood of escape in defiance of § 1357(a)(2) and the PI,

30

and they have entirely failed to document these arrests in the manner prescribed. That is enough to merit relief.

Defendants assert that no relief is necessary because there is a "positive trend" in the data. *See* ECF No. 104 at 304: 1–4; *see also* ECF No. 90 at 3. Specifically, they point to the fact that, for the first month following the PI Order, defense counsel found 71 I-213s that appeared, on their face, to reflect warrantless arrests, but in the second month, found only 15. *See* ECF No. 104 at 304: 10–25; ECF No. 90 at 3; Pl. Hr. Exs. 202.001, 207.001. In their view, this decrease indicates that, after an adjustment period, ICE has begun substantially complying with the PI.

The Court rejects this argument for several reasons. First, as the Court stated at the hearing, a "[p]ositive trend doesn't mean there was compliance," it means "that there wasn't compliance," and now, perhaps, there is less noncompliance. ECF No. 104 at 304: 5–6. When the Court issues an injunction, "it's to be followed." *Id.* Second, although fewer noncompliant I-213s were flagged for the February production, the two most flagrant examples of noncompliance in the data set—the car stops that led to the arrests of J.P.A.A.H., C.H.G., and R.H.G., and M.A.C.V. and R.C.P.—both occurred more than a month after the PI was issued. Additionally, D.C.C.'s arrest in late January raises the specter that the reduction in noncompliant I-213s reflects the reclassification of warrantless arrests as arrests pursuant to field warrants, where, in reality, the warrants were obtained after arrest.

31

Next, defendants argue that any problem was largely confined to "two officers," J.B. and J.L., who have since been reassigned to a unit that does not make street arrests.  ECF No. 104 at 305: 9–11; *see also* ECF No. 103 at 46: 22–47: 8, 221: 17–222: 6.  To be sure, this is a welcome step by the agency, but it does not eliminate the need for broader relief.  J.B. and J.L. were working alongside at least three other officers, including a supervisor, during the vehicle stop and warrantless arrests of M.A.C.V. and R.C.P, and none of them ensured that the PI was followed.  And as discussed, the Court found that A.L. also lacks an adequate understanding of his responsibilities under the PI.

Additionally, because defendants produced a random third of the "warrantless arrest" I-213s pursuant to the PI Order, the Court can't conclude that the problem is limited to only a handful of officers.  Even with the I-213s that the Court has reviewed, it is clear that J.B. and J.L. are not alone in failing to comply with the PI.  In any event, ICE could always reassign J.B. and J.L. to make field arrests again.  Without more robust compliance measures in place, they could resume violating the PI with impunity.  Perhaps most importantly, the Denver Field Office has hired dozens of new officers since the PI was issued and is likely to hire more.  *See* ECF No. 103 at 188: 20–189: 3.  The evidence at the hearing did not instill confidence that these officers will be properly trained on the PI and comply with it.

Finally, defendants contend that they have already taken steps to fix the documentation issues, and so the Court should go no further.  *See* ECF No. 90 at 6–7, 14; *see also* ECF No. 103 at 12: 12–16.  Again, the Court disagrees.  Initially, as plaintiffs argue, one of the measures that defendants have devised—requiring arresting officers to fix their warrantless arrest I-213s after-the-fact—is "troubling." ECF No. 103 at 13.  One purpose of the I-213 narrative portion is to provide a near-contemporaneous account of the arresting officer's encounter with the noncitizen.  Under the PI, and the Broadcast Statements it incorporates, officers are required to separately document information relevant to a custody determination learned post-arrest from the information that they knew and relied upon at the time of the arrest.  *See* ECF No. 49 at 63; Pl. Hr. Ex. 212.016, 212.024.  Defendants' remedial measure risks muddying the waters by asking officers to rewrite the narrative portions of their I-213s well after the decision to arrest has been made, the noncitizen has been interviewed at the field office, and in some cases, the officer has returned to the field and made additional arrests.  While the Court does not prohibit this practice outright, any amendment to an I-213 narrative must "be clearly marked as such" and indicate the time that it was made.  *Escobar Molina v. U.S. Dep't of Homeland Sec.*, No. 25-3417 (BAH), ECF No. 102 at 11 (D.D.C. May 7, 2026) (describing defendants' plan for correcting noncompliant I-213s in a similar case).

The other reforms that defendants have instituted—specifically, weekly reviews by Davies or another AFOD of warrantless arrests I-213s and counseling for arresting officers deemed not in compliance—are appropriate, but in the Court's judgment, not enough on their own to ensure fidelity with the PI going forward.

The Court now turns to the specific relief requested by plaintiffs.

## C. Relief

As stated in Part I.B, above, plaintiffs seek relief that broadly falls into four categories: training, reporting, documentation, and miscellaneous. The Court discusses each of them in turn.

### 1. Training

Items one through six in plaintiffs' Motion concern training on the PI and documentation of that training. *See* ECF No. 82 at 7.

### a. Training is appropriate and necessary relief

A court may order mandatory training for law enforcement or other government officials as a form of injunctive relief, including training on the terms of the court's own orders. *See Shaw v. Smith*, 166 F.4th 61, 73–74 (10th Cir. 2026) (upholding district court order requiring Kansas Highway Patrol, in consultation with plaintiffs, "to create new training and testing material on reasonable suspicion and voluntary consent" for traffic stops, provide troopers with at least ten hours of annual training, and provide supervisors with the new materials and at least eight

hours of annual training); *see also U.S. v. Florida*, 172 F. 4th 1201, 1245 (11th Cir. 2026) (affirming district court's order mandating state "to create and implement a training curriculum for care coordinators on a number of subjects"); *Daughtry v. Emmons*, 5:15-CV-41 (MTT), 2024 WL 1791717, at *58 (M.D. Ga. Apr. 23, 2024) (ordering prison officials to create and implement a training program to ensure compliance with earlier injunction).

Here, the Court determines that additional training beyond what defendants have done voluntarily is necessary to effectuate the injunction. Whatever their precise content, the December 2nd email regarding the PI and AFOD Davies' communications with supervisors are not reaching the officers who make arrests on the street. Nor does the February training for the 15 or so officers on the processing team—which focused on evaluating and correcting noncompliant I-213s after-the-fact—address compliance with the PI on the front end: during encounters with suspected undocumented individuals in the field. In the PI Order, the Court expressly contemplated the possibility of ordering training if compliance with the PI should "prove elusive," and it has. ECF No. 49 at 63. Accordingly, at this point, requiring training to ensure faithful compliance with the PI is entirely appropriate.

Defendants argue that this relief would "violate [ ] attorney-client privilege" and "hinder[ ] [their] ability to have 'full and frank' communications with their attorneys about compliance with the PI." ECF No. 90 at 9. The Court rejects these

contentions.   Defendants are not directed to disclose their privileged internal communications with counsel—they are directed to develop and provide training for ICE officers on compliance with the PI. *Cf. Upjohn Co. v. U.S.*, 449 U.S. 383, 395 (1981) (protecting communications made by company employees to counsel at the direction of management to obtain legal advice).   While counsel may have input in this process, requiring defendants to turn over the final materials that will be shared within the agency does not unduly burden the ability of defendants to speak freely with their attorneys.   Otherwise, a court could never compel an agency to train its employees on their legal responsibilities and exercise meaningful oversight of its order, but the Tenth Circuit has specifically approved this form of injunctive relief. *See Shaw*, 166 F. 4th at 81.   And, where appropriate, defendants may still assert privilege over individual communications. *See* ECF No. 104 at 284: 2–21.

### b.  Training must be consistent with the standards in the PI

Defendants also assert that mandating training on the PI would improperly enmesh the Court in the Executive Branch's administration and enforcement of the immigration laws. *See* ECF No. 90 at 10.   The Court agrees that it must be careful not to overstep its constitutional role. *See United States v. Texas*, 599 U.S. 670, 678–59 (2023) (recognizing the Executive Branch's substantial discretion to determine immigration law enforcement policy and priorities).   However, requiring training on

the PI does not raise these concerns, because the PI tracks the standards reflected in federal law and ICE's own Broadcast Statements.

Importantly, the Broadcast Statements already outline the assessment that ICE officers must undertake before conducting a warrantless arrest, including a list of relevant but nonexclusive factors that they are to consider for likelihood of escape. *See* Pl. Hr. Ex. 212.014–017, 212.022–025 (Broadcast Statements I and III).  ICE has also developed training materials consistent with these Broadcast Statements, and so need not create something entirely new.  *See* Pl. Hr. Ex. 258.  Furthermore, defendants do not deny that ICE officers must apply the warrantless-arrest standards as articulated in the Broadcast Statements and incorporated into the PI in this District, at least while the PI remains in effect.  *See* ECF No. 103 at 233: 4–12.  Nor could they.  *See, e.g.*, *Escobar Molina*, ECF 102 at 18 (ICE must comply with the district court's warrantless-arrest standard in the District of Columbia while the preliminary injunction remains in place).[11]  Therefore, defendants are directed to provide training to ICE officers consistent with the Broadcast Statements.

---

[11] In the *Castañon Nava* case, defendants recently argued that the Broadcast Statement was limited to the states comprising ICE's Chicago Area of Responsibility.  *See Castañon Nava*, 1:18-cv-03757, ECF No. 309 at 2–3, ¶ 5  (N.D. Ill. Feb. 23, 2026).  The court rejected that position and directed defendants to recirculate the Broadcast Statement nationwide and advise officers that it remains in effect.  *Id.*  But regardless of whether the court was right that ICE must continue to adhere to the Broadcast Statements nationally, their incorporation in the PI in *this* case certainly renders them binding in the District of Colorado no less than they are in the Northern District of Illinois pursuant to the litigation there.

One area where conflict may arise concerns the Lyons Memo, *see* Part I.A., n. 2, *supra*, which was issued two months after the PI, and, in various ways, waters down the flight risk or "likelihood of escape" analysis reflected in the Broadcast Statements. Although the Lyons Memo states at one point that "likely to escape" means the noncitizen "is unlikely to be located at the scene of the encounter *or another clearly identifiable location* once an administrative warrant is obtained"—a formulation that would likely exclude those with strong community ties, such as fixed residences or places of employment—the memo as a whole disregards the italicized phrase and instead focuses on whether the individual will indefinitely remain in the place they were initially encountered. Pl. Hr. Ex. 218.003 (emphasis added). As another court recently observed, framing the inquiry in this fashion would "swallow[ ] the whole standard" and "basically give[ ] *carte blanche*" to make warrantless arrests of anyone "unlikely to stay standing still at the scene of the encounter … forever." *Escobar Molina*, ECF No. 88, at 65: 19–22, 64: 10–14 (Mot Hr. Tr. for Mar. 11, 2026). This Court, too, finds that, by considering only whether the noncitizen will remain at the scene of the encounter, the Lyons Memo redefines "likelihood of escape" into a nullity. *See* ECF No. 103 at 10: 17–20.

Accordingly, where they can't be reconciled, defendants *must* train on the "likelihood of escape" analysis reflected in the Broadcast Statements, not the Lyon's Memo. *See id.* at 234: 3–12 (AFOD Davies agreeing that the Lyons Memo's focus

on whether an individual will remain "at the scene however long it takes" to obtain a warrant is "very different" from, and "conflicts with," the PI).  Compliance with the PI requires a broader assessment than whether the individual is likely to remain in the precise location of the encounter until they can be arrested on a warrant.

The Lyons Memo conflicts with the Broadcast Statements in two irreconcilable respects.  First, the memo indicates that an officer may find a "likelihood of escape" based solely on a "subject's ability and means to promptly depart the scene of the encounter (e.g., the subject was encountered in a vehicle and continues to have control over the vehicle)." Pl. Hr. Ex. 218.003 (factor two).  That guidance is inconsistent with the PI and may not be included in the training.  *See* ECF No. 49 at 42–43 (finding that ICE lacked probable cause for the warrantless arrest of plaintiff Goncalves where the sole factor was that she was diving on the interstate); *see also Escobar Molina*, ECF No. 102 at *25 (explaining that the Lyons' Memo does not square with the court's conclusion "that an alien's presence in a vehicle is not sufficient to find that an alien is likely to escape") (internal quotation marks omitted).  To be sure, this does not mean that a noncitizen's means and ability to travel is *never* an appropriate factor in assessing likelihood of escape.  *See, e.g.*, *U.S. v. Quintana*, 623 F.3d 1237, 1241 (8th Cir. 2010) (considering that noncitizen was driving cross-country among other aggravating circumstances in finding there was probable cause for a warrantless arrest); *U.S. v. Cantu*, 519 F.2d 494, 497 (7th

Cir. 1975) (similar). But this factor may not overwhelm and supplant the probable cause analysis such that it establishes a likelihood of escape in every instance.

Second, and of equal importance, the Lyons Memo entirely omits community ties as a factor that officers should consider in evaluating the likelihood of escape. *See Escobar Molina*, ECF No. 102 at *25. This omission seems to flow directly from the memo's redefinition of "likelihood of escape" to concern only whether the noncitizen will remain at the scene of the encounter until a warrant can be obtained. *See* Pl. Hr. Ex. 218.004–005. Removing community ties from the relevant analysis—even implicitly by omission—is plainly contrary to the PI. The direct and established relevance of community ties runs through the Court's decision and the case law. *See* ECF No. 49 at 39–45; *see also La Franca v. I.N.S.*, 413 F.2d 686, 689 (2d Cir. 1969) (noting that being "the owner and operator of a bakery in Jersey City" lowered petitioner's likelihood of escape before a warrant could be obtained); *U.S. v. Kahn*, 324 F. Supp. 2d 1177, 1186–87 (D. Colo. 2004) (considering defendant's community ties in finding that his warrantless arrest violated § 1357(a)(2)); *U.S. v. Bautista-Ramos*, No. 18-cr-4066-LTS, 2018 W: 5726236, at *7 (N.D. Iowa Oct. 15, 2018) (same); *U.S. v. Pacheco-Alvarez*, 227 F. Supp. 3d 863, 889 (S.D. Ohio 2016) (same). And, of course, community ties are one of the five nonexclusive factors expressly mentioned in the Broadcast Statements. Therefore, defendants' training may not omit or diminish a noncitizen's community ties as a relevant consideration.

Aside from these advisements, the Court does not and will not prescribe the content of defendants' training. It must provide accurate guidance on the PI and the Broadcast Statements it incorporates. It must not undermine them through the Lyons Memo in the particular ways identified. But otherwise, defendants retain broad discretion to train their officers on making warrantless arrests consistent with federal law, including deciding what factors apart from those specifically enumerated in the Broadcast Statements they may consider among the "totality of the circumstances known to the officer before making the arrest." ECF No. 49 at 61; *see also Escobar Molina*, ECF No. 102 at 29–37 (finding that remaining factors in the Lyons Memo did not violate the court's PI "on their face"). Plaintiffs should not view this Order as an invitation to litigate the permissibility of every factor ICE may instruct or permit its officers to consider in assessing the "likelihood of escape" or to otherwise reshape defendants' warrantless arrest policies according to their preferences.

### c. Rulings on the specific training-related relief

Having found that training is necessary to effectuate the original PI, the Court now addresses each of plaintiffs' specific requests in this category, which are found at items one through six of their Motion. ECF No. 82 at 7.

i.    An order requiring Defendants to ensure all officers authorized to execute immigration arrests in this District are trained on the requirements of the PI and the order. ECF No. 82 at 7, Mot. to Enforce, Request 1.

This request is GRANTED.

41

ii.  An order that any officer authorized to make warrantless arrests in this District after entry of this order shall not be permitted to make warrantless arrests until being trained on the requirements of the PI and this order. ECF No. 82 at 7, Mot. to Enforce, Request 2.

This request is MODIFIED as follows. Defendants are hereby ORDERED to develop a compliant training within 14 days of this Order. Defendants are further ORDERED to train every immigration officer currently authorized to make warrantless arrests in this District within 45 days of this Order, using the compliant training program. Immigration officers who are not trained within 45 days of this Order are prohibited from making warrantless arrests in this District unless and until they are trained on the requirements of the PI and this Order. Immigration officers who are hired by DHS to serve the responsibility area of the Denver Field Office after the date of this Order may not make warrantless arrests unless and until they have received the compliant training.

Although the evidence at the hearing demonstrated noncompliance with the PI, warranting relief, an order prohibiting *all* immigration officers in this District from exercising their statutory authority to make warrantless arrests until being trained would not strike the appropriate balance between ensuring compliance with the law and the PI, on the one hand, and respecting the Executive Branch's responsibility for immigration enforcement, on the other.

iii.  An order requiring Defendants, within thirty (30) days of the order, and on the 10th of the month thereafter until all immigration officers who are charged with making warrantless arrests in this District have been so

42

trained, to serve to Plaintiffs' counsel documentation showing that they are completing training of immigration officers who have performed, or will perform, operations in this District, on the requirements of the PI and this order. ECF No. 82 at 7, Mot. to Enforce, Request 3.

This request is MODIFIED as follows. Within 45 days of this Order, and on the 10th day of the month thereafter until such training is complete, defendants are hereby ORDERED to serve Plaintiffs' counsel documentation showing that they are completing training on the requirements of the PI and this Order for immigration officers who have performed, or will perform, operations in this District.

iv.    An order requiring Defendants to provide class counsel, on the 10th day of each month, certification of who has been trained on the warrantless arrests requirements in Colorado, and when. ECF No. 82 at 7, Mot. to Enforce Request 4.

This request is GRANTED. Defendants shall provide the first such certification on June 10, 2026.

v.    An order requiring Defendants to provide class counsel, within three (3) business days of the order, with the training materials and communications ICE has used to ensure compliance with the PI and the law to date. ECF No. 82 at 7, Mot. to Enforce, Request 5.

This request is DENIED. As discussed in Part II.A, above, the hearing demonstrated that defendants' training efforts to date consist of AFOD Davies' communications with supervisors, the December 2nd, Field Office-wide email, and the processing team training or trainings in February. The evidence also demonstrated that these efforts were not sufficient to ensure that officers making

43

arrests in the field are complying with the PI.  Ensuring compliance going forward does not depend on receiving further evidence regarding these efforts.

> vi.    An order requiring Defendants to provide class counsel, within thirty (30) days of the order, and on the 10th day of each month thereafter any new training materials and communications that ICE plans to use going forward to ensure compliance with the Court's order and the law or a certification that there is no new training materials that ICE plans to use in the next month.  ECF No. 82 at 7, Mot. to Enforce, Request 6.

This request is MODIFIED as follows.  Within 14 days of this Order, and on the 10th day of each month thereafter, defendants are hereby ORDERED to provide class counsel with any new training materials and communications that ICE plans to use going forward to ensure compliance with the Court's PI Order and the law or a certification that there is no new training materials that ICE plans to use in the next month.

## 2. Reporting

Items seven and eight in plaintiffs' Motion and item 7a in their Supplement concern modified reporting requirements to provide greater transparency into ICE's warrantless arrest practices.  *See* ECF No. 82 at 7; ECF No. 100 at 2.

### a. Additional Reporting Requirements are Appropriate and Necessary

It is axiomatic that, to monitor compliance with the PI, the Court and the parties must have a clear understanding of what is happening on the ground.  The evidence at the hearing demonstrated that the current reporting procedures— defendants' monthly production of a random one-third of the "warrantless arrest" I-

44

213s, together with plaintiffs' counsel's ability to request I-213s for specific individual warrantless arrests—are inadequate to provide a full and accurate accounting of defendants' compliance with the PI.

The principal problem is that ICE does not reliably distinguish in the I-213s between three different types of arrests: (1) arrests pursuant to preexisting warrants; (2) arrests where a warrant was obtained in the field after the encounter began; and (3) genuinely warrantless arrests. Complicating matters further, at least some of the arrests categorized as involving field warrants are, in fact, warrantless arrests within the meaning of the PI. As a result, the universe of arrests potentially subject to the PI has become blurred.

In January and February, apart from individual requests, defendants produced 32 I-213s out of 71 arrests flagged as warrantless. *See* Pl. Hr. Exs. 201, 202. But that figure may substantially overstate or understate the actual number of arrests that were effected without a warrant, and there is presently no reliable way to determine which it is. On the one hand, AFOD Davies determined that at least four of those 32 arrests had preexisting warrants, and a significant number of the other I-213s suggest the same. On the other hand, plaintiffs separately requested and received four I-213s (C.H.G., J.P.A.A.H., R.H.G., and M.A.C.V.) that plainly reflect warrantless arrests implicating the PI. *See supra* Part II.C. The fact that the narratives in those reports differ so markedly from most of the random production

45

gives the Court substantial pause as to whether plaintiffs are receiving a genuinely representative sample.[12]

At the same time, defense counsel denied plaintiffs' request for at least five specific individuals' I-213s on the grounds that the arrests were made pursuant to warrants issued in the field after the encounter began but before arrest and therefore fall outside the scope of the PI. *See* Pl. Hr. Exs. 205.002 (denying I-213 requests for C.L.P., R.L.V., D.U.V., and N.G.J.), 210.002 (same for P.S.R.).[13]  The trouble is that, if those arrests resembled D.C.C.'s, *see supra* Part II.B, they would have been warrantless within the meaning of the PI—no less than the named plaintiffs' arrests, where I-200s were later issued at the field office.  *See* ECF No. 49 at 27.  Had plaintiffs requested D.C.C.'s I-213, that request would presumably have been denied because the report references a field warrant, even though his testimony, the I-213 itself, and J.L.'s testimony all establish that the warrant was issued after-the-fact.

Accordingly, the Court finds that more comprehensive reporting is necessary to facilitate meaningful oversight and ensure full compliance with the PI.

---

[12] One of plaintiffs' specific requests was for an individual, M.A.C.V., who was arrested during the same encounter as another individual, R.C.P., whose I-213 was part of the regular production, so there is at least evidence of alignment there. *See* Pl. Hr. Exs. 207.016, 208.006. And to be clear, to the extent that the randomly sampled I-213s appear to materially diverge with those plaintiffs' counsel has specifically requested, the Court is in no way suggesting that defense counsel has done anything other than comply with the PI's reporting requirements to the very best of their ability.

[13] It appears that defense counsel never responded to plaintiffs' counsel's February 24th requests for A.M.M.'s and M.A.C.C.'s I-213s, constructively denying them, but the Court has no indication as to why. *See* Pl. Hr. Ex. 210.003.

### b.  The Court is not ruling on the lawfulness of field warrants

While the Court will require defendants to provide plaintiffs with a more complete picture of their warrantless arrest practices, including by documenting and producing I-213s for arrests allegedly made pursuant to field warrants, the Court makes no ruling on the legal validity of field warrants writ large.

The government's authority to "issue their own warrants" for immigration arrests is "a rare exception to the traditional practices of American law."  *Garcia Lanza v. Noem*, Civ. Action No. 26-0029 (GRB), ---F. Supp. 3d---, 2026 WL 585130, at *4 (E.D.N.Y. Mar. 3, 2026).  The issuance of administrative warrants by ICE officers to arrest collaterals in the field "without the concurrent or prior issuance of a notice to appear" ("NTA") is a practice that predates this case but is not explicitly provided for by statute or regulation, and no binding judicial authority has approved it.  *Ortiz v. Raycraft*, 817 F. Supp. 3d 527, 543 (2025).

In *Castañon Nava*, the district court concluded that ICE officers lack the "statutory and regulatory authority to engage in its policy of issuing I-200 warrants to collaterals in the field without the concurrent or prior issuance of an NTA."  806 F. Supp. 3d at 853–54.  The court therefore treated nine noncitizens arrested pursuant to field warrants as warrantless arrest class members and granted relief to eight of them after finding that ICE had no pre-arrest probable cause of likelihood of escape, violating § 1357(a)(2) and the underlying consent decree.  *Id.* at 854–58.

47

On appeal, the Seventh Circuit initially stayed, and later vacated, that portion of the district court's order concluding that the arrests pursuant to field warrants were invalid and therefore violated the consent decree. *See Castañon Nava v. U.S. Dep't of Homeland Sec.*, No. 25-3050, ---F.4th---, 2026 WL 1223250, at *6, 9 (7th Cir. May 5, 2026); *Castañon Nava v. U.S. Dep't of Homeland Sec.*, 161 F. 4th 1048, 1058–59 (7th Cir. 2025). The Seventh Circuit did not decide whether ICE possesses the authority to issue field warrants without an NTA, but it concluded that the district court was barred from "issuing classwide injunctive relief that would interfere with ICE's operation of § 1226, even if the court believes the manner in which the government exercised its authority under the provision (here, via the use of deficient I-200 warrants) is unlawful." 2026 WL 1223250, at *6 (citing 8 U.S.C. § 1252(f)(1) and *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022)).

Like the district court in *Castañon Nava*, this Court has its doubts about the validity of field warrants unaccompanied by a prior or concurrent NTA. *See* ECF No. 104 at 291: 6–16 (observing that the field warrant policy appears to "eviscerate" Congress' limited grant of authority). However, the Court has no occasion to decide that issue here, and it does not do so. *See id.* at 292: 20–293: 4. Unlike the *Castañon Nava* district court, the Court does not decide whether ICE's issuance of I-200 warrants in this fashion exceeds its statutory or regulatory authority, or whether this "application" of ICE's § 1226(a) arrest authority is otherwise unlawful. *See* 161

48

F.4th at 1058–59.  Nor does it reach ICE's policy of issuing field warrants to collaterals expressly to avoid situations where its officers must comply with the probable cause determinations demanded by § 1357(a)(2) and the PI.

Rather, the Court grants the requested relief based on the narrower and unremarkable proposition that the issuance of a field warrant must precede formal arrest.  *See* ECF No. 300 at 4–6 (defense counsel agreeing that D.C.C's account, if true, "certainly depicts a warrantless arrest"); *Garcia Lanza*, 2026 WL 585130 at *5 (holding that a noncitizen's "post-arrest administrative warrant was plainly invalid"); *see id.* at *10 (collecting cases).  There is no practical or legal difference between a post-arrest administrative warrant issued "in the field" and one issued a few minutes, or at most, a few hours later in the office.

Requiring defendants to account for and furnish I-213s and related documents for the arrests internally classified by ICE as having been made pursuant to field warrants does not impinge on defendant's exercise of their § 1226(a) authority or expand the scope of the PI.  Instead, considering the evidence at the hearing, this relief is necessary to give effect to the PI.  If ICE could shield every arrest of a collateral simply by writing "field warrant," or the equivalent, on an I-213, regardless of the facts of the encounter or when it was issued, the PI would be rendered toothless.

## c.  Rulings on the specific reporting-related relief

Turning now to plaintiffs' specific requests for relief in the category of reporting, the Court makes the following rulings.

    i.        An order requiring Defendants to provide class counsel, within thirty (30) days of the order, all of the Form I-213s and the associated administrative warrants and notice to appear, if any exist, for the following arrests that have happened in Colorado since the PI, in separately identified productions: (a) arrests that were warrantless, (b) arrests in which the government claims they obtained a warrant after the encounter began; and (c) arrests for which Plaintiffs have requested documentation based on a good-faith basis to believe the arrest was not a targeted arrest. For arrests in categories (a) and (b), Defendants should also produce those documents on the 10th of the following month on a going forward basis; for arrests in category (c), Defendants must produce those documents to Plaintiffs' counsel within 4 business days of a request. ECF No. 82 at 7, Mot. to Enforce, Request 7.

This request is MODIFIED as follows. Within 30 days, defendants are ORDERED to produce to plaintiffs, in separately identified productions, the listed documents for all arrests in categories (a) and (b) that have occurred in this District from *the date of this Order*, and for arrests in category (c) from the date of the initial PI. Thereafter, defendants are ORDERED to produce to plaintiffs the listed documents for arrests in categories (a) and (b) on the 10th of the month on a going-forward basis, and the documents for arrests in category (c) within four (4) business days of the request.[14]

---

[14] Plaintiffs must make any *new* requests for specific individual arrests in category (c) that predate this Order within the first 30 days. Thereafter, they are limited to requesting specific individual arrests that occurred after the entry of this Order.

50

For the reasons stated above, departing from the method of randomly sampling one-third of the monthly I-213s is necessary to provide plaintiffs and the Court with a clearer window into the state of defendants' compliance with the PI. This limited discovery for all concededly warrantless arrests and arguably warrantless arrests is also consistent with the relief ordered in *Escobar Molina* and the consent decree in *Castañon Nava*.  *See* ECF No. 82 at 8.  Nor does the Court find that this relief is particularly burdensome.  Davies testified that he is already providing the I-213s for *every* arrest in this District to defense counsel, and ICE maintains these records at the field office where they can be easily accessed.  *See* ECF No. 103 at 193: 16–24, 205: 23–206: 1.

Defendants are correct that, for the most part, backward-looking relief is not an appropriate vehicle for ensuring forward-looking compliance.  *See* ECF No. 90 at 11.  The Court makes an exception for category (c), specific individual arrests that plaintiffs have requested, because those I-213s may have been wrongfully withheld (though not purposefully) when the initial requests were made.

ii.    An Order that for each I-213 in category (b) and (c) [from Request 7], Defendants must produce the communications and records reflecting how, when, and why such warrant was obtained, requested, or created, including but not limited to call logs, emails, and text messages.  ECF No. 100 at 2, Supplement to Mot. to Enforce, Request 7a.

This request is DENIED.    While the production of I-213s, and any accompanying I-200s and NTAs, for arrests in categories (b) and (c) follows

naturally from the relief ordered in the original PI, this supplemental request would

require defendants to produce extensive communications and other records for every

arrest that the government contends was made pursuant to a field warrant and that

plaintiffs have a "good-faith basis" to believe was or may have been warrantless.

The Court is not persuaded that effective monitoring of compliance with the

PI requires plaintiffs to be privy to this level of detailed and sensitive information

for every such arrest. Nor is the Court persuaded that the existing evidentiary record

justifies imposing such a broad and extensive disclosure obligation at this stage.

> iii. An order requiring Defendants to provide class counsel within thirty (30) days of the order, and on the 10th day of the month thereafter on a going forward basis, a master list of all foreign nationals with their A# and country of origin, who were either subject to a warrantless arrest or where the government claims they obtained the warrant after the encounter began, for all arrests that have happened in Colorado since the PI. ECF No. 82 at 8, Mot. to Enforce, Request 8.

This relief is MODIFIED as follows. Within 30 days, defendants are

ORDERED to provide a master list for covered arrests that have occurred in this

District *from the date of this Order*, and on the 10th of each month thereafter on a

going-forward basis. Defendants need not include arrests predating this Order. The

master list should include, for each foreign national: (1) name; (2) A-number; (3)

country of origin; (4) date of arrest; and (5) whether the government classifies their

arrest as warrantless or as pursuant to a warrant obtained after the encounter began.

This directive is consistent with additional relief ordered by the *Castañon Nava* district court following the Seventh Circuit's partial stay or its order, and it has not been vacated following the full merits appeal. 1:18-cv-03757, ECF No. 301 at 2, ¶ 5 (N.D. Ill. Feb. 17, 2026). More importantly, the Court finds that this measure is the most effective means for plaintiffs and the Court to obtain a clear snapshot of the universe of arrests that are subject or arguably subject to the PI. In light of the current blurriness, a comprehensive master list is necessary to establish a common foundation for any future discussions regarding defendants' compliance with the PI. Nor does the Court find that this relief will impose a substantial administrative burden on defendants considering the limited information required and the fact that they have already developed a process for collecting and reviewing the I-213s for every arrest in this District.

### 3. Documentation

Items nine and ten in plaintiffs' Motion and items 9a and 13 in their Supplement concern modified documentation requirements to provide greater transparency into ICE's warrantless arrest practices. *See* ECF No. 82 at 7; ECF No. 100 at 2. The Court reviews each request in turn.

    i.    An order requiring Defendants to document in Form I-213s regarding when and how administrative warrants have been obtained after an encounter with an individual for whom there was no warrant at the time of the initial encounter. ECF No. 82 at 8, Mot. to Enforce, Request 9.

53

This request is GRANTED.  Where ICE contends that an arrest was made pursuant to a field warrant after the initial encounter, defendants must include a brief summary of when and how the administrative warrant was obtained.

This requirement follows directly from the discussion in Part III.C.2.b, above, that defendants may not insulate arrests from meaningful review merely by writing "'field warrant,' or the equivalent, on an I-213."  Furthermore, at the hearing, Officers J.B. and J.L. agreed that the I-213 narrative section is supposed to include the legally important information from the encounter, so this is something that ICE officers should be doing anyway.  *See* ECF No. 103 at 27: 17–25, 130: 19–22.

This requirement does not infringe upon ICE's statutory authority to make arrests pursuant to a warrant or impermissibly broaden the scope of the PI.  Again, in contrast to the district court in *Castañon Nava*, the Court finds that the question of whether issuing field warrants without a prior or concurrent NTA violates the PI is not before it and grants no class-wide relief as to such arrests.  Rather, the limited documentation required here—while necessarily touching on alleged field warrants—is needed to bring clarity and transparency to the warrantless arrests allegedly made in violation of § 1357(a)(2), which remain the focus of the injunction.

ii.     An order that Defendants document the following information in the narrative section of all Form I-213s for arrests in Colorado: The time the encounter began; the time of the arrest; identification of the officer(s) who authored the narrative section of the I-213; whether the arresting officer obtained a warrant or whether the arrest was warrantless; and if the arresting officer obtained a warrant [additional

54

specific information sought by plaintiffs].  ECF No. 100, Supplement to Mot. to Enforce at 3, Request 9a.

This request is DENIED.   While many of the additional documentary requirements that plaintiffs seek may be prudent as a matter of agency practice, the Court agrees with defendants that ordering changes of this magnitude and specificity to every I-213 prepared in Colorado would go well beyond enforcing the original PI. ECF No. 105 at 6.  The relief granted elsewhere in this Order adequately addresses the Court's present concern that plaintiffs and the Court are not being presented with sufficient information to meaningfully monitor and evaluate compliance with the PI.

    iii.    An order requiring Defendants to document in Form I-213s, for vehicle stops, the locations where officers encountered the vehicle, the basis for believing that the vehicle stop was lawful, and where they stopped it. ECF No. 82 at 8, Mot. to Enforce, Request 10.

This request is DENIED.  Again, while defendants would be well-advised to include this information in the narrative of their I-213s as a matter of good recordkeeping, and should their actions be challenged in court, this relief is beyond the scope of enforcing the original PI.  The Court has not been squarely presented with the issue of whether ICE has a pattern or practice of conducting traffic stops in violation of its statutory and regulatory authority or under the Fourth Amendment. Therefore, the Court may not grant the requested relief.

    iv.    An order that Form I-200s issued after the date of the Court's order on the Motion to Enforce include the date, time, and place it was signed by the issuing office, and the date, time, and place it was signed by the

55

service officer.  ECF No. 100 at 3, Supplement to Mot. to Enforce, Request 13.

This request is DENIED.  There was testimony at the hearing that I-200 administrative warrants are already annotated with the date but not the time when they are issued by a supervising officer.  ECF 103 at 108: 9–14.  There was no evidence that the arresting officer is presently expected or required, by law or agency policy, to sign the I-200 when it is served on a noncitizen.

The Court recognizes that the additional information plaintiffs seek would likely facilitate the review of arrests classified as having been made pursuant to a field warrant.  But it concludes that this concern must give way to its obligation not to modify the scope of the existing PI except to the extent necessary to enforce it. The original PI did not regulate the content or execution of I-200s, and the evidentiary record developed at the recent motion hearing was insufficient to support imposing new documentary requirements with respect to this particular form.

### 4. Miscellaneous

Finally, items 11 and 12 of in plaintiffs' Motion concern declaratory relief and fees and costs.  The Court rules as follows.

i.  A finding that defendants violated the Court's order on a widespread basis across the state since November 25, 2025.  ECF No. 82 at 8, Mot. to Enforce, Request 11.

This request is MODIFIED as follows.  The Court finds that defendants have materially violated the Court's PI Order.  This finding is amply supported by the

56

Court's findings of fact in Part II, above.  As discussed, ICE has continued to make warrantless arrests without individualized, pre-arrest probable cause determinations of flight risk in violation of 8 U.S.C. § 1357(a)(2), 8 C.F.R. § 278.8(c)(2)(ii), and the PI.  *See id.* Part II.C.  Furthermore, the evidence showed that ICE has, seemingly without exception, failed to document those warrantless arrests in accordance with the PI and the Broadcast Statement standards it incorporates.  *See id.*  Part II.D.  The Court declines, however, to find that such violations have occurred "on a widespread basis across the state" without a meaningful basis or standard for assessing the geographic reach of the violations—the most blatant violations occurred in the greater Denver metropolitan area.

> ii.  Fees/costs associated with enforcing the court's PI order.  ECF No. 82, Mot. to Enforce at 8, Request 12.

In their opposition papers, defendants do not respond to plaintiffs' request for fees and costs associated with enforcing the Court's PI Order, thereby waiving objection.  *See Crookshsanks as next fried of C.C. v. Elizabeth School Dist.*, 1:24-cv-03512-CNS-STV, 2025 WL 1000774, at *5 (D. Colo. Apr. 3, 2025) (citing *Phillips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992)).

In any event, plaintiffs' request for fees and costs is justified in light of the substantial evidence of violations of the PI.  Indeed, with respect to the PI's documentation requirements, defendants do not deny that they have not complied.

Accordingly, plaintiffs will be awarded reasonable attorneys' fees and costs incurred in enforcing the PI, which should be submitted in accordance with the local rules.

## IV.    Conclusion

For the reasons stated, plaintiffs' Motion to Enforce, ECF No. 82, is GRANTED in part and DENIED in part.  The Supplement to the Motion to Enforce, ECF No. 100, is DENIED.

## V.    Order

It is hereby ORDERED:

1. The Court finds that defendants have materially violated the preliminary injunction, ECF No. 49.

2. Where defendants amend the narrative section of a Form I-213 sometime after the form is originally completed, defendants SHALL clearly mark the amendment as such and indicate the time of the amendment.

3. Defendants SHALL ensure that all officers authorized to execute immigration arrests in this District are trained on the requirements of the preliminary injunction and this Order.

4. Defendants SHALL develop a compliant training within 14 days of this Order, and SHALL train all immigration officers currently authorized to make warrantless arrests in this District within 45 days of this Order.

5. Immigration officers who are not trained within 45 days of this Order SHALL NOT make warrantless arrests in this District unless and until they are trained on the requirements of the preliminary injunction and this Order.  Furthermore, immigration officers who are hired after the date of this Order to serve the responsibility area of the Denver Field Office SHALL NOT make warrantless arrests unless and until they have received the compliant training.

6. Defendants SHALL, within 45 days of this Order and on the 10th day of each month thereafter until such training is complete, provide to plaintiffs' counsel

58

documentation showing they are completing training on the requirements of the preliminary injunction and this Order for immigration officers who have performed, or will perform, operations in this District.

7. Defendants SHALL provide to plaintiffs' counsel, on the 10th day of each month until the preliminary injunction or this Order is dissolved or vacated, certification of which officers have been trained on the preliminary injunction and this Order, and when.

8. Defendants SHALL, within 14 days of this Order and on the 10th day of each month thereafter until the preliminary injunction or this Order is dissolved or vacated, provide to plaintiffs' counsel any new training materials and communications that ICE plans to use going forward with its officers to ensure compliance with the preliminary injunction and the law, or a certification that there are no new training materials that ICE plans to use in the next month.

9. Defendants SHALL provide to plaintiffs' counsel, within 30 days of this Order, in separately identified productions, all of the Form I-213s and the associated administrative warrants and notices to appear, if they exist, for all (a) warrantless arrests and (b) arrests in which the government claims they obtained a warrant after the encounter began, that have occurred in this District from the date of this Order, and for all (c) arrests in this District for which plaintiffs have requested documentation on a good-faith basis to believe the arrested individual was not a "target," from the date of the preliminary injunction.

10. On the 10th day of each month thereafter until the preliminary injunction or this Order is dissolved or vacated, defendants SHALL provide to plaintiffs' counsel, in separately identified productions, all of the Form I-213s and the associated administrative warrants and notices to appear, if they exist, for all arrests in categories (a) and (b) that have occurred in this District on a going-forward basis. Furthermore, defendants SHALL provide to plaintiffs' counsel the identified documents for arrests in category (c) within four (4) business days of the request.

11. Defendants SHALL, within 30 days of this Order, provide to plaintiffs' counsel a master list of all arrests in categories (a) and (b) that have occurred in this District from the date of this Order. The master list SHALL include, for each foreign national arrested, their (1) name, (2) A-number, (3) country of origin, (4) date of arrest, and (5) whether the government classifies their arrest as warrantless or as pursuant to a warrant obtained after the encounter began. Thereafter, defendants SHALL provide a master list with this information on the

59

10th of every month on a going-forward basis until the preliminary injunction or this Order is dissolved or vacated.

12. On a going-forward basis, for arrests where the government claims that an administrative warrant did not exist prior to the encounter but was obtained after the encounter began, defendants SHALL document in the Form I-213 when and how the administrative warrant was obtained.

13. Plaintiffs are awarded their reasonable fees and costs associated with enforcing the preliminary injunction.

It is SO ORDERED.

Dated: May 12, 2026                    BY THE COURT:

R. Brooke Jackson
Senior United States District Court Judge